Jon Sands
Federal Public Defender
District of Arizona
Cary Sandman (AZ No. 004779)
Kelle A. Andrews (AZ No. 035056)
Jennifer Moreno (CA Bar No. 244967)
Zachary Buchanan (AZ Bar No. 036415)
Assistant Federal Public Defenders
407 W. Congress St., Suite 501
Tucson, AZ 85701-1310
cary_sandman@fd.org
kelle_andrews@fd.org
jennifer_moreno@fd.org
zach_buchanan@fd.org
Telephone: 520.879.7622
Facsimile: 520.622.6844

*Counsel for Petitioner Juan Raul Navarro Ramirez*

## IN THE UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | |
|---|---|
| JUAN RAUL NAVARRO RAMIREZ, | CASE NO: 7:18-CV-00386 |
| Petitioner, | |
| vs. | |
| BOBBY LUMPKIN, Director, Texas Department of Criminal Justice, Correctional Institutions Division, | Capital Case |
| Respondent. | |

## AMENDED PETITION FOR WRIT OF HABEAS CORPUS
### 28 U.S.C. § 2254

# TABLE OF CONTENTS

I.     Introduction....................................................................................1
II.    Jurisdiction....................................................................................1
III.   Social History ...............................................................................1
       A.    A mentally ill mother who suffered severe trauma, repeated child molestation, parental abandonment, and domestic violence................7
       B.    A father with a history of extreme violence........................................10
       C.    A dysfunctional family marred by poverty, alcoholism, domestic violence, child abuse, and neglect.....................................12
       D.    A dysfunctional family marred by a father's abandonment................16
       E.    A dysfunctional family marred by Juana's physical abuse and extreme neglect of her children............................................18
       F.    The effects of parental neglect on Juan: hopelessness, depression, and suicidal ideation..........................................................22
       G.    Juan suffers from neglect of his educational needs and is denied treatment for a serious learning disability..........................................25
       H.    A family ravaged by and genetically predisposed to mental illness...32
       I.    An impoverished and traumatized child begins to self-medicate with drugs and inhalants, and in a state of hopelessness, is pushed towards gang culture. ........................................................37
       J.    Juvenile history: a child desperately needing treatment and rehabilitation does not receive it. ......................................................41
IV.    Procedural History ........................................................................61
       A.    Investigation and Arrest ....................................................61
       B.    Pretrial Proceedings...........................................................67
       C.    Trial Proceedings..............................................................83
       D.    Direct Appeal ...................................................................106
       E.    Post-Conviction Review.....................................................112
       F.    Federal Court Proceedings .................................................152
V.     Presumption of Correctness..........................................................155
VI.    Amendment....................................................................................156

VII.   Exhaustion and Procedural Default ............................................157

VIII.  Discovery, Expansion of the Record, and Evidentiary Hearing..................158

IX.    The Anti-terrorism and Effective Death Penalty Act of 1996 does not restrict this Court's power to review the merits of Ramirez's claims de novo. .................................................................................159

    A.   The AEDPA is unconstitutional.......................................................159

    B.   The claims raised in Ramirez's state habeas proceedings were not adjudicated on the merits...................................................163

    C.   Alternatively, Ramirez can satisfy § 2254(d) for each of the claims that were adjudicated on the merits in state court. ............................168

X.     Incorporation by Reference .......................................................169

XI.    Federal Constitutional Claims ..................................................169

CLAIM ONE..................................................................................170

    A.   Prevailing norms recognize the imperative for investigating mental health within the context of a broad investigation of an accused's psycho-social history.....................................................176

    B.   Trial counsel's performance was objectively unreasonable under prevailing professional norms because they failed to reasonably investigate Ramirez's mental health, within the context of a broad investigation of his psycho-social history. .........................................185

    C.   Trial counsel's Deficient Performance resulted in prejudice............215

    D.   There is a reasonable probability that at least one juror would have struck a different balance regarding Ramirez's moral culpability and spared him from a death sentence. ............................................241

CLAIM TWO...................................................................................245

    A.   Evolving standards of decency no longer allow for the imposition of death on those who were under 21 at the time of their crime.......248

    B.   Because of his impairments, the concerns raised in *Roper* apply to Ramirez and executing him would constitute cruel and unusual punishment in violation of the Eighth Amendment. .........................260

    C.   Conclusion .........................................................................266

CLAIM THREE................................................................................266

    A.   Relevant Facts ....................................................................267

    B.   Legal Standard....................................................................268

    C.      Trial Counsel's Deficiencies and the Resulting Prejudice ...............271

CLAIM FOUR ..........................................................................................314

    A.      The trial court erred by not appointing qualified, un-conflicted counsel, violating Ramirez's rights under the Sixth and Fourteenth Amendments. ...................................................................................314

    B.      The trial court's admission of excessively gruesome photographs during Ramirez's trial resulted in the denial of a fair trial and due process. ........................................................................................316

    C.      The trial court unconstitutionally required that Ramirez be physically restrained at the guilt and penalty phase violating Ramirez's rights under the Fifth, Sixth, and Fourteenth Amendments. ...................................................................................318

    D.      The trial court's failures to ensure that all of Ramirez's trial proceedings were recorded violated his Sixth, Eighth, and Fourteenth Amendment rights to a public trial and meaningful appeal. ....................................................................................319

    E.      The trial court erred by denying Ramirez's requests for new counsel, violating Ramirez's constitutional rights. ...........................320

    F.      The trial court erred by failing to continue the suppression hearing. .........................................................................................320

    G.      The trial court erred in allowing Mendiola's testimony about Ramirez's statements during the booking process, violating Ramirez's rights under the Fifth, Sixth, and Fourteenth Amendments. ...................................................................................322

    H.      The trial court erred in admitting statements Ramirez made during police interrogation. .........................................................................324

    I.      The trial court erred in allowing Champion to testify about Ramirez's statement admitting that he had marijuana. ....................327

    J.      The trial court erred when it overruled Ramirez's motion for a mistrial. .........................................................................................328

    K.      The trial court erred in allowing Alvarez to testify as a gang expert. ...........................................................................................329

    L.      The trial court erred in admitting evidence of another serious crime. ...........................................................................................330

M.    The trial court erred in ordering Ramirez to show the jury his arms for the State to obtain testimony about the content of Ramirez's tattoos in the guilt phase.................................................331

N.    Ramirez's Sixth, Eighth, and Fourteenth Amendment right to have all potentially mitigating evidence considered at trial was violated when the trial court prevented Ramirez from presenting relevant mitigating evidence. ...................................................................333

O.    The exclusion of venire members for cause violated Ramirez's right to an impartial jury and due process under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. ...................335

P.    The trial court erred by giving an insufficient voluntariness instruction that was contrary to Texas law and in violation of Ramirez's Fifth and Fourteenth Amendment due process rights......337

Q.    Ramirez's constitutional rights were violated when the trial court failed to use special verdict forms.....................................................341

R.    The cumulative effect of these trial-court errors prejudiced Ramirez.............................................................................................343

CLAIM FIVE ...............................................................................................344

CLAIM SIX ..................................................................................................346

CLAIM SEVEN ............................................................................................348

CLAIM EIGHT .............................................................................................352

A.    The State committed misconduct when it denied the existence of the arrest video until after the suppression hearing..........................354

B.    The State committed misconduct when it engaged in or allowed police to engage in spoliation of evidence. .......................................356

C.    The State committed misconduct when it sponsored false testimony at the suppression hearing. ..............................................357

D.    The State committed misconduct regarding Marcial Bocanegra......360

E.    The State committed misconduct when it failed to disclose conditions in the TYC and made false arguments to the jury regarding those conditions. .............................................................368

F.    The State committed misconduct by urging an unconstitutional limitation on mitigating evidence.....................................................372

G.     The State committed misconduct when the prosecutors made inflammatory and improper comments during arguments. ...............374

H.     The State committed various other forms of misconduct. ...............376

I.     Cumulative prejudice. ........................................................377

CLAIM NINE ..............................................................................378

CLAIM TEN ................................................................................381

A.     The Texas mitigation special issue given in Ramirez's case failed to adequately define "mitigating evidence," and the instruction created a reasonable possibility that the jury would construe mitigating evidence narrowly, requiring a causal nexus to the crime. ...............................................................................381

B.     The mitigation special issue instruction given in Ramirez's case was unconstitutionally vague and a violation of Ramirez's Eighth and Fourteenth Amendment rights. ...................................384

CLAIM ELEVEN ..........................................................................387

CLAIM TWELVE ..........................................................................390

CLAIM THIRTEEN ......................................................................392

CLAIM FOURTEEN ....................................................................397

CLAIM FIFTEEN..........................................................................399

CLAIM SIXTEEN .........................................................................405

CLAIM SEVENTEEN....................................................................409

A.     Ramirez's execution would be unconstitutional as he suffers from a serious mental illness.................................................................409

B.     Ramirez's death sentence is inconsistent with the evolving standards of decency that mark the progress of a maturing society. 415

C.     The Texas death penalty scheme violates Ramirez's due process rights as it is unconstitutionally arbitrary.........................................432

D.     Ramirez's execution after fifteen years on death row violates his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the U.S. Constitution..........436

E.     Ramirez's mental impairments render him insufficiently culpable, and thus ineligible, for the death penalty. .........................................442

F.     Ramirez's constitutional rights were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence. ........................................................445

G.     Texas's capital sentencing scheme violated Ramirez's rights by failing to require the jury find each element necessary to impose the death penalty beyond a reasonable doubt. ...................................450

H.     Texas's capital sentencing scheme unconstitutionally limits what constitutes mitigation in violation of Ramirez's Eighth and Fourteenth Amendment rights. ...........................................................454

I.      The capital-sentencing scheme under which Ramirez was sentenced fails to ensure a proportionality review in violation of the Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution. ......................................................................................456

J.      Texas's capital-sentencing scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because it does not sufficiently channel the sentencer's discretion or sufficiently narrow the class of death-eligible defendants. ...................................458

K.     Texas's capital-sentencing scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because it affords the prosecutor unbridled discretion to seek the death penalty. ...............................................................................................460

L.      It is a violation of the Eighth Amendment to convict someone in Texas of capital murder under the State's law of parties. .................462

CLAIM EIGHTEEN .........................................................................................463

CLAIM NINETEEN ..........................................................................................466

XII.   CONCLUSION AND PRAYER FOR RELIEF .........................................468

## I. Introduction

Pursuant to 28 U.S.C. § 2254, Petitioner Juan Raul Navarro Ramirez, through counsel, respectfully petitions this Court for a writ of habeas corpus freeing him from the custody of Respondents, pursuant to the judgments and sentences of a Texas state court, on the grounds that those judgments and sentences were obtained and affirmed in violation of his rights under the United States Constitution. Ramirez is in the custody of the Texas Department of Criminal Justice ("TDCJ") because he was sentenced to death following his 2004 conviction for first-degree murder.[1]

## II. Jurisdiction

This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 2241 and 2254.

## III. Social History

Juan Raul Navarro Ramirez was born on March 11, 1984 in Donna, Texas, to Juana Navarro and Jose Raul Ramirez. Both Juana and Jose Raul were born into poverty in the Rio Grande Valley just south of the United States border in Mexico.

---

[1] Ramirez was initially convicted and sentenced to death on two counts of first-degree murder, but the second conviction and sentence were vacated on Double Jeopardy grounds by the Texas Court of Criminal Appeals during Ramirez's appellate proceedings. *Ramirez v. State*, No. AP-75,167, 2007 WL 4375936 (Tex. Crim. App. Dec. 12, 2007).

Lacking appropriate prenatal care, a midwife helped deliver Juan[2] at his parents' home. (See ECF No. 24-5 at 26, Ex. 21.)[3] Before sentencing Juan to death, the jury knew nothing in practical terms about his human frailties, his family history, or his lessened moral culpability for the instant offenses, which occurred when Juan was just eighteen years old. "Instead, [his jury] heard absolutely none of that evidence, evidence which 'might well have influenced the jury's appraisal of [his] moral culpability.'" *Porter v. McCollum*, 558 U.S. 30, 41 (quoting, *Williams v. Taylor*, 529 U.S. 362, 398 (2000). *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (evidence about the defendant's background and character is relevant because of the belief, long held by

---

[2]     For clarity, Petitioner will be referred to as "Juan" when discussing his social history and "Ramirez" when addressing his legal arguments.

[3]     When counsel is referring to the state court record, reporter's transcripts are designated ([volume number] RR at [page number].). Indexed documents from the trial court record are designated ([volume number] CR at [page number].). Direct appeal documents are designated (DA [name of document] at [page number], [date].). Indexed documents from the state habeas court record are designated ([volume number] SH CR at [page number].), documents from the state habeas reporter's record are designated ([volume number] SH RR at [page number].). Indexed documents from the state habeas chapter 64 court record are designated ([volume number] SH DNA CR at [page number].) State habeas appellate documents are designated (HA [name of document] at [page number], [date].). Documents filed in this Court are designated (ECF No. __ at __.).

this society, that defendants who commit criminal acts that are attributable to a disadvantaged background may be less culpable).

Unbeknownst to his jury, through no choice of his own, as a young child Juan confronted intractable deeply damaging emotional hardships and he suffered from serious, untreated mental disabilities impeding normal childhood development. Among these insuperable barriers, Juan suffered from permanent brain damage resulting from a serious neurodevelopmental disorder, the origins of which are traceable to his mother's pregnancy, compounded by the serious adverse psycho-social conditions permeating his infancy and early childhood.

Neurodevelopmental disorders like Juan's are incurable, but these disorders can often be ameliorated with treatment, particularly through special education and effective parental support, which can offer the opportunity for obtaining an education and leading a relatively normal well-adjusted life. In Juan's case, his neurodevelopmental disability manifested in the expression of learning and emotional disabilities. However, although Juan's teachers and school administrators knew he needed special education services, the school district failed to provide special education treatment for his disabilities, such that he remained functionally illiterate when he ended his Donna public school education in the ninth grade. Later, when Juan was to receive rehabilitation from the juvenile justice system—despite

that system's multiple diagnoses of learning disability—his treatment needs were again neglected and ignored. Thus, throughout his childhood and adolescence, those responsible for Juan's education and institutional care consistently denied him opportunities for treatment of his pronounced brain-based learning disabilities and related cognitive and emotional impairments, and to the contrary, the responsible educational and juvenile authorities imposed conditions guaranteed to impede any potential for rehabilitation.

Without treatment, a neurodevelopmental disorder can have dire consequences, and in Juan's case, it did. As explained by Erin Bigler, Ph.D., about whom additional details are provided below:

> "[f]or children who suffer from neurodevelopmental brain disorders—even those children born into the most economically and socially stable environments—there is profound need for large amounts of extra support at home and school, intervention from psychological and educational specialists, the provision of structure and stability at home, in the community, and in school. Although, such neurodevelopmental disorders are permanent and not curable, with adequate interventions and support, the negative effects of such disorders can be lessened, children can learn to compensate, increasing the chances for success in education and achievements later in life."

(Ex. 118 ¶ 48.)

But in Juan's case, his untreated disabilities simply festered in an environment plagued by poverty, deprivation, and trauma. He encountered domestic and community violence, physical abuse, a lack of parental supervision, as well as

parental neglect and emotional abandonment. These problems were intergenerational. Both Juan's parents suffered hardships, particularly his mother, who was physically and emotionally abandoned by her mother and then repeatedly sexually assaulted for years, beginning at age eight, by an uncle, and then later by Juan's father.

In Juan's case, through no fault of his own, his dreadful childhood environment, which offered not a single well-adjusted positive adult role model, coupled with his pre-existing, untreated neurodevelopmental disorder, placed him at significant risk for developing serious psychiatric disabilities, treating those disabilities by self-medicating with drugs and inhalants, and engaging in delinquent behavior. In Juan's case, this is exactly what happened.

By the age of ten, Juan was a hopeless child roaming the streets of Donna, Texas. For a sad ten-year-old child like Juan, whose home-life was abysmal, and who through no fault of his own was a failure in school, the options were not good. Donna had its fair share of street gangs and street drugs whose tentacles reached at-risk children, of which Juan was one. Beginning at age ten, self-medicating with drugs and inhalants offered Juan temporary relief from emotional pain caused by socio-environmental factors and untreated neurodevelopmental dysfunction. For a child in Juan's circumstances, without a stable home and struggling with untreated

emotional and neurodevelopmental disabilities, delinquent behavior and association with gangs is an expected outcome. As explained by Father Gregory Boyle, an expert in gang culture, about whom more is said later, children gravitate to gangs, "not by choice, but as an outgrowth of experiencing their lives as the misery that it is." (Ex. 119 ¶ 7.)

Ultimately, the Texas juvenile justice system became Juan's last best hope for some rehabilitation, but that help never came. Contrary to the picture the prosecution presented at Juan's sentencing, suggesting that Juan had failed to take advantage of generous juvenile rehabilitative services, the opposite was true. As explained by juvenile correctional expert Michele Deitch, about whom more is also said later, the juvenile justice system did not provide Juan with a realistic opportunity for treatment and rehabilitation. Instead, the system confined him to a setting where conditions "were appallingly dangerous and brutal[,]" "youth [were] at risk of physical and sexual assault from both other youth and from staff, with drugs widely available, and with rampant gang activity." (ECF No. 28-3 at 44, Ex. 82 at 16.) As explained below, the conditions at the juvenile correctional institution where Juan was placed were so deplorable, that after an extensive investigation the U.S. Department of Justice found the institution "[failed] to adequately protect the youths in its care from youth and staff violence" (ECF No. 30-1 at 119, Ex. 82 at Ex. A(N186-1)), and this Court

declared that the conditions of confinement were a violation of the federal rights of youths detained by TYC in the Rio Grande Valley. (ECF No. 30-3 at 49, Ex. 82 at Ex. A(N316-19).)

At the time of the charged capital offenses, chronologically Juan was eighteen years old. However, his neurodevelopmental disability and chronic brain impairment tell a different story. As explained by Dr. Bigler, the "normal disadvantages in adolescent brain function were exponentially magnified due to [Juan's] pre-existing brain damage. Indeed, when considering [Juan's] moral culpability at the time the charged offense occurred, the objective and valid assessments of his brain function reveal areas of cognitive and emotional functioning that are typical of an 8 or 9 year old, not someone who was 18." (Ex. 118 ¶ 6f.)

Juan's social history was affected by numerous factors outside of his control, including patterns of intergenerational trauma and dysfunction, which are addressed below.

### A. A mentally ill mother who suffered severe trauma, repeated child molestation, parental abandonment, and domestic violence.

Juan's mother Juana Navarro was born into abject poverty in Rio Bravo, Tamaulipas, Mexico in January 1955. (4 SH RR Ex. 1 ¶ 4.) Juana's mother, Maria Dolores, gave birth to Juana when she was just seventeen years old. (4 SH RR Ex. 26 ¶ 4.) Juana's birth arose out of tragic events. Maria Delores became pregnant at

sixteen after being sexually abused by her stepfather, Guadalupe Navarro, who had been molesting Maria Delores for years. (ECF No. 28-2 at 18, Ex. 65 ¶ 4.) Maria Delores was either unwilling or unable to care for Juana from the time of her birth, and Juana was left with her grandmother, Bernadina, and her stepfather's other children, who were both her half-siblings as well as her aunts and uncles. (4 SH RR Ex. 1 ¶ 4, 4 SH RR Ex. 26 ¶ 6.) Bernadina agreed to take in Juana believing that Maria Delores could "go on with her life." (ECF No. 28-1 at 58, Ex. 55 at 1; ECF No. 28-2 at 14, Ex. 64 ¶ 5.)

Perhaps unsurprisingly, Bernadina was no better able to protect Juana than she had protected her own daughter and Juana too became a victim of repeated sexual violence and physical abuse, beginning when she was only eight years old. One of her half-brothers, who was also her paternal uncle, was the perpetrator of this abuse which occurred over several years. He threatened Juana with physical violence if she disclosed the abuse, so like so many victims, Juana kept the abuse secret and suffered its horrible effects in silence until she finally had the courage to share what happened with a therapist decades later. (ECF No. 28-3 at 11, Ex. 78 ¶ 4; ECF No. 28-1, Ex. 58 at 2, 3; ECF No. 28-1 at 79, Ex. 58 at Ex. A(2).) There is a strong association between sexual abuse and a lifetime diagnosis of psychiatric disorders,

including depression, PTSD, and suicide attempts.[4] Juana has been diagnosed with each of these disorders. (*See* ECF No. 24-6 at 24, Ex. 24; ECF No. 25-9 at 9, Ex. 41; ECF No. 26-1 at 46, Ex. 43; ECF No. 28-3 at 11, Ex. 78.) She suffered suicidal ideation and acts of self-harm when she was a child. (ECF No. 28-3 at 11, Ex. 78 ¶ 5.) Psychiatric records document that Juana attempted suicide "when [she] was small" by cutting her wrists two separate times, once with scissors and another time with a razor blade. (ECF No. 28-1 at 78, Ex. 58 at Ex. A(1).) Additional documentation describing Juana's mental illness will be detailed below.

Compounding Juana's sexual victimization, her family lived in abject poverty. (4 SH RR Ex. 26 ¶ 2.) At times, they did not have enough food. After the harvest season, farmers would burn the leftover corn, and her family would go pick up the burnt leftovers from the ground so they could eat. Juana had to quit school after the sixth grade, to earn what meager money she could, to help the family. (*See* 4 SH RR Ex. 26 ¶ 3.)

Juana faced the virulent sexual abuse and the other hardships with the painful knowledge that her mother, Maria Delores, loved and raised her other children, but

---

[4]     Chen et al., *Sexual Abuse and Lifetime Diagnosis of Psychiatric disorders: Systemic Review and Meta-Analysis*. Mayo, Clin Proc. 2010 Jul; 85(7):618–629; Jumper SA. *A meta-analysis of the relationship of child sexual abuse to adult psychological adjustment*. Child Abuse Negl. 1995;19:715-728.

did not love Juana and had rejected her. (4 SH RR Ex. 26 ¶ 4.) According to

Elizabeth De La Torre, Juana's close childhood friend, "Juana believed that her

mother . . . didn't want her and didn't love her." (ECF No. 28-1 at 59, Ex. 55 at 2.)

Maria Delores's abandonment of Juana was cruel in its expression. Even when Maria

Dolores and her other children came to visit Bernadina's home, Maria Delores

refused to acknowledge that Juana was her child. (ECF No. 28-1 at 59, Ex. 55 at 2;

4 SH RR Ex. 26 ¶ 4.)

Juana became a United States citizen when she was 16 or 17 years old, after

her father, Guadalupe, the same man who had raped and sexually molested her

mother, helped her legally enter the United States. (ECF No. 28-1 at 59, Ex. 55 at

2.) Once in the United States, Juana labored for poverty wages as a migrant worker,

picking produce from fields near the border. She moved to Donna, Texas, a small

town only a few miles north of the Rio Grande River, where she met Juan's father,

Jose Raul Ramirez, while working in the fields. (4 SH RR Ex. 1 ¶ 4–5.) As explained

below, Jose Raul physically and emotionally abused Juana for many years, further

aggravating her fragile mental condition.

### B.    A father with a history of extreme violence.

Jose Raul was born in Michoacán, Mexico in August 1955. He is the oldest of

nine siblings and has 14 half-brothers and sisters, most of whom he does not know.

(2 SH CR at 528.) Jose Raul's cousin, Santana, described their family as "poor but very hardworking." (4 SH RR Ex. 23 ¶ 3.) From a young age, Jose Raul worked in the fields and in town selling bread, ice cream, and other food. (4 SH RR Ex. 23 ¶ 3.)

Jose Raul did not complete elementary school, reportedly only finishing second grade. (2 SH CR at 529.) His teachers would not promote him because of his disruptive behavior. They corporally punished Jose Raul out of frustration and called his mother about his behavioral problems. Eventually, around the age of 11, he quit going to school altogether.

Much like Juana, Jose Raul experienced significant trauma and dysfunction growing up in Mexico. (4 SH RR Ex. 1 ¶ 7.) Jose Raul reported to Juana that when he was very young, he shot an uncle in the knee with a .22 caliber rifle, because the uncle "did mean things to him." (4 SH RR Ex. 1 ¶ 7.) Jose Raul also admitted that he forced a 15-year-old cousin to have sex with him. When Juana asked why he did this, he responded that this was just the way things were where he came from— "it was okay to ask a cousin out and, besides, she was pretty." (4 SH RR Ex. 1 ¶ 7.) Jose Raul further revealed to Juana that when he was 20 years old, he got into a fight with a male cousin and stabbed his cousin to death. No charges were ever filed, because

it was understood that if one family member offended another family member, the issue should be resolved by defending oneself. (4 SH RR Ex. 1 ¶ 7.)

In 1972, Jose Raul moved to the Unites States without documentation and began working in the fields and in warehouses boxing oranges and grapefruit. (4 SH CR at 1481 ¶ 3.) He met Juana while they were both residing and working in the fields of Donna, Texas. (4 SH CR at 1481 ¶ 3.) They dated for a few months before getting married in October 1979, thereby securing Jose Raul a legal immigration status. (4 SH CR at 1481 ¶ 3.)

### C. A dysfunctional family marred by poverty, alcoholism, domestic violence, child abuse, and neglect.

During her marriage to Jose Raul, Juana gave birth to five children: Berta in 1980, Juana Olivia ("Janie") in 1981, Juan in 1984, Olivario ("Oliver") in 1987, and Aurora[5] in 1991. Due to the seasonal nature of their low wage work, the family lived in poverty, which created an unstable and stressful environment. (4 SH CR at 1481–82 ¶¶ 3–4.) Jose Raul reported that Juana would pick fights with him over the lack of work, and that she called the police often. In addition to the extreme financial pressures in their marriage, Jose Raul reported that Juana would get drunk on wine and beer, and that this caused fights between them. (4 SH CR at 1482 ¶ 5.) He said

---

[5] Born biologically as female and given the name Aurora, she changed her name to Joey and identifies as male.

that Juana "suffered from drastic mood swings; at times she would be nice and loving, and then she would fly off into a rage." (4 SH CR at 1482 ¶ 5.) Juana's psychiatric records document her symptoms of rage reaction. (*See* ECF No. 25-9 at 9, Ex. 41; ECF No. 26-1 at 46, Ex. 43.)

Jose Raul reported that Juana lacked the ability to exercise parental control and that her frequent absences from the home added strain on their marriage. (2 SH CR at 528.) Supporting Juana's inability to parent, Jose Raul's cousin Santana, who lived with them for a time when the children were young, would often return home to find the infant children alone, playing in the living room dressed only in their diapers. (4 SH CR at 1455 ¶ 9.) Sometimes, the children would tell Jose Raul that Juana had gone to a neighbor's house; at other times they did not know where she had gone. (4 SH RR Ex. 23 ¶ 9.) Berta, the oldest of the children, similarly recalled that her mother lost her job in the warehouse after someone reported to officials that she was leaving her young children home alone. (ECF No. 28-2 at 73, Ex. 76 ¶ 10.) Santana described the family home as cramped, unclean, and cluttered. (4 SH RR Ex. 23 ¶ 5.) He witnessed aggressive fights between Jose Raul and Juana and thought that Juana should have been receiving therapy for her erratic behavior. (4 SH RR Ex. 23 ¶ 12–14.)

Both Juana and her children consistently describe Jose Raul as a violent and abusive alcoholic. (*See* 1 SH CR at 291; 2 SH CR at 527; 4 SH RR Exs. 1, 2.) Juana reported that Jose Raul beat her when she was pregnant with Juan. (2 SH CR at 529–30.) While she was pregnant, Jose Raul's beatings were "frequent, severe, and often directly to the abdomen area," and to make matters worse, he forbade Juana from seeking medical attention during her pregnancy. (2 SH CR at 530.) Jose Raul punched Juana with his fists and kicked her with his boots while she was pregnant with Juan. He also beat her with a folded-over belt. He beat her for little things, such as not waking up to cook him food at two o'clock in the morning when he returned home after a night of heavy drinking. Juana had heavy cramping and bleeding when she was six months pregnant with Juan and thought she was going to deliver him early. (4 SH RR Ex. 1 ¶ 6; 2 SH CR at 538.)

Juana's pregnancy with Juan was further stressed by the harsh working conditions she faced in the fields and in the warehouses where she worked cutting cabbage and filling heavy bags of produce to carry out of the fields and package afterwards. (4 SH RR Ex. 1 ¶¶ 6, 9) Juana did not receive prenatal care; she had some assistance from a federal nutrition program, but it did not start until the final trimester of her pregnancy. (4 SH RR Ex. 1 ¶ 9; ECF No. 24-5 at 28, Ex. 21 at 3.)

Jose Raul also physically and emotionally abused Juan and his siblings (Ex. 112 ¶ 5.) Jose Raul disciplined the children by beating them with his hands or a belt if they disobeyed him. He also kicked the children. (4 SH RR Ex. 1 ¶ 11; 4 SH RR Ex. 26 ¶ 21.) Janie "grew up thinking it was normal for a father to yell, curse, and to hit children." (1 SH CR at 291 ¶ 4.) Sometimes Jose Raul would stick his fingers in the children's mouths to keep them quiet. (4 SH RR Ex. 2 ¶ 6.) Berta explained:

> When I was small, my father physically abused us often – daily, in fact – and for the most minor of reasons. He got upset if the food wasn't ready when he wanted it, and he yelled and cursed at us, calling us "worthless" and "crybabies." If one of us kids did something small like spilling some juice, he sent us outside to get a tree branch, and then whacked us with the skinned branches. He hit Juan this way a lot. When my father hit us, he did it with an electrical cord, a belt, a shoe, anything he could find. And he hit us in a way that seemed like he had no sympathy or feeling for us.

(ECF No. 28-2 at 71, Ex. 76 ¶ 3.)

When Juan was only three years old, he witnessed his father cut his mother in the chest with a knife. At this young age, Juan frequently tried to protect his family from Jose Raul's violence. When Juan was four, he witnessed Jose Raul beating Juana with a belt and kicking her with his boots. Juan tried to protect his mother by grabbing a kitchen knife and attempting to stab his father in the buttocks. Jose Raul turned around and beat Juan with a belt. (4 SH RR Ex. 1 ¶ 11.) Berta, who

remembered this stabbing incident well, recalled that her father's retaliation toward his still diminutive son was particularly "vicious." (4 SH RR Ex. 2 ¶ 5.)

After Juana's youngest son, Oliver, was born in 1987, Juana reported that Jose Raul began a pattern of coming and going from the family's house whenever he pleased. He would rape Juana within earshot of the children who could hear her crying for help. (ECF No. 28-1 at 60, Ex. 55 at 3.) Even when Juana locked Jose Raul out of the house, he still broke in. (ECF No. 28-2 at 71, Ex. 76 ¶ 4.)

### D.    A dysfunctional family marred by a father's abandonment.

Jose Raul left Juana for long stretches of time to be with another woman he met in the fields. (4 SH RR Ex. 1 ¶¶ 8, 10.) Juana struggled to support the family by herself and relied on public assistance just to subsist in poverty. Because she did not have money for childcare, sometimes Juana had to take her children to the fields with her. The workdays could begin as early as 3:00 in the morning, and sometimes they did not leave the fields until 7:00 or 8:00 in the evening. (4 SH RR Ex. 1 ¶ 10.) Sometimes Juana left the children in the car, but other times she carried them with her or kept them in a cart next to her while she worked. (4 SH RR Ex. 1 ¶ 8.) To entertain themselves, the children played in the dirt beside her. (4 SH RR Ex. 26 ¶ 10.)

The chemicals and pesticides used in the fields they tended were strong and caused illness in the family. Juana's head and stomach hurt often from breathing in chemicals, including while she was pregnant with Juan. She knew the exposure was dangerous but felt helpless about the situation. (4 SH RR Ex. 26 ¶ 9.) Berta recalled that she and her sister Janie became ill with symptoms of vomiting, nausea, stomachaches, and headaches. (4 SH RR Ex. 24 ¶ 4.) Juana recalled times when Juan cried because of stomachaches and diarrhea. Other times, Juan made motions suggesting that he needed air and could not breathe. Juan was prescribed medication and given an inhaler to help with breathing. (4 SH RR Ex. 26 ¶ 10.)

Jose Raul left the family for good when Juan was around four or five years old. (4 SH CR at 1482–83 ¶ 9.) He married a woman named San Juana Lara, whom he had met in Reynosa, Mexico. (4 SH CR at 1484 ¶ 15.) Juana believed Jose Raul had actually married this new woman before leaving her. (4 SH RR Ex. 1 ¶ 13.) Together, Jose Raul and San Juana had three children: Ruben (born in 1989); Raul (born in 1991); and Berta (born in 1993). (2 SH CR at 529; 4 SH CR at 1484 ¶ 15.)

Juana's life-long struggle with depression worsened after Jose Raul abandoned the family. Berta described her mother's fragile mental state after her marriage finally imploded:

After my father abandoned us, my mother became very depressed. She stopped wanting to leave the house to go anywhere or do anything. You can tell when someone is depressed, with no hopes of anything, and she was like that for years . . . She spent a lot of time by herself in her room, and practically every other day I heard her crying . . . sometimes she just sat silently on the couch, staring blankly for the longest time. When she did that, I went and sat next to her; I tried to hug her to make her feel better. Sometimes she responded to me, and sometimes she did not. Even when she responded by hugging me back, I noticed that she gave me a different kind of hug, one with no emotion or feeling. My mother became drastically different after my father left. She no longer expressed her feelings, and she stopped giving us kisses on the cheek. She stopped telling us that she loved us.

(ECF No. 28-2 at 72, Ex. 76 ¶ 6–7.)

Berta felt that her mother's depression and mood swings were aggravated by the fact that her father had married a woman who shared Juana's name and that his new children had names similar to those of his children with Juana. Berta explained, "It was obvious to us that our father replaced us with a family that he wanted. He never wanted us." (4 SH RR Ex. 2 ¶ 5.)

### E. A dysfunctional family marred by Juana's physical abuse and extreme neglect of her children.

After Jose Raul's abandonment of the family, Juana started attending a Pentecostal church. (4 SH CR at 1481 ¶ 3; 4 SH RR Ex. 2 ¶ 8, 4 SH RR Ex. 6 ¶ 5; Ex.112 ¶ 4.) Her involvement with the church became an obsession to the detriment of her young children. Janie recalled that her mother sometimes took the children to Mexico, where Juana claimed that "she would predict the Lord's word." (1 SH CR

at 293 ¶ 13.) Cipriana Ortega, Juana's close friend, reported that Juana's "life was the church," and that she attended whenever she could. (4 SH RR Ex. 22 ¶ 2–3.) Oftentimes, Juana left the children at home alone, sometimes into the night. (1 SH CR at 293 ¶ 13.) Juan's godmother, Thelma Mendoza, recalled that Juana "left her children alone all the time, and [Thelma] often saw them out in the streets by themselves." (4 SH RR Ex. 7 ¶ 5.) Juana's friend, Elizabeth De La Torre, believed that she "was devoting too much time to the church and ignoring her children. Juan and his sisters resented her for spending so much of her time at church instead of caring for them." (ECF No. 28-1 at 63, Ex. 55 at 6.) Juana's niece, Erika Martinez, recalled that the children "felt abandoned by their mother." (ECF No. 28-2 at 23, Ex. 66 ¶ 9.)

Maria Rita Martinez, a family friend, visited Juana after Jose Raul left the family. Maria was surprised to learn that Juana was not home and that the younger children were being supervised by their eldest sister Berta. Berta was only eight or nine years old at the time, meaning that Juan and his brother were only five and two respectively. Berta was unable to tell Maria when Juana would return. Maria recalled that she "was worried about the situation with the Ramirez children, but [she] did not feel there was much [she] could do." (4 SH RR Ex. 19 ¶ 8.)

When she was too young to do so, Berta was expected to supervise the younger children when Juana was at work or church. (4 SH RR Ex. 2 ¶ 5.) She recognized early on that her mother was limited in her abilities to care for her family:

> Though my mother was a hard worker, and she did her best to raise five children, she was under considerable stress. I believe that she suffered from depression, and she had dramatic mood swings . . . She did not ground us much; instead, she would whip us. She used a belt, clothes hanger, or a shoe. How bad the whipping was would largely depend on her mood. . . . Even after my father left, there was a lot of stress in the home.

(4 SH RR Ex. 2 ¶ 8.)

Likewise, Juan told his father when he was around 12 years old that his mother had "abused him and would beat him with sticks and pans, would throw things at him like rocks, and would pull his hair." (4 SH CR at 1483–84 ¶ 13.)

Juana's neglect and physical abuse of her children was documented in Berta's early school records. When Berta was 11 years old, she was sent home from school for apparent psychiatric symptoms. The next day, Berta reported to the office "anxious, upset, and afraid to go home." When Berta was questioned about this, she reported that Juana was slapping her for no reason, and that if she told anyone, Juana said she was going to kill her. Berta reported that her mother sometimes left a red mark after slapping her in the face. Child Protective Services was called immediately. In a parent teacher conference that followed, Juana claimed that

Berta's accusations were unfounded and that this was just Berta's way of "rebelling." Berta was then brought into the meeting to confront her mother in front of school officials and Child Protective Services, at which point Berta expectedly changed her story. The school nurse noted that Berta "wouldn't say anything against [her] mother because of the way she was questioned in front of parents." (ECF No. 25-3 at 7, Ex. 32 at 21.)

Police officers followed up with school officials several days later; Child Protective Services had called them because they were concerned that Berta was suffering from child neglect and that the anxiety attacks she was having at school were being ignored. (ECF No. 25-4 at 2, Ex. 32 at 22.) Juana was supposed to make an appointment for Berta to have a psychological evaluation, but Juana had reportedly "forgotten" and did not follow through with this important recommendation. (ECF No. 25-4 at 3, Ex. 32 at 23.) It appears that Child Protective Services was not informed that one year prior, in 1991, Juana had dealings with school administrators when Berta continued returning to school after being sent home repeatedly for untreated head lice. The school was unable to reach Juana on multiple attempts. A home visit was made to explain to Juana the importance of keeping Berta's hair clean and free of lice and nits. (ECF No. 25-3 at 2–3, Ex. 32 at 16–17.)

It must be said that Juana was not a deliberately bad parent; she was mentally ill. As documented in her psychiatric records, from the time of the birth of her first child she began hearing a voice telling her to kill herself because she was no good. (ECF No. 28-3 at 11–12, Ex. 78 ¶ 6.) She had endured significant trauma beginning in childhood which continued into adulthood, and she suffered serious emotional harm as a result. Juana had been abandoned by her mother, sexually molested from age eight by her half-brother, only to reach an adulthood where she would sustain physical, sexual, and emotional abuse at the hands of Juan's father. Then she was left to cope with five children in a setting of extreme poverty. Although not deliberate, Juana's incapacity to parent her children, coupled with Jose Raul's abuse and eventual abandonment of the children had dire consequences for Juan and all of his siblings.

   **F.    The effects of parental neglect on Juan: hopelessness, depression, and suicidal ideation.**

Jesus Limon, Juan's best friend growing up, confirmed that Juan's mother spent much of her time at church and away from her children. This troubled Juan, and Juan told Jesus that he wished his mother would give him more attention. (4 SH RR Ex. 15 ¶ 7.) To cheer up Juan, Jesus would take Juan to his house, where Jesus's mother would cook them food and show Juan affection. (4 SH RR Ex. 15 ¶ 9.) Juan told Jesus many times that he wished his mother was more like Jesus's mother. (4

SH RR Ex. 15 ¶ 10.) Jesus recounts that Juan's desperation for parental attention left

him sad and wishing he were dead. Jesus explained:

> [Juan] talked about death as far back as I can remember . . . He
> constantly talked about wanting to die and saying that he preferred
> death to life. He talked about wanting to kill himself or provoking
> someone into shooting and killing him. Juan cried over his desire to
> stop being alive, over his father's absence, and over his mother's
> preference for her church over her children. He wanted a mother like
> mine, one who was there for him.

(ECF No. 28-1 at 105, Ex. 60 ¶ 18.)

One time, when Juan was entering early adolescence, he ran away from home.

Juana called Jose Raul, who found Juan and took him to his house in Mexico where

he was living with his new family. Juana reportedly told Jose Raul she no longer

wanted to care for Juan. (4 SH CR at 1483–84 ¶ 13.)

Juan ended up returning home to his mother after only a few weeks in Mexico.

(1 SH CR at 293 ¶ 10.) Jose Raul's new wife and children had treated Juan horribly,

and Juan's half-siblings mocked him, telling him that Jose Raul preferred them to

Juan and that this was the reason he had left Juan's family. (1 SH CR at 293 ¶ 10;

Ex.112 ¶ 10.) Jose Raul told Juan that he had never liked Juana—that the only reason

he had married her was so he could secure his immigration status in the United

States. Also during this trip, Jose Raul promised Juan some land, but Juan later

overheard his father tell his new wife that the promise was a lie. (4 SH RR Ex. 2 ¶ 12.)

Juan's older sisters stated that Juan's behavioral problems worsened after this time with their father. He grew angrier, his school performance worsened, and his legal problems started around this time. (1 SH CR at 293 ¶ 10.) Berta said Juan returned home from the trip with a great deal of resentment and a "broken heart." (4 SH RR Ex. 2 ¶ 12.) Juana recalled:

> After Juan left, he called me to come pick him up, but he was never the same afterwards…he started telling me strange things... [W]hen he was nine, he told me that he would kill his father someday because he has destroyed his life. When he was ten, he told me that he did not know what was going to happen, but he felt that he was not good and he felt hate. Around this time, Juan would wake up in the middle of the night crying, and I would try to calm him down. He told me that he dreamed that a short Asian man told him to commit suicide because no one liked him and that he was no good. Juan had few friends, and the friends he did have were all older... Once, I told Juan that he was like his father. I know that Juan did not like this at all.

(4 SH RR Ex. 1 ¶ 15.)

At the age of 12, Juan reported to a medical provider that he was feeling depressed; he did not enjoy school and he did not expect to pass the seventh grade. (ECF No. 24-3 at 7–8, Ex. 15 at 13–14.) Juan's hopelessness is well-documented throughout his juvenile record. As just an example, at age 14, Juan was diagnosed with depression with multiple suicide attempts since age ten. (4 SH CR at 1529.) In

the same report, 14-year-old Juan reported feeling emotionally abandoned as a child and expected to be killed within two years. (4 SH CR at 1529.)

### G. Juan suffers from neglect of his educational needs and is denied treatment for a serious learning disability.

Juan's development stood out from his other siblings. His mother Juana recalled that everyday tasks were much harder for him than her other children. He had difficulty with instructions from an early age. Juana recalled that Juan would come home from school upset that the teacher had told him to do something, but he could not get it right. Juan's teachers had to repeat instructions to him repeatedly. (4 SH RR Ex. 26 ¶ 17.) It took Juan a long time to get ready for school in the morning, because everyday tasks were hard for him. He had difficulty brushing his teeth and hair, and he had to get shoes with Velcro because he struggled too much with laces. (4 SH RR Ex. 26 ¶ 14.) Juan also had trouble understanding money and how much things cost, and he had to rely on his older sisters to help him count his change. (4 SH RR Ex. 26 ¶ 16.)

Juana recalled, "There were things that Juan wanted to do, but could not do because he was slower than other kids." (4 SH RR Ex. 26 ¶ 20.) For instance, Juan tried to learn how to ride a bike, but ultimately quit, resigning himself to failure. (4 SH RR Ex. 26 ¶ 20.) Because Juan had trouble understanding his teachers and others, he was bullied in school. Kids bossed him around and hit him if he did not comply.

Juana noticed that "Juan could not take initiative – he just did what other kids said to do." (4 SH RR Ex. 26 ¶ 19.) Juan's teachers telephoned Juana over the years because they were concerned with his development. Juana explained, "They told me that they wanted to teach Juan, but he was too slow and that he told his teachers that he did not understand. They told me that maybe Juan was slow of mind." (4 SH RR Ex. 26 ¶ 18.) Juan's friend, Esequiel Rodriguez, recalled that Juan had trouble with reading and writing, and that even in middle school, Juan did not know where the periods and question marks went in his sentences. (4 SH RR Ex. 28 ¶ 5.)

Debbie Dunn, a masters trained special educator since 1997, evaluated Juan's educational and testing records, as well as the sworn declarations of several educators who taught at the schools Juan attended. Dunn found substantial evidence that Juan suffers from a learning disability. (ECF No. 30-3 at 51–71, 74–75, Ex. 83 ¶¶ 1–6, 8–44, 53–54.) A learning disability is a neurological disorder that impairs the brain's ability to receive, process, store, and respond to information. A learning disability reflects deficits in brain function. (ECF No. 30-3 at 54, Ex. 83 ¶ 9.) Dunn's diagnosis is amply supported by the State's own records. Juan was evaluated three times by psychologists providing services within the juvenile justice system and each time he was noted to have learning disorders that warranted special education services.

Learning disabilities are permanent and last a lifetime. Since before 1990, children with learning disabilities have been protected and entitled to free special education services under federal law. (ECF No. 30-3 at 54–55, Ex. 83 ¶ 10.) Yet in Juan's case, despite the overwhelming evidence that Juan was in dire need of special education services, Juan was neither identified nor treated for a learning disability. (ECF No. 30-3 at 68, Ex. 83 ¶ 37.)

Although Juan's first language was Spanish, he was unable to master learning in English or Spanish. Juan's educational records demonstrate that he made virtually no progress in learning to read or write in the English language between the first and fourth grade. (ECF No. 30-3 at 63–64, Ex. 83 ¶¶ 25–27.) This contrasts with his two older sisters, who demonstrated the ability to learn English at an average rate. (ECF No. 30-3 at 64, Ex. 83 ¶ 28.)

One of Juan's third-grade teachers, Apolinar Morales, stated that Juan was an "at-risk student[]" for whom "teachers had to make learning modifications." As Ms. Morales explained, "[w]hile the rest of the students took spelling tests with 20 words on them, students like Juan might have to complete only 10 of the words." She continued, "This was the same with math. Teachers assigned only half the problems to students like Juan. Because of his limited reading and writing abilities, even in

Spanish, Juan was only able to pass his classes due to these accommodations." (ECF No. 28-2 at 31, Ex. 68 ¶ 5.)

Juan's other third-grade teacher, Ida Garcia, declared that his "records show he was poor performer" who was "far behind," and "instead of giving [Juan] special help" he needed, "the school just kept promoting him." At the end of third grade, Ms. Garcia did not promote Juan to the fourth grade. Instead she gave him the "'placement' label . . . [which] meant that he got to continue on to the next grade, but it indicated to his next teacher that he needed special assistance." (ECF No. 28-1 at 71, Ex. 57.)

Cristela Moreno, an educator who taught at Juan's elementary school when he attended, further explained the "placement" label. Students "considered to be passing" were "promoted" to the next grade. Those not necessarily capable of passing were "placed" in the next grade— "placement was a conditional promotion that could be changed to a retention." Ms. Moreno also clarified that students who were at-risk, Spanish-dominant speakers like Juan, were assessed based "on the student's performance at his current level," not his current grade level. "For example, if a child in fourth grade was performing at a first-grade level, he or she was taught at the first-grade level and promoted . . . based on his or her grades at the first-grade level." Examining Juan's school records, Ms. Moreno observed that Juan

was "promoted throughout his elementary school years despite showing no improvement. He was stuck at the beginner level ('BE1') from kindergarten through fourth grade, which is not normal." (ECF No. 28-2 at 41–42, Ex. 70 ¶¶ 5, 9.)

On March 1, 1994, when Juan was in fourth grade, his teacher Ms. Avalos evaluated Juan's English and found that even after five years of bilingual instruction, Juan had not achieved normal English acquisition. Ms. Avalos noted that Juan "[s]peaks some English but not enough to be understood by his[] teacher in the classroom." She further noted that his "[p]ronunciation problems necessitate concentrated listening and occasionally lead to misunderstanding;" that Juan made "frequent errors of grammar and word order which occasionally obscure meaning;" and that his "[c]onversation [is] somewhat limited because of inadequate vocabulary." Ms. Avalos also observed that Juan "[u]nderstands most of what is said at [a] slower-than-normal speed with repetitions," before concluding that Juan would not make satisfactory progress in English and that he remained a student of limited English proficiency. (1 SH CR at 462–64.)

Francisco Loya, one of Juan's 8th grade teachers, stated that Juan "had problems with language and reading in both English and Spanish. Juan did well enough speaking in Spanish—what [Mr. Loya] call[ed] 'barrio Spanish'—but could not really read in Spanish. He had limited vocabulary in English; he certainly

29

couldn't read an 8th grade book." Mr. Loya recalled giving Juan tests orally because of his difficulty reading, noting that "[h]e generally had low retention . . . He was also embarrassed because he didn't understand the material." (ECF No. 28-2 at 5, Ex. 62 ¶¶ 3–4.)

On the scoresheet from a reading and writing assessment (the LAS Reading/Writing) administered to Juan in February 1997, when Juan was nearly 13 years old, the notations next to Juan's scores reflect he was still a "non-reader" and a "non-writer." (1 SH CR at 450.)

Despite strong evidence of disability, even early on, Juan was never evaluated or treated for learning disability. As explained by Juan's third grade teacher Ida Garcia, this was due to the neglect of school administration. During the time Juan was in elementary school, "it was very easy for a learning disabled child to go through school without getting any testing for or placement in special needs classes." Ms. Garcia further noted that she and other teachers were "very frustrated" by the special education policies, remarking: "Our students needed help and we couldn't do anything about it. Even if a teacher wanted to hold a child back or have the child tested for special education, the school administration would tie the teacher's hands. The child was simply promoted . . ." (ECF No. 28-1 at 71, Ex. 57 ¶ 4–5.) Ms. Garcia observed that "this may have been the problem for Juan. His records suggest he

needed help, but . . . instead of giving him special help, the school just kept promoting him." (ECF No. 28-1 at 71–72, Ex. 57 ¶ 6.) Mr. Loya, similarly stated that none of the school administrators listened or responded to his efforts to get Juan remedial help and believes that "[t]he school system failed Juan." (ECF No. 28-2 at 7, Ex. 62 ¶ 12.)

Once Juan entered the juvenile justice system, he fared no better. In 1998 and 2000, mental health professionals evaluating and treating Juan recommended treatments for his learning disabilities, which he never received. (4 SH CR at 1515; 4 SH CR at 1530.) In 2000, at age 16, he was administered the English and Spanish versions of the Woodcock-Munoz Language Survey. The test showed that 16-year-old Juan was reading English at a nine-year-old level and had the writing proficiency of a seven-year-old. Juan was demonstrating only one percent proficiency on written tasks on which the average English speaker of 16 would show 90 percent proficiency. (ECF No. 30-3 at 70, Ex. 83 ¶ 42.) On the Spanish version of the test measuring reading and writing, Juan demonstrated the proficiency level of an eight-year-old; meaning he showed only four percent proficiency on tasks the average Spanish speaker at age 16 would show 90 percent proficiency. (4 SH CR at 1522; 4 SH CR at 1530.)

## H. A family ravaged by and genetically predisposed to mental illness.

Juan's family history genetically predisposed him to mental illness. Some of Juana's mental health problems have been exposed above. Juana suffered from depression for which she did not seek treatment. (4 SH RR Ex. 26 ¶ 22.) She often responded to her depression by crying all night in her room, which deeply affected her children. (ECF No. 28-2 at 23, Ex. 66 ¶ 8.) It was until after Juan's arrest that Juana sought professional diagnosis and treatment for her mental illness. In 2004, Elisa Garza Sanchez, M.D., diagnosed Juana with Major Depression (Severe with Psychotic Features) and Dysthymic Disorder. (*See* ECF No. 26-1 at 102, Ex. 43 at 57.)

Dr. Sanchez's evaluation of Juana described her suicidal thoughts, crying spells, sleep disturbances, anhedonia, isolation, guilt, fatigue, irritability, decreased concentration and energy, forgetfulness, change in appetite, anger outbursts, anxiety, excessive worry, auditory hallucinations, and an overall inability to function. (*See* ECF No. 26-1 at 99, Ex. 43 at 54.) Dr. Sanchez wanted to hospitalize Juana because she was in such poor condition, but Juana refused. (ECF No. 28-3 at 11, Ex. 78 ¶ 3.) Juana told Dr. Sanchez about a voice she had been hearing since the birth of her first child. The voice told her to kill herself and that she was "no good." (ECF No. 28-3 at 11–12, Ex. 78 ¶ 6.) Juana regularly heard a man calling her name, saying things

like "here is the well" and "death." (ECF No. 28-3 at 11–12, Ex. 78 ¶ 6.) She also had visions of someone coming after her with a knife. (ECF No. 28-3 at 11–12, Ex. 78 ¶ 6.) Juana explained that these hallucinations would take up all her attention and that she had no energy left over for anything else. (ECF No. 28-3 at 12, Ex. 78 ¶ 7.) Dr. Sanchez prescribed Juana the antipsychotic medication Geodon and the antidepressant Effexor to help treat her conditions. (ECF No. 26-1 at 102–03, Ex. 43 at 57–58.) In 2007, Juana was approved for Social Security Disability payments due to her psychiatric condition. (*See* ECF No. 26-2 at 37, Ex. 43 at 97.)

All of Juan's siblings have struggled with psychiatric issues. Berta, the oldest (and main caregiver in Juana's absence), was described as a sad and anxious child who struggled with hyperactivity and mania from a young age. (ECF No. 28-3 at 12, Ex. 78 ¶ 10.) Juana called the police on Berta on several occasions to bring her home when she took off running. Juana described Berta as acting "possessed" at times. (2 SH CR at 531.) According to Berta's school records, when she was 11 years old, Berta was sent to the nurse's office with another girl for supposedly taking pills and "sniffing something." Berta told the nurse that, "the voice, the old man with horns and dressed in real old clothes" told Berta that the other girl wanted to kill her. Berta was observed to be laughing inappropriately. The school nurse advised Juana that it was abnormal for Berta to be hearing and seeing things, and that she needed to see

33

a doctor for further psychological evaluation. (ECF No. 25-3 at 7, Ex. 32 at 21.) These records indicate that Berta had also been struggling with anxiety attacks at school but that her mother was neglecting to schedule her for treatment. (ECF No. 25-4 at 2, Ex. 32 at 22.)

Berta met an older man when she was 14 and got married at age 15 to escape her home. (ECF No. 25-2 at 8, Ex. 32 at 14.) She felt trapped and exhausted from the responsibility of taking care of her siblings. The marriage was not what she had hoped for; her husband physically and verbally abused her. (ECF No. 28-3 at 2, Ex. 76 ¶ 15.) Berta was diagnosed with severe Bipolar I Disorder, and her mental health records indicate that she has suffered from depression, mood swings, paranoid ideation, anger, crying spells, anhedonia, hopelessness, and sleep disturbances. In 2012, she was prescribed Zoloft for depression and Klonopin to help her sleep. (ECF No. 25-4 at 14, Ex. 33 at 10.)

Janie, the second oldest, also suffered with depression as a child. Juana failed to seek treatment for Janie as she did not believe in going to the doctor for mental health problems. (ECF No. 28-3 at 7, Ex. 77 ¶ 10; ECF No. 28-3 at 3, Ex. 76 ¶ 19.) As a child, Janie suffered from crying spells and had trouble articulating her feelings. She also had trouble sleeping. (ECF No. 28-3 at 7, Ex. 77 ¶ 10.) Janie stated that she and her siblings "learned to block out what was happening around us in the

household, and we talked to each other and played within ourselves." When Janie was 17, she entered the Job Corps "to escape the family dynamics..." (1 SH CR at 292 ¶ 7.)

Juan's younger brother, Oliver, also showed signs of sadness, anger, and depression from an early age. Juana recalled that Oliver could never express himself, even though she reportedly tried to understand him. (ECF No. 28-3 at 13, Ex. 78 ¶ 13.) Oliver, who dropped out of school around the age of 16, developed a serious substance abuse problem. Oliver struggled with behavioral problems and became involved in fights and gang-related activities at school. Records as early as 2002 indicate Oliver was charged with possession of marijuana, possession of a firearm, possession of brass knuckles, failure to appear, evading arrest, entering a correctional facility with a prohibited substance, possession of cocaine with intent to deliver, and disorderly conduct/fighting. (*See* ECF No. 24-6 at 29, Ex. 25; ECF No. 27-10 at 9, 29, 45, Exs. 47, 48, 49; ECF No. 28-1 at 36, Ex. 50.) In 2004, he was hospitalized after he was found passed out from sniffing gasoline. Oliver's emergency room exam indicated that he was abusing inhalants and had THC in his system. (ECF No. 27-1 at 3–7, ECF No. 27-2 at 2–8, ECF No. 27-3 at 2, Ex. 46 at 27–39.) That same year, Juana completed an application for emergency

commitment, reporting that Oliver was commenting about suicide and struggling with inhalant abuse, drug abuse, and depression. (*See* ECF No. 33, Ex. S9.)

Joey, the youngest of Juana's children, similarly developed issues with depression, anxiety, and panic attacks, as he grew older. (ECF No. 28-2 at 10, Ex. 63 ¶¶ 10–12.) Joey had his first panic attack at the age of ten, and the attacks continued into adulthood. (ECF No. 28-2 at 10–11, Ex. 63 ¶ 14.) In sixth grade, Joey was referred to mental health services due to suicidal ideation, after he wrote a poem about death and dying. (ECF No. 24-9 at 2, Ex. 27 at 6.) In order to have some control over his emotional and psychological issues, Joey created different personalities that communicated with each other and helped him cope with his various moods and emotions. (ECF No. 28-2 at 11, Ex. 63 ¶ 16.) Joey's hospital records indicate that he was treated for suicidal thoughts (he attempted suicide twice in Donna) and depression, and he was referred for counseling by the hospital's emergency department. (ECF No. 24-10 at 22–24, Ex. 29 at 8–10.) There are also notes regarding a history of sexual abuse by his father Jose Raul. (ECF No. 25 at 10, Ex. 29 at 26.)

### I. An impoverished and traumatized child begins to self-medicate with drugs and inhalants, and in a state of hopelessness, is pushed towards gang culture.

Juan's family was miserably poor. Berta recalled that their school gave the family coupons for free shoes or clothes at their local Kmart. (4 SH RR Ex. 24 ¶ 2.) Janie referred to herself and her siblings as "government babies" because they survived on food stamps, housing assistance, and WIC. (1 SH CR at 292 ¶ 8.) She remembered times "when all [they] had to eat was beans and tortillas." (ECF No. 28-3 at 6, Ex. 77 ¶ 4.)

Juan's family moved frequently within the same neighborhood in Donna, which was plagued with poverty, high crime, and gang activity. (2 SH CR at 530.) His family lived at three Section 8 rent subsidized homes on the same notoriously dangerous block of South 6th Street, where the police were called frequently to raid homes for drugs and to respond to gang-related violence. (1 SH CR at 292 ¶ 8; 4 SH RR Ex. 25 ¶¶ 3–4.)

According to a 2002 article published in the Houston Chronicle shortly before Juan's arrest, 36 percent of Hidalgo County residents lived below the poverty line, where the per capita income was only $9,899 compared to the $19,617 state average. Donna, one of the most impoverished cities within this already impoverished county, was home to 12,652 residents dependent largely on agricultural employment (like

Juan's family). Residents explained, "[T]he grinding poverty that pervades the Rio Grande Valley is at the crux of Donna's problems. There is ample evidence of the extreme need on the narrow city streets and weedy barrios, where dilapidated homes and abandoned buildings abound." The article expounds, "In Donna, the only municipal swimming pool is sealed up, the many gangs that plague the town have tagged vacant homes and buildings with satanic imagery, and the political infighting has become legendary." In 1997, when Juan was just thirteen, a federal jury indicted a former Donna police chief and six other officers for accepting bribes to escort loads of marijuana through town. This happened again in 2002. One longtime Donna resident recalled: "Some children have said, 'I want to be a drug dealer because I'll have money.' That's the idol." Further, as discussed above, the Donna School District which Juan attended was among the poorest two percent of school districts in Texas. One study found that the district "did not have curriculum guides, or work plans, for 308 of the courses it offered." The average SAT score for a student in Donna is a shocking 110 points below the state average.[6]

Through no fault of his own, Juan endured a significant set of psycho-social stressors. These included poverty, domestic violence, paternal abandonment, and a mentally ill and neglectful mother, which played out in a community ridden with

---

[6] https://www.chron.com/news/houston-texas/article/Town-of-Donna-tainted-by-legacy-of-corruption-2100809.php (last visited December 7, 2020)

drugs and gangs. Moreover, Juan had to endure an untreated neurodevelopmental disorder and a related untreated learning disability, which left him to suffer a unique embarrassment among his student peers - an embarrassment only a child unable to learn can appreciate. (4 SH CR at 1530.) He did not cope well; as his friend Jesus recounted, Juan suffered from suicidal ideation and depression. (*See* ECF No. 28-1 at 105, Ex. 60 ¶ 18.) By age ten, Juan had become at risk for self-medicating with drugs and inhalants and that came to fruition. (2 SH CR at 534, 539.) One of Juan's childhood friends, Andres Chapa, recalled that as early as middle school, he and Juan would "inhale the fumes from paint cans, and then we would choke each other until we experienced a strong high and passed out." Chapa further recalled, "At such a young age, [we] did not understand the danger of becoming addicted to inhalants or the harm that it could cause us." (Ex. 110 ¶ 4-5.) As explained below, the early onset, pre-pubescent self-medicating with inhalants worsened Juan's neurodevelopmentally damaged brain. (ECF No. 30-3 at 79, 83, Ex. 84 at 1, 5.)

Gangs were prevalent in Donna. The Tri-City Bombers ("TCB"), the gang that controlled Juan's neighborhood, was particularly brutal. Juan's sister Janie noticed that the TCB began to influence Juan. Juan was around 14 or 15 at the time. (1 SH CR at 292; ECF No. 28-1 at 102, Ex. 60 ¶ 2.) Nevertheless, as explained by Father Gregory Boyle, young children don't associate with gangs by choice. Rather,

it is "an outgrowth of experiencing their lives as the misery that it is." (Ex. 119 ¶ 7.) Juan faced misery wherever he turned. Berta felt helpless about Juan's situation, stating: "Given the stresses faced by my mother and the depression that she suffered from at this time, there was little that could be done about it." (4 SH RR Ex. 2 ¶14.)

Juan's best friend, Jesus, recounted that when they were children, TCB members directed he and Juan to smuggle drugs across the border. Jesus described the incident:

> Juan and I ended up in a house in Matamoros, Mexico, and TCB said nobody could see us there. We slept on the cement floors and didn't have enough food, but we weren't allowed to leave. It was like we had been kidnapped. TCB members gave us beer and a big ball of cocaine, and we just sat in a room and drugged ourselves for days or maybe weeks until I felt like I couldn't breathe. Juan got very sick toward the end—he was vomiting, sweating, and shaking. The TCB guys then made us return across the border; Juan crossed on foot without drugs, but I got caught at the border with weed stashed in my car. The Mexican drug guys sent some money because I didn't rat them out, but TCB took the money. They used me.

(ECF No. 28-1 at 102, Ex. 60 ¶ 3.)

When they realized they were in over their heads, Jesus and Juan both attempted to escape the gang. (ECF No. 28-1 at 68, Ex. 56 ¶ 16; ECF No. 28-1 at 102–03, Ex. 60 ¶ 6.) Jesus was told by TCB: "once you get in, you don't get out." (ECF No. 28-1 at 102, Ex. 60 ¶ 3.) Juan confided in his cousin, Fernando, about his struggles to break away. Juan told him that the older gang members had threatened

to harm him and his family if he left. The older gang members controlled newer, younger members by getting them addicted to drugs, which Fernando could see was happening to Juan. (ECF No. 28-2 at 28, Ex. 67 ¶ 6.) Fernando recalled, "When Juan or any of the other younger guys tried to resist, he was beaten up and his family was threatened. Juan said he had to do what the older gang members made him do." (ECF No. 28-2 at 28, Ex. 67 ¶ 7.)

### J. Juvenile history: a child desperately needing treatment and rehabilitation does not receive it.

Lacking parental supervision and suffering from untreated mental health and neurodevelopmental disabilities left Juan prone to educational failure and at risk for criminal offending. "For most individuals with learning disabilities who do not receive appropriate early intervention, long-term outcomes are bleak." (ECF No. 30-3, Ex. 83 ¶ 17.) "There is a strong correlation between learning disability—a disorder of brain function—and delinquency," a risk which "'is reduced by participation in remedial instruction ... [and] it is recommended that such prevention and rehabilitation services be made widely available to youth with [learning disabilities].'" (ECF No. 30-3 at 59, Ex. 83 ¶ 18, quoting Dunivant, Noel, *The Relationship Between Learning Disabilities and Juvenile Delinquency: Executive Summary,* Williamsburg, VA: National Center for State Courts (1982).) Juan never

received the remedial treatments within the educational system or from the juvenile institutions responsible for his treatment and care.

In March 1998, just after Juan turned 14, juvenile charges were brought against him and he was detained while the court considered whether he should be placed in a residential setting. (ECF No. 33, Ex. S10 at 4.) At this time, he was referred for a psychological evaluation by Gary Whitworth, Ph.D. Dr. Whitworth diagnosed Juan with Depression, Poly-substance Dependence, Conduct Disorder, and a [learning disability related] Reading Disorder. He identified stressors in Juan's life, including a lack of satisfying relationships with peers and family, association with gangs, and academic difficulties. Dr. Whitworth gave Juan a clinically significant Global Assessment of Functioning Score of 45. Dr. Whitworth recommended suicide precautions, a residential treatment program, psychiatric and substance abuse treatment, individual and family therapy, and special education when he returns to school because "he appears to have a learning disability." (2 SH CR at 495.)

On April 3, 1998, Olga Torres, a juvenile probation officer with Hidalgo County, submitted a social study based on her evaluation of Juan and his home environment. (ECF No. 33, Ex. S10.) Juan initially did not want to answer any of Torres's questions, stating, "no one knows my life." (ECF No. 33, Ex. S10 at 6.)

Juan told Torres that he had no goals in life and that he felt only "desperation" when not using drugs. (ECF No. 33, Ex. S10 at 6–7.) Torres recommended that Juan be placed outside of his home. She explained that Juan "requires a facility that can address issues concerning drugs, communication between family members, provide him with social skills, positive motivation, and stability which may be lacking at home." (ECF No. 33, Ex. S10 at 7.) On April 8, 1998, the court placed Juan on judicial probation until his 18th birthday. (Ex. S12 at 97.)

On April 17, 1998, 14-year-old Juan was admitted to the Desert Hills facility in College Station, Texas. Juan told the staff at Desert Hills that he "wanted to be dead or never born." (4 SH CR at 1529.) Staff noted that Juan "displayed a lot of inappropriate guilt, remorse, and self-hate for some events that he was a part of that resulted in someone getting injured or hurt in other ways." (4 SH CR at 1529.) He admitted to hopelessness and a "sincere feeling that nobody really cared." (4 SH CR at 1529.) At one point, he tried to call his mother, but her number had been disconnected. Juan was certain it was because she did not want to talk to him. (4 SH CR at 1529.) As noted above, Juan's best friend Jesus had observed these sentiments in Juan years before. (*See* 4 SH RR Ex. 15.)

Juan's psychologist at the facility, Michelle Woehr, Ph.D., found that Juan's primary problems included polysubstance abuse and depression, with multiple

suicide attempts since the age of ten. She also identified problems such as gang involvement, family instability and neglect, academic difficulties with reading in particular, and a history of referrals for fighting and truancy. (*See* 4 SH CR at 1529.) Juan talked with Dr. Woehr about the responsibilities he felt for his family and friends, which she indicated were inappropriate for a boy of 14. Juan expressed fear for his family, especially his younger brother, and a belief that they may be harmed by someone wanting to hurt Juan. He expressed a desire to be a positive role model for his brother, but he felt it would be "a real possibility that he will be in danger when he goes home." (4 SH CR at 1529.)

Regarding academic skills, Dr. Woehr noted that Juan required additional help in reading, writing, and spelling. She wrote, "His skills are below what could be expected from his measured intellectual ability and he may have a learning disorder." (4 SH CR at 1529.) Juan told Dr. Woehr that he was embarrassed to read aloud in class and that "He has shied away from reading, even when alone, so as not to be embarrassed." (4 SH CR at 1530.) When Juan was told that his intelligence level was average, he was surprised because he was always told by others that he was "stupid", and he believed that was true.[7]

---

[7] Average intelligence accompanied by neurodevelopmental deficits are hallmark characteristics of a learning disability. (ECF No. 30-3 at 58, Ex. 83 ¶ 17.)

Dr. Woehr further documented Juan's severe psychiatric symptoms:

Juan related a flashback involving a rat which he related to hallucinations while on drugs. He had the classic symptoms of feeling the event actually occurring, while awake and talking to a peer, who couldn't see the rat on his bed. He admitted to other flashbacks, and dreams about being in shackles, being chased, and fearing for his life. He wakes with pounding heart and sweating. He identified feelings of depersonalization and feeling 'unreal.' He displayed hypervigilance with exaggerated startle response (once in session), and difficulty concentrating. At times he also admitted to emotional numbing, and how it frightened him sometimes that he couldn't 'feel.'

(4 SH CR at 1529.)

Dr. Woehr diagnosed Juan with Major Depressive Disorder, Post-Traumatic Stress Disorder (PTSD), Polysubstance Dependence, and Conduct Disorder. Juan was prescribed the antidepressant Serzone, "with good response and no complaints of side effects." (4 SH CR at 1530.) Dr. Woehr also diagnosed Juan with a Reading Disorder and recommended that he be assessed for a learning disability. This assessment never occurred despite the recommendations of Dr. Whitworth and Dr. Woehr. In her discharge report, Dr. Woehr listed a history of head injuries with loss of consciousness. She also noted impoverished emotional relationships and stated, "Family therapy is recommended and may be crucial for this adolescent." (4 SH CR at 1530.) This therapy was never provided.

After months of treatment at Desert Hills, Juan had to be discharged because the facility was closing. Dr. Woehr believed that Juan had made great strides. (*See* 4

SH CR at 1529.) Dr. Woehr documented Juan's improvements during his time at Desert Hills, and Juan's hopes for the future, despite the serious dangers posed to Juan upon his return to his community:

> Over the course of his stay here, Juan has exhibited changes, resulting in hope that he can be a different person. He expressed wanting to go back four years to make different choices and be a "good person." He was encouraged to maintain that attitude and begin his new life at his new placement and show them who he really is. We went through his previous psychological evaluation and he was startled and excited to hear himself described at intake versus how he feels now. . .
>
> He does have periods of feeling down when he perceives his situation as negative – especially when thinking about the dangers to his brother and himself at home. *He has stated he expects to be killed within two years of return to home.* In good moods, he has also stated that he dreams of going to college and being an architect, and feels he can achieve that . . .
>
> He doesn't want to go back to the gang environment or do drugs. He does require emotional support and someone to point out positives in his behavior; he really responds to positive feedback. *He felt emotionally abandoned as a child and feels that nobody cares.* It is a new experience for someone to point out positive behavior and thoughts; he rarely perceives himself in a positive light. He is capable of developing emotionally healthy attachments to others, once he develops trust. He feels he has been sorely betrayed by others in his past, and is wary of being hurt . . .
>
> He feels a positive change in his relationship with his mother (he does have her new phone number), and asked if he could have a copy of his psych eval to show her how he has changed.

(4 SH CR at 1530.) (emphasis added.)

Despite the obvious need for treatment and structure, on November 30, 1998, the court ordered Juan released back to the custody of his mother. (Ex. S12 at 98.)

Releasing Juan back to his dysfunctional family and to the same community and family life had predictable results. As Texas juvenile justice system officers and frontline staff have consistently declared, releasing a youth back to the same environment, especially one as impoverished and gang infested as Donna, without adequate community and social supports, is a recipe for failure. (ECF No. 28-3 at 77–78, Ex. 82 at 31–32.) One case manager aptly explained, "If you send a kid back into the same snake pit so many times, he's going to get bitten again." (ECF No. 28-1 at 99, Ex. 59 ¶ 40.) When Juan was returned to the community at age 14, he did not have the resources to overcome either his mental or neurodevelopmental disabilities. He remained at risk for self-medicating with drugs and inhalants and succumbing to pressure from gang members.

Predictably, on March 10, 2000, one day before his sixteenth birthday, Juan was transferred back to the Hidalgo County Juvenile Detention Center after being charged with a new offense. (Ex. S12 at 99.) Juan was referred to Dr. Whitworth for another psychological evaluation. (2 SH CR at 482.) Dr. Whitworth recommended that Juan be placed in a juvenile correctional facility capable of providing counseling services and suicide precautions. (2 SH CR at 488.) Dr. Whitworth once again

47

diagnosed Juan with a learning disability, noting in his 2000 evaluation that Juan had still not received the special education services he had recommended in 1998. (2 SH CR at 487.) Juan would never receive these services.

On May 11, 2000, Probation Officer Juan Ramos conducted a supplemental social study on the Ramirez home. Ramos noted that "Juan is in dire need of a highly structured environment that can provide safety for him and the community." (Ex. S12 at 99.) The court determined that Juan, in his home, "cannot be provided the quality of care and level of support and supervision that [he] needs to meet the conditions of probation." (Ex. S12 at 30.) Accordingly, on May 31, 2000, Juan was placed into the custody of TYC for an indeterminate period, or until his 21st birthday. (Ex. S12 at 34.)

TYC was the worst place for 16-year-old Juan to be. After Juan's eventual discharge from TYC custody, the Texas juvenile justice system "erupted in a series of scandals that dominated the legislative process and led to massive-reforms." (ECF No. 28-3 at 30, Ex. 82 ¶ 10.) Unfortunately for Juan, these reforms came after he had been subjected to the astonishingly horrid conditions that infected the facilities in which he was held. Juvenile justice policy expert Michele Deitch, J.D., M.Sc., closely observed TYC policy developments during this time period (between 1994 and 2007) and helped conduct a performance review of TYC on behalf of the Texas

Office of the Comptroller. (ECF No. 28-3 at 30, Ex. 82 ¶¶ 8-9.) As explained by Ms. Deitch, TYC facilities during this time were permeated with "youth violence, physical abuse and neglect of youth by staff, high rates of sexual abuse, serious riots, gang activity, drug use, and suicide attempts. Notably, these deteriorating conditions led to a U.S. Department of Justice investigation of the Evins facility," where Juan had spent over a year of his adolescence in custody. (ECF No. 28-3 at 32, Ex. 82 ¶ 18.) Deitch further explained "that the punitive and dangerous conditions, staffing problems, and inadequate programming in TYC facilities at the time of [Juan's TYC] commitment . . . undermined any effort to rehabilitate youth in these facilities. Indeed, these conditions made it entirely predictable that youth would emerge from TYC made worse by their time in the agency's custody." [8] (ECF No. 28-3 at 33, Ex. 82 ¶ 20.)

The Texas Department of Protective and Regulatory Services administered a Level-of-Care Assessment after Juan was placed in TYC custody. (1 SH CR at 146.) Juan was assigned Level V, which is marked by "Severe problems, unable to

---

[8] "At the time of [Juan's] sentencing proceeding in December 2004, there was extensive and readily available social science research supporting the notion that such conditions lead to poor rehabilitative outcomes. Evidence of the harms caused to incarcerated youth by dangerous conditions and ineffective programming would have been readily accessible to [Juan's] trial counsel." (ECF No. 28-3 at 33, Ex. 82 ¶ 21.)

function in multiple areas . . . may be severely impaired in reality testing or in communications . . . Requires 24-hour supervision by multiple staff in limited access setting." (2 SH CR at 507.) Juan's demonstrated history of mental disability and long history of mental illness figured prominently in the treatment recommendations.

Given the lack of treatment provided to Juan, the TYC assessment essentially echoes what Dr. Woehr found two years earlier: "Youth has voiced intentions of harming self through self-infliction . . . overall youth believes no one cares (or should care), no one has his problems and no one understands." (2 SH CR at 510.)

The assessment noted how Juan's family system was plagued by chronic poverty, a chaotic home environment, and a lack of discipline, and that 16-year-old Juan suffered from social isolation and illiteracy. The report also indicated that Juana suffered from mental illness and disability. (2 SH CR at 517–18.) The report continued:

> Due to mother's inability to communicate with child, there is a limited relationship with family. Older sister is married but her relationship with client is also limited . . . Parent appears to be overwhelmed with the caretaking of the younger siblings that it appears this youth has grown up on his own and therefore mother's parenting techniques consist of yelling.

(2 SH CR at 517.)

On June 12, 2000, Juan entered the Marlin Orientation and Assessment Unit in Marlin, Texas. (Ex. S12 at 115.) Upon admission to Marlin, Juan completed both

the English and Spanish versions of the Woodcock-Munoz Language Survey. The results revealed that Juan's abilities fell well short of those predicted based on his average IQ scores. Despite being 16 years old, Juan demonstrated "the Very Limited Broad English ability of a 9-year old and the Very Limited English Reading-Writing ability of a 9-year old." (ECF No. 30-3 at 70, Ex. 83 ¶ 42.) "On the written portion of this measure, he had the proficiency of a second grade 7-year-old." (ECF No. 30-3 at 70, Ex. 83 ¶ 42.) His performance on the Spanish portion of the test was only negligibly better. (ECF No. 30-3 at 70–71, Ex. 83 ¶ 43.) This indicated to TYC staff that Juan desperately needed special education services and treatment for his brain-based learning disability - services Juan never received.

Juan was given a psychological screening at Marlin by Associate Clinical Psychologist, Kim Buck, MS, on July 12, 2000. Juan indicated to Ms. Buck that he felt that his mother had neglected him and that he wished he had never been born. (2 SH CR at 477.) He reported mood swings that cycled between feelings of sadness, anger, and confusion. He acknowledged sleep disturbances and unexplained periods when he felt sad, mad, and hopeless, where he would cry and become upset. He stated that he had felt this way since he was four years old. Juan discussed a history of suicide with Ms. Buck, reporting that he had played "Russian Roulette." (2 SH CR at 483.) Juan also admitted to intentional self-abuse and that he had experienced

"major trauma, through his gang activities that seem to have dramatically affected his life." (2 SH CR at 484.)

Juan's caseworker at Marlin, Gwenn Murry, described Juan's family background as "chaotic." (Ex. S13 at 1.) She described his coping skills and internal control as poor. Murry commented, "He has trouble trusting others, and may sabotage his own progress." (Ex. S13 at 1.) Murry noted that prior to coming to TYC, Juan was living with gang friends for four or five months, and that he hated his family. (Ex. S13 at 1.) Murry noted that, according to his probation officer, Juan's mother's parenting was "inconsistent", and she was unable to communicate with her son. (Ex. S13 at 1.) Murry noted that at age 16, "gang loyalty and gang violence dominated his life . . . Most of his friends have been arrested and use drugs . . . Juan now states that he has no close friends." (Ex. S13 at 1–2.) Murry noted that despite Juan's issues, he was respectful, polite, and cooperative, and had no referrals to security during his time at Marlin. (Ex. S13 at 1.)

After completing intake and evaluation at the Marlin Unit in August 2000, Juan was sent to the Evins Regional Juvenile Center in Edinburg, Texas, for approximately nine months.[9] (38 RR at 75.) Notably, "[w]ithin just a few years of [Juan's] release, the U.S. Department of Justice launched a probe of dangerous

---

[9]     Juan later spent an additional five months at Evins in 2001.

conditions and brutality in the Evins facility." (ECF No. 28-3, Ex. 82 ¶ 24.) Among the issues highlighted were a pattern of "unacceptably high rates of youth violence" and a documented rate of assaults at five times the national average. The DOJ found "an unacceptably high degree of physical abuse of youth by staff at Evins," and described Evins as having a "climate of violence." (ECF No. 28-3 at 34, Ex. 82 ¶ 24.) The DOJ further found that Evins did not provide youths with adequate programming or incentives to promote positive behavior." (ECF No. 28-3 at 38, Ex. 82 ¶ 34.) This was something Juan so desperately needed, especially because it was lacking at home.

Juan's case manager at Evins, Angel Hernandez, who could have later testified at Juan's capital sentencing but was never contacted, recalls some of the horrific conditions later substantiated by the DOJ investigation:

> In general, TYC, especially Evins, was pretty horrific during Juan's time there. Evins was miserable—a really rough place. The majority of youth were at Evins for gang-related crimes or assault. It was hard for youth to focus on the program, because of all the physical fights, conflicts, and distractions. The fights were so severe and bloody that I would come to work and find blood stains throughout the facility. *Sometimes the stains were so bad that the concrete floors needed to be re-grinded to get rid of the blood marks* . . . The riots that occurred were horrible and destructive, and usually involved gang-warfare.

(ECF No. 28-1 at 97, 99, Ex. 59 ¶¶ 27, 37.) (emphasis added.)

In 1997, not long before Juan's arrival, Evins' bed-size expanded by over 200 percent. Because of this "[s]taff became overwhelmed, and people quit left and right." (ECF No. 28-1 at 97, Ex. 59 ¶ 28.) Not only was turnover high, but staff were poorly trained; therefore, the facility was ill-equipped to treat youth like Juan with disabilities, serious substance abuse issues, and mental illness. TYC "was repeatedly denied additional training resources by the Texas Legislature, resulting in a situation where staff were little more than poorly trained guards who were warehousing these youth." (ECF No. 28-3 at 36, Ex. 82 ¶ 29.)

Hernandez explained, "Kids were heavily medicated and the infirmary lines were very long. A few times, kids even threw their own feces to get attention. The mix of problems made Evins a hostile environment at times." (ECF No. 28-1 at 98, Ex. 59 ¶ 32.) Hernandez further described the environment as being filled with "noise 24/7—doors and lockers slamming, kids arguing, staff yelling. The noise drove everyone nuts . . . One hour felt like three hours, and one month felt like three months. The youth felt it, and the staff felt it too. *It was as if nobody was ever going to go home*." (ECF No. 28-1 at 98, Ex. 59 ¶¶ 33–34.) (emphasis added.) Hernandez described an environment in which "kids were afraid to go to sleep at night . . . The dryer was the only thing that hummed the kids to sleep at night . . . When the dryer

was broken, I knew it was going to be a rough night." (ECF No. 28-1 at 99, Ex. 59 ¶ 36.)

Hernandez's disturbing memories of his time at Evins provide even more support for the fact that Juan was further hurt, rather than helped, by his time under the custody of the Texas Youth Commission. As explained by Deitch: "In every sense, this was an anti-therapeutic, toxic, and traumatic environment. Youth in these TYC facilities were struggling to stay alive and unharmed; they had few if any healthy relationships in the facility, let alone the emotional ability to engage in the challenging psychological task of behavioral change." (ECF No. 28-3 at 35, Ex. 82 ¶ 27.)

Even through these horrendous conditions, Hernandez still remembered Juan and recalled that "Juan was one of the few who really stuck out to me, because he was one of those kids who had an innocence there. He was sincere. He was crying out for a change." (ECF No. 28-1 at 94, Ex. 59 ¶ 3.) For Juan, this desire to be better and do better was never fostered by his family or the authorities in charge of his care.

Hernandez also recalls that Juan "came from a very bad neighborhood, both in terms of the people he was exposed to and the availability of drugs." (ECF No. 28-1 at 94, Ex. 59 ¶ 7.) Hernandez explained:

> From a very young age, Juan started hanging out with older people, because he was trying to make up for what he was missing at home. His father had abandoned his family, and he had no father figure. He was always on the lookout for a role model, and he respected good authority. Juan was vulnerable to older guys who took him in, gave him alcohol, introduced him to drugs, and made him feel like he belonged.

(ECF No. 28-1 at 95, Ex. 59 ¶ 9.)

During group therapy, Hernandez noticed that Juan seemed "fogged up" and struggled to process things and to communicate. Hernandez wondered if his impairments were caused by drugs, a head injury,[10] or something else. Because it took Juan so much longer to think and process what he wanted to say, Hernandez suspected that Juan had neurocognitive problems. Hernandez stated: "Cognitively, he had some kind of delay. He often looked up to the ceiling and paused before he was able to verbalize anything... Juan also had memory issues... He had difficulty expressing his feelings." (ECF No. 28-1 at 95, Ex. 59 ¶ 12.) Hernandez's instincts were absolutely correct. Juan did suffer from significant neurodevelopmental and neurocognitive disabilities, expressed in part by learning disabilities that were never treated.

---

[10]    At age 15, Juan sustained a head injury during a gang fight, when he was hit on the back on the head and "blacked out" for about 10 minutes. (ECF No. 33-35, Ex. S11 at 88.) Also, as an adolescent, Juan ran his mother's car into a pole, knocking him unconscious for about five minutes. On another occasion, Juan and a friend were driving and attempted to beat a train at a railroad crossing, flipping the car over. Juan was struck on the head, and he again lost consciousness for about five minutes. He never received any medical attention for these injuries. (2 SH CR at 533–34.)

While at Evins, Juan was treated by psychiatrist Esteban Gonzalez, M.D., who found that Juan's "depression appear[ed] to be chronic . . ." (ECF Nos. 33-35, Ex. S11 at 144.) Dr. Gonzalez prescribed Juan the antidepressant Wellbutrin. (ECF Nos. 33-35, Ex. S11 at 144.) Juan's records from Evins and previously from Desert Hills show that the symptoms of his mental illness were helped by medication and counseling. (ECF No. 30-3 at 74, Ex. 83 ¶ 52.) Juan was reported to be "sincere and gentle" in his dorm and did not cause any problems. Juan "wanted to change and to go home, because he felt like he needed to help his mother with his younger siblings and be a father figure to them. Juan tried hard to do the TYC program—he tried to get his work done, and he didn't hold back." (ECF No. 28-1 at 95, Ex. 59 ¶ 15.) In February 2001, Juan earned his GED. (38 RR at 84; Ex. S12 at 819.)

On February 21, 2001, Dr. Gonzalez determined that Juan's depression was in remission and discontinued Juan's medication. (Ex. S12 at 883.) However, the American Academy of Child and Adolescent Psychiatry warns, "Youth generally should not be abruptly discontinued from taking psychotropic medications that they have been on for any extended period of time: their brains have become used to the medicine and may react adversely with sudden changes in blood level." *A Guide for Community Child Serving Agencies on Psychotropic Medications for Children and Adolescents*, *in* American Academy of Child and Adolescent Psychiatry, 7 (February

2012),

https://www.aacap.org/App_Themes/AACAP/docs/press/guide_for_community_c

hild_serving_agencies_on_psychotropic_medications_for_children_and_adolescen

ts_2012.pdf (last visited December 7, 2020). Stopping an antidepressant too

suddenly may also result in the return of depression symptoms or cause other serious

side effects. *See* Richard C. Shelton, M.D., *Steps Following Attainment of*

*Remission: Discontinuation of Antidepressant Therapy*, Primary

Care Companion J Clin Psychiatry 168–74 (2001;3(4).)

On April 5, 2001, at age seventeen, after completing the program at Evins,

Juan was moved to Beto House, a TYC halfway house, where he worked in the

community for a brief period. (38 RR at 84; Ex. S12 at 143.) On June 7, 2001, Juan

completed the program at Beto House and was considered for placement at his

family's home. Prior to this, Juan's probation officer, Ricardo Leal, conducted a

home visit and reluctantly approved the home but documented that he was concerned

about the neighborhood's gang violence. He thought that Juan would do much better

in an independent living program. During this visit, Leal referred Juan's mother to

support services, which she declined. (38 RR at 103–08.)

Shortly before Juan was set to be released from Beto House, he was sent back

to Evins due to "horseplay." (Ex. S12 at 714.) On December 20, 2001, Juan again

completed the program at Evins. Despite Leal's expressed concerns about the risks of home placement, Juan was returned to his mother's home. This was not because home placement was appropriate; rather, he was sent home only because the system allegedly had no space for him in an appropriate out-of-home facility. (38 RR at 87–88.) After his release, Juan was not offered any mental health therapy or any of the support structures recommended by earlier therapists and caseworkers.

Seven months later, Juan was returned to TYC custody after he was arrested for multiple charges, including drug possession, in Alamo and South Padre Island. (Ex. S12 at 714.) Juan could not be placed at home because Leal found that there was "no home address to evaluate." (Ex. S12 at 416.) Juan's mother had apparently moved and did not notify TYC or give Juan the new address. With no home to return to, Juan was placed at the Coke County Juvenile Justice Center on June 28, 2002. (Ex. S12 at 714.)

The Coke County facility, like the Evins facility, had "longstanding, well-documented, and highly publicized problems involving the maltreatment of youth." (ECF No. 28-3 at 32, Ex. 82 ¶ 17.) By 2007, TYC's newly appointed ombudsman had investigated the conditions at the Coke County facility and had concluded that they were beyond the pale:

> The most basic medical and other needs of youth were ignored, education in the security unit consisted of crossword or math puzzles, and the facility was dominated by a sense of fear and intimidation. Parts of the facility were "malodorous and dark," with feces-smeared cells and insect-infested dorms; youth slept on mats on the floor. "The kids had a stench because they weren't allowed to bathe[.]" . . . Further, youth were kept in solitary confinement in violation of Texas law and TYC policy.

The facility was quickly shut down. (ECF No. 28-3 at 80, Ex. 82 at Ex. A(¶ 82).)

On November 22, 2002, Juan completed the program at Coke County and was released back to his mother's home (which had since been located) and he was placed on parole. (38 RR at 96–97.) As it had always been in Juan's life, at age eighteen, he still had no healthy social or family supports. He had no therapy for his serious mental illness or his neurodevelopmental disorder. And he had no therapeutic resources to encourage his success once he was returned to the community. A supervisor from Beto House declared:

> Once kids were released . . . they were completely out of luck. There was no follow-up treatment . . . Counseling and support services were not available. Once a youth was released, they were on their own. They went back to the same family environment without community support to stop them from falling back in trouble.

(ECF No. 28-1 at 43, Ex. 51 ¶ 14.) This supervisor recalled that sometimes, if a youth had nowhere to go, they were simply dropped off at the local Salvation Army. (ECF No. 28-1 at 43, Ex. 51 ¶ 15.)

On December 31, 2002, Juan called Leal and stated that he no longer wanted to report to parole. He stated that he was frustrated with his family and overwhelmed by the multiple requirements of his parole. (Ex. S12 at 561.) As is the case for many youth like Juan, it was too difficult for him to keep up with his supervision while attempting to survive in the same environment that did nothing but encourage his failures. Only weeks after this desperate encounter with his juvenile parole officer, Juan was arrested for the instant offense. (Ex. S12 at 712.)

## IV. Procedural History

### A. Investigation and Arrest

On January 5, 2003, the police were called to 2915 Monte Cristo Road in Edinburg, Texas. (31 RR at 9–11.) They searched both houses located on the property and discovered six deceased victims with gunshot wounds. (31 RR at 11–14.) Officers spoke with the owner of the property, Rosie Guiterrez, who told police that she had been tied up by the assailants in the west-side house, but managed to free herself after they left. (31 RR at 13, 66–69.) Luis Villa was interviewed shortly thereafter and he told police that he had jumped out of a window in the east-side house and escaped before the shooting started. (28 RR at 27–28, 38–39; 29 RR at 97–99.) Police followed up on leads from Villa and others, none of which proved helpful. (28 RR at 30–31; 29 RR at 82–83.)

On January 13, 2003, police questioned Guadalupe Bocanegra after receiving information that he had knowledge about the homicides. (28 RR at 42–43, 46.) Three days later, investigators arrested his brother Marcial Bocanegra. (28 RR at 46–49; 29 RR 90-91.) After interrogating Marcial Bocanegra, police arrested and interrogated Humberto Garza, Juan Cordova, Rudolfo Medrano, and Robert Garza, leading officers to believe that a total of eleven people were involved in the offense. (28 RR at 47, 49, 50–54; 29 RR at 89, 129-130, 153–54.)

Police arrested Jorge Martinez and Robert Cantu, and on January 26, 2003, warrants were issued for Salvador Solis, Reymundo Sauceda, Jeffrey Juarez, Juan Miguel Nunez, and Ramirez. (28 RR at 55–56; 29 at RR 93.) Police arrested Solis, Sauceda, and Juarez, but never found Nunez or another suspect thought to be named Ricardo. (29 RR at 89–90, 94–95.)

On January 29, 2003, at 2:45 p.m., a police tactical team found Ramirez asleep in his aunt's trailer in Hargill where he was arrested without incident. (28 RR at 57–58; 29 RR at 94.) In the hours leading up to his arrest, Ramirez had taken approximately 15 pills of the benzodiazepine Rohypnol. (7 RR at 33, 73.) An additional five pills were in his wallet on his nightstand. (7 RR at 33, 73.) Police handcuffed Ramirez while he was still lying in bed and walked him barefoot to the police cruiser. (6 RR at 105, 176.)

Ramirez passed out in the patrol car on the way to the police station. (7 RR at 32.) When they arrived, officers walked Ramirez back to a holding cell where he fell back asleep. (7 RR at 32.) Sometime later, Detective Ramiro Ruiz came back to the holding cell, waking up Ramirez by making comments about the offense and laughing to himself. (7 RR at 34.) Ruiz asked Ramirez why he was so sleepy and Ramirez told him that it was because he was "Roched up."[11] (7 RR at 57.) Ruiz then took Ramirez to be booked. (7 RR at 35–36.)

One of the booking officers, Robert Mendiola, fingerprinted Ramirez and took pictures of his tattoos. (7 RR at 36.) When Mendiola questioned Ramirez about his gang affiliation, Ramirez reportedly indicated that he was connected to the "Bombita gang."[12] (35 RR at 170.) At no time during his booking did anyone advise Ramirez of his rights despite multiple officers making comments and asking him questions relevant to the alleged offense. Ramiro Ruiz continued telling Ramirez that they needed to talk. (7 RR at 39.) When Ramirez said he did not want to talk, Ruiz took him back to the holding cell where he once again went back to sleep. (7 RR at 39–

---

[11] "Roche pills" are a slang term for the benzodiazepines Rohypnol and Valium, which are tablets commonly manufactured by Hoffmann-La Roche and imprinted with "Roche." See http://www.cesar.umd.edu/cesar/drugs/rohypnol.asp

[12] The Bombita gang is also known as the Tri-City Bombers or the "TCBs." (36 RR at 5.)

40.)

Ruiz eventually came back and told Ramirez that he was being taken for questioning. (7 RR at 40.) Ruiz took Ramirez back to the booking area where he told officers he wanted to telephone a lawyer. (7 RR at 41.) Ruiz joked that Ramirez watched too much television. (7 RR at 41.) Ramirez stated that he wanted to telephone Charles Banker, an attorney who had previously represented him. (7 RR at 41.) He asked Ruiz for a phone book so that he could look up Banker's telephone number, but Ruiz claimed that the police department did not have one. (7 RR at 42.)

Another one of the booking officers, Rick Garcia, let Ramirez telephone his friend, Jerry Garcia. (7 RR at 43.) Ramirez told Jerry Garcia that he had been arrested and asked him to go to his mother's house to tell her that he was being held at the Edinburg Police Department and to contact Charles Banker. (7 RR at 43.)

After Ramirez got off the phone, Ruiz and another detective, Edgar Ruiz, took Ramirez into an office and began interrogating him. (7 RR at 44–45.) The detectives told Ramirez that they knew everything that happened and claimed others had named him as the shooter. (7 RR at 46–47.) They questioned Ramirez for 30-40 minutes and played him a portion of Robert Garza's statement. (7 RR at 48–49.) Afterwards, the detectives told Ramirez: "Why don't you just go ahead and save yourself. You are the only stupid one getting sent to death row because everybody is pointing the

finger at you." (7 RR at 50.)

At first, Ramirez denied any involvement, but after being repeatedly denied contact with a lawyer, Ramirez told officers that he was present at the Monte Cristo property on the night of the offense. (7 RR at 50-51.) Only then did officers read Ramirez his rights. (7 RR at 51.) Having already implicated himself, Ramirez signed the rights waiver form and initialed it where the officers instructed. (7 RR at 52–53, 56.) The officers then filled in 3:29 pm as the time they finished reading Ramirez the form. (7 RR at 53.) After signing the form, Ramirez gave the recorded statement discussed below which ultimately became the primary evidence used against him at trial. (7 RR at 56.)

Ramiro Ruiz began Ramirez's recorded statement by stating, "In reference to the night in question, do you want to go ahead and start and tell us from when you received the phone call and who you received the phone call from." (6 RR at 29; 29 RR 118–19.)

Ramirez told the detectives that around 7:00 or 8:00 in the evening, he received a phone call from Robert Garza asking if he wanted to make some money by stealing 1,000 pounds of marijuana. (6 RR at 31.) When Garza and Ramirez arrived at their friend Juan Cordova's house, other individuals were already there, some of whom Ramirez did not know. (6 RR at 31.) Ramirez reported that everyone

was wearing black for the most part and that some were wearing ski masks. (6 RR at 39.) The group took two vehicles to the property on Monte Cristo Road and then approached the two houses from the back. (6 RR at 39.) When someone came outside, they rushed both of the houses. (6 RR at 39.)

Ramirez, Solis, and a third individual whose name Ramirez did not know found Rosie Gutierrez and Jerry Hidalgo in the house on the west side of the property. (6 RR at 31.) Ramirez said they held Hidalgo at gunpoint and he told someone to tie up Gutierrez. (6 RR at 32.) He checked to see if anyone else was in the house and looked for drugs and weapons. (6 RR at 32.) Not finding anything, he tied up Hidalgo with an extension cord and demanded drugs. (6 RR at 32.) When Hidalgo did not cooperate, he hit him with a frying pan. (6 RR at 32.) After hearing gunshots coming from the other house, they went outside to see what was happening. (6 RR at 32.) They saw the others running out of the house on the east side of the property, shouting "Let's go. Let's go." (6 RR at 32–33.) Ramirez, Solis, and the third individual started running from the property, hearing more gunshots as they ran. (6 RR at 33.)

When asked who provided the guns, Ramirez explained that everything was set up when he arrived at Cordova's residence. (6 RR at 33.) He did not know who was in charge but guessed it was the owner of the Escalade they used as

transportation. (6 RR at 34–35.) Ramirez explained that he did not know everyone involved, telling the officers, "like I said earlier, I wasn't in all my five senses, so I – I wasn't really concerned about who was there." (6 RR at 35–36.) He denied seeing anyone shooting, stating, "Nobody in the house that I was with shot no one." (6 RR at 36.) Ramirez told the officers that afterwards they went back to Cordova's house where Robert Garza told the others, "I shot the mother fuckers," and they argued about the fact that no drugs were found. (6 RR at 37, 43.) Ramirez admitted that he took a gold chain from Jerry Hidalgo, which he later threw away. (6 RR at 40–41.) He did not know what happened to the weapons but told detectives that he burned his gloves at the Donna Lakes the next day. (6 RR at 38.)

Ramiro Ruiz asked Ramirez if he was part of a gang. (6 RR at 41–42.) Ramirez admitted that he used to hang around the "TCB" gang, but stated that he was not a member and did not consider himself to be an "associate." (6 RR at 41–42.)

**B.   Pretrial Proceedings**

On January 31, 2003, Judge Aida Salinas Flores appointed attorney Alma Garza to represent Ramirez on capital murder charges. (1 CR at 002.) Alma Garza had worked at the Hidalgo County District Attorney's Office before going into

private practice, but this was her first death penalty trial.[13] (Ex. 100 at 78–82.)

On April 3, 2003, a grand jury indicted Ramirez on one count of capital murder for causing the deaths of the six homicide victims in the same criminal transaction. The case was assigned to Judge Rodolfo "Rudy" Delgado under case number CR-0956-03-B.[14] (1 CR at 003.)

In the five months that followed, little was accomplished. Due to the number of co-defendants and the nature of the cases, the trial court had considerable difficulty finding attorneys and investigators to appoint. (Ex. 100 at 85.) On September 3, 2003, Judge Delgado appointed Juan Castillo as the investigator for Ramirez's defense. (1 CR 218.) Castillo had never been involved in a death penalty

---

[13] Alma Garza later testified that in 2014 she was on the list of approved attorneys to be appointed as lead counsel in a death penalty case and that she was on that list until approximately 2012. (Ex. 100 at 82.) Her claim that she was on the list in 2003 is uncorroborated. However, her name was not on the appointment list in 2005. (Ex. 92 at 3.)

[14] On September 25, 2019, U.S. District Judge Alfred Bennett sentenced Judge Delgado to 60 months in prison after a jury convicted him of multiple counts of conspiracy, bribery, and obstructing justice. Judge Delgado had been conspiring since at least 2008 to accept bribes in exchange for favorable rulings in his court. A press release issued by the United States Attorney's Office for the Southern District of Texas stated: "In handing down the sentence, the court noted that a corrupt judge, who abuses the trust the public placed in him to enrich himself, undermines the integrity of the entire criminal justice system and tears at the very fabric of our society." See https://www.justice.gov/usao-sdtx/pr/judge-delgado-heads-prison

case before. (Ex. 100 at 140.) Judge Delgado also appointed Rolando Garza[15] as Alma Garza's co-counsel. Rolando Garza had worked for two years in the appellate section of the Hidalgo County District Attorney's Office. (Ex. 100 at 19.) After that, he went into private practice, where he tried two or three cases to verdict. (Ex. 100 at 19.) He had never represented anyone charged with capital murder and he was not on the list of attorneys qualified to be appointed to represent capital defendants. (Ex. 100 at 20.) (See also 2003 Tex. Code Crim. Proc. art. 26.052.)

Despite his lack of experience, Alma Garza specifically requested Rolando Garza be appointed because she planned to use her co-counsel primarily to conduct legal research at her behest. (Ex. 100 at 68, 84.) She believed Rolando Garza's appellate experience made him an attractive candidate in this regard. (Ex. 100 at 68, 84.) However, Rolando Garza was not qualified by training or experience to represent a defendant in a capital case.

On November 13, 2003, Ramirez requested that Judge Delgado remove Alma Garza and Rolando Garza and appoint new counsel due to "communication" issues. (ECF No. 24-2 at 35, Ex. 4 at 5.) Ramirez explained that he did not trust Alma Garza's advice. (ECF No. 24-2 at 36, Ex. 4 at 6.) The court ultimately denied

---

[15]     Undersigned counsel is not aware of any relation between Alma Garza and Rolando Garza.

Ramirez's request and both attorneys remained on Ramirez's case through the penalty phase.

On March 5, 2004, a grand jury re-indicted Ramirez, adding a second count of capital murder which alleged that the homicides occurred during a robbery while Ramirez was a member of a criminal street gang. (1 CR at 004.) The matter was also assigned to Judge Delgado and given case number CR-0551-04-G. (1 CR at 004.)

In March 2004, John Niland at the Texas Capital Assistance Project reached out to Alma Garza offering information and resources to assist her in representing Ramirez. Niland provided Garza with the name of Norma Solis, an experienced mitigation specialist in South Texas. However, at a pretrial conference on April 15, 2004, Alma Garza told Judge Delgado that she was still trying to locate a mitigation specialist. (ECF No. 24-2 at 34, Ex. 4 at 4.)

On May 24, 2004, more than a full year after her appointment and less than five months before the start of trial, Alma Garza finally moved the court for funding for a mitigation specialist. (1 CR at 243–52.) Her motion directed the court to § 11.4.1(A) of the *American Bar Association's Guidelines in Death Penalty Representation*, which states: "Counsel should conduct independent investigations relating to the guilt/innocence phase and the penalty phase of a capital trial. Both investigations should begin *immediately* upon counsel's entry into the case and

should be pursued *expeditiously*." (emphasis added). (1 CR at 243–52.) Citing *Williams v. Taylor*, 529 U.S. 362 (2000), Garza's motion conceded that she would be ineffective for failing to adequately investigate and present mitigating evidence, noting that strategic choices concerning what evidence to present must be informed by a complete investigation. *Strickland v. Washington*, 466 U.S. 668 (1984); *Wiggins v. Smith*, 539 U.S. 510 (2003). (1 CR at 243–52.) Despite her reference to the ABA Guideline and its entreaty that counsel begin the penalty phase investigation "immediately," Garza's motion did not address why she had waited more than a year after her appointment to request the assistance of a mitigation specialist.

The motion did, however, provide a list of everything Alma Garza believed still needed to be done in order for her to provide Ramirez with a constitutionally effective defense: (a) investigate Ramirez's background, assess and evaluate the dynamics of his family; (b) obtain necessary releases for securing confidential records relating to any of the relevant histories; (c) identify, obtain, and evaluate all records that will establish and describe Ramirez's contact with public and private institutions prior to the time of trial; (d) locating, documenting, and obtaining any evidence that would bear on the personal moral culpability of the defendant or would reduce his moral blameworthiness in the eyes of a jury; and (e) preparation of mitigation evidence that will be presented to the jury at trial so that jurors will have

the information needed to determine if a life verdict should be returned. (1 CR at 243–52.)

Garza represented to the court that the mitigation specialist would collect evidence and records related to (1) Ramirez's mental and physical health, including alcohol and drug use and any developmental delays; (2) his educational history, including his performance and behavior, special education needs, cognitive limitations, and learning disabilities; (3) his employment skills and job performance; and (4) his family and social history, including juvenile and correctional records. (1 CR at 243–52.) As explained below, despite obvious red flags that these investigatory topics required investigation, they were honored in the breach, and consequently Ramirez's jury never learned of his serious developmental disability or his tragic life history; it only learned the State's perspective.

Alma Garza specifically requested that the court appoint Gilda Bowen as the mitigation specialist and represented to the court that Bowen was available and qualified to undertake Ramirez's mitigation investigation. (1 CR at 243–52.) The trial court granted the request to fund Bowen on June 1, 2004. (1 CR at 231.) Alma Garza, however, did not inform Bowen of her appointment until over a month later on July 5, 2004. (Ex. 100 at 160.)

This was Bowen's first death penalty case and her first time investigating

mitigation. (Ex. 100 at 154–56.) Bowen worked in a battered women's shelter and did contract work for the family courts after earning her master's degree in 2000. (Ex. 100 at 151–52.) She first learned about mitigation at a social work conference where she completed a single course and received a certificate. (Ex. 100 at 154.) Alma Garza knew Bowen from around the courthouse and had heard that Bowen had received the certificate. (Ex. 100 at 156–57.) Garza lobbied for Bowen's appointment before even contacting Bowen to make sure she had the time, necessary resources, and capability to take on a capital mitigation investigation. (Ex. 100 at 156–57.)

Once Bowen was informed of her appointment, she spent the rest of July consulting with other mitigation specialists and preparing releases for Ramirez to sign. (4 SH RR Ex. 34.) In August 2004, Bowen met Ramirez for the first time. (Ex. 100 at 161.) It was not until October that Bowen began reviewing Ramirez's records, starting with his records from the Texas Youth Commission ("TYC"). (4 SH RR Ex. 34.) The TYC records in the defense team's file are copies of those subpoenaed by the State and turned over in discovery. (4 RR at 16.) Because TYC produced the records in response to a subpoena from the State rather than a release signed by Ramirez, TYC redacted information relating to Ramirez's childhood alcohol and drug abuse. See 42 C.F.R. § 2.1. The defense team never bothered to obtain the

unredacted records. (1 CR 265; Ex. 11.)

In mid-October 2004, just days before jury selection, Alma Garza contacted child development expert, Kate Allen, Ph.D., about testifying at the penalty phase of Ramirez's trial. (4 SH RR Ex. 9 ¶ 1.) Dr. Allen initially expressed concern that working on Ramirez's case would conflict with another capital murder trial in which she was scheduled to testify in Nebraska in mid-December, for which she had been preparing for months. (4 SH RR Ex. 9 ¶ 1-2.) After Garza assured Dr. Allen that she would receive Ramirez's records quickly and be given sufficient time to prepare—a promise she never kept—Dr. Allen agreed to testify. (4 SH RR Ex. 9 ¶ 1.)

At the end of September, Ramirez's cases were reassigned to Judge Noe Gonzalez. On Tuesday, October 12, 2004, nine days prior to jury selection, Judge Gonzalez held a pretrial hearing. (3 RR *passim*.) At the hearing, the State announced that it would proceed to trial on the second indictment against Ramirez and dismissed the first indictment. (3 RR at 1.) Judge Gonzalez asked counsel whether there were any other pretrial issues that needed to be addressed. Alma Garza told Judge Gonzalez that she had just been served the previous Friday with a Notice from the State seeking to authenticate Ramirez's 832-page juvenile correctional record under the business records exception. (3 RR at 19.) Garza lamented that once she received the records from the State, she would have to go through the records page-

by-page to determine whether any of the documents were *objectionable*. (3 RR at 19.) Garza did not seem to understand that these nearly 1,000 pages of life history records would necessarily contain or have clues to areas of mitigation that needed to further investigation.[16] Despite her complaints, Garza never asked Judge Gonzalez for additional time to review the records. She also failed to explain why she had not already obtained the records herself: in her motion requesting funding for a mitigation specialist, she represented that in order to be constitutionally effective, she needed a mitigation specialist to "obtain and evaluate all those records that will establish and describe Ramirez's contact with public… institutions prior to the time of the trial." See (1 CR at 243–52.)

In response to Alma Garza's complaints about having to review Ramirez's records page-by-page to determine their admissibility, Judge Gonzalez explained that it would be premature to object to the admissibility of any specific record until it is offered as evidence. (3 RR at 20.) Judge Gonzalez tried to explain that, at this point, the defense could challenge only the authenticity of the affidavit which declared that the records were kept in the ordinary course of business. (3 RR at 21.) Regrettably, had Garza bothered to obtain and review these necessarily relevant

---

[16]     As explained below, the records did contain abundant evidence that as a child Ramirez suffered from a developmental learning disability, mental illness, and brain damage.

documents, *she* would have been seeking admission of the records.

In any event, the State corrected Alma Garza's implication that the records themselves were only recently made available to her:

> Judge, just so that it is clear. Defense counsel asked us to take those juvenile records to Staples and make copies and we tendered them copies, not Friday, but those copies were available, at least a week ago, maybe more than that, Your Honor. They have their personal copy of those files.

(3 RR at 21.)

Near the end of the hearing, Alma Garza brought up a potential video taken by police during Ramirez's arrest and requested that the State produce any such video. (3 RR at 30.) The State indicated that this was the first time they had heard of the possibility of such a video and had no reason to believe that one existed. (3 RR at 31.)

Six days later, on October 18, 2004, the court held another pretrial hearing to discuss juror questionnaires and to follow up on the State's efforts to locate video of Ramirez's arrest. (4 RR at 23–24.) The prosecutor told the court that he had spoken with the officers present during the arrest and they confirmed that no video existed. (4 RR at 23–24.) Officers purportedly told prosecutors that they had a video camera in case they were in a good vantage point but that no video had actually been recorded. (4 RR at 23–24.)

Alma Garza once again raised the issue of the TYC records and the State's delay in providing her with her own personal copy. (4 RR at 10–11.) Garza stated: "Judge, I need to get the records as soon as possible because I need to go through all of them. We are talking about 832 pages. That's not going to take, you know, a couple of hours to go through." (4 RR at 13–14.) The Court responded: "I understand that, Ms. Garza. But you make it sound like this case has been pending for two months. This case has been pending for almost two years." (4 RR at 13–14.)

The State was forced once again to correct Alma Garza's implication that Ramirez's TYC records had only just been made available to the defense:

> Judge, if I may, as far as the juvenile records, she was aware of them months ago. In fact, she sent Gilda Bowen by my office to ask about those records because Gilda Bowen was going to be some kind of expert or whatever. I said, I have them at my desk. They are available for Alma to look at them. She had known for months. For her to sit complaining that she wasn't aware of them, I know this because Gilda Bowen approached me, and this was well over a month ago that she knows that I have the juvenile records. Why else would Gilda Bowen ask me for them?

(4 RR at 15.) Judge Gonzalez then admonished Garza for waiting until the last minute to obtain and review Ramirez's records:

> There is another thing, these are juvenile records of not just anybody else but your client. You had the same ability to subpoena the records. They are his records. He can go see his records. And the point that I am making is going back to this, Alma: You are saying that you did not, or you do not have access to certain documents. If you have access to the juvenile records and you haven't even looked at or you haven't had a

chance to review that particular report that that psychologist has, well, then you need to do that.

(4 RR at 16.)[17]

The court shifted its focus to counsel's preparation for the upcoming suppression hearing which was four days away. Alma Garza and Rolando Garza had decided amongst themselves that Rolando Garza would primarily be in charge of Ramirez's efforts to suppress his statements to police as well as physical evidence that was seized during his arrest. (Ex. 100 at 38–48, 67–68, 86–87, 98–100.) Rolando Garza stated: "Judge, there is a lot of work to be done. The reports were basically, we have been catching up with those. But there is so much information. And then with so many co-defendants and so many victims, it is voluminous." (4 RR at 39.) Alma Garza added: "And then us having to wait, depending what the State is going to present as witnesses, then we have to decide who we are going to present as witnesses." (4 RR at 39–40.) Judge Gonzalez was not impressed by counsel's apparent lack of preparation:

> You can paint the most complicated case you want, the reality, this case has been pending for a long time. And you don't investigate independently, and in the same breath, rely on everything that the State gives you. You have been on this case for over a year and a half, and you are making it sound as though, I mean, I know for a fact that the

---

[17] Garza had not only failed to timely obtain and review Ramirez's TYC records – she also failed to secure his readily available Mid-Valley pediatric records, his Tropical Texas Behavioral Health Records, his Donna Police Department records, and the records of his immediate family members.

statement, you got a long time ago.

(4 RR at 40.)

Defense counsel then told the court that they needed a continuance on the basis that two "necessary" witnesses were living out of state and would not be available until early November. (4 RR at 38, 47.) Jerry Garcia was to testify at the suppression hearing that Ramirez called him when he was arrested and asked him to contact his mother when the police would not give him a phone book to look up his attorney's telephone number. (4 RR at 38.) The second witness, Ramirez's sister, Berta, was to verify Ramirez's phone call to Garcia. (4 RR at 45–46.)

Judge Gonzalez expressed frustration with counsel's failure to have these witnesses ready because they had known about the suppression hearing date for a month. (4 RR at 43–44.) When Rolando Garza stated that the defense would not be prepared to start individual voir dire until after the suppression hearing, Judge Gonzalez lost his temper admonishing counsel: "That doesn't tell me shit. And you can write that down. It doesn't tell me anything. When can you have the Motion to Suppress? When can you be ready for it?" (4 RR at 47.) When Rolando Garza was unable to provide a specific date that the witnesses would be available, the court refused to continue the hearing. (4 RR at 47–49.) Judge Gonzalez told counsel that he would approve travel expenses for both witnesses – with the possibility that the

expenses would be deducted from trial counsel's reimbursement. (4 RR at 49.) The court ordered defense counsel to make sure the witnesses were present for the hearing:

> I am ordering you to bring those witnesses in and have them ready to go this Friday for the Motion to Suppress. You get them down here even if you have to drive over there and pick them up yourself. You had plenty of time, counsel, plenty of time to make these arrangements and you have waited for the last minute. There is no excuse. So get it done.

(4 RR at 50.)

Despite counsel's description of both Jerry Garcia and Berta Ramirez's testimony as "necessary" (4 RR at 46), and the judge's order that counsel ensure their presence, neither witness was called at the suppression hearing.

The suppression hearing was conducted over the course of two days prior to trial. (6-7 RR *passim*.) The primary dispute at the hearing was between Ramirez and Officer Edgar Ruiz, and their respective versions of what occurred prior to Ramirez's statement being recorded.

The State presented two witnesses, Edinburg Police Officers Edgar Ruiz and Daniel Ochoa. According to Ruiz, he read Ramirez his Miranda warnings prior to questioning him and then obtained a recorded statement thereafter. (6 RR at 13.) He testified that after he explained to Ramirez what information the police already collected from other co-defendants, Ramirez decided to cooperate. (6 RR at 19.)

Ruiz also claimed that Ramirez provided new information that the police did not have prior – that one of the victims was hit in the head with a frying pan. (6 RR at 77.) Rolando Garza argued to the court that police already had this information prior to Ramirez's statement and attempted to impeach Ruiz with Rosie Gutierrez's statement which was taken about three weeks prior to Ramirez's arrest. (6 RR at 78–82.) However, Gutierrez told police only that Jerry had been hit with *something* and that she was not sure what had been used. (6 RR at 81–83.) It was actually Marcial Bocanegra that provided this critical information which could have been used to impeach Ruiz. Bocanegra, who had provided a statement to police one week prior to Ramirez, told officers that one of the victims had been hit in the head with a frying pan. (4 SH RR Ex. 40 at 1–2.)

The State's other witness, Daniel Ochoa, testified that he participated in arresting Ramirez and seized a gun from a duffel bag in the room where Ramirez was arrested. (6 RR at 91–96.) Ochoa further testified that Detective Plata had a video camera during Ramirez's arrest but that no video was recorded because he was not at a good vantage point during the arrest. (6 RR at 102–03.)

The defense called Officers Ramiro Ruiz and Alberto Alvarez, Ramirez's mother Juana, and Marita Morales, a neighbor who witnessed Ramirez's arrest. (6 RR at 124–217; 7 RR at 1–26.) Ramiro Ruiz denied talking to either Edgar Ruiz or

Ramirez before starting Ramirez's recorded statement but acknowledged that he began by asking, "In reference to the night in question, do you want to go ahead and start and tell us from when you received the phone call and who you received the phone call from." (6 RR at 188–93.) At the suppression hearing, Ramiro Ruiz was not sure how he knew, prior to speaking with Ramirez, that Ramirez had received a phone call before the offense. (6 RR at 188–93.) However, he later insisted that he asked Ramirez to start at that point because he had previously received information that all the participants were summoned with a phone call: "At that point, I had already talked or – my investigation had already told me that this meeting between these people was done by phone calls." (29 RR at 119–21.)

The defense also called Ramirez who testified that he told the officers that he was under the influence of Rohypnol prior to giving his statement. (7 RR at 57.) Ramirez testified that he unambiguously informed the officers that he did not want to speak to them and that he wanted a lawyer. (7 RR at 39–40.) He confirmed that when officers brought him into Edgar Ruiz's office for questioning, they did not inform him of his rights prior to their interrogation. (7 RR at 45–46, 123.) Ramirez told Judge Gonzalez that he had not been read his rights until just prior to his statement being recorded, after he had already been interrogated for approximately 30-40 minutes. (7 RR at 48, 52.) Ramirez stated that he believed that the officers

would not relent until he gave them a statement. (7 RR at 57.)

Rolando Garza attempted to introduce evidence that the Edinburg Police Department had a pattern of using improper interrogation tactics when investigating this particular offense. (6 RR at 204–09.) Ramiro Ruiz conceded that he had also questioned Ramirez's co-defendant Robert Garza, but claimed that he could not remember whether Robert Garza had asked for an attorney during his interrogation. (6 RR at 204–09.) Rolando Garza requested to play the court a portion of Robert Garza's interrogation during which Ramiro Ruiz continued questioning Robert Garza after he asked for an attorney. (6 RR at 204–09.) Judge Gonzalez sustained the State's objection, holding that the defense could not show a pattern by presenting evidence that the police violated the rights of just one other co-defendant. (6 RR at 207.) Despite the court's suggestion that the defense present more evidence to establish a pattern, counsel did not present any additional evidence. (6 RR at 209.)

At the end of the hearing, Judge Gonzalez ruled that Ramirez's statements would be admissible but took under advisory whether he would exclude the gun that was recovered during his arrest. (7 RR at 203.)

### C.    Trial Proceedings

The jury panel was sworn in on October 20, 2004, and voir dire began five days later. (8 RR at 1.) 162 jurors were individually questioned to determine their

suitability to sit on Ramirez's jury. (8-24 RR *passim*.) After each juror was individually questioned, the judge allowed the State and then the defense the opportunity to challenge for cause. (8 RR at 86.) If neither side had a challenge for cause or that challenge was denied, the State was offered the first opportunity to use a peremptory challenge. (8 RR at 86.) If the State accepted the prospective juror, then the defense had the opportunity to use a peremptory challenge. (8 RR at 86.) If neither side exercised a peremptory challenge, the prospective juror would be seated on the jury. (*See, e.g.*, (10 RR at 119–20.)) The final seated jury consisted of eight male and four female jurors.

The number of peremptory strikes used by the State to remove female jurors exceeded what would be expected by random outcome. Although the prospective jurors were spilt nearly equally between male (83) and female (79), the State used eleven of its fifteen peremptory strikes to remove female jurors, or 73%. (8 RR at 89; 12 RR at 141–42; 13 RR at 222; 14 RR at 61, 133–34; 17 RR at 38; 18 RR at 128; 21 RR at 64; 22 RR at 67, 116; 24 RR at 28.)

On November 5, 2004, during a break in voir dire, the State notified the court that it had obtained a copy of a videotape that showed some of Ramirez's arrest. (17 RR at 133.) The prosecutor turned the tape over to the defense and stated that there were also photographs of a scene in Donna where burnt clothing was found. (17 RR

at 133.) After questions from the court regarding the content of the video, the prosecutor admitted that Ramirez's wallet which Ramirez claimed contained the last five Rohypnol pills can be seen on the videotape. (17 RR at 134.)

Judge Gonzalez told Alma Garza to review the videotape over the weekend and to let the court know if there were any issues, stating: "[I]f there is anything in the videotape that the State or the defense wishes the Court to consider for purposes of any reconsideration of the motion to – or additional evidence in support or against the Motion to Suppress, I will be glad to reopen evidence now that the videotape has been obtained." (17 RR at 136.)

Meanwhile, Bowen's timesheets reveal that she was still attempting to investigate well after the trial had started. At the time the jury panel was sworn in, on October 20, 2004, the mitigation investigation was in its primitive stages, as Bowen had not yet conducted a single witness interview. (4 SH CR Ex. 34 at 6.) In the end, the clock ran out, and from the universe of scores of family, friends, teachers, mental health professionals, and juvenile/institutional personnel, Bowen interviewed only three witnesses: Ramirez's mother, his father, and his then-girlfriend, Marisol Ibarra. (4 SH CR at 1554.) The first interview, of his mother Juana, did not take place until October 21, 2004. Ramirez's father and girlfriend were interviewed on November 4 and 17, respectively. (4 SH CR at 1561.)

Bowen's interviews uncovered conflicting accounts of Ramirez's childhood. (4 SH CR at 1533.) Juana told Bowen that Jose Raul was physically abusive to her and their children. (4 SH CR at 1533.) According to Juana, their marriage was intolerable due to this and Jose Raul's heavy alcohol use. (4 SH CR at 1533.) In contrast, Jose Raul denied the abuse and instead blamed Juana for the family turmoil due to her "lack of parental control and frequent absences from the home." (4 SH CR at 1535.) According to Jose Raul, Juana's church was a cult-like group for which she left the children alone for days or weeks at a time without supervision. (4 SH CR at 1536.) Despite these conflicting accounts, Bowen did not interview any of Ramirez's siblings to clarify the circumstances under which he grew up.

On October 25, 2004, Alma Garza filed her first expert witness disclosure. (1 CR 422.) It stated as follows: (1) Dr. Gary Whitworth, Psychologist (See juvenile records of Juan Ramirez); (2) Dwight Stewart, Gang Expert; (3) Larry Fitzgerald, TDCJ Classification Expert – Inmate daily life in Texas prison system. (1 CR 422.) Garza did not name Dr. Kate Allen as an expert witness. (1 CR 422.)

On November 9, 2004, Judge Gonzalez signed an ex parte order appointing Dr. Kate Allen as a childhood development expert. (ECF Nos. 32-35, Ex. S5.) The ex parte order submitted by the defense and signed by Judge Gonzalez referred to her as "Kate Ellen." (ECF Nos. 32-35, Ex. S5.)

Dr. Allen later testified that she hoped she could use the rest of November to begin preparing for Ramirez's trial, then turn her attention to her Nebraska case, before having to testify in Ramirez's trial. (4 SH CR at 1296.) Dr. Allen repeatedly called Alma Garza to obtain Ramirez's records to no avail. (4 SH CR at 1296–97 ¶ 2.)

The guilt/innocence phase began on the morning of November 29, 2004. Prior to opening statements, the State asked if the defense would be presenting expert testimony regarding future dangerousness or mitigation based on an expert's interview with Ramirez. (27 RR at 2.) The State requested that it have the same opportunity to have its experts interview Ramirez. (27 RR at 2.) Alma Garza agreed that the State "can do whatever our expert does." (27 RR at 3.)

Judge Gonzalez asked Alma Garza to explain the nature of Dr. Allen's testimony. (27 RR at 3–5.) Garza stated that Dr. Allen would not be addressing future dangerousness but struggled to identify exactly what Dr. Allen would be discussing. (27 RR at 3–5.) This is not surprising, since, as explained below, Dr. Allen had yet to receive a single record and had not yet developed a single opinion. The judge asked whether Dr. Allen would simply "regurgitate" what Ramirez told her about his upbringing. (27 RR at 4–5.) Garza responded:

No, judge, not necessarily, because they filed an affidavit of his records. And she is going to be revealing that because – one of her experts is testifying that they have got on there – they have a psychological – actually, there is three psychologicals. She will be reviewing those documents, also. And those are the State's documents that she will be reviewing.

(27 RR at 5.) Trying to understand, Judge Gonzalez asked: "But you are saying that she is just going to interview him and then what?" (27 RR at 5.) Garza stated: "Review all the State's records." (27 RR at 5.) Garza's dialogue with the judge demonstrated a grave lack of candor. She should have told the truth: she had no idea what Dr. Allen would testify to as she had not provided Dr. Allen with a single record, nor had Dr. Allen met or examined Ramirez. (1 SH CR at 340 ¶ 2.)

The State opened its case-in-chief by calling multiple law enforcement officers who collected and/or analyzed evidence from the crime scene. (27-29 RR *passim*.) Det. Ramiro Ruiz described the course of the investigation and played the audiotape of Ramirez's statement for the jury. (29 RR at 38.)

The State then called Rosie Gutierrez to testify about the night of the offense. (31 RR at 27–124; 32 RR at 1–51.) After playing dominoes with one of her sons, two of whom were members of TCB's rival gang, the Chicanos, she heard loud noises coming from the house on the east side of her property. (31 RR at 37–41, 85–86, 116–17.) Shortly thereafter, a number of men carrying guns and wearing ski masks and jackets labeled "Police" entered her home and tied her up, asking her and

her son, Jerry, where the drugs were. (31 RR at 41–43, 62, 118–19; 32 RR at 8–9.) The assailants beat up Jerry in an attempt to get drugs and money. (31 RR at 61.) The assailants then left but a similarly dressed man returned moments later and shot Jerry. (31 RR at 64–66.) Gutierrez did not know if he was one of the men who were previously inside. (31 RR at 64–66.) After the man left, Gutierrez untied herself and called 911. (31 RR at 67–68.)

The State closed its case-in-chief by calling Edinburg Police Officers Edgar Ruiz and Robert Alvarez. (35 RR at 54–104; 36 RR at 1–79.) On voir dire, Alvarez – the State's purported gang expert – claimed that he had substantial experience working with gangs as well as specialized training. (35 RR at 66.) He testified that because of his "superior knowledge" of gangs, he was "automatically" assigned to all cases that preliminarily indicated gang activity. (35 RR at 91.)

Alvarez's personnel file, however, contains only one mention of gang-related training: a 1992 Hidalgo County Sheriff's Academy training entitled "Standard First Aid/Adult CPR/Air Pack & Gangs Recognition." When pressed by the Court about his lack of formal gang-related training, Alvarez remarkably stated that such training was not available until after the offense at issue in this case. Alvarez's claim is belied by his own training in gang recognition some 12 years earlier. (35 RR at 93-94; Ex. 105.)

Alvarez also claimed to be the "gang liaison" between the Edinburg Police Department and other law enforcement agencies, but there is no mention of such a position in his personnel file. (Ex. 105.) Alvarez's claim is also contradicted by Det. Reyes Ramirez, the sergeant overseeing the homicide division of the Edinburg Police Department at the time of the offense: "I was surprised to be reminded that Alvarez testified as a gang expert . . . Alvarez had no gang expertise until he began working on these cases. We relied on the FBI and the Hidalgo County Sheriff's Office for gang expertise, not Robert Alvarez." (Ex. 114 at ¶ 9.)

Alvarez's testimony, like his claim to expertise, was both false and misleading. Alvarez testified that there was a "green light" between the Tri-City Bombers and the Texas Chicano Brotherhood. (36 RR at 11, 41.) According to Alvarez: "They see each other in a bar, and they can be prepared to get into it, to do what it is to do to represent their gang; to fight, to stab each other, to kill each other, whatever needs to happen at that point in time." (36 RR at 11). Contrary to Alvarez's assertions, gangs do not carry out "green lights" by exacting violence on every member of a rival gang on sight. Rather, a "green light" authorizes gang members to harm someone—not in a generalized way, but with a specific type of authorized violence—without fear of reprisal. (Ex. 121.) In fact, this target of the "green light" need not be a member of a rival gang, but could be anyone who may have crossed

the gang, including that gang's own members. (Ex. 121.)

Alvarez never reported the source of this information about the "green light" and the State supplied no external evidence regarding the existence of this "green light" between the Tri-City Bombers and the Texas Chicano Brotherhood. Alvarez is no longer a police officer. (Ex. 105.) He permanently lost his peace officer's license after being indicted on eight felony counts, including the misuse of official information, violation of civil rights of a person in custody, theft by a public servant, and tampering with governmental records. Some of the charges stemmed from Alvarez's use of his involvement in this case to seduce Dina Martinez, the wife of Ramirez's co-defendant, Jorge Martinez. The charges alleged that Alvarez filed a fake police report to obtain a subpoena for Ms. Martinez's cell phone and text message records. He also filed fraudulent paperwork to collect overtime pay while he was at Ms. Martinez's residence. He was also alleged to have engaged in oral sex with another woman that was in Edinburg police custody on robbery charges. (Ex. 96.)

After the State rested, Alma Garza began Ramirez's case in chief. (36 RR at 140.) The principal defense consisted of recalling and attacking Rosie Gutierrez, the mother of two of the victims. (36 RR at 158.) Employing a tactic which would have offended any reasonable juror, Garza questioned Gutierrez about a romantic

91

relationship she was having with Luis Villa, her son Ray's friend who had escaped the shooting by climbing through an open window. (36 RR at 159.) Garza asked Gutierrez multiple times whether her now dead son Ray had been upset over her relationship with Villa and humiliated Gutierrez in front of the jury by forcing her to admit that she had known Villa since he was young. (36 RR at 159.) As if the irrelevance of this questioning was not enough, Garza compelled Gutierrez to answer questions about her ownership interest in the property on Monte Cristo Road, where her sons died, and who was paying for the renovations to the property. (36 RR at 158-59.)

The defense also recalled Officer Ramiro Ruiz. (36 RR at 140.) He testified that the police had received information that Ramirez went by the nickname "Lenny," a name that was brought up during the questioning of one of Ramirez's co-defendants. (36 RR at 142-44.) The defense called four more witnesses who either were related to the victims or had recently been at the property where the offense occurred. (36 RR at 168-92; 37 RR at 1-33.) And finally, the defense recalled Officers Edgar Ruiz and Robert Alvarez for brief questioning, neither of whom provided any information helpful to the defense. (37 RR at 42-57.)

On December 15, 2004, the court held closing arguments and the jury returned a guilty verdict on both counts the same day. (37 RR at 113-59.)

Dr. Allen received the first record from Alma Garza on December 2, 2004, which was a one-and-a-half page summary of the case prepared by Bowen. (4 SH RR Ex. 9 ¶ 2.) Dr. Allen was informed that Bowen was still gathering data and attempting to write a mitigation story. (4 SH RR Ex. 9 ¶ 2.) Dr. Allen asked counsel a number of times for Ramirez's TYC records which she finally received on December 10, 2004. (4 SH RR Ex. 9 ¶ 2.) Because Dr. Allen was contacted very late on this case, she had two trials that were occurring close together, and she had not received the promised materials in a timely manner, she was very concerned. (4 SH RR Ex. 9 ¶ 2.) Dr. Allen called counsel to express her concerns. (4 SH RR Ex. 9 ¶ 2.) Alma Garza reassured Dr. Allen that she would not be needed until the end of December and that she would have two weeks to prepare after her return from Nebraska. (4 SH RR Ex. 9 ¶ 2.) There are reasons to question Ms. Garza's candor. When Dr. Allen spoke to Garza on Friday, December 10, the State was near the end of their case in chief, which closed on Tuesday the 14th. (36 RR at 136.) The guilt phase concluded the following day with a guilty verdict. (37 RR at 160.) Nonetheless, based upon Garza's assurances, Dr. Allen believed that she would have the minimal amount of time necessary to review the recently received materials and conduct an interview with Ramirez. (4 SH RR Ex. 9 ¶ 2.)

Dr. Allen left for Nebraska on December 12 and was scheduled to testify in

that case on December 15. (4 SH RR Ex. 9 ¶ 2-3.) She had reviewed what little documentation she had received about Ramirez but did not have time to take detailed notes or develop any theories. (4 SH RR Ex. 9 ¶ 2-3.) Importantly, Dr. Allen did not have time to review the more than 800 pages of the redacted, and therefore incomplete, set of juvenile records she had just received two days prior, which she characterized as a "main part of the case." (4 SH RR Ex. 9 ¶ 2-3.)

Dr. Allen gave three and a half hours of testimony in Nebraska on December 15. (4 SH RR Ex. 9 ¶ 3.) As she sat in court, she began to feel ill. (4 SH RR Ex. 9 ¶ 3.) As she drove to the airport after her testimony, she received a call from Alma Garza stating that they would need her in court to testify the very next day.(4 SH RR Ex. 9 ¶ 3.) At this point, counsel had not informed Dr. Allen that Ramirez's trial had even begun. (4 SH RR Ex. 9 ¶ 3.) Dr. Allen told Garza that it was physically impossible for her to get from Nebraska to Harlingen, Texas by the next day, and because she was feeling sick, she did not believe she would be capable of testifying until Monday at the earliest. (4 SH RR Ex. 9 ¶ 3.) Dr. Allen reminded Garza that she had told her that she would have two weeks to prepare for Ramirez's trial after returning from Nebraska. (4 SH RR Ex. 9 ¶ 3.) Garza ended the conversation. (4 SH RR Ex. 9 ¶ 3.) By the time Dr. Allen arrived home in Austin, she was running a fever. (4 SH RR Ex. 9 ¶ 3.)

Later that evening, after Dr. Allen had arrived home and gone to bed, she received another call from Alma Garza. (4 SH RR Ex. 9 ¶ 3.) Garza told Dr. Allen that Judge Gonzalez was not "accepting" the fact that she was ill. (4 SH RR Ex. 9 ¶ 3.) When Garza said she would try to get Dr. Allen at least one day – Thursday – to rest, Dr. Allen expressed that she might not even be able get to the doctor by Friday. (4 SH RR Ex. 9 ¶ 3.)

On December 16, 2004, counsel presented their opening statements in the penalty phase of Ramirez's trial. (38 RR at 1–2.) Trial counsel's strategy—if there was one at the penalty phase—focused on the mitigation special issue. (38 RR at 2.) During her opening statement, Alma Garza actually told the jury that Ramirez would be a future danger to society and that he anticipated that a life would be taken during the offense. (38 RR at 2.) Her entire opening statement was as follows:

> Good morning, ladies and gentlemen. I know that this is a difficult job for you. I'm going to ask you to listen. I'm hoping to bring you a mitigating specialist that will tell you about his background, the way that he was raised, things that happened to him, and why he is where he is. We're going to ask you to answer the questions yes, yes, and yes, that there is mitigating evidence.

(38 RR at 2.)

The State started by calling three witnesses who testified about Ramirez's time in the county jail while awaiting trial. Ramirez, who was being held in a cell with a number of his co-defendants, was caught smoking marijuana. (38 RR at 5–

23.) Ramirez was the only person in the cell to admit ownership of the marijuana. (38 RR at 22–23.) On another occasion, Ramirez's cell was searched and two razor blades and one full razor were discovered. (38 RR at 30, 38.) Jail personnel admitted, however, that Ramirez had always been respectful to them and that razors were often used for non-violent purposes such as making crafts and sharpening pencils. (38 RR at 33, 43–44, 48.)

Olga Torres, an investigator with the Juvenile Probation Office, testified that Ramirez had juvenile charges for possession of marijuana, burglary of a vehicle, and two counts of criminal trespass. (38 RR at 51–52, 56.) She stated that Ramirez was sent to Desert Hills of Texas, a drug treatment center, by juvenile authorities because he reported using marijuana, cocaine, and Rohypnol. (38 RR at 56–57, 63–65.) Later, Ramirez was charged as a juvenile for aggravated assault and deadly conduct. (38 RR at 58.)

Alma Garza had records at her disposal demonstrating that Torres knew much more about Ramirez's background. On April 3, 1998, Olga Torres documented that Ramirez told her that he had no goals in life and that he felt only "desperation" when not using drugs. (ECF 33, Ex. S10 at 6-7.) His mother had told Torres that she felt unable to control him and expressed her belief that her separation from Juan's father had a great impact on him. Torres recommended that Juan be placed outside of his

home, writing that Juan "requires a facility that can address issues concerning drugs, communication between family members, provide him with social skills, positive motivation, and stability which may be lacking at home." (ECF 33, Ex. S10 at 7.) In yet another indication that Alma Garza failed to review Ramirez's TYC records, she failed to bring in any of this information through Torres's testimony.

Ricardo Leal, Ramirez's TYC parole officer, was the fifth and final witness called by the State. (38 RR at 71–73.) One of Leal's responsibilities was to assess placements for juveniles being released on parole. (38 RR at 81.) He initially approved Ramirez's mother's home but noted his concern about neighborhood violence. (38 RR at 81–82.) Leal testified that Ramirez was released from Evins Regional Juvenile Center ("Evins") to a halfway house, but was sent back for another seven months after a roughhousing incident with another resident. (38 RR at 82–86.) Within a month of being paroled back to his mother's home, Ramirez was arrested by the Alamo Police Department. (38 RR at 86-88, 92–97.) He returned to the TYC system for another six months before being paroled again to his mother's home. (38 RR at 92–97.) Leal testified that after Ramirez's release, transportation issues were causing him difficulties in complying with the terms of his parole. (38 RR at 100–01.) On December 31, 2002, Leal issued a TYC directive – essentially a warrant – when Ramirez said that he would no longer comply with the terms of his parole. (38

RR at 100–03.)

If Alma Garza had read Ramirez's TYC records, she would have known that Ricardo Leal also had relevant, mitigating evidence to share with the jury. When Leal had reluctantly approved Ramirez's mother's home, he noted his specific concerns about gang violence. Leal also referred Ramirez's mother for services to help her become a better parent, but she declined. Leal documented in his report that "the gang activity in Donna is bad and she worries for her boys." Leal also referred Ramirez's brother, Oliver, to a gang intervention program as Oliver was going down a similar path. (Ex. S12 at 215.)

The defense's first witness, Dwight Stewart, testified as a gang expert. (38 RR at 168–81.) Stewart had nothing to say about Ramirez. At the outset of his testimony, Garza asked Stewart: "Now, you are not here to render an opinion as to Mr. Ramirez. Is that correct?" – to which he responded: "That's correct." (38 RR at 173.) Instead, Stewart merely offered general testimony about reasons some people might join a gang such as the need to belong, family tradition, money, status, and protection. (38 RR at 172.) Stewart's direct testimony covers eight pages which includes a discussion of his qualifications and professional background. (38 RR at 168–76.) Cross examination covers five additional pages. (38 RR at 176–81.) Stewart did not say whether Ramirez was in a gang or what reasons compelled him to join if he was.

Alma Garza then called Larry Fitzgerald, a retired public information officer with the Texas Department of Criminal Justice. (38 RR at 183–201.) He also had nothing to say about Ramirez. Fitzgerald testified about inmate classification, explaining on direct examination that there are general population inmates and inmates assigned to administrative segregation. (38 RR at 185.) Inmates that are under a sentence of death, gang members, and other inmates who are considered security threats are placed in segregation. (38 RR at 186, 198.) Fitzgerald conceded, however, that not all inmates convicted of capital murder are labeled as security threats, and therefore, can be put in general population. (38 RR at 185–86.) Fitzgerald testified that while known members of certain gangs are placed in segregation, the TCB gang was not considered a prison gang for classification purposes. (38 RR at 186–87, 191–92, 195–97.) The clear takeaway from Fitzgerald's testimony was not helpful: that the only way the jury could ensure that Ramirez would be placed in segregation and would not be a danger to others would be to sentence him to death.

After Fitzgerald's testimony, trial concluded for the day. That evening (Thursday), Alma Garza called Dr. Allen and stated that because she said she could not be in Harlingen to testify on Friday, the judge was holding court on Saturday morning. (4 SH RR Ex. 9 ¶ 3.) Because she was still ill, Dr. Allen asked a friend to

make her travel reservations and to drive her to the airport on Friday for a 10:50 a.m. flight. (4 SH RR Ex. 9 ¶ 4.) Gilda Bowen picked up Dr. Allen at the airport and they talked about the case on their way to Dr. Allen's motel. (4 SH RR Ex. 9 ¶ 4.) That evening, Dr. Allen had dinner with Bowen and Alma Garza where they discussed the case for an hour and a half. (4 SH RR Ex. 9 ¶ 4.) They met again for breakfast Saturday morning and discussed the case for another hour and a half. (4 SH RR Ex. 9 ¶ 4.)

When Dr. Allen arrived at the courthouse Saturday morning, she met Ramirez for the first time. (4 SH RR Ex. 9 ¶ 4.) That was also when Dr. Allen learned that the defense was not planning to call any of Ramirez's family members, friends, or other people who knew him to testify. (4 SH RR Ex. 9 ¶ 5.) As she was not given the opportunity to interview potential mitigation witnesses or to do more than a cursory review of Ramirez's 832-page TYC records, Dr. Allen was forced to rely entirely upon Bowen's unhelpful reports to formulate her opinions. (4 SH RR Ex. 9 ¶ 4; 39 RR at 19.)

Dr. Allen testified that Ramirez experienced maternal deprivation and chronic domestic violence during his formative years. (39 RR at 36–37.) Because of the lack of support in the home, he was forced to raise himself and turned to neighborhood gangs. (39 RR at 36–37.) When he received intervention from TYC, it was too little,

too late, and after showing improvement through their programs, he was released back into the same dysfunctional environment. (39 RR at 36–37.) These specifics concerning Ramirez's life spanned just two pages in the record. (39 RR at 39–40.) Other than this brief synopsis, the jury did not hear any specific detail concerning Ramirez's history, family life, or developmental circumstances.

Dr. Allen defined attachment disorder and explained its effects to the jury. (39 RR at 32–36.) She testified that it is important for young children to bond with their parents in order to learn trust. (39 RR at 32–33.) Failure to do so can also harm a child's cognitive and intellectual development. (39 RR at 34–35.) Dr. Allen was able to testify in very general terms about depression, substance dependency, restricted brain development, child abuse, and PTSD, but her analysis was textbook oriented, and not focused on Ramirez's experiences and the actual abuse he endured. (39 RR at 2–99.) When she attempted to testify about the potential for PTSD to result in brain damage, the trial court sustained the State's objection. (39 RR at 55–56, 67–74.) The court was concerned that Dr. Allen's testimony was going into a new area, one in which the defense had not sought to have her qualified during the expert qualification hearing. (39 RR at 55–58.)

In attempting to explain how the documents she reviewed supported her opinions about Ramirez, Dr. Allen's testimony was met by a string of objections

from the State, usually levied when she attempted to describe specific details from the records she had reviewed. (39 RR at 2–99.) Dr. Allen was permitted to state her conclusions and which records she reviewed, but was not allowed to discuss any specific instances of abuse and trauma from Ramirez's life. (39 RR at 2–99.)

Defense counsel failed to request that bench conferences discussing these rulings be transcribed. (39 RR 45, 54, 60, 99.) As such, there is little record of the court's analysis regarding Dr. Allen's testimony. However, during one bench conference that was recorded, Alma Garza complained that Dr. Allen was being prohibited from discussing the contents of Bowen's reports. (39 RR at 61–77.) Judge Gonzalez explained to Garza that all of the underlying information she was attempting to elicit from Dr. Allen was hearsay under Texas Rule of Evidence 705. (39 RR at 64–66.) Garza abandoned efforts to introduce Ramirez's background and moved on to her next witness.

Ramirez's fourth and final witness, Salomon Avila, was a pastor in Edinburg and explained how he met Ramirez through his prison ministry. (39 RR at 100.) Avila testified that he visited Ramirez at the jail once or twice a week leading up to trial and he never felt threatened. (39 RR at 101.) That was the extent of Avila's testimony. He was the only defense witness presented at the penalty phase that had actually spoken to Ramirez prior to trial.

Noticeably absent from the defense's penalty phase presentation were any family members, friends, or even a single witness who had known Ramirez prior to his incarceration.

Both parties gave closing arguments on December 18, 2004. (39 RR at 118–45.) In her closing, Alma Garza attempted to backtrack the concessions she made during her opening. She claimed that Ramirez would not be a danger because his violent past would require that he be placed in administrative segregation.[18] (39 RR at 126.) Garza then told the jury that she brought in the gang expert to demonstrate "[t]he importance of becoming aware of the children in our school system…" (39 RR at 127.) She highlighted Ramirez's juvenile adjudications that had been submitted by the State. (39 RR at 128.) This was the only evidence admitted that showed Ramirez's mother's home could not provide "the quality of care and level of support and supervision [Ramirez] needs to meet the conditions of probation." (39 RR at 128.) Finally, Garza claimed Ramirez's mother was not present at the trial because she did not care enough to ask the jury to spare her son's life. She concluded by saying: "His mother didn't testify. She never asked for his life. I did." (39 RR at 136.)

---

[18] The State objected as this was a clear mischaracterization of Fitzgerald's testimony. (39 RR at 126.)

After closings, the jury retired for deliberations. (39 RR at 145.) That same day, the jury returned a verdict of "Yes" to Special Issue One (that Ramirez would be a future danger), "Yes" to Special Issue Two (that Ramirez intended or anticipated that a life would be taken), and "No" to Special Issue Three (that mitigating circumstances warrant a sentence of life imprisonment) for both counts of capital murder. (39 RR at 147–50.)

Alma Garza presented an offer of proof concerning the evidence she sought to elicit from Dr. Allen. (39 RR at 154–63.) She marked as Defense Exhibits 8, 9, and 10, Bowen's three reports – the Bio-Psychosocial Report, a Life History Outline, and Personality Development Comparison. (39 RR at 154.) Counsel complained about the limitations the Court placed on Dr. Allen's testimony: "You only allowed her to give opinions in general, that we could not get into the details of my client's life in detail, about all the beatings that his mother received when she was pregnant with him, as he was growing up, all the family violence, how he had to – how he intervened at the age of three years old to help his mother, to save his mother from another beating, from just family violence from when he was just a baby, baby, and how he developed, about the school." (39 RR at 154–55.)

Alma Garza told Judge Gonzalez that Dr. Allen should have been able to testify to these matters: "You know, the State said that it was hearsay, and expert

witnesses should be allowed to get into that area because that's how they arrived at their opinion. And we were not allowed to go into those areas, and the jurors were not allowed to hear all that information as to all these things that happened to Juan as he was growing up since he was a child." (39 RR at 155–56.) Judge Gonzalez pointed out that all this information was still hearsay and that she could have brought those individuals in to testify if they had relevant information to share with the jury. (39 RR at 155–56.)

On December 22, 2004, Judge Noe Gonzalez sentenced Ramirez to death on both counts of capital murder. He also granted Alma Garza and Rolando Garza's motions to withdraw and appointed attorney Larry Warner to represent Ramirez in his direct appeal to the Texas Court of Criminal Appeals ("CCA") and David Sergi to represent Ramirez in filing an application for a writ of habeas corpus pursuant to Texas Code of Criminal Procedure Article 11.071. (1 CR at 571, 599.)

Of the eleven individuals arrested for the offense, Ramirez was the first to be tried. Humberto Garza was next; he was convicted and sentenced to death on March 22, 2005. His appeals remain pending. (Texas CCA, NO. WR-78,113-01.) Rodolfo Medrano was the third to be tried. He was found guilty and sentenced to death on August 27, 2005. His appeals also remain pending. (*Medrano v. Davis*, 2020 U.S. Dist. LEXIS 43691.)

On November 29, 2005, Jorge Martinez became the first to plead guilty and received a life sentence. Marcial Bocanegra followed suit and pled guilty on January 9, 2007 and was sentenced to 35 years. On April 9, 2007, Juan Cordova agreed to plead guilty in exchange for a sentence of 25 years.

On September 22, 2006, the State dismissed all charges against Jeffrey Juarez, Reymundo Sauceda, and Salvador Solis, claiming that no one would testify against them.

On March 8, 2007, Robert Cantu went to trial and was acquitted of all charges.

On November 20, 2007, the charges against Robert Garza were dismissed after he was convicted and sentenced to death for the murders of four women in Donna, Texas. He was executed on September 19, 2013.

### D.    Direct Appeal

On October 31, 2005, Larry Warner moved for an extension of time to file Ramirez's opening brief in his direct appeal. (DA Mot. for Extension of Time, Oct. 31, 2005.) The CCA granted an extension until April 5, 2006, but noted that it would not consider any further extensions. (DA Order, Oct. 31, 2005.) Six days before the brief was due, Warner moved to abate the appeal. (DA Mot. to Abate, Mar. 31, 2006.) According to Warner, he was not able to write Ramirez's opening brief until the trial court issued written findings of fact and conclusions of law explaining why

it had denied Ramirez's motion to suppress. (DA Mot. to Abate, Mar. 31, 2006.) The CCA denied Warner's request on April 3, 2006. (DA Order, Apr. 3, 2006.)

The April 5, 2006 deadline came and went without Warner filing the opening brief. On April 20, 2006, Warner filed a motion requesting that the court extend the briefing schedule. (DA Mot. for Extension of Time, Apr. 20, 2006.) The CCA again denied the motion, noting that Warner had not even attempted to file an incomplete brief. (DA Order, May 4, 2006.) Nearly two months later, on June 15, 2006, Warner filed a motion seeking permission to file an incomplete brief. (DA Motion, June 15, 2006.)

On June 28, 2006, the CCA issued an order directing the trial court to prepare and file findings of fact and conclusions of law relating to its denial of Ramirez's motion to suppress and further ordered that any supplemental briefing on Ramirez's behalf be filed within 15 days of the supplemental record being filed. (DA Order at 3, June 28, 2006.) The order also required Warner to show cause for his failure to file a timely brief. (DA Order, June 28, 2006.)

On July 6, 2006, the State filed its proposed findings of fact and conclusions of law regarding Ramirez's motion to suppress in the trial court. (1 SUPP CR at 004.) Judge Noe Gonzalez signed and adopted the State's proposed order in full. (1 SUPP CR at 006.)

On July 10, 2006, Warner filed a "Preliminary Brief," which the prosecutor described in a letter to Ramirez's post-conviction counsel as violating "a number" of the Rules of Appellate Procedure. (DA Appellant's Prelim. Br., July 10, 2006; Ex. 93.) The brief raised the following assignments of error: (1) the verdict is contrary to law and evidence; (2-3) the evidence is legally insufficient to support the judgment of conviction and sentence of death; (4-5) the trial court improperly imposed two death sentences for the same conduct; (6) the trial court failed to give an appropriate jury instruction about disregarding involuntary statements; (7) the trial court erred in failing to quash count two of the indictment; (8) the Texas death penalty statue is unconstitutional as applied to Ramirez because he was only 18 years old at the time of the offense; (9-10) the State committed misconduct in denying there was a video of Ramirez's arrest and spoliation for taping over part of the video; (11) Texas's criminal gang statute improperly holds Ramirez responsible for the criminal acts of others; (12) the trial court erred in failing to admit information from the expert's interviews; (13) the trial court erred in ruling that a booking officer's question regarding gang affiliation was a "routine" booking question; (14) Ramirez was denied counsel during time for a new trial motion; (15-17) the court erred in failing to suppress Ramirez's statements to police; (18-19) the CCA is violating Ramirez's due process rights by requiring him to proceed without a complete record;

and (20-21) expert psychiatric testimony regarding future dangerousness is too speculative to be admissible. (DA Appellant's Prelim. Br., July 10, 2006.)

The brief itself included a request for oral argument, a list of interested parties, a tables of contents listing each of the issues presented, an index of authorities, a statement of the case, a list of the issues presented, a statement of facts (which merely relisted the issues presented), and a summary of the argument (which also relisted the issues presented). (DA Appellant's Prelim. Br. at ii, iii, iv–ix, 7, 13, July 10, 2006.) In addressing his first and second assignments of error, Warner repeats the same six paragraphs summarizing Dr. Allen's testimony three times. (DA Appellant's Prelim. Br. at 28–32, July 10, 2006.) He then restates the remaining nineteen assignments of error without any analysis, concluding with an argument in support of assignment of error 21 – that expert testimony regarding future dangerousness is too speculative. (DA Appellant's Prelim. Br. at 34–37, July 10, 2006.) However, as noted by both the State in its response and the CCA in its decision, no such testimony was offered during Ramirez's trial. (DA Brief of Appellee, Nov. 29, 2006 at 117, n.34.)

On August 8, 2006, Warner filed a second "Preliminary Brief." (DA Appellant's Preliminary Brief, Aug. 8, 2006.) The prosecutor sent another letter to Ramirez's post-conviction counsel, describing the brief as follows:

You will also notice that this brief is very hard to follow, with the most difficult part to read being the "Summary of the Evidence" on pages 7-28, which merely contains record references followed by shorthand phrases describing parts of the record.

I am also not sure why pages 32-34 consist of only a few phrases surrounded by blank space.

(Ex. 94.)

The brief opened with a continuing objection to the lack of findings of fact and conclusions of law on specific topics related to Ramirez's motion to suppress. (DA Appellant's Prelim Br. at ii–iii.) Warner also presented the following additional assignments of error: (22 and 24[19]) the trial court admitted unnecessarily graphic photos; (25) the trial court erred in admitting evidence related to Ramirez's alleged gang membership; (26) the trial court erred in denying a mistrial after the State brought up the stabbing of a prison guard by a death row inmate; and (27) the trial court erred in failing to include an official Spanish to English translation of Spanish portions of Ramirez's statement to police. (DA Opening Br. at 25–28, 41–43, 97–103, Aug. 8, 2006.)

As suggested by the prosecutor, Warner's second preliminary brief was baffling. In addition to the issues the prosecutor noted, the brief itself contained what appears to be Warner's transcript notes and large passages copied from the

---

[19] The brief does not contain a twenty-third assignment of error.

transcripts without any relevant argument. (DA Opening Br. *passim*.) In assignments of error 22 and 24, Warner argues that the trial court admitted unnecessarily graphic autopsy photos, yet the exhibits he cites are photos from the crime scene. (DA Opening Br. at 41–42, 97–103, Aug. 8, 2006.)

On August 16, 2006, the CCA issued an order holding Warner in contempt for failing to file a timely brief in support of Ramirez's direct appeal. (DA Order, Aug. 16, 2006.)

The State filed its opening brief on November 29, 2006. (DA Br. of Appellee, Nov. 29, 2005.) On January 5, 2007, Warner filed Ramirez's reply brief, and on January 11, 2007, he filed a supplement to the reply brief. (DA Appellant's Reply Br., Jan. 5, 2007; Appellant's Suppl. Reply Brief, Nov. 1, 2007.) Warner's reply brief highlights the following issues for oral argument: 2 and 3 (insufficient evidence) and 20 and 21 (that expert testimony on future dangerousness is too speculative).

On December 12, 2007, after oral argument, the CCA granted relief on count two of Ramirez's conviction finding that it violated double jeopardy – the State had conceded the error. *Ramirez v. State*, No. AP-7167, 2007 WL 4375936 (Tex. Crim. App. Dec. 12, 2007) (unpublished). The CCA affirmed the judgment on count one. *Id.* at 58. In doing so, the CCA found a number of Warner's assignments of error too

inadequately briefed to consider their merits. *Id.* at 56. For example, although Warner repeated his eighth assignment of error – that Texas's death penalty scheme is unconstitutional as applied to Ramirez – five separate times in his first brief (p. v, 3, 8, 14, 35) and twice in his second brief (pp. ix, 3), no discussion or argument was offered in support. *Id.*

In his twelfth assignment of error, Warner challenged the trial court's exclusion of evidence relating to Dr. Allen's testimony. *Ramirez v. State*, No. AP-7167 at 57, 2007 WL 4375936 (Tex. Crim. App. Dec. 12, 2007) (unpublished). Although Warner "raised" the issue, he did not provide any discussion in support. *Id.* at 56. The CCA held that it was inadequately briefed and, therefore, waived. *Id.* As a result, Ramirez's appellate counsel failed to challenge, even in the most basic sense, the trial court's exercise of discretion under Rules 702, 703, and 705 of the Texas Rules of Evidence in excluding the underlying facts and data supporting Dr. Allen's opinion.

On October 8, 2008, the Supreme Court of the United States denied Ramirez's petition for a writ of certiorari. *Navarro-Ramirez v. Texas*, No. 07-10436.

### E.     Post-Conviction Review

Simultaneously, the post-conviction process was underway in the trial court. When Judge Gonzalez had asked Larry Warner to represent Ramirez in his direct

appeal, Warner specifically requested that Judge Gonzalez appoint David Sergi to represent Ramirez in his writ application pursuant to Texas Code of Criminal Procedure Article 11.071. (DA Warner Decl., Apr. 25, 2008.)

Judge Gonzalez appointed Sergi on December 22, 2004. For the next eighteen months, Sergi did nothing. On August 9, 2006, Sergi finally moved the court for funding to hire an investigator. (1 SH CR at 7.)

On December 26, 2006, Ramirez wrote a letter to Judge Gonzalez raising concerns about Sergi's representation. (1 SH CR at 31.) Ramirez informed Judge Gonzalez that his letters and questions to Sergi had largely gone unanswered. (1 SH CR at 31.) He requested that the court either hold a hearing or look into the matter and require Sergi to better communicate with him. (1 SH CR at 31.) Ramirez was particularly anxious in light of the impending deadline for his writ application. When the State filed its brief in Ramirez's direct appeal on December 4, 2006, the deadline for Sergi to file Ramirez's writ application was set for January 18, 2007. (See Tex. Code Crim. Proc. Ann. art. 11.071 § 4(a).)

On January 4, 2007, Sergi filed an unopposed motion in the trial court requesting a 90-day extension to file Ramirez's writ application, which would reset the deadline to April 15, 2007. (1 SH CR at 33.) The trial court did not grant the motion until January 22, four days after the writ application was due. (1 SH CR at

37.) Because the motion was not granted before the statutory deadline, the trial court's ruling was not authorized by Texas Code of Criminal Procedure Art. 11.071, § 4(b).

On February 22, 2007, the court appointed N. Alan Weibel as an investigator for the defense. (1 SH CR at 38.)

On April 2, 2007, Sergi filed a second motion requesting an extension of time to file Ramirez's writ application. (1 SH CR at 41.) Once again, without the authority to do so, the trial court granted the motion and extended the filing deadline to July 16, 2007. (1 SH CR at 59.) On April 9, 2007, Ramirez wrote another letter to Judge Gonzalez. (1 SH CR at 44.) Ramirez, unaware that his counsel had requested another extension, expressed concern that he had not yet met with Weibel. (1 SH CR at 44.)

Sergi filed a third motion for an extension of time on June 27, 2007. (1 SH CR at 45.) As grounds for the extension, Sergi submitted that he would be attending a seminar abroad in July and August and that a new investigator would need to be appointed. (1 SH CR at 45.) On July 2, 2007, Ramirez filed a pro se motion to have Sergi removed as counsel and requested a hearing. (1 SH CR at 47.) Ramirez alleged that, in the nearly two and a half years Sergi had been on his case, he had failed to conduct any investigation whatsoever and that he had failed to keep him informed of the deadlines in his case. (1 SH CR at 47.)

On July 10, 2007, the trial court, without the authority to do so, once again granted Sergi's motion and extended the writ application deadline to November 13, 2007. (1 SH CR at 60.) The court also appointed Richard Alaniz as the new investigator and set a hearing for August 15, 2007, to address Ramirez's pro se motion for new counsel. (1 SH CR at 60.) Sergi filed a motion to continue the hearing as he was set to leave that day for another seminar in Nashville, Tennessee. (1 SH CR at 63.)

On August 2, 2007, Ramirez filed another motion to have Sergi removed as counsel. (1 SH CR at 47.) Ramirez discovered that Sergi had been reprimanded twice by the State Bar of Texas and had recently been admonished by the Fifth Circuit Court of Appeals for mischaracterizing the facts in one of his cases. (1 SH CR at 47.) Ramirez attached an exhibit to his motion demonstrating that Sergi had been removed from the list of approved attorneys to be appointed in 11.071 writ applications. (1 SH CR at 51.)

On August 15, 2007, the hearing went forward on Ramirez's motion and the trial court agreed to remove Sergi as counsel. (Ex. 99 at 44.) When Sergi later submitted a bill for his work on Ramirez's case, Ramirez sent Judge Gonzalez another letter. (Letter, No. CR-0551-04-G(1), Feb. 6, 2008.) He attached Sergi's bill claiming to have spent six hours with Ramirez's family in February 2005 and

115

affidavits from his mother and sister verifying that Sergi had never once contacted them.[20] (Letter, No. CR-0551-04-G(1), Feb. 6, 2008.)

For nearly a year, Ramirez was without counsel. Then, on July 7, 2008, the CCA entered an order finding Sergi in contempt for failing to file Ramirez's writ application and appointed Paul Mansur as Ramirez's new state habeas counsel. (DA Order, July 7, 2008.) The CCA gave Mansur 270 days to file a writ application on Ramirez's behalf. (DA Order at 3, July 7, 2008.)

In the months that followed, Mansur struggled considerably to retrieve Ramirez's files from prior counsel. Mansur contacted Sergi to get the files Sergi had obtained from trial counsel and from the District Attorney's Office. On August 28, 2008, Sergi emailed Mansur stating that his law clerk had located some of the records from the District Attorney's Office:

> Tony found the Hake documents. And most but not all of the missing volumes. Tony also tells me we also have some copies from Almas file of witness. Statements. In a notebook called "trial notebook I indictment and witness statement" We are combing our closed files and Tonys office for anything else. (sic)

> As far as trial counsel's files were concerned, Rolando Garza did not retain a

---

[20] The CCA ultimately ordered Sergi to return all of the money he had billed for work on Ramirez's case. Sergi spent the next five years fighting that order and requested at least seven extensions to return the money.

file and therefore had not provided anything to Sergi.[21] Sergi claimed that his law clerk had copied Alma Garza's file at a Kinko's and then returned it to her. When Mansur contacted Alma Garza, she claimed that her file had never been returned.

Mansur reviewed the records he was able to obtain and found evidence that Ramirez suffered from PTSD and brain damage. Based on that information and the quality of Ramirez's writing in his letters, Mansur began to question whether Ramirez suffered from an intellectual disability. In September and October 2008, Mansur moved the trial court to appoint an investigator and a mitigation specialist. (1 SH CR at 075; 1 SH CR at 76.) He also worked to obtain unredacted copies of Ramirez's TYC records and contacted Dr. Kate Allen about her involvement in Ramirez's case.

In February 2009, the CCA granted an extension of the deadline for Mansur to file Ramirez's writ application from April 3, 2009 to July 2, 2009. (HA Order, Feb. 11, 2009.)

Mansur contacted neuropsychologist, Gilbert Martinez, Ph.D., about

---

[21] Rolando Garza's failure to maintain and retain a file fell below the standard of care demanded in capital cases. *See American Bar Association's Guidelines in Death Penalty Representation*, at Guideline 10.13(A) ("In accordance with professional norms, all persons who are or have been members of the defense team have a continuing duty to . . . maintain[] the records of the case in a manner that will inform successor counsel of all significant developments relevant to the litigation").

evaluating Ramirez's cognitive abilities. On May 21, 2009, the court approved Mansur's request for funding. (1 SH CR at 79.) Prior to meeting with Ramirez, Dr. Martinez reviewed Ramirez's TYC records which included two prior psychological assessments. (4 SH CR at 1366.) The previous assessments noted Ramirez's heavy drug use from a young age and testing indicated that Ramirez's full scale IQ was measured to be 92 in 1998 and 90 in 2000 when Ramirez was in his mid-teens. (4 SH CR at 1367.)

Dr. Martinez met with Ramirez on June 4, 2009 and conducted a neuropsychological examination. (4 SH CR at 1366.) Dr. Martinez described Ramirez as "tense, anxious, restless, and hypervigilant throughout the assessment." (4 SH CR at 1370.) He administered a number of IQ tests and measured Ramirez's full scale IQ to be 59. Dr. Martinez found Ramirez to have significant cognitive dysfunction, with severe impairment in attention and executive functioning. He also believed that Ramirez probably had some sort of damage or disorganization of the frontal lobes, partly related to his extensive substance abuse history. Dr. Martinez diagnosed Ramirez with an acquired intellectual disability that he developed prior to age 18, likely as the result of repeated injury to the brain. (4 SH CR at 1370.)

On July 2, 2009, Mansur filed Ramirez's writ application. (1 SH CR at 82.) He presented the following grounds for review: (1) ineffective assistance of trial

counsel for failing to investigate mitigating evidence; (2) ineligibility for the death penalty due to an intellectual disability; (3) ineffective assistance of trial counsel for failing to investigate evidence of intellectual disability; (4) Ramirez's death sentence is unconstitutional even if he is not intellectually disabled; (5) the trial court denied Ramirez a fair trial by restricting his ability to present mitigation evidence through Dr. Kate Allen; (6) Ramirez's Eighth Amendment rights were violated when he was denied the right to present relevant mitigation evidence; (7) Ramirez should be granted a new sentencing hearing because the CCA overturned one of the two convictions for capital murder; (8) the Texas mitigation special issue fails to contain a burden of proof in violation of due process requirements; (9) the Texas mitigation special issue is not adequately defined and creates a probability that a jury would narrowly construe its meaning; (10) the CCA's refusal to review the mitigation special issue violated Ramirez's due process rights; (11) ineffective assistance of appellate counsel for failing to raise issues related to punishment; (12) Ramirez is factually innocent; (13) the trial court admitted Ramirez's involuntary statement to police; (14) Ramirez was not competent to stand trial; (15) ineffective assistance of trial counsel for failing to investigate and present evidence of Ramirez's innocence and competency; (16) ineffective assistance of trial and appellate counsel for failing to raise issues related to guilt-innocence; (17) ineffective assistance of trial counsel

due to a conflict of interest; (18) discriminatory use of peremptory challenges by the State; and (19) ineffective assistance of trial and appellate counsel for failing to object to the State's discriminatory use of its peremptory challenges. (1 SH CR at 82–85.)

For more than two and a half years, nothing happened. Then, in February 2012, Mansur approached Judge Gonzalez about an issue that had come up in Ramirez's case. Detective Robert Alvarez, the State's "gang expert," had been fired from the Edinburg Police Department and charged with misconduct related to his position. Judge Gonzalez expressed doubt that any investigation into Alvarez would yield results helpful to Ramirez's case. Nevertheless, Judge Gonzalez agreed to grant Mansur funding for an investigator to look into the issue. Mansur also brought up the issue of funding for an expert to investigate Ramirez's adaptive deficits as this was an important component of proving a claim of intellectual disability. Judge Gonzalez stated such a request was premature as the State had yet to file its answer to the writ application. (Ex. 104.)

On May 1, 2012, nearly three years after Ramirez filed his writ application, the CCA wrote a letter to the trial court inquiring about its status. (HA Letter, May 1, 2012.) After getting no response, on August 1, 2012, the CCA ordered the trial court to resolve any remaining issues related to Ramirez's writ application in the

next 90 days and ordered the clerk to transmit the writ record within 120 days. (HA Order, Aug. 1, 2012.)

On September 7, 2012, more than three years after their answer to Ramirez's writ application was due, the State of Texas filed its 384-page answer with a proposed order designating 51 issues for review. (2 SH CR at 585.) Judge Gonzalez signed the order three days later and an amended order seven days later. (2 SH CR at 995.) The order required Alma Garza, Rolando Garza, and Larry Warner to file affidavits within twenty days responding to the allegations in Ramirez's writ application concerning their performance. (2 SH CR at 1010.) The order further required both counsel for Ramirez and the State to submit proposed findings of fact and conclusions of law within twenty days of the last affidavit being filed. (2 SH CR at 1010–11.)

Nine days later, on September 19, 2012, Paul Mansur wrote a letter to the court explaining that he had accepted a position at Texas Defender Services ("TDS"). (2 SH CR at 1016.) As TDS represented one of Ramirez's co-defendants, Mansur was unable to continue representing Ramirez in his writ application. (2 SH CR at 1016.) Mansur informed the court that he had contacted Brad Levenson at the Texas Office of Capital Writs ("OCW") to see whether OCW could represent Ramirez. (2 SH CR at 1016–17.) In his letter to the court, Mansur neglected to

121

mention that he had actually started working at TDS in March 2010, and had been working at TDS for two and a half years without informing the court that there was a conflict significant enough to warrant his removal from the case. https://www.linkedin.com/in/paul-mansur84772957/; http://www.paulmansurlaw.com/about.html (last visited July 14, 2021.)

On September 20, 2012, Larry Warner filed an affidavit in response to Judge Gonzalez's order. (2 SH CR at 1023.) Regarding the allegation that he insufficiently briefed the hearsay issue surrounding Dr. Allen's testimony, Warner initially claimed this was the result of a "scrivener's error." (2 SH CR at 1023.) He then argued, however, that any such error was inconsequential because the CCA would have found the exclusion of mitigation evidence to be harmless anyways. (2 SH CR at 1023–31.) Warner then addressed whether he had considered a claim regarding the constitutionality of Texas' mitigation special issue, and if so, why he had decided not to raise it. (2 SH CR at 1031.) Warner stated that he had considered such a claim and then noted a case in which he successfully argued that a different statute was unconstitutional. (2 SH CR at 1031–35.) Warner was asked to address conversations he had with Ramirez regarding the issues to be raised on direct appeal. (2 SH CR at 1035.) In response, Warner stated: "I do not normally consult with clients on issues to be raised on appeal." He explained that he mailed Ramirez a copy of the finished

brief, stating that a criminal defendant is not entitled to "hybrid representation." (2 SH CR at 1036.) Finally, Warner was asked why he did not challenge the CCA's handling of the multiple punishment jeopardy issue. He answered simply: "We won on that point. The Court of Criminal Appeals set aside one death sentence." (2 SH CR at 1036.)

Rolando Garza and Alma Garza filed their affidavits on October 23, 2012 and October 26, 2012, respectively. In response to all questions regarding their mitigation investigation, Alma Garza directed the court to Gilda Bowen's reports which she attached to her affidavit. (3 SH CR at 1055; Ex. 98 ¶ 2.) Regarding her preparation for the mitigation presentation, Garza claimed that she had planned to present Ramirez's "upbringing and any and all relevant information" to the jury through his "mother, sister, and the experts." (3 SH CR at 1055–56; Ex. 98 ¶¶ 5–7.) She claimed:

> The investigator interviewed Berta Alicia Ramirez and Juana Olivia Ramirez. The Mitigation Specialist is did (sic) interview them and I spent several hours speaking to both individuals.

(3 SH CR at 1057; Ex. 98 ¶ 16.) However, Berta and Janie both signed affidavits verifying that they had not been contacted by anyone on Ramirez's trial team about testifying and Bowen's reports do not mention any interviews of any of Ramirez's siblings. (1 SH CR at 288–89 ¶ 16; 1 SH CR at 294 ¶ 15.) As for why Ramirez's

sisters were not called as witnesses at the penalty phase, Alma Garza stated:

> I spoke to Berta Alicia Ramirez in preparation for trial. She had been prepared to testify, but when it was almost time for her to testify, she disappeared. Mr. Ramirez family (sic) feared for their lives. They moved and I could not even reach them on the phone number I had for them.

(3 SH CR at 1060 ¶ 37; (Ex. 98 ¶ 37.))

In her affidavit, Alma Garza continued to assert that second-hand information about Ramirez's background was admissible through expert testimony. (3 SH CR at 1056 ¶ 8; Ex. 98 ¶ 8.) She provided vague responses regarding her preparation of Dr. Kate Allen, stating that she sought Dr. Allen's assistance in the case "at least a couple of month (sic) before trial" and sent Dr. Allen Ramirez's records "well in advance." (3 SH CR at 1056 ¶¶ 11–13; Ex. 98 ¶¶ 11–13.)

Rolando Garza's affidavit confirmed that the defense did not have Ramirez evaluated by a neuropsychologist. (3 SH CR at 1057 ¶¶ 14–15; Ex. 97 ¶¶ 14–15.) According to Rolando Garza, they did not investigate whether Ramirez had suffered from brain damage because he found Ramirez "to be competent." (3 SH CR at 1057–58 ¶¶ 14–15, 22–24; Ex. 97 ¶¶ 14–15, 22–24.) In her affidavit, Alma Garza repeated the same sentiment – that testing Ramirez for brain damage was not necessary because "he seemed competent." (3 SH CR at 1057 ¶ 14; Ex. 97 ¶ 14.) The test for competency to stand trial is not relevant to considerations as to whether a client has

brain impairments. Lawyers are not trained or qualified to detect such impairments; impairments which can only be verified through testing. As explained below, the clues that Ramirez likely suffered from brain based disabilities were not dependent on whether defense counsel could diagnose them; instead the red flags for these impairments were replete in his school and juvenile records. Indeed, expert death penalty resource counsel who Alma Garza consulted with, admonished Alma that neuropsychological testing to assess brain damage was warranted based on the contents of Juan's juvenile records. (Ex. 103.)

On October 29, 2012, the prosecutor wrote a five-page letter to Judge Gonzalez. (3 SH CR at 1064.) The letter indicated that the State would be unable to complete the proposed findings of fact and conclusions of law within the timeframe set forth in the court's order. (3 SH CR at 1067.) Despite having been aware of Ramirez's intellectual disability claim for more than three years, the prosecutor claimed that the State would need additional time to retain an expert to counter the claim. (3 SH CR at 1067.) The prosecutor also stated that if new counsel was going to be appointed for Ramirez, he did not want to give new counsel an "unfair benefit." (3 SH CR at 1067.)

On November 3, 2012, OCW filed a motion to transfer Ramirez's representation on the condition that OCW be granted one year to file an amended

writ application. (3 SH CR at 1070.) OCW explicitly stated: "Should this Court not be inclined to grant a one-year extension, the OCW would be forced to decline representing Mr. Ramirez." (3 SH CR at 1073.) In the motion, OCW provided a comprehensive list of what it needed to complete before filing an amended application, which included reading the trial record and creating a transcript summary, reviewing trial counsel's files, investigating and re-interviewing trial witnesses and initial writ witnesses, investigating and re-interviewing prior counsel and their team members, consulting with experts, conducting a thorough juror analysis, and determining whether any additional claims should be brought in an amended application. (3 SH CR at 1072.) In a phone call with Brad Levenson, Judge Gonzalez agreed to OCW's terms, and on November 9, 2012, Brad Levenson and OCW were appointed to represent Ramirez. (3 SH CR at 1074.)

In February 2013, OCW contracted with neuropsychologist, James Underhill, Psy.D., to review the testing that Dr. Martinez had administered. Dr. Underhill informed OCW that Dr. Martinez did not fully test Ramirez's executive functioning. According to Dr. Underhill, Ramirez needed more testing and recommended that OCW retain Dr. David Hartman, a neuropsychological toxicologist, to evaluate the damage that Ramirez's adolescent inhalant abuse had on his brain.

On November 6, 2013, OCW filed Ramirez's Amended Writ Application. (3

SH CR at 1114.) The following issues were presented: (1) trial counsel was ineffective for failing to present evidence that Ramirez's confession to police was false (amending Grounds for Review Thirteen and Fifteen from the Initial Application); (2) trial counsel was ineffective for failing to present evidence of his innocence (amending Grounds for Review Twelve, Fifteen, and Sixteen from the Initial Application); (3) the Eighth Amendment bars Ramirez's execution as he is intellectually disabled (amending Ground for Review Two from the Initial Application); (4) trial counsel was ineffective for failing to investigate and present mitigating evidence (amending Ground for Review Three from the Initial Application); (5) trial counsel was ineffective during the pretrial suppression hearing (amending Ground for Review Thirteen from the Initial Application); (6) prosecutorial misconduct for sponsoring false testimony during the pretrial suppression hearing (newly raised); (7) Ramirez was not competent to stand trial (amending Ground for Review Fourteen from the Initial Application); (8) Ramirez is ineligible for a death sentence due to his mental impairments (amending Ground for Review Four from the Initial Application); (9) trial counsel was ineffective for failing to object to the State's discriminatory use of peremptory strikes to remove women from Ramirez's jury (amending Grounds for Review Eighteen and Nineteen from the Initial Application); (10) trial counsel's cumulative deficient performance

127

prejudiced Ramirez's constitutional rights (amending Grounds for Review Eleven and Sixteen from the Initial Application); (11) Ramirez's death sentence must be set aside because his jury was able to consider a second count of capital murder during deliberations that was unconstitutionally obtained (amending Ground for Review Seven from the Initial Application); (12) trial counsel was ineffective due to a conflict of interest (amending Ground for Review Seventeen from the Initial Application); (13) Texas's system for administering the death penalty is arbitrary (amending Ground for Review Eight from the Initial Application); (14) Ramirez's constitutional rights were violated when the trial court did not instruct the jury that one vote for life would result in a life sentence (newly raised); (15) the penalty phase jury instructions restricted the evidence that Ramirez's jury could determine was mitigating (amending Ground for Review Nine from the Initial Application); and (16) Ramirez is entitled to a new direct appeal because the CCA refused to review the sufficiency of the evidence of the mitigation special issue (amending Ground for Review Ten from the Initial Application).

On February 18, 2014, the State filed a motion to compel Ramirez to submit to a psychological examination with its expert, Dr. Thomas Allen. (4 SH CR at 1731.) The State also moved to have the initial application filed by Mansur and the amended application filed by OCW sent to the CCA for a determination of whether

OCW's amended application should be considered a "subsequent" writ application. (4 SH CR at 1726.)

On June 18, 2014, the CCA issued another order requiring the trial court to resolve the case within 60 days. (HA Order, June 18, 2014.) The parties filed a joint motion seeking an extension. (HA Joint Mot. for Extension of Time, Aug. 15, 2014.) The State indicated that its expert would be evaluating Ramirez on August 25, 2014, and that an evidentiary hearing was being planned for October. (HA Joint Mot. for Extension of Time at 2, Aug. 15, 2014.) The CCA never ruled on the motion.

On August 25, 2014, the State's expert Dr. Thomas Allen evaluated Ramirez. (Ex. 117.) Dr. Allen noted that previous testing done while Ramirez was at TYC indicated that his IQ was likely to be in the low 90s. (Ex. 117 at 11.) He further noted Dr. Martinez's "clearly inconsistent testing," which measured Ramirez's full scale IQ to be 59. (Ex. 117 at 11.) After administering the WAIS-IV and the WRAT-4, Dr. Allen ultimately concluded that Ramirez's full scale IQ was between 88 and 96. (Ex. 117 at 12.)

Although Dr. Allen's testing cast Ramirez's claim of intellectual disability in doubt, it did not refute other evidence known to OCW demonstrating that Ramirez suffered from acute developmental learning disabilities, mental illness, and brain damage. Nevertheless, inexplicably, OCW filed a Notice of Intent to Withdraw

Claims Regarding Mental Impairments. (1 SH Supp CR at 24.)

The trial court held an evidentiary hearing over two days at the beginning of November 2014, more than two months after the CCA deadline for the case to be "resolved." (Exs. 100–01 *passim*.) Ramirez was represented by Brad Levenson, Jeremy Schepers, and Erin Eckhoff from OCW. At the outset of the hearing, Levenson confirmed to Judge Gonzalez that he was abandoning all claims related to Ramirez's "mental condition." (Ex. 100 at 12–13.)

OCW and the State stipulated to the admission of 31 exhibits. The first nine exhibits were attachments to Ramirez's initial writ application and included affidavits from: Ramirez's mother Juana Navarro Ramirez (4 SH RR Ex. 1), Ramirez's sisters Berta Ramirez and Juana "Janie" Ramirez (4 SH RR Exs. 2-3), Ramirez's father and stepmother Jose Raul Ramirez and San Juana Lara (4 SH RR Exs. 4-5), Ramirez's godparents Agustin and Thelma Mendoza (4 SH RR Exs. 6-7), Ramirez's then-wife Marisol Ibarra Ramirez (4 SH RR Ex. 8), and trial psychologist Dr. Kate Allen (4 SH RR Ex. 9). The exhibits also included affidavits from false confession expert Dr. Deborah Davis[22] (4 SH RR Ex. 10), neuropsychologist Dr.

---

[22] Dr. Davis' report was based, in large part, on the findings of Dr. Gilbert Martinez. After questioning Dr. Martinez's reliability, OCW did not offer Dr. Martinez's report and withdrew all claims relying on his report. (Ex. 100 at 12.)

Ruben Gur[23] (4 SH RR Ex. 11), and addiction specialist Dr. Jane Maxwell[24] (4 SH RR Ex. 12). The remainder of the exhibits were affidavits from the following individuals: former Edinburg police officer Robert Alvarez (4 SH RR Ex. 13), co-defendant Marcial Bocanegra (4 SH RR Ex. 14), childhood friend Jesus Limon (4 SH RR Ex. 15), childhood schoolmate Brenda Maldonado (4 SH RR Ex. 16), Ramirez's sister Aurora Marroquin (4 SH RR Ex. 17), Ramirez's mother's boyfriend's mother Alicia Marroquin (4 SH RR Ex. 18), family friend Maria Martinez (4 SH RR Ex. 19), uncle Ignacio Navarro (4 SH RR Ex. 20), cousin Jose Luis Navarro (4 SH RR Ex. 21), family friend Cipriana Ortega (4 SH RR Ex. 22), cousin Santana Duarte (4 SH RR Ex. 23), sisters Berta Ramirez and Juana "Janie" Ramirez (updated) (4 SH RR Exs. 24 and 25), mother Juana Navarro Ramirez (updated) (4 SH RR Ex. 26), brother Oliver Ramirez (4 SH RR Ex. 27), childhood friend Esequiel Rodriguez (4 SH RR Ex. 28), jurors Ann Fuentes and Tanya Carillo (4 SH RR Exs. 29 and 30), and Larry Warner (4 SH RR Ex. 31).

Schepers called Rolando Garza as Ramirez's first witness. (Ex. 100 at 18.)

---

[23]    Dr. Gur did not conduct any neurological or neuropsychological testing. He merely described the value such testing may have had in Ramirez's case and indicated that such testing was available at the time of trial.

[24]    Dr. Maxwell's affidavit, addressing the effects of drug and alcohol abuse and addiction on the brain, was also based on Dr. Martinez's findings.

Garza provided a brief history of his background and confirmed that he had never represented anyone charged with capital murder before Ramirez. (Ex. 100 at 19–20.) He testified that his primary duties as co-counsel had been to copy discovery and to conduct legal research. (Ex. 100 at 20–21.) He was also involved in the efforts to suppress Ramirez's statement to police. (Ex. 100 at 21.)

Rolando Garza testified that Alma Garza was in charge of all witnesses and that she had the final say in all decisions. (Ex. 100 at 21.) When questioned about the role of the investigator, Juan Castillo, Garza speculated that Castillo may have been looking for "Raul's mom and his sister."[25] (Ex. 100 at 22–23.) He had a hard time remembering whether he had actually met the mitigation specialist, Gilda Bowen, prior to trial. (Ex. 100 at 25.) Garza conceded that he never interviewed Ramirez's mother or sisters for mitigating evidence and denied speaking with Ramirez's father, his other siblings, or any of his friends. (Ex. 100 at 27–32.)

Alma Garza was the next witness called to testify. (Ex. 100 at 77.) She began by providing an overview of her legal career. (Ex. 100 at 78–80.) Initially Garza could not recall whether she had represented anyone besides Ramirez in a death penalty case. (Ex. 100 at 80–81.) When pressed, she recalled being second chair in a death penalty case after Ramirez in which the defendant had waived jury. (Ex. 100

---

[25]    There is no evidence that Ramirez has ever gone by the name "Raul."

at 80–81.)

Schepers asked Garza how she had prepared for the guilt/innocence phase of Ramirez's capital trial. (Ex. 100 at 87–88.) Garza recalled that she had given the investigator the file to review and testified that he regularly reported back to both her and Rolando Garza.[26] (Ex. 100 at 87–88.) Garza stated that she had considered all possible angles: "[W]e talked to everybody and anybody that could have any kind of information, you know, that would help our case." (Ex. 100 at 101.) She could not, however, remember a single person she had personally spoken with in preparation for the guilt/innocence phase of Ramirez's capital trial. (Ex. 100 at 101.)

Schepers turned his questions to how the defense team prepared for the suppression hearing. Alma Garza testified in direct contradiction to Rolando Garza's testimony and asserted that it was Rolando Garza that had been in charge of preparing and producing the witnesses for the suppression hearing. (Ex. 100 at 99.) When Schepers asked her if Rolando Garza had interviewed any law enforcement officers in preparation for the suppression hearing, she was "sure" that he did.[27] (Ex. 100 at 99.)

---

[26]    Garza could not remember Castillo's name or whether he had any prior capital experience. (Ex. 100 at 87–88.)

[27]    He did not. (Ex. 100 at 40–41.)

Schepers next turned to the defense team's investigation of mitigating evidence. (Ex. 100 at 89.) Just as she did in her affidavit, Garza shifted responsibility for the mitigation investigation to Gilda Bowen. Garza testified that she had directed Bowen to talk to Ramirez and to review his records from Evins. (Ex. 100 at 91–92.) She also believed that Bowen was "supposed" to have talked to Ramirez's family. (Ex. 100 at 91.)

Garza was asked, specifically, what she had planned to present during the penalty phase and who she had planned to call as witnesses to present this evidence. (Ex. 100 at 108–09) Garza stated: "I was gonna put on his mother -- that I had already talked to and prepared -- and one of his sisters, at least -- that I had talked to her, and we had prepared . . . (Ex. 100 at 109.) When asked whether Ramirez's mother and sister ended up testifying, Garza stated:

> No. They didn't. As a matter of fact, they had been here all through the trial. There was a lot of issues, a lot of things going on. There was a lot of death threats and things going on. And at some point, even though I had their phone numbers to call them, and they were here every day -- At some point, they just stopped showing up. And then I called them. I continued to call them, and we were never able to get a hold of them.

 (Ex. 100 at 109.)

Garza claimed Ramirez's mother and sister simply stopped showing up just when it was time for them to testify and maintained that this was due to threats that his family had received:

They had told me that they were -- because of the threats and what was going on, that they were gonna be moving to Corpus, but that they would be here, or that they would be available to me to come testify.

(Ex. 100 at 110.) Schepers asked Garza what steps she took to get Ramirez's family back to testify. (Ex. 100 at 110.) She stated: "I called them to the numbers that they had left me, and I never got a call back. I was never able to talk to them." (Ex. 100 at 110.)

The unavailability of Ramirez's mother and sister during the penalty phase led to questions regarding Dr. Kate Allen's testimony and Judge Gonzalez's ruling regarding the admissibility of hearsay evidence. (Ex. 100 at 111.) At first, Garza did not remember that Dr. Allen had testified at all. (Ex. 100 at 109–11.) Once she was reminded that Dr. Allen had testified but was prohibited from testifying about the factual details of Ramirez's life, Garza stated:

Yes. Since I couldn't get the members here to testify as to that, I was hoping that she would be allowed to talk about that information that -- that the family members were not here to present.

(Ex. 100 at 109–11.)

Judge Gonzalez commandeered the State's cross examination when Garza testified that she did not know whether Dr. Allen had spoken with Ramirez's family before testifying. (Ex. 100 at 118, 120–21.) It also became evident that Garza still did not understand how that factored into the court's ruling regarding Dr. Allen's

135

testimony:

> Court: In this case, my understanding is that the expert that we're talking about was an expert that actually had talked to your mitigation investigator.

> A: Yes. And also talked to the family. And the information that that expert - - that I wanted her to offer had to do with the -- what had happened to Mr. Ramirez when he was young -- that he had some head trauma that had occurred to him. And she was not allowed to testify as to that. And as to the background -- his upbringing, the way he was brought up -- because they were very poor, their surroundings, their environment, and things like that.

> Court: Which is all evidence that could have been presented through other witnesses, and the court certainly looked at: Okay. Those witnesses could have been brought in, just like that they -- Just like they were made available to the expert, they could have been made available to the jury.

> A: Well, what had happened judge, was: Those witnesses were the ones that were threatened, and that's why they had moved away to Corpus, you know, to secure themselves, to be safe. And -- And when I tried to contact them, I couldn't get them back in here.

(Ex. 100 at 120–21.)

Garza claimed that she had told the court that Ramirez and his family had received threats. (Ex. 100 at 121–22.) Judge Gonzalez became defensive and countered that he believed it was never her intention to call Ramirez's family members at all but rather her intention all along was to present the information from the family members through an expert witness:

> Court: There was never anything brought to this court's attention in the

form of evidence or testimony from those individuals that, in fact, they were not gonna testify because they had been threatened. In other words, the Court had your -- your opinion as to what they were telling you was going on.

> A: Correct.

Court: Okay and my question to you is this: There's a lot being said about the Court not allowing your expert to testify about certain things. First of all this is a mitigation expert.

> A: Correct.

Court: And what you and your co-counsel told me is: "Look, we're not gonna bring them in, but we're just gonna try to get the evidence in through this expert who interviewed them." And I said, "Well that depends on what she's gonna testify to."

> A: Correct.

(Ex. 100 at 123.)

The State then highlighted that Garza was ignoring the extra level of hearsay that had impacted Dr. Allen's testimony: "Judge, that's not even true because -- I'll bring that out in a minute when I ask Ms. Garza -- but Kate Allen -- Dr. Kate Allen didn't even talk to these people. Gilda Bowen did, and it's another level of removal --." (Ex. 100 at 123–24.) The State posited that Garza had initially planned to call Gilda Bowen to testify about Ramirez's background but had strategically decided against doing so to avoid Bowen being cross examined. (Ex. 100 at 131–35.)

The State's theory actually gave Alma Garza more credit than she was due.

137

Garza seemed unaware that Dr. Allen had based her opinions almost exclusively on Bowen's reports, testifying that she did not know whether Dr. Allen had spoken with Ramirez's family, speculating that Dr. Allen may have done so without her knowledge:

> State: But the information that Kate Allen -- Dr. Kate Allen was gonna testify to wasn't secondhand information; was it? It was thirdhand information from the family members, the defendant, his mother, his sisters, whoever, to Gilda Bowen first, and then another level to Dr. Allen; right?
>
> A: I couldn't answer "yes" or "no".
>
> State: Well, Dr. Allen didn't talk to them --
>
> A: Hold on. Because I could not tell you if Dr. Allen actually talked to the family directly herself. I know that -- that she did base a lot of information on what Gilda had given her, but I cannot answer for her because, like I said, I do not know if she talked to the family or not also.

(Ex. 100 at 137–38.)

When the State reminded Garza that Dr. Allen had submitted an affidavit complaining about her lack of time to prepare and the untimely manner in which she received Ramirez's records, Garza stated:

> A: Yes. She had been off to another trial, and then she was sick. Yeah. She had been sick for a while. And that's why, I think, we had filed a motion for continuance -- to give her a little bit more time -- and we were denied that time.
>
> State: So it's extremely doubtful she talked to anybody personally, considering she had all those other problems?

A: I couldn't tell you that.

State: She wasn't even here to talk to anybody.

A: I don't know if she talked to them over the phone. She could have talked to them over the phone.

(Ex. 100 at 137–38.)

Garza failed to explain how Dr. Allen was able to get ahold of Ramirez's family members by phone, when, according to Garza, those family members had disappeared. But that is almost beside the point. Dr. Allen testified at the sentencing as to what she reviewed and considered and interviews of the family were not among them. (39 RR at 4.) Dr. Allen's billing records confirm that the family was never interviewed. (ECF No. 30-5 at 4, Ex. 89 at 1.)

Juan Castillo, the defense investigator appointed to assist trial counsel, was the third witness to testify at the evidentiary hearing. (Ex. 100 at 139.) Castillo testified that throughout his work on the case, he met with Rolando Garza a total of two or three times. (Ex. 100 at 140.) He could not recall ever meeting Alma Garza or even talking to her on the phone. (Ex. 100 at 140–41.) Castillo remembered that Rolando Garza had asked him to track down two witnesses related to Ramirez's arrest and confession but testified that no one ever asked him to meet with Ramirez. (Ex. 100 at 139, 141.) Despite his background in law enforcement, Castillo

confirmed that no one ever asked him to talk to the police officers involved in the investigation or to track down any witnesses who had information about Ramirez's life. (Ex. 100 at 146.)

Gilda Bowen testified next about her involvement in Ramirez's case. (Ex. 100 at 149.) Erin Eckhoff directed her testimony. Bowen confirmed that this was her first death penalty case and stated that she typically requires twelve to eighteen months, minimum, to adequately conduct a mitigation investigation. (Ex. 100 at 151.)

Bowen testified that she first heard about Ramirez's case when Alma Garza called to tell her that she had already been appointed. (Ex. 100 at 157.) Despite the short timeline, Garza did not tell Bowen to start gathering records and setting up interviews immediately. Rather, Garza told Bowen to wait until she received the appointment order which Garza neglected to send Bowen for another month. (Ex. 100 at 157.) By the time Bowen received the appointment order on July 5, 2004, there were only three and a half months remaining for Bowen, without any previous experience, to conduct a complete capital mitigation investigation.

Bowen confirmed that she met Ramirez for the first time on August 5, 2004, and then once more on August 26, 2004. (Ex. 100 at 161–62.) She further confirmed that she did not interview either of Ramirez's parents until voir dire was already under way. Bowen did not believe that the jury was presented with an accurate

picture of Ramirez - when asked what was missing, she said: "His life story." (Ex. 100 at 167.)

Eckhoff asked Bowen what kind of direction and instruction Alma Garza gave her regarding how to conduct the mitigation investigation. Bowen responded: "Well, not instruction on how to do mitigation. It was pretty much what I could -- I mean, asking me what I could provide to her on this in my new role." (Ex. 100 at 157.) She clarified: "It was more access than instruction. I never received any direct instruction. It was: 'Meet with him and, you know, tell me what you think, and tell me what you can find out, and tell me about him.'"

Although Bowen was a licensed social worker, she had only attended one training on mitigation and had never been involved in a death penalty case before. Bowen testified that, at that time, she did not know what kind of guidance she was supposed to receive from trial counsel. (Ex. 100 at 169–70.) At this point, Judge Gonzalez interjected:

Court: You were hired as an expert; were you not?

A: Yes. I was.

Court: And when you're hired as an expert -- You're hired as an expert because, normally, the person that's hiring you doesn't have that expertise, and they need assistance?

A: Correct.

Court: So when you're saying that you don't know what guidance she could have given you, you're saying that, "Look, I was an expert. I was" -- "and she could have given me access" -- which is what you said; right? Isn't that what the lawyer is supposed to do? Give you access and say, "Hey, do your magic".

(Ex. 100 at 170–71.)

The trial court's statements demonstrated a grave misunderstanding of what is required of trial counsel in a death penalty case. ABA Guideline 10.4 states: "Lead counsel bears overall responsibility for the performance of the defense team." "[T]he role of lead counsel is to direct the work of the defense team in such a way that, overall, it provides high quality legal representation in accordance with these Guidelines and professional standards." Commentary to Guideline 10.4.

After Bowen's testimony, the hearing concluded for the day. The next morning, OCW attorney Brad Levenson called Ramirez's mother, Juana Ramirez, to testify through the assistance of a translator. (Ex. 101 at 8.) Juana stated that while her son's case was pending, she would call Alma Garza about three times per week. (Ex. 101 at 9.) When Garza did not return her calls, Juana had her daughter Janie drive her to Garza's office. (Ex. 101 at 9.) Juana confirmed that Garza had both her telephone number and her address in Donna. (Ex. 101 at 9-10.)

Juana testified that she had attended her son's trial until Alma Garza told her that her life was in danger and suggested that she move away. (Ex. 101 at 10.) Juana

stated that even when she and Janie moved to Corpus Christi, she returned to attend portions of her son's trial. (Ex. 101 at 12.) She testified that Garza had their address and telephone numbers, even after they moved. (Ex. 101 at 11.) She called Garza to ask for updates and left a message with her secretary but did not hear back. (Ex. 101 at 12.)

Ramirez's sister, Janie was the final witness OCW called to testify on Ramirez's behalf. (Ex. 101 at 13.) Janie confirmed that she often drove her mother to Alma Garza's office when Garza would not return her phone calls. (Ex. 101 at 14.) Janie testified that neither Alma Garza nor Rolando Garza ever asked her about her brother's childhood or his background. (Ex. 101 at 15–16.)

Janie testified that both she and her mother kept their same cell phone numbers when they went to Corpus Christi. (Ex. 101 at 17–18.) She stated that they had moved because Alma Garza had told her mother that Juan wanted them to move away to be safe. (Ex. 101 at 17.) Janie told the court that Alma Garza had told Juan that he may need to testify against other gang members and that his family would be in danger: "After his arrest, Juan told our family that we needed to leave Donna. He said that his attorney had made it seem like he was going to testify against other gang members. He said that something would happen to us, so we left right away." (Ex. 101 at 17.)

143

After the testimony of Ramirez's mother and sister, Judge Gonzalez was clearly shaken:

> I'm a bit disturbed about something I heard today in the emphatic nature in which it was said -- that the mother of Mr. Ramirez is under oath telling this Court that she was told by her lawyer to move or by the lawyer representing Ramirez. That doesn't appear to be consistent with what Alma Garza testified about yesterday.

(Ex. 101 at 21.) Judge Gonzalez was right to be disturbed. There was no evidence presented that any threats actually existed. (Ex. 101 at 24.) Judge Gonzalez stated that counsel had not informed him during the trial that they were having difficulty getting in contact with Ramirez's family. (Ex. 101 at 24–25.) Rather, trial counsel had left him with the impression that the family would not come back to testify because they were afraid. (Ex. 101 at 24–25.)

Brad Levenson agreed that there was no evidence that the threats were real, but submitted that the issue was that trial counsel knew how to get in contact with Ramirez's family but failed to do so. (Ex. 101 at 24–25.) It was at this point that Judge Gonzalez began defending Alma Garza, contrary to his assertions earlier in the hearing. As quoted above, earlier in the hearing Judge Gonzalez asserted that trial counsel had told him they were not calling any witnesses and that they intended to rely on their expert to present *all* of the evidence. (Ex. 101 at 123.) Once he realized that OCW had made a compelling case for Alma Garza's ineffectiveness,

Judge Gonzalez's attitude shifted. He immediately began personally vouching for Garza and instructed his staff to get Alma Garza back in to testify so that she could "clear up" the record. (Ex. 101 at 27, 38–39.)

Then without any supporting evidence, the State began advocating for the position that Alma Garza had planned to call Ramirez's mother and sister during the penalty phase but simply could not locate them. (Ex. 101 at 31–32.) According to the State, Garza was forced to attempt to get the family's information into evidence through Dr. Allen's testimony as a "Hail Mary" or a "backup plan." (Ex. 101 at 31–32.) This is contrary to the State's assertion earlier in the hearing that Garza's strategy was to present all mitigation evidence through experts. (Ex. 100 at 131–35.)

Judge Gonzalez then theorized on the defense's strategy, going through an analysis of why information from Ramirez's family admitted through an expert would not have been persuasive: "[T]he jury could not have found that [Ramirez's traumatic childhood] actually happened, because there was no credible testimony. There was double hearsay of information that may have been shared with somebody, that was later on shared with an expert that would be willing to repeat it, but that's not credible testimony." (Ex. 101 at 29.) Then, in an attempt to excuse Garza's failures, he contradicted himself, stating that the information from the family would be more credible if introduced through the testimony of an expert: "[C]ertainly

getting information through a doctor gives the information more credibility than from a family member." (Ex. 101 at 31.) This assumption did not rely on evidence before the Court and conflicted with the ABA Guidelines and established professional norms, which cite evidence that juries react negatively to expert testimony that is unsupported by lay witness evidence. American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases (Rev. Ed. 2003), 10.11 Commentary, 31 Hofstra L. Rev. at 1055.

Jeremy Schepers reminded Judge Gonzalez that Alma Garza's testimony the day before clearly indicated that she had not understood (and still did not understand) the Texas Rules of Evidence. (Ex. 101 at 29–30.) Judge Gonzalez contradicted his previous comments regarding the admissibility of third-hand information from the family, claiming that Alma Garza "wasn't wrong about the rule," and then personally vouched for her . . . "I've known Ms. Garza for quite a number of years. I don't think they were confused about the rule." (Ex. 101 at 30.)

Judge Gonzalez had the parties give their closing arguments while they waited for Alma Garza to arrive. (Ex. 101 at 39.) Schepers went first and focused on a claim of ineffective assistance of counsel for failure to investigate and present mitigating evidence. (Ex. 101 at 40.) He noted that this was the first case in which Alma Garza presented evidence during the penalty phase, and highlighted how her appointment

was in direct contradiction to Texas Code of Criminal Procedure § 26.052(d)(2)(E)(ii), which states: "Trial counsel in a death penalty case must have previous trial experience in presenting mitigation evidence at the punishment phase." (Ex. 101 at 41.)

OCW broke down trial counsel's deficient performance into two primary categories: (1) their deficient investigation of mitigating evidence under the ABA Guidelines; and (2) their deficient presentation of the mitigation evidence that they had uncovered based on their lack of understanding of the Rules of Evidence. With regard to trial counsel's mitigation investigation, Schepers discussed how Bowen had only met with Ramirez two times and how those were the only two interviews she had conducted prior to the start of jury selection. (Ex. 101 at 44.) He also mentioned that Bowen did not begin writing her biopsychosocial report until December 6 and it wasn't completed until the day the penalty phase began. (Ex. 101 at 45.) Schepers then turned to Alma Garza's demonstrated ignorance regarding the Rules of Evidence. (Ex. 101 at 46.) Conceding that the court would have to make a credibility determination between Alma Garza's testimony and that of Ramirez's family, Schepers insisted that the court should believe the family as it was clear that Alma Garza continued to believe that the family's third-hand information should have been admitted through Dr. Allen. (Ex. 101 at 46–47.) Finally, as prejudice,

Schepers pointed to the 19 affidavits submitted with the writ application from people who knew Ramirez prior to the crime and were available to testify. (Ex. 101 at 48.)

The State then gave its closing argument. The prosecutor continued to assert that trial counsel's decision to introduce the family's information through Dr. Kate Allen must have been a backup strategy, used only because Ramirez's family had disappeared. (Ex. 101 at 50.) The prosecutor also claimed that Alma Garza and Rolando Garza's lack of experience and failure to meet the appointment criteria was "harmless," because no amount of mitigation would have made a difference in this case. (Ex. 101 at 56.)

After the State's closing argument, the court recalled Alma Garza to the stand. (Ex. 101 at 58.) As expected, Garza doubled down on her previous testimony. She denied telling Ramirez's family about the threats and denied telling them to move away, stating: "I mean, I would never send them to Corpus. I mean, I don't know anybody there." (Ex. 101 at 60.) Garza claimed that Ramirez's mother did not tell her how or why they believed they were being threatened. (Ex. 101 at 61.)

Garza's testimony on this topic gave rise to a massive failure on the part of Ramirez's post-conviction counsel. In the months leading up to the trial, Juana Ramirez had begun seeing a psychiatrist; her mental health had deteriorated to the point of it becoming a disability. (ECF No. 26-1 at 46–106, ECF No. 26-2 at 2–39,

Ex. 43.) OCW had in its possession Juana's social security records which contained records from her psychiatrist, Dr. Elisa Garza Sanchez, whose office was located in McAllen near Juana's Donna residence.

On October 15, 2004, just days before the start of jury selection, Juana visited Dr. Sanchez for a follow up. Dr. Sanchez's progress notes indicate that they discussed threats Juana had received from family members of the victims. (Ex. 123 ¶ 7; ECF No. 26-1 at 88, Ex. 43 at 43.) Dr. Sanchez's notes state that because of those threats, just as Juana testified at the hearing, "Ms. Ramirez was directed to move by [her son's attorney] Ms. Garza." (Ex. 123 ¶ 7.) Juana told Dr. Sanchez that she had reservations about moving because she wanted to stay nearby to attend her son's court proceedings. (Ex. 123 ¶ 7.)

Juana's psychiatric records further establish that Alma Garza had been in contact with Ramirez's family throughout the proceedings. On December 23, 2004 (four days after the conclusion of the penalty phase), Juana visited Dr. Sanchez's McAllen office for another follow-up and stated that her son had been sentenced to death. (Ex. 123 ¶ 8; ECF No. 26-1 at 87, Ex. 43 at 42.) Dr. Sanchez's contemporaneous notes from December 23, 2004 contradict Alma Garza's testimony in material respects. The notes demonstrate Juana had not disappeared and that she was still living in Donna when her son's trial concluded. Juana reported that she was

going to start the process of moving to Corpus Christi and that her home in Donna had been burglarized two days prior. (Ex. 123 ¶ 8.) Even more startling, Dr. Sanchez's notes put the lie to Alma Garza's testimony that she could not locate the family for the penalty phase. Juana reported just a few days after the sentencing that they [the lawyers] did not want her to be there. (ECF No. 26-1 at 87, Ex. 43 at 42.)

These records, which were in OCW's possession, demonstrated that Alma Garza had not testified candidly at the hearing. Juan's mother had not gone missing. She had been told to stay away from the hearing. As she told Dr. Sanchez "[On] Saturday death, they [trial counsel] not want her to be there." (ECF No. 26-1 at 87, Ex. 43 at 42.) Keeping Ramirez's family away from the courthouse was part of Alma Garza's uninformed strategy, and she reveled in portraying herself as being the only one standing up for Ramirez, concluding her penalty phase closing argument by telling the jury: "His mother didn't testify. She never asked for his life. I did." (39 RR at 136.) Because Alma Garza did not understand the evidence rules, she told the family to stay away. She later made up the story about the family being unavailable. At the sentencing, she thought that Judge Gonzalez would let Dr. Kate Allen testify to third-hand hearsay testimony. She was wrong.

At the end of the hearing, OCW and the State asked the Court for 30 days after the record was filed to submit their proposed findings of fact and conclusions of law.

Judge Gonzalez seemed to already have his mind made up and addressed how the appellate courts were likely to agree with his reasoning on the issue of ineffective assistance of counsel:

> They're gonna take it on a case-by-case basis. They're gonna use harm analysis. They're gonna make a determination based on what they have on the record. There are certain things on writs that we have, as a state, looked at, and said, "Okay" -- For lack of a better term, it's like pornography. You know it when you see it.

(Ex. 101 at 74.)

On November 11, 2014, the parties jointly moved the CCA for an extension of time until February 15, 2015 to allow the court reporter to prepare the transcript, to allow the parties time to draft proposed findings of fact and conclusions of law, and for the trial court to rule. The CCA never ruled on the request. On January 5, 2015, both parties filed their proposed orders, and on January 20, 2015, the court adopted the State's 400-page proposed order, more than four months after the CCA deadline.

The Texas Court of Criminal Appeals affirmed the denial of relief on October 14, 2015, in a two-page unpublished decision. *Ex parte Navarro Ramirez*, No. WR-71,401-01 & WR-71,401-02, 2015 WL 6282336, at *1 (Tex. Crim. App. Oct. 14, 2015) (per curiam) (unpublished).

On October 23, 2015, OCW filed a motion for DNA testing pursuant to Texas

Code of Criminal Procedure article 64.01. (*See* 1 SH DNA CR at 19.) In that motion, Ramirez sought DNA testing of two hats found at the crime scene and submitted that exculpatory results from the testing would undermine his conviction. (1 SH DNA CR at 1, 9-10.)

### F. Federal Court Proceedings

On October 30, 2015, OCW filed an Advisory Concerning Impending Case and Appointment of Counsel in this Court on Ramirez's behalf. (ECF No. 1.) The filing noted that post-conviction counsel's repeated failures led Ramirez to have just 97 days remaining on his federal statute of limitations at the time the Court of Criminal Appeals denied his state habeas applications. (ECF No. 1.) After an exhaustive search, the Federal Public Defender for the District of Arizona agreed to undertake Ramirez's representation. (ECF No. 1.)

On November 4, 2015, OCW filed a Motion for Conditional Appointment of Counsel on Ramirez's behalf seeking the appointment of the Federal Public Defender for the District of Arizona. (ECF No. 2.) The motion served to inform the Court that the Federal Public Defender for the District of Arizona had begun the process of seeking approval to be appointed to an out-of-district case. (ECF No. 2.) The motion requested that the appointment be made conditioned on that approval. (ECF No. 2.) On November 19, 2015, this Court granted that request (ECF No. 4),

and on November 24, 2015, undersigned counsel filed a notice that the appointment had been approved by the Office of Defender Services of the United States Administrative Office of the Court (ECF No. 5).

On December 7, 2015, Ramirez, through undersigned counsel, filed an unopposed motion seeking a declaration that any unexpired portion of the limitation period under 28 U.S.C. § 2244(D) has been tolled by statute. (ECF No. 14). Specifically, Ramirez requested that this Court find that his motion for DNA testing pending in the Texas trial court had tolled his time remaining under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). This Court denied Ramirez's motion, finding that while his position regarding the statute of limitations may have merit, the motion impermissibly sought an advisory opinion from the Court. On December 14, 2015, the parties jointly stipulated that Ramirez's motion to test DNA evidence tolled the statute of limitations under 28 U.S.C. § 2244(D)(1), consistent with the Fifth Circuit's holding in *Hutson v. Quarterman*, 508 F.3d 236 (2007) (per curiam).

On November 30, 2018, Ramirez filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2244. Ramirez had done so after he was made aware that the Texas trial court had denied his motion for DNA testing on June 17, 2017. The trial court had filed the order under an incorrect case number and failed to serve

Ramirez's counsel with the order. As such, both state and federal counsel for Ramirez as well as counsel for Respondents were unaware of the ruling until October 2018, despite diligently checking the state-court docket for such an order. Because Ramirez's state counsel was unaware of the trial court's order, no notice of appeal had been timely filed in the state court.

When Ramirez's federal counsel were made aware of the trial court's ruling, counsel acted immediately to remedy the effects of the error. After the state court was notified of the problems with service of its earlier ruling, it issued a superseding order on October 31, 2018, which was properly filed and served. Ramirez's state-court counsel then timely appealed the order to the Texas Court of Criminal Appeals. Due to the actions of the trial court, Ramirez was unsure whether the 28 U.S.C. § 2244(d) statute of limitations was stayed due to the ongoing state-court litigation, running based on the court's October 31, 2018 order, or expired. *See, Huston, supra*. Due to this uncertainty, Ramirez's counsel filed a federal habeas petition with supporting exhibits on November 30, 2018, thirty days after the superseding order was filed to demonstrate continued diligence in pursuing relief.

On December 21, 2018, Ramirez moved to stay his federal habeas proceedings, submitting that it would be in the best interests of the parties and the Court to stay these proceedings until the state appellate court had ruled on Ramirez's

appeal. On July 22, 2019, Magistrate Judge Peter E. Ormsby issued a Report and Recommendation recommending that a stay should be granted pending the conclusion of the state court litigation. On September 17, 2019, the Court adopted the Report and Recommendation in its entirety, stayed this case, and ordered Ramirez to move to reopen this case within 30 days after the conclusion of the state Chapter 64 litigation. (ECF. No. 64)

On May 5, 2021, the Texas Court of Criminal Appeals affirmed the trial court's order denying Ramirez's Chapter 64 motion for DNA testing of the two hats. (Opinion, No. AP-77,084, May 5, 2021.) On May 26, 2021, Ramirez filed a motion with this Court to vacate the stay and establish a briefing schedule for the resumption of this case (ECF. No. 56), and the motion was granted on June 8, 2021. (ECF. No. 62)

## V.  Presumption of Correctness

Ramirez hereby provides notice of his intention to challenge the presumption of correctness of findings of fact made by the state court in his case. Certain findings of fact by the state court in this case, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1). These include, but are not limited to, factual findings made by the trial court in Ramirez's trial and sentencing and the decisions by the Texas Court of Criminal Appeals in his appellate

proceedings. Pursuant to 28 U.S.C. § 2254(e)(1), Ramirez asserts that certain findings of fact by the state court at trial, sentencing, on direct appeal, or in his post-conviction proceedings, if any are found to exist, are not fairly supported by the record. Ramirez also asserts other exceptions to the presumption of correctness, including, but not limited to: that the procedures employed by the state courts in making findings of facts were not adequate to afford him full and fair hearings; that material facts were not adequately developed at state-court hearings; that Ramirez did not receive full, fair, and adequate hearings in the state court proceedings; and that Ramirez was otherwise denied due process of law in the state court proceedings.

## VI. Amendment

Ramirez expressly reserves his right to amend this petition. In *McCleskey v. Zant*, 499 U.S. 467, 498 (1991), the Supreme Court reaffirmed the "principle that [a] petitioner must conduct a reasonable and diligent investigation aimed at including all relevant claims and grounds for relief in the first federal habeas petition." Referring to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of the record) and Habeas Rule 8 (evidentiary hearing), the Supreme Court held that a habeas petitioner has to have reasonable means and the ability to investigate to form a sufficient basis to allege a claim in the first petition. *Id.* at 497–98. Ramirez believes additional claims may be identified following a thorough review of the record,

through investigation, after discovery is conducted and completed, or after an evidentiary hearing is held. At the appropriate time during these proceedings, Ramirez will present any additional claims, along with complete factual and procedural histories and more thorough briefing on his claims through amendment to the petition.

## VII.   Exhaustion and Procedural Default

Due to the procedural history in this case, Respondents may raise issues of exhaustion and procedural default in their answer. Ramirez shall present facts and law addressing any such contentions in further briefing in this Court. As an initial matter, none of the facts and claims presented in this Petition are procedurally barred because (a) any state court procedural rulings in this case are not independent and adequate state grounds to bar federal review; (b) Ramirez can establish cause and prejudice to overcome any procedural bar; and/or (c) Ramirez can establish a fundamental miscarriage of justice to overcome any potential procedural bar. To the extent this Court believes that this Petition contains unexhausted claims, the Court may stay and hold in abeyance the federal proceedings, and direct Ramirez to exhaust those claims in state court.

## VIII. Discovery, Expansion of the Record, and Evidentiary Hearing

At the appropriate time, Ramirez will file motions with the Court requesting the necessary evidentiary development of his claims pursuant to Habeas Rule 6 (discovery), Habeas Rule 7 (expansion of the record), and Habeas Rule 8 (evidentiary hearing). To the extent this Court believes that any of Ramirez's claims may be procedurally defaulted, this Court should grant a hearing so that he can show cause and prejudice and/or a fundamental miscarriage of justice to overcome any default. *See, e.g.*, *Jenkins v. Anderson*, 447 U.S. 231, 234 n.1 (1980) (application of cause and prejudice may require district court fact finding); *Schlup v. Delo*, 513 U.S. 298 (1995) (remanding to district court to determine whether to hold hearing on fundamental miscarriage of justice); *Trevino v. Thaler*, 569 U.S. 413 (2013) (ineffective assistance of state post-conviction counsel can establish cause). Finally, in procedural circumstances where a "procedural morass" resulted in the absence of a record, a habeas petitioner may be entitled to discovery and an evidentiary hearing to reconstruct that record. *See, e.g.*, *Wellons v. Hall*, 558 U.S. 220, 221, 226 (2010) (per curiam).

**IX.** **The Anti-terrorism and Effective Death Penalty Act of 1996 does not restrict this Court's power to review the merits of Ramirez's claims de novo.**

The Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA") is unconstitutional. As a result, AEDPA cannot lawfully apply to restrict this Court's ability to review the merits of Ramirez's claims de novo. Moreover, even accepting AEDPA's constitutionality, it is no bar to de novo review in this case. Because the court that presided over Ramirez's state habeas petition adopted nearly verbatim the findings of fact and conclusions of law supplied by Respondents, there was no "adjudication on the merits" within the meaning of 28 U.S.C. § 2254(d). Consequently, Ramirez is entitled to de novo review of the claims fairly presented in his state habeas petition. In the alternative, for any claims which this Court deems adjudicated on the merits, Ramirez alleges that § 2254(d) is satisfied, also entitling him to de novo review.

**A.** **The AEDPA is unconstitutional.**

The principle that every prisoner must have all of his constitutional claims heard by a court is central to fundamental fairness and the integrity of the U.S. justice system. *See Bounds v. Smith*, 430 U.S. 817, 822–23 (1977), *abrogated on other grounds by Lewis v. Casey*, 518 U.S. 343 (1996). One method of ensuring that a prisoner's constitutional claims are heard is through the writ of habeas corpus.

However, the passage of AEDPA substantially changed the law that governs habeas petitions. *See Felker v. Turpin*, 518 U.S. 651, 654 (1996). AEDPA's restrictions suspend the writ of habeas corpus and violate the separation of powers, which results in prisoners remaining in prison without review of alleged constitutional defects of their convictions and sentences.

First, AEDPA suspends the writ of habeas corpus. Congress cannot define prisoners' rights so narrowly that it, in effect, suspends the writ of habeas corpus. The writ of habeas corpus is guaranteed by the U.S. Constitution in the Suspension Clause, which provides that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. Const. art. I, § 9, cl. 2. The Suspension Clause is a structural limitation on the power of Congress. Like bills of attainder and ex post facto laws, which are also prohibited in Article I, section 9, the suspension of habeas (except in cases of rebellion or invasion) belongs to a "category of Congressional actions which the Constitution barred[.]" *United States v. Lovett*, 328 U.S. 303, 315 (1946). The writ "can be preserved in practice no other way than through the medium of the courts of justice; whose duty it must be to declare all acts contrary to the manifest tenor of the Constitution void." *Id*. at 314 (quoting The Federalist No. 78 (Alexander Hamilton)).

Under the tenets of AEDPA, the federal court must conclude that a constitutional violation is "unreasonable" before it may grant relief. 28 U.S.C. § 2254(d); *see also Harrington v. Richter*, 562 U.S. 86, 102 (2011). The court cannot remedy a constitutional error unless it is one that no fair-minded jurist could make. *Richter*, 562 U.S. at 101–02. Because AEDPA thereby prevents federal courts in certain circumstances from granting relief even when a conviction or sentence is unconstitutional, it suspends the writ of habeas corpus. *See* 28 U.S.C. § 2254(d).

Second, AEDPA violates the separation-of-powers doctrine. Congress cannot impinge on the courts' duty to say what the law is, but Congress does so when it requires Article III courts to ignore any part of the Constitution and to instead give effect to a contrary law. *See Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 178 (1803). Congress has the power to constrain courts' authority. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993). "The judicial Power of the United States, shall be vested in one supreme court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. However, Congress must not manipulate the "test for determining the scope of [habeas corpus]" because the writ "is designed to restrain" Congress, and because the writ is "an indispensable mechanism for monitoring the separation of powers." *Boumediene v. Bush*, 553 U.S. 723, 765–66 (2008).

The separation-of-powers doctrine found in Article III "serves both to protect the role of the independent judiciary within the constitutional scheme of tripartite government . . . and to safeguard litigants' right to have claims decided before judges who are free from potential domination by other branches of government." *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 848 (1986) (internal quotation marks and citations omitted). When it was confronted with an unconstitutional provision, the Supreme Court in *Marbury* asked whether courts are bound by "an act of the legislature" that is "repugnant to the constitution"; the Court answered, "It is emphatically the province and duty of the judicial department to say what the law is." 5 U.S. at 177.

"[I]f Congress does provide for habeas in the federal courts, Congress cannot . . . instruct the federal courts, whether acting in a federal or in a state case, how to think, how to ascertain the law, how to judge." *Irons v. Carey*, 505 F.3d 846, 855 (9th Cir. 2007) (Noonan, J., concurring), *overruled on other grounds by Hayward v. Marshall*, 603 F.3d 546 (9th Cir. 2010) (en banc). Because AEDPA requires courts to ignore unlawful detentions if the prisoner does not meet certain provisions, it unconstitutionally suspends the writ of habeas corpus. The question before the federal court should simply be whether Ramirez's constitutional rights were violated in such a way that he is entitled to habeas relief. Adding the gloss of

"unreasonable" versus reasonable constitutional violations robs the writ of its power to remedy constitutional wrongs.

Thus, AEDPA suspends the writ of habeas corpus and violates the separation-of-powers doctrine because it dictates that courts must not "grant relief to citizens who are being held in prison in violation of their constitutional rights unless the constitutional error that led to their unlawful conviction or sentence is one that could not have been made by a reasonable jurist." *Irons*, 505 F.3d at 859 (Reinhardt, J., concurring). Also, AEDPA does not allow an appellate judge to correct an unlawful detention if a lower court's "error is understandable," which is inconsistent with a judge's duty "to enforce the laws and protect the rights of our citizens against arbitrary state action." *Id.* Therefore, AEDPA is unconstitutional, and this Court should review Ramirez's claims de novo without the additional gloss, limitations, and deference that AEDPA imposes, including through § 2254(d).

**B.**    **The claims raised in Ramirez's state habeas proceedings were not adjudicated on the merits.**

Even if AEDPA is constitutional, § 2254(d) should not apply to claims Ramirez previously raised in state habeas proceedings. Section 2254(d)'s limits on the power of federal courts to grant habeas relief applies to claims that were "adjudicated on the merits in State court proceedings," and precludes relief unless the petitioner satisfies the conditions listed in § 2254(d)(1) and (d)(2). The plain

163

language of § 2254(d) therefore makes clear that it does not apply to claims not "adjudicated on the merits" in the state courts. Here, the state courts' treatment of Ramirez's state habeas claims cannot qualify as an adjudication on the merits within the meaning of § 2254(d), and therefore that section cannot apply to Ramirez's claims.

On January 5, 2015, Respondents filed a proposed order containing findings of fact, conclusions of law, and a recommendation with the 370th District Court. (2 SH Supp CR at 133.) Respondents' proposed order just exceeded 400 pages and contained 181 pages of background material on Petitioner's case, 733 discrete findings of fact, and 58 discrete conclusions of law. (*See generally* 2 SH Supp CR at 133.)

Fifteen days later, 370th District Court Judge Noe Gonzalez issued an order adopting Respondents' proposed order nearly verbatim. Like Respondents' proposed order, the judge's signed order also just exceeded 400 pages and contained 181 pages of background material, 733 discrete findings of fact, and 58 discrete conclusions of law. (*See generally* 3 SH Supp CR at 546.) The signed order even adopted errors in Respondents' proposed order. For one example, in both the proposed and signed orders Judge Gonzalez refers to himself numerous times as "Judge Ramirez." (*Compare* 2 SH Supp CR at 320, 419, *with* 3 SH Supp CR at 723,

824.) For another example, both the proposed and signed orders repeatedly refer to an expert witness retained during state habeas proceedings, Dr. Gilbert Martinez, as "Dr. Ramirez." (*Compare* 2 SH Supp CR at 185, 198–99, *with* 3 SH Supp CR at 43, 56–57.)

The Supreme Court has criticized the practice of uncritically adopting the prevailing parties proposed findings of fact and conclusions of law. *See Anderson v. City of Bessemer*, 470 U.S. 564, 572 (1985) (acknowledging that "[w]e, too, have criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties," but noting that the district court "in this case does not appear to have uncritically accepted findings prepared without judicial guidance by the prevailing party"); *see also United States v. El Paso Nat'l. Gas Co.*, 376 U.S. 651, 656 n.4 (1964). This practice is particularly troubling in death penalty cases where life is at stake. *Cf. Jefferson v. Upton*, 560 U.S. 284, 292–94 (2010) (per curiam) (remanding question of whether presumption of correctness applied to state court's factual findings in capital habeas case where state court adopted findings "drafted exclusively by the attorneys for the State pursuant to an *ex parte* request" and "adopted the State's proposed opinion verbatim even though it recounted evidence from a nonexistent witness."); *id.* at 294 (questioning the lawfulness of adopting

proposed findings "that contain internal evidence suggesting that the judge may not have read them.").

Judge Gonzalez may have simply adopted Respondents' proposed order in an effort to comply with the looming deadline set by the CCA "to resolve the claims presented and return the completed case" to the appellate court. (HA Order at 2, Nov. 19, 2014.) Indeed, the signed order was filed on the last day provided by the CCA. (*Compare* 3 SH Supp CR at 948, *with* HA Order at 2, Nov. 19, 2014.)

Or, Judge Gonzalez may have simply adhered to a troubling practice among convicting courts in Texas of simply adopting the State's proposed findings of fact and conclusions of law. A 2002 study of Texas capital habeas cases found that in the "211 cases in which the prosecution's proposed findings of fact were available for review, the trial court entered findings of fact and conclusions of law which were identical or virtually identical to the prosecutor's in 189 (90%) of the cases." Tex. Defender Servs., *Lethal Indifference: The Fatal Combination of Incompetent Attorneys and Unaccountable Courts in Texas Death Penalty Appeals* (2002), https://www.texasdefender.org/wp-content/uploads/2019/12/Lethal-Indiff_web.pdf (last visited Jun. 8, 2021) (footnotes omitted).[28]

---

[28] The same Texas Defender Services study revealed that the CCA also almost never makes changes to the prosecutor's proposed findings of fact and conclusions of law. *See* Tex. Defender Servs., *Lethal Indifference: The Fatal Combination of*

Either way, the effect is that Ramirez's adversary is responsible for the factual findings and legal conclusions on which Ramirez's death sentence rests. If the state courts' wholesale adoption of the prosecutors' findings and conclusions is treated as an adjudication on the merits, as a practical matter this Court would have to defer to the prosecutor in evaluating constitutional challenges to Ramirez's convictions and sentences. *See* 28 U.S.C. § 2254(d). Such a result is incompatible with due process and the heightened scrutiny required of capital cases, and indeed with AEDPA itself. *See, e.g., Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (emphasizing the importance of federal habeas review after AEDPA and denouncing "abandonment or abdication of judicial review."). *But see Green v. Thaler*, 699 F.3d 404, 416 (5th Cir. 2012) (declining to accord the state court's decision "less deference" because it adopted a proposed order it requested ex parte from the state).

Because Judge Gonzalez's signed order adopted Respondents' proposed order uncritically and nearly verbatim, this Court should conclude that the claims fairly

---

*Incompetent Attorneys and Unaccountable Courts in Texas Death Penalty Appeals* 54–55 (2002), https://www.texasdefender.org/wp-content/uploads/2019/12/Lethal-Indiff_web.pdf (last visited Jun. 8, 2021) ("Of the cases in which CCA orders were available for review, changes were made to the trial court's findings of fact and conclusions of law in only nine (4%) of cases.") In Ramirez's case, the CCA likewise issued a two-page order "adopt[ing] the trial judge's findings and conclusions" and denying relief. (HA Order at 2, Oct. 14, 2015.)

presented to Judge Gonzalez were not adjudicated on the merits within the meaning of § 2254(d) and should instead conduct de novo review.

### C.   Alternatively, Ramirez can satisfy § 2254(d) for each of the claims that were adjudicated on the merits in state court.

In the alternative, if the Court concludes that AEDPA is constitutional and that the state courts' denial of Ramirez's state habeas petition constituted an adjudication on the merits of the claims presented therein, Ramirez alleges that he can nonetheless satisfy § 2254(d) because the state courts' adjudication was contrary to or involved an unreasonable application of clearly established law, or because it resulted in a decision that was based on unreasonable factual determinations in light of the state-court record. *See* 28 U.S.C. § 2254(d). The state court decisions were based on unreasonable factual determinations in part because the factfinding process was itself deficient: among other problems, the state courts adopted the State's proposed findings wholesale, as noted above, and the state courts relied on false testimony presented by trial counsel at the state habeas petition evidentiary hearing, as described in further detail below.

Ramirez can similarly satisfy § 2254(d) for all claims previously raised on direct appeal because the state courts' adjudication was contrary to or involved an unreasonable application of clearly established law, or because it resulted in a decision that was based on unreasonable factual determinations in light of the state-

court record. *See* 28 U.S.C. § 2254(d). Thus, for any claim raised in state court which this Court concludes was adjudicated on the merits, Ramirez alleges that § 2254(d) is satisfied and he is entitled to de novo review.

## X.    Incorporation by Reference

Ramirez incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition into each and every claim in this Petition.

## XI.    Federal Constitutional Claims

Ramirez petitions this Court pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus freeing him from the custody of Respondents pursuant to the judgment and sentence of the state courts of Texas, on the grounds that the judgment and sentence were obtained and affirmed in violation of his rights under the Constitution of the United States. In support of this request, Ramirez offers the following:

## CLAIM ONE

**Ramirez was denied effective assistance of counsel during the penalty phase in violation of the Sixth, Eighth, and Fourteenth Amendments, when his trial counsel failed to investigate and present readily available evidence of Ramirez's neurodevelopmental disabilities, brain damage, and mental illness.**

When the events that gave rise to his murder convictions took place, Juan Ramirez was just 18 years old. This much his sentencing jury knew, but that was about all. The prosecutor took Ramirez's chronological age to the next logical level, admonishing the jury that Ramirez deserved the death penalty because at age 18, he was an adult. (39 RR at 118.) Legally, the still teenage Ramirez may have been considered an adult for purposes of eligibility for the death penalty. But that fails to tell the whole story. The jury didn't know that Ramirez suffered from brain abnormalities and neurodevelopmental disabilities, which limited his mental capacities to those of a typical eight- or nine-year-old child, and that consequently, he was not a teenager capable of early-adult reasoning or judgment. (Ex. 118 at 4, 23.) The reality, unbeknownst to his jury, is that Ramirez was a vulnerable, exploitable adolescent, who suffered from permanent brain damage, a serious disability, that gave rise to special needs for care and treatment, beginning from the moment his life began.

Ramirez's disabilities, had they been known by the jury, would have had broad implications on the penalty phase proceedings. For example, after finding

Ramirez guilty of murder, it would have been important for the jury to consider evidence that Ramirez was not the individual who organized and marshalled others to participate in the crime, and to consider whether he had diminished capacity to resist participation orchestrated by an older authoritarian adult. *See In re Garza*, 620 S.W.3d 801, 806 (Tex. Crim. App. 2021). Ramirez's co-defendant Garza confessed that he directed others to be summoned to participate in the criminal acts which resulted in the capital offense. *Id*; Ex. 95 ¶5; Ex. 106 at 11. Refusal to participate could result in death or serious injury. *Id.* at 821.

Notably, Ramirez's vulnerability to suffering injury and death at the hands of members of his own community is not mentioned here as an afterthought. Indeed, a few years before the instant offense, Ramirez's childhood institutional records document his fear that he or family members might be killed by community gang members once he was released from juvenile corrections custody. (4 SH CR at 1529; ECF No. 28-1 at 43, Ex. 51 ¶ 14; ECF No. 28-1 at 99, Ex. 59 ¶ 40.) Ramirez's fears were not unfounded. Ramirez's juvenile parole officer also feared for Ramirez's life and safety in the community. (38 RR at 83.)

Ramirez has serious disabilities, and his diminished capacity to resist manipulation by adult criminals, was in no small measure a consequence of a damaged brain and a debilitating condition not of his own choosing. Rather, his

disabilities were neurodevelopmental in origin, traceable to his mother's pregnancy and a deprived early infancy and childhood. Left untreated by those who were charged with the duty to treat him, Ramirez's neurodevelopmental deficits found their expression in significant learning, emotional, and psychiatric disabilities.

The outsized psychiatric ramifications of Ramirez's serious cogntive disorder are unique to him. That is to say that his disabilities and their expression can only be understood within the context of his individualized childhood circumstances. Thus, while familial stability, special education, and mental health treatment would have ameliorated Ramirez's neurodevelopmental disabilties and put him on the road to attaining a normal life, he was not so fortunate. Instead, his childhood was beset with instability and trauma, which only exacerbated his underlying neurodevelopmental disabilties and their psychiatric sequelae. This means that the negative course and symptomatology associated with Ramirez's untreated neurodevelopmental disabilities and related psychiatric infirmities must be conceptualized within a childhood that was afflicted with extreme poverty, domestic violence, physical abuse, and severe neglect. Ramirez struggled mightily to simply *survive* under these conditions, and he did so without a single positive role model; all within a larger community laden with drugs, gangs, and community violence.

As explained by Dr. Erin Bigler, "[f]or children [like Ramirez] who suffer

from neurodevelopmental brain disorders—even those children born into the most economically and socially stable environments—there is profound need for large amounts of extra support at home and school, intervention from psychological and educational specialists, the provision of structure and stability at home, in the community, and in school. Although such neurodevelopmental disorders are permanent and not curable, with adequate interventions and support, the negative effects of such disorders can be lessened, children can learn to compensate, increasing the chances for success in education and achievements later in life." (Ex. 118 at 18.)

But Ramirez was denied appropriate intervention for his serious neurodevelopmental and mental health disabilities at every turn. Compounding his disabilities, he endured severe parental neglect from a mother unable to parent due to her own mental illness, following her own excruciatingly painful childhood clouded by incest and sexual molestation. (*See* social history *supra* at Section III.)

In these circumstances, one could reasonably expect public institutions to intervene. They did not. The public education system disregarded well-established legal duties which required that it provide special education services to treat Ramirez's neurodevelopmentally rooted learning and emotional disabilities. (*See* social history *supra* at Section III.) But it wasn't just the education system that failed

him. Once Ramirez entered the juvenile justice system, he received no treatment for his neurocognitive impairments: this despite being diagnosed with a neurocognitively-based learning disability, no less than three times, while in juvenile custody, and despite multiple professional recommendations that juvenile authorities provide treatment in a special education program. Instead of appropriate intervention, as recounted by juvenile corrections expert Michele Deitch, the juvenile justice system confined him in a setting where conditions "were appallingly dangerous and brutal[,]" "youth [were] at risk of physical and sexual assault from both other youth and from staff, with drugs widely available [to children like Ramirez], and with rampant gang activity [inside the instititon]." (ECF No. 28-3, Ex. 82 at 16.)

Left untreated, a neurodevelopmental disorder can have dire consequneces, and in Ramirez's case, particularly within his traumatic childhood circumstances, it did. He began self-medicating with readily available street drugs and inhalants when he was just a ten-year-old child. Stimulated by his untreated neurodevelopmental disabilities, and amplified by a strong hereditary predisposition for addiction, he continued to self-medicate through the time of the instant criminal offenses.

Like his hereditary predisposition for addiction, there is a strong genetic susceptibility for mental illness in Ramirez's family. (*See* social history *supra* at

Section III.) Thus, in view of his untreated neurocognitive disorder and disturbed psychosocial environment, it was almost inevitable that Ramirez would succumb to mental illness. Institutional records report that by age 14, Ramirez had been diagnosed with clinical depression, as well as post-traumatic stress disorder. (*See* social history *supra* at Section III.)

And, given all the circumstances just recited above, it is an understatment to suggest that he would be a child vulnerable to community gang influences. As Father Boyle explains: "The moment a vulnerable child is pushed to a gang tends to be at a time when the child is experiencing hopelessness and utter despondency, when a child's experiences are so bleak that he no longer cares about his life and when it will end. This paradigm aptly applies to Juan." (Ex. 119 ¶ 19.) As explained below, no child had less hope than Juan. His institutional records report deep despair, suicide attempts beginning at age ten, and the ever-present thought of wishing he were dead. (4 SH CR at 1529; ECF No. 28-1 at 105, Ex. 60 ¶ 18.)

As noted at the beginning of this introduction, when the events which gave rise to his murder convictions took place, Juan Ramirez was just 18 and barely out of childhood. But what the jury really needed to know "when considering Ramirez's moral culpability for the offense," is that although he may have been 18 chronologically, assessments of his brain function, "reveal areas of cognitive and

emotional functioning that are typical of an 8 or 9 year old . . . ." (Ex. 118 ¶ 62.) The jury found Ramirez guilty of the capital offense. But, as mentioned above, Ramirez did not conceptualize, organize, or direct the criminal enterprise. If the State's own evidence is to be believed, he did what was asked of him. However, Ramirez suffered from a diminished capability to resist association with those who directed the events that gave rise to the capital offense. As explained below, it is not reasonably probable that a fully-informed jury would have unanimously concluded that a disabled teen, with the mental capacity of a much younger child, should be put to death under these circumstances.

Yet, because his counsel abdicated their duty to investigate and present the readily available mitigating evidence summarized above, Ramirez's jury was left in the dark. What the Supreme Court said in *Andrus v. Texas*, *infra,* applies with equal force here. "During [petitioner's] capital trial, . . . nearly none of [his] mitigating evidence reached the jury. That is because [petitioner's] defense counsel not only neglected to present it; [they] failed even to look for it. Indeed, counsel performed virtually no investigation of the relevant evidence." 140 S. Ct. at 1878.

**A.**  **Prevailing norms recognize the imperative for investigating mental health within the context of a broad investigation of an accused's psycho-social history.**

To establish deficient performance, Ramirez must show that his "counsel's

representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* The United States Supreme Court has found that the American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, *reprinted in* 31 Hofstra L. Rev. 913 (2003) ("ABA Guidelines") are useful in assessing the reasonableness of counsel's performance. Justice Stevens, writing for the Court's majority in *Padilla v. Kentucky*, 559 U.S. 356 (2010), explained: "We have long recognized that 'prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable.'" *Id.* at 366–67 (quoting *Strickland*, 466 U.S. at 688).

Here, the principal focus is on the professional norms guiding reliable investigation of a capital client's mental health. As a governing principle, professional norms recognize that "[m]ental health experts are essential to defending capital cases. Neurological and psychiatric impairment combined with a history of . . . abuse are common among persons convicted of violent offenses on death row." ABA Guidelines at § 4.1, cmt., 31 Hofstra L. Rev. at 956. "With respect to investigating mitigating evidence in preparation for the penalty phase of capital proceedings, the ABA Guidelines [explain] that a defendant's psychological history

and mental status could 'explain or lessen the client's culpability for the underlying offense[ ],' and therefore should be considered as part of the mitigation investigation." *Williams v. Stirling*, 914 F.3d 302, 313 (4th Cir. 2019), *as amended* (Feb. 5, 2019) quoting ABA Guidelines § 10.11(F)(2). "[E]xpert [mental health] testimony may explain the permanent neurological damage . . . or the hereditary nature of mental illness, and the effects of these impairments on the client's judgment and impulse control." 31 Hofstra L. Rev. at 1061.

Prevailing norms also recognize that counsel's observations alone are not sufficient to detect the array of psychological and mental health conditions that could be critical to the case in mitigation. *Id.* § 4.1 cmt. at 956–57. What's more, mental health is not evaluated in a vacuum: to achieve a reliable assessment of a client's mental health, counsel must "compile extensive historical data, as well as obtain a thorough physical and neuropsychological evaluation. Diagnostic studies, neuropsychological testing, [and] appropriate brain scans . . . may also be necessary." *Id.* And since "'the defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase,'" "the defense team should include at least one person qualified to screen for mental or psychological defects so as to 'detect the array of conditions . . . that could be of critical importance.'" *Williams*, 914 F.3d at 313,

(quoting ABA Guidelines §4.1).

However, prevailing professional capital representation norms emphasizing the need for expert mental health investigatory assistance embodies only half the equation. The other half of the equation is this: Mental health experts require expansive social history evidence to conduct a complete and reliable evaluation. *See* Russel Stetler, *Mental Health Evidence, and the Capital Defense Function: Prevailing Norms*, 82 UMKC L. Rev. 401, 417–28 (2014) (citing cases). Notably, this isn't just a legal norm. Professional psychiatric norms recognize that an accurate and complete social history is the "single most valuable element to help the clinician reach an accurate diagnosis." H. Kaplan & B. Sadock, *Comprehensive Textbook of Psychiatry*, 837 (4th ed. 1985). A "thorough inquiry into all circumstances of your client's life is always the necessary first step in identifying mental health issues." John H. Blume & Pamela Blume Leonard, *Principles of Developing and Presenting Mental Health Evidence in Capital Cases*, The Champion, Nov. 2000, at 64. *See also Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (describing medical experts as unable to find mitigating evidence because they were not provided adequate school, medical, and prison records); *Neal v. Puckett*, 239 F.3d 683, 690–91 (5th Cir. 2001) (counsel ineffective for failing to provide expert with defendant's social history); *Bond v. Beard*, 539 F.3d 256, 288 (3d Cir. 2008), *as amended* (Oct. 17, 2008)

(faulting counsel for failing to seek relevant records or conduct a meaningful inquiry into defendant's life, and consequently failing to give their mental health expert sufficient information to accurately evaluate the defendant); *Lambright v. Schriro*, 490 F.3d 1103, 1117 (9th Cir. 2007) ("counsel has an affirmative duty to provide mental health experts with information needed to develop an accurate profile of the defendant's mental health").

Because a reliable mental health diagnosis depends on a complete and accurate social history, prevailing professional norms emphasize that *a capital defense team should assemble "a comprehensive and well-documented psycho-social history of the client based on an exhaustive investigation" and "provide[] social history information to [mental health] experts to enable them to conduct competent and reliable evaluations."* ABA Guidelines, 31 Hofstra L. Rev. at 959 (emphasis added). And since an "understanding of the client's extended, multi-generational history is often needed for an understanding of his [mental] functioning, construction of the narrative normally requires evidence that sets forth and explains the client's complete social history from before conception to the present." *Id.* at 1061.

Reliable mental health evaluations depend on social history. Accordingly, prevailing norms stress that counsel can't rely on mental health experts alone;

counsel must present lay witnesses who interacted with the client "as much as possible, to provide the factual foundation for the [mental] expert's conclusions." *Id.* at 1063.

Therefore, prevailing professional norms underscore that a reliable mental health evaluation requires counsel to undertake an "extensive and generally unparalleled investigation into personal and family history" of the client. *Id.* at 1061. Counsel should, at a minimum, explore:

- mental illness, alcohol and drug use, prenatal and birth trauma, development delays and neurological damage

- physical or emotional abuse, family history of mental illness, cognitive impairments, substance abuse, domestic violence, poverty, familial instability, neighborhood environment, and peer influence

- traumatic events such as exposure to criminal violence; failures of government or social intervention, including failure to provide necessary services and placement in poor quality juvenile detention facilities

- educational history (including achievement, performance, and behavior) and special education needs, including cognitive limitations and learning disabilities

*Id.* at 1022–23. To investigate these mitigation subjects, it is "necessary [for counsel] to locate and interview the client's family members" and "virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional probation, or parole officers and others." *Id.* at 1024.

In addition, under prevailing norms, it is well understood that written records "can contain a wealth of mitigating evidence, documenting, or providing clues to childhood abuse, retardation, brain damage, and/or mental illness." *Id.*; *see Williams v. Taylor*, 529 U.S. 362, 395–96 (2000) (counsel failed to prepare for sentencing until a week before trial and failed to uncover extensive records graphically describing Williams' nightmarish childhood, to introduce available records showing that Williams was "borderline mentally retarded" and failed to seek prison records). But record investigation should not be limited to the client. Rather, counsel should seek records concerning "parents, grandparents, siblings, cousins and children" from numerous sources including schools, social service and government agencies, the military, employers, and criminal and corrections agencies, using "all appropriate avenues." ABA Guidelines, 31 Hofstra L. Rev. at 1025. The defense must undertake a "multigenerational investigation extending as far as possible vertically and horizontally" *because it "frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment*." *Id.* (emphasis added).

Finally, if the client was incarcerated or institutionalized either as a juvenile or an adult, professional norms recognize that counsel should investigate the effect of the facility's condition on the client's "contemporaneous and later conduct" as

well as the "adequacy of institutional responses *to childhood trauma, mental illness, or disability* to determine whether the client's problems were ever accurately identified or properly addressed." *Id.* at 1025–26 (emphasis added). *Williams*, 529 U.S. at 370–71, 398.

Ramirez's lead trial counsel, Ms. Garza, represented to the court that she was committed to the prevailing professional norms in the ABA Death Penalty Guidelines, including those norms attendant to investigation of Ramirez's mental health. However, as explained below, she failed to heed her own pledge to these professional norms and failed to investigate Ramirez's neurocognitive impairments, and she did so without a supporting strategic reason. Nevertheless, in her motion for the appointment of a mitigation investigator, Ms. Garza represented that Ramirez's background and mental health would be a significant factor at the penalty phase. (1 CR at 243). She acknowledged she would be ineffective under *Williams v. Taylor* if she failed to adequately investigate and present mitigating evidence, and she cited the ABA Guidelines for the proposition that a complete mitigation investigation is "necessary for proper capital representation." (1 CR at 245.) She specifically acknowledged the need to investigate Ramirez's mental and physical health, including "history of mental or physical illness or injury, alcohol and drug use, birth trauma . . . and developmental delays." (1 CR at 247.) However, as explained below,

these subjects were never reasonably investigated or presented. Ms. Garza also represented to the trial court that her investigation would focus on whether Ramirez suffered from cognitive limitations and learning disabilities (1 CR at 246), but these conditions, and their obvious, serious neurodevelopmental implications were not reasonably explored. Contrary to Ms. Garza's affirmative representations of her minimal professional duties, Ramirez's long documented history of mental illness, cognitive impairment and developmental disability was never the subject of a reasonable or thorough investigation.

Instead, Ramirez's trial counsel "abandoned their investigation of [his] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins v. Smith*, 539 U.S. 510, 523–24 (2003). They failed to follow "a range of mitigation leads" that would have revealed a "childhood and mental health very different[] from anything [Ramirez's jury] had seen or heard." *Rompilla*, 545 U.S. at 390. They failed to investigate whether Ramirez "might have had mental impairments organic in nature." *Williams*, 529 U.S. at 396. And they failed to expand their investigation into his school, correctional, and medical records, which would have confirmed that Ramirez suffered from significant cognitive deficits. *Porter v. McCollum*, 558 U.S. 30, 36 (2009).

As explained below, counsel's multiple failures to investigate obvious signs

of serious mental illness, brain damage, and neurodevelopmental disability resulted from counsel's objectively unreasonable departure from prevailing professional norms.

**B.** **Trial counsel's performance was objectively unreasonable under prevailing professional norms because they failed to reasonably investigate Ramirez's mental health, within the context of a broad investigation of his psycho-social history.**

**1.** **The record demonstrates inexcusable delay and self-imposed unreasonable limitations on the mitigation investigation.**

On May 24, 2004, more than a full year after her appointment, Alma Garza requested funding for a mitigation specialist. (1 CR at 243–52.) Her year-long delayed motion to begin an investigation cited the ABA Guidelines and its entreaty that counsel begin penalty phase investigations "*immediately* upon counsel's entry into the case . . . ." (1 CR at 243–52 (emphasis added).) Ms. Garza did not address why she waited nearly 16 months to begin an investigation that she said should have commenced immediately after her appointment. Even though the Ramirez case was Ms. Garza's first capital case, her motion specifically requested that the court appoint an acquaintance, Gilda Bowen, even though Bowen had zero experience investigating mitigation, and had never worked on a capital case. (1 CR at 243–52.) Inexplicably, Ms. Garza never forewarned Bowen that she had requested Bowen's appointment, and then she waited more than a month after the court approved the

185

appointment to tell Bowen that she had been selected to work on Ramirez's case. (Ex. 100 at 160.)

Without any guidance from counsel, and with only three months until the trial, Bowen spent her first month on the case consulting with other mitigation investigators trying to learn what she was supposed to do. (4 SH CR at 1557.)

Out of the vast array of available records demonstrating that Ramirez suffered from brain damage, mental illness, and a neurodevelopmental disability, Bowen requested only Ramirez's school records from the Donna Independent School District. But this request was made far too late. Mr. Ramirez's school records were not obtained until December 10, 2004 (4 SH CR at 1563), just several days before the penalty phase proceeding began. Accordingly, as explained below, although the school records were replete with red flags suggesting learning and emotional disabilities, it was far too late to interview teachers or to investigate further.

Not only were relevant records requested much too late to make use of them (e.g., the school records), the most significant records (e.g., Ramirez's extensive juvenile corrections record) were never requested. Although Ms. Garza claimed to comprehend the prevailing professional norms, she either did not comprehend them, or worse, she recklessly disregarded them.

Instead, on October 18, 2004, one week before the trial—when it was already

too late to pursue investigative leads in the juvenile records, or to interview knowledgeable juvenile corrections personnel about Mr. Ramirez—Ms. Garza informed the trial court that she just received notice that the State intended to introduce portions of Ramirez's 916-page juvenile correctional record. (Ex. S12 "TYC records") (3 RR at 19.) As the trial was about to begin, Ms. Garza had little or no knowledge of the substance of this nearly 1000 page set of psycho-social records. This is evidenced during the same October 18 hearing, when Ms. Garza groused that once she received the TYC records from the State, *then she would have to go through them page-by-page* to determine whether anything was objectionable. (3 RR at 19.)

Ms. Garza's protest about having to review the TYC records is a frank admission that during the prior 21 months she had failed to independently obtain and review these critical life history records; this despite her previous admission in her motion for appointment of a mitigation investigator, that she needed to do so in order to be effective. See (1 CR at 244.) Ms. Garza's unreasonable failure to obtain and review the records sooner, frustrated the trial judge and he admonished her, stating:

> There is another thing, these are juvenile records of not just anybody else but your client. You had the same ability to subpoena the records. They are his records. He can go see his records. And the point that I am making is going back to this, Alma: You are saying that you did not, or you do not have access to certain documents. If you have access to the juvenile records and you haven't even looked at or you haven't had a

chance to review that particular report that that psychologist has, well, then you need to do that.

(4 RR at 16.)

Meanwhile, Ms. Garza's billing records in the period after the October 18 hearing, make no mention of her review of any records, let alone the TYC records, nor do co-counsel's billing records make mention of them. (ECF No. 24-2 at 95, Ex. 10; ECF No. 24-2 at 101, Ex. 9.)[29] The sole record of anyone on the defense team reviewing the TYC records, is that of Ms. Bowen, who entered just 4 hours of billed time for reviewing the nearly 1000 pages of records on October 6, 2004. (4 SH CR at 1559.) And because it was too late in the game, no follow-up investigation regarding the contents of the TYC records was ever done, e.g., not a single TYC employee was interviewed.

The TYC records were made available to attorney John Niland, who was the Trial Project Director of Texas Defender Services. Bowen and Ms. Garza were seeking advice from him on the Ramirez case. (See, e.g., 4 SH CR at 1554, 1559–61.) On October 20, 2004, Niland informed Ms. Garza that the TYC records contained red flags warranting an investigation into whether Ramirez suffered from brain impairments, but this advice was ignored either due to sheer neglect, or because

---

[29] Ms. Garza did not preserve a complete copy of her billing records and neither did Hidalgo County. Accordingly, only Ms. Garza's final bill from the period October 29, 2004 through the end of her tenure are available.

the clock had run out of time for such investigation. (Ex. 103.)

In the end, the TYC records that were made available to trial counsel, were copies of those records subpoenaed by the State. (4 RR at 16.) Because TYC produced the records in response to a State subpoena, rather than a release signed by Ramirez, TYC redacted vital information about Ramirez's childhood alcohol and drug use. See 42 C.F.R. § 2.1. Counsel never bothered to obtain, nor would there likely have been time to obtain, the unredacted records.[30] (1 CR 265; 49 RR Ex. 11.)

Counsel also failed to secure Ramirez's readily available Mid-Valley pediatric records, his Tropical Texas Behavioral Health records, his Donna Police Department records, or the health records of his immediate family members, which would have demonstrated a strong hereditary disposition for mental illness. *See* ABA Guidelines, 31 Hofstra L. Rev. at 1025 (under prevailing norms counsel undertake a "multi-generational investigation extending as far as possible vertically and horizontally" *because it "frequently discloses significant patterns of family dysfunction and may*

---

[30]     It is impossible that counsel could have reviewed the records without realizing they were heavily redacted. The front page of the records states: "Part 2 of Title 42 of The Code of Federal Regulations restricts the disclosure of alcohol and drug abuse records." (Ex. S12 at 3.) In addition to this stark warning, 137 out of 916 pages contain redacted information. (Ex. S12, *passim.*) Five entire pages are redacted. (Ex. S12 at 410–12, 414–15.) Redacted information included: diagnostic impressions and intellectual functioning (Ex. S12 at 374); Axis I diagnoses (Ex. S12 at 377, 383); current diagnosis (Ex. S12 at 379, 388); treatment recommendations (Ex. S12 at 398); and treatment program attendance issues (Ex. S12 at 710).

*help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment*") (emphasis added).

Meanwhile, it was not only records that were ignored. When the jury panel was sworn in, Bowen had not yet conducted a single mitigation witness interview. (4 SH CR at 1554–59.) In the end, by the time the penalty phase began on December 16, 2004, out of all the available immediate and intergenerational family members, friends, teachers, mental health professionals, as well as juvenile and institutional personnel, Bowen had interviewed only three witnesses: Ramirez's mother, his father, and a former girlfriend. (4 SH RR Ex. 34 at 1.)

During the state habeas proceedings, trial counsel admitted to the extraordinarily limited scope of the mitigation investigation. In her sworn statement, Ms. Garza unequivocally affirmed that the only mitigation witness interviews conducted were those conducted by Bowen, who, as noted, interviewed a grand total of three persons in addition to Ramirez. (Ex. 98 at 1.) Co-counsel Mr. Garza stated in his sworn statement that he recalled speaking to Ramirez's mother and sister about Ramirez's family background (Ex. 97 at 1–2), but his billing records show that his communication was limited to a single interaction with some family members at a pre-trial conference on August 12, 2004. (ECF No. 24-2 at 103, Ex. 11 at 3.)

Given counsel's neglect of mitigation records and witnesses, it is unsurprising

that as jury selection was about to begin, trial counsel had not yet consulted with a single mental health expert. Just prior to beginning jury selection, Ms. Garza contacted a child development expert, Kate Allen, Ph.D., about testifying at the penalty phase of Ramirez's trial. (4 SH RR Ex. 9 ¶ 1.) Dr. Allen expressed concern that preparing for Ramirez's case would conflict with another trial in which she was scheduled to testify in Nebraska in mid-December. (4 SH RR Ex. 9 ¶ 1–2.) Mid-December is exactly when Ramirez's penalty-phase would begin, but Ms. Garza never mentioned that potential scheduling problem. Instead, after Ms. Garza furnished Dr. Allen with unabashedly unreliable assurances that she would receive Ramirez's records quickly and have sufficient time to prepare to testify, Dr. Allen agreed to work on Ramirez's case. (4 SH RR Ex. 9 ¶ 1.)

With time running out, or having already run out, Dr. Allen was not authorized to begin work on Ramirez's case until November 9, 2004, well after the jury selection had begun. Ms. Garza was in no position to screen prospective jurors, who might be sympathetic to a mitigation mental health case, because her mental health investigation had not yet begun.

On November 29, 2004, just prior to the guilt phase opening statements, the State asked whether the defense would be presenting expert testimony regarding future dangerousness or mitigation based on an interview with Ramirez. (27 RR at

191

2.) Ms. Garza said that Dr. Allen would be personally evaluating Ramirez. (27 RR at 78.) When the trial judge asked Ms. Garza to explain the nature of Dr. Allen's testimony, Ms. Garza *pretended* to know something about Dr. Allen's role, but she did not, and she could provide no comprehensible response to the judge's question. (27 RR at 78–84.) Ms. Garza's loss for words is not surprising. Dr. Allen had yet to receive a single case record and had not yet formed a single opinion. (4 SH RR Ex. 9 ¶ 2; ECF No. 30-5 at 4, Ex. 89 at 1.)

Meanwhile, at the November 29 hearing, when the trial judge asked Ms. Garza if Dr. Allen would simply "regurgitate" what Ramirez told her about his upbringing, rather than provide a *truthful* response—that Dr. Allen had not begun work on the case—Ms. Garza provided an incoherent response:

> No, judge, not necessarily, because they filed an affidavit of his records. And she is going to be revealing that because – one of her experts is testifying that they have got on there – they have a psychological – actually, there is three psychologicals. She will be reviewing those documents, also. And those are the State's documents that she will be reviewing.

(27 RR at 4–5.)

As the trial was heading to the penalty phase, Dr. Allen received the first record, a one-and-a-half-page summary of the case prepared by Bowen, on December 2, 2004. (4 SH RR Ex. 9 ¶ 2.) Dr. Allen repeatedly asked for Ramirez's TYC records which she did not receive until December 10—just several days before

the penalty phase was to begin on December 15. (4 SH RR Ex. 9 ¶ 2.) Dr. Allen's billing record shows she spent some time skimming the nearly 1000 pages of the TYC records on the date she received them, but she had no time to examine them in detail. (4 SH RR Ex. 9 ¶ 2; ECF No. 30-5 at 4, Ex. 89 at 1.) She had to leave for Nebraska on December 12 and was scheduled to testify in that case on December 15. (4 SH RR Ex. 9 ¶ 2–3.) So, she never had time to thoroughly review Ramirez's redacted TYC records, which she characterized as a "main part of the case," nor did she have time to develop any theories. (4 SH RR Ex. 9 ¶ 2–3 and Summary.)

As the lack of expert preparedness instigated by a neglectful trial counsel was unfolding toward total disaster, on Friday, December 10—the same day Allen finally received the bulk of the records—Ms. Garza called Dr. Allen and misled her by informing her that she would not be called to testify in the Ramirez case until the end of December. Were this true, it would have given Allen an additional two weeks after she testified in Nebraska to prepare. (4 SH RR Ex. 9 ¶ 2.) However, as Ms. Garza would have known, the guilt-phase portion of the trial was about to conclude, and the penalty phase would begin in just a few days. Accordingly, after Ms. Garza promised Dr. Allen she would have until the end of December to prepare, the State concluded its case just two business days later, and after a one day presentation of the defense case, a verdict of guilty was quickly handed down and the penalty phase

193

was scheduled to begin on December 16. (35 RR; 36 RR; 37 RR; 38 RR.)

After just being promised that she would have until the end of December to prepare, Dr. Allen was on her way to the airport after giving her Nebraska penalty phase testimony on December 15, when she received a call from Ms. Garza, insisting that she needed to testify in Ramirez's penalty phase the next day. (4 SH RR Ex. 9 ¶ 3.) This meant Dr. Allen would never be afforded time to complete record review or to personally evaluate Ramirez. (1 SH CR at 340–44 ¶¶ 2, 4, and Summary.)– Dr. Allen protested that it was impossible to be there by the next day, and because she was beginning to feel ill, she might not be able to testify for a few days. (4 SH RR Ex. 9 ¶ 3.) As explained below, Dr. Allen had to testify on December 18, without having time to evaluate Ramirez. (1 SH CR at 340–44 ¶¶ 2, 4, and Summary.)

In the meantime, the penalty phase began the next day on December 16 with counsel presenting their penalty phase opening statements. (38 RR at 1–2.) During her opening statement, Ms. Garza asked the jury to find that Ramirez would be a future danger and that he anticipated a life would be taken during the offense. (38 RR at 2.) Her entire opening statement was as follows:

> Good morning, ladies and gentlemen. I know that this is a difficult job for you. I'm going to ask you to listen. I'm hoping to bring you a mitigating specialist that will tell you about his background, the way that he was raised, things that happened to him, and why he is where he

is. We're going to ask you to answer the questions yes, yes, and yes,[31] that there is mitigating evidence.

(38 RR at 2.)

The thrust of the prosecution's case was that Ramirez had committed violent crimes as a juvenile; that he had squandered opportunities for rehabilitation; and therefore he should be considered a future danger and sentenced to death. (38 RR at 3–134; 39 RR at 118–19, 137–38.) Olga Torres, an investigator with the Juvenile Probation Office, described Ramirez's juvenile offenses and gave testimony that suggested that Ramirez had already been given the chance for out-of-home rehabilitation and substance abuse treatment. (38 RR at 51–52, 56–58, 63–65.)

Ramirez's juvenile parole officer, Ricardo Leal, also testified. (38 RR at 71–73.) Leal told the jury that prior to Ramirez's commitment to TYC, Ramirez had been involved in a drive-by shooting and therefore he was considered a violent offender. (38 RR at 82–83, 89–90.) He described in detail the treatment and rehabilitation opportunities offered to Ramirez during his placement in TYC custody. (38 RR at 72–83.)

---

[31] During the State's opening statement, the prosecutor advised jurors that they would be asked to answer three questions: "Is the Defendant a future danger? Did he anticipate that a life would be taken? Is there any sufficient mitigating evidence in the case?" and requested that the jury "answer those three questions, yes, yes, and no." (38 RR at 1–2.)

In advance of the penalty phase, it would have been obvious to any reasonable capital defense counsel that the prosecution would rely on Ramirez's juvenile history to portray him as an unredeemable violent offender who had been offered adequate treatment and services. Therefore, it would have been imperative for Ramirez's trial counsel to investigate whether these inferences were reliable, or whether they could be controverted. But no independent investigation was ever done. This is deficient performance. *See State v. Andrus*, 140 S. Ct. 1875, 1884 (2020) (per curiam) (counsel "failed to conduct any independent investigation of the State's case in aggravation [including Andrus's experiences in TYC custody] . . . reinforc[ing] counsel's deficient performance") (citing *Rompilla*, 545 U.S. at 385); *see also* ABA Guidelines at 1025–26 (counsel should investigate the effect of a juvenile incarceration on the client's "contemporaneous and later conduct," as well as the "adequacy of institutional responses to childhood trauma, mental illness, or disability, to determine whether the client's problems were ever accurately identified or properly addressed").

The failure to investigate a challenge to the prosecution's penalty phase evidence was followed by an utterly anemic case for a mitigated sentence. The only testifying defense witness who had ever met Ramirez was a jail pastor, who testified that he visited Ramirez at the jail once or twice a week leading up to trial and never

felt threatened. (39 RR at 101.) That was the extent of his testimony. He conveyed no information about Ramirez.

Defense counsel also presented testimony from Dwight Stewart and Larry Fitzgerald. Stewart testified as a "gang expert," offering general testimony about why people join gangs such as the need to belong, family tradition, money, status, and protection. (38 RR at 172.) But Stewart had not reviewed a single record about Ramirez. He knew nothing about Ramirez. He certainly knew nothing about the neurocognitive disabilities and the trauma, interwoven with Ramirez's childhood— and he lacked any understanding with respect to how Ramirez's frailties may have made him susceptible to influences of adult criminal gang members. Lacking any relevant knowledge, Stewart offered no testimony about Ramirez, absolutely none.

Defense witness Fitzgerald was a retired public information officer with the Texas Department of Criminal Justice. He knew nothing about Ramirez and had absolutely nothing to say about him. (38 RR at 183–201.) He testified that inmates under a sentence of death, as well as some gang members, and other inmates considered security threats are placed in segregation. (38 RR at 186, 198.) Whether Ramirez would qualify for segregated custody, and present as a reduced risk to others if given a life sentence, was not addressed.

Dr. Allen was the final witness. She never had the chance to evaluate Ramirez

and she too had never met Ramirez, until she was briefly able to exchange greetings with him at the courthouse on the day she testified. (4 SH RR Ex. 9 ¶ 4.) Relying on an abbreviated review of the TYC records and some information provided by Bowen (4 SH RR Ex. 9 ¶ 4; 39 RR at 19), Dr. Allen testified that Ramirez had a prior history of depression, substance dependency, and PTSD. She cited maternal abandonment, neglect, chronic domestic violence, and child abuse as contributory factors. (39 RR at 38.)

However, when Dr. Allen attempted to support her conclusions with evidence in the records she reviewed, the State objected. (39 RR at 2–28, 37, 38, 41, 42, 43, 48, 49, 50, 51, 52, 53, 54, 95.) The court ruled that Dr. Allen would be permitted to state her conclusions, but she would not be allowed to discuss any specific instances of abuse or trauma identified in other records, on the grounds that it amounted to hearsay. (39 RR at 8, 64, 66, 68, 70, 77, 78, 84, 86, 87, 89, 157.)

The judge criticized trial counsel for failing to present Ramirez's family members as witnesses to provide the necessary foundational evidence. (39 RR at 156.) And, the trial judge had a good point. As explained above, because reliable mental health evaluations are dependent on social history, prevailing norms stress that counsel should not rely on mental health experts alone; counsel should expand their investigation to include lay witnesses who interacted with the client "as much

as possible, to provide the factual foundation for the [mental] [health] expert's conclusions." ABA Guidelines at 1063. *See also* Blume, *Principles of Developing and Presenting Mental Health Evidence in Capital Cases*, *supra*, at 69. "Jurors tend to be skeptical of expert witnesses. As a general rule, they do not believe defense expert witnesses unless preexisting information supports the expert's opinion." "Therefore, you must support expert findings through lay witnesses. Lay witnesses, expert witnesses and social history documents must be interlocked if you are to achieve a comprehensible presentation of mental health issues." *Id.*

However, Ms. Garza was in no position to present lay evidence regarding Ramirez's social history. Recall, the mitigation investigation had been circumscribed to interviews of Ramirez and just three witnesses, Ramirez's mother, his father, and a former girlfriend. (4 SH RR Ex. 34.) Thus, Ramirez's trial counsel had patently disregarded prevailing norms which underscore that it is "necessary [for counsel] to locate and interview [not just] the client's family members" [but] "virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional probation, or parole officers and others." ABA Guidelines, 31 Hofstra L. Rev. 1024.

Later, during state habeas proceedings, trial counsel claimed that they intended to call Ramirez's mother and just one of his four siblings to testify, but

these two witnesses had disappeared. (Ex. 98 at 2, 6; Ex. 100 at 108–10.) Even if that were true—and it wasn't—it would not justify trial counsel's decision to limit their investigation to just three witnesses, nor would it justify the failure to undertake an "extensive and generally unparalleled investigation into personal and family history" of the client. ABA Guidelines, 31 Hofstra L. Rev. 1024.

But more to the point, the so-called witness disappearance story was at best the product of a very poor memory, or at worst, the artifact of a serious lack of candor. It is one or the other. There is not a single document in counsel's file that supports the missing two witnesses claim. Not even the billing invoices suggest time expenditures to locate missing witnesses. (ECF No. 24-2 at 95, Ex. 10; ECF No. 24-2 at 101, Ex. 9.) Nor did trial counsel speak up during the penalty phase about missing witnesses, even when the trial judge criticized trial counsel for not presenting lay testimony as foundation for the expert testimony.

There is a reason that counsel's file negates the missing witness claim, similar to the reason why trial counsel failed to candidly report such an issue to the trial judge in the first instance during the penalty phase proceeding: witnesses had not disappeared. Instead, trial counsel had instructed Ramirez's mother to stay away from the courthouse during the penalty phase. Contemporaneous psychiatric notes, written by Ramirez's mother's local Hidalgo County psychiatrist just a few days

after the penalty phase verdict, demonstrate that Mrs. Ramirez had not gone missing. The notes show that Mrs. Ramirez still had possession of her rental home in Edinburg, and that to Mrs. Ramirez's dismay, Ms. Garza instructed Mrs. Ramirez to stay away from the penalty phase proceeding.[32] (Ex. 123 ¶ 7, 8; ECF No. 26-1 at 87, Ex. 43 at 42.)

The record demonstrates Ms. Garza did not want Mrs. Ramirez in the courtroom. This appears to have been part of her larger strategy, which was to argue that Mrs. Ramirez had neglected and abandoned Ramirez during his formative years. (39 RR at 5, 40.) In her closing argument, Ms. Garza pointed to Mrs. Ramirez's absence and criticized her for failing to support her son. (39 RR at 136.) This strategy, if it can be called that, was an uninformed one, and a result of counsel's "abandon[ment] of [their] investigation of [Ramirez's] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins*, 539 U.S. at 523–24. A decision is not strategic when made without benefit of a reasonable investigation. *Id.* at 527; *Knighton v. Maggio*, 740 F.2d 1344, 1350 (5th Cir. 1984) (counsel cannot make a valid strategic choice in absence of

---

[32]     These medical notes were obtained by Ramirez's state habeas counsel, but apparently, they did not review them, or if they were reviewed, counsel did not understand their import. Thus, the psychiatric notes or testimony from the custodian psychiatrist were not offered during the state habeas hearing to rebut trial counsel's missing witness story.

reasonable investigation); *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("Tactical decisions must be made in the context of a reasonable amount of investigation, not in a vacuum.").

Here, the decision to attack Ramirez's mother and direct her to stay away from the penalty phase proceeding was not justified by a valid strategy. Pointedly, lacking the benefit of any investigation, counsel was denied the ability to consider other "*plausible* options." *Strickland,* 466 U.S. at 690–91. For example, readily available discovery of the mother's own history; her victimization and childhood sexual trauma; her own mental illness; could have created sympathy for her and her neglected children, including Ramirez, whose own mental illness could be traced in part to genetic vulnerabilities.

In the final analysis, trial counsel's neglect left Dr. Allen unable to offer testimony that was either persuasive, credible or reliable. For example, Dr. Allen recognized that Ramirez was at risk for brain damage and resulting neurocognitive impairments. But when trial counsel attempted to elicit testimony from Dr. Allen which suggested Ramirez was brain damaged, the trial judge disallowed it. (39 RR at 55–58.) The trial judge admonished Ms. Garza that there had been no study of Ramirez's brain. (39 RR at 54–56.) The judge then stated the obvious: there was no reliable evidence that Ramirez suffered from brain abnormalities, and to this point,

Dr. Allen candidly testified that she agreed. (39 RR at 56, 58.)

In the end, the jury knew practically nothing about Ramirez, and after deliberating for less than three hours, the jury sentenced Ramirez to death. (39 RR at 145.)

### 2. Trial counsel ignored areas of investigation of which they should have been aware.

Counsel in a death-penalty case has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Andrus*, 140 S. Ct. at 1881 (internal quotations omitted). Applying this standard to Ramirez's case, here, trial counsel's failure to investigate was patently unreasonable. Counsel "'ignored pertinent avenues for investigation of which he should have been aware,'" "and indeed was aware." *Andrus* 140 S. Ct. at 1882 (quoting *Porter,* 558 U.S. at 40). Clearly, "'the known evidence would [have] le[d] a reasonable attorney to investigate further.'" *Id.* at 1883 (quoting *Wiggins*, 539 U.S. at 527). "Yet counsel disregarded, rather than explored, the multiple red flags." *Id.*

First, counsel was on notice of Ramirez's long history of mental illness. The TYC records and other juvenile institutional records in trial counsel's possession repeatedly remarked on Ramirez's dire mental health. During an initial psychological evaluation on March 25, 1998, it was reported that the 14-year-old Ramirez suffered from depression and suicidal ideation. (Ex. S12 at 396.) Ramirez

203

expressed that his "greatest mistake [was] not killing [him]self when [he] had the chance" and "[he] wish[ed] that [he] could die." (Ex. S12 at 396.) Based on the March 1998 evaluation, it was recommended that Ramirez be provided a residential treatment program that could provide psychiatric treatment. (Ex. S12 at 397–98.)

One week later, in April 1998, Ramirez's caseworker recommended that Ramirez be placed at a "Level of Care 5," with intensive mental health therapy due to suicide attempts and suicidal ideations. (Ex. S12 at 81–82, 84.) At the same time, the caseworker tied Ramirez's mental illness to his family history, reporting that his mother also suffered from a mental illness. (Ex. S12 at 91–92.)

After placement in residential treatment, Ramirez was again diagnosed with a major depressive disorder, with a documented history of multiple suicide attempts starting at age ten. The 14-year-old Ramirez reported to his treating therapist that he suffered from suicidal thoughts and that he wished he was dead or had never been born. (Ex. S12 at 81, 84, 374, 377, 390.) During his placement, Ramirez displayed symptoms of and was diagnosed with post-traumatic stress disorder. He was prescribed the antidepressant Serzone. (4 SH CR at 1530.)

In 2000, when Ramirez was placed in the custody of TYC he was diagnosed with "severe [mental health] problems", and described as "unable to function in

multiple areas," and showed signs of being "severely impaired in reality testing."[33] (2 SH CR at 507.) A TYC treating psychiatrist diagnosed Ramirez with chronic depression and prescribed medication. (ECF Nos. 32–35, Ex. S11 at 144.) The 2000 TYC psychological evaluation also concluded that there were "indications of mental illness within the family." (Ex. S12 at 376.)

Second, Ramirez's records are replete with indications that he struggled to attain basic literacy and that he might suffer from significant learning disability related neurocognitive limitations. Professional norms favor exploration of these limitations and disabilities. *See* ABA Guidelines, 31 Hofstra L. Rev. at 1023. During elementary school, Ramirez's English learning skills remained static during the first through fourth grades. (ECF No. 30-3 at 63–64, Ex. 83 ¶¶ 25–27.) His fourth-grade record reports that that after five years of bilingual instruction, he had still not achieved English acquisition. His fourth-grade teacher wrote that after five years of schooling his language abilities were so primitive that he could not "be understood by his[] teacher in the classroom." (1 SH CR at 462–63.) Several years later, at nearly age 13, testing revealed Ramirez to be virtually illiterate and that he was still a "non-reader" and a "non-writer." (1 SH CR at 450.)

---

[33] Impairment in reality-testing is a major feature of psychosis. *See* https://dictionary.apa.org/reality-testing

In March 1998, during an initial juvenile court psychological evaluation, Ramirez was diagnosed with a Reading Disorder. A learning disability was suggested. (Ex. S12 at 397–98.) Several months later, a different psychologist also proposed that there was evidence of a learning disability and recommended a further assessment. (Ex. S12 at 391.)

Subsequently, in April 2000, the psychologist who conducted the March 1998 psychological evaluation, diagnosed Ramirez with a learning disability. (Ex. S12 at 388.) The evaluator noted that Ramirez was repeating the ninth grade and that in the more than two years since his initial evaluation, Ramirez had yet to receive any special education services. (Ex. S12 at 383–87.)

On June 27, 2000, at age 16, Ramirez was administered the English and Spanish versions of the Woodcock-Munoz Language Survey. The results indicated that at age 16, Ramirez was reading English at a 9-year-old level and had the writing proficiency of a 7-year-old, second grader. He demonstrated only 1% proficiency on written tasks on which the average 16-year-old English speaker would show 90% proficiency. (Ex. S12 at 527–28.) On the Spanish version, Ramirez demonstrated the proficiency of an 8-year-old; meaning that he showed only 4% proficiency on tasks on which the average Spanish speaker at age 16 would show 90% proficiency. (Ex. S12 at 527–28.)

Third, counsel had evidence that Ramirez had sustained multiple head injuries with loss of consciousness which could have caused damage to his brain. When Ramirez was around eight years old, he fell out of a tree, sustaining a blow to his head and breaking an ankle. (2 SH CR at 533–34, 539.) Counsel also learned that Ramirez had been involved in two serious car accidents where he suffered head injuries with a loss of consciousness. (2 SH CR at 533–34, 540.) TYC records confirm this history. A 1998 psychological discharge summary provided a DSM IV Axis III diagnosis: "History of head injuries with loss of consciousness." (Ex. S12 at 391.) A later TYC record reported an incident where Ramirez was struck in the head during a fight, resulting in another incident with loss of consciousness. (ECF Nos. 32–35, Ex. S11 at 88.)

Fourth, counsel was provided with evidence that Ramirez had ingested a cascade of mind-altering substances beginning in early childhood, which could have lasting detrimental effects on his brain. Under prevailing norms, this evidence is the recommended subject of investigation. *See* ABA Guidelines, 31 Hofstra L. Rev. at 1022–23. Records available to counsel disclosed that at age ten, Ramirez had started self-medicating with marijuana and toxic inhalants. (2 SH CR at 534, 540; 2 SH CR at 485.) His drug use expanded to include regular use of crack cocaine, alcohol, Rohypnol (a sedative comparable to valium), as well as periodic use of

hallucinogens. (2 SH CR at 485.) During a series of mental health evaluations conducted in 1998–2000, Ramirez was identified as suffering from severe substance dependence and polysubstance abuse, with physiological dependence, and needing treatment. (ECF Nos. 32-35, Ex. S10 at 7; 4 SH CR at 1529; ECF Nos. 32–35, Ex. S11 at 89, 91.)

Fifth, trial counsel received evidence from Ramirez's mother Juana that Ramirez's father had physically abused and beat Juana while she was pregnant, often delivering hard blows directly to her abdomen. (2 SH CR at 529, 538.) Mrs. Ramirez also disclosed she received no prenatal care despite experiencing heavy cramping and bleeding for two months before delivering Ramirez at home by midwife.[34] (2 SH CR at 529, 538.) *See* ABA Guidelines, 31 Hofstra L. Rev. at 1022–23 (counsel should investigate whether developmental delays or neurological damage were the result of prenatal trauma).

Finally, sixth, counsel had evidence Ramirez may have been exposed to

---

[34] Further interviews with Juana would have uncovered additional details about her pregnancy with Ramirez. Juana later provided an affidavit confirming that while she was pregnant, Jose Raul's beatings were "frequent" and "severe." (2 SH CR at 530.) He punched her with his fists and kicked her with his boots and beat her with a folded-over belt. (4 SH RR at Ex. 1 ¶ 6; 2 SH CR at 529.) She also described the harsh conditions she faced while working in the fields during her pregnancy. 4 SH RR at Ex. 1 ¶ 6, 9.) The chemicals and pesticides were strong, and her head and stomach often hurt from breathing them in. Juana knew the exposure was dangerous but felt helpless about the situation. (4 SH RR at Ex. 26 ¶ 9.)

pesticides while accompanying his mother to work in the agricultural fields when he was a young child. (2 SH CR at 539.) The ABA Guidelines encourage counsel to "investigate what pesticides the client may have been exposed to and their possible effect on a child's *developing brain.*" ABA Guidelines, 31 Hofstra L. Rev. at 1026 (emphasis added).

### 3. The record demonstrates that trial counsel's investigation was constitutionally deficient.

Counsel was on notice, from records in their own files, that Ramirez suffered from long-standing mental illness that likely had hereditary origins. There were also several red flags pointing to the likelihood that, in lay terms, something was wrong with Ramirez's brain. One sign was his inability to attain even basic literacy (in either Spanish or English) accompanied by repeated diagnoses of learning disability. Given the expansive indications that Ramirez suffered from serious learning disabilities, reasonably diligent counsel only had to ask: what is a learning disability? The answer would have been easy to find. A learning disability is a neurodevelopmental disorder, which manifest from deficits in brain functioning. (ECF No. 24 Ex. 83 ¶ 9; Ex. 120.) As noted, the ABA Guidelines encourage investigation of cognitive limitations and learning disabilities. 31 Hofstra L. Rev. at 1023. Another red flag for possible long-term brain damage resulted from evidence showing that Ramirez had extraordinary exposures to inhalants, alcohol, and other

mind-altering drugs—directly affecting his brain—beginning at the tender age of ten; as well as the likely exposure to pesticides. Whether these repeated toxic exposures to alcohol and drugs affected Ramirez's young, undeveloped brain would have been an obvious question. *See Caro v. Calderon*, 165 F.3d 1223, 1228 (9th Cir. 1999) ("All counsel had to do was ask the question 'What did all that extraordinary exposure to [toxic] chemicals do to his brain?' And then, in order to find the answer, [they] merely had to address the question to either a neurologist or a toxicologist. Similarly, [they] could have asked the question to the experts he did retain who would have then told him that he needed to consult others.") By 2004, it was well recognized that inhalants could cause permanent brain damage. *See* Pediatrics Child Health, 2002 Feb; 7(2): 9–94).[35] Finally, Ramirez's sustained repeated blows to his head with loss of consciousness raised the prospect that he may have damaged his brain. *See Lockett v. Anderson*, 230 F.3d 695, 714 (5th Cir. 2000) (counsel ineffective for failing to investigate possible brain damage in light of repeated head injuries and drug and alcohol addiction).

Here, trial counsel knew that Ramirez's mental and physical health, including "history of mental or physical illness or injury, alcohol and drug use, birth trauma and developmental delays," needed to be investigated. She said so. (1 CR at 247.)

---

[35] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2794702/

But as explained above, trial counsel's investigation came too little too late. Virtually no investigation was done. Dr. Allen, the mental health expert, was not appointed until the trial had started, and as explained above, she never had time to complete her own evaluation. Counsel's last-ditch effort to elicit testimony from Dr. Allen, in order to suggest that Ramirez suffered from brain damage, was prohibited due to the blatant insufficiency of counsel's investigation. No expert had evaluated the functioning of Ramirez's brain. John Niland, the trial project director of Texas Defender Services was asked to evaluate Ramirez's TYC records for possible signs of neurological damage, but his recommendation that Ramirez undergo neuropsychological testing to assess brain damage was simply ignored.

The above record describes an ineffective counsel. *See Wilson v. Sirmons*, 536 F.3d 1064, 1085–86 (10th Cir. 2008), opinion reinstated sub nom. *Wilson v. Workman*, 577 F.3d 1284 (10th Cir. 2009) (finding counsel ineffective, when mental health expert was not hired until three weeks prior to trial, despite the fact that counsel was assigned to the case two years prior). The decision in *Wilson* is instructive. Citing the normative standards set out in the ABA Guidelines, to the effect that the "preparation for the sentencing phase, in the form of investigation, should begin immediately upon counsel's entry into the case," the *Wilson* court identified the hazards occasioned by counsel's delay of a mental health investigation,

including the inability "to pursue leads discovered during the [initial mental health evaluation] process, a requirement for counsel to be effective." *Id.* (citing *Rompilla*, 545 U.S. at 392 (effective counsel would have conducted further investigation after discovering red flags in initial investigation)). *Wilson* thus describes exactly what happened in Ramirez's case, when it became too late to evaluate Ramirez for evidence of likely brain damage, once those red flags—which were staring counsel in the face all along—were belatedly called out to counsel by Niland and Dr. Allen. *See also Bloom v. Calderon,* 132 F.3d 1267, 1271, 1277 (9th Cir.1997) (defense counsel delayed contacting a psychiatric expert twenty days before trial, and as a result, the mental health evaluation was incomplete and inaccurate). "The complete lack of effort by [Ramirez]'s trial counsel to obtain a [timely mental health evaluation] . . . combined with counsel's failure to adequately prepare [the] expert . . . was constitutionally deficient performance." *Id.*; *see also Anderson v. Sirmons,* 476 F.3d 1131, 1143 (10th Cir. 2007) (citing the ABA Guidelines and concluding that trial counsel in a capital case was constitutionally ineffective, partly on the ground that the investigator assigned to investigate the case in mitigation did not begin his work until the month before trial); *Green v. Davis*, No. CV H-13-1899, 2020 WL 4805343 (S.D. Tex. Aug. 18, 2020) ("By not promptly commencing a mitigation investigation, [counsel] performed deficiently. Their deficient

performance prejudiced Green, as the record now reflects that ample mitigation evidence was available, particularly on the issue of Green's mental illness.").

The prevailing norms for mental health investigation have found their expression in several Supreme Court cases, which stand for this proposition: when there are indications that a client might suffer from brain impairment or other mental deficiency, those leads must be investigated. *Williams,* 529 U.S. at 396; *Porter v. McCollum*, 558 U.S. 30, 36, 39–40 (2009); *Wiggins*, 539 U.S. at 524; *Rompilla,* 545 U.S. at 393–94; *Sears v. Upton*, 561 U.S. 945, 946 (2010) (per curiam); *Andrus v. Texas*, 140 S. Ct. at 1881–83; *see also Gray v. Branker,* 529 F.3d 220, 229–30 (4th Cir. 2008) (finding performance of counsel deficient when counsel failed to investigate many "red flags" of mental impairment); *Lockett*, 230 F.3d at 714 (counsel deficient for failing to investigate signs of possible brain damage and mental illness); *Neal*, 239 F.3d at 690–91 (counsel ineffective for failing to prepare mental health expert); *Anderson*, 476 F.3d at 1143–46 (finding counsel's performance deficient as a result of the unreasonably limited investigation of defendant's family history and mental health); *Williams,* 914 F.3d at 313–14 (counsel ineffective for failing to investigate red flags for possible organic brain damage); *Ferrell v. Hall,* 640 F.3d 1199, 1227 (11th Cir. 2011) ("[T]he record amply establishes that trial counsel's mental health investigation was unjustifiably and

213

unreasonably circumscribed" and that "[n]otably, [the mental health expert] had *not* been asked to look for evidence of brain damage, . . . and was *not* asked to perform a clinical interview.").

At the time of Ramirez's 2004 sentencing, it had long been recognized under prevailing professional norms that mental impairments can be powerfully mitigating and given great weight when juries are charged with assessing individualized culpability. For clients who have psychiatric disorders and brain damage, such evidence may explain the succession of facts and circumstances that led to the crime, and how that client's disabilities distorted his judgment and reactions. *See Abdul-Kabir v. Quarterman*, 550 U.S. 233, 237, 240, 241 (2007) ("possible neurological damage" and the "strength [of the defendant's mitigation case] was its tendency to prove that his violent propensities were caused by factors beyond his control– namely, neurological damage and childhood neglect and abandonment").

Yet, when the final verdict of death was imposed by the jury in 2004, "as far as [his] jury knew, [Ramirez] did not suffer from brain damage or neurological impairment; he had no organic disorders; and his emotional stability, impulse control, and judgment were perfectly normal." *Jefferson v. Upton*, 560 U.S. 284, 286–87 (2010) (internal quotations omitted). As discussed below, in these respects, his jury was materially misled. Trial counsel's performance was constitutionally

deficient.

### C.   Trial counsel's Deficient Performance resulted in prejudice

#### 1.   Introduction

To establish prejudice, Ramirez must show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "[P]rejudice exists if there is a reasonable probability that, but for his counsel's ineffectiveness, the jury would have made a different judgment about whether [Ramirez] deserved the death penalty as opposed to a lesser sentence." *Andrus*, 140 S. Ct. at 1885–86. When making this prejudice assessment, the court must consider "the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding"—and "reweig[h] it against the evidence in aggravation." *Williams*, 529 U.S. at 397–98; *see also Sears*, 561 U.S. at 956 ("A proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered [mitigation] evidence . . . , along with the mitigation evidence introduced during [the defendant's] penalty phase trial, to assess whether there is a reasonable probability that [the defendant] would have received a different sentence after a constitutionally sufficient mitigation investigation" (citing cases)). Here, because Ramirez's death sentence required a verdict by a unanimous jury, the showing of prejudice is made

when there is a "'reasonable probability that at least one juror would have struck a different balance' regarding [Ramirez's] moral culpability.'" *Andrus*, 140 S. Ct. at 1886 (quoting *Wiggins*, 539 U.S. at 537–38); *Ex parte Garza*, 620 S.W.3d at 825 (same).

The undisputed evidence shows that despite her earlier acknowledgement that the prevailing norms demanded a wide-ranging, expansive investigation, Ms. Garza came to Ramirez's capital sentencing armed with just three pre-sentencing witness interviews; one expert mental health witness, who could not have been more ill-prepared by counsel; and three professional witnesses (a retired Texas corrections spokesman, a pastor, and a gang expert), none of whom knew anything about Ramirez, and had naught to say about him. As explained above, the performance of trial counsel was pitifully deficient. That outcome was easily avoidable. There were prevailing professional norms to guide the way.

A "thorough inquiry into all circumstances of your client's life is always the necessary first step in identifying mental health issues." Blume, *Principles of Developing and Presenting Mental Health Evidence in Capital Cases*, at 64. "The defense team should assemble 'a comprehensive and well-documented psychosocial history of the client based on an exhaustive investigation' and 'provide[] social history information to [mental health] experts to enable them to conduct competent

and reliable evaluations.'" ABA Guidelines, 31 Hofstra L. Rev. at 959. In this context, a thorough investigation entails "interview[ing] the client's family members" and "virtually everyone else who knew the client and his family, including neighbors, teachers, clergy, case workers, doctors, correctional probation, or parole officers and others." *Id.* at 1024. Here, Ramirez has adhered to this normative process, by investigating and then compiling evidence from 40 lay witnesses: among them, seven schoolteachers, as well as immediate and extended family members, friends, and neighbors. (ECF Nos. 28-1, 28-2, 28-3, Exs. 51–81; Exs. 108–116.) Together, these witnesses paint a representative narrative of Ramirez's unfortunate, traumatic childhood.

Relatedly, if the client was incarcerated or institutionalized as either a juvenile or an adult, professional norms recognize that counsel should investigate the effect of the facility's condition on the client's "contemporaneous and later conduct" as well as the "adequacy of institutional responses to childhood trauma, mental illness, or disability to determine whether the client's problems were ever accurately identified or properly addressed." ABA Guidelines, 31 Hofstra L. Rev. at 1025–26 (emphasis added). Ramirez investigated these obvious leads to discovering mitigating evidence. And as explained below, he uncovered evidence that the Texas Youth Commission had a decidedly negative impact on his "later conduct" and that

the "institutional responses to childhood trauma, mental illness, or disability," were categorically inadequate. Included among the 40 lay witness declarations are statements of nine individuals who held correctional, mental health, or administrative positions with the Texas Youth Commission during the relevant time. (Exs. 51, 53, 59, 61, 69, 71, 72, 80, 81.)

Finally, prevailing norms emphasize that defense counsel should undertake a "multigenerational investigation extending as far as possible vertically and horizontally" because it "frequently discloses significant patterns of family dysfunction and may help establish or strengthen a diagnosis or underscore the hereditary nature of a particular impairment." ABA Guidelines, 31 Hofstra L. Rev. at 1025. Ramirez also followed this typical investigative roadmap, and through basic record collection, as well as witness interviews, Ramirez uncovered readily available evidence showing that some of his own difficulties follow a pattern of serious mental illness and addiction suffered by immediate and extended family members. (*See* social history, *supra* at Section III; 1 SH CR Ex. E at 291; 2 SH CR Ex. X at 527; 4 SH RR Exs. 1, 2.)

Taken together, the evidence collected from records and lay witnesses provides a sound foundation for understanding the psychosocial environment in which Ramirez's myriad mental and neurological disabilities originated, developed,

and then festered, when educational and juvenile systems outright failed him. The bulk of this evidence has already been summarized in detail in the Social History section of this Amended Petition and need not be repeated here. That summary shows how Ramirez's childhood history was influenced by severe poverty, intergenerational mental illness, domestic violence, physical abuse, parental abandonment, and neglect. His childhood was rife with trauma, stripped of all hope, but full of helplessness and frequent spells of just wishing he was dead.

All the noted psychosocial evidence serves as the foundational backbone for several important expert witnesses. They include: special education expert Debbie Dunn; board-certified neuropsychologist Dr. James Sullivan; board-certified neurologist Dr. Thomas Hyde; board-certified neuropsychologist, neuroscientist, and brain imaging expert, Dr. Erin Bigler; juvenile justice expert Michele Deitch; and finally, Father Gregory Boyle, who has been recognized with repeated honors and awards for his groundbreaking gang rehabilitation programs.

### 2. Summary of Expert Evidence

#### a. Special Educator Debbie Dunn

Debbie Dunn, an experienced educator who holds a master's degree in special education, evaluated Ramirez's educational records, as well as the sworn declarations of seven teachers who taught at the schools Ramirez attended. Ms. Dunn

found substantial evidence that Ramirez had evident learning disabilities that should have been treated beginning in elementary school. (ECF No. 30-3 at 51–71, 74–75, Ex. 83 ¶¶ 1–6, 8–44, 53–54.) As Ms. Dunn explains, a learning disability is a neurological disorder that reflects deficits in brain function, expressed in the brain's inability to normally receive, process, store, and respond to information. (ECF No. 30-3 at 54, Ex. 83 ¶ 9.) Ms. Dunn's diagnosis is confirmed and supported by the State's own records, e.g., Ramirez was evaluated three times by psychologists within the juvenile justice system, who diagnosed Ramirez with learning disorders and recommended special education services. (2 SH CR at 482; 2 SH CR at 491; 4 SH CR at 1529.)

As emphasized by Ms. Dunn, a learning disability and the brain impairments underlying it are permanent and last a lifetime. (ECF No. 30-3 at 54–55, Ex. 83 ¶¶ 22, 53.) It is because of the serious nature of these disabilities that for the past several decades, federal law has mandated that children with learning disabilities receive free special education services. (ECF No. 30-3 at 54–55, Ex. 83 ¶ 10.) Yet in Ramirez's case, Dunn found that despite evidence that Ramirez was in dire need of special education services, his disabilities were ignored and left untreated. (ECF No. 30-3 at 68, Ex. 83 ¶ 37.)

Ramirez's third grade teacher Ida Garcia has stated that disregard of treatment and special education for disabled children was the product of school administration indifference. By Ms. Garcia's account, during the time Ramirez was in elementary school, "it was very easy for a learning-disabled child to go through school without getting any testing for or placement in special needs classes." Ms. Garcia further reports that she and other teachers were "very frustrated" by the special education policies, remarking: "Our students needed help and we couldn't do anything about it. Even if a teacher wanted to hold a child back or have the child tested for special education, the school administration would tie the teacher's hands. The child was simply promoted . . .." (ECF No. 28-1 at 71, Ex. 57 ¶ 4–5.) Ms. Garcia relates that "[Ramirez's] records suggest he needed help, but . . . instead of giving him special help, the school just kept promoting him." (ECF No. 28-1 at 71–72, Ex. 57 ¶ 6.) Mr. Francisco Loya, Ramirez's teacher in eighth grade, came to similar conclusions, explaining that none of the school administrators listened or responded to Loya's own efforts to get Ramirez remedial help and that quite literally "[t]he school system failed Juan." (ECF No. 28-2 at 7, Ex. 62 ¶ 12.)

According to Ms. Dunn, the outcome for Ramirez was sadly predictable. "In 2002, the National Council on Disability stated that '[o]ften students who are not identified with a disability are the result of a poor minority community with a greatly

221

underfunded public school district . . . [and] not identifying or providing appropriate disability-related services to these minority adolescents may be a link to delinquent and offending behaviors. (Mallett, 2014.)'" (ECF No. 30-3 at 54–55, Ex. 83 ¶ 23.) The denial of special education treatment mandated by federal law has significant effects on a child's development. While "[r]esearch clearly demonstrates that the earlier a child is given appropriate help for a learning disability, the more successful the outcome . . .[f]or most individuals with learning disabilities who do not receive appropriate early intervention, long-term outcomes are bleak. School drop-out rates are higher, the individuals face limited educational and vocational opportunities, and . . . are at higher risk for delinquency." (ECF No. 30-3 at 54–55, Ex. 83 ¶ 16–17.)

But, poor outcomes for learning disabled children are not simply a matter of a child's choice; poor outcomes correlate with neurological deficits affecting the disabled children. As Dunn explains, "[c]hildren with learning disabilities have cognitive, neurological, and intellectual difficulties that often result in a lack of impulse control, the inability to anticipate the future consequences of actions, poor perception of social cues, limited social skills, irritability, suggestibility, and the tendency to act out. Consequently, children with learning disabilities are particularly susceptible to engaging in delinquent activities. Their deficits also make it more difficult for the children to withdraw from a pattern of crime once they have started

engaging in criminal activity. Such children who have been abused become exceptionally vulnerable to environmental stress, peer pressure, and more violence." (ECF No. 30-3 at 54–55, Ex. 83 ¶ 19.)

Dunn concluded with the observation that if Ramirez had "received necessary remedial instruction by qualified personnel, he would have had a reasonable chance for a different life outcome." (ECF No. 30-3 at 54–55, Ex. 83 ¶ 54.)[36]

### b.    Dr. James Sullivan

Over the course of two days, on March 31 and April 1, 2016, board-certified neuropsychologist Dr. James Sullivan administered a broad range of tests measuring Ramirez's neuropsychological functioning. (ECF No. 30-4, Ex. 87; Ex. 124A.) Prior to this testing, Ramirez had never received comprehensive neuropsychological testing. Like Ms. Dunn, Dr. Sullivan found in Ramirez's childhood history clear evidence of learning disabilities, "which clearly indicated the need for specialized services," which he never received. (ECF No. 30-4 at 9, Ex. 87 at 4.) During his testing of Ramirez, Dr. Sullivan found statistically significant disparities between certain test scores, which occur in fewer than 5% of the population, and are often seen in individuals with learning disabilities. (ECF No. 30-4 at 14, Ex. 87 at 9.) Other

---

[36]    Ms. Dunn confirms that the bases for her findings and conclusions were extant at the time of Ramirez's 2004 sentencing proceeding and could have been presented by her or another qualified expert at that time. (Ex. 120.)

testing showed that on measures of learning and memory, Ramirez scored in the lowest 1% of the normative sample, and on measures of recall for auditory and visual information Ramirez showed severe impairments in the lowest 0.1% of the normative sample. (ECF No. 30-4 at 14, Ex. 87 at 9.) On tests measuring executive functioning (which "explain brain-based aberrations in behavior") Ramirez was "profoundly impaired" in areas such as "inductive and deductive reasoning, impulse control, self-monitoring, and inhibition of competing responses," which can be expected to cause "frequent difficulties in everyday living." (ECF No. 30-4 at 16, Ex. 87 at 11.)

Dr. Sullivan found it "abundantly clear, and beyond a reasonable psychological certainty that Ramirez has pronounced and authentic neuropsychological impairment." (ECF No. 30-4 at 19, Ex. 87 at 14.) He also determined that it was likely that Ramirez's "documented cerebral dysfunction (i.e. brain damage) is a direct result of prenatal insult (e.g., physical abuse of mother during pregnancy) as well as exposure to severe psychological trauma in the form of physical abuse." (ECF No. 30-4 at 18, Ex. 87 at 13.) Dr. Sullivan identified evidence in Ramirez's educational records which makes it "extremely likely" that he suffered from brain damage prior to his use of drugs and inhalants; although it is likely that substance abuse did exacerbate his pre-existing brain damage.

However, like special educator Dunn, Dr. Sullivan found it significant that Ramirez had been denied treatment through special education services, concluding that if Ramirez "had received specialized services during elementary school, that he wouldn't have been at such a high risk for self-medicating through polysubstance abuse."[37] (ECF No. 30-4 at 18, Ex. 87 at 13.)

### c.     Dr. Thomas Hyde

On September 12, 2016, board-certified neurologist and research scholar Dr. Thomas Hyde conducted a neuropsychiatric neurological examination of Ramirez. (ECF No. 30-3 at 79, Ex. 84 at 1; Ex. 122A.) This was the first such examination for Ramirez. Dr. Hyde identified brain damage during his neurological examination, and as explained below, Dr. Hyde's independent findings substantiate the validity of the testing results obtained by Dr. Sullivan.

Upon routine neurological physical examination of Ramirez, Dr. Hyde found that Ramirez's "Cranial Nerve, Motor, Gait, and Sensory examinations were notable for the presence of two frontal release signs: a glabellar reflex and a right palmomental reflex." (ECF No. 30-3 at 79–80, Ex. 84 at 1–2.) These "two frontal release signs, are primitive reflexes normally only seen in infancy . . . and normally

---

[37]     Dr. Sullivan confirms that the bases for his findings and conclusions were extant at the time of Ramirez's 2004 sentencing proceeding and could have been presented by him or another qualified expert at that time. (Ex. 124.)

disappear around 1 year of age as the [brain's] frontal lobes mature. Their persistence into or reappearance in adulthood reflects either developmental or acquired brain injury to the frontal lobes. The presence of frontal release signs in Mr. Ramirez is consistent with profoundly impaired executive function on the neuropsychological testing performed by Dr. Sullivan." (ECF No. 30-3 at 82, Ex. 84 at 4.)

Dr. Hyde, like Ms. Dunn and Dr. Sullivan, found well-documented evidence of Ramirez's learning disabilities in his psychosocial history, as confirmed by childhood psychological examinations and associated testing, statements of teachers, and educational records. (ECF No. 30-3 at 80–81, Ex. 84 at 2–3.) And like Ms. Dunn, Dr. Hyde explains that Ramirez's learning disabilities "are direct evidence of organic brain dysfunction, especially when they persist into adulthood," and such persistence is evident here, as Dr. Sullivan's "neuropsychological testing results from 2016 [still] support the diagnosis of learning disability." (ECF No. 30-3 at 82, Ex. 84 at 4.)

Also, Dr. Hyde, like Dr. Sullivan, found evidence that Ramirez's neurological impairment was consistent with "a disorder of early brain development," supported by evidence of "well-documented environmental factors, no doubt enhanced by genetic factors[,]" . . . [including] "an adverse *in utero* environment" . . . [and] academic" problems from a young age." (ECF No. 30-3 at 82, Ex. 84 at 4.)

Dr. Hyde determined that Ramirez's developmental brain disorder was made worse and "compounded by continued adversity[,] [including] multiple closed head injuries, in adolescence, exposure to marijuana, alcoholic beverages, a variety of illicit drugs and most importantly inhalants, beginning in childhood and persisting from early adolescence into adulthood. The child and adolescent brains are uniquely vulnerable to the effects of these substances, particularly organic solvents. Mr. Ramirez inhaled fumes from spray paint, Whiteout, gasoline, Freon, and glue daily from around 12–14 years of age, passing out from intoxication on several occasions." (ECF No. 30-3 at 82, Ex. 84 at 4.)[38]

Dr. Hyde also examined an MRI containing images of Ramirez's brain. In his September 2016 report, he stated that the MRI "showed abnormalities in the white matter in the occipital region of the brain bilaterally." (ECF No. 30-3 at 82, Ex. 84 at 4.) In 2018, based on review of additional material, Dr. Hyde prepared a supplemental report. (ECF No. 30-3, Ex. 85). There, Dr. Hyde announced that further review "expanded [his] understanding of the biological bases of the behavioral problems manifested by Mr. Ramirez throughout his life." (ECF No. 30-3 at 85, Ex. 85 at 1.) Dr. Hyde identified abnormalities in the lateral thalamus,

---

[38]     Ramirez's abuse of inhalants is documented in his juvenile records and by eyewitness accounts. (2 SH CR at 534, 540; Ex. 110 ¶ 4-5; ECF No. 30-3, Ex. 84 at 4.)

"indicative of pathological changes in the composition of the brain." (ECF No. 30-3 at 85, Ex. 85 at 1.) After ruling out differential diagnoses, Dr. Hyde concluded "to a reasonable degree of medical certainty" the thalamic lesions seen on the MRI were due to the combined effects of inhalation of fumes from organic solvents with associated loss of consciousness. (ECF No. 30-3 at 86, Ex. 85 at 2.)

According to Dr. Hyde, damage to the thalamus contributes to behavioral dysregulation, inhibitory control, and impaired decision-making, and Ramirez's thalamic brain damage likely contributed to some of the serious brain impairments seen in the results of Dr. Sullivan's neuropsychological testing. (ECF No. 30-3 at 86, Ex. 85 at 2.) Dr. Hyde concluded with the observation that the damage to Ramirez's brain "contribut[ed] to the behavior problems he ha[d] manifested throughout his adolescence and contributed to the actions that have led to this incarceration." (ECF No. 30-3 at 86, Ex. 85 at 2.)[39]

### d.    Dr. Erin Bigler

Dr. Erin Bigler is a board-certified neuropsychologist; he is a recognized neuroscientific scholar, with a long history in academia as a professor in neuroscience at both the University of Texas and Brigham Young University

---

[39]    Dr. Hyde confirms that the bases for his findings and conclusions were extant at the time of Ramirez's 2004 sentencing proceeding and could have been presented by him or another qualified expert at that time. (Ex. 122.)

(professor emeritus, now retired). He has published prolifically in peer-reviewed scientific journals and textbooks. (Ex. 118, App. A.) While at Brigham Young, he founded and directed the Brain Imaging and Behavior Laboratory and the Magnetic Resonance Imaging Research Facility. Prior to that, during his professorship at the University of Texas from 1978 to 1990, he established and directed the Neuropsychology Service at Austin State Hospital for the Texas Department of Mental Health and Mental Retardation (as it was referred to at that time). (Ex. 118 at 1.)

Dr. Bigler prepared a report dated November 25, 2019. There, based on a thorough review of Ramirez's psychsocial history, and the objective results obtained from testing and neuroimaging (Ex. 118 at 2), he made findings and drew conclusions relevant to the assessment of Ramirez's moral culpability. His broad findings are quoted here below.

- Mr. Ramirez suffers from permanent damage to his brain, which has resulted in significant impairments in his cognitive, emotional/psychological, academic, and social functioning.

- There is evidence that damage to Mr. Ramirez's brain is developmental in origin, traceable to his mother's pregnancy, and/or the serious adverse environmental conditions permeating his infancy; or very early childhood, prior to his reaching school age.

- Beginning in early childhood, Mr. Ramirez's untreated brain abnormalities found expression in both learning, emotional, and psychiatric disabilities.

- Throughout his childhood and adolescence, those responsible for his education and institutional care denied him opportunities for treatment of his pronounced brain-based learning disabilities and related cognitive and emotional impairments, and to the contrary, the responsible educational and juvenile authorities imposed conditions that would have impeded any potential for rehabilitation.

- Without appropriate treatment of his underlying neurocognitive disorder, or a realistic avenue of escape from a variety of familial and other traumatic childhood exposures, there were predictable consequences: failure in school, development of serious emotional and psychiatric disorders, self-medicating with drugs and inhalants, and becoming all too easily susceptible to manipulation by adult criminal gang members, who permeated his community.

- In Mr. Ramirez's case, he was convicted of an offense occurring when he was just 18 years old, prior to full development of brain regions related to higher-order functions such as, impulse control, planning ahead, the evaluation of future consequences, making mature judgments, and risk evaluation. For Mr. Ramirez these normal disadvantages in adolescent brain function were exponentially magnified due to his pre-existing brain damage.

- Indeed, when considering Mr. Ramirez's moral culpability at the time the charged offense occurred, the objective and valid assessments of his brain function reveal areas of cognitive and emotional functioning that are typical of an 8 or 9 year old, not someone who was 18.

- I emphasize that the original causes and later further degeneration of Mr. Ramirez's damaged brain must be understood within the context of his childhood circumstances. The records I reviewed show that Mr. Ramirez's childhood was beset with deprivation and trauma. His problems ensued from the moment of conception.

230

(Ex. 118 at 3–4.)

Dr. Bigler presents extensive support for each of his conclusions in his detailed report. (Ex. 118 at 4–25.) Some of his additonal findings regarding the etiolgy and course of Ramirez's brain impairments are important enough to be highlighted and quoted here.

- Left untreated a neurodevelopmental disorder can have dire consequences, and in Mr. Ramirez's case it did. [T]hroughout his childhood and adolescence, those responsible for his education and institutional care denied him opportunities for treatment of his pronounced brain-based learning disabilities and related cognitive and emotional impairments, and to the contrary, the responsible educational and juvenile authorities imposed conditions that likely would have inhibited any potential for rehabilitation.

- For children who suffer from neurodevelopmental brain disorders—even those children born into the most economically and socially stable environments—there is profound need for large amounts of extra support at home and school, intervention from psychological and educational specialists, the provision of structure and stability at home, in the community, and in school. Although, such neurodevelopmental disorders are permanent and not curable, with adequate interventions and support, the negative effects of such disorders can be lessened, children can learn to compensate, increasing the chances for success in education and achievements later in life.

- Mr. Ramirez lacked either an economically or socially stable environment, or *any* appropriate intervention. While any child and adolescent who grew up in Mr. Ramirez's environment would have had difficulty understanding and bringing organization to the chaotic environment he grew up in, Mr. Ramirez was in a position of considerable disadvantage due to his pre-existing brain impairments.

- Taken together, Mr. Ramirez's traumatic disadvantaged childhood environment and his pre-existing but untreated neurodevelopmental disorder placed him at significant risk for developing psychiatric disabilities, self-medicating with drugs and other toxic substances, manipulation by older community gang members, and delinquent behavior, and in the case of Mr. Ramirez, this is what transpired.

- For those children like Mr. Ramirez, who suffer with an untreated neurodevelopmental disorder, the underlying brain pathology in regions of the brain that regulate emotional functioning and impulse control, as well as cognition would be expected to result in observable behaviors reflecting the outward manifestation of the brain impairment. There is a neuropsychological saying that "every behavior has an anatomy," meaning if one examines the behaviors and psychiatric disabilities exhibited by Mr. Ramirez during childhood, there is a nexus between those behaviors/disabilities and his impaired brain. Indeed, such marked manifestations of behavior linked to brain impairment are evident throughout Mr. Ramirez's childhood.

- Mr. Ramirez suffered from marked functional deficits, which have been well documented by educators, family, and other witnesses. For example, in school, Mr. Ramirez had difficulty understanding instructions; his teachers had to repeat instructions to him over and over again. His mother noticed that everyday tasks were much harder for him than her other children. He struggled to get ready for school on time. His mother had to get him shoes with Velcro, instead of normal laces, because he could not learn how to tie his shoes. He had trouble understanding money and how much things cost, and he had to rely on his older sister to help him count change. His mother recalled that there were things he wanted to do, like riding a bike, but he would give up on tasks because he could not master them. He was described by family as hyperactive and difficult to manage. According to his mother, Mr. Ramirez "could not take initiative – he just did what other kids said to do." (Declaration of Juana Ramirez, October 15, 2013 at ¶ 19.)

- Mr. Ramirez's untreated neurodevelopmental disorder and related neural dysregulation are a root cause for Mr. Ramirez's childhood emotional and psychiatric disorders. What's more, children with the constellation of diagnoses like Mr. Ramirez had in his youth—particularly those suffering from childhood maltreatment like Mr. Ramirez—have diminished coping skills and oftentimes self-medicate their disabilities with drugs or other toxic substances and engage in delinquent behavior. This is what occurred when Mr. Ramirez was just a child.

- In Mr. Ramirez's case, it is unsurprising that without proper treatment, his neurodevelopmental disorder, with its related emotional and psychiatric sequelae, would contribute to self-medicating with drugs and inhalants, which the records show began when he was just 10 or 11 years old. Unfortunately, substance abuse occurring prior to adolescence, while the young brain is still developing (as in the case of Mr. Ramirez) permanently changes neurobehavioral and neurocognitive functioning. Once damaged, the brain never returns to its pre-injury state. Here, there is every indication that Mr. Ramirez's self-medicating with drugs and inhalants beginning at an early age resulted in further permanent damage to his already impaired brain.

- In summary, Mr. Ramirez has a developmental brain disorder secondary to the challenging conditions related to his genetic endowment, environmental, and social-emotional deprivation during gestation, infancy, childhood, and adolescence. The neurodevelopmental brain impairments have been aggravated by inhalant abuse, polysubstance abuse, and possibly by acquired traumas from reported injuries to his head.

- I agree with Dr. Sullivan, that if Mr. Ramirez had received special education services during elementary school, "it is quite possible" that he "wouldn't have been at such high risk for self-medicating through polysubstance abuse." In that event, it is equally possible that he would have acquired the tools to succeed in school and achieve an acceptable degree of normal adolescent and adult functioning.

(Ex. 118 ¶¶ 41–42, 46–52, 55, 60–65.)[40]

### e. Michele Deitch

During Ramirez's penalty phase, the State presented evidence that Ramirez had been offered quality opportunities for rehabilitation and treatment. (38 RR at 3–134; 39 RR at 137–38.) As explained above, under prevailing norms, counsel routinely investigate the quality and effect of juvenile confinement on their client. ABA Guidelines, 31 Hofstra L. Rev. at 1025–26. Ramirez's counsel ignored these norms and conducted no investigation despite Ramirez's lengthy interaction with the juvenile justice system for most of his adolescence from age 14-18. Here, Ramirez's habeas counsel conducted an investigation of the TYC conditions extant during his custody and control by that agency. Counsel interviewed TYC staff, consulted public records, and sought expert assistance from Michele Deitch, a leading expert on issues related to criminal justice, including juvenile corrections, and in partcular, the now dismantled Texas Youth Commission. (ECF No. 28-3 at 29–31, Ex. 82 at 1–3.)

Based upon all of the evidence collected, Ms. Deitch was asked to consider two broad questions: were the conditions of Ramirez's TYC confinement detrimental to the possibility of rehabilitation? And if the answer to that question is

---

[40] Dr. Bigler confirms that the bases for his findings and conclusions were extant at the time of Ramirez's 2004 sentencing proceeding and could have been presented by him or another qualified expert at that time. (Ex 118 at 1.)

yes, was there evidence of those detrimental effects that could have been presented to Ramirez's penalty phase jury? (ECF No. 28-3 at 31, Ex. 82 at 3.) Relying on a wide ranging set of government records, media reports, juvenile justice corrections literature and eyewitness accounts, Ms. Deitch answered these questions in the affirmative, and stated her reasons for doing so in her 17-page report. A summary of her findings is quoted here.

- The conditions in TYC at the time of Mr. Ramirez's commitment were appallingly dangerous and brutal, with youth at risk of physical and sexual assault from both other youth and from staff, with drugs widely available, and with rampant gang activity. The entire agency operated according to a punitive philosophy that aimed to punish, control, and demean the youth but that did nothing to provide them with the skills they needed to change their behaviors. Staff were in short supply, and they were severely under-qualified and untrained for their critical tasks of supervision and rehabilitation. Programs and services for youth were limited in scope and of poor quality.

- [J]ust a couple of years after Mr. Ramirez's release, the entire agency collapsed under the weight of scandal, with TYC's extensive dysfunction exposed to public view. In my opinion, this was not an environment in which youth could reasonably have been expected to thrive, let alone become rehabilitated. Rather, it was an environment that, for many youth, traumatized them and made them even more likely to act out in anti-social ways upon their release. Especially considering the almost nonexistent aftercare services available to paroled youth, it is little surprise that more than 50 percent of released youth during this timeframe were reincarcerated in just over a year.

- The punitive and dangerous conditions, staffing problems, and inadequate programming in TYC facilities at the time of Mr. Ramirez's

commitment, especially in the Evins and Coke County facilities where he was housed for the longest periods of time, undermined any effort to rehabilitate youth in these facilities. Indeed, these conditions made it entirely predictable that youth would emerge from TYC made worse by their time in the agency's custody.

- Extensive evidence of the harms caused to youth by TYC's harsh conditions of confinement, poorly trained staff, ineffective programing, and inadequate transition and aftercare services would have been readily available to Mr. Ramirez's trial counsel back in 2004. Such evidence could easily have been found in popular literature, scholarly journals, legal rulings, staff guidebooks, and the news media. And since TYC administrators and staff were well-aware of the problems in the facilities and the impact such conditions had on youths' prospects for rehabilitation, there were numerous witnesses that trial counsel could have called upon to raise these concerns. Indeed, the Declarations of former TYC employees Pamela Ward, Angel Hernandez, Maria Elena Lopez, John Arrendondo, and Deborah Nance, among others, all indicate that these individuals would have been willing to testify at Mr. Ramirez's trial.

(ECF No. 28-3 at 33, 44, Ex. 82 at 5, 16.)

As made plain by Ms. Deitch's well substantiated findings, Ramirez's jury was given a false portraiture of his time in TYC custody. Ramirez had not been offered adequate rehabilitation services as represented to his jury. Rather, the conditions of his confinement, and lack of adequate support and treatment upon his release, only worsened his already compromised functioning.

### f.    Father Gregory Boyle

Father Boyle, as his title implies, is a Catholic Priest and a member of the Society of Jesus religious order, commonly known as the Jesuits. In 1988, he founded a program called Jobs for a Future. Its name was changed to Homeboy Industries in 1992. (Ex. 119 at 1.) Based in Los Angeles, Homeboy Industries is the largest gang rehabilitation-and-reentry program in the world. Father Boyle has worked with thousands of gang members and their families. (Ex. 119 at 1.) In recognition of his work, Father Boyle was inducted into the California Hall of Fame; the White House has recognized him as a Champion of Change; and he was awarded the University of Notre Dame's Laetare Medal in 2017, the oldest honor given to American Catholics, "whose genius has ennobled the arts and sciences, illustrated the ideals of the church and enriched the heritage of humanity." He has served on the State Commission for Juvenile Justice and Delinquency Prevention, The National Youth Gang Center Board, and the Attorney General's Defending Childhood Task Force. His rehabilitative work with former gang members has been the subject of acclaimed books that he authored, including the 2010 New York Times-bestseller "Tattoos on the Heart: The Power of Boundless Compassion," and the 2017, Los Angeles Times-bestseller "Barking to the Choir: The Power of Radical Kinship." (Ex. 119 at 2.)

Father Boyle has helped thousands of young men and women find redemption, overcome their involvement in gang culture and become productive members of society. Given his extensive knowledge of gang culture, and the factors that place children at risk for involvement with gangs, he has provided expert testimony on these subjects, including in death penalty cases. (Ex. 119 at 2.)

Father Boyle reviewed evidence bearing on Ramirez's psychosocial and mental health history in order to bring a better understanding to those "factors contributing to Juan's childhood association with gang members, with emphasis on how Juan's childhood circumstances were predictive of his gravitation to a gang at a very young age." (Ex. 119 at 3.) Some of the key evidence explaining Father Boyle's ultimate conclusions are quoted in full below.

- Juan's distressing childhood circumstances . . . placed him at risk and therefore were predictive that he would flee to a gang when he was still a young child.

- It is often suggested that a child is seeking something, e.g., the "need to belong" when he joins a gang. This has logical appeal, but it is not true and fails to get at the root causes. Instead, just as in Juan's case, it is typically an unstable homelife accompanied by exposure to trauma, abuse, neglect, and desolation, which pushes a child toward association with a gang. These risks are compounded, as in Juan's case, when a child lives in an impoverished community and is placed in an underprivileged school.

- Typically, three types of youth join gangs: the despondent child, the traumatized child, and the mentally ill child. Each of these profiles are on a continuum of severity. Some kids are more mentally ill than traumatized.

Others are more despondent than mentally ill. Unfortunately, in Juan's case, he evidenced all three in good measure.

- The moment a vulnerable child is pushed to a gang tends to be at a time when the child is experiencing hopelessness and utter despondency, when a child's experiences are so bleak that he no longer cares about his life and when it will end. This paradigm aptly applies to Juan.

- Not surprisingly, the antidote to gang involvement is parental support and attention. Dr. Woehr implicitly recognized this in her 1998 report, noting that Juan wanted to disassociate with gangs, but that he would "require emotional support and someone to point out positives in his behavior, [as] he really responds to positive feedback." Unfortunately, these supportive resources were not available to Juan once he returned home and to his community.

- The same misery and hopelessness that pushes children into gang involvement can keep them there for many years, especially while they remain in the community where their fellow gang members reside. In Juan's case, he was released from the custody of TYC, back to the same gang environment that he had come from, without the social or community supports needed to foster his chances for rehabilitation.

- There is evidence that Juan would have benefited from appropriate social and community support. We can see in Juan's social history that he made efforts to do well and break away from gang life. He earned his GED, found a job, and expressed interest in vocational training. Dr. Woehr noted in her 1998 report that the 14 year old Juan "[had] dreams of going to college and being an architect, and feels he can achieve that . . . [and] [h]e doesn't want to go back to the gang environment or do drugs." The records summarized in the Social History further demonstrate that Juan responded well to tenderness and compassion from loving, caring adults. [A] TYC caseworker described Juan as sincere, gentle, and "crying out for a change." Juan expressed to the caseworker that he wanted to change and go home, because he felt like he needed to help his mother with his younger siblings and be a father figure to them.

239

- While Juan's efforts to break free from gang life were ultimately unsuccessful, he did show a desire to change and make a better life. This is the necessary first step towards ending involvement with gangs and violence; a sure sign that Juan had some potential for benefitting from sound and supportive long-term rehabilitative programs like Homeboy Industries.

- Prosecutors, law enforcement, and even jurors have the misconception that gangs are about bad kids who did bad things and thrive off their behaviors. In my work, I encourage people to move away from this type of demonizing that undergird these mythic assessments. In truth, it is about Juan's desolate environment, his mammoth struggles, and his immense pain that pushed him towards gang life in the first place. If I testified at Juan's sentencing proceeding, I could have explained all of this to Juan's jury, and that Juan was not beyond hope. In my experience, presenting his story as such would lead any juror to feel, "*There but for the grace of God . . . I or my kid could have gone there too*." Had I or a similarly qualified expert been called to testify at Juan's sentencing, the opinions I have expressed above could have been presented to the jury in 2004.

(Ex. 119 ¶¶ 12, 17, 19–25.)

The jury didn't get to hear the whole story surrounding Ramirez's gang involvement, a narrative that would have helped further show his diminished moral culpability. Ramirez's desolate environment, his mammoth struggles, and his immense pain pushed him towards gang life while he was still a vulnerable child. (Ex. 119 ¶ 24.) And what's more, the record shows he wanted to be somebody; he wanted to change, but he was never given the tools to do so. (Ex. 119 ¶¶ 22–23.)

**D.**   **There is a reasonable probability that at least one juror would have struck a different balance regarding Ramirez's moral culpability and spared him from a death sentence.**

This is not a case in which the new evidence "would barely have altered the sentencing profile presented to [Ramirez's jury]." *Porter*, 558 U.S. at 41 (internal quotation omitted). And while the murder offenses underlying Ramirez's death sentence were an immense tragedy, the crimes do not foretell a sentence of death, as the recent reversal of the death sentence of one of Ramirez's co-defendant's shows. *See Ex parte Garza*, 620 S.W.3d at 824–26, citing *Andrus*, 140 S. Ct. at 1887 ("[W]e think that the habeas mitigation evidence would have provided jurors with important context about Applicant's life that trial counsel failed to present and that would have drawn a considerably different picture for the jury of Applicant's childhood and mental health than what it was presented with at trial.").

Here, the prejudice analysis begins with Ramirez's alleged role in the offense. Ramirez was convicted based on his own statements, but he denied killing any of the victims. (42 RR, Ex. 3 at 2–3.) It is undisputed that he was not the individual who recruited anyone to commit the planned drug robbery; he had no role in planning the execution of the offense, and he did not arrange for the delivery of the firearms ultimately used during the crime. (Ex. 106; 42 RR, Ex. 3; *and see Ex parte Garza*, 620 S.W.3d at 825.)

241

To the contrary, everything the teenage Ramirez is alleged to have done was done at the direction of others. But taking direction from others implicates Ramirez's diminished capacity to resist those forces. As Dr. Bigler explains, Ramirez suffered from neurocognitive deficits that left him functioning no better than a nine-year-old child—abnormalities which crystalize Ramirez's mental frailties and his lessened moral culpability.[41] (Ex. 118 at 4, 23.)

Recall that Ramirez's serious brain abnormalities "profoundly impaired" his capacity for "inductive and deductive reasoning . . . , impulse control, self-monitoring, and inhibition of competing responses." (ECF No. 30-4 at 16, Ex. 87 at 11.) He suffered from "behavioral dysregulation, [lack of] inhibitory control, and impaired decision-making," which "contributed to the actions that have led to [his] incarceration." (ECF No. 30-3 at 86, Ex. 85 at 2.) He had "exponentially magnified" impairments in the abilities inherent to "planning ahead, the evaluation of future consequences, making mature judgments, and risk evaluation." (Ex. 118 at 4.)

Courts uniformly agree that "[o]f all the diverse frailties of humankind, brain damage is singularly powerful. It is an objective scientific fact. It does not reflect a

---

[41]    *See Penry v. Lynaugh*, 492 U.S. 302, 319 (1989), *abrogated on other grounds by Atkins v. Virginia*, 536 U.S. 304 (2002) (it is "the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse").

bad choice made by the client." Blume & Leonard, *Principles of Developing and Presenting Mental Health Evidence in Capital Cases*, The Champion, 63, 68 (Nov. 2000); *see, e.g.*, *Abdul-Kabir*, 550 U.S. at 237, 240–241, 256 ("possible neurological damage" and the "strength [of the defendant's mitigation case] was its tendency to prove that his violent propensities were caused by factors beyond his control– namely, neurological damage and childhood neglect and abandonment"); *Lockett*, 230 F.3d at 716 ("If the medical opinion testimony in this case—that Lockett suffered from some organic brain disorder that tended to explain his violent conduct and made him less able to control his behavior than a normal person—had been presented to the jury, we think a reasonable juror could have found that his particular mental condition, which resulted from no fault of his own, made him less morally culpable for his cruel and senseless crime"); *Grant v. Royal*, 886 F.3d 874, 920 (10th Cir. 2018) ("Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect.") (quotations omitted); *Littlejohn v. Trammell*, 704 F.3d 817, 864 (10th Cir. 2013) ("Evidence of organic mental deficits ranks among the most powerful types of mitigation evidence available."); *United States v. Barrett*, 985 F.3d 1203, 1230 (10th Cir. 2021) (finding prejudice where a proper presentation of family history and evidence of significant brain damage would have been powerful mitigation).

The words of the Eleventh Circuit in *Jefferson v. GDCP Warden* are particularly apt here: "There is a powerful difference between someone who grew up poor and without a father and a person who grew up suffering from organic brain damage yielding debilitating mental impairments that worsened into adulthood. There is an even bigger difference between someone who has an 'attitude problem' and someone whose frontal lobe was permanently damaged at a young age and who is therefore not capable of controlling his impulses or reactions to external stimuli at critical moments." 941 F.3d 452, 484 (11th Cir. 2019); *id*. at 486–87 ("[T]he benefit of presenting the new and powerful forensic evidence would have been anything but small — as we've detailed, evidence of Jefferson's brain damage would have dramatically altered Jefferson's sentencing profile and given the jury a compelling reason not to impose the death penalty").

Ramirez has demonstrated that his new mitigating evidence, all available at the time of his initial sentencing, would have made a difference to at least one juror. His traumatic childhood, his neurocognitive disabilities, and the institutional failures to treat him would have been sufficient to change the outcome of his penalty phase proceedings.

# CLAIM TWO

**As he was only 18 years old at the time of the crime, Ramirez's execution would violate the Eighth Amendment prohibition on cruel and unusual punishment.**

The Eighth Amendment prohibits "all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive." *Atkins v. Virginia*, 536 U.S. 304, 311 n.7 (2002); *see also Enmund v. Florida*, 458 U.S. 782, 788 (1982). A punishment's proportionality is determined by the evolving standards of decency, as "the standard of extreme cruelty is not merely descriptive, but necessarily embodies a moral judgment." *Kennedy v. Louisiana*, 554 U.S. 407, 419, *modified on denial of reh'g*, 554 U.S. 945 (2008). "The standard itself remains the same, but its applicability must change as the basic mores of society change." *Id.* (citing *Furman v. Georgia*, 408 U.S. 238, 382 (1972) (Burger, C. J., dissenting)). The Eighth Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles*, 356 U.S. 86, 101 (1958).

The concern over cruel and unusual punishment is even more significant when a person's life is at stake. In capital cases, "the Court has been particularly sensitive to insure that every safeguard is observed," because "[t]here is no question that death as a punishment is unique in its severity and irrevocability." *Gregg v. Georgia*, 428 U.S. 153, 187 (1976). Under the Eighth Amendment, a death sentence "is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct

245

social purposes served by the death penalty: retribution and deterrence of capital crimes." *Kennedy*, 554 U.S. at 441 (citing *Coker v. Georgia*, 433 U.S. 584, 592 (1977)).

When assessing the proportionality of a death sentence under the Eighth Amendment, "the Court [also] insists upon confining the instances in which the punishment can be imposed." *Id.* at 420. The result has been that the death penalty is only proportionate when used for "'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 568 (2005)); *see also Roper*, 543 U.S. at 569 (recognizing that the death penalty should be reserved for "the worst offenders").

The Supreme Court has established that the Eighth Amendment limits the sentences that may be imposed on those under 18. Recognizing their inherent diminished capacity and culpability, in 2005, the Court prohibited the death penalty for individuals under 18 at the time of their crime. *Roper*, 543 U.S at 574. In 2010, the Court held that juveniles convicted of non-homicide offenses cannot be sentenced to life without parole and must have a "realistic" and "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham v. Florida*, 560 U.S. 48, 74–75 (2010). In the years that followed, the Court

established that juveniles must have this meaningful opportunity for release even in homicide cases—except in the rarest of cases where the sentencer determines that the particular individual "exhibits such irretrievable depravity that rehabilitation is impossible[.]" *Montgomery v. Louisiana*, 136 S. Ct. 718, 733 (2016); *Miller v. Alabama*, 567 U.S. 460, 473 (2012). *Roper*, *Graham*, *Miller*, and *Montgomery* are grounded in youths' reduced culpability and greater capacity for reform, an understanding gleaned in large part from "developments in psychology and brain science [showing] fundamental differences between juvenile and adult minds." *Graham*, 560 U.S. at 68; *see also Miller*, 567 U.S. at 471–72, 472 n.5.

The Court recognized in *Roper* that delineating the category of only those under 18 years old as exempt from capital punishment may have been arbitrary and under-inclusive, but that nevertheless "a line must be drawn." *Roper*, 543 U.S. at 574. That line, however, was not drawn in *Roper*, but re-drawn. In 1988, the Supreme Court held that the death penalty was unconstitutional for offenders under the age of 16. *Thompson v. Oklahoma*, 487 U.S. 815 (1988). Evolving standards of decency must move apace with emerging scientific consensus. Courts must continue to reevaluate arbitrary rules to ensure that only those who are most culpable and therefore "most deserving of execution" are sentenced to death. *Roper*, 543 U.S. at 568.

The effects of brain development in young adults has reached the point of scientific consensus. The medical community has overwhelmingly determined that adolescents in their late teens are more comparable to their younger peers than they are to adults in their late-twenties or older with developed brains. Moreover, as "the imposition of death by public authority is so profoundly different from all other penalties . . . an individualized decision is essential in capital cases." *Lockett v. Ohio*, 438 U.S. 586, 605 (1978). This is especially true for Ramirez who has other factors delaying his development. For the same reasons *Roper* extended the categorical bar to all adolescents under 18, conformity with Eighth Amendment standards now counsels this Court to apply the constitutional protection to individuals under 21. While 18-year-olds should be categorically exempt from execution, under an individualized determination, Ramirez's execution in particular would violate the Eighth Amendment's prohibition on cruel and unusual punishment.

### A. Evolving standards of decency no longer allow for the imposition of death on those who were under 21 at the time of their crime.

The Eighth Amendment's prohibition of cruel and unusual punishment requires that "punishment for crime should be graduated and proportioned to [the] offense." *Roper*, 543 U.S. at 560 (internal quotation marks omitted). This proportionality principle requires the court to "determine which punishments are so disproportionate as to be cruel and unusual" and limit the death penalty to those who

248

commit "the most serious crimes" and are "most deserving of execution." *Id.* at 561, 568 (quoting *Trop*, 356 U.S. at 100–01). The death penalty is categorically barred for certain groups of offenders (1) if a national consensus develops against executing that particular group; (2) scientific consensus supports a finding of lesser culpability for certain classes of offenders; and/or (3) if a capital sentence fails to serve the purported aims of punishment. *See, e.g.*, *Roper*, 543 U.S. at 560; *Atkins*, 536 U.S. at 311; *Kennedy*, 554 U.S. at 441; *see also Gregg*, 428 U.S. 153 (the death penalty is said to serve two purposes, retribution and deterrence).

### 1. National consensus

A national consensus has developed against executing offenders who were under 21 years old at the time they committed their offense. A review of the laws and practices of various states demonstrates this consensus. At the time of this writing, 23 states plus the District of Columbia and five United States territories have banned the death penalty. Three additional states have imposed moratoria on executions, and during the last 10 years, only 10 of those remaining states have executed anyone under 21 at the time of his or her offense. Since 2014, that number has dropped to five.

Recently, courts in some states have extended the Eighth Amendment protections of *Roper*, *Graham*, *Miller*, and *Montgomery* to young adults, at least in

some circumstances. For example, a circuit court in Kentucky declared the death penalty unconstitutional for offenders under 21. *See* Order Declaring Kentucky's Death Penalty Statute as Unconstitutional at 12, *Commonwealth v. Bredhold*, No. 14-CR-161, (Fayette Cir. Ct., 7th Div. Aug. 1, 2017) (Scorsone, J.). The court reasoned that "[g]iven the national trend toward restricting the use of the death penalty for young offenders, and given the recent studies by the scientific community, the death penalty would be an unconstitutionally disproportionate punishment for crimes committed by individuals under twenty-one (21) years of age[]" "at the time of their offense." *Id.* (relying heavily on brain science-related testimony to conclude that the death penalty is a disproportionate punishment for offenders younger than 21 because such individuals are categorically less culpable and have a better chance at rehabilitation); *see also* Order Declaring Kentucky's Death Penalty Statute as Unconstitutional, *Commonwealth v. Diaz*, No. 15-CR-584-001, (Fayette Cir. Ct., 7th Div. Sept. 6, 2017) (Scorsone, J.).[42]

A New Jersey appellate court similarly relied on *Miller* to support its decision to remand for resentencing a 75-year aggregate sentence imposed for murder

---

[42] In both cases, the Commonwealth of Kentucky filed an interlocutory appeal challenging the circuit court's ruling. On March 26, 2020, both cases were remanded by the Supreme Court of Kentucky finding that the issues were not justiciable as neither defendant-appellee had been convicted. *Commonwealth v. Bredhold*, 599 S.W.3d 409 (Ky. 2020).

committed by a 21-year-old defendant, reasoning that where the sentence is the practical equivalent of life without parole, courts must "consider at sentencing a youthful offender's failure to appreciate risks and consequences as well as other factors often peculiar to young offenders." *State v. Norris*, No. A-3008-15T4, 2017 WL 2062145, at *5 (N.J. Super. Ct. App. Div. May 15, 2017) (internal quotation omitted); *see also Cruz v. United States*, No. 11-CV-787 (JCH), 2017 WL 3638176 (D. Conn. Apr. 3, 2017) (granting defendant's motion for a hearing on a § 2255 motion, concluding that he raised an issue of material fact as to whether an 18 year old is legally and developmentally a child such that his mandatory life-without-parole sentence violates the Eighth Amendment).

National consensus is clear that, under evolving standards of decency, the execution of 18-year-olds is no longer appropriate under the Eighth Amendment.

## 2. Scientific Evidence

Based on findings from the medical and scientific community, the Supreme Court held in *Roper* that it is cruel and unusual punishment to impose the death penalty on those under 18. Given the knowledge about the human brain maturation process then available, the Court's cutoff at age 18 made sense at that time. When the Court decided *Roper*, available research failed to focus on the brain development of late adolescents, and "[y]oung adults between the ages of eighteen and twenty-

one constitute[d] a less well-defined category." *See* Elizabeth S. Scott, Richard J. Bonnie & Laurence Steinberg, *Young Adulthood as a Transitional Legal Authority: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 644 (2016), *available at* https://ir.lawnet.fordham.edu/cgi/viewcontent.cgi?article=5246& context=flr (last visited Nov. 30, 2020). While evidence previously existed that "psychological and neurobiological development that characterizes adolescence continues into the midtwenties, [] the research [had] not yet produced a robust understanding of maturation in young adults age eighteen to twenty-one." *Id.* at 653.

After *Roper*, mental health professionals turned their attention to older adolescents and found that many of the same traits possessed by juveniles under 18—traits that make them ineligible for the death penalty—also apply to older adolescents in their late teens and early twenties. In the 16 years since *Roper*, three major changes have altered the justification for a strict age 18 cutoff: (1) scientific research has developed to explain the effects of brain maturation, or lack thereof, on the behavior and decision-making of adolescents in their late teens; (2) recent changes in the treatment of older adolescents in the criminal justice system reflecting a more informed understanding of the differences between late adolescents and adults; and (3) the Court decided *Hall v. Florida*, 572 U.S. 701 (2014), *Moore v. Texas*, 137 S. Ct. 1039 (2017), and *Moore v. Texas*, 139 S. Ct. 666 (2019), which

illuminated the interaction between law and science and sought to reduce the "unacceptable risk" that death sentences are imposed on those who lack the requisite culpability. *See Hall*, 572 U.S. 704.

Given the recently available research, the scientific community has confirmed that 18-year-olds do not have fully developed brains and continue to be vulnerable to peer pressure and risk-taking behavior just like their peers under 18. Neuroscientific research has shown that the human brain does not fully mature until a person reaches his or her mid-20s. In 2016, for example, scientists tested the degree to which the brains of 18-21year-olds functioned as compared to adolescents or adults with respect to critical regulatory tasks. In "key brain areas," those studies found that the 18-21 year-olds' brain activity during threat conditions was more similar to that of teenagers. *See* Leah H. Somerville, *Searching for Signatures of Brain Maturity: What Are We Searching For?*, 92 Neuron 2 (2016), *available at* https://andl.wjh.harvard.edu/sites/default/files/pdf/somerville_neuron16.pdf?width=85%25&height=85%25&iframe=true (last visited Nov. 30, 2020).[43]

---

[43]     *See also* House of Commons Justice Committee, *The Treatment of Young Adults in the Criminal Justice System*, Seventh Report of Session 2016–17 at 6 (hereinafter "House of Commons Committee"), *available at* https://publications.parliament.uk/pa/cm201617/cmselect/cmjust/169/169.pdf (last visited Nov. 30, 2020) (Scientific evidence has identified "a distinctive phase of development occurring between the ages of 18 and 24.").

Young adults do grow out of impulsive and reckless behaviors; they become more reflective, more risk-adverse, more mature, and less vulnerable to peer pressure.[44] The national consensus that 18-year-olds are not as responsible and mature as those over 21 is further confirmed by state and federal laws that impose minimum age requirements (e.g., consumption of alcohol and tobacco, obtaining a concealed carry handgun permit), or that extend protections afforded to those under 18 (e.g., educational opportunities, parental health insurance, and foster care benefits). Recent scientific literature confirms this consensus, as there is now "an irrefutable body of evidence from advances in behavioral neuro-science that the typical adult male brain is not fully formed until at least the mid-20s, meaning that young adult males typically have more psycho-social similarities to children than to older adults." House of Commons Committee at 7.

---

[44] *See, e.g.*, A. Cohen, *et al.*, *When is an Adolescent an Adult? Assessing Cognitive Control in Emotional and Nonemotional Contexts*, 27(4) Psychological Science 549, 559 (2016) ("[T]hese findings suggest that young adulthood is a time when cognitive control is still vulnerable to negative emotional influences, in part as a result of continued development of lateral and medial prefrontal circuitry."), *available at* https://pdfs.semanticscholar.org/9354/d66a43e803b160124b2b46dae 50a70d12e10.pdf (last visited Nov. 30, 2020); L. Steinberg, *A Social Neuroscience Perspective on Adolescent Risk-Taking*, 28 Dev. Rev. 78 (Mar. 2008) (noting that "rates of risk-taking are high among 18- to 21-year-olds" and explaining that adolescents and young adults are more likely than adults over 25 to engage in risky behaviors), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2396566/ (last visited Nov. 30, 2020).

The new scientific consensus about brain development as it relates to someone like Ramirez, who was 18 years old at the time of the offense, is so significant that in 2018 the American Bar Association's House of Delegates passed a resolution calling on American jurisdictions that still have capital punishment to prohibit its imposition against those who were 21 years of age or younger at the time of the offense. *See* L. Rawles, *Ban Death Penalty for Those 21 or Younger, ABA House Says*, ABA Journal (Feb. 5, 2018), available at http://www.abajournal.com/news/article/Ban_death_penalty_for_those_21_or_younger_aba_house_says (last visited Nov. 30, 2020).

Because young adults (ages 18, 19, or 20) as a class are not fully mature, they should not be considered among "the worst offenders" for purposes of the death penalty. *Roper*, 543 U.S. at 569. Therefore, "the State cannot extinguish his life and his potential to attain a mature understanding of his own humanity" without violating constitutional principles. *Id.* at 573–74. Because Ramirez was merely 18, and well under the age of 21, at the time of the offenses, he should not be subjected to the death penalty.

### 3.    Other judicial considerations

First, executing 18-year-olds serves no penological purpose. "[C]apital punishment is excessive when it is grossly out of proportion to the crime or it does

not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes." *Kennedy*, 554 U.S. at 441; accord *Gregg*, 428 U.S. at 183.

Executing an offender under 21 serves no retributive purpose. The culpability and blameworthiness of 18-year-olds are diminished to a substantial degree by their youth and immaturity. American society recognizes the need to provide greater protections for this group and to prohibit them from participating in activities where youthful impulsivity and immaturity could put them or others at risk. The law does not grant these youth the same rights and entitlements of adults; and for punishment, they should not be treated the same as adults. Just as with those under 18, research suggests this group can mature and age out of their characteristic recklessness and impulsivity. That this group can mature and attain a better understanding of their own humanity means that they cannot be the worst of the worst to justify the ultimate sanction. *Roper*, 543 U.S. at 568. "Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree, by reason of youth and immaturity." *Id.* at 571. Capital punishment is only lawful if the offender's "consciousness [is] materially more 'depraved' than that of any person guilty of murder." *Godfrey v. Georgia*, 446 U.S. 420, 433 (1980). Youthful offenders' impulsivity and lack of full brain

development so affect their individual responsibility and moral guilt it categorically precludes such a finding.

As for the rationale of deterrence, *Roper* stated, "the same characteristics that render juveniles less culpable than adults suggest as well that juveniles will be less susceptible to deterrence." *Roper*, 543 U.S. at 571–72 (internal quotations and citation omitted). "The likelihood that the teenage offender has made the kind of cost-benefit analysis that attaches any weight to the possibility of execution is so remote as to be virtually nonexistent." *Id.* This reasoning also applies to individuals under 21. Deterrence as a rationale for punishment requires a group to reflect upon the consequences of its actions. Those in late adolescence suffer from the same impulsivity as younger teenagers; they act rashly, without reflection and full consideration of the consequences of their actions.

Second, the concerns raised in *Roper* about the heightened vulnerability of juvenile offenders are especially heightened in Texas, where future dangerousness is at issue. The Supreme Court's determination that certain groups of people must be categorically barred from capital punishment is based in part on the unacceptable risk that jurors would not give adequate weight to the offenders' diminished culpability in the face of the brutality of their crimes. For example, discussing the need for a categorical bar on executing juvenile offenders, the Court noted:

The differences between juvenile and adult offenders are too marked and well understood to risk allowing a youthful person to receive the death penalty despite insufficient culpability. An unacceptable likelihood exists that the brutality or cold-blooded nature of any particular crime would overpower mitigating arguments based on youth as a matter of course, even where the juvenile offender's objective immaturity, vulnerability, and lack of true depravity should require a sentence less severe than death. In some cases a defendant's youth may even be counted against him.

*Id.* at 572–73.

This was true in the instant case, where the State's closing argument emphasized Ramirez's youth as evidence of his future dangerousness. The State first told the jury not to consider Ramirez's age as mitigating:

Throughout the trial, you kept hearing testimony about how young the Defendant is . . . He was 18 when he committed the crime. You heard from the child development specialist that they brought this morning. Child development? He was 18 when he committed this crime. He is an adult.

(39 RR at 118–19.) But then the prosecutor used Ramirez's youth against him. After listing Ramirez's childhood crimes, he told the jury, "He is only going to get worse. It is not going to get better." (39 RR at 138.) Rather than accurately portray Ramirez as a child in crisis and in desperate need of support, the State painted Ramirez as a hardened criminal who was irredeemable *because of his young age*.[45] Use of young

---

[45]     This line of argument is also at odds with the findings relied upon by the Supreme Court in its cases regarding juvenile offenders. As the Court stated in *Miller v. Alabama*, holding that states may not impose mandatory life-without-parole

age as a factor to support capital punishment when it is rather, as confirmed by scientific consensus, evidence of diminished culpability, renders death sentences of young adults unreliable.

Given the complete lack of penological justification, the heightened risk of unreliable sentences, and the vulnerability of the defendant, executing an offender who was 18 years old at the time of his crime violates the Eighth Amendment's prohibition on cruel and unusual punishment.

---

sentences on juvenile offenders:

> Our decisions rested not only on common sense—on what any parent knows—but on science and social science as well. In *Roper*, we cited studies showing that only a relatively small proportion of adolescents who engage in illegal activity develop entrenched patterns of problem behavior. And in *Graham*, we noted that developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds—for example, in parts of the brain involved in behavior control. We reasoned that those findings—of transient rashness, proclivity for risk, and inability to assess consequences—both lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed.

*Miller*, 567 U.S. at 471 (citations omitted) (internal quotation marks omitted).

**B.** **Because of his impairments, the concerns raised in *Roper* apply to Ramirez and executing him would constitute cruel and unusual punishment in violation of the Eighth Amendment.**

In 2018, medical professionals filed a brief encouraging the Supreme Court to revisit its holding in *Roper*:

> What was surmised at the time of this Court's decision in *Roper v. Simmons*, 543 U.S. 551 (2005); can now be stated as fact: an individual in his young twenties who has experienced lifelong trauma, been subjected to extensive abuse and neglect, and engaged in substance abuse is likely to bear many of the same cognitive and emotional characteristics as the juveniles at issue in *Roper*.

Brief of Concerned Psychiatrists, Psychologists and Neuropsychologists in Support of Petition for Writ of Certiorari, *Branch v. Florida*, (No. 17-7825) 2018 WL 1010497, at *6 (Feb. 20, 2018).

"[B]rain maturation is a multi-layered process that does not map on to a single developmental timeline." Leah H. Somerville, *Searching for Signatures of Brain Maturity: What Are We Searching For?*, 92 Neuron 1 (2016). "The ability to designate an adolescent as 'mature' or 'immature' neurologically is complicated by the fact that neuroscientific data are continuous and highly variable from person to person[.]" Sara B. Johnson, *et al.*, *Adolescent Maturity and the Brain: The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolesc. Health 216, 218 (2009) *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC2892678/ (last visited Nov. 30, 2020). The Supreme Court in recent holdings

such as *Hall*, 572 U.S. at 712 (holding that legal decisions should follow "established medical practice"), *Moore*, 137 S. Ct. at 1049 (stating that the Court's precedent does not "license disregard of current medical standards") and *Brumfield v. Cain*, 135 S. Ct. 2269, 2278 (2015) (stating that it is unconstitutional to prevent further consideration of whether an individual is intellectually disabled "simply because a capital defendant is deemed to have an IQ above [the previous threshold]" (internal quotation omitted)) emphasize that an individual's "condition, not a number" must be considered when determining if execution would be cruel and unusual punishment. *See Hall*, 572 U.S. at 723. Therefore, and as required by Supreme Court precedent, an individualized determination as to the appropriateness of capital punishment should be made for a defendant who was only 18 years old at the time of the crime. *Lockett*, 438 U.S. at 605.

The concerns that *Roper* enumerated in establishing a categorical ban on executing individuals under 18 apply equally to Ramirez as an 18-year-old struggling with significant deficits and organic brain damage. (ECF No. 30-3, Exs. 83, 84, 85; ECF No. 30-4, Ex. 87.) Born with those impairments, he was then raised in an environment rife with abuse, domestic violence, and severe neglect. Unsurprisingly, Ramirez began self-medicating with drugs, including marijuana, cocaine, and Rohypnol, when he was only ten years old. (38 RR at 63–65.) He used

inhalants like paint thinner, glue, or gasoline daily between the ages of 12 and 14, which may have aggravated his pre-existing brain impairments and undoubtedly further impaired his brain development.[46] (ECF No. 30-3, Ex. 84 at 4.) Neuropsychologist James P. Sullivan, Ph.D., determined that Ramirez has "pronounced and authentic neuropsychological impairment." (ECF No. 30-4, Ex. 87 at 14.) Dr. Sullivan believes that Ramirez's brain damage "is a direct result of prenatal insult (e.g. physical abuse of mother during pregnancy) as well as exposure to severe childhood psychological trauma in the form of physical abuse." (ECF No. 37-4, Ex. 87 at 13.) And while Ramirez's developmental brain damage in the context of his traumatic childhood surely contributed to his substance abuse, his childhood

---

[46]    Recent research has demonstrated that alcohol and drug exposure in adolescence hinders brain development. *See* Anita Cservenka & Ty Brumback, *The Burden of Binge and Heavy Drinking on the Brain: Effects on Adolescent and Young Adult Neural Structure and Function*, 8 Front. In Psychol. 1111 (2017) (finding that heavy drinking by adolescents alters brain structure), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5491846/ (last visited Nov. 30, 2020); Center for Brain Health, *Starting Age of Marijuana Use May Have Long-Term Effects on Brain Development*, Science Daily (Feb. 10, 2016) (adolescents "who began using marijuana at the age of 16 or younger demonstrated brain variations that indicate arrested brain development in the prefrontal cortex, the part of the brain responsible for judgment, reasoning, and complex thinking") (citing to Francesca M. Filbey, *et al.*, *Preliminary Findings Demonstrating Latent Effects of Early Adolescent Marijuana Use Onset on Cortical Architecture*, 16 Dev. Cognitive Neuroscience 16–22 (2015)), *available at* https://www.sciencedaily.com/releases/2016/02/160210135334.htm (last visited Nov. 30, 2020).

addictions very likely exacerbated his preexisting neurological impairments. (ECF No. 37-4, Ex. 87 at 13.)

School records also demonstrate that Ramirez suffered from severe impairments at a very young age. There is clear evidence that he had learning disabilities and associated deficits in brain functioning which began in early primary school. (ECF No. 30-3, Ex. 83 at 4.) Ramirez's school records reveal his ongoing struggles with low cognitive functioning and neurological impairments, which persisted through adolescence. (ECF No. 30-3, Ex. 83 at 13–21.) He suffered from a learning disorder, a "neurological disorder that impairs the brain's ability to receive, process, store, and respond to information." (ECF No. 30-3, Ex. 83 at 4.)

Moreover, Ramirez has a developmental or acquired brain injury[47] to the frontal lobes of his brain, which impairs his ability to control his impulses and self-regulate (otherwise known as "executive functioning"). (ECF No. 30-3, Ex. 84 at 4.) This is supported by MRI imaging that shows lesions in the lateral thalamus of his

---

[47] At age 15, Juan sustained a head injury during a gang fight, when he was hit on the back on the head and "blacked out" for about 10 minutes. (ECF No. 33-35, Ex. S11 at 88.) Also, as an adolescent, Juan ran his mother's car into a pole, knocking him unconscious for about five minutes. On another occasion, Juan and a friend were driving and attempted to beat a train at a railroad crossing, flipping the car over. Juan was struck on the head, and he again lost consciousness for about five minutes. He never received any medical attention for these injuries. (2 SH CR at 532–33.)

brain. (ECF No. 30-3, Ex. 85 at 1.) As reported by neurologist, Dr. Thomas M. Hyde, M.D., Ph.D., damage to the thalamus "has a wide range of clinical outcomes, including behavioral dysregulation, inhibitory control, and impaired decision-making." (ECF No. 30-3, Ex. 85 at 2.) Neuropsychological testing corroborated Ramirez's inability to develop reasoned responses to complex situations, and his profoundly impaired executive functioning. (ECF No. 30-3, Ex. 85 at 2.) Dr. Hyde concluded:

> Within a reasonable degree of medical certainty, the longstanding damage to Mr. Ramirez's thalamus, as noted on MRI scan, contributes significantly to the behavior problems he has manifested throughout adolescence, and contributed to the actions that have led to this incarceration. Additionally, the thalamic lesions would act in concert with pre-existing neurodevelopmental problems, leading to greater brain dysfunction and functional disability.

 (ECF No. 30-3, Ex. 85 at 2.)

At the time of the crime, Ramirez suffered from an inability to engage in "the kind of cost-benefit analysis that attaches any weight to the possibility of execution[.]" *Roper*, 543 U.S. at 561–62 (quoting *Thompson*, 487 U.S. at 836–38). Ramirez suffered from "a lack of maturity," and the brain damage affecting his impulse control resulted in "impetuous and ill-considered actions and decisions." *Id.* at 569 (quoting *Johnson v. Texas*, 509 U.S. 350, 367 (1993)). According to clinical neuropsychologist, Erin Bigler, Ph.D.:

The brain develops as an "experience-dependent organ" and does not fully mature until the mid-20s. In Mr. Ramirez's case, he was convicted of an offense occurring when he was just 18 years old, prior to full development of brain regions related to higher-order functions such as: impulse control, planning ahead, the evaluation of future consequences, making mature judgments, and risk evaluation. For Mr. Ramirez these normal disadvantages in adolescent brain function were exponentially magnified due to the brain damage from which he suffered. Indeed, when considering Mr. Ramirez's moral culpability at the time the charged offense occurred, the objective and valid assessments of his brain function reveal areas of cognitive and emotional functioning that are typical of an 8 or 9 year old, not someone who was 18.

(Ex. 118 ¶ 62.)

Because of his impairments, Ramirez at 18 years old was susceptible to peer pressure and evidenced the same reckless behavior typically seen in younger adolescents. *Roper*, 543 U.S. at 569 (citing Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Rev. 339 (1992)). He had long struggled with depression and PTSD, had attempted suicide multiple times, and used drugs to self-medicate since the age of 10. (ECF No. 30-3, Ex. 83 at 23; 38 RR at 63–64.) Raised in an abusive household and suffering from severe mental illness, Ramirez had "less control, or less experience with control, over [his] own environment." *Roper*, 543 U.S. at 569. Finally, Ramirez's character was not as fixed or as well-formed as that of an adult. *Id.* at 570. Though the State painted Ramirez as a continuing threat in prison because of his young age, evidence existed

that Ramirez was successful when previously placed in a more structured, supportive environment. (38 RR at 84, 116.)

## C. Conclusion

Ramirez qualifies for exemption from execution under each factor the *Roper* court relied upon to find that capital punishment of those under 18 years old at the time of crime is unconstitutional. For all the foregoing reasons, executing Ramirez, an 18 year old with significant impairments at the time of the offenses, would violate the principles articulated in *Roper*, *Graham*, *Miller*, and *Montgomery* and the Eighth Amendment's prohibition against cruel and unusual punishment and frustrate the aims of capital punishment. Based upon evolving standards of decency, this court must grant Ramirez relief.

## CLAIM THREE

**Ramirez's Sixth Amendment right to counsel was violated because trial counsel rendered ineffective assistance during the pretrial and guilt phases of his capital trial.**

Ramirez's trial counsel failed to investigate and prepare for the pretrial and guilt phases of his capital trial. Consequently, they failed to protect his constitutional rights and neglected to develop and present available defenses to Ramirez's charges of capital murder. Counsel's deficient performance in that respect and others, both individually and cumulatively, prejudiced Ramirez and thereby violated his rights

under the Sixth and Fourteenth Amendments to the U.S. Constitution. Ramirez presented this claim below.

## A.    Relevant Facts

Ramirez was arrested on January 29, 2003, while under the influence of Rohypnol. (1 CR at 2; 7 RR at 57.) Police ignored Ramirez's requests for a lawyer and continued with an interrogation. (7 RR at 41–43.) Ramirez, who was only 18 years old and highly susceptible to influence based on his background and mental health, was not capable of voluntarily waiving his rights. Police obtained an involuntary and unreliable statement from Ramirez. (45 RR Exs. 101–02.) This statement was the centerpiece of the State's case against him.

Among other failures, Ramirez's trial counsel failed to timely consult and hire experts who could adequately address the issues related to Ramirez's interrogation. They did nothing to investigate or present evidence countering the State's false narrative and did little to investigate the crime itself, telling the court days before jury selection that they "[were] unfamiliar with the scene of the alleged crime." (1 CR at 266.)

Counsel's failures continued throughout Ramirez's trial. As discussed below, counsel failed to challenge either the grand jury proceedings or the venire, failed to competently conduct voir dire, failed to preserve issues and make a complete record,

failed to object to critical issues, and failed to present evidence in support of Ramirez's defense.

## B.    Legal Standard

The Sixth Amendment guarantees a defendant the right to effective assistance of counsel, which in turn protects the due process right to a fair trial. *Strickland v. Washington*, 466 U.S. 668, 684 (1984); *see also Kimmelman v. Morrison*, 477 U.S. 365, 374 (1986) ("The right to counsel is a fundamental right of criminal defendants; it assures the fairness, and thus the legitimacy, of our adversary process."). Under *Strickland*, a defendant is denied effective assistance when (1) the "representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 687–88, 694. Ultimately, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

With respect to the first prong of the *Strickland* test, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Id.* at 688. The Supreme Court has consistently relied upon guidelines from the ABA and similar professional groups to inform the inquiry into reasonable

professional conduct. *See, e.g.*, *Padilla v. Kentucky*, 559 U.S. 356, 366–67 (2010) ("We long have recognized that '[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . .'" (omissions in original) (quoting *Strickland*, 466 U.S. at 688)); *see also* Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (American Bar Association 2003). Courts have regularly used these and similar guidelines to help determine whether counsel performed deficiently. *See, e.g.*, *Rompilla v. Beard*, 545 U.S. 374, 387 & n.7 (2005) (citing the 1982 ABA Criminal Justice Standards when deeming trial counsel ineffective for their failure to conduct a thorough investigation); *Wiggins v. Smith*, 539 U.S. 510, 524–25 (2003) ("Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred as 'guides to determining what is reasonable.'" (quoting *Strickland*, 466 U.S. at 688)).

Regarding the prejudice prong of the *Strickland* test, the inquiry is whether there is a "reasonable probability" that the jury would have reached a different result absent counsel's errors. *Strickland*, 466 U.S. at 694. A "reasonable probability" is one "sufficient to undermine confidence in the outcome"—a "defendant need not

show that counsel's deficient conduct more likely than not altered the outcome[.]" *Id.* at 693–94.

When evaluating prejudice, a court must consider "the totality of the evidence—'both that adduced at trial, *and the evidence adduced in the habeas proceeding*[*s*].'" *Wiggins*, 539 U.S. at 536 (emphasis in original) (quoting *Williams (Terry) v. Taylor*, 529 U.S. 362, 397–98 (2000)). And, critically, the question is not only whether each instance of deficient performance was on its own prejudicial, but also whether the combined effect of all instances was sufficient to undermine confidence in the outcome. *See Strickland*, 466 U.S. at 694; *see also, e.g.*, *Martin v. Grosshans*, 424 F.3d 588, 592 (7th Cir. 2005) ("[E]ven if these [unprofessional] errors, in isolation, were not sufficiently prejudicial, their cumulative effect prejudiced Martin's defense.").

With regard to the *Strickland* test for the culpability phase specifically, the Fifth Circuit has long "recognized that, at a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case. This duty is reflected in the American Bar Association Standards for Criminal Justice, a proper guide for determining what is reasonable under the circumstances." *Nealy v. Cabana*, 764 F.2d 1173, 1177–78 (5th Cir. 1985) (footnotes omitted).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Counsel therefore "has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Id.* at 691.

Alma Garza and Rolando Garza, the attorneys appointed to represent Ramirez during his capital trial, abdicated their responsibilities and failed to protect Ramirez's rights. Their errors infected the whole of Ramirez's trial, rendering it reasonably probable that the result would have been different but for trial counsel's deficient performance.

## C. Trial Counsel's Deficiencies and the Resulting Prejudice

### 1. Ramirez was denied effective assistance of counsel due to his trial counsel's conflicts.

The Sixth Amendment right to counsel requires effective assistance by an attorney, which has two components: competence and conflict-free representation. *Wood v. Georgia*, 450 U.S. 261, 271–72 (1981). The right to conflict-free representation is a right to counsel's undivided loyalty, and it is evaluated by a different standard than one measuring competence. *See Cuyler v. Sullivan*, 446 U.S.

335, 348–49 (1980); *Wood*, 450 U.S. at 271. The Supreme Court has stated that to establish a Sixth Amendment violation based on a conflict of interest, a defendant must make two showings: (1) that counsel actively represented conflicting interests and (2) that the actual conflict of interest adversely affected the lawyer's performance. *Cuyler*, 446 U.S. at 348–50. Prejudice is presumed if the defendant shows both prongs have been met. *Strickland*, 466 U.S. at 692.

In Ramirez's case, both lead counsel, Alma Garza, and co-counsel, Rolando Garza, had conflicts that adversely affected their ability to represent Ramirez. Ramirez's interests were in direct conflict with those of Alma Garza's then-husband Hector Villarreal. Villarreal and their nephew Oscar Rene Florez represented Ramirez's co-defendant Rodolfo Medrano. Ramirez and his co-defendants were in direct competition with each other over who would get the best offer from the State to plead guilty and who would be forced to go to trial.

The relationship between Ramirez and Alma Garza was highly strained. They routinely fought over Alma Garza's failure to communicate with Ramirez. After one particularly bad fight, Ramirez requested new counsel. (ECF No. 24, Ex. 4 at 5–8.) The trial judge briefly considered and then denied his request. (ECF No. 24, Ex. 4 at 5.) Alma Garza consistently failed to advocate for Ramirez's rights and, this failure can be attributed to her conflict of interest. *See Cuyler*, 446 U.S. at 350.

Rolando Garza, as co-counsel, had a duty to alert the court on Ramirez's behalf that Alma Garza had a conflict that was adversely affecting her performance. However, Rolando Garza also had a conflict of interest. Rolando Garza's first cousin, Andres Garza, fathered a child with Ramirez's sister, Berta, prior to trial. (4 SH RR Ex. 24 ¶ 5.) Berta had tried to end their relationship due to Andres's drug abuse. When Andres refused to accept that the relationship was over, Ramirez confronted Andres, which led to an altercation. (4 SH RR Ex. 24 ¶ 6.) Not long after, Andres reportedly gave information to police, which led to Ramirez's arrest for the instant offenses. (4 SH RR Ex. 24 ¶ 7.)

Rolando Garza's conflict tainted his decisions throughout his representation of Ramirez. (4 SH RR Ex. 24 ¶¶ 8–9; ECF No. 24, Ex. 76 ¶ 22.) Berta Ramirez could have offered valuable evidence to corroborate Ramirez's testimony at the suppression hearing as well as to support Ramirez's mitigation presentation. (4 SH RR Ex. 24 ¶¶ 8, 2-4; ECF No. 24, Ex. 76 ¶ 22.) However, she was not called as a witness at either proceeding.

"The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862 (1975). In Ramirez's case, the State received partisan advocacy, while both of

Ramirez's counsel had divided loyalties. Counsel's interests directly conflicted with Ramirez's interests. Prejudice must be presumed, as conflicts existed between Ramirez and his counsel, which hurt counsel's performance. *Cuyler*, 446 U.S. at 348–50.

> **2.** **Ramirez was denied effective assistance of counsel due to trial counsel's failure to prepare for and represent him during suppression proceedings.**

When police arrested Ramirez, they conducted an unrecorded and unwarned interrogation of Ramirez in violation of his Fifth Amendment rights. After Ramirez had made incriminating statements, detectives read him his rights and he agreed to give a recorded statement. These statements were the unreliable product of police coercion. Because Ramirez's statement was the only direct evidence of his guilt, it is reasonably probable that there would have been a different outcome at trial if his statements had been suppressed. Counsel's deficient performance both before and during Ramirez's suppression hearing deprived him of the effective assistance of counsel and he was prejudiced.

> **a.** **Trial counsel failed to investigate and present evidence that Ramirez's statement was coerced and unreliable.**

Trial counsel failed to investigate or present any evidence that Ramirez made his statement involuntarily or that his statement was unreliable due to his ingestion of a significant amount of the powerful benzodiazepine Rohypnol in the hours

leading to his interrogation. ABA Guideline 10.7 directs that counsel "at every stage have an obligation to conduct thorough and independent investigations relating to the issues of both guilt and penalty." ABA Guidelines at 1015. The ABA Guidelines specifically identify coerced confessions and the mental vulnerabilities of clients when underscoring the importance of counsel's duty to scrutinize the State's case and investigate all possible defenses. *Id.* at 1017–18. Had counsel done a thorough investigation as required and presented critical evidence of Ramirez's drug use, there is a reasonable probability that the trial court would have concluded that Ramirez's statement was not voluntary.

To determine whether a statement is voluntary, a court must examine the totality of the circumstances and consider the effect that the totality of the circumstances had on the will of the defendant. *See Arizona v. Fulminante*, 499 U.S. 279, 285 (1991); *Schneckloth v. Bustamonte*, 412 U.S. 218, 226–27 (1973); *Procunier v. Atchley*, 400 U.S. 446, 453 (1971). The "totality" test requires the court to consider the police tactics, the details of the interrogation, and the characteristics of the accused. *Fulminante*, 499 U.S. at 285; *Dickerson v. United States*, 530 U.S. 428, 434 (2000). Due to counsel's failure to investigate and present evidence at Ramirez's suppression hearing, the trial court was unable to properly examine the totality of the circumstances surrounding Ramirez's statement to police.

Trial counsel failed to investigate the influence of Rohypnol on Ramirez at the time of his interrogation. Ramirez testified that he had taken about 15 "Roches" and had been asleep at the time of his arrest. (7 RR at 29, 32–33, 35, 57.) The trial judge recommended that counsel obtain a Rohypnol expert who could offer testimony about the drug's effects, yet counsel never consulted such an expert who could have testified at both the suppression hearing and at Ramirez's trial. (7 RR at 72.) Witnesses were available to testify about Ramirez's drug use in the hours leading up to his arrest. (4 SH CR at 1466; 4 SH CR at 1447.) Ramirez spent the evening before his arrest with his first cousin, Jose Luis Navarro. (4 SH CR at 1447.) Ramirez offered Navarro some Rohypnol pills and Navarro witnessed Ramirez ingest several of them. (4 SH CR at 1447.) Reasonable counsel would have developed and presented this evidence in support of Ramirez's testimony that he was under the influence at the time of his interrogation.

Trial counsel was on notice that a general investigation into Ramirez's drug use was warranted by statements he made to police (e.g. that he was out of his "five senses" on the night of the offense). (6 RR at 35–36.) They also had access to multiple psychological evaluations establishing Ramirez's abuse of benzodiazepines. Two evaluations administered by the Texas juvenile authorities concluded that Ramirez was suffering from Polysubstance Dependence. (4 SH CR

at 1515; 4 SH CR at 1523.) A Substance Abuse Subtle Screening Inventory administered to Ramirez when he was sixteen indicated a "High Probability of Severe Substance Dependence." (4 SH CR at 1719.) These records would have validated his testimony that he was under the influence during his arrest and interrogation.

Trial counsel failed to investigate and present available evidence that Rohypnol would have affected Ramirez's influenceability, his memory, and his ability to understand and appreciate what was happening at the police department. Ramirez's statements were unreliable, because he made them under the influence of Rohypnol and he was also influenced by detectives. Trial counsel failed to investigate and present any expert testimony explaining Ramirez's susceptibility to police influence due to his history of trauma, young age, and social history.

Trial counsel were also ineffective for failing to investigate and present evidence about the discrepancies in the timeline of how police reportedly obtained Ramirez's statements. Doing so would have cast doubt on the detectives' timeline and strengthened Ramirez's testimony that the police influenced his statements. Ramirez was arrested around 2:45 p.m., on January 29, 2003. (6 RR at 120.) At the suppression hearing, Detective Ramiro Ruiz testified that his first contact with Ramirez was when he entered Detective Edgar Ruiz's office Ramirez around 3:15

p.m., before leaving for Solis's arraignment. (6 RR at 183.) Edgar Ruiz testified that he read Ramirez his Miranda warnings at 3:27 p.m. and that Ramirez acknowledged and signed the waiver form at 3:29 p.m. (6 RR at 15–19; 42 RR Ex. 1.) Edgar Ruiz claimed that "ten minutes, the top" went by before Ramirez gave him a statement. (6 RR at 64.) However, the audio recording does not begin until 4:20 p.m., with Ramiro Ruiz reading Ramirez his Miranda warnings. (45 RR Ex. 101; 45 RR Ex. 102 at 1, 9.) The detectives' timeline leaves an unexplained 45 minutes between the Miranda warnings and the beginning of the recording, when the officers would have had ample time to ignore Ramirez's request for counsel, and otherwise obtain his involuntary statements.

Ramirez testified that after arriving at the Edinburg Police Department, he asked for a lawyer, (7 RR at 40–41), was placed in a cell, and went to sleep before talking with Edgar Ruiz. (7 RR at 34–35.) The booking records indicate that Ramirez was not actually booked until the following day, January 30, 2003. (Ex. 107 at 7.) [Booking records.] Ramirez testified that he was not given his Miranda warnings until Ramiro Ruiz read them on the recording. By that point, his plea for counsel had been ignored and he had allegedly placed himself at the crime scene during his non-mirandized statement to Edgar Ruiz. These discrepancies were not investigated or presented at Ramirez's suppression hearing and would have been powerful

impeachment evidence against the detectives and their versions of the events. Trial counsel's failure prejudiced Ramirez.

### b. Trial counsel failed to properly interview lay witnesses and arrange for them to appear at the hearing.

Four days before the hearing on Ramirez's motion to suppress, Alma Garza alerted the court that she had not arranged for two "necessary" out-of-state witnesses to appear. (4 RR at 37–38, 40.) She acknowledged that she had been aware of the witnesses and that her investigator had located them. (4 RR at 42.) However, she explained that she had not yet obtained all the relevant information from these witnesses and told the court that it would be impossible to arrange their travel in only three days. (4 RR at 42–43.)

The court admonished counsel for failing to conduct a proper investigation and questioned why they were not prepared as they had a month's notice of the suppression hearing:

> [Y]ou don't investigate independently, and in the same breath, rely on everything that the State gives you. You have been on this case for over a year and a half, and you are making it sound as though, I mean, I know for a fact that the statement, you got a long time ago.

(4 RR at 40.)

The trial court ordered counsel to do whatever was necessary to ensure the witnesses' presence at the suppression hearing. (4 RR at 50.) One witness was

Ramirez's sister, Berta Ramirez, who could have addressed testimony offered by Detective Daniel Ochoa about alleged statements she made before Ramirez's arrest and information about Ramirez having requested a lawyer. (6 RR at 93, 100, 117–18, 138; 7 RR at 96.) What Berta said, or did not say, became a major issue at the suppression hearing. (7 RR at 116, 142–44.) Berta would have corroborated Ramirez's testimony about police misconduct and Ramirez's use of Rohypnol. (4 SH CR at 1465 ¶ 15.) The other witness was Jerry Garcia, the person Ramirez called after arriving at the Edinburg Police Department. Garcia would have testified that Ramirez had asked him to contact a lawyer, corroborating Ramirez's testimony that he had requested an attorney before police began their recorded interrogation. (6 RR at 138–40; 7 RR at 77.)

Trial counsel's failure to prepare and produce these lay witnesses, despite the court's order to do so, prejudiced Ramirez.

**c.** **Trial counsel failed to properly investigate the existence of audio and video recordings of Ramirez's arrest and booking.**

Despite guidance from the ABA that "counsel should make efforts to secure information in the possession of law enforcement, including videos," it wasn't until four days prior to the suppression hearing that trial counsel first raised the possibility that police had videotaped Ramirez's arrest. ABA Guidelines at 1020; (4 RR at 23.)

During the suppression hearing, the State maintained that it was unaware of any such video. (6 RR at 181.) However, after trial began, the video was located. (17 RR at 133.) Had trial counsel made a timely request for the video, they could have used it to impeach Detective Daniel Ochoa's testimony and to undermine the credibility of the other detectives regarding the details of Ramirez's arrest.

Trial counsel also failed to investigate promptly whether the Edinburg police department had maintained video and call records that could have supported Ramirez's testimony that he called Jerry Garcia asking for help contacting his lawyer. (7 RR at 44, 149.) Counsel did nothing until the suppression hearing to obtain those recordings only to discover that by that time, police had recorded over the video. (26 RR at 5.) Counsel's failures prejudiced Ramirez's defense.

### d. Trial counsel subpoenaed the wrong booking officer to testify at the suppression hearing.

Trial counsel knew that Ramirez had requested a lawyer in front of one of the booking officers who worked at the jail. Ramirez described this officer to trial counsel and requested they subpoena him. Trial counsel subpoenaed Alberto Alvarez, a booking officer who worked at the Edinburg jail (6 RR at 6), but was not on duty at the time of Ramirez's arrest. Had trial counsel investigated which officer was on duty during the relevant time frame, they would have called Ricardo Garcia, who was the booking officer present at the time Ramirez requested a lawyer. This

booking officer was a critical witness. Had counsel subpoenaed the correct booking officer, there is a reasonable probability that the court would have suppressed Ramirez's statements.

### e. Trial counsel failed to competently impeach the State's law enforcement witnesses.

Trial counsel also failed to competently impeach the State's key witness, Edinburg Police Detective Edgar Ruiz. Ruiz testified at the suppression hearing that Ramirez was the first person to tell police that one victim was struck in the head with a frying pan. (6 RR at 77, 82–83.) Ruiz claimed that after speaking with Ramirez, police returned to the crime scene and found the frying pan. (6 RR at 69–70, 77.) Trial counsel attempted to impeach Ruiz with Rosie Gutierrez's statement, but Gutierrez stated only that her son was hit with *something*—not that a frying pan was used. (6 RR at 81–82.) Had trial counsel been properly prepared, they would have impeached Ruiz with Marcial Bocanegra's statement, which was taken a week before Ramirez's and had also mentioned a frying pan. (4 SH CR at 1709–10.) The ABA Guidelines state that "[c]ounsel should investigate all sources of possible impeachment" of witnesses. ABA Guidelines at 1020. Had counsel undermined Ruiz's credibility, it would have called into question the veracity of the remainder of Ruiz's testimony.

Counsel had ample grounds to challenge the credibility of the detectives' testimony at the suppression hearing, an important attack given the limited recording of Ramirez's interrogation. (6 RR at 200–03.) For example, while Ramiro Ruiz testified that he had not questioned Ramirez before taping Ramirez's statement, trial counsel failed to impeach Ramiro Ruiz with his own admissions on the recording that questioning had preceded the recording. (6 RR at 200–03.) Counsel attempted to point out that Ramiro Ruiz had ignored a co-defendant's request for an attorney during his interrogation. (6 RR at 204–06.) However, Judge Gonzalez sustained the State's objection, holding that the defense could not show a pattern of police misconduct by presenting evidence that the police violated the rights of just one other co-defendant. (6 RR at 207.) Despite the court's suggestion that the defense present more evidence to establish a pattern of police misconduct, counsel presented none of the available evidence that Edinburg police routinely violated suspects' Miranda rights. (6 RR at 209.)

The City of Edinburg has one of the most corrupt law enforcement and criminal justice systems in the United States. *See generally*, *Report Brands Edinburg the Most Corrupt Border City*, https://www.valleycentral.com/news/local-news/report-brands-edinburg-the-most-corrupt-border-city/ (last visited Dec. 11, 2020). Counsel could have presented a wealth of information about the Edinburg

283

police department's corruption to establish this pattern, yet they failed to do so. *See, e.g.*, John Burnett & Marisa Peñaloza, *With Corruption Rampant, Good Cops Go Bad in Texas' Rio Grande Valley*, https://tinyurl.com/ychdc8uv (last visited Dec. 11, 2020). (*See also* 4 SH CR at 1401–02 ¶¶ 3, 9.)

Counsel's failure to inform the court about the levels of corruption that permeated the Edinburg police department, and specifically their investigation in this case, prejudiced Ramirez.

> ### f. Trial counsel failed to conduct a proper direct examination of Ramirez.

Trial counsel also failed to competently conduct their direct examination of Ramirez. Counsel did not ask Ramirez a question critical to the court's determination of whether to suppress his statement: whether Detective Ramiro Ruiz had interrogated him before the recorded statement. (7 RR at 187–88.) At the end of the suppression hearing, the trial judge informed counsel of this deficiency:

> R. Garza: …Ramiro Ruiz had already been talking to him and that the warnings were not given timely. Juan Ramirez, he testified that when he signed that document, it was right before the recording was made.
>
> Court:     Do you realize that you put your client on the stand and you never asked him if he was interviewed by that investigator --
>
> R. Garza: He --
>
> Court:     -- before?

(7 RR at 187.)

By failing to ask Ramirez a question necessary to meet their burden at the suppression hearing, there was virtually no chance that the trial court would suppress Ramirez's coerced and unreliable statements. Counsel's error prejudiced Ramirez.

### g.  Trial counsel failed to retain a false confession expert.

Trial counsel were also ineffective for failing to retain a false confession expert. A false confession expert would have provided necessary insight into why people make false confessions. This was vital as false confessions dramatically reduce innocent defendants' likelihood of success. (*See* 4 SH CR at 1303–04.)

Ramirez was prejudiced because his statement would reasonably have been suppressed had trial counsel demonstrated through expert testimony Ramirez's specific vulnerabilities that would lead him to make a false confession. Absent the errors by Ramirez's counsel, the trial court, after considering the totality of the circumstances would likely have suppressed Ramirez's statement and without that statement, there is a reasonable probability that Ramirez would not have been convicted of capital murder.

### 3. Ramirez was denied effective assistance of counsel due to his trial counsel's failure to conduct an adequate pretrial investigation.

The ABA Guidelines direct counsel to conduct a thorough and independent investigation related to issues of guilt. ABA Guidelines at 1015. A non-exhaustive outline of the scope of the investigation required in a capital case includes: seeking out and interviewing eyewitness and alibi witnesses; securing information in the possession of the State; requesting physical evidence and retaining appropriate experts to "aggressively re-examine the government's forensic evidence" and conduct independent analysis; and visiting the scene of the alleged offense as soon as possible. ABA Guidelines at 1019–20. Counsel's failure to conduct such an investigation prevented them from formulating and presenting a persuasive and understandable defense theory at all stages of the case. ABA Guidelines at 1047.

Trial counsel failed to investigate key evidence and follow up on issues that the State had retained experts to discuss. At a pretrial hearing on October 18, 2004, trial counsel stated that they had just considered their response to what the State's experts would be presenting. (4 RR at 5.) Not only should trial counsel have requested more time, as discussed below, but trial counsel never attempted to confirm the opinions of the State's experts or to present a counter narrative.

Trial counsel failed to investigate, examine, and test the State's evidence. Less than a month before trial, trial counsel requested permission for the first time to view the crime scene and stated, "counsel is unfamiliar with the scene of the alleged crime." (1 CR at 266.) Police collected several pieces of evidence from the scene that could have been tested for DNA, including a black cap, which the State implied belonged to Ramirez. (28 RR at 32; 37 RR at 150–52 (linking Gutierrez's description to Ramirez).) The State also used the "bent" frying pan collected from Gutierrez's home as important evidence throughout the suppression hearing and trial, yet trial counsel never pursued conflicting testimony about where it was found and whether testing was ever done. (29 RR at 24–26; 32 RR at 182; 33 RR at 80–81.) Despite the State's theory that Ramirez committed acts which co-defendant Marcial Bocanegra ascribed to a person named Lenny, trial counsel never followed up, investigated, or presented evidence that Ramirez was not Lenny and had never gone by that name. (4 SH CR at 1709–10.)

Counsel failed to timely secure their own experts. On October 22, 2004, trial counsel received the State's expert witness list. (2 CR at 420.) Despite voir dire beginning in three days, trial counsel had yet to consult with or retain any necessary guilt-phase defense experts. (ECF No. 24, Exs. S1–S3.) Based on information revealed in discovery and on information from Ramirez himself, trial counsel was

aware that this case involved gangs, coerced confessions, use of benzodiazepines and other drugs, DNA testing, and ballistics. However, counsel never secured experts on these issues to present during the guilt phase of his capital trial.

Nor did trial counsel pursue any testing or crime scene reconstruction regarding ballistics. The State offered evidence that victims in both houses were shot with 7.62 x 39 caliber bullets, which all came from the same AK-47. The State argued that Ramirez confessed to carrying an AK-47 that night and implied that he could be linked to shooting all the victims. (29 RR at 38; 37 RR at 150–52.) Trial counsel had a duty to investigate this evidence and present available countervailing arguments.

Trial counsel did little to investigate and prepare for Ramirez's capital trial. Trial counsel were ineffective for failing to secure experts, interview key witnesses, and pursue critical evidence, which counsel knew the State would use.

Trial counsel's deficient performance prejudiced Ramirez. Had trial counsel done anything to investigate and present evidence discrediting the State's guilt-phase evidence, there is a reasonable likelihood that the jury would have found Ramirez not guilty of capital murder.

### 4. Ramirez was denied effective assistance of counsel due to trial counsel's failure to raise a grand jury challenge.

Trial counsel's failure to move to remand for new grand jury proceedings deprived Ramirez of his rights to counsel, reliable proceedings, due process, and equal protection in violation of the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

Under the ABA Guidelines, counsel were obligated to examine Ramirez's charging documents to identify "any issues, constitutional or otherwise" that could be raised to attack them. Guideline 10.7. The Guidelines also direct counsel to consider pretrial motions related to "potential defects in the charging process." The Guidelines specifically instruct counsel to consider "challenges to the selection of the grand jury and grand jury forepersons" and "investigate whether minorities or women are underrepresented on the jury lists from which grand and petit juries are drawn, or if race or gender played a role in the selection of grand jury forepersons." ABA Guidelines at 1049, 1053.

"Pretrial investigation and preparation are the keys to effective representation of counsel." *United States v. Tucker*, 716 F.2d 576, 581 (9th Cir. 1983); *see also Strickland*, 466 U.S. at 684 (guaranteeing defendants the effective assistance of counsel under the Sixth Amendment); *supra*. Filing relevant pretrial motions constitutes rudimentary trial preparation. Failure to file such motions "is not a

strategic decision." *Id.* at 689–90; *Wiggins*, 539 U.S. at 521–22; *see also Kimmelman*, 477 U.S. at 384 (finding counsel ineffective for failing to file a pretrial motion).

Ramirez's grand jury proceedings were constitutionally infirm and Ramirez's trial counsel failed to effectively challenge them. Ramirez was prejudiced.

### 5. Ramirez was denied effective assistance of counsel due to trial counsel's failure to request a change of venue.

Counsel was ineffective for failing to request a change of venue. "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors" whose decisions "must be based upon the evidence developed at the trial." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961) (internal citation and quotation marks omitted).

The instant offense occurred in Hidalgo County, where violence between the Tri-City Bombers and the Texas Chicano Brotherhood was widely publicized. *See* Sarah Ovaska, *Donna a city in recovery*, The Brownsville Herald (Aug. 24, 2003). (Ex. 125 at 37–38.) Before Ramirez's trial began, Judge Gonzalez acknowledged that the "case may be in the media every day." (2 RR at 6.) He later acknowledged that a "camera man" and "a reporter for *The Monitor*" were present at the suppression hearing and lamented that the media had to wait on Alma Garza who had shown up late for the proceedings. (6 RR at 54.)

Counsel should have requested a change of venue due to the extensive media coverage generated by the crime and the subsequent investigation. (*See* ECF No. 30-5, Ex. 90, Ex. 125.) The ABA Guidelines regarding the Duty to Assert Legal Claims specifically reference motions for change of venue. ABA Guidelines at 1031. The Guidelines direct counsel to "maintain copies of media reports about the case for various purposes, including to support a motion for change of venue, if appropriate . . ." ABA Guidelines at 1027. Although over 40 newspaper articles had been published locally prior to trial, trial counsel's file contained just three.

Because counsel failed to request a change of venue, jurors' decisions were influenced by fear and negative media coverage. Counsel's deficient performance prejudiced Ramirez.

> **6. Counsel's ineffective assistance during jury selection deprived Ramirez of his rights to counsel, a fair trial, an impartial jury, reliable proceedings, due process, and equal protection.**

The effective assistance of counsel is necessary to ensure that a defendant's rights are protected during one of the most critical phases of trial: jury selection. "*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored. Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be

fulfilled." *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981) (plurality opinion). In a capital case, the importance of jury selection is heightened—jury selection can even be dispositive. *See Harris ex rel. Ramseyer v. Blodgett*, 853 F. Supp. 1239, 1265 (W.D. Wash. 1994); Gary Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N.Y.U. L. Rev. 299 (1983).

The Constitution safeguards against a mandatory death sentence upon conviction. *Woodson v. North Carolina*, 428 U.S. 280 (1976) (plurality opinion). At the heart of that protection is the right to be sentenced by jurors who make an individualized, reasoned moral decision whether life or death is the appropriate sentence, by considering and giving full effect to all mitigation. *See Lockett v. Ohio*, 438 U.S. 586 (1978); *Eddings v. Oklahoma*, 455 U.S. 104 (1982); *Hitchcock v. Dugger*, 481 U.S. 393 (1987). Thus, in selecting a capital jury, counsel must elicit sufficient information to determine whether a prospective juror has a "substantial[] impair[ment]" regarding sentencing—if the answer is yes, that juror cannot serve. *See Morgan v. Illinois*, 504 U.S. 719, 728 (1992).

Jurors with absolutist views for or against the death penalty must be disqualified. *Wainwright v. Witt*, 469 U.S. 412, 424–26 (1985). Such jurors include those who would automatically vote for the death penalty if, for example, a certain type of aggravating circumstance was established. "The risk that such jurors may

have been empaneled . . . and 'infected petitioner's capital sentencing [is] unacceptable in light of the ease with which that risk could have been minimized.'" *Morgan*, 504 U.S. at 736 (quoting *Turner v. Murray*, 476 U.S. 28, 36 (1986)). To avoid such an outcome, counsel must learn jurors' feelings on issues relevant to the individual case. This requires familiarity with the information that both parties will likely present. *See Rosales-Lopez*, 451 U.S. at 188.

The 2003 ABA Guidelines provide standards counsel must meet to adequately represent a capital defendant during voir dire. *See* 2003 ABA Guideline 10.10.2. These guidelines require capital counsel to familiarize themselves "with the precedents relating to questioning and challenging of potential jurors, including the procedures surrounding 'death qualification' concerning any potential juror's beliefs about the death penalty." *Id.* The standards, therefore, require counsel to ask prospective jurors more than just their views on the death penalty.

Counsel must learn each juror's feelings on relevant issues. For example, a juror might feel that a life sentence is never appropriate if a defendant has participated in a gang-related homicide. Effective counsel must know of these impairments before they select the jury. To elicit the information necessary to avoid the selection of biased jurors, counsel must use vigorous voir dire to fully explore each prospective juror's views, knowing well ahead the information that both parties

will likely present. When voir dire began in Ramirez's capital trial, however, his counsel were still attempting to learn the State's evidence against him and were only in the initial stages of investigating mitigation. Ramirez's trial counsel failed to satisfy even the most minimal standards for competent jury selection.

While the Constitution "does not dictate a catechism for *voir dire*," it entitles a defendant to a voir dire proceeding that is adequate to ensure both that an impartial jury is empaneled and that unqualified jurors are identified. *Morgan*, 504 U.S. at 729; *Dennis v. United States*, 339 U.S. 162, 171–72 (1950). To effectuate that right, counsel must elicit information that goes to whether a prospective juror is unable to be impartial. *See Morgan*, 504 U.S. at 729; ABA Guideline 10.10.2(B).

Finally, the right to adequate voir dire as guaranteed by *Morgan* hinges on counsel making reasoned professional judgments. While counsel's decisions are typically given deference, this deference applies only insofar as counsel makes a strategic decision based on reasonable professional judgment, based on "thorough investigation of law and facts relevant to plausible options[.]" *Strickland*, 466 U.S. at 690–91; *Williams (Terry)*, 529 U.S. at 373. Deference is not warranted where a decision is based on inattention. *See Rompilla*, 545 U.S. at 395–96 (O'Connor, J., concurring) (finding prejudice where counsel made a decision that prejudiced a

defendant as "the result of inattention, not reasoned strategic judgment") (quoting *Wiggins*, 539 U.S. at 534).

Ramirez's trial counsel failed to adequately and meaningfully question jurors to ensure Ramirez's trial was heard in front of a fair and impartial jury. Trial counsel failed to use peremptory challenges on jurors who expressed bias. For example, Juror Number 2 worked in law enforcement, had worked on a counter-drug task force while serving in the National Guard, had been a victim of a violent crime, had read media about the crime in Ramirez's case, lived near the crime scene, and expressed sorrow that the crime had occurred. (15 RR 147–97.) Yet, Ramirez's trial counsel did not raise a challenge to him serving on the jury. At which point, even the judge expressed shock, saying: "you are proof positive that a law enforcement agent can get selected." (15 RR at 197–99.)

Counsel's failure to question and appropriately challenge jurors led to the impaneling of a jury that was not fair or impartial. Ramirez was prejudiced as a result.

### 7. Ramirez was denied effective assistance of counsel when trial counsel failed to object to the State's discriminatory use of peremptory challenges.

The Equal Protection Clause of the Fourteenth Amendment prohibits litigants from peremptorily striking potential jurors based on race or gender. *See Batson v.*

*Kentucky*, 476 U.S. 79, 96 (1986). *See also Powers v. Ohio*, 499 U.S. 400, 413–16 (1991) (holding that the State violated equal protection when it excluded black veniremembers from jury service even though the defendant was white). The Supreme Court subsequently extended the *Batson* rationale to gender discrimination; thus, litigants cannot remove potential jurors based solely on their gender. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 140 (1994).

The State used 11 of its 15 peremptory strikes (this amounted to 73% of its peremptory strikes) to remove women from Ramirez's jury. (8 RR at 89; 12 RR at 141–42; 13 RR at 222; 14 RR at 61, 133; 17 RR at 38; 18 RR at 128; 21 RR at 64; 22 RR at 67, 116; 24 RR at 28.) Ramirez's trial counsel could have established prima facie discrimination, *see Batson*, 476 U.S. at 94, and the burden would have shifted to the prosecutor to explain the exclusion by offering permissible gender-neutral justifications for the strikes. *Johnson v. California*, 545 U.S. 162, 168 (2005); *see also Linscomb v. State*, 829 S.W.2d 164, 166 (Tex. Crim. App. 1992).

Ramirez's counsel should have objected to the State not only striking women, but also to disproportionately striking non-white veniremembers.

At the time of Ramirez's trial, *Batson* and its progeny were longstanding precedent. Further, the 2003 ABA Guidelines obligated counsel to consider "challenges to the procedures for selecting the jury that would be available in any

criminal case (particularly those relating to bias on the basis of race or gender)."

2003 ABA Guideline 10.10.2(A). By failing to object to the State's peremptory

challenges, counsel's deficient performance not only prejudiced Ramirez at trial but

also on appeal, where the issue was determined to be defaulted. Counsel's ineffective

assistance violated Ramirez's constitutional rights.

### 8. Ramirez was denied effective assistance of counsel when trial counsel failed to request continuances, despite being unprepared.

Trial counsel were ineffective when they failed to request additional time

despite knowing they were not ready to proceed. On the eve of trial, counsel had not

reviewed critical documents, viewed the crime scene, or hired critical experts.

Counsel's lack of preparation is apparent throughout the trial record.

At a pretrial hearing on October 12, 2004, thirteen days prior to commencing

voir dire, Alma Garza informed the trial court that she had recently received over

800 pages from the State containing Ramirez's TYC records. Although she

complained that she did not have time to review the records prior to trial, she did not

request additional time. (3 RR at 19–21.) At the same hearing, she also told the court

that she had not yet received a critical lab report from the State. (3 RR at 11.) The

State conceded that the report, which contained information about blood stains found

on some of the suspected weapons, was not finished. (3 RR at 11.) Although the

State said it intended to provide the report to the defense by October 15 (3 RR at 12), the State waited to do so until October 18. (4 RR at 3.)

On October 18, 2004, Alma Garza told the court that the defense would "like to have experts of our own" in response to the State's late disclosure. However, she never objected to the State's late disclosure or requested a continuance to review the report or to hire any experts for the defense. (4 RR at 5.)

At the same hearing, Rolando Garza admitted that the defense had not yet formulated a response to multiple other State's expert reports, stating: "Judge, there is a lot of work to be done. The reports were basically, we have been catching up with those. But there is so much information. And then with so many co–defendants and so many victims, it is voluminous." (4 RR at 39.)

Trial counsel knew of two critical witnesses for the suppression hearing but failed to properly interview them or arrange for their appearances. Yet, trial counsel never actually moved the court to continue the hearing.

Four days before the suppression hearing, trial counsel raised the possibility for the first time that Ramirez's arrest was videotaped. (4 RR at 23.) A few weeks after the suppression hearing, the police video of Ramirez's arrest and new photographs were located. (17 RR at 133–34.) Trial counsel did not object, request

a continuance, or move to reconsider the trial court's previous decision on Ramirez's motion to suppress.

Ramirez was prejudiced by trial counsel's failures to request more time to properly prepare, obtain experts, and secure witnesses. The ABA Guidelines direct counsel to conduct a thorough and independent investigation related to issues of guilt. ABA Guidelines at 1015. Counsel's failure to conduct such an investigation and subsequent failure to request additional time to do so prevented them from formulating and presenting a persuasive and understandable defense theory at all stages of the case. ABA Guidelines at 1047. Had counsel performed effectively, there is a reasonable likelihood that the outcome of Ramirez's capital trial would have been different.

### 9. Ramirez was denied effective assistance of counsel when his trial counsel failed to investigate and raise innocence claims.

The Supreme Court has determined that "[i]n assessing the reasonableness of an attorney's investigation . . . a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527. Failing to do so cannot be described as a reasonable exercise of professional judgment or as "part of a calculated trial strategy but is likely the result of either indolence or

incompetence." *Anderson v. Johnson*, 338 F.3d 382, 393 (5th Cir. 2003) (internal quotation marks and citation omitted).

Trial counsel were ineffective for failing to investigate and present evidence of Ramirez's innocence. The prosecution's case against Ramirez rested almost exclusively on his statement to the police. Yet counsel had evidence suggesting that Ramirez's statements were a fabrication, the substance of which was fed to him by the detectives. For example, the detectives and eventually trial counsel had evidence that the actions which Ramirez attributed to himself during the recorded police statement, were committed by another man named Lenny, according to co-defendant, Marcial Bocanegra. (4 SH CR at 1710–11.) At trial, Detective Ramiro Ruiz testified that Ramirez and "Lenny" were the same person, but he offered no evidence to support this statement. (36 RR at 143.) By that time, Ruiz would have known that Bocanegra had not identified Ramirez as Lenny and that there was no evidence identifying Ramirez as Lenny.

Trial counsel had Bocanegra's statement attributing Ramirez's admissions to a different person named Lenny and performed deficiently by failing to investigate the obvious discrepancy. Meanwhile, Bocanegra has confirmed that Ramirez is not the same person as "Lenny." (4 SH CR at 1405.) He said that he did not meet

Ramirez until after the crime when they were both incarcerated in the Hidalgo County Jail. (4 SH CR at 1405.)

ABA Guidelines state that counsel has a duty to "take seriously the possibility of the client's innocence" and to seek out and interview potential alibi witnesses. ABA Guidelines 1018–1019. Trial counsel could and should have presented evidence that someone else named Lenny committed the acts attributed to Ramirez, leaving the voluntariness of Ramirez's confession in doubt and rendering it reasonably probable that at least one juror would have refused to convict Ramirez.

> **10. Ramirez was denied effective assistance of counsel when his trial counsel failed to introduce evidence to the jury that his confession was involuntary, false, and unreliable.**

Trial counsel was ineffective for failing to present evidence to the jury that Ramirez's statements to police were involuntary, false, and unreliable. It is well established law that "[c]onfessions, even those that have been found to be voluntary, are not conclusive of guilt. And, as with any other part of the prosecutor's case, a confession may be shown to be 'insufficiently corroborated or otherwise . . . unworthy of belief." *Crane v. Kentucky*, 476 U.S. 683, 689 (1986) (quoting *Lego v. Twomey*, 404 U.S. 477, 485–86 (1972)). This is especially true when the defendant is not the only person charged with committing the crime.

Even though the trial court allowed the State to present evidence of Ramirez's statements to the police, trial counsel should have presented evidence to undermine the credibility of Ramirez's statements. As discussed above, trial counsel should have investigated and presented evidence about the discrepancies in the detectives' testimony, should have presented witnesses, including Ramirez's sister, the booking officer Ricardo Garcia, as well as Jerry Garcia, to confirm Ramirez requested a lawyer prior to submitting to police interrogation, should have presented an expert to explain the effects of Rohypnol, and should have presented evidence that Ramirez falsely admitted to committing acts attributable to another man named Lenny. Trial counsel should also have introduced the video taken of Ramirez's arrest to further undermine the detectives' testimony about his state of mind.

Abundant evidence cast doubt on the voluntariness and reliability of the statements police obtained from Ramirez. Yet, at trial and sentencing, counsel presented no evidence nor made any arguments that would cast doubt on the voluntariness, believability, or veracity of Ramirez's statements to police (e.g. police intimidation tactics, promises made, Ramirez's substance use, his youth, and his susceptibility to influence and ultimate willingness to admit to acts actually committed by Lenny.

Ramirez was prejudiced. With no other evidence linking Ramirez to the crimes, the prosecutor vigorously used his involuntary statement and the statement of his co-defendant that someone named "Lenny" committed the offenses to support the State's theory. Had trial counsel presented evidence of the police coercion and evidence that Ramirez was not "Lenny," there is a reasonable probability that the outcome of the case would have been different.

### 11. Ramirez was denied effective assistance of counsel when his trial counsel failed to preserve issues for review.

#### a. Failure to object to gruesome photographs.

Despite the excessively disturbing nature of some of the photographs of the victims, Ramirez's counsel failed to properly object to their admission and repeated display. When the photographs were first introduced, trial counsel only objected to five. Later, counsel stated that she had finally reviewed the photos and objected to a few:

> [The photos] would bias the jury and cause them to be more sympathetic toward the victims and just because of that find the defendant guilty because there is dead people and, you know, it is a gruesome scene.

(27 RR at 76–77.)

Trial counsel's failure to state a coherent objection was abject regarding the photographs admitted into evidence of the victims' wounds and brain matter. (27 RR

303

at 69–72; *See, e.g.*, 44 RR Exs. 88, 89 (depicting bullet wounds and brain matter around the victim's head).) Trial counsel was also deficient for only objecting to some of the photographs, which the Court of Criminal Appeals later determined waived Ramirez's right to appeal the admission of those photographs. *See Ramirez v. State*, No. AP-75,167, 2007 WL 4375936, at *22 (Tex. Crim. App. Dec. 12, 2007). Trial counsel also failed to object to the admission of the video taken by police of the crime scene. (27 RR at 147.)

Because of the particularly haunting nature of these images, counsel's failure to properly object to their admission at trial was ineffective. *See Strickland*, 466 U.S. at 688, 694; *see also, e.g.*, *Duncan v. Henry*, 513 U.S. 364, 366 (1995) (per curiam) (recognizing due process violation when evidence is admitted that is so inflammatory as to prevent a fair trial).

Trial counsel should have been able to articulate how inflammatory the photographs depicting the victims' wounds and brain matter were. Had the jury not been repeatedly shown these exhibits, there is a reasonable probability that the verdicts would have been different. *See Strickland*, 466 U.S. at 694.

### b. Failure to object to untranslated statements.

Ramirez made several statements in Spanish during his recorded statement. Without objection from Ramirez's counsel, Detective Ramiro Ruiz testified

regarding *his* interpretation of Ramirez's statements. (29 RR at 38–40, 42–43). The State then introduced a transcript of Ramirez's untranslated statement as an exhibit for the jury to review. (29 RR at 36–37.) Trial counsel were ineffective for failing to object and argue that these statements must be translated into English for the jury's consideration. Trial counsel had a duty to object to false, misleading, or unsupported statements, but they failed to do so. Ramirez was prejudiced.

### c. Failure to challenge admission of other bad acts.

Before trial, the State gave notice of its intention to use evidence of prior bad acts attributed to Ramirez. (1 CR at 216; 1 CR at 233–35; 2 CR at 458–61.) During trial, the State solicited testimony implying Ramirez was connected to other violent crimes. (*See, e.g.*, 28 RR at 50 (referencing the "Donna murders," of which Ramirez was never suspected and during which Ramirez was in the custody of TYC).)

Trial counsel was ineffective for failing to properly object to the State raising issues connecting Ramirez to other criminal acts and this deficient performance prejudiced Ramirez.

### d. Failure to contest the State's evidence of gang membership.

Trial counsel knew that gang membership would be a pivotal issue in Ramirez's trial. (1 CR at 4.) Even the trial court acknowledged that Ramirez's case had "everything to do with gang relation." (27 RR at 12.) Yet, trial counsel did

nothing to contest the State's evidence. The State called Robert Alvarez, a detective with the Edinburg Police Department, as an expert on gangs. (35 RR at 54.) Trial counsel failed to effectively object that Alvarez was not qualified as an expert and even solicited information about gangs that benefited the State. (35 RR at 67–80.) During Alvarez's testimony, the State offered a photograph depicting Ramirez obtained from a co-defendant's home. (47 RR Ex. 312.) Alvarez testified that photographs are an important way to identify gang membership, and then said everyone in the photograph was a TCB member. (36 RR at 13–16.) Trial counsel did not object to this unsupported testimony which led to the admission of the photograph. (36 RR at 16.)

Trial counsel presented no evidence from a defense expert to counter Alvarez's testimony about gangs and Ramirez's alleged gang associations. Trial counsel's deficient performance prejudiced Ramirez.

> **e.** **Failure to challenge the language charged, failing to request instruction on criminal responsibility for anticipated result of a conspiracy under Texas Penal Code Ann. § 7.02(b) (2003), and failing to request special verdict forms.**

Trial counsel were ineffective for failing to challenge the charge in Count One as being insufficient to sustain a capital murder conviction. (2 CR at 529–36.) The charge as written does not adequately ensure sufficient culpability under *Tison v.*

*Arizona*, 481 U.S. 137 (1987), and trial counsel should have raised this objection to the trial court.

Trial counsel were also ineffective for failing to request that the jury be instructed on criminal responsibility for the anticipated result of a conspiracy under Texas Penal Code Ann. § 7.02(b) (2003), which says:

> If, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been *anticipated* as a result of the carrying out of the conspiracy.

*Id*. (emphasis added).

Trial counsel failed to request critical instructions to assist the jury's understanding of the requisite level of culpability to warrant a capital conviction, and the court neglected to instruct the jury appropriately. Trial counsel's failure to request clarifying instructions on key issues, regarding the capital murder charges, prejudiced Ramirez. *See Strickland*, 466 U.S. at 688, 694.

Finally, trial counsel were ineffective for failing to request special verdict forms. The complexities and seriousness of Ramirez's case required the jury to make individualized factual findings. This necessity became evident in Ramirez's direct appeal proceedings when the CCA ruled that Ramirez had been convicted twice of

the same crime. *Ramirez*, 2007 WL 4375936, at *9. Had trial counsel requested special verdict forms, the CCA would have known more about the jury's decision.

Because counsel provided ineffective assistance, Ramirez was prejudiced both at trial and on appeal.

>    **f.**    **Failure to object to Ramirez's improper confinement and excessive security presence in front of the jury.**

Ramirez's trial counsel were deficient for failing to object to Ramirez's shackling and to the excessive security presence in the courtroom. Throughout the guilt-phase proceedings, Ramirez's legs were shackled and security in the courtroom was excessive. Ramirez had a due process right to be tried without being shackled unless there were no acceptable alternatives. The Supreme Court has defined shackling and the presence of security personnel as "the sort of inherently prejudicial practice that . . . should be permitted only where justified by an essential state interest specific to each trial." *Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986). Counsel had a duty to protect Ramirez from the inherent prejudice of shackling but failed to do so. *See Roche v. Davis*, 291 F.3d 473, 483 (7th Cir. 2002) (holding that counsel's performance was deficient in failing to object to client's shackling and in failing to ensure that shackles were not visible to the jury); *see also Strickland*, 466 U.S. at 688. By extension, counsel performed deficiently in failing to ensure that Ramirez's due process rights were protected. *See Roche*, 291 F.3d at 483.

The prejudice arising from excessive security precautions—and the ways in which it undermined Ramirez's rights—is manifold. First, it compromised his right to a fair trial by (1) crippling the presumption of innocence, and (2) denying his right to an impartial jury. *See Illinois v. Allen*, 397 U.S. 337, 344–45 (1970); *Estelle v. Williams*, 425 U.S. 501, 504–05 (1976) (recognizing shackles as a "constant reminder of the accused's condition . . . [that] may affect a juror's judgment" and are "so likely to be a continuing influence throughout the trial that . . . an unacceptable risk is presented of impermissible factors coming into play."); *see also Deck v. Missouri*, 544 U.S. 622, 633 (2005) (noting that shackles imply that the court considers the defendant dangerous, which is "nearly always a relevant factor in jury decisionmaking" in a capital case). Second, restraints inhibit the defendant, thereby impeding his ability to assist counsel in his own defense, which is critical to his ability to present a meaningful defense. *See id.* at 631–32 ("The use of physical restraints diminishes that right."). Shackling has been found to impede easy communication with counsel. *See Allen*, 397 U.S. at 344.

Given the degree of prejudice on multiple fronts from Ramirez's restraints, there is a reasonable probability that, absent counsel's failures, at least one juror would have voted differently. *See Strickland*, 466 U.S. at 694.

### 12. Ramirez was denied effective assistance of counsel when his trial counsel failed to ensure a complete record for review.

Ramirez's counsel made a practice of conducting proceedings off the record and of not making objections. This resulted in a failure to preserve critical portions of the record for appellate review.

In the capital context, where heightened reliability is required, *see Woodson v. North Carolina*, 428 U.S. 280, 305 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.), the Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker v. Dugger*, 498 U.S. 308, 321 (1991); *see also Zant v. Stephens*, 462 U.S. 862, 890 (1983) (recognizing mandatory appellate review as "an important procedural safeguard . . . to avoid arbitrariness").

Trial counsel let significant portions of the pretrial and trial proceedings go unrecorded, despite the need for meaningful appellate review. *See Gregg v. Georgia*, 428 U.S. 153, 197–98 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.). Ramirez was prejudiced by counsel's failure, which crippled his ability to vindicate his rights on direct appeal. *See Strickland*, 466 U.S. at 694; *see also* 2003 ABA Guideline 10.7 ("Counsel at every stage have an obligation to satisfy themselves independently that the official record of the proceedings is complete and to supplement it as appropriate.").

"As any effective appellate advocate will attest, the most basic and fundamental tool of his profession is the complete trial transcript, through which his trained fingers may leaf and his trained eyes may roam in search of an error, a lead to an error, or even a basis upon which to urge a change in an established and hitherto accepted principle of law." *Hardy v. United States*, 375 U.S. 277, 288 (1964) (Goldberg, J., concurring). The Supreme Court has clarified that an indigent defendant has both due process and equal protection rights to the "basic tools" of a constitutionally complete and adequate judicial review—a constitutionally effective attorney acting as an advocate, *e.g.*, *Strickland*, 466 U.S. at 684–85; *Evitts v. Lucey*, 469 U.S. 387 (1985), and a record that will permit meaningful, effective presentation of his claims, *e.g.*, *Griffin v. Illinois*, 351 U.S. 12, 18–19 (1956).

In the context of a death penalty case, there must be a "'record of sufficient completeness,' for adequate consideration of the errors assigned." *Draper v. Washington*, 372 U.S. 487, 497 (1963) (internal citation omitted) (quoting *Coppedge v. United States*, 369 U.S. 438, 446 (1962)). In the absence of a "complete verbatim transcript," a "record of sufficient completeness" must include an "equivalent report of the events at trial from which the appellant's contentions arise." *Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971) (quoting *Draper*, 372 U.S. at 495–96).

Trial counsel failed to request the recording of relevant portions of the trial, including bench conversations, throughout pretrial and guilt phase proceedings. (*See, e.g.*, 6 RR at 55; 7 RR at 12–13, 102; 26 RR at 1; 27 RR at 39, 147; 28 RR at 61, 108.) And trial counsel failed to incorporate relevant arguments and case law into the record. (*See, e.g.*, 7 RR at 138–39, 179.) On this incomplete and insufficient record, there is no way of knowing whether other errors of constitutional magnitude occurred during Ramirez's trial. Trial counsel's failure to object to the lack of recording constituted deficient performance. *See Strickland*, 466 U.S. at 688.

Trial counsel's failure to ensure that all proceedings were recorded and that all crucial documents and objections were preserved hindered Ramirez's ability to effectively challenge his convictions and sentences, violating his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. This prejudiced Ramirez, because it has deprived and continues to deprive him of an adequate and complete review and undermines confidence in the reliability of his proceedings. *See Strickland*, 466 U.S. at 694.

### 13. The cumulative effect of trial counsel's deficiencies prejudiced Ramirez at both the guilt and penalty phases.

While each instance of deficient performance described above is prejudicial on its own, counsel's guilt-phase errors were prejudicial when considered cumulatively. When evaluating an ineffective assistance claim, this Court must

consider the cumulative impact of counsel's various errors. As the Supreme Court has stated, "In making this [prejudice] determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury." *Strickland*, 466 U.S. at 695; *see Williams (Terry)*, 529 U.S. at 397–98.

Here, had counsel not performed deficiently, the jury would have heard a legally cognizable and factually supported defense, would have seen the State's evidence get undercut, and would have been properly instructed on the charges. Further, the jury would not have been influenced by unduly prejudicial photographs. Had counsel performed competently, there is at least a reasonable probability that one juror would have decided differently. *See Strickland*, 466 U.S. at 694.

In assessing prejudice, a reviewing court considers the effects of more than one deficiency cumulatively:

> In *Strickland*, the Supreme Court explained that in order to show that counsel's deficient performance prejudiced the defendant, it must be shown that "counsel's *errors* were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." This court has previously applied a cumulative *Strickland* prejudice analysis when confronted with a case in which there were multiple instances of deficient performance by counsel.

*Dodson v. Stephens*, 611 F. App'x 168, 178–79 (5th Cir. 2015) (internal citations and footnote omitted) (assuming that cumulative prejudice analysis is required).

Trial counsel's deficient performance resulted in cumulative prejudice that warrants relief.

## CLAIM FOUR

**The trial court's numerous errors during the guilt phase of trial violated Ramirez's constitutional rights.**

The trial court committed numerous errors during Ramirez's trial, infringing upon his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

### A. The trial court erred by not appointing qualified, un-conflicted counsel, violating Ramirez's rights under the Sixth and Fourteenth Amendments.

The trial court failed to conduct an appropriate inquiry into trial counsel's conflicts and into whether trial counsel was qualified to be appointed in a capital case.

Ramirez's counsel, Rolando Garza, had a conflict representing Ramirez. Rolando Garza's cousin, Andres Garza, was in a relationship with Ramirez's sister, Berta, prior to the crime. (4 SH RR Ex. 24 ¶ 5.) Andres and Ramirez had recently fought about Berta, and Andres allegedly provided police information about Ramirez's whereabouts after the crime. (4 SH RR Ex. 24 ¶ 7.) Rolando Garza's decisions throughout his representation of Ramirez were subsequently tainted by this conflict. (4 SH RR Ex. 24 ¶ 8; ECF No. 28-3, Ex. 76 ¶ 22.) The conflict denied

Ramirez the "right to have the effective assistance of counsel." *Glasser v. United States*, 315 U.S. 60, 76 (1942); *see also Cuyler*, 446 U.S. at 349.

Alma Garza also had a conflict representing Ramirez. Alma Garza's husband, at the time, represented one of the co-defendants, her nephew represented another, and her brother-in-law represented a third. Alma Garza consistently failed to advocate for Ramirez's rights, and this failure can be attributed in part to her conflict of interest. Alma Garza's working relationship with Ramirez was also strained to the point where Ramirez believed Alma Garza was not acting in his best interests. (ECF No. 24-2, Ex. 4 at 5.) The trial court should have been aware of these conflicts but did nothing. *See Cuyler*, 446 U.S. at 350.

Moreover, the trial court failed to appoint qualified counsel to represent Ramirez, denying his Sixth Amendment rights. To provide the "counsel" guaranteed by the Sixth and Fourteenth Amendments, a lawyer must satisfy standards set by the court. *See Reese v. Peters*, 926 F.2d 668, 669 (7th Cir. 1991) ("[T]he 'Counsel' to which the sixth amendment refers is a professional advocate who meets the standards set by the court." (citing *Solina v. United States*, 709 F.2d 160 (2d Cir. 1983))).

A court that appoints counsel who falls short of those standards also falls short of ensuring the constitutional rights of due process and effective representation. *See id*. at 670. Especially in a capital case, the defendant "has a substantial and legitimate

315

expectation that he will be deprived of his liberty" only after the state has followed its own statutory guidelines setting forth the mandatory protections guaranteed to preserve a defendant's right to a fair trial and adequate representation. *Hicks v. Oklahoma*, 447 U.S. 343, 346 (1980). Alma Garza was not qualified to be appointed as lead counsel in a complex capital murder case, violating Ramirez's right to effective assistance of counsel.

The trial court failed to address counsel's conflicts or to appoint competent counsel, and as a result Ramirez was denied effective assistance of counsel in violation of the Sixth Amendment.

**B.     The trial court's admission of excessively gruesome photographs during Ramirez's trial resulted in the denial of a fair trial and due process.**

The trial court violated Ramirez's rights to a fair trial and due process when it admitted sixty-nine, enlarged, color photographs that depicted unnecessarily gruesome and repetitive images of the victims and crime scene. (27 RR at 89–90.) Ramirez presented this claim below. (DA Opening Br. at 97, Aug. 8, 2006.)

In Ramirez's case, the photographs were so unduly prejudicial that admitting them for the jury to consider rendered Ramirez's trial unfair. *See Romano v. Oklahoma*, 512 U.S. 1, 12 (1994); *Darden v. Wainwright*, 477 U.S. 168, 179–83 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).

Several photographs depicted the victims' blood-covered bodies splattered with brain matter. (*See, e.g.*, 44 RR Exs. 79–80.) Others contained images of the victims' injuries, their bodies at the crime scene, and general crime scene characteristics. Many photographs were highly inflammatory and were duplicative or offered no probative value.

Here, the admission of these photographs undermined the fairness of the trial and amounted to a denial of due process. *See Romano*, 512 U.S. at 12; *Bruton v. United States*, 391 U.S. 123, 131 n.6 (1968) ("An important element of a fair trial is that a jury consider only relevant and competent evidence bearing on the issue of guilt or innocence."). The highly prejudicial effect of these photographs easily outweighed any potential minimal probative value, and introducing the photographs undermined the fairness of the trial and sentencing proceeding. They had a "substantial and injurious effect" on Ramirez's conviction. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993). The trial court abused its discretion by allowing the photos to be admitted to the jury, in violation of Ramirez's due process rights. *See Romano*, 512 U.S. at 12; *Bruton*, 391 U.S. at 131 n.6.

**C.** **The trial court unconstitutionally required that Ramirez be physically restrained at the guilt and penalty phase violating Ramirez's rights under the Fifth, Sixth, and Fourteenth Amendments.**

The trial court abused its discretion by requiring that Ramirez be physically restrained during the guilt-phase proceeding in violation of Ramirez's rights under the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution. Ramirez had a due process right to be tried without physical restraints absent a compelling justification those restraints were necessary. *See Holbrook v. Flynn*, 475 U.S. 560, 568–69 (1986). Throughout the trial, Ramirez was forced to wear a leg brace with no individualized determination of necessity by the court. Ramirez's shackling and the presence of security in the courtroom prevented him from fully participating in his defense and prejudiced the jury.

By failing to determine that shackling was necessary before requiring restraints, the trial court denied Ramirez the right to a fair trial. Juror observance of shackling undermined the presumption of innocence to which Ramirez was entitled, and it denied him an impartial jury. *See Illinois v. Allen*, 397 U.S. 337, 344–45 (1970); *Estelle v. Williams*, 425 U.S. 501, 504–05 (1976). In Texas, shackling a defendant is particularly prejudicial because a jury must affirmatively find that a capital defendant poses a future danger in order to impose a sentence of death. *See* Tex. Code Crim. Proc. Ann art. 37.071 § 2.

Because the restraints were not justified, the court violated Ramirez's due-process rights and substantially affected his trial. *See Brecht*, 507 U.S. at 623.

**D. The trial court's failures to ensure that all of Ramirez's trial proceedings were recorded violated his Sixth, Eighth, and Fourteenth Amendment rights to a public trial and meaningful appeal.**

The trial court erred by conducting numerous critical proceedings off the record during Ramirez's trial. (*See, e.g.*, 28 RR at 61 (concerning admission of Ramirez's contested statements to the police); 26 RR at 1 (regarding motion to strike language in indictment).)

The context surrounding these unrecorded discussions reveals that they involved critical subject matters, including objections to evidence or argument (*e.g.* 32 RR at 124), and discussions about witnesses (*e.g.* 32 RR at 75).

Further, the failure to ensure that these proceedings were recorded deprived Ramirez of his Fourteenth Amendment right to meaningful appellate review. *See Parker*, 498 U.S. at 321; *Draper*, 372 U.S. at 500; *Gregg*, 428 U.S. at 195 (joint opinion of Stewart, Powell, and Stevens, JJ.). This is especially true in capital cases, which demand heightened reliability. *See Woodson*, 428 U.S. at 305 (plurality opinion).

Because of the omissions from the record, it was impossible for subsequent counsel or the courts to properly review the proceedings against Ramirez. The trial

court's failure to ensure a complete record deprived Ramirez of a meaningful appellate review and violated his rights under the Eighth and Fourteenth Amendments. This error had a "substantial and injurious effect" on Ramirez's sentence. *See Brecht*, 507 U.S. at 627. Accordingly, Ramirez is entitled to relief.

### E. The trial court erred by denying Ramirez's requests for new counsel, violating Ramirez's constitutional rights.

Ramirez petitioned the trial court for appointment of new counsel on at least one occasion. (ECF No. 24-2, Ex. 4 at 5–6.) The trial court never followed up on Ramirez's requests and never granted a hearing to ensure Ramirez received effective representation. As a result, Ramirez's Sixth and Fourteenth Amendment rights were violated. *See Cuyler*, 446 U.S. at 347.

### F. The trial court erred by failing to continue the suppression hearing.

Ramirez's Sixth and Fourteenth Amendment rights were violated when the trial court refused to reschedule the suppression hearing. Four days prior to the suppression hearing, trial counsel informed the court that two key witnesses would not be available for the hearing. (4 RR at 37–40.) Trial counsel told the court "there is a lot of work to be done," (4 RR at 39), and that they still "need more information" from witnesses (4 RR at 43).

Trial counsel was clearly unprepared, yet the trial court did nothing to ensure that Ramirez's crucial witnesses would be present. Instead, the trial court scolded

defense counsel for making excuses and said that the date of the suppression hearing could not change because jury summons had already been sent. (4 RR at 43–44.)

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Crane*, 476 U.S. at 690 (internal citations omitted) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)); *see also Simmons v. South Carolina*, 512 U.S. 154, 175 (1994) (O'Connor, J., concurring) ("[O]ne of the hallmarks of due process in our adversary system is the defendant's ability to meet the State's case against him.").

The trial court's failure to reschedule the suppression hearing, or do anything to ensure Ramirez's counsel were prepared, deprived Ramirez of his right to due process, a fair trial, and to effective counsel. *See Ungar v. Sarafite*, 376 U.S. 575, 589 (1964) ("Contrariwise, a myopic insistence upon expeditiousness in the face of a justifiable request for delay can render the right to defend with counsel an empty formality."); *see also Wheat v. United States*, 486 U.S. 153, 160 (1988) (requiring a court to "take adequate steps" to ascertain whether defendant was receiving effective counsel). This error had a substantial and injurious effect on Ramirez's trial and Ramirez is entitled to relief. *See Brecht*, 507 U.S. at 623.

**G.    The trial court erred in allowing Mendiola's testimony about Ramirez's statements during the booking process, violating Ramirez's rights under the Fifth, Sixth, and Fourteenth Amendments.**

The trial court erred when it permitted testimony about Ramirez's statements to police while he was being booked into the Hidalgo County jail.

Robert Mendiola, the officer who processed Ramirez when he was transferred to jail the day after his arrest, testified for the State during Ramirez's trial. (35 RR at 29.) Mendiola testified that the booking process included questioning the prisoner regarding gang-affiliation. (35 RR at 33.) The State argued Mendiola should be able to testify to Ramirez's response since questions about gang-affiliation were routine, administrative questions. (35 RR at 36–37.) Trial counsel objected on the grounds that Mendiola's answer would be hearsay and violate Ramirez's Fifth Amendment rights. (35 RR at 50.) On the record, the trial court implied, without ruling, that Mendiola could testify to Ramirez's statement. (35 RR at 102–03.) After an off-the-record bench conversation (35 RR at 169), the State recalled Mendiola, who testified over trial counsel's objection, that Ramirez told Mendiola he was a "Bombita." (35 RR at 170.)

The Fifth and Fourteenth Amendments "secure[] against state invasion the . . . right of a person to remain silent unless he chooses to speak in the unfettered exercise of his own will, and to suffer no penalty . . . for such silence." *Malloy v.*

*Hogan*, 378 U.S. 1, 8 (1964). Thus, for a statement to be admissible, it "must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542–43 (1897) (citation omitted); *accord Malloy*, 378 U.S. at 7.

Evidence demonstrates that Ramirez did not voluntarily agree to answer Mendiola's question about gang affiliation. Ramirez was in custody and was asked questions that called for responses that had the potential to be incriminating, yet he was not advised of his *Miranda* rights and did not "knowingly and intelligently" waive those rights. *Miranda* v. *Arizona*, 384 U.S. 436, 444 (1966). The United States Supreme Court has clearly established rules that police must follow when interrogating a person in custody to ensure that the State does not violate the "basic" and "precious" rights of the Fifth Amendment against self-incrimination. *Id.* at 442. Individuals in custody who are subjected to police questioning must be apprised of the privilege against self-incrimination. *Id.* at 468. Absent these "proper safeguards" in-custody interrogations "contain[] inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." *Id.* at 467. This is what happened to Ramirez. During the booking process, Mendiola, without advising Ramirez of his rights, questioned

him about his gang affiliation and elicited an involuntary statement that Ramirez was connected to the "Bombita gang". (35 RR at 170). This statement was used to inculpate Ramirez. Because his statement was obtained without an acknowledgement that he was waiving his *Miranda* rights, Ramirez's statement was involuntary and obtained in violation of the Fifth, Sixth, and Fourteenth Amendments. The trial court erred in overruling trial counsel's objections and admitting Mendiola's testimony. The admission of this unconstitutionally obtained statement had a substantial and injurious effect on the jury's verdict. *See Brecht*, 507 U.S. at 623.

### H. The trial court erred in admitting statements Ramirez made during police interrogation.

The trial court violated Ramirez's Fifth, Sixth, and Fourteenth Amendment rights by admitting statements involuntarily obtained from Ramirez during police interrogation.

As discussed above, after Ramirez's arrest, he was interrogated by police and gave an involuntary and unreliable confession. Ramirez did not make a knowing, intelligent, and voluntary waiver of his Miranda rights, and the subsequent recorded statement taken by police should not have been admitted at trial.

Before trial, Ramirez moved to suppress statements he gave to police during their interrogation of him on January 29, 2003. (1 CR at 79–81.) At the suppression

hearing, Ramirez argued that he had invoked his right to an attorney, but the detectives neither provided him with an attorney nor ceased questioning him. (7 RR at 40–41.) Ramirez also argued that he could not knowingly and voluntarily waive his Miranda rights because he was under the influence of Rohypnol, a powerful sleep-aid, and the detectives were employing tactics to force him into waiving his rights. (7 RR at 32–33, 35, 41, 123.) Ramirez also argued that the detectives interrogated him prior to giving him his Miranda warnings (7 RR at 52), then told him what to say (7 RR at 83). The trial court denied Ramirez's motion, and Ramirez's recorded statement was introduced at trial. (7 RR at 203, 208; 29 RR at 35.)

The evidence strongly supports Ramirez's argument that his confession was not free and voluntary. Furthermore, had the trial court not insisted on holding the suppression hearing without Ramirez's witnesses present (4 RR at 43–44), Ramirez could have corroborated his claims.

The trial court's error was a violation of Ramirez's Fifth, Sixth, and Fourteenth Amendment rights. "[A]n accused's request for an attorney is per se an invocation of his Fifth Amendment rights, requiring that all interrogation cease." *Fare v. Michael C.*, 442 U.S. 707, 719 (1979). Police cannot reinitiate interrogation once a suspect invokes his rights, even if additional warnings follow and a defendant

expressly waives those rights. *See Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981). Ramirez testified that he requested an attorney, but the detectives ignored his request. This was a clear violation of Ramirez's constitutional rights.

Moreover, for a statement to be admissible, it "must be free and voluntary; that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram*, 168 U.S. at 542–43 (citation omitted). Because the evidence demonstrates that Ramirez's statement was not voluntary, the trial court erred in admitting it.

Texas law at the time of Ramirez's trial also required that the trial court make an independent finding as to the voluntariness of the statement and enter an order stating the specific finding of facts upon which the conclusion was based. Tex. Code Crim. Proc. Ann. art. 38.22 § 6. The trial court failed to make these findings until July 13, 2006 (1 Suppl. CR at 6), and only did so after it was ordered by the Court of Criminal Appeals (DA Order at 3, June 28, 2006). The trial court failed to explain its reasoning, and in fact adopted the State's proposed order in full (1 Suppl. CR at 6), thereby prejudicing Ramirez.

Moreover, the trial court admitted Ramirez's statement without an official translation of the statements from Spanish into English. Not all members of the jury

spoke Spanish, so those jurors would not have a complete understanding of the questions police asked Ramirez and his responses. This error prejudiced Ramirez.

Finally, a "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Fulminante*, 499 U.S. at 296 (internal quotation marks and citation omitted). Although Ramirez never confessed to shooting any of the victims, Ramirez's statement was the key evidence used by the State to link Ramirez to the crime. Thus, the admission of the unconstitutionally obtained statements had a substantial and injurious effect on Ramirez's trial. *See Brecht*, 507 U.S. at 623.

## I.   The trial court erred in allowing Champion to testify about Ramirez's statement admitting that he had marijuana.

The trial court erred in admitting Ramirez's statement to police that he possessed marijuana while in county jail awaiting trial.

At Ramirez's penalty phase proceedings, the State called Sergeant Alex Champion, a police officer with the Hidalgo County Sheriff's Department, to testify. (38 RR at 3.) Champion testified that on June 29, 2004, he responded to a jail cell containing Ramirez and seven other men after smelling marijuana. (38 RR at 5.) Champion said officers removed everyone but Ramirez and Jeffrey Juarez from the cell while they searched it. (38 RR at 8.) During the search, police found a small bag

of marijuana. (38 RR at 10.) Champion testified that he asked Ramirez if it was his and Ramirez said yes. (38 RR at 11.)

At the time of this incident, Ramirez was already represented by counsel, and Champion did not inform Ramirez of his *Miranda* rights before questioning him about the marijuana. Permitting Ramirez's statement to be used against him later at his capital murder trial violated Ramirez's Fifth and Sixth Amendment rights. *Miranda*, 384 U.S. at 444; *Massiah v. United States*, 377 U.S. 201, 206 (1964).

Finally, even though Ramirez's trial counsel failed to object to Champion's testimony, the trial court erred by admitting this testimony because it was irrelevant and prejudicial to the issue of future dangerousness at sentencing. Fed. R. Evid. 403; *id*. at R. 404(b). Champion's testimony was so unduly prejudicial that it violated Ramirez's Due Process rights and rendered the trial fundamentally unfair. *See Darden*, 477 U.S. at 179–83.

**J.      The trial court erred when it overruled Ramirez's motion for a mistrial.**

The trial court erred in denying Ramirez's motion for a mistrial after the State intentionally and improperly referred to information that a different death row inmate had stabbed a prison guard. (38 RR at 198–99.)

Ramirez was denied a fair trial when the trial court denied his motion for a mistrial after the State introduced irrelevant, unduly prejudicial information. This

error was so extreme as to deny Ramirez fundamental fairness under the Due Process Clause. *Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir. 1988).

**K.        The trial court erred in allowing Alvarez to testify as a gang expert.**

Ramirez's Due Process rights were violated when the trial court permitted Robert Alvarez to testify as a gang expert when Alvarez lacked the qualifications to do so. Alvarez testified about local gangs and their activities. (35 RR at 61–62.) Alvarez also testified that he was familiar with how to identify gang members and gang affiliation. (35 RR at 64–65.) The trial court then held a hearing outside of the jury's presence concerning Alvarez's qualifications as a gang expert. (35 RR 66–116.) While the trial court never made a ruling on the record, Alvarez was recalled by the State and testified to Ramirez's gang membership. (36 RR at 2.) Alvarez then testified about the Bombita gang and their activities. (36 RR at 4–5, 8.)

The trial court erred in permitting Alvarez to offer opinions about Ramirez's gang affiliation and local gang activity because Alvarez was not qualified to offer reliable evidence as to either topic. *See Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–92 (1993) ("relaxation of the usual requirement of firsthand knowledge . . . is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline"); Fed. R. Evid. 702. Alvarez was not properly qualified as an expert, thereby making his opinion

testimony inadmissible. This testimony had an unduly prejudicial effect on the jury and biased the outcome of Ramirez's trial. *See Brecht*, 507 U.S. at 623.

### L.   The trial court erred in admitting evidence of another serious crime.

Ramirez's rights to a fair trial were violated when the trial court admitted evidence that implied Ramirez was connected to an additional crime. At trial, Detective Ramiro Ruiz testified for the State that he had received a lead in the investigation concerning Ramirez from an investigation into another crime. (29 RR at 152.) The other crime Ruiz was referring to was the murder of four victims in Donna, TX, allegedly committed by the same gang. (29 RR at 142–46, 150–51.) While the trial court did not permit the State to explicitly reference the Donna murders, the State elicited testimony that the detective received a list of names connected to gang members involved in another Hidalgo County murder investigation. (29 RR at 152–53.) Jurors associated this testimony with the Donna murders. Even if the jurors did not make this association, the implication was that Ramirez was connected to another serious crime.

This information was unduly prejudicial and inflammatory. The trial court erred when it allowed the State to introduce evidence linking Ramirez to other crimes. *See Darden*, 477 U.S. at 179–83.

**M.     The trial court erred in ordering Ramirez to show the jury his arms for the State to obtain testimony about the content of Ramirez's tattoos in the guilt phase.**

The trial court violated Ramirez's Fifth and Fourteenth Amendment rights when it required Ramirez to remove part of his shirt to reveal his tattoos. (36 RR 38–39.) During the guilt phase, the State's gang expert, Robert Alvarez, testified that tattoos help identify whether someone belongs to a gang. (36 RR at 18), after which the State requested Ramirez remove his shirt in front of the jury. (36 RR at 21.)

Outside of the presence of the jury, over trial counsel's objection, the court ordered Ramirez to remove his shirt. (36 RR at 24.) The State had noted that it appeared Ramirez obtained new tattoos since the time of booking, which the State "would be interested in" (36 RR at 24), and commented that they "don't know what else he has on [his body]." (36 RR at 26.)

The State informed the court that the content of Ramirez's tattoos mattered, specifically pointing out the word "ghost" and a cross-hairs. (36 RR at 25.) The trial court then ordered Ramirez to roll up his sleeves in front of the jury and warned Ramirez not to act out when the State's expert approaches him to view the tattoos. (36 RR at 36–37.) Subsequently, in the presence of the jury, Ramirez was forced to show his arms to the jury, allowing Alvarez to testify that the content of Ramirez's tattoos linked Ramirez to gang activity. (36 RR at 40–41.)

Evidence of Ramirez's tattoos was testimonial in nature and incriminating. *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt Cty.*, 542 U.S. 177, 189 (2004). Where the government relies on evidence of the defendant's tattoos for the content of the communication, "[t]he tattoo [is] testimonial." *United States v. Greer*, 631 F.3d 608, 613 (2d Cir. 2011) (holding that evidence of a tattoo which "in combination with other evidence, allowed jurors to infer" key facts about the defendant was testimonial).

The State did not contend that it would use Ramirez's tattoos to physically identify him as a participant in the crime. Thus, this was not a situation where the presence of a tattoo stood in for other readily identifiable physical characteristics, such as a defendant's height, hair color, voice, or handwriting style. *See United States v. Hubbell*, 530 U.S. 27, 34–35 (2000). Instead, the State introduced evidence of Ramirez's tattoos because the tattoos allegedly helped to establish gang membership. Accordingly, evidence of Ramirez's tattoos was testimonial and incriminating, and the trial court erred in compelling Ramirez to reveal his arms. *See Greer*, 631 F.3d at 613; *see also United States v. Doe*, 465 U.S. 605, 614 n.13 (1984).

In addition to violating Ramirez's Fifth and Fourteenth Amendment rights, the trial court's error was highly prejudicial and had a "substantial and injurious

effect" on the outcome of Ramirez's trial. *See Brecht*, 507 U.S. at 623. Accordingly, Ramirez is entitled to relief.

**N.    Ramirez's Sixth, Eighth, and Fourteenth Amendment right to have all potentially mitigating evidence considered at trial was violated when the trial court prevented Ramirez from presenting relevant mitigating evidence.**

The Eighth and Fourteenth Amendments guarantee a capital defendant the right to present and have considered all potentially mitigating evidence at trial. Moreover, a defendant has a Sixth Amendment right to confront and cross-examine witnesses and to call witnesses in his defense. *See Chambers v. Mississippi*, 410 U.S. 284, 302 (1973); *Washington v. Texas*, 388 U.S. 14 (1967). The trial court erred in excluding evidence at the punishment phase by restricting Ramirez's presentation of mitigating evidence. For example, the trial court prevented Ramirez from presenting testimony from his psychological expert, Dr. Kate Allen, by significantly restricting the scope of her testimony. (*E.g.*, 39 RR at 70–75.) The excluded evidence was relevant to Ramirez's mitigation, and its exclusion warrants a new punishment phase trial for Ramirez.

The Supreme Court has held that the Eighth and Fourteenth Amendments require that the jury "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*,

438 U.S. at 604. The Constitution "requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by [the defendant]." *Boyde v. California*, 494 U.S. 370, 377–78 (1990).

Exclusion on technical grounds of potentially mitigating evidence violates these fundamental rights. *Green v. Georgia*, 442 U.S. 95, 97 (1979) (per curiam). The Supreme Court has held that the court cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death." *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (quoting *McKoy v. North Carolina*, 494 U.S. 433, 441 (1990)).

The trial court prevented Ramirez's expert, Dr. Allen from testifying about mitigating evidence concerning Ramirez's life history and background, his abusive family life, and the consequent abandonment and drug addiction he suffered. (39 RR at 70–75, 78.) The evidence, which at least one juror could have found mitigating enough to vote for a life sentence, was excluded on technical grounds at the punishment phase, because, as discussed above, trial counsel was ineffective for erroneously believing the testimony was admissible.

This error had a "substantial and injurious effect" on Ramirez's sentence. *See Brecht*, 507 U.S. at 623. Accordingly, Ramirez is entitled to relief.

**O.    The exclusion of venire members for cause violated Ramirez's right to an impartial jury and due process under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

The Supreme Court has held that a capital defendant's due process rights are violated, requiring reversal of a sentence of death, when the "'inadequacy of *voir dire*' leads [] to doubt that [the defendant] was sentenced to death by a jury empaneled in compliance with the Fourteenth Amendment." *Morgan*, 504 U.S. at 739. The Court has "not hesitated, particularly in capital cases, to find that certain inquiries must be made to effectuate constitutional protections" regarding the "adequacy of *voir dire*." *Id.* at 730. For example, "general fairness and 'follow the law'" questions are insufficient "general inquiries" that fail to "detect those jurors with views preventing or substantially impairing their duties in accordance with their instructions and oath." *Id.* at 734–35. The Court has specifically held "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 521–22 (1968); *see also Lockhart v. McCree*, 476 U.S. 162, 176 (1986). A venire member with a general opposition to the death penalty may not be excluded for cause unless his or her views would "prevent or substantially impair the performance of his duties as a juror in

accordance with his instructions and his oath." *Witt*, 469 U.S. at 424 (internal quotation and citation omitted).

Here, the trial court dismissed venire members who merely voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction, in violation of *Witherspoon*. These "dismissal[s] of [] juror[s] in violation of *Witherspoon* . . . is constitutional error that requires vacation of a death sentence." *Rivera v. Illinois*, 556 U.S. 148, 161 (2009).

The trial court's error violated Ramirez's constitutional right to be tried by an impartial jury that was not "uncommonly willing to condemn a man to die." *See Witherspoon*, 391 U.S. at 521. The trial court's erroneous failure to strike those persons left Ramirez with insufficient peremptory challenges to remove jurors who were biased against him. Because a juror's qualification to serve on a capital jury under *Witherspoon* and *Witt* is "rooted in the constitutional right to an impartial jury, and because the impartiality of the adjudicator goes to the very integrity of the legal system," such an error can never be harmless. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987) (internal citations omitted).

Second, the trial court dismissed veniremembers based on their views about the death penalty without giving counsel the opportunity to rehabilitate those persons. Constitutional principles carefully restrict the disqualification of jurors

based on anti-death penalty views. The Supreme Court has made clear that the exclusion of prospective jurors from service solely because they had reservations about capital punishment violated capital defendants' due process right not to be placed on trial before a "tribunal organized to return a verdict of death." *Witherspoon*, 391 U.S. at 521–22. The Court has reformulated this rule to forbid courts from disqualifying a juror on the basis of death-penalty opposition unless that opposition is so categorical that it "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Witt*, 469 U.S. at 420 (emphasis omitted). The trial court improperly dismissed jurors in violation of *Witherspoon* and *Witt*, violating Ramirez's constitutional rights.

Finally, the trial court had improper contact with, and thus improperly influenced, the jury's deliberations in Ramirez's proceedings. This is a violation of Ramirez's rights under the Constitution. *Irvin*, 366 U.S. at 722. Given that the bias of even a single juror can render a sentence unconstitutional, *see Parker v. Gladden*, 385 U.S. 363, 366 (1966) (holding a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors"), Ramirez's death sentence must be vacated.

   P.    **The trial court erred by giving an insufficient voluntariness instruction that was contrary to Texas law and in violation of Ramirez's Fifth and Fourteenth Amendment due process rights.**

Under Texas law, when a defendant disputes the admission of a confession, the voluntariness of the confessions is a question of fact submitted to the jury. In full, the law states:

> (a)  No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

Tex. Code Crim. Proc. Ann. art. 38.23(a).

The law thus requires a jury to determine whether, based upon federal constitutional principles, the facts surrounding a confession support the confession as voluntarily given.

Ramirez's attorneys requested the court instruct the jury that evidence obtained in violation of the Constitution shall not be admitted. Specifically, the defense requested that the jury be informed that Ramirez's statement to the police, including his confession, could only be regarded as evidence if the jury believed he had knowingly, voluntarily, and intelligently waived his rights before giving it. (2 CR at 514–15); *Miranda*, 384 U.S. 436. The court denied that instruction, saying that the charge from the court would be "sufficient." (37 RR at 81–82.)

The court gave this instruction regarding the voluntariness of Ramirez's confession instead:

> You are instructed unless you believe from the evidence beyond a reasonable doubt that the alleged confession or statement introduced into evidence was freely and voluntarily made by the Defendant without compulsion or persuasion, or if you have a reasonable doubt thereof, you shall not consider such alleged statement or confession for any purpose nor any evidence obtained as a result thereof.

(2 CR at 545.) No further definitions or explanations were provided.

This was constitutionally insufficient. Juries must evaluate the facts surrounding a confession to determine if they allowed a defendant the "free choice to admit, to deny, or to refuse to answer." *Lisenba v. California*, 314 U.S. 219, 241 (1941); *Garrity v. New Jersey*, 385 U.S. 493, 496 (1967). In order to determine this, there are constitutional criteria that juries must consider before a confession can be factually determined to have been un-coerced. For instance, voluntariness is not assumed without physical threat; coercion of an accused can be "mental as well as physical." *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960). Other factors used to determine whether a confession is voluntary include the length of time for which the interrogation continues (*Corley v. United States*, 556 U.S. 303, 313–14 (2009); *Ashcraft v. Tennessee*, 322 U.S. 143, 154 (1944)); the length of detention, the amount and manner of interrogation, and whether the defendant had been held incommunicado by the police (*Reck v. Pate*, 367 U.S. 433, 442 (1961)); whether

coercive government conduct or deception was involved in obtaining the confession (*Spano v. New York*, 360 U.S. 315, 318–19 (1959); *Colorado v. Connelly*, 479 U.S. 157, 165–68 (1986)); actual threats of physical violence (*Fulminante*, 499 U.S. at 287; the mental capacity or impairments of the suspect (*Townsend v. Sain*, 372 U.S. 293, 307–08 (1963), *overruled on other grounds by Keeney v. Tamayo-Reyes*, 504 U.S. 1 (1992); *Reck*, 367 U.S. at 442); and whether the environment producing the confession is "so inherently coercive that its very existence is irreconcilable with the possession of mental freedom by a lone suspect (*Ashcraft*, 322 U.S. at 154).

In sum, "voluntariness" has a constitutional, legal definition to which specific legal standards attach. Without any criteria or standards, a jury will substitute its lay understanding of the word, resulting in improper admissions of coerced confessions and unreliable convictions and sentences. Juries must be instructed to consider the totality of the circumstances under which the confession was given, as well as given legal standards against which they may evaluate the facts and make a determination. *See Bustamonte*, 412 U.S. at 223. In addition, Texas law, which requires that confessions admitted as evidence comply with federal constitutional standards for voluntariness, compels courts to give jurors adequate instructions to guide their deliberations.

As the court gave instructions that were unconstitutionally vague and insufficient—as well as insufficient under Texas law—Ramirez's confession was improperly admitted into evidence, and it had a "substantial and injurious effect" on his sentence. *See Brecht*, 507 U.S. at 631.

### Q. Ramirez's constitutional rights were violated when the trial court failed to use special verdict forms.

The trial court's failure to use special verdict forms for the sentencing phase of Ramirez's trial violated his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, as it unconstitutionally prohibits effective review of his sentence.

Under Texas law, three special issues were submitted to Ramirez's jury during the sentencing phase of his capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) whether the defendant actually caused, intended, or anticipated the death of the deceased; and (3) whether, considering all the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death. Tex. Code Crim. Proc. Ann. art. 37.071 § 2(b)(1)-(2), (e)(1).

However, the Texas statute renders the jury misinformed of the full impact of the way it answers these special issues. The jury is instructed that it cannot answer "Yes" to either of the first two special issues without unanimous agreement and that

341

it cannot answer "No" to those questions unless at least ten jurors agree. Tex. Code Crim. Proc. Ann. art. 37.071 § 2(d)(2). Similarly, the jury is instructed that it may not answer "No" to the third special issue without unanimous agreement and that it may only answer "Yes" if at least ten or more jurors agree. Tex. Code Crim. Proc. Ann. art. 37.071 § 2(f)(2). The judge shall inform the jury that if they unanimously find a mitigating circumstance under the third special issue, the defendant will be sentenced to life without parole. Tex. Code Crim. Proc. Ann. art. 37.071 (e)(2).[48]

Critically, the statute expressly bars an instruction that if the jury is unable to reach a unanimous verdict, or have at least ten members agree, on either of the special issues, the trial court is required to sentence the defendant to life in prison. Tex. Code Crim. Proc. Ann. art. 37.071 § 2(a)(1) (barring instruction on the effect of a failure to agree); Sec. 2(g) (life sentence required if jury is unable to agree). Thus the instruction violates *Mills v. Maryland*, 486 U.S. 367 (1988). *See* Claim Seventeen *infra*.

Because the statute and instructions also create an unconstitutional risk of jury coercion, wherein the jurors perceive that they must reach a certain result—*see Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam)—the court should

---

[48] Though the current statute has the language "life imprisonment *without parole*," the jury in Ramirez's case was instructed only on "life imprisonment" because his offense occurred on January 5, 2003, before Texas law and the jury instruction on this point was changed.

have required a special verdict form. Without a special verdict form the trial court had no way to know if the jury verdict was constitutionally sound and had the requisite number of jurors in agreement. In addition, without such a record there could be no meaningful appellate review of Ramirez's sentence.

In the capital context, where heightened reliability is required, *see Woodson*, 428 U.S.at 305 (joint opinion of Stewart, Powell, and Stevens, JJ.), the Supreme Court has "emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." *Parker*, 498 U.S. at 321; *see also Zant*, 462 U.S. at 890 (recognizing mandatory appellate review as "an important procedural safeguard . . . to avoid arbitrariness"). The trial court's failure to employ a special verdict form crippled its own and Ramirez's ability to ensure his sentence is constitutionally sound. As such, Ramirez's sentence must be vacated.

### R.     The cumulative effect of these trial-court errors prejudiced Ramirez.

The trial court committed numerous errors during Ramirez's trial. Even if this Court were to find that none of them merits relief alone, the cumulative effect of all the errors is so prejudicial that Ramirez is entitled to relief. The errors "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*,

343

414 U.S. 141, 147 (1973); *see also*, *Taylor v. Kentucky*, 436 U.S. 478, 487 n.15 (1978); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (en banc).

## CLAIM FIVE

**Ramirez's convictions and sentence should be vacated because the trial judge was biased, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Ramirez's rights to due process and fair proceedings required that the judge presiding over his trial be impartial and free from bias or prejudice. *See In re Murchison*, 349 U.S. 133, 136 (1955) ("A fair trial in a fair tribunal is a basic requirement of due process."); *see also Bracy v. Gramley*, 520 U.S. 899, 904–05 (1997); *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986). Moreover, the Eighth Amendment's requirement of a heightened degree of reliability demanded that Ramirez be tried by a neutral decision maker rather than one predisposed to his guilt and culpability. *See, e.g.*, *Woodson*, 428 U.S. at 305 (joint opinion of Stewart, Powell, and Stevens, JJ.).

A defendant need not prove actual bias. Even the appearance of bias violates his rights. *See Liteky v. United States*, 510 U.S. 540, 558 (1994) (Kennedy, J., concurring) ("One of the very objects of law is the impartiality of its judges in fact and appearance."); *Pub. Utils. Comm'n v. Pollak*, 343 U.S. 451, 467 (1952) (opinion

of Frankfurter, J.) ("The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact.").

Here, the appearance of bias requires reversal. Judge Noe Gonzalez, who presided over Ramirez's trial, had been the committing judge in several of Ramirez's juvenile proceedings. (49 RR Ex. 11 at 46, 113, 118.) Judge Gonzalez's bias against Ramirez manifested itself throughout trial. In pretrial proceedings, Judge Gonzalez told Ramirez "there hasn't been anyone in this County that has sentenced more people in accordance with death sentences. . . ." (2 RR at 13.) Then, Judge Gonzalez warned Ramirez to "[b]e very careful" (2 RR at 13) and said that he did not "want any outbursts in the Court." (2 RR at 14.)

The trial court's comments bear on his impartiality. During trial, Judge Gonzalez routinely asked questions that supported the State's case and made statements aligning himself with the prosecutor. *E.g.*, 6 RR at 202 (asking the State's witness leading questions); 7 RR at 205 (referring to the prosecutor as "my Clint Eastwood"). The trial court also made various statements reflecting prejudgment of Ramirez's case.

Because a violation of a defendant's right to be tried before an impartial judge is structural and not susceptible to harmless error review, Ramirez is entitled to relief. *See Tumey v. Ohio*, 273 U.S. 510, 535 (1927). Moreover, the trial judge's

failure to recuse himself had a substantial and injurious effect on both phases of the proceedings. *See Brecht*, 507 U.S. at 623. Accordingly, Ramirez is entitled to relief.

## CLAIM SIX

**Ramirez was denied the right to confront a witness against him and therefore his convictions and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

The Sixth Amendment's Confrontation Clause prohibits prosecutors from introducing an out-of-court testimonial statement unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine them. *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004) (prohibiting the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination"). A statement is generally "testimonial" if it is a solemn declaration made to establish a fact. *Id.* at 51.

At the penalty phase of Ramirez's trial, the State called Ricardo Leal to testify about his role as Ramirez's juvenile probation officer during his participation in the Texas Youth Commission. (38 RR at 71.) This testimony violated Ramirez's confrontation rights because Leal's testimony turned on a review of probation records prepared at least in part by individuals who the State did not show were unavailable to testify at trial and were previously available for cross-examination.

(*E.g.*, 38 RR at 83, 91, 129.) *Cf. Russeau v. State*, 171 S.W.3d 871, 880–81 (Tex. Crim. App. 2005) (sustaining confrontation challenge where the trial court admitted incident and disciplinary reports from the county jail and Texas Department of Criminal Justice containing statements written by corrections officers and which documented the appellant's disciplinary offenses, statements which were read to the jury during the penalty phase and argued in closing).

More specifically, Leal testified about specific, prejudicial examples of Ramirez's conduct, which Leal learned about second-hand from unidentified declarants. For example, Leal testified that in January 2002 he "got information that Juan might have been arrested by the Alamo PD." (38 RR at 91-92.) Leal clarified that this information did not come from Ramirez himself, and his use of the passive voice indicates he received the information from a separate individual. (38 RR at 92.) This information was testimonial in nature and, as a result of receiving it, Leal "issued out a directive—what we call a Texas Youth Commission directive, similar to a warrant." (38 RR at 92.) Similarly, Leal testified that in March 2002 he was informed (again by an unidentified declarant) that Ramirez had been arrested, which caused TYC to initiate a revocation hearing. (38 RR at 93–94.) The court was not presented with any evidence that the out-of-court declarants who were the source of the information about Ramirez's negative conduct were unavailable or that Ramirez

had an opportunity to cross-examine them. Because the State used Leal as a "mere conduit[]" for out-of-court statements contained in the probation records, Ramirez's confrontation rights were violated and he is entitled to relief. *Williams v. Illinois*, 567 U.S. 50, 80 (2012).

## CLAIM SEVEN

**Ramirez's execution would be unconstitutional because he is actually innocent.**

Ramirez is actually innocent, so his conviction and death sentence violate the Due Process Clause of the Fourteenth Amendment and the prohibition against cruel and unusual punishment of the Eighth Amendment to the U.S. Constitution.

Ramirez presented this claim below.

"The quintessential miscarriage of justice is the execution of a person who is entirely innocent." *Schlup v. Delo*, 513 U.S. 298, 324–25 (1995); *see also Herrera v. Collins*, 506 U.S. 390, 419 (1993) ("[T]he execution of a legally and factually innocent person would be a constitutionally intolerable event.") (O'Connor, J., joined by Kennedy, J., concurring); *id.* at 431 ("The Constitution forbids the execution of a person who has been validly convicted and sentenced but who, nonetheless, can prove his innocence with newly discovered evidence.") (Blackmun, J., joined by Stevens, J., and Souter, J., dissenting); *accord House v. Bell*, 547 U.S. 518, 554–55 (2006).

Ramirez can demonstrate that he is actually innocent, making his imprisonment and execution unconstitutional.[49] *Herrera*, 506 U.S. at 417; *see also Jackson v. Virginia*, 443 U.S. 307 (1979). In a capital case, the Eighth Amendment requires a reliable determination of guilt. *Beck v. Alabama*, 447 U.S. 625, 638 (1980); *see also Spaziano v. Florida*, 468 U.S. 447, 456 (1984) ("We reaffirm our commitment to the demands of reliability in decisions involving death[.]"), *overruled on other grounds by Hurst v. Florida*, 577 U.S. 92 (2016). Moreover, the Due Process Clause of the Fourteenth Amendment also paves the way for a petitioner to challenge his punishment on the ground that he is actually innocent. *See Herrera*, 506 U.S. at 437 (Blackmun, J., joined by Stevens, J., and Souter, J., dissenting).

In considering whether a prisoner is entitled to relief on an actual-innocence claim, a court should take all the evidence into account, giving due regard to its reliability. *See Sawyer v. Whitley*, 505 U.S. 333, 339 (1992); *Kuhlmann v. Wilson*, 477 U.S. 436, 454 n.17 (1986).

Exculpatory evidence renders Ramirez's conviction and death sentence unconstitutional in violation of the Eighth and Fourteenth Amendments. *See*

---

[49] Ramirez preserves the right to argue an actual innocence claim pursuant to *Schlup*, 513 U.S. at 324–25 should any of his claims be found procedurally barred. A *Schlup* "claim of innocence is thus not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass" in order to bring a valid constitutional claim. *Id.* at 315 (internal quotation marks and citation omitted).

*Herrera*, 506 U.S. at 417. The evidence used to convict Ramirez and sentence him to death is unreliable, as explained throughout the claims in this Petition. At trial, the State did not present any physical evidence linking Ramirez to the crime. The State's case rested on Ramirez's unreliable confession that he was at the crime scene, his statement to the booking officer about being a member of the "Bombitas," and evidence generally linking unknown gang members to the crime. *Ramirez*, 2007 WL 4375936, at *1–4. However, prior to trial, a co-defendant, Marcial Bocanegra, told police that a man named "Lenny" had committed the actions that the State attributed to Ramirez. (4 SH CR at 1710.) The State offered no evidence to support the theory that "Lenny" and Ramirez are the same person, nor did Ramirez's trial counsel do anything to investigate it.[50]

Evidence exists showing Ramirez is factually innocent of the crime. Newly-discovered evidence that further and conclusively exculpates Ramirez of committing the shootings is relevant to his actual-innocence claim because it supports Ramirez's assertions that his confession was false.

Ramirez's co-defendant, Marcial Bocanegra, was the first to be arrested and he provided police a statement that proved to be the "key break in the case." (4 SH

---

[50]    At trial, Ramirez's trial counsel solicited brief testimony from Detective Ramiro Ruiz about "Lenny," but trial counsel failed to develop this issue. (36 RR at 143.)

RR Ex. 13 ¶ 6.) Bocanegra's statement explained that a man known as "Lenny" was involved in the robbery. (4 SH CR at 1710.) Bocanegra described going inside the house with Lenny, who began giving Bocanegra orders. (4 SH CR at 1710.) Bocanegra saw Lenny tie up the man, hit the man with a frying pan, and ask him about money and drugs. (4 SH CR at 1710.) Bocanegra saw Lenny reenter the first house and then heard shots fired from within the house. (4 SH CR at 1710.) Detectives showed Bocanegra a photo line-up that included Ramirez's picture. (ECF No. 24, Ex. 14 at 14.) While Bocanegra identified some individuals, he did not identify Ramirez. The State did not provide the photo line-up associated with Bocanegra's identification to Ramirez's counsel.

New evidence reveals that Ramirez and Lenny are not the same person. First, Bocanegra has confirmed that "Juan Ramirez is not Lenny . . . I do not know how the police linked Juan Ramirez to Lenny." (4 SH RR Ex. 14 ¶¶ 2–4.)

Second, evidence shows that Lenny's true identity is Bocanegra. In a post-conviction declaration, Bocanegra admitted that he actually "Lenny" and when he gave the pre-trial statement to the police, he made up the story about a person named "Lenny." (Ex. 109 at 1.) He stated that he "did the actions that [he] attributed to 'Lenny'" and "when [he] described to the police what 'Lenny' did . . . [he] was

describing [his] own actions on that date." (Ex. 109 at 1.) Finally, Ramirez has never used the nickname "Lenny." (4 SH RR Ex. 27 ¶ 10; 4 SH CR at 1420 ¶ 23.)

Evidence demonstrates that Ramirez did not commit the crime for which he was convicted. His execution, therefore, would violate the Eighth and Fourteenth Amendments. *See Herrera*, 506 U.S. at 417, 431.

## CLAIM EIGHT

**The State committed misconduct throughout Ramirez's proceedings in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

A prosecutor in a criminal case is not simply a party to a controversy; he represents "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all[.]" *Berger v. United States*, 295 U.S. 78, 88 (1935). His interest should not be to win a case or obtain the maximum penalty. It should be "that justice shall be done." *See id.*; *see also United States v. Kojayan*, 8 F.3d 1315, 1323 (9th Cir. 1993) (prosecutor's "job isn't just to win, but to win fairly, staying well within the rules"). While it is his duty to prosecute a case with earnestness, it is "as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger*, 295 U.S. at 88. As the United States Supreme Court has explained, "the average jury, in a greater or less degree, has confidence that these obligations . . .

will be faithfully observed. Consequently, improper suggestions, insinuations, and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." *Id.*

A prosecutor oversteps "the bounds of . . . propriety and fairness which should characterize the conduct of such an officer" when he misstates facts in examination of witnesses; puts "into the mouths of such witnesses things which they had not said"; suggests "by his questions that statements had been made to him personally out of court, in respect of which no proof was offered"; pretends to understand a witness "said something which he had not said" and persistently examines the witness on that basis; assumes prejudicial facts not in evidence; bullies and argues with witnesses; and conducts "himself in a thoroughly indecorous and improper manner." *Id.* at 84. He further oversteps these bounds when his arguments are "undignified and intemperate" or contain "improper insinuations and assertions calculated to mislead the jury." *Id.* at 85.

Moreover, prosecutors may not knowingly present false testimony, knowingly misrepresent the evidence, permit a witness to give a false impression of the evidence, or fail to correct evidence it knows to be false. *See Miller v. Pate*, 386 U.S. 1 (1967); *Napue v. Illinois*, 360 U.S. 264, 269 (1959); *Alcorta v. Texas*, 355 U.S. 28, 31 (1957); *Mooney v. Holohan*, 294 U.S. 103, 112 (1935) (per curiam). Even when

the false testimony goes only to the credibility of the witness that is testifying, the defendant's rights are violated. *Napue*, 360 U.S. at 269 ("The principle that a State may not knowingly use false evidence, including false testimony, to obtain a tainted conviction, implicit in any concept of ordered liberty, does not cease to apply merely because the false testimony goes only to the credibility of the witness.").

The State committed prosecutorial misconduct in various ways, described more particularly below. Taken individually and cumulatively, these errors demonstrate that Ramirez's convictions and sentence are unlawful under the Fifth, Sixth, Eighth, and Fourteenth Amendments.

### A. The State committed misconduct when it denied the existence of the arrest video until after the suppression hearing.

In May 2003, Ramirez filed a discovery motion requesting that the State produce copies of any "videotapes made in connection with this case." (1 CR at 198.) On October 12, 15, and 18, 2004, counsel for Ramirez noted that a camera was present at his arrest and specifically requested a copy of any video recorded pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). (3 RR at 29–32; 1 CR at 280–81; 4 RR at 23–24.) The State denied that any such video recording existed. (3 RR at 31; 4 RR at 23–25.) Nonetheless, at the October 22, 2004 suppression hearing, testimony clarified that the arresting officers did have a video camera and strongly suggested

that the camera was recording while Ramirez was arrested. (6 RR at 102–04, 163–67, 178, 180; 7 RR at 31.)

Had the State timely disclosed the videotape, it would have revealed, at a minimum, that Ramirez had "Roche pills" (7 RR at 57–61), which would have corroborated Ramirez's explanation that his statements to police were compromised by the effects of drugs (7 RR at 152–54).

Subject to additional investigation, the video may have also revealed other material and/or exculpatory information, including but not limited to, additional evidence of Ramirez's intoxication or evidence that the police committed misconduct during the search incident to Ramirez's arrest.

Beyond violating its duty to disclose exculpatory evidence, *see United States v. Agurs*, 427 U.S. 97 (1976), and its duty of candor to the tribunal, the State's actions amount to prosecutorial misconduct. A prosecutor occupies a unique position in the bar and is subject to uniquely rigorous standards. *Berger*, 295 U.S. at 88. Here, the prosecutors' conduct did not meet those standards. The State's failure to disclose the arrest video before the suppression hearing and its persistent denial that any such video existed prevented Ramirez from offering evidence to corroborate his testimony. The State's misconduct is particularly prejudicial because it deprived Ramirez of evidence undermining the voluntariness of statements critical to the case

355

against him. *See Kojayan*, 8 F.3d at 1323–24 (finding misconduct where the State "deprived the defendants of an opportunity to put on what could have been a powerful defense"); *see also Davis v. Zant*, 36 F.3d 1538, 1549–50 n.17 (11th Cir. 1994) ("[P]rosecutorial misconduct is least acceptable under the Constitution when aimed [at] the core of the defense's case").

## B. The State committed misconduct when it engaged in or allowed police to engage in spoliation of evidence.

The record from the final pretrial conference supports that the State deleted three minutes from the copy of the arrest video it ultimately produced to Ramirez. (26 RR at 9–11.) The video likely contained evidence that, at a minimum, corroborated Ramirez's explanation that he was intoxicated when arrested. Thus, the omission may have undermined the admissibility and/or persuasive force of statements he gave to police, which became powerful evidence against him. Ramirez therefore submits that the State's failure to preserve the complete video should give rise to the inference that the footage was favorable to Ramirez and that the State's failure, considering its unique obligations to ensure justice is done, amounted to reversible misconduct. *Cf. White v. State*, 248 S.W. 690, 692 (Tex. Crim. App. 1923) ("In a case of circumstantial evidence, inferences from evidence not introduced which are in the possession of the State are in favor of and not against the accused.").

### C. The State committed misconduct when it sponsored false testimony at the suppression hearing.

At the suppression hearing, Edinburg Officer Edgar Ruiz testified that Ramirez's statement included previously unknown information—that one of the victims had been struck with a frying pan. (6 RR at 69, 77, 81–83.)

Prosecutor: As far as Rosie Gutierrez goes, she never told you she heard or saw Jerry get hit in the face with a pan, did she?

E. Ruiz: No, just that she heard them hitting. She didn't know who they were.

Prosecutor: And she didn't know what was being used to hit him with?

E. Ruiz: No.

Prosecutor: But there was a skillet there at the house, and that skillet was later recovered?

E. Ruiz: Was recovered.

Prosecutor: And at the time of the crime, the time of the incident, that skillet was in the living room; is that correct?

E. Ruiz: Yes, that's correct, yes.

Prosecutor: And that skillet was bent up, and based on the defendant's statement, that might explain why the skillet was bent up?

E. Ruiz: Yes.

Prosecutor: And that was information you learned from the defendant's statement?

E. Ruiz: From the defendant.

(6 RR at 83–84.)

In fact, Marcial Bocanegra had told Edinburg police employees on January 22, 2003, another individual named "Lenny was beating the guy on the head with a frying pan . . .." (4 SH CR at 1710.) This was a full week before Ramirez's January 29, 2003 statements. (*Compare* 6 RR at 11, *with* 4 SH CR at 1709.) It is reasonably certain that the prosecutors actually had co-defendant Marcial Bocanegra's statement. But even if they did not, the information in the possession of police is imputed to the State. *See Giglio v. United States*, 405 U.S. 150, 154 (1972); *see also Ex parte Adams*, 768 S.W.2d 281, 292 (Tex. Crim. App. 1989) ("[I]t is of no consequence that the facts pointed to may support only knowledge of the police because such knowledge will be imputed to state prosecutors." (quoting *Williams v. Griswald*, 743 F.2d 1533, 1542 (11th Cir. 1984))). Thus, the State knew of Bocanegra's statement to police which demonstrated that Ruiz's testimony was false.

The State not only failed to correct Ruiz's false testimony, the State sponsored the testimony on direct examination that the information about the frying pan first came from Ramirez. Then, they aggravated the harm by re-eliciting this information on redirect. This violated Ramirez's due process rights. *Mooney*, 294 U.S. at 112; *Napue*, 360 U.S. at 269.

The violation likely affected the outcome of the proceedings against Ramirez. At the suppression hearing, the primary dispute was between Ruiz's and Ramirez's conflicting testimony regarding what occurred before Ramirez gave the recorded statement. Ruiz testified that Ramirez agreed to give him a statement after his arrest on January 29, 2003. (6 RR at 11.) Ruiz testified further that he read Ramirez his *Miranda* warnings before questioning him, and that after Ruiz explained to Ramirez what information police already obtained from others, Ramirez agreed to cooperate and give a statement. (6 RR at 13–19.) Moreover, Ruiz testified that he perceived no signs that Ramirez was intoxicated during his statement. (6 RR at 21–22.)

Ramirez testified that he was not read his *Miranda* rights until after being subject to interrogation for thirty to forty minutes, and that he explained to police officers before the interrogation that he was high on Rohypnol. (7 RR at 48, 52, 57.) Additionally, Ramirez described abusive tactics detectives employed during the unrecorded, pre-*Miranda* interrogation. These included one of the detectives removing his gun from its holster, and both detectives ignoring his unambiguous requests for a lawyer and threatening that he would receive the death penalty if he failed to talk. (7 RR at 39–41, 45–50, 123.) Considering this conduct, Ramirez believed that he would continue to be subjected to abuse until he provided a

statement. (7 RR at 56–57.) At the end of the hearing, the court declined to suppress Ramirez's statements. (7 RR at 203, 208.)

The judge's ruling at the suppression hearing required a credibility determination between Ramirez and Ruiz and their accounts of what happened at the police station. Had the State corrected Ruiz's false testimony regarding the frying pan (as due process required, *see Napue*, 360 U.S. at 269–70), there is a reasonable likelihood that the judge would have given Ramirez's testimony more weight. Ramirez's statements were an integral part of the State's case. *See generally Colorado v. Connelly*, 479 U.S. 157, 182 (1986) ("Triers of fact accord confessions such heavy weight in their determinations that 'the introduction of a confession makes the other aspects of a trial in court superfluous . . .'" (citing E. Cleary, *McCormick on Evidence* 316 (2d ed. 1972))). If the jury had not considered Ramirez's statements to police, it likely would have acquitted him. Thus, there is a "reasonable likelihood that the false testimony could have affected the judgment of the jury," and Ramirez is entitled to relief. *Agurs*, 427 U.S. at 103.

### D. The State committed misconduct regarding Marcial Bocanegra.

The State concealed evidence that was exculpatory, or the Court should infer was exculpatory, due to the State's concealment. Beyond violating *Brady*, the State's disclosure violations also amounted to prosecutorial misconduct because the State

misled the court regarding the undisclosed information and misrepresented the evidence.

1. **The State concealed and then misrepresented the nature of the cooperation agreement it reached with Marcial Bocanegra.**

Edinburg police records reflect that investigators interviewed Marcial Bocanegra on January 21, 2003, at Bocanegra's request. (ECF No. 24-2 at 139, Ex. 14 at 10.) Detective Jose Soto's report indicates that Bocanegra quickly asked investigators "what he could receive in return" for discussing the murders. (ECF No. 24-2 at 139, Ex. 14 at 10.) After obtaining some preliminary information from Bocanegra about what information he would provide, Soto met with the Hidalgo County District Attorney, Rene Guerra. (ECF No. 24-2 at 140, Ex. 14 at 11.) According to Soto's report, Guerra "stated that the deal was that if Marcial Bocanegra provided details in the case that he would do away with the death penalty *and life sentence and would start the sentence at 50 years.*" (ECF No. 24-2 at 140, Ex. 14 at 11 (emphasis added).) Guerra advised that Bocanegra's information would have to be "checked out and that the information would have to help in the arrest and conviction of the person(s) involved in the crime." (ECF No. 24-2 at 140, Ex. 14 at 11.)

Soto related the terms of Guerra's offer to Bocanegra, who "was not too happy with the 50 years and stated that he needed something better tha[n] the 50 years." (ECF No. 24-2 at 140, Ex. 14 at 11.) Soto explained to Bocanegra that 50 years "is where it started and that depending on the information the years could be reduced." (ECF No. 24-2 at 140–41, Ex. 14 at 11–12.) Soto also explained that "the investigation was going to continue and that if the information he was providing was not true that the district attorney could refuse to help him out." (ECF No. 24-2 at 141, Ex. 14 at 12.) Bocanegra gave a statement which was subsequently reduced to writing. (ECF No. 24-2 at 141–45, Ex. 14 at 12–16; 4 SH CR at 1709.) Soto then relayed to the Hidalgo County District Attorney's Office that Bocanegra had provided a statement "and that he had been cooperating in the investigation." (ECF No. 24-2 at 145, Ex. 14 at 16.)

As early as April 30, 2003, within four months of Bocanegra's bargained-for cooperation, Ramirez repeatedly requested through counsel that the State disclose any agreements, promises, or inducements made to each witness, "including, but not limited to, plea bargain agreements . . . , agreements to dismiss or reduce or not bring charges, or any other agreement of leniency." (1 CR at 69; *see also, e.g.*, 1 CR at 176 (requesting "[a]ll 'consideration' or promises of 'consideration' given to or on behalf of all State's witnesses or expected or hoped for by said State witnesses,"

including "absolutely anything . . . which arguably could be of value or use to a witness . . ." such as "leniency, favorable treatment or recommendations or other assistance with respect to any pending or potential criminal action . . ."); 1 CR at 113 (seeking "any agreement entered into between the District Attorney . . . and any prosecution witness that could conceivably influence said witness' testimony").)

Notwithstanding Ramirez's requests and Soto's report that Bocanegra cooperated after receiving a promise to cap his sentence at 50 years, the State initially denied any cooperation agreement. On August 28, 2003, the prosecutor denied in open court that any deal had been made with any codefendant, stating "We have nothing to notify them of, your Honor." (ECF No. 24-2 at 57, Ex. 2 at 6.) Even after the court granted a defense motion on September 3, 2003, requiring the State to disclose any agreements, the prosecutor declared: "We haven't made any deals with the co-defendants as of today." (1 CR at 219; ECF No. 24-2 at 39, Ex. 4 at 9.) Even as late as August 2004, the prosecutor claimed: "There's no deals." (ECF No. 24-2 at 72, Ex. 7 at 10).

On October 12, 2004, however, just two weeks before trial began, the prosecutor announced to the court, in response to yet another defense request for information regarding any deals made with codefendants, that the State had extended an agreement to Bocanegra. (3 RR at 23.) Still, the State did not disclose the true

nature of the deal. Rather, the prosecutor revealed only that the "State has decided not to seek the death penalty against a co-defendant, Marcial Bocanegra . . . [a]s part of his cooperation in this case." (3 RR at 23.) Defense counsel tried to clarify whether "that's the only part, that's the only thing you offered him, basically, an offer that the death – actually, you decided not to seek the death penalty; is that correct?" (3 RR at 24.) The prosecutor responded only that the State had "decided not to seek the death penalty against him, Bocanegra." (3 RR at 24; *see also* 3 RR at 24 (repeating that in exchange for Bocanegra's cooperation "the State came off the death penalty"); 3 RR at 27 ("The agreement was to cooperate. We have come off the death penalty on him.").)

Based on Soto's police report and subject to further investigation, the State had entered into an agreement with Bocanegra in which he would cooperate in exchange for a term-of-years sentence that would not exceed 50 years. That is supported by Bocanegra's actual sentence for murder, which was 35 years. (ECF No. 30-5 at 29, Ex. 91 at 1.) *See* Tex. Dep't of Crim. Justice, Offender Information Details, available                                                                                                          at https://offender.tdcj.texas.gov/OffenderSearch/offenderDetail.action?sid=05388935 (last visited Dec. 15, 2020). The prosecutor's failure to timely and accurately disclose the

existence of the cooperation agreement with Bocanegra, who was identified as a State's witness, violated *Brady*. *See Giglio*, 405 U.S. at 154–55.

Worse, perhaps, once the State did disclose its cooperation agreement with Bocanegra, it affirmatively misled the court and Ramirez to believe that the bargained-for sentence could be anything short of death, when it was capped at 50 years. The State's evasive, misleading statements to the court and to Ramirez regarding the agreement gave a false impression of the evidence and constitutes misconduct. *Cf. Hayes v. Brown*, 399 F.3d 972, 978 (9th Cir. 2005) (en banc) (explaining that misleading the court in seeking to persuade it to grant a motion, no less than misleading a jury, is "inconsistent with the rudimentary demands of justice" (quoting *Mooney*, 294 U.S. at 112)). He is entitled to relief.

### 2. The State concealed evidence obtained from Bocanegra exculpating Ramirez and instead misleadingly suggested that Bocanegra would provide inculpatory testimony as a State witness.

According to Soto's reports, after Edinburg police arrested Marcial Bocanegra they showed him "some photo line ups . . . Marcial Bocanegra identified some of the individuals in the photo line ups and . . . sign[ed] the photo line ups." (ECF No. 24-2 at 143, Ex. 14 at 14.) The lineup was not admitted at trial, and neither Bocanegra nor Soto testified. Additionally, in a post-conviction declaration, Bocanegra stated that he did not identify Ramirez in the photo lineup. (Ex. 109)

Notwithstanding that this evidence would have been favorable to Ramirez and material to guilt and punishment, the State never disclosed the signed photo lineups. This violated Ramirez's right to due process. *See Brady*, 373 U.S. at 87.

Moreover, in addition to the lineup, the State knew from interviewing Bocanegra that he did not identify Ramirez as among those who participated in the murders. Neither Soto's notes of Bocanegra's interview nor his written statement refer to Ramirez. (ECF No. 24-2 at 141–45, Ex. 14 at 12–16; 4 SH CR at 1709.) In fact, the actions which the State attributed to Ramirez, were, according to Bocanegra, committed by another individual by the name of Lenny. And, contrary to the State's position at trial, no evidence established that Ramirez ever went by the nickname "Lenny." That Ramirez was not Lenny was settled in 2014, when Bocanegra signed a statement declaring under penalty of perjury that he "met Juan Ramirez for the first time in Hidalgo County Jail" and that "Juan Ramirez is not Lenny."[51] (4 SH RR Ex. 14 ¶ 3.)

Thus, Bocanegra's failure to identify Ramirez in the lineup, failure to describe him as one of the perpetrators, and failure to identify Ramirez as Lenny, demonstrates that Bocanegra could not tie Ramirez to the murders. But the State

---

[51]     In 2019, Bocanegra admitted that he, in fact, was "Lenny." (Ex. 109 at 1 ("When I spoke to the police, I did not want to tell them about what I had done, so I made up a story about "Lenny" having done what I did.").)

listed him as a witness who would testify against Ramirez and link Ramirez to the crime. Although both defense counsel and the trial court attempted to ascertain pretrial whether Bocanegra's cooperation agreement required him to testify, or whether he would be called as a State's witness, the prosecutor would not provide a direct answer. (3 RR at 25–28.)

For example, when the court specifically asked the prosecutor whether the agreement was "that the cooperation would include him voluntarily testifying," the prosecutor responded, "The agreement was to cooperate. We have come off the death penalty on him." (3 RR at 27.) When the court asked further whether the State intended to call Bocanegra, the prosecutor responded, "He is in our witness list." (3 RR at 28.) When the court pressed and suggested that the State "may call him, but you don't know at this point," the prosecutor responded, "We are not revealing that at this point. But that's certainly a possibility." (3 RR at 28.)

The State failed not only to disclose evidence obtained from Bocanegra that would have exculpated Ramirez—showing that Ramirez was not among the crime participants—but the State also misled the court and defense counsel to believe that Bocanegra possessed inculpatory information as a State witness. Beyond the *Brady* violation, giving such a false characterization of the evidence amounts to misconduct and deprived Ramirez of due process.

**E.**     **The State committed misconduct when it failed to disclose conditions in the TYC and made false arguments to the jury regarding those conditions.**

As noted above, the State may not suppress favorable evidence that is material to guilt or punishment, *Brady*, 373 U.S. at 87; may not present false testimony or allow it to go uncorrected, *Napue*, 360 U.S. at 269; and may not create a false impression of the evidence, *see Miller*, 386 U.S. at 6–7.

At trial, the State called Ramirez's former juvenile parole officer from the Texas Youth Commission, Ricardo Leal. (38 RR at 71, 73.) The State elicited from Leal that there were "a range of options" for placements that "would best be suited for Juan Ramirez, and what services he might need." (38 RR at 74.) The State further elicited that Ramirez was placed at the Evins Regional Juvenile Center, where he was eligible for and placed into a "resocialization program" focusing on "interpersonal skills, the independent skills . . . their counseling, or with the programs that they faced when they were out there in the community prior to TYC." (38 RR at 75–76.) Leal testified that Ramirez had a case worker and that his progress at TYC was assessed by the case worker as well as a program administrator, other program staff, and teachers. (38 RR at 77.)

The State asked Leal specifically to describe the Evins facility that housed Ramirez. (38 RR at 78.) Leal described an environment in which juveniles routinely

attended group sessions under the direction of staff who "make[] sure everything is okay[,]" attended academic classes, received time for physical activity, and attended a "treatment group" working on social skills like anger management, independent living, and family issues. (38 RR at 78–80.) He elaborated: "The goal on Juan Ramirez after he completed Evins was to teach him skills to live on his own, for him to have that option or that privilege . . ." (38 RR at 82.) Leal also described the living conditions at Evins, which he testified ensured the youths' "basic needs." (38 RR at 80.)

He further testified that after leaving Evins, Ramirez was placed in a halfway house to continue working on "independent living" skills. (38 RR at 82.) The halfway house placement provided opportunities to learn about "savings accounts, checking accounts. They [gave] him the opportunity to go out into the community and look for employment." (38 RR at 85.) When Ramirez was discharged on juvenile parole, the TYC provided "intensive" surveillance, including guidance for completing financial aid packages to enroll in community college and help finding a job. (38 RR at 89–90, 97.) After Ramirez's parole was revoked, he was returned to a detention facility where he was again managed by various program administrators and enrolled in education and resocialization programs. (38 RR at 95–96.)

369

Thus, the thrust of Leal's testimony was that the State of Texas, through the TYC, had provided Ramirez with exhaustive rehabilitative programs. This left the jury to infer that Ramirez could not be rehabilitated and that he was a future danger.

The State reinforced this inference through argument. During closing argument at the penalty phase, the State argued that, although only 18, Ramirez had kept "getting more violent and more violent" throughout his adolescence. (39 RR at 119.) The State asserted that Ramirez had "proven through his past that he is a violent individual, he is a threat to our society. . ." (39 RR at 125.) The State argued that although Ramirez had been "given the opportunity" to rehabilitate in treatment facilities, he nonetheless violated the law upon his release. (39 RR at 137–38.) In its closing rebuttal argument, the State belittled the defense's argument that "society . . . let this defendant down." (39 RR at 140–41.) The effect of the prosecutors' argument was to suggest to the jury that the TYC had provided effective resources to help Ramirez get his life on track, and that Ramirez could not be salvaged. This could reasonably have led the jury to believe that Ramirez was more likely to be a future danger and deserving of death.

The Texas Youth Commission, which was responsible for providing the programs Leal described and the opportunities to which the prosecutor referred, was in fact plagued by highly publicized problems involving the mistreatment of its

370

wards, which left youth subject to an environment riddled with violence, neglect, sexual abuse, riots, gang activity, drug use, and suicide. (ECF No. 28-3, Ex. 82 at 4, ¶ 18.) Indeed, severe maltreatment of juveniles within the TYC caused the U.S. Department of Justice to investigate one facility, the Evins facility, where Ramirez had been housed during much of the time he was alleged to be receiving rehabilitative services. (ECF No. 28-3 at 32, Ex. 82 at 4 ¶ 18.) In truth, the Evins facility did not facilitate rehabilitation of the youth in its custody.

A leading expert on the TYC has stated that:

> [T]he punitive and dangerous conditions, staffing problems, and inadequate programming in TYC facilities at the time of Mr. Ramirez's commitment, especially in the Evins and Coke County facilities where he was housed for the longest periods of time, undermined any effort to rehabilitate youth in these facilities. Indeed, these conditions made it entirely predictable that youth would emerge from TYC made worse by their time in the agency's custody.

(ECF No. 28-3 at 33, Ex. 82 at 5 ¶ 20.)

The State knew of these rampant problems within the TYC, problems which ultimately led to appointment of a conservator to oversee the agency and eventually to its dissolution. This information would have been favorable to Ramirez and material to the question of the proper penalty. By failing to disclose it, the State created the false impression that Ramirez would have benefited from his placement with TYC but for his own character and conduct. The State's failure to disclose this

information therefore violated due process, undermined the reliability of Ramirez's sentence, and requires reversal.

**F.    The State committed misconduct by urging an unconstitutional limitation on mitigating evidence.**

The Eighth and Fourteenth Amendments require that a capital sentencer, along with a reviewing court, consider and give effect to any relevant mitigating evidence. *Eddings*, 455 U.S. at 114. This requirement furthers the fundamental underpinnings of constitutional capital sentencing by avoiding arbitrary death sentences and evaluating the character and record of an individual defendant. *See, e.g.*, *Kennedy*, 554 U.S. at 436, *modified on denial of reh'g*, 554 U.S. 945 (2008). The Supreme Court has reiterated that the State may not preclude a capital sentencer "from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence." *Eddings*, 455 U.S. at 113–14; *Penry*, 492 U.S. at 317; *Lockett*, 438 U.S. 586.

During its closing rebuttal argument at the penalty phase, the prosecutor suggested that evidence that a capital defendant suffered trauma in childhood is only mitigating to the extent it explains the defendant's participation in the same type of violence that once traumatized him. Belittling the defense's evidentiary showing that Ramirez had suffered deprivation as a child, the prosecutor argued:

> [I]f you your mom gets beaten by your dad, then maybe that is a mitigating factor for a person to engage in domestic violence.
>
>    . . . .
>
> You see one parent abuse the other, then maybe somewhat that is an extenuating circumstance when you abuse your own spouse, because you saw it when you were growing up.
>
> And child abuse, maybe that's a mitigating – maybe that reduces the person's blame when they abuse their own child. Maybe you can make that kind of argument.

(39 RR at 141.) The prosecutor then contrasted these examples with Ramirez's homicide convictions:

> Is it sufficient that because somebody says his mom didn't love him or love him enough, is it sufficient to reduce the punishment that he deserves for these six cases?
>
> Now, maybe it is sufficient if this was a child abuse case. Maybe that background would be sufficient if this was a domestic violence case.

(39 RR at 142.) Thus, the prosecutor sought to discourage the jurors from finding Ramirez's suffering to be mitigating because his conduct did not replicate the traumatic behavior inflicted on him as a child.

Imposing the prosecutor's proposed rule—indeed, the imposition of any threshold standard other than the "most expansive" interpretation of the general relevance standard—has "no foundation" in the Supreme Court's jurisprudence and violates the Eighth and Fourteenth Amendment. *Tennard v. Dretke*, 542 U.S. 274, 284–85 (2004). It is not enough for the state court to merely permit the admission of

373

relevant mitigating evidence when, at the same time, the prosecutor impedes a sentencer from giving complete effect to that evidence. "[F]ull consideration of evidence that mitigates against the death penalty is essential if the [sentencer] is to give a reasoned moral response to the defendant's background, character, and crime." *Penry*, 492 U.S. at 328 (internal quotation marks omitted). The Eighth and Fourteenth Amendments require that "[t]he sentencer must [] be able to consider and give effect to that evidence in imposing sentence." *Id.* at 319.

Because the prosecutor's improper arguments circumscribed the evidence which the jury could find mitigating, it violated the Eighth and Fourteenth Amendments and Ramirez is entitled to relief.

### G. The State committed misconduct when the prosecutors made inflammatory and improper comments during arguments.

The purpose of a closing argument "is to explain to the jury what it has to decide and what evidence is relevant to its decision." *Sandoval v. Calderon*, 241 F.3d 765, 776 (9th Cir. 2000), *amended on denial of rehearing* (Feb. 21, 2001). Arguments that frustrate this purpose and are inflammatory or prejudicial to a defendant are improper. *Id.*; *see also Berger*, 295 U.S. at 85 (proscribing arguments that are "undignified and intemperate" or are "calculated to mislead the jury"). And a prosecutor's comments are improper and prejudice a defendant where they

constitute personal and institutional guarantees of the trustworthiness of the State's case. *United States v. Smith*, 962 F.2d 923, 933 (9th Cir. 1992).

Here, the prosecutors made inflammatory and vouching comments during argument at both the guilt and penalty phase intended to inappropriately arouse the jury's passions, depriving Ramirez of his right to due process at his guilt and penalty proceedings and to a reliable penalty verdict.

The prosecutors' intemperate comments during the State's guilt phase argument included, but were not limited to: arguing or suggesting that the jury instructions required the jurors to "render a decision, a decision that is justice for the six deceased" (37 RR at 121); and that the State's case was stronger because "federal agents" participated in solving it (37 RR at 155). The prosecutors' intemperate comments during the State's penalty phase argument included, but were not limited to: arguing that Ramirez's age was not mitigating because two of the victims were also young adults (39 RR at 119–20); that Ramirez was a "cold-hearted killer" (39 RR at 120); that one victim "didn't live to see another Christmas" (39 RR at 120); and that Ramirez was likely to be a future danger because some other condemned inmate assaulted a guard (39 RR at 137).

These arguments did not explain "what evidence is relevant to [the jury's] decision" but instead simply inflamed the jury's passions to ensure verdicts of guilt

and death, *Sandoval*, 241 F.3d at 776, and placed the institutional imprimatur of the State behind its case. This misconduct violated due process and undermined the reliability of Ramirez's capital proceedings, and he is entitled to relief. *See Berger*, 295 U.S. at 85.

### H. The State committed various other forms of misconduct.

Besides these specific examples of misconduct described above, Ramirez also alleges on information and belief, and subject to additional investigation, that the State committed misconduct in various other ways that violated Ramirez's rights to a fair trial, to present a defense, to the due process of law, to a reliable and accurate determination of guilt and penalty, and to be free from cruel and unusual punishment.

This misconduct included, but was not limited to: making statements to the media in the jury's presence; sponsoring false testimony regarding prison classification and/or conditions; mischaracterizing Ramirez's juvenile record, including regarding his future dangerousness; failing to investigate, disclose, or timely disclose material evidence and issues related to Ramirez's guilt, innocence, penalty, or related to the witnesses with information in his case; knowingly or with implied knowledge eliciting false testimony and evidence or allowing false testimony and evidence to go uncorrected; questioning witnesses in ways which were argumentative or misleading; misstating the law or evidence (or failing to

correct misstatements of the law or evidence) to potential jurors, the jury, and the court; presenting to the court and jury charges and theories known to be false or that that could not be supported with testimony and evidence; continuing to prosecute Ramirez despite conflicts of interest; failing to maintain or supervise the proper handling and maintenance of crucial evidence; introducing testimony and evidence in violation of Ramirez's fair trial, due process, and confrontation rights, and that violated the rules of court and evidence which protect those constitutional rights; and limiting trial counsel's investigation and defense by failing to disclose or correct evidence and limiting Ramirez's defense through police misconduct, tampering with evidence or witnesses, mishandling evidence, and by improperly limiting defense access to evidence and witnesses.

## I. Cumulative prejudice.

Prosecutorial misconduct is not evaluated based on isolated instances alone; rather, the reviewing court must consider the cumulative effect of the harm. *Id.* at 89. Here, to the extent it is necessary to prove any prejudice, the foregoing demonstrates that through all phases of Ramirez's trial court proceedings, the prosecutors committed misconduct including, but not limited to, the instances discussed above. Taken together, these instances of misconduct "so infected the trial

with unfairness as to make the resulting conviction a denial of due process."

*Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Ramirez is entitled relief.

## CLAIM NINE

**Juror misconduct during Ramirez's guilt- and sentencing-phase proceedings deprived Ramirez of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial.**

Due to juror misconduct, Ramirez was denied his rights to a fair trial and an impartial jury, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution. The Supreme Court has long held that "[t]he requirement that a jury's verdict must be based upon the evidence developed at the trial goes to the fundamental integrity of all that is embraced in the constitutional concept of trial by jury." *Turner v. Louisiana*, 379 U.S. 466, 472 (1965) (internal quotation marks omitted). The integrity of the jury is paramount, and "any ground of suspicion that the administration of justice has been interfered with" cannot be tolerated. *Mattox v. United States*, 146 U.S. 140, 149 (1892), *superseded by rule as stated in Pena-Rodriguez v. Colorado*, 137 S. Ct. 855 (2017). And "[i]t is vital in capital cases that the jury should pass upon the case free from external causes tending to disturb the exercise of deliberate and unbiased judgment." *Id*.

Ramirez's rights were violated for several reasons. First, Ramirez's jurors felt threatened and scared to be seated on a jury in a gang-related case. (*See* ECF No.

28-1 at 100, Ex. 59 at 7 ¶ 42; Ex. 115 ¶ 5; Ex. 111 ¶¶ 2–3.) A defendant's right to a fair trial and impartial jury is violated when jurors feel threatened or intimidated. "A juror must feel free to exercise his functions without . . . anyone else looking over his shoulder. The integrity of jury proceedings must not be jeopardized by unauthorized invasions." *Remmer v. United States*, 347 U.S. 227, 229 (1954). "Due process requires that the defendant be tried by a jury capable and willing to decide the case solely on the evidence before it," *Mach v. Stewart*, 137 F.3d 630, 633 (9th Cir. 1998), and not on biases, prejudices, threats, or intimidation.

Second, Ramirez's rights to due process, confrontation, and a fair and impartial jury were violated by the introduction of extraneous information into juror deliberations. *See generally Turner*, 379 U.S. at 472. The court admonished Ramirez's guilt-phase jury on multiple occasions to avoid media about the case during the trial. (*See, e.g.*, 24 RR at 84.) Given the pervasive news coverage about Ramirez's case, the jury was exposed to extrinsic information about the case and jurors considered this extraneous information during their deliberations.

The jury's knowledge of and reliance upon extrinsic evidence violated Ramirez's constitutional rights to confrontation, due process, a fair trial, assistance of counsel, and a fair and impartial jury. A jury's verdict "must be based upon the evidence developed at the trial" to ensure the integrity of the constitutional right to

trial by jury. *Irvin*, 366 U.S. at 722; *see also Fields v. Brown*, 503 F.3d 755, 779 (9th Cir. 2007). Consideration of extrinsic facts during deliberations implicates the Confrontation Clause. *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000). These constitutional violations were not harmless errors; the extrinsic information had a "substantial and injurious effect or influence" in determining at least one juror's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993); *Mach*, 137 F.3d at 634.

Given the importance of the mitigation phase of a capital trial, it is critical that the jurors charged with determining the appropriate punishment consider the mitigation evidence presented to them, without being influenced by information outside the proceedings. *See Lockett*, 438 U.S. at 605 ("Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases."). However, evidence shows that jurors were influenced by extraneous information during their penalty phase deliberations.

In Ramirez's case, jurors were improperly influenced in multiple ways, individually and cumulatively, causing a substantial and injurious effect on the jury's verdicts and rendering Ramirez's convictions and death sentence unreliable. *See Brecht*, 507 U.S. at 623. Ramirez is therefore entitled to relief.

# CLAIM TEN

**The jury instructions given during Ramirez's trial violated his rights to a reliable sentence and to due process as enshrined by the Eighth and Fourteenth Amendments to the U.S. Constitution.**

Ramirez's death sentence was imposed in violation of due process guarantees under the Fourteenth Amendment because the jury instructions given in his case: (1) failed to define "mitigating evidence" and effectively required a causal nexus; and (2) failed to define terms regarding future dangerousness and thus are unconstitutionally vague.[52]

> **A.** **The Texas mitigation special issue given in Ramirez's case failed to adequately define "mitigating evidence," and the instruction created a reasonable possibility that the jury would construe mitigating evidence narrowly, requiring a causal nexus to the crime.**

In capital cases, the Eighth Amendment requires heightened reliability because death is a qualitatively different punishment. *Lockett*, 438 U.S. at 605 (plurality opinion). Resultantly, the capital sentencer must undertake an individualized assessment of a defendant's culpability when assessing punishment. *See id.*; *Woodson*, 428 U.S. at 304 (opinion of Stewart, Powell, and Stevens, JJ.) ("[T]he fundamental respect for humanity underlying the Eighth Amendment . . .

---

[52] As the jury instructions given at Ramirez's trial were constitutionally infirm, it was ineffective assistance of counsel not to object to them and trial court error to give them. *See Strickland*, 466 U.S. at 694; *Brecht*, 507 U.S. at 623.

requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.").

Individualized sentencing requires that the sentencer must "not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604–05 (footnote omitted) ("[A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty.").

Texas's statute requires the trial court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." Tex. Code Crim. Proc. Ann. art. 37.071 § 2(f)(4). The charge given to the jury was:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(2 CR 563, 569.)

As neither "mitigating evidence" nor "mitigating circumstance(s)" were defined for the jury, the instructions effectively instructed the jury to disregard important classes of mitigating evidence if they were not linked to "blameworthiness" or "culpability" for the crime. *See also* Claim 14 *infra* ("The Court of Criminal Appeals of Texas prohibited Ramirez from raising sufficiency of the evidence claims on direct appeal regarding the mitigation special issue in violation of Ramirez's Eighth and Fourteenth Amendment rights.").

By requiring a causal nexus between mitigation and the crime at issue, the jury instructions were unconstitutional. In *Tennard*, 542 U.S. 274, the Supreme Court held that the Eighth Amendment is violated when courts impose a requirement that evidence must satisfy a "causal nexus" test before it is considered mitigating. While mitigating evidence must be relevant to be admitted, the Court held that courts cannot apply a screening mechanism such as a heightened relevance standard to take mitigating evidence out of the sentencer's effective reach. *Id.* at 285 (quoting *McKoy*, 494 U.S. at 441 ("[A] State cannot bar 'the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.'")). "Once this low threshold for relevance is met, the 'Eighth Amendment requires that the [sentencer] be able to consider and give effect to' a capital defendant's mitigating evidence." *Id.* at 285 (quoting *Boyde*, 494 U.S. at 377–78).

The *Tennard* Court expressly disapproved of the causal nexus portion of the test utilized by the Fifth Circuit, finding that the test would screen out much traditionally mitigating evidence. 542 U.S. at 285–86. In *Smith v. Texas*, 543 U.S. 37 (2004), the Supreme Court again condemned a state appellate court's application of a causal nexus to find mitigating evidence irrelevant. *Id.* at 45. The Court characterized the causal nexus test as "a test we never countenanced and now have unequivocally rejected." *Id*. Because the jury could not give full effect to Ramirez's mitigation as required by the Eighth and Fourteenth Amendments, Ramirez's sentence is unreliable and unconstitutional.

**B.     The mitigation special issue instruction given in Ramirez's case was unconstitutionally vague and a violation of Ramirez's Eighth and Fourteenth Amendment rights.**

Texas's capital sentencing statute required Ramirez's jury to decide "whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society[.]" Tex. Code Crim. Proc. Ann. art. 37.071 § 2(b)(1).

Capital sentencing schemes must be tailored to minimize the arbitrary and capricious imposition of the death sentence. Texas courts have held that the circumstances of the crime itself can be sufficient to meet the State's burden under the first special issue. *See, e.g.*, *Fuller v. State*, 253 S.W.3d 220, 231–32 (Tex. Crim.

App. 2008). Thus, since any defendant who reaches the penalty phase of trial has necessarily been convicted of capital murder, the special issue performs absolutely no narrowing function. Therefore the special issue, as interpreted by the state courts, fails to genuinely narrow the class of defendants eligible for the death penalty, and thus violates the Eighth Amendment.

Additionally, the instruction submitted to the jury is unconstitutionally vague on its face and as applied to Ramirez, as it fails to constitutionally guide the jury's discretion. Neither the statute nor the required jury charge defines the terms "probability," "criminal acts of violence," or "continuing threat to society." The use of the term "probability" is unconstitutionally vague. As many judges and commentators have noted, "a probability is simply a chance—however large or small—as measured and defined in mathematical or statistical terms." *See Jurek v. State*, 522 S.W.2d 934, 948 (Tex. Crim. App. 1975) (Roberts, J., dissenting). Notwithstanding the obviously plain meaning of "probability," the Texas courts have for decades held that "probability" in special issue number one means "[l]ikelihood," or "true, real, or likely to occur." *See, e.g.*, *Granviel v. State*, 552 S.W.2d 107, 117 n.6 (Tex. Crim. App. 1976); *Renteria v. State*, 206 S.W.3d 689, 706 (Tex. Crim. App. 2006) ("This Court has repeatedly held that the trial court need not define this term because the jury is presumed to understand it without further

instruction."). Yet juries in general are not—and Ramirez's jury in particular was not—instructed of that definition. Therefore, the jury in Ramirez's case could have answered the special issue with a "yes" based on their belief that there was a probability anywhere from 1% to 99% that Ramirez would be dangerous in the future. Thus, a failure to define "probability" in the jury instruction is patently unconstitutionally vague. Moreover, the use of "probability" without defining precisely what degree of probability is required undermines the State's burden of proof of a special issue that ostensibly must be proven beyond a reasonable doubt.

The "continuing threat to society" is similarly vague and constitutionally infirm. The vagueness of this term turns on the term "society": the Texas Court of Criminal Appeals has held that "society" means both the prison society to which any life- or death-sentenced prisoner would be confined, and society at large. *See, e.g.*, *Berry v. State*, 233 S.W.3d 847 (Tex. Crim. App. 2007) (vacating death sentence for lack of sufficient evidence of future dangerousness where defendant is dangerous only toward her own children, and she likely will not have more children while sentenced to life imprisonment); *cf. Martinez v. State*, 327 S.W.3d 727, 735 (Tex. Crim. App. 2010) (future dangerousness special issue is construed as whether a defendant would be a threat "whether in or out of prison"). That approach alone injects unconstitutional arbitrariness into capital sentencing, because whether a

defendant is sentenced to death or a term of 40 years, the defendant will not be soon released back into society and cannot therefore be a continuing threat to it. In conclusion, the mitigation special issue on future dangerousness is unconstitutionally vague and Ramirez's rights under the Eighth and Fourteenth Amendment have been violated.

Finally, a special verdict form for the mitigation special issues (*see* Tex. Code Crim. Proc. Ann. art. 37.071 § 2(b)) should have been required under Texas law to ensure the reliability of Ramirez's death sentence, as provided under the Eighth Amendment.[53]

As Ramirez's sentence is constitutionally infirm, it must be vacated.

## CLAIM ELEVEN

**Ramirez was sentenced based in part on an invalid murder conviction in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Ramirez was charged with two counts of capital murder. Count one alleged that Ramirez murdered multiple people in the same criminal transaction and count two alleged that he murdered the same people named in count one during the course

---

[53] As the lack of a special verdict renders Ramirez's sentence unreliable and thus unconstitutional, it was ineffective assistance of counsel not to request a special verdict form and trial court error not to provide one. *See Strickland*, 466 U.S. at 694; *Brecht*, 507 U.S. at 623.

of a robbery. (1 CR at 4.) The jury returned guilty verdicts on both counts (2 CR at 529–49), and Ramirez was sentenced to death (2 CR at 591–98). On appeal, the CCA vacated the conviction on count two because it violated double jeopardy. *See Ramirez*, 2007 WL 4375936, at *5.[54]

The Eighth Amendment demands heightened reliability in capital sentencing proceedings given the qualitative difference of the death penalty to all other forms of punishment. *See Stephens*, 462 U.S. at 884; *Woodson*, 428 U.S. at 305 (opinion of Stewart, Powell, and Stevens, JJ.). Similarly, because of the additional due process safeguards required of capital cases, the Supreme Court "has gone to extraordinary measures to ensure that the prisoner sentenced to be executed is afforded process that will guarantee, as much as is humanly possible, that the sentence was not imposed out of whim, passion, prejudice, or mistake." *Eddings*, 455 U.S. 118 (O'Connor, J., concurring).

To ensure this heightened reliability and additional due process, close scrutiny of a death sentence is required when the jury considers a factor that should not have otherwise affected its sentencing determination. *See Stringer v. Black*, 503 U.S. 222,

---

[54]    The court noted that "[w]hen a defendant is convicted of two offenses that are the same for double jeopardy purposes, the most serious offense is retained and the other conviction is set aside." *Ramirez*, 2007 WL 4375936, at *5 (internal quotation marks and citation omitted). The court then vacated count two at the State's request. *Id.*

230 (1992) ("We require close appellate scrutiny of the import and effect of invalid aggravating factors to implement the well-established Eighth Amendment requirement of individualized sentencing determinations in death penalty cases."). Here, it is nearly certain that, in deliberating on the appropriate punishment for count one, the jury considered the guilty verdicts on two separate counts of capital murder as a factor militating in favor of death, even though one count was invalid. The jury's consideration of this invalid factor very likely skewed its punishment selection.

Indeed, the invalid factors considered here is more prejudicial than the invalid aggravating factor considered by the juries in *Stephens* and *Stringer*. In those cases, the Supreme Court scrutinized death sentences returned after the jury considered aggravating circumstances subsequently invalidated. *Stephens*, 462 U.S. at 885–91; *Stringer*, 503 U.S. at 225. Here, by contrast, Ramirez's jury was permitted to consider an entire unconstitutional count of capital murder. Because consideration of an invalid factor likely influenced the jury's punishment selection, Ramirez's sentence fails to meet the heightened reliability required for capital sentences. *See Stephens*, 462 U.S. at 884. He is entitled to a new sentencing hearing on count one at which the unconstitutional count of capital murder cannot be considered.

# CLAIM TWELVE

**The evidence presented at trial was factually and legally insufficient to convict Ramirez and to sentence him to death, violating Ramirez's Eighth and Fourteenth Amendment rights.**

The evidence at Ramirez's trial factually and legally cannot sustain his conviction and death sentence under the Eighth and Fourteenth Amendment's protections against disproportionate punishment. *See Jackson v. Virginia*, 443 U.S. 307 (1979); *Enmund v. Florida*, 458 U.S. 782 (1982); *Tison v. Arizona*, 481 U.S. 137 (1987).

The Fourteenth Amendment protects a defendant in criminal proceedings against conviction "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also Jackson*, 443 U.S. at 315–16.

Furthermore, the Eighth Amendment does not permit imposition of the death penalty on a defendant who aids and abets a felony during which a murder is committed by others when the defendant does not kill, attempt to kill, or intend that a killing will occur. *Enmund*, 458 U.S. at 797. American criminal law has long considered a defendant's intention—and therefore his moral guilt—to be critical to "the degree of [his] criminal culpability," *Mullaney v. Wilbur*, 421 U.S. 684, 698

(1975), and the Supreme Court has found criminal penalties to be unconstitutionally excessive in the absence of intentional wrongdoing. *Enmund*, 458 U.S. at 800.

Moreover, the Constitution requires "individualized consideration" when imposing a death sentence, *Lockett*, 438 U.S. at 605, which requires the sentencer to focus on "relevant facets of the character and record of the individual offender[.]" *Woodson*, 428 U.S. at 304.

In this case, Ramirez did not kill, nor did he intend to kill. No rational factfinder could readily have found that Ramirez was guilty beyond a reasonable doubt of first-degree murder. *Jackson*, 443 U.S. at 319. Nor does the evidence presented at trial support that Ramirez was a major participant in this crime. *See Tison*, 481 U.S. at 158.

At trial, no evidence physically linked Ramirez to the crime. The State relied on Ramirez's alleged confession and Ramirez's alleged statement about gang involvement to secure Ramirez's conviction of capital murder.[55] Of note, the prosecutor never connected Ramirez to any weapon used at the crime scene nor any DNA evidence. Other than Ramirez's own statement, which was tainted with indications of a false confession, nothing places him at the scene of the crime.

---

[55] As discussed in this Petition, *supra/infra*, Ramirez contests the validity of his statements to police and maintains these statements were taken in violation of his constitutional rights and should have been suppressed.

Even if Ramirez assumes without conceding that his statements to the police were admissible, these statements do not provide proof beyond a reasonable doubt that Ramirez killed or intended to kill anyone the night of the crime. Ramirez's alleged connections to the TCB do not prove he shot anyone or that he was even a major participant in the events leading to the crime. *Tison*, 481 U.S. at 158. Ramirez's statement about the crime only places him at the crime scene with multiple other people, who were all wearing similar facial coverings and clothing. However, Ramirez's statement provides no evidence that Ramirez shot Jerry Hildalgo or the other victims.

Based on these facts, no rational trier of fact could find Ramirez committed capital murder beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. Nor, for purposes of imposing the death penalty, does proof exist that Ramirez had any culpable mental state. Even if Ramirez was present at the crime scene, Ramirez's punishment must be tailored to his personal responsibility and moral guilt. *Enmund*, 458 U.S. at 797.

## CLAIM THIRTEEN

**Ramirez was denied the effective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution.**

Effective assistance of appellate counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. *Evitts*, 469 U.S. at 396 ("A first appeal as of

right . . . is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney."). "[N]ominal representation" during an appeal "does not suffice to render the proceedings constitutionally adequate[.]" *Id*.

The ABA Guidelines are instructive as to what is required of appellate counsel in capital cases. *See, e.g.*, *Rompilla*, 545 U.S. at 387. The ABA Guidelines indicate that "counsel should seek to litigate all issues . . . that are arguably meritorious[.]" 2003 ABA Guideline § 10.15.1(C). In addition, appellate counsel should "make every professionally appropriate effort to present issues in a manner that will preserve them for subsequent review." 2003 ABA Guideline 10.15.1(C).

Ramirez's direct appeal counsel, Larry Warner, failed to do even the minimum constitutionally required of appellate counsel. At the outset, Warner requested and received an additional 180 days to file Ramirez's opening brief. (DA Order, Oct. 31, 2005.) Yet, only six days before the brief was due, Warner moved to abate the appeal claiming he could not submit a brief until the trial court issued written findings relating to Ramirez's motion to suppress. (DA Mot. to Abate, Mar. 31, 2006.) The CCA denied Warner's request, and the April 5, 2006 deadline came

and went without Warner filing a brief on Ramirez's behalf.[56] (DA Order, Apr. 3, 2006.)

Over three months later, Warner finally filed Ramirez's opening brief. The prosecutor described the brief in a letter to Ramirez's post-conviction counsel as violating "a number" of the Rules of Appellate Procedure. (DA Appellant's Prelim. Br., July 10, 2006; Ex. 93.) Warner's rambling and incoherent brief relists the assignments of error four times. (DA Appellant's Prelim. Br. at ii, iii, iv–ix, 7, 13, July 10, 2006.) The brief also repeats the same six paragraphs summarizing Dr. Allen's testimony three times. (DA Appellant's Prelim. Br. at 28–32, July 10, 2006.) Warner concludes with an argument that expert testimony regarding future dangerousness is too speculative despite no such testimony being offered during Ramirez's trial. (DA Appellant's Prelim. Br. at 34–37, July 10, 2006.)

On August 8, 2006, Warner filed a second opening brief. (DA Appellant's Prelim. Br., Aug. 8, 2006.) The prosecutor sent another letter to Ramirez's post-conviction counsel, describing the brief:

> You will also notice that this brief is very hard to follow, with the most difficult part to read being the "Summary of the Evidence" on pages 7–28, which merely contains record references followed by shorthand phrases describing parts of the record.

---

[56] Nearly three months later, the CCA ordered Warner to show cause -- and ultimately held Warner in contempt -- for his failure to file Ramirez's opening brief in a timely manner. (DA Order, June 28, 2006; DA Order, Aug. 16, 2006.)

> I am also not sure why pages 32–34 consist of only a few phrases surrounded by blank space.

(Ex. 94.) Indeed, the brief appears to contain Warner's transcript notes and large passages copied from the transcripts with no relevant argument. (DA Opening Br. *passim*, Aug. 8, 2006.)

Both briefs failed to include a facts section and failed to follow the Texas Rules of Appellate Procedure. The second brief raised issues contradicted by fact and law (*see, e.g.*, *Ramirez*, 2007 WL 4375936, at *7, n.12), and raised the same issues, copied and pasted, multiple times within the same document (*see, e.g.*, DA Opening Br. at 12, 23, 43, 59, 112, Aug. 8, 2006) (repeating the exact same claim on "future dangerousness" on each page; the only thing that changes is font and spacing).

The Court of Criminal Appeals did not find the briefing easier to follow; its opinion includes the phrase, "[t]o the extent that appellant may be claiming," calls one claim "merely speculative," and devotes an entire section to "Inadequately Briefed Points of Error." *Ramirez*, 2007 WL 4375936, at *9, *12, *19–20. These "inadequately briefed claims" include important constitutional issues and violations, such as the unconstitutionality of the death penalty as applied to Ramirez (see Claim Two, *supra*), and various trial court errors including the exclusion of expert mitigation testimony, overruling Ramirez's motion for a mistrial, and admitting

Ramirez's statements without an official translation of non-English words and phrases (see Claim Four, *supra*). *Ramirez*, 2007 WL 4375936, at *19.

Not only did Warner fail to adequately brief many of the issues he did raise, he also failed to raise several meritorious claims. Warner did not challenge the mitigation special issue jury instruction or any other jury instruction errors (see Claim Eleven, *supra*). He failed to challenge the CCA's selection of the "most serious offense" when it set aside one of his convictions on double jeopardy grounds. *Ramirez,* 2007 WL 4375936, at *5 (internal quotation marks omitted) ("The State suggests that we vacate the trial court's judgment and sentence of death for Count Two, and appellant has not expressed a preference in his brief. Thus, we reverse appellant's capital murder conviction and vacate the judgment in Count Two"). And crucially, Warner did not request new penalty phase proceedings after the second conviction was set aside.

Warner failed to raise other due process violations as well. In 1991, the Supreme Court held that the Equal Protection Clause of the Fourteenth Amendment prohibits litigants from peremptorily striking potential jurors based on race. *See Batson*, 476 U.S. at 96; s*ee also Powers*, 499 U.S. at 413–16. The Supreme Court subsequently extended the *Batson* rationale to gender discrimination; thus, litigants cannot remove potential jurors based solely on their gender. *J.E.B.*, 511 U.S. at 140.

Yet Warner did not raise any *Batson* issues even though the State impermissibly used 11 of its 15 (73%) peremptory challenges to remove women from the jury, amounting to a prima facie case of purposeful discrimination. *See, e.g.*, *Miller-El v. State*, 748 S.W.2d 459, 459 (Tex. Crim. App. 1988) (holding that use of 10 of 14 strikes to exclude all but one African American made out a prima facie case).

Warner also failed to present other claims regarding prosecutorial misconduct—misconduct that rose to the level of violating Ramirez's due process rights (see Claim Nine, *supra*). *See, e.g.*, *Berger*, 295 U.S. at 88; *Donnelly*, 416 U.S. at 643. He further failed to raise trial counsel's conflicts of interest, their ineffective assistance (see Claim Three, *supra*), or any issues relating to Ramirez's innocence (see Claim Eight, *supra*). *See, e.g.*, *Cuyler*, 446 U.S. at 349 (1980).

As Ramirez did not even receive "nominal representation" on appeal, his due process rights have been violated and his sentence must be vacated. *Evitts*, 469 U.S. at 396.

## CLAIM FOURTEEN

**The Court of Criminal Appeals of Texas prohibited Ramirez from raising sufficiency of the evidence claims on direct appeal regarding the mitigation special issue in violation of Ramirez's Eighth and Fourteenth Amendment rights.**

The Court of Criminal Appeals of Texas has prohibited defendants from raising sufficiency of the evidence claims on direct appeal regarding the mitigation

special issue. This allows juries to have unfettered discretion over which offenders to sentence to death and violates the Eighth Amendment's prohibition on imposing cruel and unusual punishment and the Fourteenth Amendment's due process protections.

The third special issue submitted to the jury during the punishment phase of Ramirez's trial required the jurors to determine:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is sufficient mitigating circumstances or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(2 CR at 563.) Mitigating evidence was defined as "evidence that a juror might regard as reducing the Defendant's moral blameworthiness." (2 CR at 563.) The mitigation special issue did not assign a burden of proof, and Ramirez's jury answered this question "No." (2 CR at 563.)

A capital sentencing scheme cannot give juries unfettered discretion in determining which offenders to sentence to death. *See Furman v. Georgia*, 408 U.S. 238 (1972) (per curiam). Yet, the CCA has rejected claims raising sufficiency of the evidence regarding the mitigation special issue on direct appeal. *See Prystash v. State*, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999). Even though Texas is not a state that weighs aggravating and mitigating circumstances, similar concerns that led the

Supreme Court to prohibit automatic affirmance of death sentences in weighing states afflict the Texas system. Defendants are not given the individualized treatment on appeal that the Constitution requires. *See Clemons v. Mississippi*, 494 U.S. 738, 752 (1990) (internal citations omitted) ("An automatic rule of affirmance in a weighing State would be invalid [because] . . . it would not give defendants the individualized treatment that would result from actual reweighing of the mix of mitigating factors and aggravating circumstances.").

The CCA's refusal to consider the sufficiency of the evidence regarding the mitigation special issues violates Ramirez's due process rights under the Fourteenth Amendment and his protection against cruel and unusual punishment guaranteed by the Eighth Amendment. Ramirez's sentence is constitutionally infirm, and he is entitled to relief.

## CLAIM FIFTEEN

**Ramirez's post-conviction counsel were ineffective and deprived Ramirez of his constitutional rights to due process and effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution.**

Ramirez was represented by three sets of attorneys throughout his state habeas proceedings. None provided Ramirez with effective assistance, and as a result, Ramirez was denied the opportunity to raise valid legal challenges to his conviction and sentence.

In *Coleman v. Thompson*, the Court stated the general rule that "there is no right to counsel in state collateral proceedings." 501 U.S. 722, 755 (1991). But the Court recognized there might be an exception to that general rule when "state collateral review is the first place a prisoner can present a challenge to his conviction." *Id.* Ramirez submits that there is such an exception and a corresponding right to collateral review counsel under *Douglas v. California*, 372 U.S. 353 (1963), and *Halbert v. Michigan*, 545 U.S. 605 (2005). *Halbert*, building on *Douglas's* constitutionally required appointment of counsel for direct appeal, extended *Douglas* to cases where a defendant sought to appeal from a conviction following a plea, because it was the defendant's "first and likely the only, direct review." 545 U.S. at 617, 618–22. The holdings and rationale in *Douglas* and *Halbert* apply squarely to this case, because with respect to Ramirez's ineffective-assistance-of-trial-counsel claim, the first realistic opportunity for first tier of review available to him is a state post-conviction relief proceeding. *See Trevino*, 569 U.S. at 424–27.

"Without the help of an adequate attorney, a prisoner will have . . . difficulties vindicating a substantial ineffective-assistance-of-trial-counsel claim." *Martinez*, 566 U.S. at 11. Ineffective-assistance claims "often require investigative work and an understanding of trial strategy. When the issue cannot be raised on direct review, moreover, a prisoner asserting an ineffective-assistance-of-trial-counsel claim"

during post-conviction proceedings cannot "rely on a court opinion or the prior work of an attorney addressing that claim." *Id.* at 11–12. Thus, "[t]o present a claim of ineffective assistance at trial in accordance with the State's procedures . . . a prisoner likely needs an effective attorney." *Id.*; *see also Trevino*, 569 U.S. 413.

In addition to the above, because Texas entitles a defendant to the appointment of state post-conviction counsel and provides standards to ensure counsel's competence, due process requires that counsel be effective. *See* Tex. Code Crim. Proc. Ann. art. 11.071(2)(b). Implementation of this statutorily provided right must comport with due process: "when a State opts to act in a field where its action has significant discretionary elements, it must nonetheless act in accord with the dictates of the Constitution—and, in particular, in accord with the Due Process Clause." *Evitts*, 469 U.S. at 401. Due process demands that when a statutory right to counsel is established, the concomitant right to effective assistance of counsel must also be recognized; otherwise, the statutory right would be meaningless. *See id*. at 396 ("[A] party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all.").

Other state courts have recognized that, because their state statutes provide for counsel in post-conviction proceedings, due process demands that counsel perform effectively: "[W]e will not presume that our legislature has mandated some

'useless formality' requiring the mere physical presence of counsel as opposed to effective and competent counsel." *Jackson v. Weber*, 637 N.W.2d 19, 23 (S.D. 2001). Their reasoning has been based on the well-established principle that the right to counsel means the right to the effective assistance of counsel. The Due Process Clause of the Constitution ensures fundamental fairness. If Texas ignores the dictates of its own statute and appoints incompetent counsel, the petitioner is entitled to relief. *Cf. Lozada v. Warden*, 613 A.2d 818, 822 (Conn. 1992) ("[F]undamental fairness opens the door for relief by habeas corpus when the state, in discharging its statutory duty, appoints incompetent counsel.").

Above, in Claim One, Ramirez demonstrates the ineffectiveness of trial counsel, resulting from counsel's failure to investigate signs of Ramirez's serious neurocognitive impairments and mental illness, as well as the failure to investigate the development and expression of those untreated impairments within the context of his unique, individualized psychosocial history. Here, the record shows that the investigative failures of trial counsel were substantially replicated by state post-conviction counsel, thereby satisfying the showing that post-conviction counsel were also constitutionally ineffective within the meaning of *Strickland*. Thus, the failure of post-conviction counsel to raise the substantial claim of trial counsel's ineffectiveness, as set forth in Claim One, was itself ineffective.

As one example, post-conviction counsel had possession of trial counsel's file. That file contained an email showing that trial counsel ignored recommendations that Ramirez be assessed for cognitive deficits and brain damage. (Ex. 103.) But post-conviction counsel repeated trial counsel's error when they ignored advice from their own consulting neuropsychologist, who also recommended that Ramirez undergo a thorough neuropsychological assessment. (Ex. 127.) Instead, despite all the red flags pointing to the need to investigate, post-conviction counsel withdrew any claims that trial counsel was ineffective for failing to investigate Ramirez's mental health. (3 SH Supp CR at 618–19.)

Post-conviction counsel was also ineffective for failing to impeach Ramirez's trial counsel, Alma Garza and Rolando Garza, at the state habeas evidentiary hearing. Alma Garza testified that she was unable to locate Ramirez's mother and one of his sisters, so she was unable to call them to testify during the penalty phase. (Ex. 100 at 109.) Ms. Garza testified these witnesses had moved to Corpus Christi without leaving a forwarding address or phone number. (Ex. 100 at 110.) Co-counsel Rolando Garza provided testimony to the same effect. (Ex. 100 at 22–23.) However, sitting in post-conviction counsel's file were Mrs. Ramirez's psychiatric records. Those records, generated by her Hidalgo County psychiatrist nearly contemporaneous with the penalty phase proceeding, demonstrate that Mrs. Ramirez

was still in Donna for the penalty phase proceedings, that she still had her residence there, and that she wanted to attend the proceedings but was told to stay away by Ms. Garza—thereby putting the lie to trial counsel's post-conviction testimony. (*E.g.*, Ex. 58 at 2.) Being unaware of the content of their own files, post-conviction counsel failed to impeach the Garzas' testimony.

In addition, post-conviction counsel failed to effectively advocate during arguments, and failed to sufficiently investigate (or in some instances failed to raise at all) errors committed by Ramirez's trial counsel. Post-conviction counsel failed to raise errors pertaining to jury selection and instructions, prosecutorial misconduct, and due process, among a significant list of others. *See Claim* 15.

Ramirez's post-conviction counsel failed to bring meritorious claims for state post-conviction review and fell below the standards expected of post-conviction counsel. *See* 2003 ABA Guidelines 10.15.1(C). Ramirez's post-conviction counsel were ineffective. This deprived him of his constitutional rights to due process and the effective assistance of counsel, and he is entitled to relief. Alternatively, post-conviction counsel's ineffectiveness excuses procedural default of claims asserting ineffective assistance of trial counsel alleged herein. *Trevino*, 569 U.S. at 429.

# CLAIM SIXTEEN

**The state court erred in denying Ramirez's motion to test DNA evidence, violating Ramirez's rights under the Fourteenth Amendment's Due Process Clause.**

At Ramirez's trial, the State presented evidence of four hats found at the crime scene. (28 RR at 32; 32 RR at 116, 118; 33 RR at 16.) Two hats were linked through DNA testing to co-defendants of Ramirez—State's Exhibit 302 was consistent with the DNA of Humberto Garza and State's Exhibit 303 was consistent with the DNA of Robert "Bones" Garza. (33 RR at 89–91.) According to witnesses for the State, only these two hats were tested for DNA, and State's Exhibits 211 and 215 were not. (33 RR at 78, 94.)

Prior to trial, Marcial Bocanegra gave a statement to police providing a key break in the case (4 SH RR Ex. 13 ¶ 6), eventually leading to eleven arrest warrants for persons suspected to be involved, including Ramirez. (28 RR at 50–58.) Bocanegra implicated a person known as "Lenny" and told police that Lenny had dropped his "bennie cap" at the crime scene. (4 SH CR at 1711.) Leading up to trial, the State suggested that it could connect Ramirez to the actions of "Lenny" (3 RR at 23–27), and at trial, the State associated Ramirez with the actions prescribed to "Lenny." (27 RR at 43.) However, the State never presented eyewitness evidence

that placed Ramirez at the scene nor did it present any DNA or fingerprint evidence linking Ramirez to the offense.

Post-conviction statements made by Bocanegra cast further doubt that Ramirez committed the actions attributed to "Lenny." In a post-conviction affidavit, Bocanegra unequivocally stated that Ramirez is not "Lenny." (4 SH RR Ex. 14 ¶¶ 3–4.). In a subsequent declaration, Bocanegra admitted that when he gave the pre-trial statement to the police, he had made up the story about a person named "Lenny." (Ex. 109 at 1.) He stated that he "did the actions that [he] attributed to 'Lenny'" and "when [he] described to the police what 'Lenny' did . . . [he] was describing [his] own actions on that date." (Ex. 109 at 1.) These revelations provide support for the claim above that Ramirez is not "Lenny."

In state post-conviction proceedings, Ramirez moved the Texas state court to order post-conviction DNA testing on the two additional hats collected at the scene of the crime. (1 SH DNA CR at 19.) Ramirez argued that the hats had a reasonable likelihood of containing biological materials, were in the State's possession, and were never tested for DNA. (1 SH DNA CR at 25–26.) On May 5, 2021, the Texas Court of Criminal Appeals affirmed the trial court's order denying Ramirez's motion for DNA testing of the two hats. (Opinion, No. AP-77,084, May 5, 2021.)

Exculpatory results from the DNA testing would establish that Ramirez would not have been convicted. First, DNA testing could confirm that Bocanegra is "Lenny." There is a high probability that one of the hats that Ramirez requested DNA testing on was the hat worn by Bocanegra and dropped at the scene. If testing reveals that one of the hats contains Bocanegra's DNA, it would establish that Ramirez is not "Lenny" and he did not commit the actions attributed to "Lenny." Second, exculpatory evidence from the second hat would prove that Ramirez did not participate in the crime at all and without his false confession, discussed above, there is no evidence whatsoever linking him to the crime.

The state court violated Ramirez's federal constitutional rights by not permitting potentially exculpatory evidence be submitted for DNA testing. "[I]f a State establishes postconviction proceedings, [then] these proceedings must comport with due process." *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 293 (1998) (Stevens, J., concurring); *see also Yates v. Aiken*, 484 U.S. 211, 217–18 (1988) (unanimous decision making clear that state post-conviction proceedings are subject to due process protections).

Due Process requires, at *minimum*, that before the State can deprive a defendant of his life, a defendant must receive notice of the State's grounds for denying review of his federal constitutional claim, and an opportunity to be heard

where those grounds turn out to be factually and materially incorrect. *See Woodard*, 523 U.S. at 290 (O'Connor, J., concurring) (recognizing that Due Process protections would be transgressed where capital petitioner failed to receive notice of a clemency hearing and an opportunity to participate in clemency interview prior to his execution, but finding no such transgression to have occurred); *Dusenbery v. United States*, 534 U.S. 161, 167 (2002) (due process requires "notice and an opportunity to be heard" before one is deprived of a constitutionally protected interest); *Woodard*, 523 U.S. at 291 (Stevens, J., concurring) ("There is, however, no room for legitimate debate about whether a living person has a constitutionally protected interest in life. He obviously does.").

Because the right of access to DNA evidence for testing is an essential component to satisfy numerous federal constitutional claims, the state court's denial impeded Ramirez's ability to adequately raise constitutional violations. *See generally Herrera*, 506 U.S. at 404 ("'[A]ctual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."); *Strickland*, 466 U.S. at 687 (requiring defendant to show that counsel's performance was deficient); *Brady*, 373 U.S. at 87 ("[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is

material either to guilt or to punishment . . . ."). In light of these principles, the State's refusal to grant Ramirez access to the DNA evidence violates Ramirez's Fourteenth Amendment rights and Ramirez is entitled to relief.

**CLAIM SEVENTEEN**

**Ramirez's death sentence is unconstitutional.**

**A. Ramirez's execution would be unconstitutional as he suffers from a serious mental illness.**

The Eighth Amendment to the U.S. Constitution prohibits the infliction of cruel and unusual punishments. In defining the contours of that which is "cruel and unusual" under the Eighth Amendment, courts must look to the "evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 101.

In determining whether contemporary standards of decency necessitate a finding that a particular punishment is unconstitutional, courts must look to "objective factors to the maximum possible extent." *Harmelin v. Michigan*, 501 U.S. 957, 1000 (1991) (Kennedy, O'Conner, and Souter J.J., concurring) (internal quotation marks omitted). These factors include: whether state legislation indicates that a national consensus has emerged against a particular punishment (*see, e.g.*, *Roper*, 543 U.S. 551); whether prosecution and sentencing trends indicate the practice is uncommon (*see, e.g.*, *Atkins*, 536 U.S. at 316 ); whether there is a consensus among relevant professional and social organizations (*see, e.g.*, *Atkins*,

409

536 U.S. at 316 n.21; *Thompson*, 487 U.S. at 830); and how the international community views the practice (*see, e.g.*, *Atkins*, 536 U.S. at 316 n.21)).

A court must also exercise its own independent judgment in determining whether a punishment is a disproportionate response, given either the severity of the crime or the moral culpability of the defendant. *See Coker*, 433 U.S. 584. The Supreme Court, citing both objective indicia of consensus and its own reasoned judgment, has identified several classes of defendants for whom the death penalty is unconstitutional. In *Enmund*, 458 U.S. 782, the Court found that sentencing to death those who did not kill, intend to kill, or anticipate that death would occur was an unconstitutionally excessive punishment. In *Atkins*, 536 U.S. at 306, the Court held that the Eighth Amendment prohibits the imposition of the death penalty upon the intellectually disabled because "their disabilities in areas of reasoning, judgment, and control of their impulses" mean they do not act with the requisite level of culpability. And finally, in *Roper*, 543 U.S. 551, the Court held that the Eighth Amendment prohibits the execution of individuals who were juveniles at the time of the offense, because they lacked the culpability of adult offenders.

The same considerations cited by the *Atkins* Court and the *Roper* Court apply equally to individuals with severe mental illness. National consensus supports this conclusion. Of the 27 jurisdictions with death penalty statutes, 23 specifically

address mental illness as a mitigating factor.[57] Representative language is found in the North Carolina statute, which directs the jury to consider whether "[t]he capital felony was committed while the defendant was under the influence of mental or emotional disturbance" and whether "[t]he capacity of the defendant to appreciate the criminality of [his] conduct or to conform [his] conduct to the requirements of law was impaired." N.C. Gen. Stat. Ann. §§ 15A-2000(f)(2), (6). Other statutes

---

[57]     Ala. Code § 13A-5-51 (mental or emotional disturbance and capacity); Ariz. Rev. Stat. Ann. § 13-751(G)(1) (capacity); Ark. Code Ann. § 5-4-605(1) (mental or emotional disturbance and capacity); Cal. Penal Code § 190.3 (same); Fla. Stat. Ann. § 921.141(7) (same); Ind. Code § 35-50-2-9(c) (same); Ky. Rev. Stat. Ann. § 532.025(2)(b) (same); La. Code Crim. Proc. Ann. art. 905.5 (same); Miss. Code Ann. § 99-19-101(6) (same); Mo. Rev. Stat. § 565.032(3) (same); Mont. Code Ann. § 46-18-304(1) (same); Neb. Code § 29-2523 (mental or emotional disturbance); Nev. Rev. Stat. § 200.035 (same); N.C. Gen. Stat. Ann. § 15A-2000(f) (mental or emotional disturbance and capacity); Ohio Rev. Code Ann. § 2929.04(B) (capacity); Or. Rev. Stat. Ann. § 163.150(1) (mental and emotional pressure); 42 Pa. Cons. Stat. Ann. § 9711(e) (capacity); S.C. Code Ann. § 16-3-20(C)(b) (mental or emotional disturbance and capacity); Tenn. Code Ann. § 39-13-204(j) (same); Utah Code Ann. § 76-3-207(4) (same); Wyo. Stat. Ann. § 6-2-102(j); 18 U.S.C. § 3592(a) (same); 18 U.S.C. § 3592(a) (same).

consider whether the impaired capacity was due to "mental disease or defect,"[58] "mental condition,"[59] or "mental illness."[60]

The American Bar Association and nearly every major mental health association in the United States has issued policy statements recommending the banning of the death penalty for severely mentally ill offenders.[61]

---

[58] Ark. Code § 5-4-605(3); Cal. Penal Code § 190.3; Ind. Code § 35-50-2-9(c)(6); La. Code Crim. Proc. art. 905.5(e); Ohio Rev. Code § 2929.04(B)(3); Tenn. Code § 39-13-204(j)(8).

[59] Utah Code § 76-3-207(4)(d).

[60] Ky. Rev. Stat. § 532.025(2)(b)(7).

[61] *See* Am. Bar Ass'n, ABA Recommendation 122A (adopted Aug. 7–8, 2006), https://files.deathpenaltyinfo.org/legacy/documents/122A.pdf (last visited Dec. 18, 2020); Am. Psychiatric Ass'n, *Position Statement on Issues Pertaining to Capital Sentencing and the Death Penalty* (approved Apr. 2020), https://www.psychiatry.org/home/policy-finder?g=f8cb0c95-5e90-420e-84d1-eff893d0b449&Page=3 (last visited Dec. 18, 2020) (stating position that "[d]efendants charged with capital crimes should not be sentenced to death or executed if, at the time of the offense, they had: a mental disorder or disability1 that significantly impaired their capacity (a) to appreciate the nature, consequences or wrongfulness of their conduct, (b) to exercise rational judgment in relation to their conduct, or (c) to conform their conduct to the requirements of the law.); Am. Psychological Ass'n, *Report of the Task Force on Mental Disability and the Death Penalty* (2005), https://www.apa.org/pubs/info/reports/mental-disability-and-death-penalty.pdf (last visited Dec. 18, 2020) (outlining its recommendation to "prohibit execution of persons with severe mental disabilities whose demonstrated impairments of mental and emotional functioning at the time of the offense would render a death sentence disproportionate to their culpability"); Mental Health Am., *Position Statement 54: Death Penalty and People with Mental Illnesses* (approved Mar. 5, 2011), https://www.mhanational.org/issues/position-statement-54-death-

And finally, it is a violation of a customary international law norm to execute a person suffering from a serious mental illness. The Supreme Court has often cited international laws and norms in its Eighth Amendment jurisprudence. *See Atkins*, 536 U.S. at 316 n.21; *Thompson*, 487 U.S. at 830–31; *Enmund*, 458 U.S. at 796 n.22. The United Nations Commission on Human Rights has called for capital punishment countries "[n]ot to impose the death penalty on a person suffering from any form of mental disorder or to execute such person[.]" *See* U.N. Comm'n on Human Rights Res. 2004/67, U.N. Doc. E/CN.4/RES/2004/67 (Apr. 21, 2004); U.N. Comm'n on Human Rights Res. 1996/91, U.N. Doc. E/CN.4/RES/1996/91 (Apr. 28, 1999). A recent report by the U.N. Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions emphasized concern with "the number of death sentences imposed and executions carried out" in the United States, "in particular, in matters involving individuals who are alleged to suffer from mental illness." Report of the Special

---

penalty-and-people-mental-illnesses (last visited Dec. 18, 2020) (declaring position that "defendants should not be executed or sentenced to death if, at the time of the offense, they had a severe mental disorder or disability that significantly impaired their capacity (a) to appreciate the nature, consequences or wrongfulness of their conduct, (b) to exercise rational judgment in relation to conduct, or (c) to conform their conduct to the requirements of the law."); Nat'l Alliance on Mental Illness, *Death Penalty*, https://www.nami.org/Learn-More/Mental-Health-Public-Policy/Death-Penalty (last visited Dec. 18, 2020) (declaring opposition to "the execution of persons with serious mental illness").

Rapporteur on Extrajudicial, Summary or Arbitrary Executions, U.N. Doc. A/HRC/26/36/ADD.2 (June 2, 2014).

The European Union has likewise declared that the execution of persons "suffering from any form of mental disorder . . . [is] contrary to internationally recognized human rights norms and neglect[s] the dignity and worth of the human person." European Union, Delegation of the European Commission to the USA, EU Memorandum on the Death Penalty, presented to United States Assistant Secretary of State for Human Rights (Feb. 25, 2000).

Ramirez has suffered from emotional disturbance and mental illness since childhood. He has been diagnosed as suffering from post-traumatic stress disorder and major depressive disorder with multiple suicide attempts since age 10. As a child, he was found to have impulsive hostility and self-destructive tendencies, among other severe mental and emotional disturbances. (ECF No. 24, Ex. 83 at 23.) Ramirez is severely mentally ill, and therefore lacks personal culpability in the same manner as those who are intellectually disabled. As such, this Court should recognize that the Eighth Amendment's prohibition of cruel and unusual punishment, defined by the "evolving standards of decency that mark the progress of a maturing society," exempts Ramirez from being executed.

**B.      Ramirez's death sentence is inconsistent with the evolving standards of decency that mark the progress of a maturing society.**

Ramirez's death sentence is unconstitutional under the Eighth Amendment to the U.S. Constitution—applied to the States by the Fourteenth Amendment— because the death penalty is inconsistent with evolving standards of decency, is arbitrary and torturous, and serves no valid penological purpose.

Ramirez's death sentence was obtained pursuant to an arbitrary process that failed to limit the death penalty to the worst offenders and instead operated by means of and promoted discrimination based on race. *Furman*, 408 U.S. 238. As a result, Ramirez's death sentence and continued confinement deprive him of his rights to due process, equal protection, and freedom from the infliction of torture and cruel and unusual punishment, as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution; decisional law, and other mandatory rules; and international law as set forth in treaties, customary law, and international human rights law.

Ramirez's sentence of death is further unconstitutional because Ramirez has been and will continue to be confined for a time that is unnecessarily lengthy and under conditions that are torturous and inhumane. Justices of the Supreme Court have increasingly opined that the delay that transpires between a capital prisoner's conviction and his execution violates the Eighth Amendment in light of the current

standards of decency because it subjects the prisoner, in addition to and in anticipation of the forfeiture of his life, to the endurance of many years living under sentence of death under extraordinary psychological duress, as well as extreme physical conditions and social restrictions. *Lackey v. Texas*, 514 U.S. 1045 (1995) (Stevens, J., respecting denial of the petition for writ of certiorari); *Thompson v. McNeil*, 556 U.S. 1114 (2009) (Stevens, J., same); *Glossip v. Gross*, 576 U.S. 863 (2015) (Breyer, J., dissenting); *Davis v. Ayala*, 576 U.S. 257, 285–89 (2015) (Kennedy, J., concurring).

The conditions of confinement on Texas's Death Row are draconian, especially so for an inmate like Ramirez who suffers from serious mental illness. These conditions of confinement dangerously deteriorate prisoners' mental health. There have been multiple suicides in recent years on Texas's Death Row, in addition to many failed attempts.[62]

### 1. There is a national trend towards abolition.

Jurisdictions throughout the country have increasingly repealed or abolished the death penalty, with greater frequency within the past few years, and thus the use of the penalty has become unusual within the meaning of the Eighth Amendment.

---

[62] *See* Eric Dexheimer, *Texas Prison Suicide Rate High Among Inmates in Isolation*, Austin American-Statesman, May 29, 2013 (updated Sept. 25, 2018), https://www.statesman.com/NEWS/20130529/Texas-prison-suicide-rate-high-among-inmates-in-isolation (last visited Dec. 18, 2020).

New York's death penalty was declared unconstitutional in 2004, *People v. LaValle*, 817 N.E.2d 341 (N.Y. 2004), and no legislative or other attempt was made to reinstate it. New Jersey repealed the death penalty in 2007,[63] and New Mexico repealed capital punishment in 2009.[64] Following the commutation of all death sentences by the governor in 2003, Illinois abolished capital punishment in 2011.[65] Connecticut repealed the death penalty in 2012,[66] Maryland did so in 2013,[67] and Washington did so in 2018.[68] Just in the time since Ramirez filed his initial petition

---

[63] Jeremy W. Peters, *Death Penalty Repealed in New Jersey*, N.Y. Times, Dec. 17, 2007, http://www.nytimes.com/2007/12/17/nyregion/17cnd-jersey.html?_r=0 (last visited Dec. 18, 2020).

[64] *Death Penalty Is Repealed in New Mexico*, N.Y. Times, Mar. 18, 2009, http://www.nytimes.com/2009/03/19/us/19execute.html (last visited Dec. 18, 2020).

[65] John Schwartz & Emma G. Fitzsimmons, *Illinois Governor Signs Capital Punishment Ban*, N.Y. Times, Mar. 9, 2011, http://www.nytimes.com/2011/03/10/us/10illinois.html (last visited Dec. 18, 2020).

[66] Laura Bassett, *Connecticut Repeals Death Penalty*, Huffington Post, Apr. 25, 2012, http://www.huffingtonpost.com/2012/04/25/connecticut-repeals-deathpenalty_n_1453331.html (last visited Dec. 18, 2020); *State v. Santiago*, 318 Conn. 1, 33 (2015).

[67] *Maryland: Governor Signs Repeal of the Death Penalty*, N.Y. Times, May 2, 2013, http://www.nytimes.com/2013/05/03/us/maryland-governor-signs-repeal-of-the-death-penalty.html (last visited Dec. 18, 2020).

[68] Kirk Johnson, *Washington State Supreme Court Deems Death Penalty Unconstitutional*, N.Y. Times, Oct. 11, 2018, https://www.nytimes.com/2018/10/11/us/death-penalty-ruling-washington-state.html (last visited Dec. 18, 2020).

in this matter, three additional jurisdictions have repealed their death penalty statutes -- New Hampshire in 2019,[69]Colorado in 2020,[70] and Virginia in 2021.[71]

Numerous other U.S. jurisdictions, while retaining the death penalty on the books, have not carried out any executions in recent years. The military capital punishment system has not executed anyone since 1961. Thirteen states that legally authorize the death penalty have not carried out an execution in the past ten years: California, Indiana, Kansas, Kentucky, Louisiana, Montana, Nevada, North Carolina, Oregon, Pennsylvania, South Carolina, Utah, and Wyoming.

Only nine states have accounted for over 90% of all executions over the last decade, with a single state, Texas, responsible for over 36% (109/301). Death Penalty Information Center, *Searchable Execution Database*, http://www.deathpenaltyinfo.org/views-executions (last visited Dec. 18, 2020).

---

[69]     Kate Taylor and Richard A. Oppel, Jr., *New Hampshire, With a Death Row of 1, Ends Capital Punishment*, N.Y. Times, April 11, 2019, https://www.nytimes.com/ 2019/04/11/us/death-penalty-new-hampshire.html (last visited Dec. 18, 2020).

[70]     Neil Vigdor, *Colorado Abolishes Death Penalty and Commutes Sentences of Death Row Inmates*, N.Y. Times, March 23, 2020, https://www.nytimes.com/2020/ 03/23/us/colorado-death-penalty-repeal.html (last visited Dec. 18, 2020).

[71]     Hailey Neil Vigdor, *Colorado Abolishes*Hailey Fuchs, *Virginia Becomes First Southern State to Abolish the Death Penalty and Commutes Sentences of Death Row Inmates*, N.Y. Times, March 23, 2020, https://www.nytimes.com/ 2020/ 03/23/us/ colorado-death-penalty-repeal.html Mar. 24, 2021, https://www.nytimes.com/ 2021/03/24/us /politics/virginia-death-penalty.html (last visited Jul. 9, 2021).

Even those states which still routinely employ the death penalty have seen a marked drop in executions, as reflected in a steady decline nationally. Executions reached their apex in 1999, when 98 offenders were executed. The ensuing years have shown decreases in executions. In 2018 and 2019, the numbers of offenders executed dropped to 25 and 22, respectively.[72]

The decline in new death sentences handed down by courts is just as stark. In 1995, 310 people were sentenced to death nationwide.[73] By 2004, that number dropped by more than half. In 2019, only 34 people were sentenced to death nationwide.[74]

The executive branches of multiple states have demonstrated concerns about the fairness and appropriateness of the death penalty as well. Governors of California, Oregon, and Pennsylvania have declared official moratoria on

---

[72] *See, e.g.*, Death Penalty Information Center, "Facts about the Death Penalty," updated December 14, 2020, https://files.deathpenaltyinfo.org/documents/pdf/FactSheet.f1607980192.pdf (last visited Dec. 18, 2020).

[73] Tracy L. Snell, U.S. DOJ, Bureau of Just. Stat. Bull. *Capital Punishment 1995* (Dec. 1995), http://www.bjs.gov/index.cfm?ty=pbdetail&iid=468 (last visited Dec. 18, 2020).

[74] *See, e.g.*, Death Penalty Information Center, "The Death Penalty in 2019: Year End Report," December 17, 2019, https://deathpenaltyinfo.org/facts-and-research/dpic-reports/dpic-year-end-reports/the-death-penalty-in-2019-year-end-report (last visited Dec. 18, 2020).

executions.[75] The result is that the death penalty is now actively practiced in just a handful of states.

When assessing the constitutionality of the death penalty for categories of offenders, the United States Supreme Court has examined actual practices rather than simply whether the death penalty was legislatively authorized. *See, e.g.*, *Atkins*, 536 U.S. at 316 ("[E]ven among those States that regularly execute offenders and that have no prohibition with regard to the [intellectually disabled], only five have executed offenders possessing a known IQ less than 70 since we decided *Penry* [, 492 U.S. 302].""); *Roper*, 543 U.S. at 564–65 (noting that although twenty states authorized capital punishment for juveniles, the practice was infrequent, with only three states, Oklahoma, Texas, and Virginia, actually executing juveniles in the prior ten years); *see also Graham*, 560 U.S. at 62 ("Here, an examination of actual sentencing practices in jurisdictions where the sentence in question is permitted by

---

[75] Tim Arango, *California Death Penalty Suspended; 737 Inmates Get Stay of Execution*, N.Y. Times, March 12, 2019, https://www.nytimes.com/2019/03/12/us/ california-death-penalty.html (last visited Dec. 18, 2020); William Yardley, *Oregon Governor Says He Will Block Executions*, N.Y. Times, Nov. 22, 2011, http://www.nytimes.com/2011/11/23/us/oregon-executions-to-be-blocked-by-gov-kitzhaber.html (last visited Dec. 17, 2020); Shelby Sebens, *New Oregon Governor Kate Brown to extend death penalty moratorium*, Reuters, (Feb. 20, 2015), https://www.reuters.com/article/us-usa-politics-oregon-idUSKBN0LO2E420150220 (last visited Dec. 18, 2020) Gov. Tom Wolf, Death Penalty Moratorium Declaration (Feb. 13, 2015), https://www.scribd.com/doc/255668788 /Death-Penalty-Moratorium-Declaration (last visited Dec. 17, 2020).

statute discloses a consensus against its use. Although these statutory schemes contain no explicit prohibition on sentences of life without parole for juvenile nonhomicide offenders, those sentences are most infrequent."); *Miller*, 567 U.S. at 485 (simply counting legislative enactments can present a distorted view).

Capital punishment is infrequently practiced in all but a very few states, and new death sentences are rapidly and consistently declining. The infrequency of the use of the death penalty, relative to the number of death eligible offenders, renders it "truly unusual" and it can now be concluded that a "national consensus has developed against it." *Atkins*, 536 U.S. at 316 (footnote omitted).

## 2. The death penalty is excessive.

The Eighth Amendment proscribes "all excessive punishments, as well as cruel and unusual punishments that may or may not be excessive." *Atkins*, 536 U.S. at 311, n.7. The traditional goals of punishment—deterrence, retribution, incapacitation, and rehabilitation—form the baseline for analyzing excessiveness. *Graham*, 560 U.S. at 71 (discussing "penological justifications" relevant to the Eighth Amendment analysis). The death penalty fails to significantly further these goals in any measurable degree over life imprisonment. *Ring v. Arizona*, 536 U.S. 584, 615 (2002) (Breyer, J., concurring) (concluding that "[s]tudies of deterrence are, at most, inconclusive") (citation omitted); *Glossip*, 576 U.S. at 929–30 (Breyer,

J., dissenting) ("Capital punishment by definition does not rehabilitate. It does, of course, incapacitate the offender. But the major alternative to capital punishment—namely, life in prison without possibility of parole—also incapacitates."); *id.* at 933 ("[W]hatever interest in retribution might be served by the death penalty as currently administered, that interest can be served almost as well by a sentence of life in prison without parole . . .").[76]

Because the death penalty fails to measurably promote any of the principal penological goals over life imprisonment, it is excessive. *Furman*, 408 U.S. at 279 (Brennan, J, concurring) ("If there is a significantly less severe punishment adequate to achieve the purposes for which the punishment is inflicted, the punishment inflicted is unnecessary and therefore excessive." (internal citation omitted)).

### 3. The United States is out of step with the international community's consensus against the death penalty.

Since the 1970s, more than 75 countries have abolished the death penalty for all crimes, bringing the total number of abolitionist countries to 106. 29 additional countries can be considered abolitionist in practice as they have not executed anyone

---

[76] *See also* Justin F. Marceau & Hollis A. Whitson, *The Cost of Colorado's Death Penalty*, 3 U. Denv. Crim. L. Rev. 145, 145 (2013) ("[S]ocial scientists increasingly agree that the deterrence benefits of the death penalty are entirely speculative"); Michael L. Radelet & Traci L. Lacock, *Do Executions Lower Homicide Rates?: The Views Of Leading Criminologists*, 99 J. Crim. Law & Criminology 489, 489–90 (2009).

during the last ten years and are understood to have an established policy or practice of not carrying out executions.[77] The General Assembly of the United Nations, comprising all 193 members of the UN, has repeatedly adopted resolutions calling for countries that still maintain the death penalty "to establish a moratorium on executions with a view to abolishing it."[78]

Additionally, Ramirez's prolonged confinement under sentence of death violates international human rights law.[79] In 1989, the European Court of Human Rights held that the protracted post-conviction, pre-execution confinement is a human rights violation of sufficient magnitude to prohibit the United Kingdom from sending an accused to face such a fate. *Soering v. United Kingdom*, App. No. 14038/88, 11 Eur. H. R. Rep. 439 (1989) (six to eight year delay before execution in Virginia prohibited United Kingdom from extraditing potential capital defendant to that state). The Canadian Supreme Court cited such delays as a relevant consideration in deciding that extradition of a murder suspect to the United States

---

[77]     Death Penalty Information Center, *Abolitionist and Retentionist Countries*, https://www.deathpenaltyinfo.org/abolitionist-and-retentionist-countries (last visited Dec. 18, 2020).

[78]     G.A. Res. 69/186 ¶ 4, U.N. Doc. A/RES/69/186 (Dec. 18, 2014), http://www. un.org/en/ga/search/view_doc.asp?symbol=A/RES/69/186 (last visited Dec. 18, 2020).

[79]     As of this writing, Ramirez has spent over 16 years on Texas's death row.

without first obtaining assurances that the death penalty would not be imposed violated principles of fundamental justice. *United States v. Burns*, 1 S.C.R. 283, 353 (2001).

The U.S. Supreme Court has routinely considered the climate of international opinion in its Eighth Amendment jurisprudence. *See, e.g.*, *Graham*, 560 U.S. at 80 (the Court may look "beyond our Nation's borders for support for its independent conclusion that a particular punishment is cruel and unusual"); *Roper*, 543 U.S. at 575 ("[F]rom the time of the Court's decision in *Trop*, the Court has referred to the laws of other countries and to international authorities as instructive for its interpretation of the Eighth Amendment's prohibition of 'cruel and unusual punishments.'" (citation omitted)).

### 4. Capital punishment has failed to ensure reliability, consistency, and equal protection of the law.

The risk of wrongful execution, the execution of an innocent person, attends all death penalty schemes in the United States. There is evidence of at least 172 exonerations in capital cases throughout the nation.[80] Researchers have estimated that nearly one in twenty (4.1%) of those sentenced to death in the United States from 1973 through 2004 are actually innocent, an unacceptably high error rate given

---

[80] *Facts about the Death Penalty*, Death Penalty Information Center (Dec. 14, 2020),https://files.deathpenaltyinfo.org/documents/pdf/FactSheet.f1607980192.pdf (last visited Dec. 17, 2020).

the consequences.[81] Because due process of law protects the innocent, if there remains the possibility of exoneration, this right should not be foreclosed.

The Eighth Amendment's requirement to eliminate arbitrariness in capital sentencing is undermined by the conflicting demands of consistency in application, and a capital defendant's right to individualized sentencing. These requirements may ultimately be irreconcilable.

The Eighth Amendment prohibits the imposition of a death sentence unless the governing statute reasonably justifies the imposition of a more severe sentence on the defendant compared to others found guilty of murder. Thus, to pass constitutional muster, a death penalty statute must genuinely narrow the subclass of offenders upon whom a sentence of death may be imposed and provide a meaningful basis for distinguishing the few cases in which death is imposed from the many cases in which it is not, and suitably guide the sentencer's discretion. *See, e.g.*, *Furman*, 408 U.S. 238; *Zant*, 462 U.S. at 877.

In conflict with these clearly established U.S. Supreme Court mandates, many death penalty statutes, were designed to, and do, operate in the precise manner the

---

[81] Samuel R. Grossa, Barbara O'Brien, Chen Huc, & Edward H. Kennedy, *Rate of false conviction of criminal defendants who are sentenced to death* 7230–35 (Lee D. Ross ed. PNAS May 20, 2014), https://www.pnas.org/content/111/20/7230 (last visited Dec. 17, 2020).

Supreme Court found violated the Eighth Amendment in *Furman*. Death penalty statutes fail to justify the imposition of a more severe sentence on some defendants than other similarly-situated defendants; permit the imposition of a freakish, wanton, arbitrary, and capricious judgment of death; and allow prosecutors to arbitrarily select defendants for capital prosecution without providing consistent guidelines to ensure reliability. Because of the extraordinary breadth of the future-dangerousness aggravating circumstance, individual prosecutors are afforded virtually unfettered discretion to determine whether to seek death, creating a substantial risk of arbitrariness.

One of the fundamental goals of our criminal justice system is to ensure that justice is meted out fairly, under the law, and not based on improper concerns such as race. Applying the death penalty in a discriminatory manner constitutes functional and structural error. *McCleskey v. Kemp*, 481 U.S. 279, 292 (1987). The denial of equal protection is established where a defendant demonstrates that the prosecutorial authorities' selective enforcement decision is deliberately based upon an arbitrary classification, such as race, ethnicity, national origin, or gender.

Statistical evidence shows disproportionate prosecution of people of color under the Texas death penalty statute. The prosecution of and imposition of the death sentence against Ramirez contributed to "the inevitable loss of confidence in our

judicial system that state-sanctioned discrimination in the courtroom engenders." *J.E.B.*, 511 U.S. at 140.

Many studies have demonstrated the significant role that race plays in the criminal justice system generally, and on the administration of the death penalty in particular. These studies consistently reveal, even after accounting for legitimate non-racial case characteristics, that offenders who kill white people have a higher chance of receiving a death sentence than offenders who kill people of other races. *See, e.g.*, U.S. General Accounting Office, *Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities* (GAO/GGD-90-57, Feb. 1990).

Some states have invoked the persistence of discrimination as a basis for eliminating or restricting the use of the death penalty. Governor Martin O'Malley of Maryland, a state that repealed the death penalty, flatly declared that the death penalty "cannot be administered without racial bias."[82] Connecticut Governor Dannel P. Malloy, signing repeal legislation, observed that he saw discrimination in the administration of the death penalty.[83] Illinois Governor Pat Quinn, signing repeal

---

[82]    Ian Simpson, *Maryland Becomes Latest U.S. State to Abolish Death Penalty*, Reuters, (May 2, 2013), http://mobile.reuters.com/article/idUSBRE9410TQ20130 502 (last visited Dec. 18, 2020).

[83]    Peter Applebome, *Death Penalty Repeal Goes to Connecticut Governor*, N.Y. Times, (April 11, 2012), https://www.nytimes.com/2012/04/12/nyregion/

legislation, similarly commented that it is impossible to design a death penalty system that is consistent and free from discrimination based on race.[84] And New Mexico Governor Bill Richardson, on approving the abolition of capital punishment, stated, "It bothers me greatly that minorities are overrepresented in the prison population and on death row."[85]

The governors of California, Oregon, and Pennsylvania have declared moratoria on executions in their states, and each has cited concerns about racial discrimination and equal justice supporting the moratoria.[86] Additionally, on July 1,

---

connecticut -house-votes-to-repeal-death-penalty.html (last visited Dec. 17, 2020).

[84]     Press Release, *Statement from Governor Pat Quinn on Senate Bill 3539* (Mar. 9, 2011), http://www3.illinois.gov/PressReleases/ShowPressRelease.cfm?Subject ID=2& REcNum=9265 (last visited Dec. 17, 2020).

[85]     Press Release, *Governor Bill Richardson Signs Repeal of the Death Penalty* (Mar. 18 2009), https://deathpenaltyinfo.org/stories/governor-bill-richardson-signs-repeal-of-the-death-penalty (last visited Dec. 18, 2020).

[86]     Governor Gavin Newsom, Exec. Dep't. State of Cal., *Executive Order N-09-19* (Mar. 13, 2019), https://www.gov.ca.gov/wp-content/uploads/2019/03/3.13.19-EO-N-09-19.pdf (last visited Dec. 17, 2020); William Yardley, *Oregon Governor Says He Will Block Executions*, N.Y. Times, (Nov. 22, 2011), http://www.nytimes.com/2011/11/23/us/ oregon-executions-to-be-blocked-by-gov-kitzhaber.html (last visited Dec. 17, 2020); Shelby Sebens, *New Oregon Governor Kate Brown to extend death penalty moratorium,* Reuters, (Feb. 20, 2015), https://www.reuters.com/article/us-usa-politics-oregon-idUSKBN0LO2E420150220idUSKBN0LO2E420150220idUSBN0LO2E4201502 20 (last visited Dec. 17, 2020); Government that Works Statement, *Governor Tom Wolf Announces a Moratorium on the Death Penalty in Pennsylvania*, Feb. 13, 2015,

2021, the United States Department of Justices imposed a moratorium on federal executions.[87]

And there are significant unaddressed, concerns. For example, *Roper* and *Atkins* recognized that certain classes of offenders are on average sufficiently lacking in culpability so as to render their execution unconstitutional. Yet, the severely mentally ill, like Ramirez, whose illness may defy ready categorization but who nevertheless occupy the less-culpable end of the spectrum, remain subject to the death penalty.[88] Indeed, there is growing evidence that the categorical approach to death penalty exclusions exemplified in *Roper* and *Atkins* may have missed the

---

https://www.governor.pa.gov/moratorium-on-the-death-penalty-in-pennsylvania/ (last visited Dec. 17, 2020).

[87] Katie Benner, *Merrick Garland pauses federal executions a year after his predecessor resumed them,* N.Y. Times, (Jul. 1, 2021), https://www.nytimes.com/ 2021/07/01/us/ politics/executions-pause-merrick-garland.html.

[88] *See, e.g.*, *Corcoran v. State*, 774 N.E. 2d 495, 502 (Ind. 2002) (Rucker, J., dissenting) ("[T]he underlying rationale for prohibiting executions of the [intellectually disabled] is just as compelling for prohibiting executions of the seriously mentally ill . . . ."); American Bar Association, Recommendation 122A (recommending "prohibit[ing] execution of persons with severe mental disabilities whose demonstrated impairments of mental and emotional functioning at the time of the offense would render a death sentence disproportionate to their culpability"), https://files.deathpenaltyinfo.org/legacy/documents/122A.pdf (last visited Dec. 18, 2020).

larger picture, and even introduced unintended arbitrariness.[89] It is estimated that as many as 25% of the approximately 3,000 inmates on death row have a serious mental illness, and even this number may significantly underestimate its prevalence.[90] There is a troubling randomness in excluding some groups of less-culpable defendants from execution while allowing the execution of others whose culpability is equally reduced.

There are also wide disparities in the quality of capital counsel and the resources states are willing to provide, introducing additional arbitrariness. This is far from rare. *See* Cory Isaacson, *How Resource Disparity Makes the Death Penalty*

---

[89] *Graham*, 560 U.S. at 75 (acknowledging that "[c]ategorical rules tend to be imperfect . . .."); Stephen B. Bright, *The Role of Race, Poverty, Intellectual Disability, and Mental Illness in the Decline of the Death Penalty*, 49 U. Rich. L. Rev. 671, 687-88 (2015) ("Another reason for arbitrariness is the impossibility of measuring the mental state or level of intellectual functioning of a person accused of a capital crime.").

[90] Rebecca Covarrubias, *Lives in Defense Counsel's Hands: The Problems and Responsibilities of Defense Counsel Representing Mentally Ill or Mentally Retarded Capital Defendants*, 11 The Scholar: St. Mary's Law Rev. On Minority Issues 413, 416, 440 (2009) (noting that mentally ill defendants often mask their symptoms because of the enduring stigma associated with mental illness; counsel often fail to recognize their clients' mental health problems; and lack of funding, before and after conviction, often precludes thorough mental health examinations). *See also* Robert J. Smith, *Forgetting Furman*, 100 Iowa L. Rev. 1149, 1153 (2015) ("Juvenile offenders and the intellectually disabled are categorically exempt from capital punishment due to their insufficient culpability; yet, most of the last hundred people executed in America possessed functional impairments that rivaled or outpaced those endured by the typical adolescent or intellectually disabled person.").

*Unconstitutional: An Eighth Amendment Argument Against Structurally Imbalanced Capital Trials*, 17 Berkeley J. Crim. L. 297, 300 (2012) ("An inadequately resourced defense, when pitted against a much better resourced prosecution, yields distorted capital trials and a consequential risk of arbitrary sentencing outcomes."). Lack of resources and lack of quality counsel remain endemic in capital proceedings.

Notwithstanding the Supreme Court's efforts, the fact remains we have achieved nothing close to the consistency the Constitution requires. *Glossip*, 576 U.S. at 917 (Breyer, J., dissenting) ("Despite the *Gregg* Court's hope for fair administration of the death penalty, 40 years of further experience make it increasingly clear that the death penalty is imposed arbitrarily, *i.e.*, without the 'reasonable consistency' legally necessary to reconcile its use with the Constitution's commands."). Unacceptable levels of arbitrariness persist, and the problem appears to be growing, not abating.

Among others, the people closest to Texas's death penalty mechanism have called for its abolition. In *Ex parte Panetti*, 450 S.W.3d 144 (Tex. Crim. App. 2014), Judge Tom Price of the Texas Court of Criminal Appeals published a thoughtful dissent from the denial of a stay of execution and declared that, having spent forty years as a trial and appellate judge in Texas, the death penalty should be abolished. He cited in support of his position that "[e]volving societal values" militate for

abolition, that the life-without-parole option assures "that the public at large is forever protected from a capital murder defendant, who will never re-enter our society," and perhaps most important that "society is now less convinced of the absolute accuracy of the criminal justice system." *Id.* at 145–46. Because of the many exonerations in Texas and elsewhere, Judge Price noted that "it is wishful thinking to believe that this State will never execute an innocent person for capital murder." *Id.* at 146. He also decried the ineffectiveness of post-conviction counsel whose poor representation of defendants at the initial stage resulted in procedural bars to subsequent, well-drafted petitions. *Id.*

Judge Price is not alone in his opinions. Judge Alcala of the same court has recently published multiple lengthy opinions highlighting the myriad of problems with Texas's capital sentencing scheme. *See, e.g.*, *Ex Parte Murphy*, 495 S.W.3d 282 (Tex. Crim. App. 2016) (Alcala, J., concurring and dissenting); *Ex parte Moore*, 470 S.W.3d 481, 529 (Tex. Crim. App. 2015) (Alcala, J., dissenting), *vacated and remanded by Ex parte Moore*, 137 S. Ct. 1039 (2017).

The death penalty is inhumane, arbitrary, inaccurate, and obsolete. Society has recognized as much and it is now time for the courts to come into line with our evolved standard of decency.

### C. The Texas death penalty scheme violates Ramirez's due process rights as it is unconstitutionally arbitrary.

Due to the prosecutorial discretion established under Texas's system of administering criminal justice, a minority of Texas counties are responsible for a sizable majority of death sentences assessed over the last 36 years. Both geographic and racial disparities have created a system of capital punishment in Texas that punishes not based on the heinousness of a defendant's crime or moral culpability, but on irrelevant factors such as the race of the defendant, the race of the victim, and where the offense was committed. Ramirez's capital sentence was handed down in the midst of this arbitrary system, and he has been denied his rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

The Supreme Court has long held that proceedings surrounding the imposition of a death sentence must meet a "heightened standard of reliability" because of the severe and irreversible nature of the death penalty. *Ford v. Wainwright*, 477 U.S. 399, 411 (1986) ("This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different."). The Court briefly suspended the nation's death penalty in *Furman* during the 1970s based on this heightened standard. 408 U.S. 238. The Court rested its decision because the lack of guidance and narrowing considerations in a jury's decision of who was to receive the death penalty created an arbitrariness too cruel and unusual to withstand constitutional scrutiny. *Id.* at 309 (Stewart, J., concurring)

("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual.").

Following *Furman*, the Court has been careful to weigh a death penalty sentencing scheme to determine whether there are suitable safeguards to prevent the arbitrary assignment of death. *Woodson*, 428 U.S. at 305 (noting "the need for reliability in the determination that death is the appropriate punishment in a specific case"). The Court held that procedural reforms—such as bifurcated trials, narrowing of death-eligible crimes, and proportional appellate review—"focus the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant," thus preventing it from "wantonly and freakishly impos[ing] the death sentence." *Gregg*, 428 U.S. at 206–07.

Even those procedures, however, must be reviewed for their effectiveness in preventing the arbitrary assessment of death. *See, e.g.*, *Godfrey*, 446 U.S. at 432–33 (reviewing the application of Georgia's aggravating factor that a crime be "outrageously or wantonly vile, horrible or inhuman"). When "[t]here is no principled way to distinguish [a] case, in which the death penalty was imposed, from the many cases in which it was not," a state's death penalty scheme can no longer be said to be imposing a death sentence "based on reason rather than caprice or emotion." *Id.* at 433.

The Texas death penalty scheme fails this review, however, as capital punishment continues to be arbitrarily and wantonly applied. While the numbers show that even in Texas a death sentence is becoming increasingly rare as a utilized punishment, there are arbitrary factors at work in imposing a death sentence. Therefore, Texas's system does not function as an "evenhanded, rational, and consistent imposition of death." *Jurek v. Texas*, 428 U.S. 262, 276 (1976).

The factors that create the arbitrary assignment of death have nothing to do with any individual crime, trial, or defendant, but are based on such determinations as geography[91] or race. Studies show that race continues to be a motivating factor

---

[91]  Of the total offenders who either have been executed or are currently housed on death row in Texas since 1976, only 104 out of the 254 counties in Texas have contributed an offender to that list. Tex. Dep't Crim. Just., *Death Row Information*, http://www.tdcj.state.tx.us/death_row/index.html (last visited Dec. 18, 2020); Tex. Dep't Crim. Just., *Number of Offenders Sentenced to Death From Each County*, http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited Dec. 18, 2020). Seven counties (Bexar, Dallas, Harris, Jefferson, Nueces, Smith, and Tarrant) account for nearly eighty percent of these offenders. *Id.* Five additional counties (Cameron, El Paso, Lubbock, Montgomery, and Travis) account for another ten percent. *Id.* Texas is not alone in this phenomenon. A report conducted by the Death Penalty Information Center found that geography is a major factor in whether a person is sentenced to death. Since 1976, 2 percent of the counties in the United States are responsible for 52 percent of all executions and 56 percent of the death row population. Death Penalty Information Center, *The 2% Death Penalty: How a Minority of Counties Produce Most Death Cases at Enormous Cost to All* (2013), http://www.deathpenaltyinfo.org/twopercent#pressrelease (last visited Dec. 18, 2020).

behind imposing the death penalty—even if that factor is unconsciously applied.[92]

Ramirez, as a Hispanic man, was undoubtedly prejudiced by jurors' unconscious biases. When a law is utilized in such a way it becomes more directed at a "particular class of persons," especially in the context of racial discrimination, the implementation of that law violates an individual's right to equal protection under the law. *See Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

For the foregoing reasons, Texas's death penalty scheme is unconstitutional, and Ramirez's sentence of death should be vacated.

### D. Ramirez's execution after fifteen years on death row violates his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the U.S. Constitution.

The Eighth and Fourteenth Amendments require that state-imposed punishment remain within civilized standards. *See Robinson v. California*, 370 U.S. 660, 675 (1962) (Douglas, J., concurring). Ramirez has spent over 16 years on death row, he was arrested for the instant offense when he was only 18 years old. For the

---

[92] *See, e.g.*, David Baldus, et al., *Race and Proportionality Since* McCleskey v. Kemp *(1987): Different Actors with Mixed Strategies of Denial and Avoidance*, 39 Colum. Hum. Rts. L. Rev. 143 (2007); Isaac Unah, *Choosing Those Who Will Die: The Effect of Race, Gender, and Law in Prosecutorial Decision to Seek the Death Penalty in Durham County, North Carolina*, 15 Mich. J. Race & L. 135 (2009-2010) (finding that prosecutors were more likely to pursue capital cases for white victims than black victims); Scott Phillips, *Racial Disparities in the Capital of Capital Punishment*, 45 Hous. L. Rev. 807 (2008) (same); Scott Phillips, *Continued Racial Disparities in the Capital of Capital Punishment: The Rosenthal Era*, 50 Hous. L. Rev. 131 (2012) (same).

reasons below, continuing to detain Ramirez on death row or executing him after so long a confinement, starting at such a young age, does not fall within those civilized bounds.

First, executing Ramirez after so long spent on death row is inconsistent with the history of the Eighth Amendment and foundational British and American jurisprudence. At the time the Bill of Rights was adopted, the Anglo-American legal tradition—which had a direct influence on the framers of the U.S. Constitution—had uniformly denounced undue delays between death sentences and executions as cruel and unusual. *See, e.g.*, 2 William Blackstone, *Commentaries on the Laws of England* 2650 (William C. Jones, ed., 1916) ("It has been well observed that it is of great importance, that [capital] punishment should follow the crime as early as possible[.]"); Cesare Beccaria, *An Essay on Crimes and Punishments* 73 (5th ed. 1804) (immediate punishment will be more just "because it spares the criminal the cruel and superfluous torment of uncertainty . . . ; and because the privation of liberty, being [in and of itself] a punishment, ought to be inflicted before condemnation but for as short a time as possible."); *see also, e.g.*, *Harmelin v. Michigan*, 501 U.S. 957, 966 (1991) (there is no doubt the English Declaration of Rights of 1689, which prohibited "cruel and unusual punishments," is the "antecedent of our constitutional text[s]"); *Ex parte Grossman*, 267 U.S. 87, 108–09

(1925) (Eighteenth-century English criminal jurisprudence is directly relevant to determining what framers intended in drafting the Bill of Rights).

The framers' writings confirm that they also viewed such inordinate delay as inherently "cruel and unusual." *See, e.g.*, 2 The Works of James Wilson 629–30 (Robert McCloskey ed., 1967); 2 The Papers of John Marshall 208 (Univ. of N.C. Press 1977) (clemency petition filed by Marshall and others sought commutation in part because prisoner's execution was delayed five months). Historically, then, executing Ramirez after being incarcerated for more than 18 years would have been considered cruel and unusual.

Second, such a punishment is no less cruel and unusual under modern jurisprudence. The current death-penalty scheme is purported to serve two purposes: retribution and deterrence. *Gregg*, 428 U.S. at 183 (joint opinion of Stewart, Powell, and Stevens, JJ.). But, the "longer the delay, the weaker the justification for imposing the death penalty in terms of punishment's basic retributive or deterrent purposes." *Knight v. Florida*, 528 U.S. 990, 993 (1999) (mem.) (Breyer, J., dissenting from denial of certiorari); *see also Lackey*, 514 U.S. at 1045 (mem.) (Stevens, J., dissenting from denial of certiorari) ("It is arguable that neither [retribution nor deterrence] retains any force for prisoners who have spent some 17 years under a sentence of death."). The lengthy delay between the day of incarceration and the day

of execution "can inflict 'horrible feelings' and 'in (sic) immense mental anxiety amounting to a great increase of the offender's punishment.'" *Foster v. Florida*, 537 U.S. 990, 991 (2002) (mem.) (Breyer, J., dissenting from denial of certiorari) (quoting *In re Medley*, 134 U.S. 160, 172 (1890)).

After inflicting such anxiety on the petitioner by making him wait long periods before carrying out his death sentence, the State hardly furthers the goal of retribution by finally executing him. *See, e.g.*, *Dist. Att'y for the Suffolk Dist. v. Watson*, 411 N.E.2d 1274, 1287 (Mass. 1980). Further, the added deterrent effect of executing someone who has spent a long time on death row awaiting his execution is slight. *See Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (mem.) (Stevens, J., concurring in the denial of certiorari). When the death penalty ceases to realistically further the purposes of retribution and deterrence, its imposition is simply "the pointless and needless extinction of life with only marginal contributions to any discernible social or public purposes." *Lackey*, 514 U.S. at 1046 (mem.) (Stevens J., dissenting from denial of certiorari) (quoting *Furman*, 408 U.S. at 312 (White, J., concurring)). "A penalty with such negligible returns to the State would be patently excessive and cruel and unusual punishment violative of the Eighth Amendment." *Id*.

Any penological goals served when Ramirez was first sentenced to death no longer apply. Executing Ramirez, almost two decades after the crime for which he was condemned, can have no deterrent or retributive purpose.

Third, the stress of living under threat of death for lengthy periods is so oppressive that it, on its own, can constitute cruel and inhumane treatment. Conditions of confinement on death row can be "so degrading and brutalizing to the human spirit as to constitute psychological torture." *People v. Anderson*, 493 P.2d 880, 894 (Cal. 1972), *superseded as stated in Strauss v. Horton*, 207 P.3d 48 (Cal. 2009); *see also Solesbee v. Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting) ("[T]he onset of insanity while awaiting execution of a death sentence is not a rare phenomenon."); *In re Medley*, 134 U.S. at 172 ("[W]hen a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it."). "Whatever one believes about the cruelty of the death penalty itself, this violence done to the prisoner's mind must afflict the conscience of enlightened government and give the civilized heart no rest." *Watson*, 411 N.E.2d at 1291 (Liacos, J., concurring). Foreign courts have similarly found that extended delay in imposing a death sentence "renders ultimate execution inhuman, degrading, or unusually cruel." *Knight*, 528 U.S. at 990 (Breyer,

J., dissenting from denial of certiorari). Then, such cruel treatment also renders any further punishment, namely execution, unconstitutional.

Finally, Ramirez has spent his 16 years on death row in solitary confinement. The conditions of confinement on Texas's Death Row are draconian: at the Polunsky Unit, inmates under a sentence of death are automatically and permanently housed in solitary confinement. *See* Burke Butler, *Liman Report: Solitary Confinement on Texas's Death Row*, Yale Law Sch. Arthur Liman Pub. Interest Prog. (Oct. 24, 2014). For two days a week, inmates are confined to these steel-door-enclosed cells twenty-four hours each day, with only a few minutes outside of their cells to shower. The other five days per week, inmates are permitted a maximum of two hours per day in a recreation area—a cage slightly larger than their cells. Dave Mann, *Solitary Men*, Texas Observer (Nov. 10, 2010), https://www.texasobserver.org/solitary-men/ (last visited Dec. 18, 2020). All visits are conducted through glass with both the visitor and the prisoner communicating through a telephone bolted to the wall. Inmates receive no educational programming, and outside ministerial and spiritual advisors may visit only at the warden's discretion. These conditions of confinement dangerously deteriorate prisoners' mental health. *See* Kathleen M. Flynn, Note, *The "Agony of Suspense": How Protracted Death Row Confinement Gives Rise to an*

*Eighth Amendment Claim of Cruel and Unusual Punishment*, 54 Wash. & Lee L. Rev. 291, 294–98 & nn.25–38 (1997).

The "added punishment" on prisoners in solitary confinement is not a revelation of modern psychology. *See Ayala*, 576 U.S. at 288 (Kennedy, J., concurring). The Court in 1890 recognized time spent in solitary confinement awaiting execution as "an additional punishment of the most important and painful character," *In re Medley*, 134 U.S. at 171 (Brewer and Bradley, JJ., dissenting), and "research still confirms what [the] Court suggested over a century ago: Years on end of near-total isolation exact a terrible price." *Ayala*, 576 U.S. at 289 (Kennedy, J., concurring). The American Bar Association and the United Nations Special Rapporteur on Torture have recommended limitations on solitary confinement. *See Glossip*, 576 U.S. at 925–26 (Breyer, J., dissenting).

Given the length of time Ramirez has already spent on death row, the conditions of confinement, including the unique stress of living under threat of execution, historical understandings of "cruel and unusual" punishment, and the evolving standards of decency, executing Ramirez at this time would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution.

### E. Ramirez's mental impairments render him insufficiently culpable, and thus ineligible, for the death penalty.

442

The Supreme Court has held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of individuals with intellectual disabilities. *Atkins*, 536 U.S. at 321. The Court determined that there was a national consensus prohibiting the execution of people with diminished capacity, given their inability to fully comprehend actions or their consequences. *Id.* at 320–21. Persons with intellectual impairments, by definition, have "diminished capacities to understand and process information, . . . to engage in logical reasoning, [and] to control [their] impulses." *Atkins*, 536 U.S. at 318.

Recognizing these cognitive deficits, the Court found that "the large number of States prohibiting the execution of [intellectually disabled] persons . . . provides powerful evidence that . . . our society views [intellectually disabled] offenders as categorically less culpable than the average criminal." *Id.* at 315–16. The Court reaffirmed the importance of decision-making and impulse control on culpability when it extended immunity from execution to juveniles in *Roper*, 543 U.S. at 571.

Executing persons with diminished capacity serves no legitimate goal of criminal punishment. Unless imposing the death penalty "measurably contributes" to one or both of the penological goals of retribution or deterrence, "it is nothing more than the purposeless and needless imposition of pain and suffering, and hence an unconstitutional punishment." *Enmund*, 458 U.S. at 798 (internal quotation marks

443

and citation omitted). When faced with capital punishment, "the lesser culpability" of impaired offenders "surely does not merit that form of retribution." *Atkins*, 536 U.S. at 319. And the deterrent value of punishment is reduced when an individual's cognitive and behavioral impairments "make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information." *Id.* at 320.

Finally, the reduced capacity of impaired offenders increases the risk that "the death penalty will be imposed in spite of factors which may call for a less severe penalty . . ." *Id.* at 320 (internal quotation marks and citation omitted). Intellectually disabled individuals are less able to "make a persuasive showing of mitigation . . . are typically poor witnesses, and their demeanor may create an unwarranted impression of lack of remorse . . ." *Id.* at 320–21. Intellectual disability is often inaccurately viewed by juries as an aggravating factor, rather than as mitigating. Such defendants are also less able to give meaningful assistance to their counsel. Each of these factors demonstrated that persons with intellectual disability "face a special risk of wrongful execution." *Id.* at 321.

While *Atkins* spoke of defendants with intellectual disabilities, Ramirez's diminished capacity and mental impairments similarly render him insufficiently culpable and ineligible for the death penalty. Beginning in early primary school,

Ramirez suffered from deficits in brain functioning associated with a severe learning disability, "a neurological disorder that impairs [his] brain's ability to receive, process, store, and respond to information." (ECF No. 30-3 at 54, 60, Ex. 83 at 4, 10.) His school records repeatedly substantiate his ongoing struggles with low cognitive functioning and neurological impairments. (ECF No. 24 at 63–71, Ex. 83 at 13–21.) Ramirez's cognitive, neurological, and intellectual disabilities result in a lack of impulse control, the inability to anticipate the future consequences of his actions, poor perceptions of social cues, and suggestibility. (ECF No. 24 at 60, Ex. 83 at 10.) Moreover, Ramirez has an injury to the frontal lobes of his brain, impairing his executive functioning ability. (ECF No. 24 at 54, Ex. 84 at 4.) Ramirez suffers from cognitive deficits. (ECF No. 24 at 54, Ex. 84 at 4.) These mental impairments mirror those highlighted by the Supreme Court to support the ban on the execution of the intellectually disabled. *Atkins*, 536 U.S. at 315–21.

The imposition of the death penalty would be grossly disproportionate to Ramirez's moral culpability, would not "measurably advance the deterrent or the retributive purpose of the death penalty," and carries an enhanced risk of error. *Id.* at 320–21. For these reasons, this Court should vacate Ramirez's death sentence.

**F.** **Ramirez's constitutional rights were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence.**

The "10–12" jury instruction in the Texas capital sentencing scheme violates Ramirez's rights under the Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution, as it unconstitutionally encourages arbitrary and capricious death sentences.

When the U.S. Supreme Court reinstated the death penalty in *Gregg*, 428 U.S. at 188, it did so only after it was satisfied that Georgia's death penalty statute would "not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner." Otherwise put, a death penalty statute would run afoul of the Constitution if it lacked a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." *Id.* (quoting *Furman*, 408 U.S. at 313 (White, J., concurring) (per curiam)). The *Gregg* Court noted that, for a death statute to be constitutional, the sentencing body's "discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." 428 U.S. at 189. To do so, the sentencing jury must be "apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Id.* at 195.

Under Texas law, up to three special issues are submitted to the jury during the sentencing phase of a capital trial: (1) whether there is a probability that the defendant constitutes a continuing threat to society; (2) whether the defendant

actually caused, intended, or anticipated the death of the deceased; and (3) whether, considering all the evidence, there are sufficient mitigating circumstances to warrant life without parole rather than death. Tex. Code Crim. Proc. art. 37.071 §§ 2(b)(1)-(2), (e)(1). The court must sentence a defendant to death if the jury answers "yes" to the first two special issues and "no" to the third special issue. If the jury returns a "no" answer to either of the first two special issues, a "yes" to the third special issue, or if the jury is unable to answer all the questions submitted under these guidelines, the court shall sentence the defendant to life without parole. Tex. Code Crim. Proc. art. 37.071 § 2(g).

However, the jury is statutorily misinformed about the full impact of the way it answers these special issues. The jury is instructed that it cannot answer "Yes" to either of the first two special issues without unanimous agreement and that it cannot answer "No" to those questions unless at least ten jurors agree. Tex. Code Crim. Proc. art. 37.071 § 2(d)(2). Similarly, the jury is instructed that it may not answer "No" to the third special issue without unanimous agreement and that it may only answer "Yes" if at least ten or more jurors agree. Tex. Code Crim. Proc. art. 37.071 § 2(f)(2). The jury is informed by the judge that if the jury unanimously finds a mitigating circumstance under the third special issue, the defendant will be

sentenced to life without parole. Tex. Code Crim. Proc. art. 37.071 (e)(2).[93] Critically, the statute expressly bars the jury from being instructed that if the jury cannot reach a unanimous or at-least-ten verdict on either of the first two special issues, the trial court must sentence the defendant to life in prison. Tex. Code Crim. Proc. art. 37.071 § 2(a) (barring instruction on the effect of a failure to agree); *Id.* § 2(g) (life sentence required if jury cannot agree).

The statute and the confusing instructions create a scenario in which the opposite of "unanimous" is "ten people agree." Clearly, deliberations in a jury room on a death sentence could reach multiple outcomes that fall into neither category: a vote of 9–3, 8–4, 7–5, and so on. However, juries are given no instruction on how to proceed if that likely scenario plays out. Instead, jurors are instructed that, in order to make the predicate findings that would result in a sentence of life imprisonment, "10 or more jurors [must] agree."

The instruction thus violates *Mills v. Maryland*, 486 U.S. 367 (1988). As in *Mills*, a reasonable juror could understand the jury charge to mean that her single vote for life imprisonment would have no effect. *Mills*, 486 U.S. at 375–76; *Francis v. Franklin*, 471 U.S. 307, 315–16 (1985). Ramirez's jury was instructed that it "may

---

[93] Though the current statute has the language "life imprisonment *without parole*," Ramirez's jury was instructed only on "life imprisonment" because his offense occurred on January 5, 2003, before Texas law and the jury instruction on this point was changed.

not answer" special issue number three "yes" (mitigation warrants a life sentence) "unless 10 or more jurors agree." (39 RR at 115.) On its face, this is precisely the kind of ambiguity that the Constitution does not tolerate in a capital sentencing scheme. *Lockett*, 438 U.S. at 605 ("[T]he risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty . . . is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments."); *Andres v. United States*, 333 U.S. 740, 752 (1948) ("That reasonable men might derive a meaning from the instructions given other than the proper meaning . . . is probable. In death cases doubts such as those presented here should be resolved in favor of the accused.").

The statute and instructions also create an unconstitutional risk of jury coercion, wherein the jurors perceive that they must reach a certain result. *See Jenkins v. United States*, 380 U.S. 445, 446 (1965) (per curiam). The instruction is also contrary to *Wiggins*, which held that a death sentence cannot stand if a single juror strikes a different balance in weighing the mitigating circumstances. *Wiggins*, 539 U.S. at 537.

This portion of the jury instruction, which suggests that it requires the agreement of ten out of twelve jurors to find "no" on the first two special issues and to find "yes" on special issue three, unconstitutionally diminished each juror's

individual sense of responsibility in the sentencing process in violation of the Eighth Amendment. The plain language of the statute creates the impression that one juror's dissent from the remaining members of the jury, without the agreement of at least one other juror, would not make a difference in determining either of the first two special issues or the ultimate sentence the jury imposes. This instruction is also a violation of *Caldwell v. Mississippi*, 472 U.S. 320 (1985). By actively misleading potential holdout jurors to believe their individual votes will not change the outcome, the instruction injects arbitrariness and unfairness into the penalty phase, in violation of Ramirez's due process rights.

### G. Texas's capital sentencing scheme violated Ramirez's rights by failing to require the jury find each element necessary to impose the death penalty beyond a reasonable doubt.

Texas's capital sentencing scheme is facially unconstitutional because it violates the Sixth and Fourteenth Amendments' requirements that each fact necessary to impose death be found by a jury beyond a reasonable doubt. As discussed in Claim Eighteen (F) *supra*, special issues are found by the jury under Texas law. Although special issue one and two must be found beyond a reasonable doubt, *see* Tex. Code Crim. Proc. art. 37.071 § 2(c), special issue three—whether mitigation evidence warrants a life sentence—need not be found beyond a reasonable doubt, *see id.* § 2(e)(1).

The jury's finding on special issue three is a finding of fact that exposes a defendant to a greater punishment—a sentence of death—and must therefore be found beyond a reasonable doubt. Without the jury's finding on special issue three, a sentence of death cannot be imposed under Texas law. *See* Tex. Code Crim. Proc. art. 37.071 § 2(g) ("If the jury . . . is unable to answer any issue submitted under Subsection (b) or (e), the court shall sentence the defendant to confinement in the Texas Department of Criminal Justice for life imprisonment without parole."). Texas's capital sentencing scheme therefore violates the Constitution.

The Sixth Amendment provides that, "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . ." This right, with the Due Process Clause, requires that each element of a crime be proved to a jury beyond a reasonable doubt. *Alleyne v. United States*, 570 U.S. 99, 104 (2013). In *Apprendi v. New Jersey*, 530 U.S. 466, 494 (2000), the Supreme Court held that any fact that "expose[s] the defendant to a greater punishment than that authorized by the jury's guilty verdict" is an "element" that must be submitted to a jury.

Shortly after *Apprendi*, the Supreme Court invalidated Arizona's capital sentencing scheme in *Ring*, 536 U.S. 584. In Arizona, judges were charged with finding aggravating circumstances that would increase the maximum punishment for

451

murder from life in prison to a sentence of death. *Ring*, 536 U.S. at 592. The Court held that, "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it— must be found by a jury beyond a reasonable doubt." *Id.* at 602; *see also id.* at 610 (Scalia, J., concurring) ("I believe that the fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane—must be found by the jury beyond a reasonable doubt."); *Blakely v. Washington*, 542 U.S. 296, 301–02 (2004) (quoting *Apprendi* for proposition that any fact that increases penalty "must be submitted to a jury, and proved beyond a reasonable doubt").

These principles were powerfully applied to invalidate state capital sentencing schemes by the U.S. Supreme Court in *Hurst v. Florida*, 577 U.S. 92 (2016). In *Hurst*, the U.S. Supreme Court invalidated Florida's death penalty scheme because it violated the Sixth Amendment by allowing for a non-unanimous, standardless jury verdict that served as a recommendation to the sentencing judge. The Court adopted the logic in *Apprendi*, that to comply with the Sixth Amendment, the focus should be on the finding of facts that expose a defendant to a greater punishment. *Id.* at 97 (citing *Apprendi*, 530 U.S. at 494).

The Sixth Amendment requires that: "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602; *see also Blakely*, 542 U.S. at 301–02; *Hurst*, 577 U.S. at 97; *Hurst v. State*, 202 So. 3d 40, 53 (Fla. 2016) *receded from in part by State v. Poole*, 297 So. 3d 487 (Fla. 2020).; *Rauf v. State*, 145 A.3d 430, 434 (Del. 2016) ("must the jury [find whether the aggravating circumstances outweigh the mitigating circumstances] unanimously and beyond a reasonable doubt to comport with federal constitutional standards? **Yes**.") (emphasis in the original).

The reasoning in *Ring*, *Apprendi*, and *Hurst* about the Sixth Amendment's jury trial right also renders the Texas capital sentencing scheme unconstitutional. Applying those principles to Texas's death penalty scheme, the finding in special issue three is a finding of fact necessary for the imposition of a sentence of death. Tex. Code Crim. Proc. art. 37.071. If a jury makes no finding, the sentence is life. *Id.* Thus, the special-issue-three finding is a finding of fact that increases a defendant's possible penalty from a penalty of life to a penalty of death. The Sixth Amendment mandates it must be made unanimously and beyond a reasonable doubt. Texas's statute falls short of that standard and therefore violates the Sixth Amendment. Ramirez's death sentence must be vacated.

**H. Texas's capital sentencing scheme unconstitutionally limits what constitutes mitigation in violation of Ramirez's Eighth and Fourteenth Amendment rights.**

The "Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604–05 (footnote and emphasis omitted) ("[A] statute that prevents the sentencer in all capital cases from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation creates the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty."). *Id.* at 605. Texas's statute governing capital trials expressly limits the evidence that a jury may consider mitigating, in violation of this constitutional mandate.

Texas's statute requires the trial court to instruct the jury that it "shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's *moral blameworthiness*." Tex. Code Crim. Proc. art. 37.071 §2 (e)(4) (emphasis added). No further definition of "moral blameworthiness" is provided. Nor are there further instructions regarding the relationship between this instruction and the dictates of the special issue itself.

Texas's statute unconstitutionally limits the categories of evidence a capital jury may find mitigating. The Supreme Court has long required that a jury "must be permitted to 'consider fully' [] mitigating evidence" and that such consideration is meaningless "unless the jury not only [has] such evidence available to it, but also [is] permitted to give that evidence meaningful, mitigating effect in imposing the ultimate sentence." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 260 (2007) (quoting *Penry*, 492 U.S. at 321, 323, *abrogated on other grounds by Atkins*, 536 U.S. 304).

Each juror must have broad discretion to give impact to the mitigation evidence put forward by the defense and cannot be limited to certain categories of evidence the state approves as mitigating. *Tennard v. Dretke*, 542 U.S. 274, 285 (2004) ("[A] State cannot bar the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.") (internal quotations marks and citation omitted); *McCleskey*, 481 U.S. at 304 ("[T]he Constitution limits a State's ability to narrow a sentencer's discretion to consider relevant evidence that might cause it to decline to impose the death sentence.") (emphasis removed).

The avenues of mitigation open to a capital jury are not, and must not be, limited to evidence that relates solely to the defendant's culpability for the crime, the nature of the crime, or even what the crime says about that individual defendant. *Abdul-Kabir*, 550 U.S. at 246 ("[S]entencing juries must be able to give meaningful

consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.").

The trial court in Ramirez's case gave the statutorily required instructions during the punishment phase of trial before the jury retired to deliberate. (39 RR at 116.) The instruction precluded the jury from giving effect to any category of mitigation evidence that did not specifically relate to Ramirez's "moral blameworthiness." "[W]hen the jury is not permitted to give meaningful effect or a 'reasoned moral response' to a defendant's mitigating evidence—because it is forbidden from doing so by statute or a judicial interpretation of a statute—the sentencing process is fatally flawed." *Abdul-Kabir*, 550 U.S. at 264.

Here, application of the Texas death penalty statute impaired Ramirez's right to have *all* mitigating evidence considered by the jurors assessing whether he deserved a life or death sentence. *Penry*, 492 U.S. at 320 ("[T]he Texas death penalty statute was applied in an unconstitutional manner by precluding the jury from acting upon the particular mitigating evidence [the defendant] introduced."). Ramirez's death sentence should be vacated.

**I.      The capital-sentencing scheme under which Ramirez was sentenced fails to ensure a proportionality review in violation of the Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution.**

The Texas capital-sentencing scheme fails to ensure a comparative proportionality review of Ramirez's death sentence, rendering the sentence unconstitutional. When the U.S. Supreme Court sanctioned the modern death-penalty scheme, it did so based on the belief that state supreme courts would conduct careful and effective proportionality reviews in individual cases to guard against the arbitrary and capricious infliction of the death penalty. *See Gregg*, 428 U.S. at 203–06 (joint opinion of Stewart, Powell, and Stevens, JJ.) (highlighting proportionality review on appeal as an important protection against caprice in sentencing); *Proffitt v. Florida*, 428 U.S. 242, 258 (1976) (joint opinion of Stewart, Powell, and Stevens, JJ.) (same); *see also Glossip*, 576 U.S. at 921–22 (Breyer, J., dissenting) (recognizing the importance of comparative proportionality review to avoid arbitrary imposition of the death penalty). *But see Pulley v. Harris*, 465 U.S. 37, 50–51 (1984). The Texas appellate courts, however, do not ensure this procedural safeguard. *See id.* at 44. The denial of proportionality review allows for the death penalty to be applied arbitrarily in Texas and violates the Fifth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

Ramirez's sentence, affirmed without such a review, is constitutionally unsound, and Ramirez is entitled to relief.

**J.      Texas's capital-sentencing scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because it does not sufficiently channel the sentencer's discretion or sufficiently narrow the class of death-eligible defendants.**

In *Furman*, the U.S. Supreme Court declared that a death-sentencing procedure is unconstitutional when it provides "no meaningful basis for distinguishing the few cases in which [death] is imposed from the many cases in which it is not." 408 U.S. at 313 (White, J., concurring) (per curiam); *see also, e.g.*, *Maynard v. Cartwright*, 486 U.S. 356, 362 (1988); *Godfrey*, 446 U.S. at 427–28 (plurality opinion). "*Furman* mandates that where discretion is afforded a sentencing body on a matter so grave as the determination of whether a human life should be taken or spared, that discretion must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Gregg*, 428 U.S. at 189 (joint opinion of Stewart, Powell, and Stevens, JJ.).

The narrowing process must moreover be established by statute. *See id.* at 207 (stating that the selection of the persons eligible to be prosecuted and ultimately sentenced to death "[must] always [be] circumscribed by . . . legislative guidelines"). "Part of a State's responsibility in this regard is to define the crimes for which death may be the sentence in a way that obviates 'standardless [sentencing] discretion.'" *Godfrey*, 446 U.S. at 428 (alteration in original) (quoting *Gregg*, 428 U.S. at 196). Ultimately, "[t]o pass constitutional muster, a capital sentencing scheme must

'genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Lowenfield v. Phelps*, 484 U.S. 231, 244 (1988) (quoting *Zant*, 462 U.S. at 877).

Texas's death penalty statute violates these mandates of the U.S. Supreme Court. Per Texas Penal Code § 19.02, the mens rea required for murder is intentionally or knowingly causing the death of an individual. Capital murder is murder committed under one of the enumerated offenses under the statute. *See* Tex. Penal Code § 19.03. Under the capital murder statute, a broad range of conduct constitutes first-degree murder, including intentional killings, premeditated killings, killings committed in the course of a myriad of other crimes, and the killings of law enforcement officers in the line of duty. *See id*. Thus, the initial "pool" of individuals eligible for the death penalty is so broadly defined that it encompasses the vast majority of murders actually committed. This is seen by reading the statute, which only distinguishes between murder and manslaughter; there is no statutory recognition of non-capital murder (e.g. second-degree murder). Tex. Penal Code § 19.01. A thorough review of the actual cases would demonstrate that most murders in Texas could be categorized as first-degree murder. That there is no further statutory narrowing renders the Texas death-penalty scheme unconstitutional.

459

Given the failure of the Texas statute to narrow the class of death-eligible defendants, the function is ostensibly performed by the jury. However, there is no statute to channel the sentencer's discretion in determining whether a crime deserves capital punishment. Once the State has proven capital murder, the jury may then only consider mitigation that has been *limited* by statute to spare a defendant a capital sentence. Tex. Code Crim. Proc. art. 37.071 §2 (f)(4); *see* Claim Eighteen (I) *supra*.

Nothing in Texas's capital sentencing scheme "genuinely narrow[s] the class of persons eligible for the death penalty" or assists the jury in reasonably determining to "justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder.'" *Stephens*, 462 U.S. at 877. Because Ramirez was sentenced under Texas statutes which fail to meet constitutional requirements, Ramirez's sentence is constitutionally infirm and he is entitled to relief.

**K.** **Texas's capital-sentencing scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because it affords the prosecutor unbridled discretion to seek the death penalty.**

In Texas, each prosecutor has the sole authority and complete discretion to determine whether to seek the death penalty as a sentencing option, following his or her unreviewable determination that a defendant has committed capital murder. *See Jurek*, 428 U.S. at 274. This discretion is limited only by the whims of each individual prosecutor as to which cases are appropriate for the death penalty. Texas's

scheme thus allows arbitrary and capricious charging decisions and creates a substantial risk of variation between similar cases. Such "arbitrary and wanton" discretion, *Woodson*, 428 U.S. at 303 (joint opinion of Stewart, Powell, and Stevens, JJ.), leads to the "wanton[] and freakish[]" imposition of the death sentence. *Furman*, 408 U.S. at 310 (Stewart, J., concurring) (per curiam). *But see Jurek*, 428 U.S. at 274.

Indeed, unbridled prosecutorial discretion has led to the arbitrary imposition of death sentences across Texas—where a defendant is brought to trial, and thus which State office will handle a case, has greater bearing on whether a capital sentence is sought than any individualized determination about the case itself, the defendant, or the crime.[94]

The fact that Texas prosecutors have unbridled discretion to seek the death penalty violates the Eighth and Fourteenth Amendments. Ramirez's death sentence must therefore be vacated.

---

[94] Of the total offenders who either have been executed or are currently housed on death row in Texas since 1976, only 104 out of the 254 counties in Texas have contributed an offender to that list. Tex. Dep't Crim. Just., *Death Row Information*, http://www.tdcj.state.tx.us/death_row/index.html (last visited Dec. 18, 2020); Tex. Dept. Crim. Just., *Number of Offenders Sentenced to Death From Each County*, http://www.tdcj.state.tx.us/death_row/dr_number_sentenced_death_county.html (last visited Dec. 18, 2020). Seven counties (Bexar, Dallas, Harris, Jefferson, Nueces, Smith, and Tarrant) account for nearly eighty percent of these offenders. *Id.*

**L.    It is a violation of the Eighth Amendment to convict someone in Texas of capital murder under the State's law of parties.**

Per U.S. Supreme Court precedent, capital punishment is only proportionate when used for "'a narrow category of the most serious crimes' and whose extreme culpability makes them 'the most deserving of execution.'" *Kennedy*, 554 U.S. at 420 (quoting *Roper*, 543 U.S. at 568); *see also Simmons*, 543 U.S. at 568 (recognizing that the death penalty should be reserved for "the worst of the worst"). Under the Eighth Amendment, a death sentence is excessive when it is grossly out of proportion to the crime or it does not fulfill the two distinct social purposes served by the death penalty: retribution and deterrence of capital crimes. *Gregg*, 428 U.S. at 173, 183, 187.

Under Tex. Penal Code § 7.02(b), (often called "the law of parties") a defendant can be convicted of capital murder under Tex. Penal Code § 19.03:

> [i]f, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

Tex. Penal Code § 7.02(b) is unconstitutional because it is grossly disproportionate—it qualifies for capital murder those who have neither committed murder nor intended to do so. It does not narrow capital punishment for only "the

most serious of crimes" or "the most deserving of execution." Rather, it proscribes execution for those who are in proximity to murder, a capital guilt-by-association.

And given the lack of any definition or narrowing of the phrase "should have been anticipated," if a murder is committed then a jury would naturally conclude, *ipso facto*, it should have been anticipated. And finally, using the law of the parties to convict a person of capital murder serves no retributive or deterrent purpose. A punishment can only deter an individual when it can influence that individual's own reasoned judgment and risk calculation. The law of parties condemns defendants for *another* individual's inability to make reasonable decisions. Nor can it serve a retributive purpose when the individual sentenced to death is less culpable and blameworthy than the actual murderer.

Sentencing a person to death for capital murder based on the law of parties is wildly disproportionate to the crime, serves no penological purpose, and is therefore a violation of the Eighth Amendment's prohibition against cruel and unusual punishment. Ramirez's death sentence is unconstitutional and must be vacated.

## CLAIM EIGHTEEN

**Texas's lethal injection protocol is a violation of the Eighth Amendment's prohibition on cruel and unusual punishment.**

Lethal injection in Texas cannot be carried out in a manner that comports with the constitutional right of condemned prisoners to be free from cruel and unusual

punishment. The Eighth Amendment of the U.S. Constitution forbids the Government, in carrying out a death sentence, from inflicting pain beyond that necessary to end the condemned prisoner's life. *See In re Kemmler*, 136 U.S. 436, 447 (1890). "Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life." *Id.* A method of execution violates the Eighth Amendment if it presents a "substantial risk of serious harm." *Baze v. Rees*, 553 U.S. 35, 50 (2008).

The manner in which Texas carries out execution by lethal injection violates the Eighth Amendment. Texas carries out executions via a procedure utilizing intravenous injection of five grams of pentobarbital sodium, a barbiturate. Execution Procedure, Texas Department of Criminal Justice Correctional Institutes Division, June 2012. Intravenous injection of a high dose of pentobarbital (including five grams as required by the Execution Procedure) will cause "flash" pulmonary edema almost immediately upon administration, which produces foam or froth in the lungs, obstructing or partially obstructing the airways. The experience of flash pulmonary edema produces sensations of drowning and asphyxia comparable to death by drowning. Autopsies conducted on executed prisoners show that flash pulmonary edema occurs in the vast majority, if not all, prisoners executed by a single drug pentobarbital procedure. Because the onset of flash pulmonary edema occurs

virtually immediately during and after a high-dose pentobarbital injection, well within the timeframe for pentobarbital to reach peak effect on the brain, it is extremely likely that prisoners executed according to the Execution Procedure will experience sensations of suffocation and drowning before they die. Based on the foregoing, the Texas Execution Procedure presents a "substantial risk of serious harm," in violation of the Eighth Amendment. *Id.*

Additionally, Texas provides only very limited information about the pentobarbital used to execute condemned prisoners, but the information that is available raises significant questions about the safety and efficacy of Texas' execution drugs. In 2018, the media reported that Texas was receiving pentobarbital from a compounding pharmacy called Greenpark. *See* Chris McDaniel, *Inmates Said the Drug Burned as They Died. This is How Texas Gets Its Execution Drugs*, BuzzFeed News (Nov. 28, 2018 5:09 PM) https://www.buzzfeednews.com/article/ chrismcdaniel/inmates-said-the-drug-burned-as-they-died-this-is-how-texas (last visited May 10, 2021). Compounding injectable drugs is a complex and highly specialized process and even minor deviations from the procedures can result in a drug that is subpotent, contaminated, or damaged, and that will not have the pharmacological effect as expected, potentially leading to the prisoner's prolonged suffering. According to documents obtained by BuzzFeed News, "[i]n inspections

by state regulators, Greenpark has been cited for 48 violations over the past eight years. The violations included keeping out-of-date drugs in stock, using improper procedures to prepare IV solutions, and inadequate cleaning of hands and gloves." *Id.* Because Texas sources drugs from a compounding pharmacy with a history of violations, there is a substantial risk that Ramirez will be administered a subpotent or contaminated drug and suffer a painful or lingering death, in violation of the Eighth Amendment. *See Baze*, 553 U.S. at 50.

Because the Texas lethal injection process subjects prisoners to cruel and unusual punishment in violation of the Eighth Amendment, Ramirez's sentence of death should be vacated.

## CLAIM NINETEEN

**The cumulative prejudice of the constitutional errors in Ramirez's case demands his conviction and sentence be vacated under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.**

Ramirez submits that the errors in this pleading each independently entitle him to relief. Should this Court disagree, however, it must analyze the cumulative prejudicial impact of the errors set forth herein. Courts have long recognized that constitutional claims of error are to be considered cumulatively and individually, and that cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief. *See, e.g.*, *Kyles v. Whitley*, 514 U.S.

419, 437–38 (1995) (cumulative prejudice from state's failure to reveal multiple pieces of exculpatory evidence undermined fairness of trial and entitled defendant to relief); *Strickland*, 466 U.S. at 694 (prejudice assessed from effect of "counsel's unprofessional errors"); *Taylor v. Kentucky*, 436 U.S. 478, 488 (1978) (cumulative prejudicial effect of prosecutor's misstatements and improper jury instructions undermined fairness of trial, necessitating relief); *Derden v. McNeel*, 978 F.2d 1453, 1456 (5th Cir. 1992) (en banc).

The combination of errors, discussed in the preceding claims, deprived Ramirez of such rights as his right to a fair trial, trial by impartial jury, equal protection, due process, effective assistance of counsel, freedom from cruel and unusual punishment, presentation of a complete defense, a reliable determination at both the guilt and penalty phases, and fundamental fairness. Even if the errors are deemed harmless when viewed individually, their cumulative effect substantially prejudiced Ramirez and undermined the fairness and reliability of his proceedings.

Even in cases where no single trial error examined on its own is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant. *See, e.g.*, *Parle v. Runnels*, 505 F.3d 922, 934 (9th Cir. 2007) (affirming grant of habeas relief based on the cumulative prejudicial effect of multiple errors); *Alcala v. Woodford*, 334 F.3d 862, 894–95 (9th Cir. 2003) (same);

467

*Duckett v. Mullin*, 306 F.3d 982, 992 (10th Cir. 2002) ("[T]he 'cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error.'" (quoting *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990) (en banc))). When evaluating cumulative error, while only guilt-phase errors relate to Ramirez's convictions, "all errors are relevant to the sentence." *Darks v. Mullin*, 327 F.3d 1001, 1018 (10th Cir. 2003); *see also Satterwhite v. Texas*, 486 U.S. 249, 261 (1988) (Marshall, J., concurring).

Here, because of the cumulative effect of the errors in the guilt and penalty phases, Ramirez's conviction and sentence were unlawfully and unconstitutionally imposed. These constitutional violations so infected the integrity of the proceedings that the errors cannot be deemed harmless; and they had a substantial and injurious effect on the guilt and penalty judgments. Considering all the errors above, this Court should conclude that Ramirez was denied fair and reliable proceedings and grant him habeas relief.

## XII.  CONCLUSION AND PRAYER FOR RELIEF

WHEREFORE, Ramirez prays that this Court:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be relieved of his unconstitutional conviction and sentence of death;

2. If necessary to resolve disputed factual issues, schedule an evidentiary hearing during which Ramirez may present evidence in support of his claims;

3. Grant such other relief as law and justice requires.

Respectfully submitted this 15th day of July, 2021.

Jon M. Sands
Federal Public Defender
Cary Sandman
Kelle A. Andrews
Jennifer Moreno
Zachary Buchanan
Assistant Federal Public Defenders

By s/Cary Sandman
Attorney-in-Charge
Arizona Bar No. 004779
*Pro Hac Vice*
407 W. Congress, Suite 501
Tucson, Arizona 85701
Telephone: 520.879.7622
Facsimile: 520.622.6844
cary_sandman@fd.org

**Certificate of Service**

I hereby certify that on July 15, 2021, I electronically filed the foregoing with the Clerk's Office by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Rachel Patton
Assistant Attorney General
Office of the Attorney General
Criminal Appeals Division
P.O. Box 12548
Austin, TX 78711-2548

s/Daniel Juarez
Assistant Paralegal
Capital Habeas Unit