No. 7:18-cv-00386

_____

IN THE UNITED STATES DISTRICT COURT
FOR SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

_____

JUAN RAUL NAVARRO RAMIREZ,
Petitioner,

v.

BOBBY LUMPKIN, Director, Texas Department of
Criminal Justice, Correctional Institutions Division,
Respondent.

_____

CAPITAL CASE

_____

**RESPONDENT LUMPKIN'S MOTION FOR SUMMARY JUDGMENT
AND ANSWER WITH BRIEF IN SUPPORT**

_____

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
For Criminal Justice

*Counsel of Record

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*RACHEL L. PATTON
Assistant Attorney General
Criminal Appeals Division

P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Ph.: (512) 936-1400

_____

ATTORNEYS FOR RESPONDENT

# TABLE OF CONTENTS

TABLE OF CONTENTS ........................................................................ II

TABLE OF AUTHORITIES ..............................................................XIV

RESPONDENT LUMPKIN'S ORIGINAL MOTION FOR SUMMARY JUDGMENT AND ANSWER WITH BRIEF IN SUPPORT ........................... 1

RAMIREZ'S ALLEGATIONS ............................................................... 1

STATEMENT REGARDING THE RECORD ................................... 10

STATEMENT OF THE CASE ................................................................ 10

STATEMENT OF FACTS ...................................................................... 13

I.      Guilt/Innocence Facts .................................................... 13

II.     Punishment Evidence ...................................................... 18

MOTION FOR SUMMARY JUDGMENT ...................................... 25

ANSWER ................................................................................................. 26

I.      Standard of Review ......................................................... 26

II.     Presumption of Correctness ............................................ 28

III.    Further Amendment ......................................................... 31

IV.     Exhaustion and Procedural Default ............................... 33

        A. General law ............................................................... 34

        B. Exceptions ................................................................. 36

                1.      Cause and prejudice........................................ 37

                2.      Miscarriage of justice..................................... 38

V.     New Evidence Presented in Federal Court is Barred.......................... 40

VI.    Deference Is Owed to the State Court's Adjudication of Ramirez's
       Claims that Were Adjudicated on the Merits in State Court................ 44

       A. AEDPA is constitutional........................................................ 44

       B. CCA's adjudications are owed deference. .......................................... 46

       C. Ramirez cannot receive de novo review of his adjudicated claims
          because he cannot satisfy the requirements in § 2254(d)................ 49

VII.   Non-retroactivity.................................................................. 50

VIII.  Insufficient Briefing and Conclusory Claims ........................................ 51

IX.    Timeliness ........................................................................ 53

RAMIREZ'S CLAIMS FOR RELIEF ................................................................ 56

I.     The State Court's Adjudication of Ramirez's Ineffective Assistance
       Claim   Was   Reasonable,   and   Ramirez   Received   Effective
       Assistance of Counsel During Sentencing in Any Event. (Claim 1) ..... 56

       A. Law ............................................................................ 56

          1.     Deficiency ........................................................ 58

          2.     Prejudice ........................................................ 62

       B. Argument........................................................................ 63

          1.     The state court adjudication. ..................................... 63

                 a.     The claim and evidence in state court. .................... 63

                 b.     The state court's adjudication was reasonable. ........ 65

          2.     Alternatively, even considering Ramirez's new evidence on
                 de novo review, the claim fails. ..................................... 76

a. Ramirez's new evidence.............................................. 77

    i. Debbie Dunn...................................................... 77

    ii. Dr. James Sullivan .......................................... 84

    iii. Dr. Thomas Hyde .............................................. 86

    iv. Dr. Erin Bigler ................................................. 90

    v. Michele Deitch ................................................ 91

    vi. Father Gregory Boyle ....................................... 93

b. Deficiency ................................................................. 97

c. Prejudice ................................................................. 105

    i. Ramirez's new experts................................... 109

    ii. Failure to connect his role in the offense...... 115

C. Conclusion .......................................................................... 118

II. Ramirez's Eighth Amendment Claim Is Procedurally Defaulted, *Teague*-barred, and Meritless. (Claim 2)................................ 119

A. The claim is procedurally defaulted. .............................. 120

B. Alternatively, the claim is meritless................................. 120

    1. Evolving standards of decency do not prohibit death sentences for those under 21............................................ 121

    2. *Roper v. Simmons* does not apply to Ramirez................. 122

C. The claim is *Teague*-barred............................................ 124

III. Ramirez Received Effective Assistance of Counsel as Required by the Sixth Amendment During the Pretrial and Guilt Phases of His Capital Trial. (Claim 3) ........................................................ 125

A. Conflict of interest claim (Claim 3(C)(1)) ........................................ 125

    1.    The state court's rejection of Ramirez's conflict claim concerning Rolando Garza was reasonable. .................... 128

        a.    The state court adjudication was reasonable. ........ 128

        b.    Ramirez's new evidence cannot be considered. However, even with the new evidence the claim fails. .................................................................................. 134

    2.    The conflict claim concerning Alma Garza is procedurally defaulted and, alternatively, without merit under de novo review. .............................................................................. 136

        a.    The claim is procedurally defaulted. ..................... 137

        b.    The claim is meritless. ............................................. 138

B. Suppression hearing claim (Claim 3(C)(2)) .................................... 140

    1.    Trial counsel did not fail to investigate and present evidence that Ramirez's statement was coerced and unreliable. (Claim 3(C)(2)(a)) .............................................................. 144

    2.    Trial counsel did not fail to properly interview lay witnesses and arrange for them to appear at the hearing. (Claim 3(C)(2)(b)) ........................................................................ 149

    3.    Trial counsel did not fail to properly investigate the existence of audio and video recordings of Ramirez's arrest and booking. (Claim 3(C)(2)(c)) ......................................... 153

    4.    If trial counsel subpoenaed the "wrong" booking officer to the suppression hearing, that mistake did not rise to the level of insufficient assistance of counsel. (Claim 3(C)(2)(d)) ....... 155

    5.    Trial counsel did not fail to competently impeach the State's law enforcement witnesses. (Claim 3(C)(2)(e)) ................. 156

6.  Trial counsel did not fail to conduct a proper direct examination of Ramirez. (Claim 3(C)(2)(f)) .................. 160

7.  Trial counsel was not ineffective for not retaining a false confession expert. (Claim 3(C)(2)(g)) ................................ 162

C.  Pretrial investigation and preparation (Claim 3(C)(3)) ................. 163

D.  Grand jury challenge claim (Claim 3(C)(4)) ..................................... 165

E.  Change of venue claim (Claim 3(C)(5)) ............................................ 166

1.  Law ..................................................................................... 167

2.  Argument ............................................................................. 168

F.  Jury selection claim (Claim 3(C)(6)) ................................................ 169

G.  Peremptory strike claim (Claim 3(C)(7)) ......................................... 171

H.  Continuance claim (Claim 3(C)(8)) .................................................. 181

I.  Innocence claim (Claim 3(C)(9)) ....................................................... 183

J.  Confession claim (Claim 3(C)(10)) ................................................... 185

K.  Preservation for review claim (Claim 3(C)(11)) .............................. 187

1.  Failure to object to gruesome photographs (Claim 3(C)(11)(a)) ....................................................... 188

2.  Failure to object to untranslated statements (Claim 3(C)(11)(b)). ........................................................ 191

3.  Failure to challenge admission of other bad acts (Claim 3(C)(11)(c)) ....................................................... 192

4.  Failure to contest the State's evidence of gang membership. (Claim 3(C)(11)(d)) .............................................. 194

5.    Failure to challenge the charge language, request an instruction on conspiracy criminal responsibility, and ask for special verdict forms. (Claim 3(C)(11)(e)) ........................ 196

6.    Failure to object to Ramirez's improper confinement and excessive security presence in front of the jury. (Claim 3(C)(11)(f)) ......................................................... 199

L.  Complete record claim (Claim 3(C)(12)) ......................................... 201

M. Cumulative effect claim (Claim 3(C)(13)) ......................................... 202

IV.   The Trial Court Did Not Commit Error in Ramirez's Case That Violated His Constitutional Rights. (Claim 4) ..................................... 204

A. As neither had a conflict with Ramirez, the trial court did not commit error by appointing Alma Garza and Rolando Garza. (Claim 4(A)) .... ..................................................................................... 204

B. The trial court did not err in admitting the crime scene and autopsy photographs. (Claim 4(B)) ................................................................. 205

1.    Law ..................................................................................... 206

2.    Argument......................................................................... 206

C. The trial court did not violate Ramirez's constitutional rights by requiring him to wear leg restraints. (Claim 4(C)) ........................ 209

D. The trial court did not fail to ensure that all of Ramirez's trial proceedings were recorded. (Claim 4(D))......................................... 211

E. The trial court did not err by denying Ramirez's requests for new counsel. (Claim 4(E)) ..................................................................... 214

F. The trial court did not err by failing to continue the suppression hearing. (Claim 4(F)) ..................................................................... 214

G. The trial court did not err in allowing testimony about Ramirez's statements during the booking process. (Claim 4(G)) ................... 216

1.   Facts ................................................................. 217

2.   Law ................................................................... 219

3.   The statement was admissible, and the state court adjudication was reasonable. ............................................ 220

H. The trial court did not err in admitting statements Ramirez made during police interrogation. (Claim 4(H)) ...................................... 222

1.   Law ................................................................... 223

2.   State court decision ............................................. 225

3.   Argument ........................................................... 229

I.  The trial court did not err in allowing Sgt. Champion to testify about Ramirez's admission to possessing marijuana in the jail. (Claim 4(I)). ............................................................................... 231

J.  The trial court did not err when it overruled Ramirez's motion for mistrial. (Claim 4(J)) ............................................................ 233

K. The trial court did not err in allowing Alvarez to testify as a gang expert. (Claim 4(K)) ............................................................. 236

L.  The trial court did not err in admitting evidence of other serious crime. (Claim 4(L)) ............................................................. 239

M. The trial court did not err in ordering Ramirez to show the jury his arms for the State to obtain testimony about the content of Ramirez's tattoos in the guilt phase. (Claim 4(M)) ..................................... 242

N. The trial court did not prevent Ramirez from presenting relevant mitigating evidence. (Claim 4(N)) ......................................... 246

O. The exclusion of venire members for cause did not violate Ramirez's right to an impartial jury and due process under the Sixth, Eight, and Fourteenth Amendment to the U.S. Constitution. (Claim 4(O)).... 258

P. The trial court did not err in giving voluntariness instructions. (Claim 4(P)) ................................................................ 259

Q. Ramirez's constitutional rights were not violated when the trial court failed to use special verdict forms. (Claim 4(Q)) ............................ 266

R. The cumulative effect of any alleged trial court errors did not prejudice Ramirez. (Claim 4(R)) ...................................... 268

V. Ramirez's Trial Judge Was Not Biased. (Claim 5) ............................. 269

A. Law ..................................................................... 269

B. Argument................................................................ 270

VI. Ramirez Was Not Denied His Right to Confront a Witness Against Him in Violation of the Sixth Amendment's Confrontation Clause. (Claim 6) ................................................................ 277

A. Law ..................................................................... 278

B. Argument................................................................ 279

VII. Ramirez Is Not Actually Innocent of the Crime for Which He Was Convicted. (Claim 7) ............................................... 284

VIII. The State Did Not Commit Misconduct. (Claim 8) ............................. 288

A. The State did not improperly deny the existence of the arrest video until after the suppression hearing. (Claim 8(A))........................... 288

B. The State did not commit misconduct with relation to the arrest video. (Claim 8(B)) ...................................................... 296

C. The State did not sponsor false testimony at the suppression hearing. (Claim 8(C)) ...................................................... 300

D. The State did not commit misconduct regarding Marcial Bocanegra. (Claim 8(D)) ...................................................... 304

1.  The State did not improperly conceal the cooperation agreement reached with Marcial Bocanegra. (Claim 8(D)(1)) ............................................................ 305

2.  The State did not conceal exculpating evidence obtained from Bocanegra. (Claim 8(D)(2)) ........................................ 307

E.  The State did not commit misconduct by failing to disclose conditions at TYC. (Claim 8(E)) .......................................................... 311

F.  The State did not commit misconduct by improperly arguing for a limitation on mitigating evidence. (Claim 8(F)) .............................. 315

G.  The State's closing arguments were not improper. (Claim 8(G)) ... 319

H.  The State did not commit any other forms of misconduct. (Claim 8(H)) ............................................................ 326

I.  Cumulative prejudice. (Claim 8(I)) .................................................. 327

IX.  There Was No Juror Misconduct at Ramirez's Trial. (Claim 9) .......... 329

A.  Law ................................................................................................ 329

B.  Argument ........................................................................................ 330

X.  The Jury Instructions Given During Ramirez's Punishment Trial Were Constitutional. (Claim 10) ............................................................ 334

A.  The Texas mitigation special issue adequately defines mitigating evidence and does not create a reasonable possibility that the jury would construe the mitigating evidence narrowly. (Claim 10(A)) . 334

B.  The special issue instruction on future dangerousness is constitutional. (Claim 10(B)) .......................................................... 338

XI.  Ramirez's Death Sentence Is Reliable and Valid Despite the Fact That One of His Convictions for Capital Murder Was Overturned. (Claim 11) ............................................................ 343

XII.  The Evidence Presented at Trial Was Sufficient to Support Ramirez's Conviction and Death Sentence. (Claim 12) ...................... 347

    A. Law ................................................................................. 348

    B. The state court adjudication was reasonable. ................................ 349

    C. Alternatively, the claim fails even if reviewed de novo. ................. 355

XIII. Ramirez Received Effective Assistance of Counsel on Appeal. (Claim 13) ........................................................................... 359

    A. Law ................................................................................. 359

    B. Insufficiently briefed claims on appeal ........................................ 361

    C. Claims that should have been raised on appeal ............................. 364

XIV.  The Texas Court of Criminal Appeals's Prohibition on Raising Sufficiency of the Evidence Claims on Direct Appeal Regarding the Mitigation Special Issue Did Not Violate Ramirez's Eighth or Fourteenth Amendment Rights. (Claim 14) ......................................... 368

XV.   Ramirez's Post-Conviction Counsel Were Effective. (Claim 15) ......... 372

XVI.  The State Court's Denial of Ramirez's Postconviction Motion to Test DNA Evidence Is Not Cognizable in Federal Habeas. (Claim 16) ................................................................................... 374

    A. Alleged errors in denying a motion for DNA testing under Chapter 64 are not cognizable on federal habeas. ............................ 375

    B. The state court's denial of Ramirez's motion was proper. .............. 379

XVII. Ramirez's Death Sentence Is Constitutional. (Claim 17) ................... 382

    A. Execution of those with mental illness is not unconstitutional. (Claim 17(A)) ...................................................................... 382

B. Ramirez's death sentence is not inconsistent with the evolving standards of decency that mark the progress of a maturing society. (Claim 17(B)) ..................................................................... 384

C. The Texas death penalty scheme does not violate Ramirez's due process rights because it is not unconstitutionally arbitrary. (Claim 17(C)) ............................................................................. 386

D. The amount of time spent on death row does not violate Ramirez's Constitutional rights. (Claim 17(D)) ................................................ 390

E. Ramirez's mental impairments do not render him insufficiently culpable or ineligible for the death penalty. (Claim 17(E)) ........... 392

F. Ramirez's constitutional rights were not violated by the "12-10" instruction. (Claim 17(F)) ................................................................. 393

G. Texas's capital sentencing scheme is not unconstitutional for failing to require the State to prove the mitigation special issue beyond a reasonable doubt. (Claim 17(G)) ...................................................... 396

H. Texas's capital sentencing scheme does not unconstitutionally limit what constitutes mitigation. (Claim 17(H)) ...................................... 399

I. The capital sentencing scheme under which Ramirez was sentenced is not unconstitutional for failing to ensure a proportionality review. (Claim 17(I)) ...................................................................................... 403

J. Texas's capital sentencing scheme does not violate the Eighth and Fourteenth Amendments of the U.S. Constitution because sufficiently narrows the class of death-eligible defendants. (Claim 17(J)) ....... 404

K. Texas's capital sentencing scheme does not violate the Eighth and Fourteenth Amendments of the U.S. Constitution due to the discretion it affords the prosecutor. (Claim 17(K)) ........................ 406

L. It is not a violation of the Eighth Amendment to convict someone in Texas of capital murder under the State's law of parties. (Claim 17(L)) ............................................................................................... 411

XVIII. Texas's Legal Injection Protocol Is Constitutional. (Claim 18) ......... 414

XIX. There Are No Constitutional Errors in Ramirez's Case to Cumulate. (Claim 19) ............................................................ 416

CONCLUSION............................................................................. 418

CERTIFICATE OF SERVICE....................................................... 420

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page**

*Ables v. Scott,* 73 F.3d 591 (5th Cir. 1996)  .................................  260

*Adams v. Armontrout*, 897 F.2d 332 (8th Cir. 1990)  .....................  52

*Alexander v. Johnson*, 211 F.3d 895 (5th Cir. 2000)  ............................  395-396

*Alexander v. McCotter,* 775 F.2d 595 (5th Cir. 1985)  ...................  115

*Allen v. State*, 108 S.W.3d 281 (Tex. Crim. App. 2003)  .......................  337, 368

*Allen v. Stephens,* 805 F.3d 617 (5th Cir. 2015)  ...........................  38

*Amos v. Scott*, 61 F.3d 333 (5th Cir. 1995)  ...........................  36, 231

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985)  ..............................  46

*Anderson v. Harless*, 459 U.S. 4 (1982)  .....................................  34

*Apprendi* v. *New Jersey,* 530 U.S. 466 (2000)  ..............................  397

*Arizona v. Fulminante*, 499 U.S. 279 (1991)  .................................  143

*Arizona v. Youngblood,* 488 U.S. 51 (1988)  .................................  296

*Asgrow Seed Co. v. Winterboer*, 513 U.S. 179 (1995)  ..............................  340

*Atkins v. Virginia*, 536 U.S. 3304 (2002)  ....................................  384

*Avila v. Quarterman*, 560 F.3d 299 (5th Cir. 2009)  .....................  312

*Ayestas v. Davis*, 138 S. Ct. 1080 (2018)  ......................................  38

*Barbaro v. State*, 115 S.W.3d 799 (Tex. App.—Amarillo 2003, pet. ref'd)  ..  131

*Barefoot v. Estelle*, 697 F. 2d 593 (5th Cir. 1983)  ........................  254

*Barnes v. Johnson*, 160 F.3d 218 (5th Cir. 1998)  ........................  142

*Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000) .................................. 301

*Basso v. Stephens*, 555 F. App'x 335 (5th Cir. 2014) .................................... 47

*Batson v. Kentucky,* 476 U.S. 79 (1986) ................................................. passim

*Baze v. Rees*, 553 U.S. 35 (2008) .................................................. 385, 415-416

*Beazley v. Johnson*, 242 F.3d 248 (5th Cir. 2001) .................................... passim

*Beets v. Scott*, 65 F.3d 1258 (5th Cir. 1995) .......................................... 126-127

*Bell v. Cone*, 535 U.S. 648 (2002) ....................................................... 57

*Bigby v. Dretke,* 402 F.3d 551 (5th Cir. 2005) ..................................... 269, 279

*Blackledge v. Allison*, 431 U.S. 63 (1977) .......................................... 52

*Blue v. State*, 125 S.W.3d 491 (Tex. Crim. App. 2003) ............................. 337

*Blue v. Thaler*, 665 F.3d 647 (5th Cir. 2011) .............................. 341, 395, 402

*Bordenkircher v. Hayes*, 434 U.S. 357 (1978) ..................................... 388, 407

*Bousley v. United States*, 523 U.S. 614 (1998) ................................... 39

*Bower v. Quarterman*, 497 F.3d 459 (5th Cir. 2007) .................................. 297

*Boyde v. California*, 494 U.S. 370 (1990) .............................. 318-319, 325, 401

*Brecht v. Abrahamson*, 507 U.S. 619 (1993) .......................................... passim

*Bridge v. Lynaugh*, 838 F.2d 770 (5th Cir. 1988) ........................................ 234

*Brogdon v. Blackburn*, 790 F.2d 1164 (5th Cir. 1986) ............................... 311

*Brown v. Allen*, 344 U.S. 443 (1953) .............................................. 37

*Brown v. Collins*, 937 F.2d 175 (5th Cir. 1991) ......................................... 348

*Brown v. Dretke,* 419 F.3d 365 (5th Cir.2005) ............................................ 257

*Bruton v. United States,* 391 U.S. 123 (1968) ............................................... 208

*Buchanan v. Angelone,* 522 U.S. 269 (1998) ................................................ 401

*Buntion v. Lumpkin,* 142 S. Ct. 1464 (2022) ............................................... 386

*Buntion v. Lumpkin,* 31 F.4th 952 (5th Cir. 2022) ............................... 386, 391

*Buntion v. Quarterman,* 524 F.3d 664 (5th Cir. 2008) ......................... 269-271

*Busby v. Dretke,* 359 F.3d 708 (5th Cir. 2004) ............................................ 167

*Butler v. McKellar,* 494 U.S. 407 (1990) ...................................................... 50

*Cabana v. Bullock,* 474 U.S. 376 (1986) ...................................................... 412

*Calderon v. Thompson,* 523 U.S. 538 (1998) ................................................ 286

*Caldwell v. Mississippi,* 472 U.S. 320 (1985) ......................................... 394-395

*California. v. Trombetta,* 467 U.S. 479 (1984) .............................................. 297

*Callins v. Collins,* 998 F.2d 269 (5th Cir. 1993) ........................................... 348

*Canales v. Davis,* 966 F.3d 409 (5th Cir. 2020) ............................................ 62

*Cantu v. Quarterman,* 341 F. App'x 55 (5th Cir. 2009) ................................ 336

*Cantu v. State,* 939 S.W.2d 627 (Tex. Crim. App. 1997) .............................. 337

*Carter v. Estelle,* 677 F.2d 427 (5th Cir. 1982) ............................................. 34

*Carty v. Thaler,* 583 F.3d 244 (5th Cir. 2009) ...................................... 72, 104

*Caspari v. Bohlen,* 510 U.S. 383 (1994) ........................................................ 50

*Castille v. Peoples,* 489 U.S. 346 (1989) ....................................................... 34

*Castro v. Collecto, Inc.,* 634 F.3d 779 (5th Cir. 2011) ................................. 341

*Cavazos v. Smith,* 565 U.S. 1 (2011) ...................................................... 348-349

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................. 25

*Chaidez v. United States*, 568 U.S. 342 (2013) ........................................ 50-51

*Chambers v. Mississippi*, 410 U.S. 284 (1973) ...................................... passim

*Chambers v. State,* No. PD-0424-19, 2022 WL 1021279 (Tex. Crim. App. 2022)

.............................................................................................................. 264

*Charles v. Thaler,* 629 F.3d 494 (5th Cir. 2011) ........................................ 260

*Clemons v. Mississippi*, 494 U.S. 738 (1990) ........................................ 370-371

*Cobb v. Thaler*, 682 F.3d 364 (5th Cir. 2012) .............................................. 403

*Coble v. Davis*, 682 F. App'x 261 (5th Cir. 2017) ........................................ 167

*Coble v. Dretke*, 444 F.3d 345 (5th Cir. 2006) ............................................ 203

*Coble v. Quarterman*, 496 F.3d 430 (5th Cir. 2007) ................................... 203

*Coble v. State,* 330 S.W.3d 253 (Tex. Crim. App. 2010) ............... 111, 336-337

*Colella v. State*, 915 S.W.2d 834 (Tex. Crim. App. 1995) ................... 337, 368

*Coleman v. Thompson*, 501 U.S. 722 (1991) ..................................... 35-36, 233

*Colorado v. Connelly*, 479 U.S. 157 (1986) ................................. 140, 223, 224

*Cortez v. Stephens*, No. 4:12-CV-2869, 2013 WL 4520038 (S.D. Tex. Aug. 26,

2013) ...................................................................................................... 376

*Corwin v. Johnson*, 150 F.3d 467 (5th Cir. 1998) ......................................... 44

*Crane v. Johnson*, 178 F.3d 309 (5th Cir. 1999) .......................................... 105

*Crawford v. Washington*, 541 U.S. 36 (2004) ............................... 277-279, 283

*Cross v. State,* 144 S.W.3d 521 (Tex. Crim. App. 2004) .............................. 220

*Crustinger v. State*, 206 S.W.3d 607 (Tex. Crim. App.) ............................... 337

*Cullen v. Pinholster*, 563 U.S. 170 (2011) ................................. passim

*Cupp v. Naughten*, 414 U.S. 141 (1973) ............................... 260, 267

*Cuyler v. Sullivan*, 446 U.S. 335 (1980) ................................. passim

*Darden v. Wainwright*, 477 U.S. 168 (1986) ................................ 208, 317, 320

*Darden v. Wainwright*, 699 F.2d 1031 (11th Cir. 1983) ............................. 317

*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) ................. 236-237

*Davila v. Davis*, 137 S. Ct. 2058 (2017) ................................... passim

*Davis v. Scott*, 51 F.3d 457 (5th Cir. 1995) .................................. 395

*Davis v. United States*, 512 U.S. 452 (1994) ................................. 142

*Davis v. Washington*, 547 U.S. 813 (2006) .................................. 278

*Day v. Quarterman*, 566 F.3d 527 (5th Cir. 2009) ........................................ 60

*Deck v. Missouri*, 544 U.S. 622 (2007) ........................................... 211

*Delaware v. Van Arsdall*, 475 U.S. 673 (1986) ............................... 279

*Derden v. McNeel*, 978 F.2d 1453 (5th Cir. 1992) ................................. passim

*Dickerson v. Guste*, 932 F.2d 1142 (5th Cir. 1991) ........................................ 233

*Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52 (2009) ......... 375

*Dobbert v. Florida*, 432 U.S. 282 (1977) ........................................ 167

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) ..................................... passim

*Dowthitt v. Johnson*, 230 F.3d. 733 (5th Cir. 2000) ....................................... 60

*Dowthitt v. State*, 931 S.W.2d 244 (Tex. Crim. App. 1996) ........................ 220

xviii

*Doyle v. Stephens*, 535 F. App'x 391 (5th Cir. 2013) ............................ 121, 123

*Draper v. Washington*, 372 U.S. 487 (1963) ................................................. 213

*Drew v State*, 743 S.W.2d 207 (Tex. Crim. App. 1987) ................................. 311

*Drinkard v. Johnson*, 97 F.3d 751 (5th Cir. 1996) ............................... 143, 225

*Druery v. State*, 225 S.W.3d 491 (Tex. Crim. App. 2007) ............................ 340

*Druery v. Thaler*, 647 F.3d 535 (5th Cir. 2011) ........................................... 395

*Duncan v. Henry*, 513 U.S. 364 (1995) ........................................................... 34

*Dunham v. Travis*, 313 F.3d 724 (2d Cir. 2002) .......................................... 157

*Edwards v. Arizona*, 451 U.S. 477 (1981) ..................................................... 141

*Edwards v. Scroggs*, 849 F.2d 204 (5th Cir. 1988) ....................................... 254

*Edwards v. Vannoy*, 141 S. Ct. 1547 (2021) ................................................... 50

*Eldridge v. State*, 940 S.W.3d 646 S.W.2d (Tex. Crim. App. 1996) ..... 338, 369

*Enmund v. Florida,* 458 U.S. 782 (1982) ............................................... 412-414

*Estelle v. McGuire*, 502 U.S. 62 (1991) ......................................................... 229

*Ex parte Gutierrez,* 337 S.W.3d 883 (Tex. Crim. App. 2011) ............... 375, 380

*Ex parte Kimes,* 872 S.W.2d 700 (Tex. Crim. App. 1993) ............................ 292

*Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006) ......................... 66

*Ex parte Morrow*, 952 S.W.2d 530 (Tex. Crim. App. 1997) ......................... 131

*Ex parte Tuley*, 109 S.W.3d 388 (Tex. Crim. App. 2002) ............................ 375

*Ex parte Woods*, 176 S.W.3d 224 (Tex. Crim. App. 2005) ............................. 66

*Fearance v. Scott*, 56 F.3d 633 (5th Cir. 1995) ............................................ 392

*Felder v. Johnson*, 180 F.3d 206 (5th Cir. 1999) .......................................... 391

*Felker v. Turpin*, 518 U.S. 651 (1996) ............................................................ 44

*Felkner v. Jackson*, 562 U.S. 594 (2011) ....................................................... 26

*Fields v. City of South Houston*, 922 F.2d 1183 (5th Cir. 1991) ................... 25

*Foster v. Quarterman*, 466 F.3d 359 (5th Cir. 2006) ................................... 284

*Franklin v. Lynaugh*, 487 U.S. 164 (1988) ................................................... 405

*Fratta v. Davis*, 889 F.3d 225 (5th Cir. 2018) ............................................... 40

*Fritz v. State*, 946 S.W.2d 844 (Tex. Crim. App. 1997) ............................... 175

*Fuller v. State*, 253 S.W.3d 220 (Tex. Crim. App. 2008) ..................... 338, 369

*Galvan v. Cockrell*, 293 F.3d 760 (5th Cir. 2002) ....................................... 260

*Garza v. Stephens*, 738 F.3d 669 (5th Cir. 2013) .......................................... 38

*Glossip v. Gross*, 576 U.S. 863 (2015) .................................................. 385, 415

*Goeke v. Branch,* 514 U.S. 115 (1995) ........................................................... 50

*Gonzalez v. State*, 222 S.W.3d 446 (Tex. Crim. App. 2007) ........................ 168

*Goodrum v. Quarterman.* 547 F.3d 249 (5th Cir. 2008) .............................. 279

*Goodwin v. Johnson*, 132 F.3d 162 (5th Cir. 1997) ..................................... 143

*Goss v. Johnson*, 199 F.3d 439, 1999 WL 1067676 (5th Cir. 1999) ............ 389

*Graham v. Collins*, 506 U.S. 461 (1993) ................................. 51, 335, 402, 405

*Graham v. Florida*, 560 U.S. 48 (2010) ...................................................... 120

*Graham v. Johnson,* 94 F.3d 958 (5th Cir. 1996) .......................................... 35

*Grant v. State*, 325 S.W.3d 655 (Tex. Crim. App. 2010) ............................. 174

*Gray v. Greer*, 800 F.2d 644 (7th Cir. 1986) .................................................. 360

*Gray v. Lucas,* 677 F.2d 1086 (5th Cir. 1982) ................................................. 59

*Green v. Georgia*, 442 U.S. 95 (1987) ............................................................. 253

*Green v. Johnson*, 116 F.3d 1115 (5th Cir. 1997) .......................................... 60

*Green v. Johnson,* 160 F.3d 1029 (5th Cir. 1998) ......................................... 197

*Green v. State*, 934 S.W.2d 92 (Tex. Crim. App. 1996) ....................... 338, 369

*Green v. Thaler*, 699 F.3d 404 (5th Cir. 2012) ............................................... 47

*Gregg v. Georgia,* 428 U.S. 153 (1976) ......................................... 212, 388, 408

*Gregory v. Thaler*, 601 F.3d 347 (5th Cir. 2010) ........................................... 59

*Grossman v. McDonough*, 466 F.3d 1325 (11th Cir. 2006) .......................... 61

*Hancock v. Davis*, 906 F.3d 387 (5th Cir. 2018) .................................... 286-287

*Harm v. State,* 183 S.W.3d 403 (Tex. Crim. App. 2006) ............................. 292

*Harrington v. Richter*, 562 U.S. 86 (2011) ............................................. passim

*Harris v. Cockrell,* 313 F.3d 238 (5th Cir.2002) ......................................... 320

*Harris v. Reed*, 489 U.S. 255 (1989) ............................................................... 36

*Haynes v. Quarterman*, 526 F.3d 189 (5th Cir. 2008) ................................. 373

*Henderson v. Kibbe*, 431 U.S. 145 (1977) .................................................... 267

*Henderson v. Stephens*, 791 F.3d 567 (5th Cir. 2015) ................................. 372

*Herbert v. Rogers,* 890 F.3d 213 (5th Cir. 2018) ................................... 172, 181

*Hernandez v. Thaler,* No. SA-08-CA-805-XR, 2011 WL 4437091 (W.D. Tex.

Sept. 23, 2011), *modified on reh'g,* 2012·WL 394597 (W.D. Tex. Feb. 6, 2012)

...................................................................................................... 398

*Herrera v. Collins*, 506 U.S. 390 (1993) ........................................... 39, 285, 378

*Hiibel v. Sixth Jud. Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177 (2004)

...................................................................................................... 242-243

*Higginbotham v. Louisiana*, 817 F.3d 217 (5th Cir. 2016) ................... 212-213

*Higgins v. Cain*, 720 F.3d 255 (5th Cir. 2013) ............................................. 172

*Holberg v. State*, 425 S.W.3d 282 (Tex. Crim. App. 2014) ......................... 382

*House v. Bell*, 547 U.S. 518 (2006) ............................................................ 285

*Howard v. State*, 153 S.W.3d 382 (Tex. Crim. App. 2004) ................... 337, 368

*Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183 (5th Cir. 1990) ............ 25

*Hudson v. Quarterman*, 273 F. App'x 331 (5th Cir. 2008) ............................ 48

*Hughes v. Dretke*, 412 F.3d 582 (5th Cir. 2005) ......................................... 395

*Hughes v. Johnson*, 191 F.3d 607 (5th Cir.1999) ................................... 44, 341

*Hummel v. Davis*, 807 F.App'x 282 (5th Cir. 2020) ..................................... 386

*Hummel v. Lumpkin,* 141 S. Ct. 330 (2020) ................................................ 386

*Hurst v. Florida,* 577 U.S. 92 (2016) .......................................................... 397

*Hutson v. Quarterman*, 508 F.3d 236 (5th Cir. 2007) ................................... 54

*In re Gentras*, 666 F.3d 910 (5th Cir. 2012) ............................................... 372

*In re Neville,* 440 F.3d 220 (5th Cir. 2006) ................................................. 384

*In re Raby*, 925 F.3d 749 (5th Cir. 2019) .................................................... 301

*In re Swearingen*, 556 F.3d 344 (5th Cir. 2009) .......................................... 284

*J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127 (1994) ........................... 172, 175

*Jackson v. Denno,* 378 U.S. 368 (1964) ................................. 261, 265

*Jackson v. Johnson,* 194 F.3d 641 (5th Cir. 1999) ........................ 203

*Jackson v. Virginia,* 443 U.S. 307 (1979) ...................... 26, 348-349

*Jacobs v. Scott,* 31 F.3d 1319 (5th Cir. 1994) ............................. 395

*Janecka v. Cockrell,* 301 F.3d 316 (5th Cir. 2002) ....................... 206

*Jasper v. Thaler,* 466 F. App'x 429 (5th Cir. 2012) ...................... 123

*Jefferson v. Upton,* 560 U.S. 294 (2010) ....................................... 46

*Johnson v. Puckett,* 176 F.3d 809 (5th Cir.1999) ........................ 257

*Johnson v. Texas,* 509 U.S. 350 (1993) ................................. 335, 401

*Jones v. Barnes,* 463 U.S. 745 (1983) ........................................ 360

*Jones v. United States,* 527 U.S. 373 (1999) ............................... 394

*Jurek v. Texas,* 428 U.S. 262 (1976) ..................................... 405, 408

*Kansas v. Carr,* 577 U.S. 108 (2016) ......................................... 400

*Keeney v. Tamayo-Reyes,* 504 U.S. 1 (1992) ........................... 34, 41

*Keeter v. State,* 74 S.W.3d 31 (Tex. Crim. App. 2002) ................. 311

*Kelly v. State,* 824 S.W.2d 568 (Tex. Crim. App. 1992) ............... 237

*Kerr v. Thaler,* 384 F. App'x 400 (5th Cir. 2010) ........................ 406

*Kimmelman v. Morrison,* 477 U.S. 365 (1986) ............................. 57

*King v. Davis,* 883 F.3d 577 (5th Cir. 2018) ................................. 61

*Kinsel v. Cain,* 647 F.3d 265 (5th Cir. 2011) ............................... 372

*Kirkpatrick v. Blackburn*, 777 F.2d 272 (5th Cir. 1985) ....... 215, 234, 320-321

*Knowles v. Mirzayance*, 556 U.S. 111 (2009) ................................. 58

*Koch v. Puckett*, 907 F.2d 524 (5th Cir. 1990) ................................. 52

*Kunkle v. Dretke*, 352 F.3d 980 (5th Cir. 2003) ............................... 62

*Kutzner v. Cockrell*, 303 F.3d 333 (5th Cir. 2002) ......................... 307

*Kutzner v. State*, 75 S.W.3d 427 (Tex. Crim. App. 2002) ............... 381

*Ladd v. Stevens*, 748 F.3d 637 (5th Cir. 2014) ............................. 372

*Lambrix v. Singletary*, 520 U.S. 518 (1997) ................................. 51

*Lavernia v. Lynaugh*, 845 F.2d 493 (5th Cir. 1988) .................... 233

*Lawrence v. Lensing*, 42 F.3d 255 (5th Cir. 1994) .................... 51-52

*Lewis v. Jeffers*, 497 U.S. 764 (1990) .................................... 229, 256

*Liteky v. United States*, 510 U.S. 540 (1994) ....................... 270-271

*Little v. Johnson*, 162 F.3d 855 (5th Cir. 1998) ........................... 237

*Livingston v. Johnson*, 107 F.3d 297 (5th Cir. 1997) .................. 203

*Lockett v. Anderson*, 230 F.3d 695 (5th Cir. 2000) ........................ 52

*Long v. State,* 823 S.W.2d 259 (Tex. Crim. App. 1991) ............... 207

*Lorraine v. Coyle*, 291 F.3d 416 (6th Cir. 2002) .......... 268, 328, 417

*Lowenfield v. Phelps*, 484 U.S. 231 (1988) ....................... 340, 405

*Lowery v. Estelle*, 696 F.2d 333 (5th Cir. 1983) ....................... 317

*Lucas v. Johnson*, 123 F.3d 1069 (5th Cir. 1998) ......................... 40

*Lucero v. State*, 246 S.W.3d (Tex. Crim. App. 2008) ................... 337

*Madden v. State,* 242 S.W.3d 504 (Tex. Crim. App. 2007) ......................... 264

*Madera v. Risley,* 885 F.2d 646 (9th Cir. 1989) ............................................. 212

*Martin v. McCotter,* 796 F.2d 813 (5th Cir. 1986) ....................................... 115

*Martinez v. Dretke,* 404 F.3d 878 (5th Cir. 2005) ........................................ 110

*Martinez v. Estelle,* 612 F.2d 173 (5th Cir. 1980) ....................................... 265

*Martinez v. Ryan,* 566 U.S. 1 (2012) ........................................ 37-38, 367, 373

*Maryland v. Shatzer,* 559 U.S. 98 (2010) .............................. 141-142, 223-224

*Mattheson v. King,* 751 F.2d 1432 (5th Cir. 1985) ...................................... 115

*May v. Maschner,* 668 F. Supp. 1305 (W.D. Mo. 1987) ................................ 52

*Mays v. Stephens,* 757 F.3d 211 (5th Cir. 2014) ......................................... 383

*McCleskey v. Kemp,* 481 U.S. 79 (1987) ....................................................passim

*McDonough v. Greenwood,* 464 U.S. 548 (1984) ......................................... 329

*McFarland v. State,* 928 S.W.2d 482 (Tex. Crim. App. 1996) 337-338, 368-369

*McGinnis v. Johnson,* 181 F.3d 686 (5th Cir. 1999) .................... 254-255, 257

*McKinny v. State,* 76 S.W.3d 463 (Tex. App.—Houston [1st Dist.] 2002, no

pet.) ............................................................................................................... 131

*McNeil v. Wisconsin,* 501 U.S. 171 (1991) ........................................... 141, 224

*McQuiggin v. Perkins,* 569 U.S. 383 (2013) .............................................. 39, 42

*Medrano v. State,* No. AP-75,320, 2008 WL 5050076 (Tex. Crim. App. 2008) ..

................................................................................................................... 138

*Michigan v. Bryant,* 562 U.S. 344 (2011) .................................................... 278

*Michigan v. Harvey*, 494 U.S. 344 (1990) ..................................................... 142

*Mickens v. Taylor*, 535 U.S. 162 (2002) ....................................................... 126

*Miller v. Alabama*, 567 U.S. 460 (2012) ...................................................... 120

*Miller v. Fenton,* 474 U.S. 104 (1985) ........................................................ 143

*Miller v. Johnson*, 200 F.3d 274 (5th Cir. 2000) .......................................... 156

*Mills v. Maryland*, 486 U.S. 367 (1988) ....................................................... 395

*Miranda v. Arizona,* 384 U.S. 436 (1966) .................................................... 141

*Mitchell v. Esparza*, 540 U.S. 12 (2003) ...................................................... 221

*Mitchell v. Johnson*, 252 F.3d 434, 2001 WL 360655 (5th Cir. 2001) ........... 45

*Monreal v. State*, 947 S.W.2d 559 (Tex. Crim. App. 1997) .......................... 131

*Montgomery v. Louisiana*, 577 U.S. 190 (2016) ........................................... 120

*Montoya v. Scott*, 65 F.3d 405 (5th Cir. 1995) ............................................. 414

*Moore v. Vannoy,* 968 F.3d 482 (5th Cir. 2020) ........................................... 172

*Morales v. Thaler*, 714 F.3d 295 (5th Cir. 2013) .................................... 229-230

*Moran v. Burbine*, 475 U.S. 412 (1986) ....................................................... 141

*Moore v. Quarterman*, 534 F.3d 454 (5th Cir. 2008) ..................................... 40

*Moreno v. Dretke*, 450 F.3d 158 (5th Cir. 2006) ............................................ 35

*Moss v. United States*, 323 F.3d 445 (6th Cir. 2003) ................................... 139

*Mullen v. Blackburn*, 808 F.2d 1143 (5th Cir. 1987) ......................... 268, 328

*Muniz v. Johnson*, 132 F.3d 214 (5th Cir. 1998) .............................. 35-36, 224

*Murphy v. Florida*, 421 U.S. 794 (1975) ..................................................... 167

*Murphy v. Johnson*, 205 F.3d 809 (5th Cir. 2000)  ........................................ 308

*Murray v. Carrier*, 477 U.S. 478 (1986)  ......................................... 37

*Napue v. Illinois,* 360 U.S. 264 (1959)  ......................................... 301

*Narvaiz v. State,* 840 S.W.2d 415 (Tex. Crim. App. 1992)  ......................... 208

*Neal v. Cain*, 141 F.3d 207 (5th Cir. 1998)  ................................... 206

*Neal v. Puckett*, 286 F.3d 230 (5th Cir. 2002)  ................................. 27

*Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998)  ............................ 237

*Nichols v. Scott*, 69 F.3d 1255 (5th Cir. 1995)  ............................... 376

*Nieto v. State*, 365 S.W.3d 673 (Tex. Crim. App. 2012)  ............................ 174

*Nobles v. Johnson*, 127 F.3d 409 (5th Cir. 1997)  ........................... 35

*O'Dell v. Netherland*, 521 U.S. 151 (1997)  ................................. 50-51

*Ohio v. Clark*, 576 U.S. 237 (2015)  ............................................. 278

*Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272 (1998)  ....................... 377

*Oliver v. Quarterman*, 541 F.3d 329 (5th Cir. 2008)  ................................. 329

*Ortega v. McCotter*, 808 F.2d 406 (5th Cir. 1987)  ......................... 317

*Oursbourn v. State*, 259 S.W.3d 159 (Tex. Crim. App. 2008)  .................... 262

*Oyler v. Boles*, 368 U.S. 448 (1962)  ...................................... 388, 408

*Padilla v. Kentucky*, 559 U.S. 356 (2010)  ............................... 58, 144

*Paredes v. Quarterman*, 574 F.3d 281 (5th Cir. 2009)  ............................. 341

*Parker v. Dugger,* 498 U.S. 308 (1991)  ....................................... 212

*Parker v. Matthews*, 567 U.S. 37 (2012)  ................................... 349

*Parker v. Procunier,* 763 F.2d 665 (5th Cir. 1985)  ....................................... 348

*Parr v. Quarterman*, 472 F.3d 245 (5th Cir. 2006)  ............................. 293, 313

*Pemberton v. Collins*, 991 F.2d 1218 (5th Cir. 1993)  ................................... 348

*Pennsylvania v. Muniz*, 496 U.S. 582 (1990)  ........................................ 219-221

*People v. Boyde*, 758 P.2d 25 (Cal. 1988)  ...................................... 318

*Penry v. Johnson*, 532 U.S. 782 (2001)  ......................................... 335

*Penry v. Lynaugh,* 492 U.S. 302 (1989)  ............................... 316, 335

*Penry v. State,* 903 S.W.2d 715 (Tex. Crim. App. 1995)  ............................ 226

*Perillo v. Johnson*, 205 F.3d 775 (5th Cir. 2000)  .................................. 126-127

*Perry v. State*, 158 S.W.3d 438 (Tex. Crim. App. 2004)  .............................. 337

*Pondexter v. Quarterman*, 537 F.3d 511 (5th Cir. 2008)  .............................. 35

*Pope v. Illinois,* 481 U.S. 497 (1987)  ........................................... 412

*Powell v. Quarterman*, 536 F.3d 325 (5th Cir. 2008)  ................................. 294

*Poyner v. Murray,* 964 F.2d 1404 (4th Cir. 1992)  ......................................... 61

*Presley v. City of Benbrook*, 4 F.3d 405 (5th Cir. 1993)  ...................... 219, 221

*Prystash v. State*, 3 S.W.3d 522 (Tex. Crim. App. 1999)  ..................... 338, 369

*Pulley v. Harris,* 465 U.S. 37 (1984)  ............................................ 256, 278, 403

*Pyles v. Johnson*, 136 F.3d 986 (5th Cir. 1998)  ........................................ 330

*Rayford v. State,* 125 S.W.3d 521 (Tex. Crim. App. 2003)  .......................... 398

*Reed v. Quarterman*, 504 F.3d 465 (5th Cir. 2007)  ..................................... 391

*Reed v. State*, 541 S.W.3d 759 (Tex. Crim. App. 2017)  ................................ 380

*Reed v. Stephens,* 739 F.3d 753 (5th Cir. 2014) ............................................ 215

*Remmer v. United States*, 347 U.S. 227 (1954) ........................................... 329

*Renico v. Lett*, 559 U.S. 766 (2010) ............................................................. 349

*Renteria v. State,* 206 S.W.3d 689 (Tex. Crim. App. 2006) ......................... 352

*Resendiz v. State*, 112 S.W.3d 541 (Tex. Crim. App. 2003) ................ 337, 368

*Rhines v. Weber*, 544 U.S. 269 (2005) ........................................................... 33

*Rhode Island v. Innis,* 446 U.S. 291 (1980) ................................................. 220

*Richards v. Dist. Att'y's Off.*, 355 F. App'x 826 (5th Cir. 2009) ................. 376

*Richardson v. Procunier*, 762 F.2d 429 (5th Cir. 1985) ................................ 34

*Ripkowski v. Thaler*, 438 F. App'x 296 (5th Cir. 2011) ............................... 384

*Rhoades v. Martinez,* 142 S. Ct. 54 (2021) ................................................... 386

*Rhoades v. Martinez*, No. 21-70007, 2021 WL 4434711 (5th Cir. Sept. 27, 2021) ............................................................................................................... 386

*Ring v. Arizona,* 536 U.S. 584 (2002) ........................................................... 397

*Roach v. Quarterman*, 220 F. App'x 270 (5th Cir. 2007) ............................ 403

*Roberts v. Louisiana,* 428 U.S. 325 (1976) .................................................. 409

*Roberts v. State*, 220 S.W.3d 521 (Tex. Crim. App.) .................................... 337

*Roberts v. Thaler*, 681 F.3d 597 (5th Cir. 2012) ......................................... 120

*Robinson v. Polk,* 438 F.3d 350 (4th Cir. 2006) ........................................... 329

*Robinson v. State*, 16 S.W.3d 808 (Tex. Crim. App. 2000) ......................... 367

*Rodriguez v. Quarterman*, 204 F. App'x 489 (5th Cir. 2006) ..................... 110

*Romano v. Oklahoma*, 512 U.S. 1 (1994) ............................................. 208, 395

*Rompilla v. Beard,* 545 U.S. 374 (2005) .......................................... 60, 66, 104

*Roper v. Simmons*, 543 U.S. 551 (2005) ............................................... 120, 123

*Roquemore v. State,* 60 S.W.3d 862 (Tex. Crim. App. 2001) ....................... 220

*Ross v. Estelle*, 694 F.2d 1008 (5th Cir. 1983) ............................................... 53

*Rowell* v. *Dretke,* 398 F.3d 370 (5th Cir. 2005) ............................ 370-371, 396

*Ruiz v. Davis,* 850 F.3d 225 (5th Cir. 2017) .................................................. 391

*Ruiz v. Quarterman*, 460 F.3d 638 (5th Cir. 2006) ........................................ 34

*Russeau v. State*, 171 S.W.3d 871 (Tex. Crim. App. 2005) .... 337-338, 368-369

*Saffle v. Parks*, 494 U.S. 484 (1990) .............................................................. 124

*Salazar v. State*, 38 S.W.3d 141 (Tex. Crim. App. 2001) ..................... 337, 368

*Santellan v. State,* 939 S.W.2d 155 (Tex. Crim. App. 1997) ....................... 207

*Sawyer v. Whitley*, 505 U.S. 333 (1992) ................................................. 39, 286

*Scheanette v. Quarterman,* 482 F.3d 815 (5th Cir. 2007) ........................... 341

*Schlang v. Heard*, 691 F.2d 796 (5th Cir. 1982) ............................................ 53

*Schlup v. Delo,* 513 U.S. 298 (1995) ....................................................... passim

*Schriro v. Landrigan*, 550 U.S. 465 (2022) .................................................... 42

*Segundo v. State*, 270 S.W.3d 79 (Tex. Crim. App. 2008) ........................... 336

*Self v. Collins*, 973 F.2d 1198 (5th Cir. 1992) ............................................. 140

*Sharpe v. Bell*, 593 F.3d 372 (4th Cir. 2010) ............................................... 286

*Shinn v. Martinez Ramirez,* 142 S. Ct. 1718 (2022) ................................ passim

*ShisInday v. Quarterman*, 511 F.3d 514 (5th Cir. 2007) .................... 384, 391

*Sims v. Georgia*, 385 U.S. 538 (1967) ........................................... 261

*Skilling v. United States*, 561 U.S. 358 (2010) ............................. 167

*Skinner v. Switzer*, 562 U.S. 521 (2011) ...................................... 375

*Smith v. Cockrell*, 311 F.3d 661 (5th Cir. 2002) ............................ 25

*Smith v. Collins,* 977 F.2d 951 (5th Cir. 1992) .............................. 61

*Smith v. Davis,* 927 F.3d 313 (5th Cir. 2019) ................................ 384

*Smith v. Dixon*, 14 F.3d 956 (5th Cir. 1994) .................................. 39

*Smith v. Murray*, 477 U.S. 527 (1986) .......................................... 359

*Smith v. Phillips,* 455 U.S. 209 (1982) ......................................... 329

*Smith v. Puckett*, 907 F.2d 581 (5th Cir. 1990) ............................. 360

*Smith v. Robbins*, 528 U.S. 259 (2000) ........................................ 359

*Smith v. State,* 297 S.W.3d 260 (Tex. Crim. App. 2009) ............... 370

*Snyder v. Louisiana*, 552 U.S. 472 (2008) .................................... 174

*Sonnier v. Quarterman*, 476 F.3d 349 (5th Cir. 2007) ............ 340, 404

*Sonnier v. State,* 913 S.W.2d 511 (Tex. Crim. App. 1995) ........... 207

*South Dakota v. Neville,* 459 U.S. 553 (1983) .............................. 220

*Splawn v. Thaler,* 494 F. App'x 448 (5th Cir. 2012) ...................... 172

*Sprouse v. Stephens*, 748 F.3d 609 (5th Cir. 2014) ................ 336, 402

*Stevens v. Epps,* 618 F.3d 489 (5th Cir. 2010) .............................. 373

*Strickland v. Washington*, 466 U.S. 668 (1984) ....................... passim

*Strickler v. Greene*, 527 U.S. 263 (1999) ................................................ 293, 313

*Stringer v. Black*, 503 U.S. 222 (1990) ...................................................... 345-346

*Sullivan v. Blackburn*, 804 F.2d 885 (5th Cir. 1986) .................................. 260

*Summers v. Dretke*, 431 F.3d 861 (5th Cir. 2005) ................................. 312-313

*Swarthout v. Cooke*, 562 U.S. 216 (2011) ................................................... 237

*Tanner v. United States,* 483 U.S. 107 (1987) ............................................ 329

*Taylor v. Thaler*, 397 F. App'x 104 (5th Cir. 2010) .................................... 404

*Teague v. Lane*, 489 U.S. 288 (1989) ...................................................... passim

*Tennard v. Dretke*, 542 U.S. 274 (2004) .................................................. 25, 60

*Tercero v. Stephens*, 738 F.3d 141 (5th Cir. 2013) .................................... 372

*TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432 (Tex. 2011) ....... 341

*Thompson v. State*, 94 S.W.3d 11 (Tex. App.—Houston [14th Dist.] 2002, pet.

ref' d) ........................................................................................................ 131

*Tison v. Arizona,* 481 U.S. 137 (1987) .................................................... passim

*Trevino v. Johnson*, 168 F. 3d 173 (5th Cir. 1999) ................................. 47, 376

*Trevino v. Thaler,* 569 U.S. 413 (2013) .................................................... 37-38

*Tucker v. Johnson*, 242 F.3d 617 (5th Cir. 2001) ........................................ 44

*United States v. Anderton*, 629 F.2d 1044 (5th Cir. 1980) .......................... 340

*United States v. Arellano-Banuelos*, 912 F.3d 862 (5th Cir. 2019) ...... 219-220

*United States v. Bagley,* 473 U.S. 667 (1985) ........................ 292-293, 297, 315

*United States v. Bell*, 367 F.3d 452 (5th Cir. 2004) ..................................... 203

*United States v. Bernard*, 762 F.3d 467 (5th Cir. 2014) ..................... 123, 157

*United States v. Caballero*, 712 F.2d 126 (5th Cir. 1983) ........................... 321

*United States v. Castillo-Rubio*, 34 F.4th 404 (5th Cir. 2022) .............. passim

*United States v. Cronic*, 466 U.S. 648 (1984) ................................................ 57

*United States v. Culverhouse*, 507 F.3d 888 (5th Cir. 2007) ...................... 127

*United States v. Cutno*, 431 F. App'x 275 (5th Cir. 2011) ......................... 312

*United States v. Doe*, 465 U.S. 605 (1984) ..................................................... 243

*United States v. Fields,* 483 F.3d 313 (5th Cir. 2007) ................. 188, 237, 282

*United States v. Green*, 882 F.2d 999 (5th Cir. 1989) .................................... 59

*United States v. Greer*, 631 F.3d 608 (2d Cir. 2011) .................................... 243

*United States v. Grinnell Corp.*, 384 U.S. 563 (1966) ................................. 270

*United States v. Hubbell*, 530 U.S. 27 (2000) ........................................ 242-243

*United States v. Jones*, 132 F.3d 232 (5th Cir. 1998) ................................... 385

*United States v. McKinney*, 758 F.2d 1036 (5th Cir. 1985) ......................... 295

*United States v. Pace,* 10 F.3d 1106 (5th Cir. 1993) .................................... 189

*United States v. Robinson*, 367 F.3d 278 (5th Cir. 2004) ............................ 386

*United States v. Stalnaker,* 571 F.3d 428 (5th Cir. 2009) ........................... 279

*United States v. Velasquez,* 881 F.3d 314 (5th Cir. 2018) .................... 244-245

*United States v. Walters,* 351 F.3d 159 (5th Cir. 2003) ............................... 306

*United States v. Wilkes*, 20 F.3d 651 (5th Cir. 1994) ................................... 360

*United States v. Williams,* 132 F.3d 1055 (5th Cir. 1998) ........................... 295

*Uresti v. Lynaugh*, 821 F.2d 1099 (5th Cir. 1987) ............................... 141, 223

*Valdez v. Cockrell*, 274 F.3d 941 (5th Cir. 2001) ................................. 28, 30, 47

*Valle v. Quarterman*, No. 08-70005, 2008 U.S. App. LEXIS 22165 (5th Cir.

2008) ........................................................................................ 254-255

*Valle v. State,* 109 S.W.3d 500 (Tex. Crim. App. 2003) ............................... 352

*Varga v. Quarterman*, 321 F. App'x 390 (5th Cir. 2009) ........................... 360

*Vela v. Estelle*, 708 F.2d 954 (5th Cir. 1983) ..................................... 35

*Virgen-Moreno*, 265 F.3d 276 (5th Cir. 2001) ................................. 220

*Wacht v. Cardwell*, 604 F.2d 1245 (9th Cir. 1979) ........................... 52

*Ward v. Dretke*, 420 F.3d 479 (5th Cir. 2005) ................................. 194

*Ward v. Stephens*, 777 F.3d 250 (5th Cir. 2015) ........................... 383

*Ward v. Whitley*, 21 F.3d 1355 (5th Cir. 1994) ............................. 324

*Washington v. Texas*, 388 U.S. 14 (1967) ...................................... 246

*Watkins v. State*, 245 S.W.3d 444 (Tex. Crim. App. 2008) ........................ 174

*Watson v. State,* 204 S.W.3d 404 (Tex. Crim. App. 2006) ........................... 349

*Watts v. Quarterman*, 244 F. App'x 572, 2007 U.S. App. LEXIS 18295 (5th

Cir. 2007) ................................................................................ 254

*Watts v. Quarterman*, 448 F. Supp. 2[d] 786 (W.D. Tex. 2006) ................... 253

*Weeks v. Angelone*, 528 U.S. 225 (2000) ....................................... 319

*Westley v. Hudson*, 83 F.3d 714 (5th Cir. 1996) ........................... 204

*Whitaker v. Collier*, 862 F.3d 490 (5th Cir. 2017) ........................ 416

*White v. Johnson*, 79 F.3d 432 (5th Cir. 1996) ............................................. 391

*White v. Thaler*, 522 F. App'x 226 (5th Cir. 2013) ....................................... 336

*White v. Woodall*, 572 U.S. 415 (2014) ........................................................ 133

*Wiggins v. Smith,* 539 U.S. 510 (2003) .................................................... 60, 66

*Wiley v. Epps,* 625 F.3d 199 (5th Cir. 2010) ................................................. 47

*Wilkerson v. Cain,* 233 F.3d 886 (5th Cir. 2000) ......................................... 257

*Wilkinson v. Dotson*, 544 U.S. 74 (2005) ...................................................... 375

*Williams v. Illinois*, 567 U.S. 50 (2012) ...................................................... 283

*Williams v. Maggio*, 727 F.2d 1387 (5th Cir. 1984) .................................... 265

*(Michael) Williams v. Taylor*, 529 U.S. 420 (2000) ....................................... 41

*(Terry) Williams v. Taylor*, 529 U.S. 362 (2002) ........................................... 26

*Witherspoon* [*v. Illinois*, 391 U.S. 510 (1968) ............................................. 259

*Wong v. Belmontes*, 558 U.S. 15 (2009) ........................................................ 62

*Wood v. Collier*, 836 F.3d 534 (5th Cir. 2016) ............................................. 416

*Wood v. Quarterman,* 503 F.3d 408 (5th. Cir. 2007) .................................... 205

*Woodard v. Beto*, 447 F.2d 103 (5th Cir. 1971) ............................................. 53

*Woods v. Cockrell,* 307 F.3d 353 (5th Cir. 2002) ......................................... 370

*Woods v. Johnson,* 75 F.3d 1017 (5th Cir. 1996) .................................. 341, 405

*Woodson v. North Carolina,* 428 U.S. 280 (1976) ........................................ 409

*Wyatt v. State,* 23 S.W.3d 18 (Tex. Crim. App.2000) ................................... 226

*Yarborough v. Alvarado*, 541 U.S. 652 (2004) ............................................... 27

*Yohey v. Collins,* 985 F.2d 222 (5th Cir. 1993) .............................. 61, 104, 418

*Young v. Stephens*, 795 F.3d 484 (5th Cir. 2015) ........................................ 203

## Constitutional Provisions

U.S. Const. art. VI ..................................................................... passim

U.S. Const. art. VIII ................................................................... passim

U.S. Const. art. XIV ................................................................... passim

## Rules

Fed. R. Evid. 606 ......................................................................... 331

Fed. R. Evid. 702 ......................................................................... 237

Tex. R. App. P. 26.2 ....................................................................... 55

Tex. R. Evid. 403 ................................................................. 188, 206-207

Tex. R. Evid. 705 ......................................................... 68-69, 248, 256

Tex. R. Civ. Proc. 226a ................................................................. 333

## Statutes

28 U.S.C. § 455 ........................................................................... 270

28 U.S.C. § 2244 ................................................................... 53-54, 56

28 U.S.C. § 2254 ...................................................................... passim

28 U.S.C.A. § 2254 ............................................................... 143-144

Tex. Code Crim. Proc. Ann. art. 11.071 § 5 ............................................ passim

Tex. Code Crim. Proc. Ann. art. 37.071 § 2 ....................... 266, 342, 399, 402

Tex. Code Crim. Proc. art. 12.31 ................................................... 398

Tex. Code Crim. Proc. art. 29.06 ................................................. 215

Tex. Code Crim. Proc. art. 31.03 ................................................. 169

Tex. Code Crim. Proc. art. 37.071 § 2 .................................... 266, 342, 399, 402

Tex. Code Crim. Proc. art. 38.22 .......................................... passim

Tex. Code Crim. Proc. art. 64.01 ................................................. 379

Tex. Code Crim. Proc. art. 64.03 ........................................... 379, 381

Tex. Pen. Code § 7.02 ......................................... 196, 198, 350, 411

Tex. Pen. Code § 19.03 ....................................................... 398, 406

**RESPONDENT LUMPKIN'S ORIGINAL
MOTION FOR SUMMARY JUDGMENT AND ANSWER
WITH BRIEF IN SUPPORT**

In a Texas state court, Juan Raul Navarro Ramirez was convicted of capital murder for intentionally and knowingly causing the deaths of six persons. Ramirez challenges his conviction and sentence by means of a petition for writ of habeas corpus. The Court has jurisdiction over the subject matter and the parties. *See* 28 U.S.C. § 2254. The Director, through his attorney, the Attorney General of Texas, files this response. Except for those allegations supported by the record and those admitted herein, the Director denies every allegation of fact made by Ramirez.

## RAMIREZ'S ALLEGATIONS

### Claim One

Ramirez was denied effective assistance of counsel during the penalty phase of trial in violation of the Sixth, Eighth, and Fourteenth Amendments, when his trial counsel failed to investigate and present readily available evidence of Ramirez's neurodevelopmental disabilities, brain damage, and mental illness.

### Claim Two

As he was 18 at the time of the crime, Ramirez's execution would violate the Eighth Amendment prohibition on cruel and unusual punishment.

### Claim Three

Ramirez's Sixth Amendment right to counsel was violated because trial counsel rendered ineffective assistance during the pretrial and guilt phases of his capital trial for the following reasons:

1.  Ramirez was denied effective assistance of counsel due to his trial counsel's conflicts.

2.  Ramirez was denied effective assistance of counsel due to trial counsel's failure to prepare for and represent him during suppression proceedings, specifically:

    a.  Trial counsel failed to investigate and present evidence that Ramirez's statement was coerced and unreliable.

    b.  Trial counsel failed to properly interview lay witnesses and arrange for them to appear at the hearing.

    c.  Trial counsel failed to properly investigate the existence of audio and video recordings of Ramirez's arrest and booking.

    d.  Trial counsel subpoenaed the wrong booking officer to testify at the suppression hearing.

    e.  Trial counsel failed to competently impeach the State's law enforcement witnesses.

    f.  Trial counsel failed to conduct a proper direct examination of Ramirez.

    g.  Trial counsel failed to retain a false confession expert.

3.  Ramirez was denied effective assistance of counsel due to his trial counsel's failure to conduct an adequate pretrial investigation.

4.  Ramirez was denied effective assistance of counsel due to trial counsel's failure to raise a grand jury challenge.

5.  Ramirez was denied effective assistance of counsel due to trial counsel's failure to request a change of venue.

6.  Counsel's ineffective assistance during jury selection deprived Ramirez of his rights to counsel, a fair trial, an impartial jury, reliable proceedings, due process, and equal protection.

7.   Ramirez was denied effective assistance of counsel when trial counsel failed to object to the State's discriminatory use of peremptory challenges.

8.   Ramirez was denied effective assistance of counsel when trial counsel failed to request continuances, despite being unprepared.

9.   Ramirez was denied effective assistance of counsel when his trial counsel failed to investigate and raise innocence claims.

10.  Ramirez was denied effective assistance of counsel when his trial counsel failed to introduce evidence to the jury that his confession was involuntary, false, and unreliable.

11.  Ramirez was denied effective assistance of counsel when his trial counsel failed to preserve the following issues for review:

   a.   Failure to object to gruesome photographs.

   b.   Failure to object to untranslated statements.

   c.   Failure to challenge admission of other bad acts.

   d.   Failure to contest the State's evidence of gang membership.

   e.   Failure to challenge the charge language, request an instruction on conspiracy criminal responsibility, and ask for special verdict forms.

   f.   Failure to object to Ramirez's improper confinement and excessive security presence in front of the jury.

12.  Ramirez was denied effective assistance of counsel when his trial counsel failed to ensure a complete record for review.

13.  The cumulative effect of trial counsel's deficiencies prejudiced Ramirez at both the guilt and penalty phases.

## Claim Four

The trial court's numerous errors during the guilt phase of trial violated Ramirez's constitutional rights, specifically:

1.  The trial court erred by not appointing qualified, un-conflicted counsel, violating Ramirez's rights under the Sixth and Fourteenth Amendments.

2.  The trial court's admission of excessively gruesome photographs during Ramirez's trial resulted in the denial of a fair trial and due process.

3.  The trial court unconstitutionally required that Ramirez be physically restrained at the guilt and penalty phase violating Ramirez's rights under the Fifth, Sixth, and Fourteenth Amendments.

4.  The trial court's failures to ensure that all of Ramirez's trial proceedings were recorded violated his Sixth, Eighth, and Fourteenth Amendment rights to a public trial and meaningful appeal.

5.  The trial court erred by denying Ramirez's requests for new counsel, violating Ramirez's constitutional rights.

6.  The trial court erred by failing to continue the suppression hearing.

7.  The trial court erred in allowing testimony about Ramirez's statements during the booking process, violating Ramirez's rights under the Fifth, Sixth, and Fourteenth Amendments.

8.  The trial court erred in admitting statements Ramirez made during police interrogation.

9.  The trial court erred in allowing Champion to testify about Ramirez's statement that he had marijuana.

10. The trial court erred when it overruled Ramirez's motion for new trial.

11.  The trial court erred in allowing a police investigator to testify as a gang expert.

12.  The trial court erred in admitting evidence of other serious crime.

13.  The trial court erred in ordering Ramirez to show the jury his arms for the State to obtain testimony about the content of Ramirez's tattoos in the guilt phase.

14.  Ramirez's Sixth, Eighth, and Fourteenth Amendment right to have all potentially mitigating evidence considered at trial was violated when the court prevented Ramirez from presenting relevant mitigating evidence.

15.  The exclusion of venire members for cause violated Ramirez's right to an impartial jury and due process under the Sixth, Eight, and Fourteenth Amendment to the U.S. Constitution.

16.  The trial court erred by giving an insufficient voluntariness instruction that was contrary to Texas law and in violation of Ramirez's Fourteenth Amendment due process rights.

17.  Ramirez's constitutional rights were violated when the trial court failed to use special verdict forms.

18.  The cumulative effect of the trial-court errors prejudiced Ramirez.

## Claim Five

Ramirez's conviction and sentence should be vacated because the trial judge was biased, in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

## Claim Six

Ramirez was denied the right to confront a witness against him and therefore his conviction and sentence violate the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

## Claim Seven

Ramirez's execution would be unconstitutional because he is actually innocent.

## Claim Eight

The State committed misconduct throughout Ramirez's trial in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

1. The State committed misconduct when it denied the existence of the arrest video until after the suppression hearing.

2. The State committed misconduct when it engaged in or allowed police to engage in spoilation of evidence.

3. The State committed misconduct when it sponsored false testimony at the suppression hearing.

4. The State committed misconduct regarding Marcial Bocanegra, a co-conspirator in the murders, in the following ways:

   a. The State concealed and then misrepresented the nature of the cooperation agreement it reached with Marcial Bocanegra.

   b. The State concealed evidence obtained from Bocanegra exculpating Ramirez and instead misleadingly suggested that Bocanegra would provide inculpatory testimony as a State's witness.

5. The State committed misconduct when it failed to disclose conditions in the Texas Youth Commission (TYC) and made false arguments regarding those conditions.

6. The State committed misconduct by urging an unconstitutional limitation on mitigating evidence.

7. The State committed misconduct when the prosecutors made inflammatory and improper comments during arguments.

8. The State committed various other forms of misconduct.

9. Cumulative prejudice.

## Claim Nine

Juror misconduct at the guilt and sentencing phases of trial deprived Ramirez of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial.

## Claim Ten

The jury instructions given during Ramirez's trial violated his rights to a reliable sentence and to due process as enshrined by the Eighth and Fourteenth Amendments to the U.S. Constitution.

1. The Texas mitigation special issue given in Ramirez's case failed to adequately define "mitigating evidence," and the instruction created a reasonable possibility that the jury would construe the mitigating evidence narrowly, requiring a cause nexus to the crime.

2. The mitigation special issue instruction given in Ramirez's case was unconstitutionally vague and a violation of Ramirez's Eighth and Fourteenth Amendment rights.

## Claim Eleven

Ramirez was sentenced based in part on an invalid murder conviction in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

## Claim Twelve

The evidence presented at trial was factually and legally insufficient to convict Ramirez and to sentence him to death, violating Ramirez's Eighth and Fourteenth Amendment.

## Claim Thirteen

Ramirez was denied the effective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution.

## Claim Fourteen

The Texas Court of Criminal Appeals prohibited Ramirez from raising sufficiency of the evidence claims on direct appeal regarding the mitigation special issue in violation of Ramirez's Eighth and Fourteenth Amendment rights.

## Claim Fifteen

Ramirez's post-conviction counsel were ineffective and deprived Ramirez of his constitutional rights to due process and effective assistance of counsel in violation of the Sixth and Fourteenth Amendments to the U.S. Constitution.

## Claim Sixteen

The state court erred in denying Ramirez's motion to test DNA evidence, violating Ramirez's rights under the Fourteenth Amendment's Due Process Clause.

## Claim Seventeen

Ramirez's death sentence is unconstitutional for the reasons stated below:

1. Ramirez's execution as someone with a serious mental illness would be unconstitutional.

2. Ramirez's death sentence is inconsistent with the evolving standards of decency that mark the progress of a maturing society.

3. The Texas death penalty scheme violates Ramirez's due process rights as it is unconstitutionally arbitrary.

4. Ramirez's execution after fourteen years on death row violates his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the U.S. Constitution.

5. Ramirez's mental impairments render him insufficiently culpable, and thus ineligible, for the death penalty.

6.   Ramirez's constitutional rights were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence.

7.   Texas's capital sentencing scheme violated Ramirez's rights by failing to require the jury to find each element necessary to impose the death penalty beyond a reasonable doubt.

8.   Texas's capital sentencing scheme unconstitutionally limits what constitutes mitigation in violation of Ramirez's Eighth and Fourteenth Amendment rights.

9.   The capital sentencing scheme under which Ramirez was sentenced failed to ensure a proportionality review in violation of the Fifth, Eighth, and Fourteenth Amendments of the U.S. Constitution.

10.   Texas's capital sentencing scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because it does not sufficiently channel the sentencer's discretion or sufficiently narrow the class of death-eligible defendant.

11.   Texas's capital sentencing scheme violates the Eighth and Fourteenth Amendments of the U.S. Constitution because it affords the prosecutor unbridled discretion to seek the death penalty.

12.   It is a violation of the Eighth Amendment to convict someone in Texas of capital murder under the State's law of parties.

## Claim Eighteen

Texas's legal injection protocol is a violation of the Eighth Amendment's prohibition on cruel and unusual punishment.

## Claim Nineteen

The cumulative prejudice of the constitutional errors in Ramirez's case demands his conviction and sentence be vacated under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution.

ECF 67.

## STATEMENT REGARDING THE RECORD

On July 19, 2022, with the exception of the previously sealed volumes of the trial reporter's record containing the completed juror questionnaires that have yet to be received, the Director will file with the Court a copy of the state court record from Ramirez's direct appeal, state habeas proceedings, and postconviction DNA testing proceedings. The remaining volumes will be filed with this Court under seal upon receipt.

## STATEMENT OF THE CASE

On August 27, 2005, Ramirez was found guilty of two counts of capital murder and sentenced to death on each. 2 CR[1] 591–98. Count one was charged under Texas's capital murder statute as a murder of multiple persons in one transaction. 1 CR 4. Count two was charged as murder in the course of committing or attempting to commit robbery. 1 CR 4. The underlying facts and the victims in both cases were the same. Among others, this issue was raised on direct appeal as a violation of double jeopardy. The Texas Court of Criminal Appeals (CCA) affirmed the conviction as to count one and reversed and vacated the conviction on count two on double jeopardy grounds. *Ramirez v.*

---

[1] "CR" refers to the Hidalgo County, Texas clerk's record submitted to the Court of Criminal Appeals (CCA) on direct appeal from cause number CR-0551-04-G, preceded by the volume number and followed by the page number.

*State*, No. AP-75,167, 2007 WL 4375936, at *20 (Tex. Crim. App. 2008) (unpublished).

Ramirez filed a state application for writ of habeas corpus on July 2, 2009. 1 SHCR[2] 82. Subsequently, and after the deadline for filing an initial application under Texas Code of Criminal Procedure article 11.071, Ramirez filed what he titled an "Amended Initial Application for a Writ of Habeas Corpus." 3 SHCR 1114. With regard to Ramirez's initial application for writ of habeas corpus, the CCA adopted the trial judge's findings of fact and conclusions of law. *Ex parte Ramirez*, No. WR-75,401-01 & WR-71-401-02, 2015 WL 6282336, at *1 (Tex. Crim. App. Oct. 14, 2015) (unpublished). Based upon these and the court's own review, the CCA dismissed claims two, three, four, and fourteen as waived[3] and denied the remaining claims on the merits. *Id.* With regard to what Ramirez termed his Amended Initial Application, the CCA found that, it was filed years after the statutory deadline to file an initial

---

[2] "SHCR" refers to the Hidalgo County, Texas clerk's record submitted on state habeas to the CCA from cause number CR-0551-04-G, preceded by the volume number and followed by the page number.

[3] Claim two was "Applicant's death sentence must be set aside because he is mentally retarded." 1 SHCR 83. Claim three was "Applicant's trial attorney's [sic] were ineffective for failing to investigate and present evidence of Mr. Ramirez's mental retardation." 1 SHCR 83. Claim four was "Even if it is determined that Applicant is not retarded, his death sentence violates the Due Process Clause of the Fifth and Fourteenth Amendments and the Eighth Amendment of the United States Constitution." 1 SHCR 83. Claim fourteen was "Applicant was not competent to stand trial, and his conviction should be set aside." 1 SHCR 84.

application, the "amendment" was a subsequent application, and dismissed it under article 11.071 §5 as an abuse of the writ.[4] *Id.*

On October 21, 2015, Ramirez filed a Motion for Post-Conviction DNA Testing under Chapter 64 of the Texas Code of Criminal Procedure. DNACR[5] 19. The state trial court signed an order denying Ramirez's motion on June 7, 2017. DNACR 5. On November 1, 2018, the state trial court entered a superseding order that also denied the motion. DNACR 143–47. Ramirez filed a notice of appeal on November 9, 2018. DNACR 148–51. On May 5, 2021, in a published opinion, the CCA affirmed the denial on appeal. *Ramirez v. State*, 621 S.W.3d 711 (Tex. Crim. App. 2021).

Ramirez filed the instant proceeding on November 30, 2018. ECF 24. On January 9, 2019, Ramirez filed a motion to stay the federal proceedings in order to allow him to return to state court to file a motion for post-conviction DNA testing. ECF 38. This Court stayed the case on case on September 17, 2019. ECF 54. Ramirez eventually returned to federal court and filed his amended petition for writ of habeas corpus on July 15, 2021. ECF 67.

---

[4] As such, the application Ramirez labeled as "Amended" will henceforth be referred to as Ramirez's subsequent application.

[5] "DNACR" refers to the Hidalgo County, Texas clerk's record submitted to the CCA on appeal from the District Court's denial of Ramirez's Motion for DNA testing from cause number CR-0551-04-G, preceded by the volume number and followed by the page number.

## STATEMENT OF FACTS

### I.  Guilt/Innocence Facts

This trial involved the gang-related, "pseudo-cop" robbery-homicide of six men, some of whom were rival gang members of the "Bombita" gang to which [Ramirez] belonged.

In the early morning hours of January 5, 2003, police responded to a 9–1–1 call and found the bodies of six men at 2915 East Monte Cristo Road in Edinburg. There were two houses on the property that were separated by a dirt driveway. Police found the body of Jerry Hidalgo in the kitchen of the larger house that was located on the west side of the driveway (the "west-side house"). He was lying face down on the floor and his hands and legs were bound with extension cords. He had sustained numerous gunshot wounds, and there was a bullet hole in his back and blood around his head. The living room had been ransacked, and it appeared that someone had rummaged through one of the bedrooms, leaving the bed mattress standing on its side.

The body of Juan Delgado, III, was lying face down in the grass outside the front door of the smaller house on the east side of the driveway (the "east-side house"). He had suffered a fatal gunshot wound to the back of his neck. There was a live 9–millimeter round in the grass near his body. As they entered the house, police discovered the bodies of Juan Delgado, Jr., who had been shot in the back and head, and Jimmy Almendarez, who had suffered multiple gunshot wounds, including a fatal head wound. Police also found a magazine clip underneath a stereo speaker. The bodies of Ray Hidalgo and Ruben Castillo were in another room. Ray had sustained two gunshot wounds to the head and was missing an eye. Ruben had suffered multiple gunshot wounds including shots to the buttocks. Police also found a burnt marijuana cigarette and small baggies of marijuana and cocaine in that room. The "east-side house" had also been ransacked, and the victims' pockets had been pulled out.

Some of the ballistics evidence recovered from the scene included 7.62 by 39 caliber bullets and casings. Police also recovered a cooking pan and some black skull caps from the west-

side house and a "cold weather knit cap" from the open field behind the houses. There were three cars parked at the scene: an inoperable dark-colored Dodge Ram that belonged to Rosie Gutierrez; a small maroon car that had been rented by Jimmy Almendarez; and a brown Buick Regal that belonged to Luis Villa.

Rosie Gutierrez was present during the shootings and called 9–1–1 after the assailants left the scene. She testified that she and her sons, Jerry and Ray Hidalgo, lived at 2915 East Monte Cristo Road, and that the Delgados, Almendarez, and Castillo were her sons' friends. On the night of January 4, she played dominoes with her sons in the west-side house. Ray went to the east-side house with Delgado, Jr., at around midnight. Shortly thereafter, she and Jerry finished playing dominoes and went into the living room. Ms. Gutierrez suffered from a medical condition that affected her legs, so she laid down in a borrowed hospital bed she kept in the living room to watch television while Jerry talked on the phone with a friend. She heard loud booming noises that sounded like fireworks; then someone banged on her door, and three or four men entered her house. The leader, a man who spoke Spanish and who had a long gun with holes in the barrel, pointed the gun at her head and told her to lie down and face the wall. He was wearing a ski mask and a jacket with the word "Police" on the sleeves and back. He ordered his cohorts to tie up Ms. Gutierrez and Jerry, and they used extension cords to do so. The man who tied up Ms. Gutierrez was unmasked and carried a smaller handgun. The other men who restrained Jerry were masked, and she was unsure if they had guns. The leader demanded "drugs, money, gold and guns" and kept hitting Jerry in the head with his gun. Jerry responded that they did not have anything. "They" told Jerry to take off his gold necklace and asked for the car keys. Jerry answered that the car was "no good" and that they would get caught if they left in it. "The guy" pulled off Jerry's tennis shoes and asked if anyone wanted them. He then dropped the tennis shoes, stating, "Let's go," and they left.

Shortly thereafter, "a man with a ski mask" carrying a long gun and wearing a jacket with "Police" on it came back into the house and ransacked the living room. He left, came back inside, shot Jerry "a whole bunch of times," then left again. Ms. Gutierrez then untied herself and called 9–1–1.

14

Police later questioned Luis Villa, who was also present at the scene on the night of the shootings. Villa told police that he and Castillo took Delgado, Jr. to "Ray's house" at 9:30 p.m. Villa and Castillo then tried to go to a nightclub. Villa was denied entrance to the club because he did not have proper identification, so they returned to Ray's house at about 10:30 p.m. Delgado, III, came to the house with a friend about 12:30 a.m. Castillo went outside to use the bathroom, and Villa heard a voice tell Castillo: "Hey you mother fucker get your ass on the floor ..." Delgado, Jr., said there were a lot of people with guns outside. Villa, who was seated on a sofa, heard some gunshots and jumped out the window. He told Delgado, Jr., to follow him, but he did not do so. As Villa ran away, he heard "two kinds of machine guns shooting at the same time."

Villa's friend Jose Carreon testified that he called Villa on his cell phone around 1:00 or 1:30 a.m. Villa, who was "scared, tired, [and] running," said that "they were shooting at him, and they shot his cousins." Carreon heard gunshots in the background. Carreon also lived near the scene and heard gunshots outside.

Police received information about a "pseudo-cop" robbery and took various suspects into custody. Police also discovered that suspect Rodolfo Medrano (a/k/a "Kreeper") had given his friend Miguel Tinajero some weapons to hide. Tinajero testified that on January 20, Medrano gave him a long case and said, "Take this and put it away." Tinajero later opened the case and saw three military-style rifles inside. Tinajero placed the weapons inside the trunk of a car at his father's residence in Elsa. When he opened the trunk, he saw that other weapons had already been placed inside. He testified that Medrano had been to his father's residence before and knew where the car keys were kept. Tinajero notified police about the guns. Two of the guns, State's Exhibits 107 and 113, had apparent bloodstains and were submitted for DNA testing. The stain on the stock area of State's Exhibit 107 was inconclusive. The stain on the muzzle of State's Exhibit 113 was consistent with the DNA profile of victim Delgado, Jr.

[Ramirez] was eventually arrested and gave an audiotaped statement to police. In his statement, he admitted that he "used to hang around with" some "TCB" gang members. He said that at

7:00 or 8:00 p.m. on January 4, Robert Garza (a/k/a "Bones") called and asked him if he wanted to make some money. "Bones" told him it was about "some jelly beans," which means "some pounds." Bones told him an amount, which [Ramirez] thought was "a thousand pounds or a little bit more of something." He agreed to participate and met Bones at the home of a person who went by the name Juanon (a/k/a "Barney"). Some of the other people present included Salvador Solis, Freddy Krueger, and Marcial Bocanegra. Most of them were wearing black, some wore ski masks, and all of them wore gloves. [Ramirez] stated that "it was supposed to be a pseudo-cop" type of robbery, and they "were supposed to go in there to look for drugs and weapons."

[Ramirez] stated that when he arrived at Juanon's, the guns and bullets had already been cleaned of fingerprints. [Ramirez], the last one to choose his weapon, selected a "cuerno de chivo." [Ramirez] said the men drove to the scene in a black or dark blue truck and a light brown Escalade, and the "one with the Escalade" was "the one who was telling us what was going down." The "one with the Escalade" said: "They got guns and there might be some people in there, too, so you gotta put them down 'cause the family members got some guns."

[Ramirez] stated that they hid in the tall grass in a field behind the houses with their high-caliber weapons. When a man stepped outside to use the bathroom, they got up, "started rushing the houses," and "rushed him in." [Ramirez], Salvador, and another man went into one house where "there was only a lady and a guy." [Ramirez] stated: "We heard ... some gunshots in the other house, but we didn't know what was it about, so we didn't think nothing bad was happening." [Ramirez] stated that they put the male victim down on the floor at gunpoint and that he ordered one of the men to tie up the female victim, who was in bed. [Ramirez] checked the house for other people, drugs, or weapons but did not find anyone or anything. [Ramirez] then "tied down the guy with an orange extension cord" and "started demanding the drugs." The male victim responded that he had nothing and that all of the drugs were in the other house, so [Ramirez] "started beating him up" and "hit him with a pan a couple of times." [Ramirez] also took a gold chain from his neck, which he later threw away.

[Ramirez] said that Salvador kept an eye on the door and that [Ramirez] and "the other guy" held the male victim at gunpoint. After a while, [Ramirez] heard gunshots at the other house. He went outside and saw the others running out of the house, saying, "Let's go. Let's go." He asked one of them "where was everything at" and was told "that nothing was there, and that we gotta leave." [Ramirez] heard more gunshots as he and his two cohorts were running away. They ran across the field, got into the truck, and left. Everyone met back at Juanon's, where [Ramirez] heard Bones say, "I shot the mother fuckers."

Investigator David Valdez testified that four high-caliber bullet projectiles, State's Exhibits 229, 230, 231, and 232, were recovered from Jerry Hidalgo's body during his autopsy. Forensic firearms and toolmarks examiner Tim Counce testified that these exhibits "were .30 caliber class" and offered "a more discriminating opinion to include a 7.62 by 39 millimeter cartridge."

When appellant was booked into the county jail, he told detention officer Robert Mendiola that he was affiliated with the "Bombita" gang. Investigator Robert Alvarez with the Edinburg Police Department testified that the "Tri–City Bombers" gang used to call themselves "the TCBs," but now call themselves "the Bombitas." Alvarez testified that some TCB members formed a rival gang, the Texas Chicano Brotherhood, or "the Chicanos." Alvarez further testified that the "Bombitas" and "Chicanos" have "a green light against each other," meaning they could fight or kill each other "without asking permission from the [gang] command structure." Alvarez testified that [Ramirez] associated with TCB members and had a tattoo that was indicative of TCB membership. Rosie Gutierrez testified that victims Jerry and Ray Hidalgo were "Chicanos."

Defense witness Marissa Martinez testified that she and a friend visited the east-side house a few days before the murders. Villa, Castillo, Delgado, Jr., and Ray Hidalgo were there. She testified that Villa showed her that they were "stashing drugs" in a room at the east-side house. The drugs were "stacked to the ceiling" and "covered with a blue tarp." She testified that there were "a lot" of drugs, estimating the amount at "[l]ike 1,000" pounds. She told her boyfriend Robert Cantu that there was a lot

17

of marijuana at Ray Hidalgo's house and that she had met Villa there. She testified that Cantu was angry at her for going over to the house. She further testified that Villa was a member of the "Texas Syndicate" gang.

Defense witness Jennifer Marie Dimas testified that she was the common-law spouse of victim Delgado, III. She testified that Villa had bought bulletproof vests about two to three months before the murders and that he tried to get one from Delgado, III, on January 4.

Defense witness Gloria Ann Rivera testified that she was the former girlfriend of victim Ray Hidalgo. She testified that Ray had been living with his mother, Rosie Gutierrez, and that it "was kind of getting to a point that [Ms. Gutierrez] didn't really want him there because ... he wouldn't work." Several hours after the shootings, Rivera heard Ms. Gutierrez talking on the phone to Villa and saying "[s]omething in regards to sticking to the story." Ms. Gutierrez admitted that she had been having a relationship with Villa. She testified that she called Villa after the murders and asked him what happened, but the phone "cut off."

*Ramirez*, 2008 WL 5050076, at *1–6 (alterations, except Ramirez's name, in

original) (footnotes omitted).

## II.   Punishment Evidence

During the punishment phase, Sergeant Alex Champion testified that he had responded to the Bravo 12 unit, an 8-man cell of the county jail, on June 29, 2004, because some officers had smelled an odor of what was possibly marihuana or some other drug; that Juan Cordova, Jeffrey Juarez, Reymundo Sauceda, and [Ramirez] were among the occupants of that cell at the time; that inmates were classified based on such factors as the charge involved, their criminal history, and their gang affiliation; that he and the others had moved the occupants of the cell out into the recreation yard, while leaving Jeffrey Juarez and [Ramirez] there to make sure that no one could accuse them of mistreating or taking any of their belongings. He then noted that one could smell the odor of marihuana upon entering the cell; that an officer had

indicated that he had seen something behind an outlet; that he had then found a Ziploc bag of marihuana inside the outlet; and that [Ramirez] had admitted that the marihuana was his, while Juarez had not said anything.

Jorge Arrezaola indicated that he had been working as a rover in the Echo Section of the county jail, which contains 48 one-man cells, on October 19, 2004; that his job as a rover is to go cell by cell keeping an eye on the inmates and distributing items; that [Ramirez] had requested a razor at about 5:30 p.m. that day; and that he had given a razor to [Ramirez] and told [Ramirez] that he had 35 minutes to shave. He also stated that he had later traded places with Officer R. Garza and told Garza to get the razor back from [Ramirez]; that Garza had brought him the razor; that the razor had been tampered with and its blade was missing; that he and Garza had advised their superiors; that [Ramirez's] one-man cell had then been shaken down; and that Sergeant Palomo had then found two blades and a full razor by the light bulb "on the top."

Juvenile Probation Officer Olga Torres sponsored into evidence State's Exhibits Nos. 335–337; explained that State's Exhibit No. 335 was a Judgment of Adjudication and Disposition for Outside Placement indicating that [Ramirez] had been adjudicated for burglary of a vehicle on October 26, 1997, two counts of criminal trespass on October 26, 1997, and possession of marihuana on January 3, 1997 and that the disposition involved had been placement in the Desert Hills of Texas rehabilitation facility in College Station. She also indicated that State's Exhibit No. 336 was an Agreed Modified Judgment of Probation transferring [Ramirez] from Desert Hills to the Coastal Bend facility in Driscoll and that State's Exhibit No. 337 was a Judgment of Adjudication and Disposition for a Texas Youth Commission (T.Y.C.) Commitment dated May 31, 2000 which committed [Ramirez] to T.Y.C. for committing an aggravated assault on November 27, 1999, another aggravated assault on February 4, 2000, and deadly conduct on February 4, 2000 and March 10, 2000. At this point, State's Exhibit No. 101, the unedited cassette recording of [Ramirez's] statement, was offered into evidence and Judge Gonzalez ruled that the entire tape, including

19

those portions held inadmissible at the guilt phase, was admissible at the punishment phase.

Juvenile Parole Officer Ricardo Leal testified that [Ramirez] had been on parole twice and he had been [Ramirez's] parole officer both times; that [Ramirez] had been classified as a violent offender and been placed at the Evins Regional Juvenile Center; that [Ramirez's] minimum stay as a violent-type B offender was one year; and that this does not mean that [Ramirez] would be released in one year, as he first needed to complete the re-socialization program. He also stated that he had visited [Ramirez's] home and family and had approved [Ramirez's] home "with concerns"; that he had been concerned that the activity which had gotten [Ramirez] committed had occurred in his neighborhood; and that he had recommended that [Ramirez] earn his G.E.D. and complete an independent living program and that his family participate in family sessions. Leal also noted that [Ramirez] had been at the Evins facility from August 17, 2000 until April 5, 2001 and had gotten his G.E.D. while there; that [Ramirez] had been placed at the Beto House, a halfway house, upon being released from Evins; that [Ramirez] had been at Beto House from April 5 until June 11, 2001; and that he had then been returned to Evins after being involved in an incident at the Beto House.

Leal then stated that [Ramirez] had been back at the Evins Regional Juvenile Center from June 11, 2001 until December 20, 2001; that he had then been released on parole to his mother's house; that he had met with [Ramirez] a few days after his release and gone over the conditions of parole with him; that said conditions included not associating with any other gang members and reporting once a week; and that [Ramirez] had checked the question about being a gang member on the intake form during their first meeting. He also noted that [Ramirez] had been considered in violation of his parole one-and-a-half to two months after being put on parole; that he had gotten information that [Ramirez] had been arrested on January 16, 2002, confirmed that information, and issued a T.Y.C. directive, which is similar to a warrant; that he had spoken to [Ramirez] on the telephone on January 22, 2002 and told [Ramirez] to come in and report the next day; and that [Ramirez] had not done so.

Mr. Leal next indicated that he had learned that [Ramirez] had been arrested and charged with resisting arrest and unlawful carrying of a weapon on March 16, 2002; that those charges had been referred to the District Attorney's Office, as [Ramirez] was already an adult; that [Ramirez's] parole had been revoked and [Ramirez] had then been assigned to the Coke County Juvenile Justice Center; and that [Ramirez] had been at that facility from June of 2002 until November 22, 2002, when he was released home on parole. He also testified that he had then met with [Ramirez] and gone over the conditions of parole; that he had asked [Ramirez] what gang he used to associate with; and that [Ramirez] had responded "TCB." Leal further stated that [Ramirez] had not been very consistent about attending the counseling sessions he was ordered to attend; that he had discussed issues [Ramirez] was having and [Ramirez's] failure to provide any documentation showing that he had completed any of the community service he had been ordered to perform with [Ramirez] on December 31, 2002; that [Ramirez] told him that he had not had any contact with the police; that [Ramirez] had called him on the way home and told him that he was no longer going to report or abide by the conditions of his parole; and that [Ramirez] had never reported again.

Larry Fitzgerald indicated that he had formerly been the public information officer for the state prison system; that he knew of the classification levels in prison; and that one coming into the system would go through the diagnostic process and then have their placement determined by the state classification committee. He also noted that there are several levels of general population classification and three levels of administrative segregation; that one in administrative segregation is kept alone in a cell for 23 hours a day and allowed one hour for recreation; and that one would be placed in administrative segregation for being combative, being a security threat, or being identified as a gang member.

Dr. Kate Allen indicated that she is licensed to practice clinical social work in California and Texas; has a Bachelor's degree in psychology and sociology, a Masters in clinical social work, and a doctorate in family sociology; is retired from a university faculty position; and has a private consultation practice in forensic social work. She also noted that her areas of expertise include Attachment Disorder, Fetal Alcohol Syndrome, Post-

21

traumatic Stress Disorder, and general psychiatric diagnoses; that attachment disorder refers to a child who has not bonded with his mother or any other parent figure; that the first three years are very important to a child's development; and that one part of this early development involves learning to handle stress.

Dr. Allen next stated that the child is then ready to go into the bigger world of school or daycare; that we expect one to be able to control their negative emotions in constructive ways by their late teens and early 20s; and that she had looked at documents that were made available to her by defense counsel's office, [Ramirez's] school records, his I.Q. testing, his T.Y.C. records, psychological evaluations on [Ramirez], newspaper articles about the killings, and the mitigation reports provided by "the mitigation expert specialist, Ms. Bowen." She then stated her conclusions that [Ramirez] suffered from attachment disorder, chronic depression, post-traumatic stress disorder, and substance dependency; said that she based them on her education, training, and clinical experience; and noted that she had also looked at the data which had been provided to her.

Dr. Allen then said that the conditions she had mentioned had resulted from maternal abandonment and chronic domestic violence and child abuse during [Ramirez's] formative years; that the deprivation in his family had been matched by very injurious elements outside of it, including violence and gang dominance; and that there had not been any meaningful societal interventions with [Ramirez] until age 16. She also said that the intervention had been very good, but had been too late; that [Ramirez] had been returned to the same environment; that his mother had been unable or unwilling to discipline and protect him; that he had thus become part of gang life; and that these conditions had resulted in his inability to exercise the full range of choices in his behavior normally expected of a law-abiding citizen.

Dr. Allen next said that she had developed the idea that [Ramirez] had raised himself from the mitigation specialist's report of her interviews with [Ramirez] and others around him and from [Ramirez's] T.Y.C. and school records; that she had also reviewed the psychological reports on [Ramirez]; that the fact that [Ramirez] had done well while at T.Y.C., but had not done so once

he got out shows that he had had support while in T.Y.C., but had lacked it once he got out; and that a return to an environment lacking positive authority will cause one to regress and return to the gang as a source of authority.

3 Supp. SHCR 695–703.

In addition to the witnesses described in the state habeas court's recitation of the punishment evidence above, the defense called Dwight Stewart, a gang expert. 38 RR 168. Stewart started his career gathering gang data for TYC. 38 RR 168. He went from that position to a juvenile probation officer working with gang members in Comal County, Texas and from there "had an opportunity to run one of the largest boot camps in the State of Texas . . . . [in] which a majority of the clients there were gang members." 38 RR 168. Then he worked as a "superintensive supervision officer with parole, again working with prison gang members." 38 RR 168. After that, he worked at the "Texas School Safety Center out of Texas State University as a trainer and research specialist . . . doing training on gang awareness, bullying, school violence issues, to law enforcement officers, to administration, to teachers, and to probation and parole officers." 38 RR 168–69.

According to Stewart, young people become associated with a particular gang for a variety of reasons, which include the need to belong, family tradition, provision of money, status, and protection. 38 RR 172–74. With respect to the need to belong, Stewart explained as follows:

> Maybe, mom and dad [are] not giving them that love and attention
> at home, or maybe there is something that is missing at home that
> they are not getting, so they are looking for a need to belong.

38 RR 172. As far as gang membership being a family tradition, Stewart

testified that joining a gang may be "a traditional type of thing, where dad was

in a gang and uncles are in a gang, so you know, they feel a need to want to

join." 38 RR 172. Regarding protection, Stewart testified that "if they are living

in a neighborhood that is gang infested, these kids walking home, getting beat

up every day, they want that protection." 38 RR 168. And returning to the

subject of family dynamics, he stated that:

> Violence doesn't really matter if it is [a] single [parent] or it
> is two parents. What needs to be looked at is what is happening at
> the house, what kind of discipline is at the house. You know, a lot
> of the times, these kids join gangs because, you know, maybe that's
> the safest place to be, is in a gang.
>
> Maybe mom is getting beat up all the time. Maybe dad is
> drunk all the time. So there [are] so many factors involved with
> that, the violence side of it all.

38 RR 175–76.

On cross-examination, Stewart testified that the Tri-City Bombers are

not to be confused with the Texas Chicano Brotherhood and that the Tri-City

Bombers are not considered a "security threat." 38 RR 180.

The final witness for the defense was Solomon Avila who was a pastor in

Edinburg. 39 RR 100. Avila testified that he met Ramirez through a prison

24

ministry. 39 RR 100. Avila stated that he never felt threatened during his visits with Ramirez and that Ramirez had never been rude to him. 39 RR 100–01.

## MOTION FOR SUMMARY JUDGMENT

A party moving for summary judgment bears the burden of informing the Court of the basis for the motion and identifying pleadings and other record evidence demonstrating the absence of any genuine issues of material fact. *Howell Hydrocarbons, Inc. v. Adams*, 897 F.2d 183, 191 (5th Cir. 1990) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). If the moving party makes the required showing, then the burden shifts to the nonmoving party to show summary judgment is not appropriate. *Fields v. City of South Houston*, 922 F.2d 1183, 1187 (5th Cir. 1991). However, summary judgment rules apply only to the extent that they do not conflict with the rules governing habeas review. "Therefore, [28 U.S.C.] § 2254(e)(1)—which mandates that findings of fact made by a state court are 'presumed to be correct'—overrides the ordinary rule that, in summary judgment proceedings, all disputed facts must be construed in the light most favorable to the nonmoving party. Unless [the petitioner] can 'rebut [ ] the presumption of correctness by clear and convincing evidence' as to the state court findings of fact, they must be accepted as correct." *Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (second alteration in original), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

# ANSWER

## I.    Standard of Review

Section 2254(d) of Title 28 of the U.S. Code "reflects the view that habeas corpus is a 'guard against extreme malfunctions in state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 100–01 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)). For claims that were adjudicated in state court, § 2254(d) "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (per curiam). Relief is only possible, but not mandated, in one of two situations. § 2254(d)(1)–(2). A federal court may review a claim de novo if the state court adjudication was contrary to, or unreasonably applied, clearly established federal law as determined by the Supreme Court. *Richter*, 562 U.S. at 100–01 (citing *(Terry) Williams v. Taylor*, 529 U.S. 362, 412 (2002)). Or relief may be available if the state court decision was based on an unreasonable determination of facts in light of the record. *Id.* Section 2254(d)'s standard is necessarily difficult to meet because it was so designed. *Id.* at 102.

A state court decision can be "contrary" to established federal law in two ways. *(Terry) Williams*, 529 U.S. at 405–06. First, the state court could apply a rule that contradicts Supreme Court precedent. *Id.* at 405. Second, the state

court could confront facts that are "materially indistinguishable" from relevant Supreme Court precedent but reach an opposite result. *Id.* at 406.

A state court decision applying the correct Supreme Court rule to the facts of a particular case is to be reviewed under the "unreasonable application" clause. *Id.* at 406. A state court unreasonably applies Supreme Court precedent only if it correctly identifies the governing precedent but unreasonably applies it to the facts of a particular case. *Id.* at 407–09. The focus of this test is not on the state court's method of reasoning, but rather on its ultimate legal conclusion. *Neal v. Puckett*, 286 F.3d 230, 246 (5th Cir. 2002) (en banc) ("It seems clear to us that a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision.").

To determine if the state court made an unreasonable application, a federal court "must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court." *Richter*, 562 U.S. at 87. Thus, "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree'" on the correctness of the state court's decision. *Id.* (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)).

27

## II.    Presumption of Correctness

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) establishes a presumption that factual findings by a state court are correct. § 2254(e)(1). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." *Valdez v. Cockrell*, 274 F.3d 941, 941, 948 n.11 (5th Cir. 2001). The burden of rebutting that presumption by clear and convincing evidence is placed directly at the feet of a petitioner. § 2254(e)(1).

Ramirez, however, "provides notice of his intention to challenge the presumption of correctness of findings of fact made by the state court in his case." ECF 67 at 162. He then simply declares that, "[c]ertain findings of fact by the state court in this case, if any are found to exist, are not entitled to the presumption of correctness under 28 U.S.C. § 2254(e)(1)." ECF 67 at 162. Ramirez states that he will demonstrate that the findings should not be presumed correct for one or more of the following reasons:

(1)    The findings are not fairly supported by the record,

(2)    The procedures employed by the state courts in making findings of facts were not adequate to afford him full and fair hearings,

(3)    The material facts were not adequately developed at state-court hearings,

(4)     He did not receive full, fair, and adequate hearings in the state court proceedings, and

(5)     He was otherwise denied due process of law in the state court proceedings.

ECF 67 at 163.

However, Ramirez does not enlighten the Court as to *which* of the findings of fact he believes are not entitled to the presumption of correctness or *when* he intends to actually provide a challenge to that presumption.[6] Because he does not, the briefing on this point is inadequate and he forfeits the right to argue it further. *See, e.g.*, *United States v. Castillo-Rubio*, 34 F.4th 404, 411 (5th Cir. 2022) (inadequately briefed issues are forfeited).

Nonetheless, there is no basis on which to challenge the presumption of correctness under § 2254(e)(1). With regard to the allegations that the findings are not supported by the record, this matter is addressed further in the briefing on each claim where it is relevant. As far as allegations two, three, and four, they can be summed up as a claim that the state court procedures, including the hearings that were held, were inadequate. In this, Ramirez tries to resurrect the pre-AEDPA exceptions to the presumption of correctness. But AEDPA "jettisoned all references to a 'full and fair hearing' from the

---

[6] However, in briefing his individual claims, Ramirez fails to even acknowledge that issues were presented in state court, much less identify why the adjudication is not objectively reasonable or why the findings are not entitled to the presumption of correctness granted by federal law.

29

presumption of correctness accorded state court findings of fact, along with the other situations which previously swept aside the presumption." *Valdez*, 274 F.3d at 949. To reimpose them "would displace the application of § 2254(e)(1)'s presumption" and "would have the untenable result of rendering the amendments enacted by Congress a nullity." *Id.* at 950. "[N]ow," § 2254(e)(1) "simply provides that unless the petitioner can rebut the findings of fact through clear and convincing evidence, those findings are presumed correct." *Id.* at 949. Adequacy has no place in presuming state court facts correct.

Nonetheless, the adequacy of the proceedings and related matters is addressed more fully in the briefing to follow. At this point, the state court proceedings, to the extent that Ramirez was entitled to them, were adequate and any failure to develop material facts in state court lies entirely at Ramirez's feet.

Ramirez's final allegation, that he was "otherwise denied due process of law," is too vague to allow the Director to develop a proper response. It, too, is therefore forfeited. *See, e.g.*, *Castillo-Rubio*, 34 F.4th at 411. Regardless, Ramirez's foreshadowing of pleadings to come is insufficient to properly challenge the presumption of correctness required by AEDPA. However, none of the exceptions he claims he will prove have any merit at all. The state court adjudication of Ramirez's claims is fully entitled to the presumption of correctness and deference established by AEDPA.

## III.   Further Amendment

In his already amended petition before this Court, Ramirez "expressly" reserves his right to further amend his claims. According to his amended petition,

> Ramirez believes additional claims may be identified following a thorough review of the record, through investigation, after discovery is conducted and completed, or after an evidentiary hearing is held. At the appropriate time during these proceedings, Ramirez will present any additional claims, along with complete factual and procedural histories and more thorough briefing on his claims through amendment to the petition.

ECF 67 at 163–64.

However, any assertion that Ramirez has not had reasonable time to conduct a thorough review of the record or conduct investigation is decidedly lacking. Ramirez was initially appointed state habeas counsel in December of 2004. He filed his initial state habeas application on July 2, 2009. 1 SHCR 82. On November 6, 2013, Ramirez filed a subsequent state habeas application. 3 SHCR 1114. Ramirez was granted the opportunity to develop evidence during his state habeas proceedings via a live evidentiary hearing. *See* 1–4 SHRR.[7] Ramirez's state habeas proceedings were concluded on October 14, 2015, more

---

[7] "SHRR" refers to the reporter's record of the evidentiary hearing during Ramirez's state habeas proceedings, preceded by the volume number and followed by the page number.

than a decade after they began. *See Ex parte Ramirez,* 2015 WL 6282336, at *1.

Ramirez was appointed federal habeas counsel by this Court on November 19, 2015. ECF 4. However, Ramirez did not file his initial petition until November 30, 2018, over three years later. ECF 24. Despite the fact that the results of a Chapter 64 proceeding could not exhaust any claim for review in federal habeas, Ramirez was given the opportunity to return to state court. *See* ECF 54. During the time Ramirez's case was in state court, there were no obstacles preventing federal counsel from continuing to review the record or investigate the case while state court proceedings continued. Therefore, as explained further below, it would be inappropriate to allow Ramirez to attempt to supplement the record here, whether through discovery or an evidentiary hearing.[8]

Regardless, federal counsel had three years from the time they were appointed to review and investigate claims prior to filing the *initial* petition. Then the case was stayed on September 17, 2019, and not reopened until June 4, 2021, for a total of over twenty months.[9]

---

[8] This is particularly true in light of the Supreme Court's recent decision in *Shinn v. Martinez Ramirez* which will be discussed in greater detail in the section discussing discovery, expansion of the record, and evidentiary hearings below. 142 S. Ct. 1718 (2022).

[9] While it could reasonably be argued that the existence of rules to limit the spread of COVID-19 posed certain obstacles during this period, such limitations would have

It is reasonable to question what stone has yet to be overturned when Ramirez's current petition contains 85 distinct issues, covers 468 pages, is supported by a total of 127 exhibits,[10] and presents facts starting from before Ramirez was born, and contains reports from no less than five experts, including two neuropsychologists, with many of those experts issuing multiple reports and addendums. Ramirez's present petition should be his last.

## IV.   Exhaustion and Procedural Default

Many of Ramirez's claims in this Court are unexhausted and therefore procedurally defaulted. To the extent that any of the exhaustion arguments require additional briefing, such will be addressed in each individual section.[11]

no effect on the ability to thoroughly review the record or conduct many types of investigation as evidenced by the fact that the Office of Forensic and Capital Writs was able to appeal the DNA ruling and federal counsel was able to obtain no less than fifteen additional declarations and addendums during the time.

[10] Including the exhibits filed with the original petition.

[11] Ramirez claims that should this Court believe that any of his claims are unexhausted, the court must stay the case to allow him to return to state court to exhaust. ECF 67 at 164. Notwithstanding Ramirez's incorrect standard for a stay, this single sentence is insufficient to raise the issue and should be considered forfeited. *See, e.g.*, *Castillo-Rubio*, 34 F.4th at 411.

Nevertheless, a "stay and abeyance should be available in *limited* circumstances." *Rhines v. Weber*, 544 U.S. 269, 277 (2005) (emphasis added). Those "limited circumstances" exist when a petitioner can prove (1) good cause for the failure to exhaust; (2) that the claim is not plainly meritless; and (3) that the request is not for purposes of delay. *Id.* at 277–78. Ramirez offers no argument on good cause, and none exists, so he fails to meet the first prong. As explained below, all of Ramirez's claims are without merit, so he fails to meet the second prong. And, finally, Ramirez has already had his federal case stayed once so that he could return to state court and any further requests would be a blatant attempt to improperly delay the process, so

## A.     General law

The exhaustion doctrine requires that the state courts be given the initial opportunity to address and, if necessary, correct alleged deprivations of federal constitutional rights. *Castille v. Peoples*, 489 U.S. 346, 349 (1989); *Anderson v. Harless*, 459 U.S. 4, 6 (1982). The purpose of exhaustion "is not to create a procedural hurdle on the path to federal habeas court, but to channel claims into an appropriate forum, where meritorious claims may be vindicated and unfounded litigation obviated before resort to federal court." *Ruiz v. Quarterman*, 460 F.3d 638, 642–43 (5th Cir. 2006) (quoting *Keeney v. Tamayo-Reyes*, 504 U.S. 1, 10 (1992)).

In order to satisfy the exhaustion requirement, a claim must be presented to the highest court of the state for review. *Richardson v. Procunier*, 762 F.2d 429, 431 (5th Cir. 1985); *Carter v. Estelle*, 677 F.2d 427, 443 (5th Cir. 1982). To do this, a petitioner must provide the state's highest court with a fair opportunity to apply (1) the controlling federal constitutional principles to (2) the same factual allegations. *Ruiz*, 460 F.3d at 642–43 (citing *Duncan v. Henry*, 513 U.S. 364, 365–66 (1995)). "Normally, the exhaustion requirement

---

he fails to meet the third prong. As to the last prong, it is worth emphasizing that "a federal habeas court may never 'needlessly prolong' a habeas case." *Martinez Ramirez*, 142 S. Ct. at 1739 (quoting *Pinholster*, 563, U.S. at 209 (Sotomayor, J., dissenting)). To the extent that Ramirez's single sentence mentioning a stay is a request for one, it should clearly be denied.

is not satisfied if a petitioner presents new legal theories or entirely new factual claims in his petition to the federal court." *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983) (footnote omitted). Claims are only exhausted so far as they make substantially similar arguments made under the same factual posture as were presented to the state court. *See Graham v. Johnson,* 94 F.3d 958, 968–69 (5th Cir. 1996).

Where a petitioner has failed to exhaust claims in state court,[12] and that failure would now result in the state procedurally rejecting those claims, the petitioner has procedurally defaulted the claims. *Ruiz*, 460 F.3d at 643 (citing *Coleman v. Thompson*, 501 U.S. 722, 735 n.1 (1991)); *Nobles v. Johnson*, 127 F.3d 409, 423 (5th Cir. 1997) (finding unexhausted claim, which would be barred by the Texas abuse-of-the-writ doctrine if raised in a subsequent state habeas petition, to be procedurally barred).

"Texas law also requires [state] habeas petitioners to present all of their state habeas claims in their first [application];" therefore, "absent facts giving rise to one of the statutory exceptions, the Texas Court of Criminal Appeals will not entertain a new issue in a [subsequent application]." *Muniz v. Johnson*, 132 F.3d 214, 221 (5th Cir. 1998) (citing Tex. Code Crim. Proc. Ann. art. 11.071

---

[12] A federal habeas court may deny an unexhausted claim on the merits. § 2254(b)(2); *Pondexter v. Quarterman*, 537 F.3d 511, 527 (5th Cir. 2008); *Moreno v. Dretke*, 450 F.3d 158, 166 (5th Cir. 2006).

§ 5(a)). In this case, Ramirez's state habeas proceedings prove that the CCA would reject further claims raised on his behalf on procedural grounds, because the CCA has already dismissed an application, his amended one, as an abuse of the writ. *Ex parte Ramirez,* 2015 WL 6282336, at *1.

Similarly, if a claim has been presented to the state court and that court expressly and unambiguously denied the claim based on a state procedural default, it is well settled that federal review of the claim is procedurally barred. *Coleman*, 501 U.S. at 729; *Harris v. Reed*, 489 U.S. 255, 263 (1989); *Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995).

A number of Ramirez's claims are barred under this rule because, during the pendency of his original state habeas application, Ramirez filed what was titled an amended application in state court. 3 SHCR 1114. In response, the CCA considered it subsequent and dismissed it as an abuse of the writ. *Ex parte Ramirez*, 2015 WL 6282336. The Director will point out these issues in the sections directly addressing them.

### B.    Exceptions

Exceptions to default exist where the petitioner shows "cause and actual prejudice" or that application of the procedural bar will result in a "fundamental miscarriage of justice." *Muniz*, 132 F.3d at 221 (citing *Coleman*, 501 U.S. at 750).

36

### 1.   Cause and prejudice

"To establish cause, the [petitioner] must 'show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Martinez Ramirez*, 142 S. Ct. at 1733 (quoting *Murray v. Carrier*, 477 U.S. 478, 488 (1986)). Although the Court has not established "an exhaustive catalog" of circumstances that can constitute cause, the Court has noted "that a showing that the factual or legal basis for a claim was not reasonably available to counsel or that 'some interference by officials,' made compliance impracticable, would" be sufficient. *Carrier*, 477 U.S. at 488 (quoting *Brown v. Allen*, 344 U.S. 443, 486 (1953)). "[T]o establish prejudice, the [petitioner] must show not merely a substantial federal claim, such that 'the errors at . . . trial created a *possibility* of prejudice,' but rather that the constitutional violation 'worked to his *actual* and substantial disadvantage.'" *Martinez Ramirez*, 142 S. Ct. at 1733 (quoting *Carrier*, 477 U.S. at 494).

In *Martinez v. Ryan,* the Supreme Court "recognized a 'narrow exception' that attorney error cannot establish cause to excuse a procedural default." *Id.* (quoting *Martinez v. Ryan*, 566 U.S. 1, 9 (2012)). *Martinez* held that where state law requires a petitioner to bring an ineffective-assistance-of-trial-counsel (IATC) claim in an initial state habeas proceeding, and where state habeas counsel fails to bring such a claim, a petitioner can plead state habeas counsel's failure as cause to avoid the default. 566 U.S. at 17. In *Trevino v.*

*Thaler*, the Supreme Court held that the *Martinez* exception applies to Texas inmates seeking federal habeas review. 569 U.S. 413, 428–29 (2013). And in *Davila v. Davis*, the Supreme Court reiterated that *Martinez* applies only to IATC claims. 137 S. Ct. 2058, 2066 (2017).

To take advantage of *Martinez*, a "petitioner must show (1) that his claim of ineffective assistance of counsel at trial is substantial—i.e., has some merit—and (2) that habeas counsel was ineffective in failing to present those claims in his first state habeas proceeding." *Garza v. Stephens*, 738 F.3d 669, 676 (5th Cir. 2013). *Martinez* applies to only those cases where a petitioner can "show that the representation provided by his state habeas counsel fell below the standards established in *Strickland* and that his underlying ineffective assistance of trial counsel claim 'is a substantial one, which is to say . . . that the claim has some merit.'" *Allen v. Stephens,* 805 F.3d 617, 626 (5th Cir. 2015) (quoting *Martinez,* 566 U.S. at 13), *abrogated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080 (2018). But *Martinez* is not an invitation to expand the record or rely on evidence outside of that developed in state court. *Martinez Ramirez*, 142 S. Ct. at 1737–38. Rather, a petitioner must make his *Martinez* showing on only "the state court-court record." *Id*. at 1738.

## 2.    Miscarriage of justice

In the context of an exception to a procedural default, a miscarriage of justice means that the petitioner is actually innocent of the crime of which he

was convicted. *Sawyer v. Whitley*, 505 U.S. 333, 339–40 (1992); *Smith v. Dixon*, 14 F.3d 956, 974 (5th Cir. 1994). In *Schlup v. Delo*, the United States Supreme Court held that actual innocence, if proved, may serve as a gateway through which a habeas petitioner may avoid a procedural bar to consideration of the merits of constitutional claims. 513 U.S. 298, 316 (1995). However, tenable actual-innocence gateway pleas are rare. *See McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). Indeed, the Court has continually stressed:

> The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'

*Id.* at 386 (quoting *Schlup*, 513 U.S. at 316). It is important to note in this regard that "actual innocence" means factual innocence, not mere legal insufficiency. *Bousley v. United States*, 523 U.S. 614, 623–624 (1998) (*citing Sawyer*, 505 U.S. at 339).

The high bar established in *Schlup* stems from the fact that "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears." *Herrera v. Collins*, 506 U.S. 390, 399 (1993). To take advantage of the *Schlup* gateway, a petitioner must demonstrate "that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Schlup*, 513 U.S. at 327. However, a prisoner cannot overcome this hurdle merely by compiling

evidence that favors his claim of actual innocence; the evidence must be "new." *Schlup*, 513 U.S. at 316 ("Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas court to reach the merits of a barred claim."). In this circuit, to be new, evidence must have been unavailable to the petitioner at the time of trial. *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008). Moreover, the new evidence must be material, not merely cumulative or impeaching. *Lucas v. Johnson*, 123 F.3d 1069, 1075 n.3 (5th Cir. 1998). Courts then "weigh th[e] 'new' evidence against 'old' evidence, even old inadmissible evidence, because 'the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial.'" *Fratta v. Davis*, 889 F.3d 225, 232 (5th Cir. 2018) (quoting *Schlup*, 513 U.S. at 327–28).

## V.   New Evidence Presented in Federal Court is Barred.

Ramirez states that, "[a]t the appropriate time, [he] will file motions with the Court requesting the necessary evidentiary development of his claims." ECF 67 at 165. He continues that, "to the extent this Court believes that any of Ramirez's claims may be procedurally defaulted, this Court should grant a hearing so that he can show cause and prejudice and/or a fundamental miscarriage of justice to overcome any default." ECF 67 at 165.

Where a petitioner "has failed to develop the factual basis of a claim in State court proceedings," a federal court may not consider new evidence related to that claim, whether at an evidentiary hearing or not, unless certain exceptions are met. 28 U.S.C. § 2254(e)(2). Specifically, new evidence is precluded unless a petitioner's claims (1) rely on a new rule of constitutional law or (2) a factual predicate previously undiscoverable through the exercise of due diligence *and* the petitioner establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty. § 2254(e)(2)(A)–(B). "[E]ven if all these requirements are satisfied, a federal habeas court still not *required* to hold a hearing or take any evidence." *Martinez Ramirez*, 142 S. Ct. at 1734.

Section 2254(e)(2) is triggered when a petitioner is "'at fault' for the undeveloped record in state court," meaning that "he 'bears responsibility for the failure' to develop the record." *Id*. (quoting *Tamayo-Reyes*, 529 U.S. at 432). In other words, federal courts sitting in habeas are not an alternative forum for "trying facts and issues which a [petitioner] made insufficient effort to pursue in state proceedings." *(Michael) Williams v. Taylor*, 529 U.S. 420, 437 (2000). That is because "[f]ederal courts, years later, lack the competence and authority to relitigate a State's criminal case." *Martinez Ramirez*, 142 S. Ct. at 1739.

Initially, because Ramirez simply presents this Court with a placeholder instead of argument, he has forfeited his right to factual development. *See, e.g.*, *Castillo-Rubio*, 34 F.4th at 411. Even then, the idea that this Court should grant Ramirez a hearing or permit discovery is untenable—he is at fault for the failure to develop the state court record and he fails to demonstrate any exception to the general bar on evidentiary development under AEDPA. And this means that the Court cannot consider many of the 132 exhibits attached to Ramirez's amended petition, most of which have never been presented in state court. *See generally* ECF 24, ECF 67.

That failure to develop also dooms Ramirez's request for a hearing on overcoming procedural default because he has not first established that the new evidence can be considered for purposes of merits review. *Martinez Ramirez*, 142 S. Ct. at 1739 ("[A] Martinez hearing is improper if the newly developed evidence never would 'entitle [the petitioner] to federal habeas relief.'" (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2022)). In short, *Ramirez* has not demonstrated that his is an extraordinary case that overcomes the "genera[l] ba[r on] evidentiary hearings" or factual development. *Id*. at 1740 (alterations in original) (quoting *McQuiggin*, 569 U.S. at 395).

For the few claims that Ramirez raises which have been adjudicated on the merits in state court, *Cullen v. Pinholster* prohibits the use of new evidence

for purposes of reviewing them. 563 U.S. 170, 180 (2011). This is because review under § 2254(d) is limited to the record considered by the state court. *Id.* at 180. Thus, evidence introduced in federal court "has no bearing on a § 2254(d)(1) review. If a claim has been adjudicated on the merits by a state court, a federal habeas petitioner must overcome the limitation of § 2254(d)(1) on the record that was before the state court." *Id.* at 185. In such instance, a federal court is prohibited from considering new evidence and from expanding the record through an evidentiary hearing even if § 2254(e)(2)'s requirements are met. *See id.* at 181, 185–86. As such, Ramirez cannot use his new exhibits or develop new evidence in federal court through discovery or an evidentiary hearing to support any of his state-court-adjudicated claims.

In sum, under § 2254(d), the arguments supporting Ramirez's state-court-adjudicated claims must stand, or fail, on the factual record as presented to the state court. *Pinholster,* 563 U.S. at 185. Under § 2254(e)(2) and *Martinez Ramirez*, in the event he can overcome their default, Ramirez's unexhausted claims must also be evaluated based on the factual record that existed in state court. Conducting discovery or holding an evidentiary hearing would be an entirely futile and fruitless endeavor that would do nothing more than needlessly prolong Ramirez's federal habeas proceedings and frustrate the essential need to promote the finality of state convictions. *Martinez Ramirez,* 142 S. Ct. at 1739. To the extent that Ramirez's placeholder is a legally

sufficient request for an evidentiary hearing or discovery, it should be denied. Furthermore, the new evidence Ramirez attaches to his petitions cannot be considered for any purpose.

## VI. Deference Is Owed to the State Court's Adjudication of Ramirez's Claims that Were Adjudicated on the Merits in State Court.

As a preliminary matter, Ramirez argues that the state court adjudication of his state-court-adjudicated claims is not due deference by this Court. Ramirez is mistaken on this front and all of his arguments on the point lack any persuasive value.

### A. AEDPA is constitutional.

In order to challenge the deference due to the state court adjudication of his claims, Ramirez first challenges the constitutionality of the statutory basis for analyzing claims presented by state prisoners in federal court for habeas review. ECF 67 at 159–63. In claiming that AEDPA is unconstitutional, Ramirez attempts to resurrect an argument that has been laid to rest. As such, the Director will not belabor the point. Starting in 1996, courts have repeatedly upheld the constitutionality of AEPDA, either explicitly or implicitly, against the type of attacks raised by Ramirez. *See Felker v. Turpin*, 518 U.S. 651, 663–64 (1996); *Tucker v. Johnson*, 242 F.3d 617, 620–21 (5th Cir. 2001); *Hughes v. Johnson*, 191 F.3d 607, 612 (5th Cir.1999); *Corwin v. Johnson*, 150 F.3d 467, 472 (5th Cir. 1998).

44

In *Terry Williams*, the Supreme Court rejected a construction of § 2254(d) that "would wrongly require the federal courts to defer to state judges' interpretations of federal law," and which the Court suggested might present separation of powers problems. 529 U.S. at 377, 378–79. The Court in *Terry Williams* went on to articulate the proper interpretation of § 2254(d) which did not present such problems. With respect to the "unreasonable application" clause, the Court recognized that federal courts perform only a limited review function under the AEDPA, since they may grant the writ only when the state court's decision is unreasonable. *Id.* at 410–413. While the Supreme Court in *Terry Williams* did not specifically rule on the constitutionality of § 2254(d), its holding is clearly "an implicit acknowledgment that § 2254(d) is constitutional." *Mitchell v. Johnson*, 252 F.3d 434, 2001 WL 360655, at *3 (5th Cir. 2001) (unpublished).

Ramirez offers nothing new in support of his meritless argument. AEDPA is constitutional. Therefore, this Court should apply the AEDPA standard of review to Ramirez's claims that were adjudicated on the merits in state court. As will be demonstrated below, Ramirez cannot overcome the burdens AEDPA places upon him in to order to obtain relief.

**B.     CCA's adjudications are owed deference.**

Next, Ramirez argues that the CCA did not "properly" adjudicate his claims on the merits. As such, he argues, they are not due deference by this Court, and he is entitled to a de novo review of his claims. ECF 67 at 163–68.

The CCA denied relief in Ramirez's state habeas proceeding based upon its own review and the trial court's findings. *Ex parte Ramirez*, 2017 WL 562725, at *2. Three days after receiving the proposed findings of fact and conclusions of law (FFCL) from both sides, the trial court adopted the State's proposed findings almost in their entirety. 3 Supp. SHCR 948. Ramirez now contends that because the state habeas trial court adopted the State's findings "nearly verbatim," and presumably because the CCA based its decision in part on those findings, that the CCA's ultimate decision was not an adjudication on the merits. ECF 67 at 164. Therefore, he argues, § 2254(d) should not apply to his claims adjudicated in his state habeas proceedings. ECF 67 at 163–68. However, this argument has no more merit than his complaint about the constitutionality of AEDPA.

Certainly, the Supreme Court has "criticized courts for their verbatim adoption of findings of fact prepared by prevailing parties, particularly when those findings have taken the form of *conclusory statements unsupported by citation to the record." Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985) (emphasis added); *see also Jefferson v. Upton*, 560 U.S. 294, 294–95

46

(2010). "But despite criticizing the practice, the Supreme Court has never found it to violate due process or to entitle a state court's decision to less deference under the AEDPA." *Green v. Thaler*, 699 F.3d 404, 416 (5th Cir. 2012).

Furthermore, the Fifth Circuit has not only rejected the contention that habeas findings adopted verbatim are not entitled to deference but has done so in cases where the state court took significantly less time before doing so than in this case. *See id.* at 408–09, 416 (rejecting assertion that deference was not required because state court adopted respondent's proposed findings and conclusions, likely within two days of denying the claim); *Trevino v. Johnson*, 168 F. 3d 173, 180 (5th Cir. 1999) (rejecting challenge to state habeas court's verbatim adoption of district attorney's proposed findings of fact and conclusions of law only three hours after they were filed with court); *see also Basso v. Stephens*, 555 F. App'x 335, 342 (5th Cir. 2014).

In *Wiley v. Epps,* the Fifth Circuit pointed out that a full and fair hearing in state court is not a prerequisite to applying the AEDPA's deferential scheme. 625 F.3d 199, 207 (5th Cir. 2010). Additionally, in determining whether the state court adjudicated the matter on the merits, the question is "whether the state court reached the merits of the petitioner's claim rather than deciding it on procedural grounds." *Valdez*, 274 F.3d at 952. Therefore, a state court

47

decision is an adjudication on the merits if it is not based on procedural grounds.

In claiming that his state petition was not adjudicated on the merits, Ramirez lists a number of facts surrounding the trial court's entry of its findings of fact and conclusions of law. ECF 67 at 171–72. Whatever scrivener's errors might be in those findings, they do not provide any evidence that the trial court abdicated its duties due to time constraints or any other reason. Ramirez's argument fails because he has "[made] no showing that the state habeas court failed independently to consider and evaluate the state's proposed findings before adopting them as its own." *Hudson v. Quarterman*, 273 F. App'x 331, 335 (5th Cir. 2008) (rejecting similar claim).

Furthermore, while Ramirez claims that the state habeas court decision was not an adjudication on the merits, he fails to acknowledge that some of his claims were decided on direct appeal. Even if Ramirez's complaints about the state habeas decision had merit, the CCA's decision on his direct appeal would remain standing as a merits adjudication due deference under AEDPA.

Ramirez's argument that the CCA's decisions in his case were not adjudications on the merits, and therefore not entitled to deference under AEDPA, wholly fails.

### C.   Ramirez cannot receive de novo review of his adjudicated claims because he cannot satisfy the requirements in § 2254(d).

Finally, Ramirez asserts that he is entitled to de novo review of his claims because he can satisfy the dictates of 28 U.S.C. § 2254(d). ECF 67 at 168–69. He is mistaken.

He argues that he can establish that the state court adjudication was based on an unreasonable determination of facts. According to Ramirez, the state court determined the facts unreasonably because (1) the factfinding process was deficient, (2) the trial court adopted the State's proposed findings of fact, and (3) the state court relied on what Ramirez boldly declares was the "false testimony" of trial counsel during the state evidentiary hearing. ECF 67 at 168. The Director addressed the merits, or rather the lack thereof, of Ramirez's first allegation in his section on the presumption of correctness and the second allegation in the preceding section. As to the third allegation, the Director cannot address allegations of falsity if Ramirez provides no examples. Thus, the third allegation, like the other two, is entirely conclusory and the argument should be forfeited. *See, e.g.*, *Castillo-Rubio*, 34 F.4th at 411.

Ultimately, Ramirez does not demonstrate in this section, or in any of the issue-specific briefing that follows, that the state court's adjudication of any of his claims were contrary to, or involved an unreasonable application of, clearly established law or resulted in a decision that was based on

unreasonable factual determinations in light of the record. § 2254(d). Thus, he is not entitled to federal habeas relief.

## VII.   Non-retroactivity

A federal habeas proceeding is not the appropriate avenue for recognition of new constitutional rules. *Teague v. Lane*, 489 U.S. 288, 310 (1989) (plurality opinion). Therefore, in the federal habeas context, new rules of constitutional law are generally barred by nonretroactivity principles. *See Edwards v. Vannoy*, 141 S. Ct. 1547, 1560 (2021) ("New procedural rules do not apply retroactively on federal collateral review."). This limitation "validates reasonable, good-faith interpretations of existing precedents made by state courts even though they are shown to be contrary to later decisions." *Butler v. McKellar*, 494 U.S. 407, 414 (1990).[13]

"The *Teague* inquiry is conducted in three steps. First, the date on which the [petitioner's] conviction became final is determined." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997). Second, a reviewing court must determine whether the rule or proposed rule is new. *Id.* "[A] case announces a new rule,' *Teague* explained, 'when it breaks new ground or imposes a new obligation' on the government." *Chaidez v. United States*, 568 U.S. 342, 347 (2013) (quoting

---

[13] The application of *Teague* is a threshold question in a federal habeas case. *Goeke v. Branch,* 514 U.S. 115, 117 (1995). Although a federal court may or may not choose to raise *Teague sua sponte* if the State does not assert it, a court must apply *Teague* if the respondent raises it. *Caspari v. Bohlen,* 510 U.S. 383, 389 (1994).

*Teague*, 489 U.S. at 301)). "To put it differently, . . . if the result was not *dictated* by precedent existing at the time the [petitioner's] conviction became final," the rule is new. *Teague*, 489 U.S. at 301. "And a holding is not so dictated . . . unless it would have been 'apparent to all reasonable jurists.'" *Chaidez*, 568 U.S. at 347 (quoting *Lambrix v. Singletary*, 520 U.S. 518, 527–28 (1997)). Third, "the *Teague* analysis requires the court to determine whether the rule nonetheless falls within" the sole exception[14] "to the *Teague* doctrine." *O'Dell*, 521 U.S at 157. That limitation is for rules that would place primary conduct beyond the government's power to proscribe or a class of persons beyond its power to punish in certain ways. *See Graham v. Collins*, 506 U.S. 461, 477 (1993).

A number of Ramirez's claims would require this Court to declare a new rule as defined by *Teague*. As such, Ramirez is barred from obtaining relief on those claims. The Director will note claims that are barred under *Teague* as necessary in the briefing of each relevant claim.

## VIII. Insufficient Briefing and Conclusory Claims

A state prisoner seeking federal habeas corpus review of his conviction must assert a violation of a federal constitutional right. *Lawrence v. Lensing*,

---

[14] Watershed rules of criminal procedure used to be exempt from *Teague*'s non-retroactivity ambit. This exception has been eliminated—it "is moribund. It must 'be regarded as retaining no vitality.'" *Edwards*, 141 S. Ct. at 1560.

42 F.3d 255, 258 (5th Cir. 1994). A conclusory allegation does not state a claim for federal habeas corpus relief and is subject to summary dismissal. *Koch v. Puckett*, 907 F.2d 524, 529 (5th Cir. 1990). The prisoner bears the burden of demonstrating that a constitutional violation occurred. *Lockett v. Anderson*, 230 F.3d 695, 707 (5th Cir. 2000).

A federal habeas petition must specify all grounds for relief available to the petitioner and, to support each ground specified, must set forth facts in summary form. *See* Rule 2(c), 28 U.S.C. foll. § 2254; *Adams v. Armontrout*, 897 F.2d 332, 334 (8th Cir. 1990) (holding that to comply with Rule 2(c), a petitioner must state specific, particularized facts entitling him to habeas relief for each ground specified; facts must consist of sufficient detail to allow court to determine whether petition merits further review from face of petition alone); *Wacht v. Cardwell*, 604 F.2d 1245, 1247 (9th Cir. 1979) (failing to grant relief where, after alleging he was prejudiced by state trial judge's actions, petitioner failed to support allegation with facts); *May v. Maschner*, 668 F. Supp. 1305, 1307 (W.D. Mo. 1987) (holding that court may not consider ground for habeas relief where ground included in petition "attachment"); *see also Blackledge v. Allison*, 431 U.S. 63, 75–76 (1977) (stating that petitioner's allegation that his plea was involuntary was not "vague or conclusory" where petition alleged facts, including terms of unkept promise inducing plea; where, when and by whom promise made; and identity of witness to communication).

52

"Absent evidence in the record, a court cannot consider a habeas petitioner's bald assertions on a critical issue in his pro se petition (in state and federal court), unsupported and unsupportable by anything else contained in the record, to be of probative evidentiary value." *Ross v. Estelle*, 694 F.2d 1008, 1011–12 (5th Cir. 1983) (citing *Woodard v. Beto*, 447 F.2d 103, 104 (5th Cir. 1971)). A mere conclusory allegation does not raise a constitutional issue in a habeas proceeding. *Id.* at 1012 (citing *Schlang v. Heard*, 691 F.2d 796, 798 (5th Cir. 1982)).

Many, if not all, of Ramirez's claims contain conclusory allegations that permit summary denial. Claims that contain conclusory allegations will be identified in their individual sections with additional briefing as necessary.

## IX.   Timeliness

Ramirez's petition is time-barred. With regard to the timeliness of petitions for federal habeas corpus relief, Section 2244:

(d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of–

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B) the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed,

if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

(2) The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

28 U.S.C. § 2244(d).

As the procedural history detailed above indicated, Ramirez was convicted on August 27, 2005. 2 CR 591–98. His conviction was affirmed on December 12, 2007. *Ramirez*, 2007 WL 4375936. His state habeas proceedings were concluded on October 14, 2015. *Ex parte Ramirez,* 2015 WL 6282336. Therefore, Petitioner's federal application was initially due one year from that date on October 13, 2016.

However, generally a defendant's state postconviction motion for DNA testing tolls the statute of limitations for seeking federal habeas relief. *Hutson v. Quarterman*, 508 F.3d 236, 240 (5th Cir. 2007); 28 U.S.C. § 2254(d)(2). On October 21, 2015, eight days after the conclusion of his state habeas proceedings, Ramirez filed a Motion for Post-Conviction DNA Testing under

54

Chapter 64 of the Texas Code of Criminal Procedure. DNACR 19. The state trial court signed an order denying Ramirez's motion on June 7, 2017. DNACR 5[15]. At that point, under Texas Rules of Appellate Procedure Rule 26.2(a)(1), Ramirez had until July 7, 2017, to file a notice of appeal. However, Ramirez did not file a notice of appeal until November 9, 2018. DNACR 148–51.

In the interim the state trial court entered a superseding order on November 1, 2018. DNACR 143–47. This order came 512 days after the trial court properly denied Ramirez's motion. DNACR 5; DNACR 143–47. However, a trial court loses jurisdiction over a case 30 days after the entry of the appealable order. *See* Tex. R. App. R. 26.2(a). Due to the length of time that had passed, the trial court was without jurisdiction to enter any order in the case. *See* Tex. R. App. R. 26.2(a). Therefore, the trial court's order dated November 1, 2018, has no lawful effect and does not resurrect the pendency of the Chapter 64 proceedings.

Therefore, the DNA proceedings stopped tolling on June 7, 2017. As eight days of the statutory period passed prior to Ramirez filing his Chapter 64 motion, he had 357 days to file his federal habeas petition from the denial of DNA testing. As such, Ramirez's federal petition was due no later than May 30, 2018. Ramirez's federal petition filed on November 30, 2018, was six

---

[15] The clerk's record does not contain the original order. It is attached to this motion as Exhibit A.

months too late. Therefore, the Court must dismiss this action with prejudice because Ramirez failed to file his federal writ petition within the statutory period of limitations provided in § 2244(d) of AEDPA.

## RAMIREZ'S CLAIMS FOR RELIEF

## I.   The State Court's Adjudication of Ramirez's Ineffective Assistance Claim Was Reasonable, and Ramirez Received Effective Assistance of Counsel During Sentencing in Any Event. (Claim 1)

Ramirez centers Claim 1 on the purported failure of trial counsel to properly investigate and present a mitigation case. ECF 67 at 177–244. In state habeas, Ramirez raised a claim of ineffective assistance of counsel during the sentencing phase of trial. 1 SHCR 164–83. The CCA denied relief and its merits adjudication was a reasonable application of Supreme Court precedent based on the record before the state court, which is all this Court may consider. Alternatively, if Ramirez's new evidence fundamentally alters the claim, it is unexhausted and procedurally barred, and Martinez fails to prove entitlement to merits review. But in the event this Court chooses to review the claim de novo, Ramirez wholly fails to demonstrate either deficiency or prejudice under *Strickland*. As such, this claim must fail.

### A.   Law

A petitioner who wishes to demonstrate ineffective assistance of counsel must demonstrate (1) that counsel's performance was deficient and (2) that the

deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

To establish deficient performance, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Richter*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 688). A court considering a claim of ineffective assistance must apply a "strong presumption" that counsel's representation fell within the "wide range" of reasonable professional assistance. *Id.* (quoting *Strickland*, 466 U.S. at 689). The petitioner must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* (quoting *Strickland*, 466 U.S. at 687).

Even if a petitioner proves an inadvertent omission on counsel's behalf, relief is not automatic. The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight. *See Bell v. Cone*, 535 U.S. 648, 702 (2002); *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986); *Strickland*, 466 U.S. at 689; *United States v. Cronic*, 466 U.S. 648, 656 (1984). "The question is whether an attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Richter*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690).

With respect to prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* (quoting *Strickland*, 466 U.S. at 694). It is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* (quoting *Strickland*, 466 U.S. at 693). Counsel's errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* (quoting *Strickland*, 466 U.S. at 687).

"Surmounting *Strickland*'s high bar is never an easy task." *Id.* at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)). "[T]he *Strickland* standard must be applied with scrupulous care, lest 'intrusive post-trial inquiry' threaten the integrity of the very adversary process the right to counsel is meant to serve." *Id.* at 105. (quoting *Strickland*, 466 U.S. at 689–90). Therefore, "[e]ven under de novo review, the standard for judging counsel's representation is most deferential." *Id.* And when viewed through the lens of § 2254(d), it "is 'doubly' so." *Id.* (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

### 1.    Deficiency

Concerning investigatory efforts, "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular

investigations unnecessary." *Strickland*, 466 U.S. at 691. However, "*Strickland* itself rejected the notion that the same investigation will be required in every case." *Pinholster*, 563 U.S. at 195. "An applicant 'who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of trial.'" *Gregory v. Thaler*, 601 F.3d 347, 352 (5th Cir. 2010) (quoting *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989)).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91. Thus, a particular decision not to investigate further "must be directly assessed for reasonableness in all the circumstances," and a heavy measure of deference is given to counsel's strategic decisions. *Id.* at 691. "Counsel's decision to pursue one course rather than another is not to be judged in hindsight," and the fact that a particular strategy may prove to be unsuccessful does not by itself establish ineffective assistance. *Gray v. Lucas,* 677 F.2d 1086, 1094 (5th Cir. 1982). Indeed, a "'conscious and informed decision on trial tactics and strategy' is not a permissible basis for a claim of [IATC] unless the strategy was so poor that it robbed the defendant of any opportunity to get a fair trial." *Smith,* 311 F.3d at

59

668 (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)), *overruled on other grounds by Tennard v. Dretke*, 542 U.S. 274 (2004).

In assessing reasonableness in this context, courts should "conduct an objective review of [counsel's] performance, measured for 'reasonableness under prevailing professional norms,'" which must include a "context-dependent consideration of the challenged conduct as seen 'from counsel's perspective at the time.'" *Wiggins v. Smith,* 539 U.S. 510, 523 (2003) (quoting *Strickland,* 466 U.S. at 688–89). The question of the effectiveness of pretrial investigation is one of degree; it is not subject to precise measurement. *Strickland,* 466 U.S. at 680; *Dowthitt v. Johnson,* 230 F.3d. 733, 743 (5th Cir. 2000). Indeed, "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins,* 539 U.S. at 533. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard,* 545 U.S. 374, 383 (2005).

Relatedly, "complaints of uncalled witnesses are not favored in federal habeas corpus review because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have stated are largely speculative." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009). "The mere fact that other witnesses might have been available or that

other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel." *King v. Davis*, 883 F.3d 577, 590 (5th Cir. 2018) (quoting *Grossman v. McDonough*, 466 F.3d 1325, 1347 (11th Cir. 2006)). To prevail on such a complaint, a petitioner must name the witness, prove the witness's availability, allege what the witness would have testified to, and explain how such testimony would have been beneficial. *Day,* 566 F.3d at 538.

Further, whether or not to retain a defense expert is the very sort of trial decision that is insulated from ineffective assistance claims and disfavored on federal habeas review because it is a matter of strategy. *See Yohey v. Collins,* 985 F.2d 222, 228 (5th Cir. 1993) ("Given the almost infinite variety of possible trial techniques and tactics available to counsel, this Circuit is careful not to second guess legitimate strategic choices."). Counsel cannot be considered ineffective for not hiring every conceivable kind of expert to contest the State's case or develop a theory that might have supported Ramirez's defense. *See Smith v. Collins,* 977 F.2d 951, 960 (5th Cir. 1992) ("The defense of a criminal case is not an undertaking in which everything not prohibited is required. Nor does it contemplate the employment of wholly unlimited time and resources."). Nor does *Strickland* require counsel to "canvass[] the field to find a more favorable defense expert." *Dowthitt,* 230 F.3d. at 748; *see also Poyner v. Murray,* 964 F.2d 1404, 1419 (4th Cir. 1992) (explaining that the Sixth

61

Amendment does not require attorneys to "shop around" for more favorable expert testimony).

### 2.   Prejudice

To assess prejudice, reviewing courts "reweigh the evidence in aggravation against the totality of available mitigating evidence." *Wiggins*, 539 U.S. at 534. This requires a court to "consider *all* the relevant evidence that the jury would have had before it if [the petitioner] had pursued a different path—not just the evidence [the petitioner] could have presented, but also the . . . evidence that almost certainly would have come in with it." *Wong v. Belmontes*, 558 U.S. 15, 20 (2009) (per curiam). In evaluating the utility of any mitigating evidence which was not introduced, its nature as potentially "double edged" should also be taken into consideration. *Wiggins*, 539 U.S. at 535.

The question is whether "the additional mitigating evidence [is] so compelling that there [is] a reasonable probability that at least one juror could have determined that because of the defendant's reduced moral culpability, death [is] not an appropriate sentence." *Canales v. Davis,* 966 F.3d 409, 412 (5th Cir. 2020) (quoting *Kunkle v. Dretke*, 352 F.3d 980, 991 (5th Cir. 2003)). Such a reasonable probability exists if "the likelihood of a different result [is] substantial, not just conceivable." *Richter*, 562 U.S. at 112.

**B.    Argument**

In his state habeas application, Ramirez argued as his "Ground for Review One" that he "was denied the effective assistance of counsel guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution when his trial attorneys failed to investigate and present mitigating evidence that called for a sentence less than death." 1 SHCR 82, 164–83. The state court's denial of this claim constitutes an adjudication on the merits. That decision did not involve an unreasonable application of clearly established Federal law and was not based on an unreasonable determination of the facts. Furthermore, although Ramirez brings a plethora of new evidence to this Court, none of it can be considered in deciding his claims. Nonetheless, even if the new evidence were considered, Ramirez's claim fails on a de novo review.

**1.    The state court adjudication.**

**a.    The claim and evidence in state court.**

In state court, Ramirez presented the expert report of neuropsychologist Dr. Gilbert Martinez. 1 SHCR 146–55. Dr. Martinez performed a neuropsychological assessment of Ramirez and conducted neuropsychological testing. 1 SHCR 146–55. Dr. Martinez's report yielded the following recommendations and opinions:

1.    Mr. Ramirez currently suffers from substantial cognitive deficits that are likely related to brain damage secondary to severe drug abuse. He will have difficulty understanding

63

and responding to moderately complex written and orally presented information.

2.  Mr. Ramirez will have significant difficulty developing a rational or factual understanding of information required to participate fully in legal proceedings. He will have difficulty consulting with attorneys and his cognitive deficiencies will limit his ability to comprehend, and respond to, much of the information typically involved in legal proceedings.

3.  Mr. Ramirez's current intelligence test scores and his clinical presentation suggest he is currently functioning within the Mild Mental Retardation range of intelligence. He appears to have acquired these deficits prior to age 18, likely as a result of repeated insults to the brain. Further assessment of his adaptive functioning is recommended to explore the nature and severity of functional deficiencies.

4.  Clinical recommendations to improve Mr. Ramirez's level of emotional and functional adjustment include psychotropic medication for his affective/thought disorder and psychological counseling.

1 SHCR 154–55.

Ramirez's expert at trial, Dr. Kate Allen, expressed "frustration with trial counsels' preparation with respect to the mitigation case." 1 SHCR 155–75. Further, Ramirez argued that trial counsel did not understand the rules of evidence, which led to the details of Ramirez's life being excluded because trial counsel unsuccessfully attempted to introduce them through Dr. Allen. 1 SHCR 175. Ramirez also complained about Bowen's mitigation investigation. 1 SHCR 176–78. And he additionally argued that trial counsel did not

independently obtain and adequately use Ramirez's TYC records during the punishment phase. 1 SHCR 178–79.

A hearing was held in the state trial court to address some of Ramirez's claims, and the vast majority of the hearing was dedicated to that claim. The judge that heard this evidence is the same judge that presided over Ramirez's trial. *See* 2 CR 591, 1–4 SHRR.

### b.   The state court's adjudication was reasonable.

Based upon the evidence developed at the hearing, the application and its exhibits, and the State's response, the trial court issued findings of fact and conclusions of law recommending that Ramirez be denied relief. 3 Supp. SHCR 947. The CCA adopted the trial court's findings. *Ex parte Ramirez*, 2015 WL 6282336, at *1. Based upon those findings and the CCA's own review, the CCA denied Ramirez's application. *Ex parte Ramirez*, 2015 WL 6282336, at *1. The findings on this issue are as follows:

1.    Trial counsel did not fail to render effective assistance of counsel in regard to their investigation and presentation of potential mitigating evidence.

2.    Although [Ramirez's] case was the first death penalty case handled by Rolando Garza, he was, at the time, an experienced criminal law practitioner at both the trial and appellate level.

3.    Although [Ramirez's] case was the first death penalty case handled by Alma Garza, she was, at the time, also an experienced criminal law practitioner, who had handled non-death penalty capital murder cases and was on the list of

attorneys approved to be appointed lead counsel in death penalty cases.

4.    In addition, the record of [Ramirez's] case demonstrates that [Ramirez's] trial attorneys and attorney on direct appeal had done a commendable job of representing Ramirez, particularly given the material they had had to work with.

5.    Language in *Strickland v. Washington* states that strategic choices which counsel makes after a thorough investigation of the law and the facts relevant to plausible options are virtually unchallengeable; that strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgment supports the limitations on investigation; that a decision not to investigate must be directly assessed for reasonableness in all of the circumstances, applying a heavy measure of deference to counsel's judgments; and that the reasonableness of counsel's action may be determined or substantially influenced by the defendant's own statements or actions. *Strickland,* 466 U.S. at 690–91.

6.    The Texas Court of Criminal Appeals has repeatedly held that an attorney must have a firm command of the facts of the case as well as the law before he can render reasonably effective assistance of counsel and have also held that counsel must make an independent investigation of the facts of his client's case.

7.    The United States Supreme Court has addressed the specific topic of counsel's duty to investigate and present potential mitigating evidence in a death penalty case in *Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); and *Rompilla v. Beard*, 545 U.S. 374 (2005).

8.    The Texas Court of Criminal Appeals applied the principles discussed in *Wiggins v. Smith* and *Rompilla v. Beard* in *Ex parte Woods*, 176 S.W.3d 224 (Tex. Crim. App. 2005) and *Ex parte Martinez*, 195 S.W.3d 713 (Tex. Crim. App. 2006).

9.    In particular, the record demonstrates that trial counsel had met their constitutional obligation to conduct an independent investigation of the facts of [Ramirez's] case.

10.   [Ramirez's] trial attorneys made [a] reasonable strategic decision to focus their strategy at the punishment phase of his trial on the mitigation issue.

11.   [Ramirez's] trial attorneys and trial mitigation specialist conducted a constitutionally adequate investigation into potential mitigating circumstances in [Ramirez's] background.

12.   Those aspects of [Ramirez's] challenge to the adequacy of his attorneys' investigation and presentation of potential mitigating evidence dealing with his mental condition, cognitive disorder, mental retardation, psychological afflictions, or the psychological effects of his use of drugs or alcohol are not part of the analysis of the constitutional adequacy of said attorneys' investigation and presentation of potential mitigating evidence since [Ramirez] has waived all of his claims dealing with his mental condition.

13.   Alma Garza spoke to [Ramirez] about mitigating evidence in his background as well as to family members in compliance with her duty to investigate.

14.   Further, the defense team procured the assistance of Gilda Bowen, a mitigation specialist. Ms. Bowen talked to [Ramirez] and his family members and prepared a detailed bio-psychosocial report; which contained extensive information about [Ramirez] and his background.

15.   Additionally, Rolando testified that the defense team was aware of Berta Alicia Ramirez, [Ramirez's] oldest sister; however, they were only able to determine that she lived somewhere in Ohio, and not a definite address or location.

16.   Habeas mitigation specialist Maria Gloria Rodriguez' investigation was substantially similar to that conducted by [Ramirez's] trial team.

17. [Ramirez's] mother and sister moved to Corpus Christi and became unavailable to trial counsel; Counsel preformed a constitutionally adequate sentencing phase in light of the limitations imposed by [Ramirez's] family's unavailability.

18. Alma Garza was aware that [Ramirez's] mother and sister were moving to Corpus Christi, however it was not at her direction. Rather, [Ramirez's] family moved at his direction. Further, [Ramirez's] trial counsel was not provided reliable and current contact information. The record merely reflects that at some time, after the trial, counsel was provided a Corpus Christi address and phone number.

19. In any event, family members are hardly objective and often change their views as to willingness to testify and what to say after the defendant receives a death sentence.

20. This left the attorneys to come up with a "fall-back" position: the use of Dr. Kate Allen as an expert witness.

21. The record demonstrates that [Ramirez's] attorneys had adequately investigated [Ramirez's] background and had presented the evidence concerning that subject which was available to them, given the unavailability of the members of [Ramirez's] family.

22. The Trial Court properly exercised its discretion under Texas Rule of Evidence 705(d) in weighing the admission of the background information used by Dr. Allen against the potential that the jury would be lead to believe that Dr. Allen was testifying as to the truth of Ramirez's background. This Court weighed the potential that the jury would get the impression that the hearsay information is necessarily true against the [Ramirez's] right to present mitigation.

23. A miscalculation as to how the Trial Court will apply a rule of evidence does not constitute ineffective assistance; particularly when the rule in question inherently allows the court discretion in the area involved.

24.   It is inappropriate to use hindsight to judge the actions of trial counsel as to what this Court would let in and must instead evaluate it based on the circumstances at the time. Given that the balancing test leaves the admission in the sound discretion of the trial court, trial counsel was not ineffective for attempting to use their "fall back" method to present the mitigation evidence to the jury.

25.   Trial counsel made a reasonable strategic decision as to how to handle presentation of mitigation evidence given the unexpected limitations on the availability of the witnesses they had intended to utilize to present said evidence to the jury. The witnesses were simply out of contact with the defense team at the critical stage of the case.

26.   Trial Counsel competently made an offer of proof to challenge trial court's ruling on Rule 705 issue; said offer reflects that counsel understood the possibility of an adverse ruling on the admissibility of Dr. Allen's testimony and competently preserved the issue for appeal.

27.   [Ramirez's] trial attorneys also made a sound strategic decision not to attempt to interview [Ramirez's] co-defendants based on the fact that it was very unlikely that the codefendants' attorneys would allow them to do so.

28.   Said attorneys likewise made a valid strategic decision not to call any of [Ramirez's] co-defendants to testify because they might say things that hurt the defense's case.

29.   The trial record demonstrates that [Ramirez's] attorneys were fully prepared by the time [Ramirez's] case went to trial.

30.   The additional information [Ramirez] now criticizes his attorneys for not finding or not presenting, which is largely cumulative of that which his Mother and sister would have been able to testify to and that Gilda Bowen provided in her biopsychosocial report, would not have affected the end result, a decision that none of said information about

> [Ramirez] constituted sufficient mitigating circumstances to warrant imposition of a life sentence.

3 Supp. SHCR 934–41

At the outset, because Ramirez repudiated the postconviction mental health expert's testimony, 1 Supp. SHCR 41, the complaint in state court was narrow, not including "potential mitigating evidence dealing with his mental condition, cognitive disorder, mental retardation, psychological afflictions, or the psychological effects of his use of drugs or alcohol." 3 Supp. SHCR 937. Given that withdrawal of evidence, the challenge was mostly focused on Ramirez's background and how trial counsel chose to present the information they had gathered, *see* 1 SHCR 164–83, which the state court reasonably adjudicated.

The state court determined that trial counsel had intended to present information about Ramirez's life and upbringing through Ramirez's mother and sister, but that the family had moved during the trial and counsel was unable to locate them to testify at punishment. 3 Supp. SHCR 937–38. That was undoubtedly reasonable. "[I]t [is] not 'outside the wide range of professionally competent assistance' to assume that [the petitioner's] family members, who had been cooperative and had provided mitigating testimony in their interviews, would be willing to testify on his behalf at a trial that could result in a death sentence." *Allen*, 805 F.3d at 637. Indeed, trial counsel "may

70

not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Richter*, 562 U.S. at 110. That the Ramirez's family members eventually didn't cooperate, and therefore didn't testify, does not demonstrate deficient performance. *Allen*, 805 F.3d at 637–38.

Left without the witnesses that they had planned to call, counsel developed a "fall-back" plan to use their expert Dr. Kate Allen to develop the evidence of Ramirez's life. 3 Supp. SHCR 938. At that point, trial counsel had no other option but to hope that the trial court would come down on their side in applying the rules related to testimony about the bases of expert opinions. The state court reasonably found that "[a] miscalculation as to how the Trial Court will apply a rule of evidence does not constitute ineffective assistance; particularly when the rule in question inherently allows the court discretion in the area involved." 3 Supp. SHCR 939. This is consistent with the Supreme Court's recognition that "there is no expectation that competent counsel will be a flawless strategist or tactician." *Richter*, 562 U.S. at 110.

Finally, the state court pointed out that any remaining evidence that Ramirez criticized trial counsel for not finding or presenting was "largely cumulative of that which [Ramirez's] mother and sister would have been able to testify to." 3 Supp. SHCR 940. This too is reasonable because, while those witnesses ultimately didn't testify, it wasn't deficient performance to not

71

uncover and present what would have amounted to cumulative testimony. *See Carty v. Thaler*, 583 F.3d 244, 264 (5th Cir. 2009) ("We agree with the district court that [the petitioner] has not shown any deficiency related to her proffer of cumulative evidence.").

Ramirez's state habeas application complained that trial counsel did not interview enough witnesses about Ramirez's life. 1 SHCR 164. Therefore, trial counsel was unprepared to present evidence of Ramirez's troubled background. 1 SHCR 164. Furthermore, Ramirez argued that his attorneys waited too long before employing Dr. Allen and that they exacerbated the problem by waiting too long before providing her with the necessary background information. 1 SHCR 164. Finally, Ramirez alleged that his attorneys should have hired a neuropsychologist. 1 SHCR 164. The court concluded that none of the information Ramirez alleged trial counsel was ineffective for failing to present would have been sufficient mitigation to warrant a life sentence. 3 Supp. SHCR 940–41.

The state habeas court found that the factual investigation conducted by the habeas mitigation expert "was substantially similar to that conducted by [Ramirez's] trial team." 3 Supp. SHCR 937–38. State habeas mitigation expert Maria Gloria Rodriguez located the lay witnesses whose affidavits were attached to Ramirez's state habeas application. 1 SHCR 320–27. However,

these statements are rife with inadmissible hearsay and gave different and conflicting accounts about Ramirez's family and life.

The witnesses Rodriguez located can generally be divided into two categories based upon whether the statements portrayed Ramirez's father or Ramirez's mother as the cause of the familial troubles. Admittedly, few of the statements provided entirely favorable views of either parent.

Witnesses that tended to support Juana described Jose Raul Ramirez, Ramirez's father, as "violent and drunk." 1 SHCR 278–82, 285, 291. This version of Jose Raul Ramirez was a man who had no regard for his children and was amused by causing them emotional pain who only ever returned to the home to sexually assault Juana. 1 SHCR 285, 291. Some of these witnesses described Juana as "a hard-working person" who was "nice to her children." 1 SHCR 293.

According to other witnesses, Juana was strict and verbally and physically abusive. 1 SHCR 296–99, 302–03, 310. There were allegations that she drank regularly, demonstrated mood swings, and provoked physical and verbal altercations. 1 SHCR 296–99, 310. In this version of history, Jose was able to keep control of the children and prevented them from going "into the streets with other children." 1 SHCR 297. However, once the parents split up, Juana prevented Jose from seeing his children. 1 SHCR 297–98, 302–03. 307. One witness, Ramirez's godmother Thelma Mendoza, believed that Ramirez

73

left home "because his mother did not pay enough attention to him." 1 SHCR 311.

In addition to the internal inconsistences found in Ramirez's new evidence, the court accurately noted that Ramirez's trial team procured a mitigation specialist and that the investigation conducted by the habeas mitigation specialist investigation "was substantially similar to that conducted by [Ramirez's] trial team." 3 Supp. SHCR 938. Ramirez was not prejudiced by trial counsel's choice of mitigation expert when the differences between the end products were negligible.

Ramirez was no more prejudiced by the alleged delays in hiring and providing background information to Dr. Allen. The only hint of how Ramirez was prejudiced by this alleged deficiency found in his state habeas application is the comment that because Dr. Allen did not get the background materials in a timely fashion, "she had only a brief time to review records and prepare for her testimony." 1 SHCR 165. However, in explaining his complaints about Dr. Allen's testimony, Ramirez never explains how these problems were caused by the fact she only had a brief time to review records. 1 SHCR 171–73. Instead, Ramirez complained that Dr. Allen was not able to testify about "specific links to Mr. Ramirez." 1 SHCR 172. But this problem was caused by the trial court's evidentiary ruling and not Dr. Allen's preparation. As Ramirez notes in his application, that "the court held it would not allow Allen to go into these

specifics because it was hearsay." 1 SHCR 173. Ramirez did not explain how the court's ruling would have been affected had Dr. Allen spent months reviewing records. Whether or not trial counsel was deficient in delaying in the hiring and preparing of Dr. Allen, Ramirez provided no evidence to the state habeas court that the deficiency prejudiced him.

Finally, due to the fact that even Ramirez's state habeas counsel believed the proposed neuropsychologist unreliable, Ramirez was not prejudiced by a failure to present him as an expert witness.

Therefore, the habeas court's conclusion that the additional information Ramirez charged his attorneys with failing to find and present was "largely cumulative" and did not constitute "sufficient mitigating circumstances to warrant imposition of a life sentence" was entirely reasonable.

The state court accurately cited the relevant law on the subject and reasonably applied that law to the facts in the case, and Ramirez has not rebutted the fact findings with clear and convincing evidence. Considering the evidence from the trial, the exhibits admitted on state habeas, and the testimony heard at the state habeas hearing, Ramirez had an opportunity to present everything to the Court that he believed was relevant to the case and the Court may not consider anything else. *See Martinez Ramirez*, 142 S. Ct. at 1738; *Pinholster*, 563 U.S. at 181. This claim should be denied.

### 2. Alternatively, even considering Ramirez's new evidence on de novo review, the claim fails.

If the Court finds that Ramirez's IATC mitigation claim hasn't been presented in state court, it is unexhausted and therefore procedurally defaulted. *See supra* Answer IV. But even if it is considered de novo in the alternative, it fails.

Ramirez argues that, but for his trial counsel's ineffective assistance at punishment, he would not have been sentenced to death. ECF 67 at 177–251. Ramirez states that had his disabilities "been known by the jury, [they] would have had broad implications on the penalty phase proceedings." ECF 67 at 170. Ramirez then lays out what he believes those implications would have been.

> It would have been important for the jury to consider evidence that Ramirez was not the individual who organized and marshalled others to participate in the crime, and to consider whether he had diminished capacity to resist participation orchestrated by an older authoritarian adult.

> Ramirez's childhood institutional records document his fear that he or family members might be killed by community gang members once he was released from juvenile corrections custody. (4 SH CR at 1529; ECF No. 28-1 at 43, Ex. 51 ¶ 14; ECF No. 28-1 at 99, Ex. 59 ¶ 40.) Ramirez's fears were not unfounded. Ramirez's juvenile parole officer also feared for Ramirez's life and safety in the community.

> Ramirez's neurodevelopmental disorders are permanent and not curable, with adequate interventions and support, the negative effects of such disorders can be lessened, children can learn to compensate, increasing the chances for success in education and achievements later in life.

76

Ramirez suffered "severe parental neglect" due to his mother's own issues.

The public school system failed to recognize and treat "Ramirez's neurodevelopmentally rooted learning and emotional disabilities."

The juvenile justice system confined him in a setting where conditions "were appallingly dangerous and brutal[,]" "youth [were] at risk of physical and sexual assault from both other youth and from staff, with drugs widely available [to children like Ramirez], and with rampant gang activity [inside the institution]. Ramirez, consistent with his genetics, had been diagnosed with clinical depression and PTSD.

ECF 67 at 171, 173, 174–75. Ramirez claims that all of these factors led him to medicate with street drugs and be extremely vulnerable to "community gang influences." ECF 67 at 175.

### a.    Ramirez's new evidence

In support of this claim, Ramirez presents this Court a plethora of additional, potentially mitigating evidence that he claims was missed due to counsel's deficient performance.[16] He provides declarations from the following experts.

### i.    Debbie Dunn

Debbie Dunn has a master's degree in special education and has worked in the field of special education since 1997. ECF 30-3 at 51. Ramirez asked

---

[16] Again, because this evidence was never presented in state court, this Court is prohibited from considering it on federal habeas. *See Martinez Ramirez*, 142 S. Ct. at 1738; *Pinholster,* 563 U.S. at 186.

Dunn to opine on "whether there is evidence in the records that [Ramirez] suffered from neurological impairments and corresponding deficits in brain function during the early years of his primary education." ECF 30-3 at 53. Dunn was further asked "whether there is evidence in the records that [Ramirez] had symptoms of emotional disturbance." ECF 30-3 at 53. Dunn reviewed Ramirez's educational records, statements from educators in the schools he attended, childhood psychological reports, other childhood records, and Ramirez's neuropsychological testing scores from 2016. ECF 30-3 at 53.

On the subject of the neuropsychological test results, Dunn states as follows:

> With respect to the 2016 neuropsychological test results, *counsel have represented to me*, and I agree based on my own interpretation of the results, that these test results reveal that Juan suffers from neurological impairments and deficits in brain function.

ECF 30-3 at 53 (emphasis added). Dunn further opines that, based upon the records she reviewed, Ramirez had symptoms of learning disabilities, and associated deficits in brain functioning, from pre-kindergarten through fourth grade, and continuing thereafter. According to Dunn, Ramirez was exhibiting symptoms of emotional disturbance by the beginning of middle school. ECF 30-3 at 53–54.

Dunn states that "a child with a learning disability will generally exhibit a significant discrepancy between his actual academic achievement and his

apparent capacity to acquire basic academic skills. This discrepancy is typically seen in children who have average intelligence and the apparent capacity to acquire basic academic skills, but who are still unable to learn to read, write, spell, or learn mathematics." ECF 30-3 at 56. Ramirez demonstrated this discrepancy. ECF 30-3 at 56. "[Ramirez] has consistently struggled with reading and shown symptoms of a reading-based learning disability." ECF 30-3 at 57.

"Scientific research has not identified precisely what causes learning disabilities, but there is evidence that learning disabilities are associated with differences in brain structure that are present at birth and linked to neurobiological and genetic factors. Poverty and disability are often found together, and each tends to exacerbate the other, but poverty is not a standalone causative factor. Children who are not exposed to a language-rich environment and language-development activities during the first five years of life are at a higher risk for reading disabilities." ECF 30-3 at 57.

"In addition, '[s]everal studies have examined learning environments and interventions used such as small group interaction and direct teacher instruction to help increase positive social skills and behavior in elementary school-aged children with learning disabilities. These studies show early intervention decreases behavior problems and increases school success.' Among the studies cited were studies from 1995 and 2003. Importantly,

children with delays in understanding phonological concepts in first grade are unlikely to catch up later without explicit and informed teaching." ECF 30-3 at 58.

"For most individuals with learning disabilities who do not receive appropriate early intervention, long-term outcomes are bleak. School drop-out rates are higher, the individuals face limited educational and vocational opportunities, and, as discussed further below, the individuals are at higher risk for delinquency." "As noted below, Juan never received any special-education services or comparable intervention." ECF 30-3 at 58.

"There is a strong correlation between learning disability-a disorder in brain function-and delinquency." ECF 30-3 at 59. "[Ramirez], however, never received special-education services known to remediate academic deficiencies and reduce delinquent behavior." ECF 30-3 at 59.

"Delinquent outcomes for learning-disabled youth are tied to neurological and associated cognitive deficits." ECF 30-3 at 60. "[A] learning disability is a neurological disorder that impairs the brain's ability to receive, process, store, and respond to information. Children with learning disabilities have cognitive, neurological, and intellectual difficulties that often result in a lack of impulse control, the inability to anticipate the future consequences of actions, poor perception of social cues, limited social skills, irritability, suggestibility, and the tendency to act out." ECF 30-3 at 60. "[C]hildren with

learning disabilities are particularly susceptible to engaging in delinquent activities. Their deficits also make it more difficult for the children to withdraw from a pattern of crime once they have started engaging in · criminal activity. Such children who have been abused become exceptionally vulnerable to environmental stress, peer pressure, and more violence." ECF 30-3 at 60.

"Learning disability co-occurs with numerous other conditions, including depression and certain behavioral or emotional disorders, and deficits in social skills." ECF 30-3 at 62. "Thus, especially if left untreated, a learning disability not only impairs the ability to learn; it impairs adaptive and social functioning. The end result can be educational failure and, more broadly, a failure to function successfully in society." ECF 30-3 at 62.

Ramirez made slight progress over a 20-month period from the age of four through the age of six in the English language. ECF 30-3 at 63. However, "[Ramirez] made no or next to no progress in English all the way through fourth grade." ECF 30-3 at 63.

One of Ramirez's third-grade teachers said that Ramirez appeared to be an at-risk student for who required learning modifications to pass his classes. ECF 30-3 at 64–65. At the end of third-grade, Ramirez was given a "placement" label which promoted him to fourth grade while indicating to his next teacher that he needed special assistance. ECF 30-3 at 65.

Ramirez's IQ scores from 1998 and 2000 were in the average range. ECF 30-3 at 69. Also in 1998, Ramirez scored at the fourth and third grade levels for reading and spelling. ECF 30-3 at 69. In 2000, Ramirez's IQ score showed a significant discrepancy between his verbal and performance abilities, with his performance IQ score, 100, exceeding his verbal IQ score, 83, demonstrating difficulties with language-based tasks. ECF 30-3 at 69. Ramirez was diagnosed with a reading disorder in 1998 and a learning disorder in 2000. ECF 30-3 at 69.

Students with learning disabilities are often motivated; however, their success will often depend on the support, remediation, and assistance they receive. ECF 30-3 at 71. According to Dunn, "[Ramirez's] reports demonstrate this phenomenon. When [Ramirez] was in residential programs or alternative settings, he had more support and showed academic progress. Once he left these settings, his support was gone, and he fell back into a pattern of delinquency." ECF 30-3 at 71.

Symptoms of emotional disturbance may include hyperactivity, short attention span, impulsiveness, aggression and acting out, withdrawal from others, immaturity and poor coping skills, and low academic performance. ECF 30-3 at 72. Emotional disorders often co-occur with learning disabilities. ECF 30-3 at 72. Dunn believes Ramirez displayed "symptoms of emotional disturbance, which may have been secondary to his learning disability," which

should have triggered special-education services under the IDEA." ECF 30-3 at 72.

Poor behavior at school, such as Ramirez displayed during middle school and thereafter, is often a secondary effect of untreated learning disability. ECF 30-3 at 73. In 1998, Ramirez displayed signs of anger, aggression, polysubstance abuse, and was diagnosed with major depressive disorder and post-traumatic stress disorder depression. ECF 30-3 at 73.

Also in a 1998 evaluation, Ramirez was described as "a depressed and angry young man who is deeply disappointed in himself and his relationships with others." ECF 30-3 at 73. Ramirez displayed suicidal ideation and pervasive depression, as well as his drug use "to dull his emotional pain." ECF 30-3 at 73. Further, Ramirez was extremely defensive, and irritable. ECF 30-3 at 73. Ramirez had "affective instability, erratic interpersonal relationships, impulsive hostility, and self-destructive tendencies." ECF 30-3 at 73. In 2000, Ramirez had disciplinary issues at school and conflicts with teachers around fifth grade. ECF 30-3 at 73.

However, Dunn noted that Ramirez's symptoms of emotional disability stabilized when Juan received treatment. ECF 30-3 at 74. Dunn specifically pointed out that when Ramirez was in counseling at a youth residential program, Ramirez "was 'no longer suicidal,' 'no longer angry,' and felt 'in control of his negative emotions.'" ECF 30-3 at 74. There Ramirez was no

longer "automatically hostile in new situations," defensive, or easily provoked. ECF 30-3 at 74.

Dunn provides the ultimate opinion that Ramirez displayed symptoms of learning disability as early as pre-kindergarten. ECF 30-3 at 75. Second, Ramirez "exhibited symptoms of emotional disability, likely secondary to his learning disabilities." ECF 30-3 at 75. Third, Ramirez "should have been identified as a child with learning and emotional disabilities and given appropriate services under federal law." ECF 30-3 at 75. Fourth, Ramirez was disserved by a "failure to provide him with special education." ECF 30-3 at 75. Dunn concludes that "had [Ramirez] received necessary remedial instruction by qualified personnel, he would have had a reasonable chance for a different life outcome." ECF 30-3 at 75.

### ii.    Dr. James Sullivan

Ramirez asked Dr. James Sullivan, a neuropsychologist, to conduct a neuropsychological assessment of Ramirez in the spring of 2016 in order to document Ramirez's "current level of cognitive function in order to inform the Court during upcoming proceedings." ECF 30-4 at 6–7. In doing so, Dr. Sullivan reviewed a number of expert reports, school records, and declarations from lay people. ECF 30-4 at 7–8. Based upon these documents and a clinical interview of Ramirez, Dr. Sullivan noted the following that, based upon the hearsay information provided in the documents, Ramirez's mother was

reportedly physically abused by [Ramirez's] father while pregnant with [Ramirez], and that Ramirez's "childhood was reportedly significant for regular physical abuse by his parents." ECF 30-4 at 8. Sullivan concluded, based upon potentially self-serving information from Ramirez, that he has an extensive drug and alcohol history that includes the use of psychoactive substances by eleven years-of-age. ECF 30-4 at 9. Further, based upon objective facts that Ramirez had multiple psychological assessments that detailed learning, emotional, and behavioral difficulties while in school; he was a "consistently poor student;" and that despite this Ramirez never received special education. ECF 30-4 at 10–11.

Dr. Sullivan performed a variety of psychological tests on Ramirez. Notably, Dr. Sullivan specifically points out that Ramirez "had no apparent difficulty reading" the two page Informed-Consent form that was presented to him at the beginning of the interview. ECF 30-4 at 12. Dr. Sullivan reported that, while Ramirez "occasionally became distracted," he was able to be redirected. Further, according to Dr. Sullivan, Ramirez's reality testing appeared to be intact and he displayed no indications of malingering. ECF 30-4 at 12.

Dr. Sullivan concluded that Ramirez demonstrated impairments in many areas. Ramirez's "full scale IQ is 82, in the low average range." ECF 30-4 at 17. Ramirez showed a "mild to moderate degree of brain impairment" with

"severe impairments in virtually all areas of assessed memory." ECF 30-4 at 17.

Dr. Sullivan found that Ramirez's "areas of most profound neuropsychological compromise are confrontation naming, simple visual scanning tasks, verbal fluency, phoneme recognition, kinesthetic processing and memory, and executive function." ECF 30-4 at 17. Of those, Dr. Sullivan specifies that the areas of executive function in which Ramirez showed the most impairments were "verbal fluency, abstract conceptualization (both inductive and deductive reasoning), switching of cognitive set, impulse control, self-monitoring and inhibition of competing responses." ECF 30-4 at 17.

Finally, Dr. Sullivan opines that Ramirez's deficits are "a direct result of prenatal insult" and as well and "childhood psychological trauma in the form of physical abuse." ECF 30-4 at 18. He believes that Ramirez's deficits predated his substance abuse, but that the abuse most likely exacerbated the existing impairment. ECF 30-4 at 18.

### iii.   Dr. Thomas Hyde

Dr. Thomas Hyde examined Ramirez on September 12, 2016. ECF 30-3 at 79. In his declaration, Hyde first gives an overview of developmental brain abnormalities and acquired brain injury. ECF 30-3 at 79. "Developmental brain abnormalities result from adverse factors operating early in life, especially during fetal development. Examples of developmental brain

abnormalities include genetic factors that cause perturbations in the normal anatomy and connections within the brain, as well as fetal and perinatal adversity that also alter the normal trajectory of brain growth and maturation. High levels of maternal stress, physical injury to the mother during pregnancy, and a lack of prenatal care all can produce developmental brain abnormalities." ECF 30-3 at 79.

According to Dr. Hyde, "Mr. Ramirez has suffered numerous closed head injuries, especially as an adolescent. Many of these were during fights where he was punched in the head." "Mr. Ramirez also reported he has suffered from polysubstance abuse issues since adolescence." Marijuana, inorganic solvents by inhalation, cocaine, Rohypnol, and alcohol. ECF 30-3 at 79.

Dr. Hyde states that on neuropsychiatric examination, Ramirez performed normally on Mental Status testing. "His Cranial Nerve, Motor, Gait, and Sensory examinations were notable for the presence of two frontal release signs: a glabellar reflex and a right palmomental reflex." ECF 30-3 at 79–80. "The persistence into or re-appearance in adulthood [of frontal release signs] reflects either developmental or acquired brain injury to the frontal lobes" and is consistent with impaired executive functioning. ECF 30-3 at 83. Dr. Hyde further opines that Ramirez's MRI scan showed abnormalities that "could be the result of brain damage from closed head injuries and/or inhalants." ECF 30-3 at 82.

Dr. Hyde states that "[t]he history provided by Mr. Ramirez, buttressed by declarations from educational experts and former teachers, in conjunction with educational records, psychological testing and neuropsychological testing results, is consistent with the diagnosis of a developmental learning disability." ECF 30-3 at 82. It is Dr. Hyde's opinion that Ramirez's "persistent deficits in both language and mathematics skills" is due to this learning disability. ECF 30-3 at 82. Hyde notes that "neuropsychological testing results from 2016 support the diagnosis of a learning disability." ECF 30-3 at 82.

Hyde concludes his first report as follows:

> [W]ithin a reasonable degree of medical certainty, Mr. Ramirez suffers from a developmental brain disorder related to an abnormal in utero environment, genetic factors, and deleterious post-natal events including severe financial hardship, closed head injury, and polysubstance abuse beginning in late childhood and continuing through adolescence. This resulted in organic brain damage that had a marked adverse influence on Mr. Ramirez's cognitive function and behavior through adulthood.

ECF 30-3 at 82–83.

In June of 2018, Dr. Hyde issued a second report. ECF 30-3 at 84–86. This second report details Hyde's conclusions based upon a review of Ramirez's MRI images from October 25, 2013. ECF 30-3 at 84. Hyde claims that the additional material expanded his "understanding of the biological bases of [Ramirez's] behavioral problems," but did not alter his original opinions. ECF 30-3 at 84. However, it led to additional opinions." ECF 30-3 at 84.

According to Dr. Hyde, the MRI images revealed

> abnormal signal symmetrically in the lateral thalamus most apparent on the FLAIR sequence, but also apparent as increased signal intensity on the T2-weighted images, decreased signal intensity on the Tl-weighted images, and increased signal intensity on the diffusion weighted images. Signal abnormalities such as these are indicative of pathological changes in the composition of the brain, localized to a particular brain region. These findings are in addition to the previously referenced biooccipital white matter hyperintensities also noted on the FLAIR sequence. The MRI images did not include enhancement of either the lateral thalamic or biooccipital hyperintensities with contrast.

ECF 30-3 at 85.

Hyde suspects that the lesions in the lateral thalamus may be the result of brain damage from low blood flow caused by Ramirez's abuse of inhalants and an episode where "a friend choked [Ramirez] until he passed out." ECF 30-3 at 85.

Hyde concludes his second report as follows:

> Within a reasonable degree of medical certainty, the longstanding damage to Mr. Ramirez's thalamus, as noted on MRI scan, contributes significantly to the behavior problems he has manifested throughout adolescence, and contributed to the actions that have led to this incarceration. Additionally, the thalamic lesions would act in concert with pre-existing neurodevelopmental problems, leading to greater brain dysfunction and functional disability.

ECF 30-3 at 86.

### iv.   Dr. Erin Bigler

Dr. Erin Bigler, Ph.D. is a neuropsychologist specializing in "neuropsychological diagnostics and neuroimaging, as well as the etiological, neurobehavioral, neurobiological, neurocognitive, psychosocial, and therapeutic considerations associated with both developmental and acquired brain damage, including brain damage concomitant with learning disabilities." ECF 67-17 at 55. Dr. Bigler reviewed "a substantial set of records bearing on Juan Navarro Ramirez's social, educational, juvenile justice, medical, and psychological history." ECF 67-17 at 56. Bigler summarized her conclusions as follows:

  a.   Mr. Ramirez suffers from permanent damage to his brain, which has resulted in significant impairments in his cognitive, emotional/psychological, academic, and social functioning.

  b.   There is evidence that damage to Mr. Ramirez's brain is developmental in origin, traceable to his mother's pregnancy, and/or the serious adverse environmental conditions permeating his infancy; or very early childhood, prior to his reaching school age.

  c.   Beginning in early childhood, Mr. Ramirez's untreated brain abnormalities found expression in both learning, emotional, and psychiatric disabilities.

  d.   Throughout his childhood and adolescence, those responsible for his education and institutional care denied him opportunities for treatment of his pronounced brain-based learning disabilities and related cognitive and emotional impairments, and to the contrary, the responsible

educational and juvenile authorities imposed conditions that would have impeded any potential for rehabilitation.

e.  Without appropriate treatment of his underlying neurocognitive disorder, or a realistic avenue of escape from a variety of familial and other traumatic childhood exposures, there were predictable consequences: failure in school, development of serious emotional and psychiatric disorders, self-medicating with drugs and inhalants, and becoming all too easily susceptible to manipulation by adult criminal gang members, who permeated his community.

f.  In Mr. Ramirez's case, he was convicted of an offense occurring when he was just 18 years old, prior to full development of brain regions related to higher-order functions such as, impulse control, planning ahead, the evaluation of future consequences, making mature judgments, and risk evaluation. For Mr. Ramirez these normal disadvantages in adolescent brain function were exponentially magnified due to his pre-existing brain damage. Indeed, when considering Mr. Ramirez's moral culpability at the time the charged offense occurred, the objective and valid assessments of his brain function reveal areas of cognitive and emotional functioning that are typical of an 8 or 9 year old, not someone who was 18.

### v.  Michele Deitch

Michele Deitch is an attorney who works for the University of Texas School of Law where she teaches a course in juvenile justice and criminal justice policy. ECF 28-3 at 29. She also holds a master's degree in experiential psychology and has worked in various capacities on criminal justice issues for more than thirty years. ECF 28-3 at 29.

Deitch attaches to her report an exhibit that she says was "*provided to me by habeas counsel,* contains a detailed summary of problems that existed in

TYC, and specifically in the facilities where Mr. Ramirez was housed, during the relevant time period." ECF 28-3 at 32 (emphasis added). Deitch states that in developing her expert opinions she relied "on the accuracy of the information described" in the exhibit. ECF 28-3 at 32. Deitch then tells us that Ramirez's counsel's report is consistent with her expert knowledge. ECF 28-3 at 32.

> Deitch summed up her opinions as follows:
>
> It is my opinion that the punitive and dangerous conditions, staffing problems, and inadequate programming in TYC facilities at the time of Mr. Ramirez's commitment, especially in the Evins and Coke County facilities where he was housed for the longest periods of time, undermined any effort to rehabilitate youth in these facilities. Indeed, these conditions made it entirely predictable that youth would emerge from TYC made worse by their time in the agency's · custody.
>
> Further, it is my opinion that at the time of Mr. Ramirez's sentencing proceeding in December 2004, there was extensive and readily available social science research supporting the notion that such conditions lead to poor rehabilitative outcomes. Evidence of the harms caused to incarcerated youth by dangerous conditions and ineffective programming would have been readily accessible to Mr. Ramirez's trial counsel.

ECF 28-3 at 33. The remainder of Deitch's report describes basic psychological theories, details findings by the Department of Justice report on TYC facilities, including some at the time and at the facilities where Ramirez was placed, and generally describes the regrettable conditions associated with confinement at TYC. ECF 28-3 at 33–44. The opinion portion of the report provides another summary from Deitch as follows:

The conditions in TYC at the time of Mr. Ramirez's commitment were appallingly dangerous and brutal, with youth at risk of physical and sexual assault from both other youth and from staff, with drugs widely available, and with rampant gang activity. The entire agency operated according to a punitive philosophy that aimed to punish, control, and demean the youth but that did nothing to provide them with the skills they needed to change their behaviors. Staff were in short supply, and they were severely under-qualified and untrained for their critical tasks of supervision and rehabilitation. Programs and services for youth were limited in scope and of poor quality. And just a couple of years after Mr. Ramirez's release, the entire agency collapsed under the weight of scandal, with TYC's extensive dysfunction exposed to public view. In my opinion, this was not an environment in which youth could reasonably have been expected to thrive, let alone become rehabilitated. Rather, it was an environment that, for many youth, traumatized them and made them even more likely to act out in anti-social ways upon their release. Especially considering the almost non-existent aftercare services available to paroled youth, it is little surprise that more than 50 percent of released youth during this timeframe were reincarcerated in just over a year.

ECF 28-3 at 44.

### vi.   Father Gregory Boyle

Father Boyle was asked to identify factors that may have contributed to Ramirez's association with gang members. ECF 67-18 at 4. Boyle "reviewed and relied on a summary of [Ramirez's] records and social history, prepared for me by [Ramirez's] current defense counsel."[17] ECF 67-18 at 4.

---

[17] At the outset, the Director notes that the reliability of an opinion that relies in large part on a document created by Ramirez is suspect to say the very least.

In 1988, Boyle founded a program that later became Homeboy Industries. ECF 67-18 at 3. Homeboy Industries is "the largest gang intervention, rehabilitation and re-entry program in the world." ECF 67-18 at 3. Boyle has developed knowledge with gang culture and gang life while working as an "insider" with gang members. Boyle believes that "it is 'the outsider's view' which drives the common societal perception of why young people are drawn to gangs." ECF 67-18 at 3. According to Boyle, despite frequently interacting with gangs, law enforcement officers are usually "outsiders." ECF 67-18 at 3. Therefore, "[g]ang members are less likely to confide in police officers or give them accurate information about how gangs work, and their contacts with gang members often occur during interrogations and arrests, under circumstances in which it is highly unlikely that gang members will be candid about their lives."  That includes the sharing of any insight as to how or why they joined in the first place. ECF 67-18 at 3.

According to Father Boyle, Ramirez had "a number of adverse risk factors" which included poverty, parental abuse and abandonment, severe domestic violence, intergenerational substance abuse, and neglect." ECF 67-18 at 4. Further says Boyle, Ramirez was raised by a "mentally and emotionally challenged mother; a single parent, was not able to provide effective child-care, supervision, or direction." ECF 67-18 at 4.

According to Boyle, the social history he was provided by Ramirez's counsel indicated that Ramirez grew up in a poor area where gang activity, drugs and violence were not uncommon. Boyle gleaned from the social history that these problems extended to the schools where gangs were "pervasive," there was insufficient discipline which permitted violent fights to take place. ECF 67-18 at 4.

The declaration does not say so specifically, but it appears that Boyle's summary of Ramirez's mental health history came from the "social history" prepared by Ramirez's counsel. Nonetheless, Boyle points out Ramirez's history of "significant mental health and developmental delays, including chronic and major depression, Post-Traumatic Stress Disorder, substance dependency, suicidal ideation, learning and emotional disabilities, head injuries, and neurocognitive delays, all of which further compromised his ability to cope with the traumas affecting his everyday life. ECF 67-18 at 4-5.

Boyle expresses his opinion that Ramirez's childhood "placed him at risk and therefore were predictive that he would flee to a gang." ECF 67-18 at 5. Boyle describes the negative impact gang membership has on a person. "Gangs are bastions of conditional love." ECF 67-18 at 5. "Gangs are filled with despairing, hopeless and despondent youth, such as Juan, who are fleeing something and have internalized the adage that misery loves company." ECF 67-18 at 5.

95

"[C]hildren who associate with gangs have a history of trauma and are often struggling with significant mental health issues. They are unable to find their way clear to transform their pain, so they keep transmitting it." ECF 67-18 at 6.

Boyle summarizes Ramirez's counsel's summary of various reports from professionals who had an opportunity to observe Ramirez. ECF 67-18 at 6. This summary includes quotes from counsel's summary and covers some details to support the conclusions that Ramirez suffered depression, neglect, and self-abuse. ECF 67-18 at 6.

Boyle tells us that "three types of youth join gangs: the despondent child, the traumatized child, and the mentally ill child" and that Ramirez exhibited all three. ECF 67-18 at 6. In Boyle's opinion, "[g]ang violence is the urban poor's version of teenage suicide. To that end, no gang member ever makes a foray into enemy territory wanting to kill. He is always hoping to die." ECF-18 at 7.

According to Boyle, children with "well-adjusted families" do not consider joining a gang as an option because their "vigilant parents" would not allow it. ECF-18 at 7. However, Ramirez had no one who cared. ECF 67-18 at 7.

Boyle, as informed by counsel's social history, says that Ramirez wanted to quit the gang but lacked the emotional support to do so. ECF 67-18 at 8. Ramirez "would have benefitted from appropriate social and community

support." ECF 67-18 at 8. However, Ramirez was always returned to his community. ECF 67-18 at 8.

### b.   Deficiency

Ramirez alleges that trial counsel was deficient in preparing a mitigation case in two general areas. First, he claims that "the record demonstrates inexcusable delay and self-imposed unreasonable limitations on the mitigation investigation." ECF 67 at 192. Ramirez notes that the American Bar Association (ABA) Guidelines suggest that trial counsel should "begin penalty phase investigation 'immediately upon counsel's entry into the case." ECF 67 at 192. Ramirez argues that trial counsel was deficient for waiting over a year after she was appointed to represent him before she requested funding for a mitigation specialist. ECF 67 at 192. According to Ramirez, lead counsel "did not address why she waited nearly 16 months to begin an investigation that she said should have been commenced immediately after her appointment." ECF 67 at 192. Ramirez further complains that

> Inexplicably, Ms. Garza never forewarned Bowen that she had requested Bowen's appointment, and then she waited more than a month after the court approved the appointment to tell Bowen that she had been selected to work on Ramirez's case.

ECF 67 at 192.

In addition to being factually inaccurate, these allegations do not place the events described in the context of the progression of events during lead

counsel's representation. The offense was committed on January 5, 2003. 1 CR 4. Ramirez was arrested on January 29, 2003. 1 CR 5. Lead counsel was appointed on January 31, 2003. 1 CR 2. Ramirez was originally indicted on April 3, 2003. 1 CR 3. Lead counsel was able to get the Court to appoint co-counsel, Rolando Garza, and an investigator, Juan Castillo, on September 3, 2003. 2 SHRR 84, 87.

> At a pretrial hearing, on April 15, 2004, lead counsel stated the following:
>
> MS. GARZA: Well, we're here on status, first of all. We will be filing a motion. I'm trying to locate mitigating specialists, Your Honor. Those are not, you know, easy to come by. They're difficult to locate. And I'll be filing for one of those in this particular case. I'd like a status hearing probably in about two weeks on that.

ECF 24-2 at 50. Trial counsel filed a motion requesting funding for a mitigation expert, Gilda Bowen, on May 24, 2004. 1 CR 243. Contrary to Ramirez's allegation that Bowen was not aware that counsel was seeking her appointment, attached to the motion for funding was an affidavit signed by Gilda Bowen indicating that she was aware of and agreed to her appointment as a mitigation expert. 1 CR 252. Additionally, based upon the statements made during the pretrial hearing, lead counsel explained that she had been working on locating a mitigating specialist well before the motion requesting funding was filed. ECF 24-2 at 50; 1 CR 243.

The clerk's record contains the motion for funding filed by lead counsel on May 24, 2004, but there is no signed order. *See* 1 CR–2 CR. However, the

docket sheet shows that the order was signed on June 1, 2004. 1 CR 7. Bowen

began work when she received a copy of the order on July 5, 2004. 2 SHRR 160.

At the state habeas hearing, lead counsel testified further about the

challenges caused by the combination of a case so extensive being tried in a

relatively small community.

> A.   The problem is: Because of the type of case it was and the
> investigation, it takes a while for the case to be investigated
> and for all the evidence to come in. This is one of those cases
> where every single defendant had, like, those boxes -- the big
> boxes, like the -- full of paper. Each defendant had, like, their
> own box of information by the time the whole investigation
> was finished. And since there was 12 defendants, it took a
> while for all the information to come in to the DA's Office.
>
> A lot of it is, like: You come in. You get arraigned. It gets
> passed. You're waiting for more information to come in. You
> read the file. There's more information that needs to come
> in. We've got missing -- At some point, we had the videos that
> -- that we were trying to locate that were missing, and they
> needed to be -- they needed to be looked for. And it just takes
> a while for these investigations. Because of the way it
> happened, it took a while for all the information to come in
> to the DA's Office.
>
> Q.   [by Prosecutor] I believe you also said it took quite a while -
> - the judge had to scramble to find enough qualified
> attorneys to handle all these cases
>
> A.   That too.
>
> Q.    -- for so many defendants?
>
> A.   Yeah. We had to -- My -- From what I found -- was that there
> was, like, attorneys from other counties that had to be
> brought in that would be qualified to do capital murder

death penalty, because not too many attorneys were qualified here in this county.

Q.     That also applied to trying to find somebody who could do mitigation investigation down here; right?

A.     Yes. The mitigation specialist also. We had -- We had -- It was a challenge to find enough experts that did mitigation specialist work for all the different cases. Again, we had to look outside of the county for some of the other defendants to -- to find those. It was not that easy to find experts because of the amount of defendants that were that were involved. It had been two or three -- four, maybe, but

THE COURT: You were not only limited in this particular case to the lawyers that were available to try these cases, but it's fair to say you were limited to the experts available?

THE WITNESS: In the areas. In the different areas.

THE COURT: You were also limited to experts and investigators because conflicts were arising because there were so many defendants?

THE WITNESS: That's correct.

2 SHRR 116–18.

Bowen testified at the state habeas hearing about a conversation that she had with lead counsel when she says she learned about her appointment to Ramirez's case.

Q.     [by Ramirez's habeas counsel] When did you first speak to Ms. Garza [lead counsel] about Mr. Ramirez's case?

A.     She called me. I think she just called me on the phone and told me that I was -- that she had -- that I had been appointed on a capital murder case, and that she understood that I had just -- that I had received training, and I guess -- I wasn't

100

present when I was appointed. I don't know how she -- how my name was brought up, but I was appointed. I guess she must have requested it.

Q.  So had she spoken to you in advance of you being appointed?

A.  No.

Q.  Did Ms. Garza [lead counsel] give you any specific instructions when you were served as Mr. Ramirez's mitigation specialist?

A.  No. She just called and said that I had been appointed, and that -- that the order -- I guess it was -- hadn't been signed the day I was appointed -- just to wait until I got the order, which I think was about a month later, more or less.

2 SHRR 156–57. However, as is evidenced by Bowen's affidavit attached to the motion for funding, Bowen's memory of the case was diminished by the passage of time. Lead counsel clearly conferred with Bowen to ensure that she was ready and willing to take on Ramirez's case when she was appointed.

The delays in getting a mitigation specialist and expert appointed are explainable as a consequence of having twelve capital murder defendants at the same time in a small county. Professionals qualified to work on a capital murder case are limited and the record demonstrates that lead counsel had been working on finding someone not already employed or otherwise unavailable.

Ramirez complains that lead counsel "specifically requested that the court appoint an acquaintance, Gilda Bowen, even though Bowen had zero

experience investigating mitigation, and had never worked on a capital case." ECF 67 at 192. However, the record also shows that she did not randomly pick someone and request their appointment without thought. Whether or not Bowen had handled a capital murder mitigation investigation before, she was qualified and available.

Next, Ramirez complains that "[t]rial counsel ignored areas of investigation of which they should have been aware." ECF 67 at 210. Ramirez complains that counsel should have investigated his mental health history further. ECF 67 at 210–12. Second, Ramirez argues that counsel should have looked into his learning difficulties. ECF 67 at 212–14. Third, Ramirez complains that counsel ignored evidence of head trauma. Fourth, Ramirez failed to present evidence of his drug abuse history. Fifth, trial counsel should have presented evidence of the abuse Ramirez's mother suffered at the hands of his father during her pregnancy. ECF 67 at 215. And sixth, counsel should have looked into the fact that Ramirez may have been exposed to pesticides when working "in the agricultural fields when he was a young child." ECF 67 at 215–16.

However, lead counsel testified that she instructed Bowen to talk to Ramirez, look into his records at TYC, his background, and talk to his family. 2 SHRR 91. Lead counsel also testified that she herself had interviewed

Ramirez to try to find mitigating evidence and spoken to family members. 2

SHRR 93–97. Lead counsel testified that

> We were hoping to be able to get like, his family on there to testify about the things that had happened to [Ramirez] since he was very young: How he'd become a gang member at a very young age: how he had some trauma to his head when he was young. I think he had some kind of accident where he had blacked out. And those things that could have affected him -- that he may not have been able to think straight or think, you know, the way a normal person would be able to think.

2 SHRR 108. She had planned on putting on this evidence through Ramirez's

mother and sister. 2 SHRR 109. Dr. Allen was to testify regarding the

information that had been gathered and provide her expert opinion. 2 SHRR

111–12. All of the areas that Ramirez complains that counsel ignored were

looked into by reviewing Ramirez's TYC records, talking to his family, and

interviewing Ramirez himself. Trial counsel's decisions on where to focus their

limited resources were based on a thorough knowledge of Ramirez's

background, which informed available avenues of defense. They were aware of

the areas that Ramirez lists as ignored and made the strategic decision to

present evidence through Ramirez's family and through the expert testimony

of Dr. Kate Allen. This was a conscious and informed decision that was

reasonable based upon what counsel had to work with. Trial counsel made the

strategic decision to go with Dr. Allen instead of attempting to get the trial

court to approve funding for the procession of experts that Ramirez presents

now. This is the exact type of trial decision that is insulated from IATC claims as a matter of strategy. *See Yohey*, 985 F.2d at 228.

That Ramirez was able to find other documents and talk with additional people likely speaks to having years to investigate his background, using the immense amount of work product generated by trial counsel and unencumbered by a looming trial date, and having more attorneys and investigative staff on the case postconviction than there were pretrial. But that is not how a reviewing court is to judge trial counsel's performance. *See Richter*, 562 U.S. at 107 ("Counsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies."); *Rompilla*, 545 U.S. at 383 ("[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste."). Rather, Ramirez's complaints are those of which a reviewing court "must be particularly wary" because they "essentially come down to a matter of degrees. Did counsel investigate enough? Did counsel present enough mitigating evidence? Those questions are even less susceptible to second-guessing." *Carty v. Thaler*, 583 F.3d 244, 258 (5th Cir. 2009) (quoting *Dowthitt*, 230 F.3d at 743).

Trial counsel properly investigated and presented a mitigation case on behalf of Ramirez. That counsel did not pursue the investigation in the manner

Ramirez argues now was a reasoned trial strategy that should not be judged in hindsight. A reviewing court should not find ineffective assistance simply because it disagrees with counsel's trial strategy. *Crane v. Johnson*, 178 F.3d 309 (5th Cir. 1999) (citing *Green*, 116 F.3d at 1122). Trial counsel's decisions were reasonable and did not rob Ramirez of the opportunity to get a fair trial. *Smith*, 311 F.3d at 668.

### c.   Prejudice

With regard to prejudice, Ramirez takes significant time and great care to challenge trial counsel's preparations related to Dr. Allen. ECF 67 at 192–205. The crux of Ramirez's argument on prejudice related to Dr. Allen centers on how counsel's purported lack of preparation led to Dr. Allen being prevented from testifying as to the factual underlying bases of her opinion. *Id.* Ramirez points out that the trial judge refused to allow Dr. Allen to testify as to the hearsay she considered and questioned counsel on whether any of the witnesses that provided the factual information would be appearing. ECF 67 at 205. Ramirez implies that had counsel been planning to call the witnesses to testify that the trial court would have allowed Dr. Allen to provide inadmissible hearsay evidence to the jury. *Id.* However, the trial court did not know that trial counsel had originally planned to call Ramirez's family and was thwarted in that attempt by the family's disappearance. Furthermore, although Dr. Allen was not allowed to go into specific examples from Ramirez's

life, she effectively conveyed the sort of information that Ramirez argues that the jury should have heard. *See* 39 RR 29–99.

Additionally, Ramirez's juvenile parole officer, Ricardo Leal, provided a lot of context for the home environment Ramirez came from. He testified about the fear he had that there might be retaliation against Ramirez if he were returned home. 38 RR 82. Yet, the parole officer allowed Ramirez to return to that environment—a fact that the jury was certainly be able to recognize as at least some evidence that the juvenile justice system "failed" him. He testified that there was considerable gang activity in Ramirez's neighborhood and that he had concerns "for [Ramirez's] home -- with the home was that the activity that he was involved in, and actually occurred in his neighborhood, had got him committed to TYC." 38 RR 82. He further testified that "it was a pretty run-down area neighborhood." 38 RR 104. Trial counsel forcefully cross-examined Leal's decision to return Ramirez to his home and dangerous neighborhood. 38 RR 104–05.

Never acknowledging the state habeas court's conclusion that counsel's decision to attempt to get the evidence in through Dr. Allen was reasonable, Ramirez focuses on his version of events and evidence to argue that the family was not unavailable or, if they were, it was due to some fault of trial counsel. Nonetheless, as much of the evidence that Ramirez argues was not presented to the jury would have come in through Ramirez's unavailable relatives, it is

106

clear counsel was aware of, and had a strategy to present, that evidence. That the strategy was thwarted through the actions of the witnesses themselves does not make counsel ineffective. This is particularly true when, as is the case here, counsel managed to attempt to present the evidence to the jury in another plausible way.[18] Ramirez's counsel was able to admit much of the mitigating evidence through cross-examination of the State's witnesses and the testimony of their own. Counsel hired a mitigation expert and Dr. Allen. Essentially, Ramirez's complaint is not that his trial counsel did plan to present the mitigation in the same manner and detail as, in hindsight, he believes was necessary. Ramirez is essentially complaining that trial counsel had no strategy by complaining about the effectiveness of that strategy. In doing so, Ramirez ignores the evidence as developed in state habeas proceedings because it inconveniently disagrees with his version of events.

Ramirez takes trial counsel to task because of the delay preventing Dr. Allen from interviewing family and Ramirez such that she had to rely on

---

[18] Admittedly, had Dr. Allen been permitted to testify as to the facts that supported her opinion, that evidence would not have been admitted for the truth of the matter asserted. However, as attorneys regularly attempt to have experts testify about the basis of their opinion, it is well understood that having the jury hear the information for any purpose is of significant value. Ramirez's trial counsel also understood this fact.

information gathered from someone else.[19] ECF 67 at 107, 204–05. However, a number of the experts that Ramirez proffers to this Court suffer from the same disabilities. At least two of the new experts relied on a social history written by counsel.[20] ECF 28-3 at 32 (Dietch), ECF 67-18 at 4 (Boyle). They state that their opinion is based in part on that social history. ECF 28-3 at 32, ECF 67-18 at 4. Even the current experts who have interviewed Ramirez would have been prevented from testifying as to what Ramirez said.

The biggest problem Ramirez has is not necessarily with trial counsel. Ramirez is most outraged by the fact that the expert was not able to testify in detail about the basis for her opinion. That was not due to some deficiency of trial counsel, that was due to the trial court's evidentiary ruling. Yet, somehow Ramirez thinks that the court would have made a different evidentiary ruling had Dr. Allen specifically talked to the individuals, reviewed more pages of background, or reviewed other expert opinions. What Ramirez does not want to acknowledge is the extent to which Dr. Allen was allowed to give specific details about the facts underlying her opinion had absolutely nothing to do

---

[19] Ramirez does not acknowledge that, had Dr. Allen interviewed him prior to her testimony, the State would have been entitled to have an expert of their own interview him. This is a "Pandora's box" situation that just as easily could have resulted in significantly more aggravating evidence than the mitigation was worth.

[20] Dr. Bigler states that the documents she reviewed included "a detailed summary of Mr. Ramirez's social and family history, supported by corroborating witness declarations." ECF 67-17 at 56. However, there is no indication who prepared this document. ECF 67-17 at 56, 206.

with how long she had to prepare, whether she was sick or stressed, or who she did or did not talk to. The trial court was strictly enforcing his reasonable interpretation of the evidentiary rule about experts and their ability to testify about the bases of their opinions. A parade of additional experts would have not been treated differently.

### i.    Ramirez's new experts

Ramirez's collection of neuropsychologists describes a man that has disabilities that have led to his being less able to rationally evaluate his actions and more susceptible to influence. Ramirez argues that these factors contributed to his involvement in the crime for which he was convicted. The problem with this from a mitigation standpoint is that these disabilities are permanent. *See* ECF 30-3 at 86 ("longstanding damage . . . contributes significantly to the behavior problems he has manifested throughout adolescence, and contributed to the actions that have led to this incarceration."); ECF 67-17 at 56 ("Mr. Ramirez suffers from permanent damage to his brain"). Therefore, a jury was just as likely to determine that the disabilities made him a permanent risk for re-offending as they were to decide that the disabilities were mitigating. This type of evidence is the epitome of double-edged testimony that is referred to when discussing these types of claims. "Evidence of . . . permanent brain damage presents the proverbial double-edged sword: it could bolster the State's case on future

dangerousness without significantly reducing, if at all, . . . moral blameworthiness." *Rodriguez v. Quarterman*, 204 F. App'x 489, 499 (5th Cir. 2006).

Rather than focus on the "permanent and incurable neurodevelopmental disorders" that Ramirez's current experts present, trial counsel offered an image of a man who was capable of conforming to society's requirements with sufficient supervision. *See* ECF 67 at 173. "[E]vidence of organic brain injury presents a 'double-edged' sword, and deference is accorded to counsel's informed decision to avert harm that may befall the defendant by not submitting evidence of this nature." *Martinez v. Dretke,* 404 F.3d 878, 889 (5th Cir. 2005). It is entirely reasonable to choose to present Ramirez as someone who could conform his behavior, rather than someone permanently and incurably beset with disabilities that left his susceptible to the influence of others and less able to think rationally about acting in violent ways.

TYC expert, Michele Deitch, presents expert opinions that are inconsistent with the opinions of the educational experts—at least when applied to Ramirez himself.[21] ECF 28-3 at 29–43; ECF 30-3 at 74. Deitch

---

[21] As far as Michele Deitch is concerned, it appears that, to a certain extent, she did not have the required expertise needed to reach her ultimate opinions at the time she was employed in this case. Rather, she indicates that she developed the necessary expertise as "part of her preparation for the work on this project." ECF 28-3 at 31. "Expertise that is developed entirely independent of litigation by professionals acting in their normal field is more likely to be considered reliable than expertise developed

provides an extensive discussion about the horrors of TYC and how, not only did TYC deny the youth confined there necessary rehabilitation services, but enabled further abuse which exacerbated pre-existing problems. However, Ramirez's education expert Dunn points to the structure and extra assistance Ramirez received while in TYC as examples of how, if the school system hadn't failed him, Ramirez could have been expected to grow and improve. ECF 30-3 at 74. Although TYC might have had problems during the time Ramirez was there, as far as Ramirez's personal experience, his own educational experts point to that time as beneficial to him and his educational development.

Deitch explains that there were "numerous witnesses that trial counsel could have called" to raise concerns about the conditions at TYC. ECF 28-3 at 43. Specifically, Deitch references the "declarations of former TYC employees Pamela Ward, Angel Hernandez, Maria Elena Lopez, John Arrendondo, and Deborah Nance, among others, [that] all indicate that these individuals would have been willing to testify at Mr. Ramirez's trial." ECF 28-3 at 43–44. As these witnesses have provided their declarations, and the declarations have some direct relevance to Ramirez, the unnecessary nature of Deitch's expert report becomes readily apparent. Deitch has nothing to offer that is specifically

---

especially for trials." *Coble v. State,* 330 S.W.3d 253, 281 (Tex. Crim. App. 2010). It also means she couldn't have testified at the time of trial, which also causes the claim to fail. *See Day*, 566 F.3d at 538.

relevant to Ramirez—other than the information and "report" written by counsel. ECF 28-3 at 32. This fact, the necessity for Deitch to become an expert on the subject before developing an opinion, and the slightly dubious nature of the procedure used to conduct the research to gain her supposed expertise, casts serious questions about the necessity, reliability, and credibility of Deitch's expert opinion. It is unlikely that a jury would have placed much significance this type of testimony and certainly not enough for it to have made a difference in their ultimate verdict.

Finally, Deitch's testimony would have contradicted the testimony offered by Dunn and called into question the idea that with the appropriate structure, such as that provided by TDCJ, Ramirez could conform his behavior and thrive.

Father Boyle states that violence perpetrated by gangs is a version of teenage suicide where the gang member is "hoping to die." ECF 67-18 at 7. However, Boyle does not provide any citation to source this bold statement. Purportedly, it is based on his experience with gang members. However, it is nothing more than a broad generalization. His definitive statement and the implication that it was applicable to Ramirez when he joined the gang, or when he committed this murder, is pure speculation. It also begs the factual reminder that it was not Ramirez who died in the "enemy territory." Ramirez walked away—the six murder victims did not.

Interestingly, Ramirez complains in federal court of his trial counsel's deficient performance in that they called a gang expert who had never met Ramirez. However, later Ramirez suggests that counsel should have called a different gang expert that never met Ramirez. Seemingly the difference is that the new expert would have the necessary talking points as received from counsel and be able to testify to a litany of distressing life events that made Ramirez join a gang. However, Ramirez continues to ignore the fact that such background is inadmissible as the trial court held. Thus, Ramirez's new and better expert could have done no more than explain that he had reviewed various documents and that in his opinion this hearsay that he could not know was accurate demonstrated the type of life experiences he had testified to generally. Furthermore, by providing the gang testimony that was provided in trial, the jury heard about the general topics and was capable of making its own determination on whether Ramirez could excuse his gang behavior by the terrible life he purportedly led prior to his participation in the murder of six people. Finally, the gang expert trial counsel employed was from Texas, had worked with Texas youth and gangs his entire career, and therefore was specifically an expert on Texas gangs. While this may seem a small point to some, juries are often suspicious of expert testimony in general. Presented with a gang expert from Los Angeles, California, a jury from a small town in Texas

113

may well have believed that Father Boyle's take on gangs in L.A. had no bearing on life in their community.

Additionally, that an expert, such as Deitch and Boyle, relied on a report written by a petitioner's counsel poses serious questions about the reliability and credibility of the expert. ECF 28-3 at 32; ECF 67-18 at 4. Deitch even goes so far as to attach a report written by Ramirez's attorneys as an exhibit to her declaration. This is nothing less than an attempt by counsel to create their own evidence. It is a mere step away from counsel signing declarations of their own and expecting them to be considered as substantive evidence. Ramirez takes trial counsel to task because of the delay preventing Dr. Allen from interviewing family and Ramirez such that she had to rely on information gathered from someone else.[22] ECF 67 at 107, 204–05. However, a number of the experts that Ramirez proffers to this Court suffer from the same disabilities. At least two of the new experts relied on a social history written by counsel.[23] ECF 28-3 at 32 (Dietch), ECF 67-18 at 4 (Boyle). They state that

---

[22] Ramirez does not acknowledge that, had Dr. Allen interviewed him prior to her testimony, the State would have been entitled to have an expert of their own interview him. This is a "Pandora's box" situation that just as easily could have resulted in significantly more aggravating evidence than the mitigation was worth.

[23] Dr. Bigler states that the documents she reviewed included "a detailed summary of Mr. Ramirez's social and family history, supported by corroborating witness declarations." ECF 67-17 at 56. However, there is no indication who prepared this document. ECF 67-17 at 56, 206.

their opinion is based in part on that social history. ECF 28-3 at 32, ECF 67-18 at 4. Even the current experts who have interviewed Ramirez would have been prevented from testifying as to what Ramirez said.

Furthermore, Ramirez has not proven that any expert would have appeared at trial and testified. "In order for the [petitioner] to demonstrate the requisite *Strickland* prejudice, the [petitioner] must show not only that this testimony would have been favorable, but also that the witness would have testified at trial." *Alexander v. McCotter,* 775 F.2d 595, 602 (5th Cir. 1985) (citation omitted). None of Ramirez's new experts have indicated that they were available to examine Ramirez or testify at his trial as scheduled.

Further, the Fifth Circuit has held that "'[h]ypothetical or theoretical' testimony will not justify the issuance of a writ." *Martin v. McCotter,* 796 F.2d 813, 819 (5th Cir. 1986) (quoting *Mattheson v. King*, 751 F.2d 1432, 1441 (5th Cir. 1985)). Even with a declaration from an expert, the weight of the proposed testimony remains speculative as the potential damage from a vigorous cross-examination is always an unknown.

### ii.    Failure to connect his role in the offense

Ramirez complains that he was also prejudiced by trial counsel's failure to connect his "alleged role in the offense" to the expert claims that he was too young and damaged to be fully morally responsible for his actions. ECF 67 at 249. Ramirez contends that he "was convicted based on his own statements,

but he denied killing any of the victims." ECF 67 at 248. Ramirez claims that he played no role in the recruitment, planning, or weapons procurement necessary for the murder. *Id.*

However, Ramirez's current version of his involvement in the multiple murder conveniently leaves out the majority of the aggravating circumstances. Even the most experienced defense experts cannot explain away Ramirez's actions as the behavior of a brain damaged child who was merely following the group. The truth is that, whether or not Ramirez was involved in the planning, he acted as a leader in the execution of the murders. Ramirez played a significant role in directing his co-defendants' actions—a fact that belies Ramirez's claim of being a follower. Namely,

> [Ramirez] stated that they put the male victim down on the floor at gunpoint and that he ordered one of the men to tie up the female victim, who was in bed. [Ramirez] checked the house for other people, drugs, or weapons but did not find anyone or anything. [Ramirez] then "tied down the guy with an orange extension cord" and "started demanding the drugs." The male victim responded that he had nothing and that all of the drugs were in the other house, so [Ramirez] "started beating him up" and "hit him with a pan a couple of times." [Ramirez] also took a gold chain from his neck, which he later threw away.

*Ramirez*, 2007 WL 4375936, at *3.

Corroborating Ramirez's statement was the testimony of Rosie Gutierrez. Ms. Gutierrez testified that:

> The leader, a man who spoke Spanish and who had a long gun with holes in the barrel, pointed the gun at her head and told her to lie

down and face the wall. He was wearing a ski mask and a jacket with the word "Police" on the sleeves and back. He ordered his cohorts to tie up Ms. Gutierrez and Jerry, and they used extension cords to do so. The man who tied up Ms. Gutierrez was unmasked and carried a smaller handgun. The other men who restrained Jerry were masked, and she was unsure if they had guns. The leader demanded "drugs, money, gold and guns" and kept hitting Jerry in the head with his gun. Jerry responded that they did not have anything. "They" told Jerry to take off his gold necklace and asked for the car keys. Jerry answered that the car was "no good" and that they would get caught if they left in it. "The guy" pulled off Jerry's tennis shoes and asked if anyone wanted them. He then dropped the tennis shoes, stating, "Let's go," and they left.

Shortly thereafter, "a man with a ski mask" carrying a long gun and wearing a jacket with "Police" on it came back into the house and ransacked the living room. He left, came back inside, shot Jerry "a whole bunch of times," then left again. Ms. Gutierrez then untied herself and called 9–1–1.

*Ramirez*, 2007 WL 4375936, at *2.

Other arguments Ramirez claims could have been raised by experts are clearly belied by the actual facts of this case. Using testimony about executive disfunction, the impact of voluntary drug use on Ramirez's brain, and the like to suggest that he was not culpable, or was somehow less culpable, would not have been well received by a jury who had heard all the evidence presented in the guilt phase of the trial. Nothing Ramirez's proposed experts could say would erase the fact that he lied in wait for a victim to exit the house. That he directed the actions of others. That he tied up and beat one of the victims

without any instruction from others.[24] To attempt to explain away these irrefutable facts by expert testimony that Ramirez was vulnerable to the influence of others and less culpable than others for his actions would have appeared implausible at best, and more likely disingenuous to the jury. Looking at the evidence Ramirez places before this Court, none of it, individually or cumulatively, is sufficient to create a reasonable probability that Ramirez would not have received a death sentence.

## C.    Conclusion

In light of the extent of the mitigating evidence that was presented by trial counsel, the State's aggravating evidence, and Ramirez's failure to demonstrate that counsel was unaware of any of the evidence, or the potential to develop the evidence, he now proffers, he has not shown counsel performed deficiently or that he was prejudiced by such deficiency, much less that the state courts unreasonably applied federal law in denying him relief.

Ramirez claims only that there was no strategic reason for not obtaining these types of experts or presenting such evidence. This statement has no basis other than Ramirez's bare assertion. When given the opportunity at the state habeas evidentiary hearing, Ramirez never questioned trial counsel as to why

---

[24] These are merely a couple of points from Ramirez's own confession and leaves aside the testimony of Rosie Gutierrez, which provides strong circumstantial evidence that Ramirez was the one who shot Jerry Hidalgo.

he did not retain experts such as the ones he now presents. However, as is generally the case, Ramirez's new mitigation evidence carries with it a significant risk that the jury would have found such "double-edged" testimony more aggravating than mitigating.

Ramirez fails to acknowledge the state court adjudication on this claim. As such, he does not address the deference owed to the state court's decision or argue that it was unreasonable. Ramirez merely presents his claim as though federal courts were the appropriate venue for initiating habeas challenges to state criminal convictions. However, even if the evidence not presented to the state court was admissible, the claim Ramirez presents to this Court fails on a de novo review. No matter how this claim is evaluated, it fails. Claim one should be denied.

## II.   Ramirez's Eighth Amendment Claim Is Procedurally Defaulted, *Teague*-barred, and Meritless. (Claim 2)

Ramirez phrases his second claim as follows: "As he was only 18 years old at the time of the crime, Ramirez's execution would violate the Eighth Amendment prohibition on cruel and unusual punishment."[25] ECF 67 at 252. This claim is procedurally defaulted, *Teague*-barred, and meritless.

---

[25] Claim 17(A) also relates to the unconstitutionality of the death penalty as applied to Ramirez due to his mental illness. The Director incorporates the argument under that claim herein to the extent that it is applicable.

## A.     The claim is procedurally defaulted.

This claim was raised on direct appeal as issue number eight. *Ramirez*, 2007 WL 4375936, at *19. The CCA found the claim barred because it was inadequately briefed. *Ramirez*, 2007 WL 4375936, at *20. A finding of inadequate briefing is an adequate and independent state law ground barring federal review. *Roberts v. Thaler*, 681 F.3d 597, 607–08 (5th Cir. 2012). Therefore, the claim is procedurally defaulted in this Court.

## B.     Alternatively, the claim is meritless.

Ramirez bases this claim on a series of Supreme Court decisions addressing the appropriateness of various sentences as applied to defendants who were under the age of 18 at the time of their crime.[26] ECF 67 at 252–73. First, Ramirez claims that evolving standards of decency prevent the imposition of a death sentence on individuals who were 18 at the time they committed their crime. ECF 67 at 255–66. Then, Ramirez argues that *Roper v. Simmons* should apply to him "because of his impairments." ECF 67 at 267–73.

---

[26] *Montgomery v. Louisiana*, 577 U.S. 190 (2016) (mandatory sentence of life without parole for juvenile murder convicts violates the Eighth Amendment prohibition against cruel and unusual punishment); *Miller v. Alabama*, 567 U.S. 460 (2012) (the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders); *Graham v. Florida*, 560 U.S. 48 (2010) (the Eighth Amendment prohibits a sentence of life without the possibility of parole for a juvenile convicted of a nonhomicide offense); *Roper v. Simmons*, 543 U.S. 551 (2005) (the Eighth Amendment bars capital punishment for those under 18).

### 1. Evolving standards of decency do not prohibit death sentences for those under 21.

Ramirez asks this Court to "ignore clear Supreme Court precedent," *Doyle v. Stephens*, 535 F. App'x 391, 395 (5th Cir. 2013), and find that those who committed capital murder when they were less than 21 years old are exempt from the death penalty, ECF 67 at 255. However, the only caselaw that Ramirez can summon to support his contention that "a national consensus has developed against executing offenders who were under 21 years old at the time they committed their offense," are two cases decided by the same judge in a circuit court in Kentucky—and the rulings are no longer standing because the state supreme court ruled that the issues were not justiciable at the time. ECF 67 at 257. Other than this, the remainder of the national consensus evidence is a citation to the number of states actively enforcing the death penalty and a review of caselaw that covers sentences short of death for juvenile offenders. In short, there is no evidence of a national consensus for the proposition that those under 21 should be treated as those under 18 for purposes of eligibility for the death penalty.

While some mental health experts may be continually pushing back the age at which the brain "fully matures," and Ramirez points to the various age-related limits and protections placed upon those under 21, there is no support for the idea that the general public wishes to remove adult privileges and

responsibilities from those between the ages of 18 and 21. The fact that young adults behave in "impulsive and reckless" manners and "neuroscientific research has shown that the human brain does not fully mature until a person reaches his or her mid-20s" has not led to a nationwide push to prohibit those under 21 from entering into contracts, including marriage, or joining the military. ECF 67 at 260–61. Of significant importance is the fact that, rather than a push to prohibit or limit the practice, society regularly encourages "impulsive and reckless children" to exercise one of the most important rights and privileges in a democratic society—the right to vote. It is very difficult to swallow the idea that standards of decency prohibit those under 21 from being subject to a death sentence when the entire legal system is based upon the results of elections where a number of the voters would be deemed to be too immature to be fully responsible for their actions.

## 2. *Roper v. Simmons* does not apply to Ramirez.

In the second point in claim two, Ramirez argues that "[b]ecause of his impairments, the concerns raised in [*Simmons*] apply to [him] and executing him would constitute cruel and unusual punishment in violation of the Eighth Amendment." ECF 67 at 267–73. This argument parallels those raised in claims 17(A) and (B). ECF 67 at 416–39. Ramirez claims that *Simmons* should apply to him "as an 18-year-old struggling with significant deficits and organic brain damage." ECF 67 at 268.

In *Roper v. Simmons*, the Supreme Court held that imposing the death penalty for a crime committed when the defendant was younger than 18 was a violation of the Eighth Amendment. 543 U.S. at 578–79. *Simmons* noted three differences between those under 18 and adults: (1) "comparative immaturity and irresponsibility," (2) vulnerability or susceptibility to negative influences and outside pressures, and (3) a less fixed and well-formed character and personality. *Id.* at 569–70. The Supreme Court acknowledged that "[d]rawing the line at 18 years of age is subject, of course, to the objections always raised by categorical rules." *Id.* at 574. However, the Supreme Court concluded that, as "a line must be drawn," "where society draws the line for many purposes between childhood and adulthood . . . [is] the age at which the line for death eligibility ought to rest." *Id.*

Furthermore, all attempts to extend the holding in *Simmons* to those over 18 have been rejected. This is true even when the petitioner has presented evidence of more than a youthful biological age. The Fifth Circuit has rejected efforts to undermine *Simmons* by trying to extend it to developmental age. *See United States v. Bernard*, 762 F.3d 467, 482–83 (5th Cir. 2014) (rejecting efforts to extend *Simmons* to a mental age of less than 18); *Doyle*, 535 F. App'x at 395; *Jasper v. Thaler*, 466 F. App'x 429, 438–39 (5th Cir. 2012) (rejecting efforts to extend *Simmons* to immaturity).

The *Simmons* Court did not hold that the Eighth Amendment prohibits a death sentence for an offender with a "mental age" of less than 18. Rather, the *Simmons* Court clearly held that a sentence of death may not be imposed upon an offender with a chronological age of less than 18. *See Simmons,* 543 U.S. at 574. The status of the law is clear. Ramirez was over eighteen, so he cannot use *Simmons* as a shield. The claim is meritless even if reviewed de novo.

### C.    The claim is *Teague*-barred.

Furthermore, *Teague* bars relief. As noted above, *Simmons* permits the execution of individuals over the age of 18. It did so when Ramirez's conviction became final, and it does so now. Thus, Ramirez is seeking a new rule because he is attempting to overturn existing precedent. *See Saffle v. Parks*, 494 U.S. 484, 488 (1990) ("The explicit overruling of an earlier holding no doubt creates a new rule."). And he is not seeking a bright-line rule, but rather arguing that his particular "significant impairments," ECF 67 at 273, combined with his youthful age make executing *him* an Eighth Amendment violation. In other words, he's asking for an as-applied rule, not a categorical exemption of a class from certain punishment. Hence, his claim is barred under *Teague*'s non-retroactivity doctrine.

### III. Ramirez Received Effective Assistance of Counsel as Required by the Sixth Amendment During the Pretrial and Guilt Phases of His Capital Trial. (Claim 3)

Claim 3 is a multipart claim where Ramirez details thirteen claims of ineffective assistance. ECF 67 at 273–321. These claims relate to counsel's performance in preparing for trial, during the pretrial suppression hearing, and during the guilt portion of the trial. ECF 67 at 273–321. To the extent that they are relevant, the Director incorporates the facts, law, and argument from Claim 1. Additional facts and legal standards relating to individual IATC claims in this issue will be addressed in the relevant sections below.

### A. Conflict of interest claim (Claim 3(C)(1))[27]

In Claim 3(C)(1), Ramirez asserts that both of his trial attorneys had a conflict of interest that adversely affected their representation of him. ECF 67 at 271–74. The part of this issue relating to co-counsel Rolando Garza was adjudicated on the merits in state court. 1 SHCR 232–33. Although the state court's adjudication is due deference, Ramirez makes no attempt to demonstrate that the decision was unreasonable. The argument related to lead counsel Alma Garza is unexhausted and therefore procedurally defaulted. *See*

---

[27] To avoid confusion, the Director will refer to the issues and their numerous sub-points using the numbering from the headings in Ramirez's amended petition.

*supra* Answer IV. In any event, under a de novo review, both parts fail on the merits.

The vast majority of Sixth Amendment ineffectiveness claims are subject to a two-prong standard that requires the petitioner to prove deficient performance and actual prejudice as a result. *Strickland*, 466 U.S. at 694. However, under *Cuyler v. Sullivan*, a defendant may "demonstrate a violation of his Sixth Amendment rights" upon establishing that "an actual conflict of interest adversely affected his lawyer's performance." 446 U.S. 335, 350 (1980). In such a case, "prejudice is presumed without any further inquiry into the effect of the actual conflict on the outcome of the defendant's trial." *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000). Importantly, though, "until a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 350. In other words, the *Cuyler* standard still "requires proof of effect upon representation but (once such effect is shown) presumes prejudice." *Mickens v. Taylor*, 535 U.S. 162, 173 (2002).

However, the Supreme Court has not extended *Cuyler* beyond circumstances where an attorney simultaneously represented multiple defendants. *See Mickens*, 535 U.S. at 174–75; *Beets v. Scott*, 65 F.3d 1258, 1266 (5th Cir. 1995) (en banc) ("Neither *Cuyler* nor its progeny strayed beyond the ethical problems of multiple representation. One cannot read *Cuyler* to analyze

126

conflicts of interest in a context broader than that of multiple client representation."). And the Fifth Circuit has expressly rejected the notion that *Cuyler* should apply in cases where there is an alleged conflict between an attorney's personal interests and their duty of loyalty to their client. *See Beets*, 65 F.3d at 1265. Instead, it has reasoned that "*Strickland* offers a superior framework for addressing attorney conflicts outside the multiple or serial client context." *Id*.

Even in multiple representation cases, a conflict only arises when "counsel is compelled to compromise his or her duty of loyalty or zealous advocacy to the accused by choosing between or blending [] divergent or competing interests." *Perillo*, 205 F.3d at 781; *see also United States v. Culverhouse*, 507 F.3d 888, 893 (5th Cir. 2007) (finding that multiple representation creates a "conflict when the attorney *knows* that his clients' interests diverge *and must then choose between* the interests of multiple clients, or be compelled to compromise his duty of loyalty" (emphasis added)).

### 1. The state court's rejection of Ramirez's conflict claim concerning Rolando Garza was reasonable.

The portion of Claim 3(C)(1) where Ramirez argues that co-counsel counsel Rolando Garza[28] was ineffective due to a conflict of interest was raised by state habeas counsel as issue seventeen. 1 SHCR 232–33.

#### a. The state court adjudication was reasonable.

The allegation in state court was that co-counsel's cousin, "Andreas," had been in a relationship with Ramirez's sister that had ended badly and resulted in a physical altercation with Ramirez and Andreas. 1 SHCR 232–33. Ramirez alleged that the situation caused co-counsel to have "divided loyalties between his family and his client." 1 SHCR 233. In addition to state cases on the subject, Ramirez cited to *Cuyler* alleging that "Rolando Garza had divided loyalties between his family and his client." 1 SHCR 232–33. Ramirez's state habeas briefing did not cite to any evidence to support his allegation. 1 SHCR 232–33. However, an affidavit from Ramirez's sister, Berta Alicia Ramirez,[29] was attached as an exhibit to the application. 1 SHCR 284–89. That affidavit

---

[28] As lead counsel, Alma Garza, and co-counsel, Rolando Garza, who are not related, share the same surname the Director will refer to them as "lead counsel" and "co-counsel."

[29] As Ramirez and his sister, Berta Ramirez, share a surname, to avoid confusion the Director will henceforth refer to the sister as "Berta."

indicated that co-counsel had contacted Berta about arranging transportation

for her to Ramirez's trial. 1 SHCR 289. Then she stated the following:

> I do not think [] Rolando wanted me there. Andreas is his cousin,
> and prior to all this happening, Andreas had an altercation with
> Juan. I think this had an impact on Rolando, and at the very least,
> created an appearance of conflict.

1 SHCR 289.

At the hearing in state court, Berta's affidavit, described above, was

admitted, along with a new affidavit Berta executed after Ramirez's state

habeas application was filed. 4 SHRR A2, A24. In relevant part, this second

affidavit stated the following:

> 5.    Andres Garza is the father of my child. Rolando Garza, one
> of [Ramirez's] trial attorneys, is Andres Garza's cousin. I met
> Rolando a few times before [Ramirez's] trial at family events
> that I would go to with Andres.

> 6.    Prior to [Ramirez's] trial, I tried to leave Andres when I
> learned that he had a drug problem. He did not want our
> relationship to end, and one day even took my car while I
> was at work. My brother, [Ramirez,] confronted him because
> Andres and I were having problems. I saw [Ramirez] and
> Andres yelling at each other about me.

> 7.    When the police came to arrest [Ramirez,] they handcuffed
> me and then threatened me. They said that I was going to
> jail and that they would take my children if I did not tell
> them [Ramirez's] whereabouts. I told the police that I did not
> know where [Ramirez] was. I know it was Andres Garza who
> told the police where [Ramirez] was because they took him
> outside for what seemed like a long time, and when they
> came back inside they said that they were going to find
> [Ramirez,] but that if they did not they would come back and
> arrest me.

8.  I was contacted by Rolando Garza prior to [Ramirez's] trial. He asked me to testify, but never actually called me to testify. Had I been asked about these issues, I would have told them what is contained in this affidavit and I would have testified to the same had I been called as a witness, and I would have verified the information about Rolando and Andres Garza.

4 SHRR A24.

During the hearing, co-counsel testified briefly about the alleged conflict. 2 SHRR 32–37. He acknowledged that he had a cousin named Andres Garza. 2 SHRR 32. He testified that "during the course of the trial" he became aware that his cousin and Ramirez's sister "were expecting a child or already had a child." 2 SHRR 32. Co-counsel stated that he had no relationship with Andres Garza and was "pretty distant" from him. 2 SHRR 34–35. Co-counsel and Ramirez had a conversation about the existence of the relationship between Andres Garza and Berta. 2 SHRR 36. Co-counsel testified that he was not aware of any alleged conflicts between Ramirez and Andres Garza and that nothing about the situation affected his decisions in Ramirez's case. 2 SHRR 37.

The habeas court issued the following findings concerning this claim:

693.  *Strickland v. Washington* recognizes that ineffective assistance of counsel may result from an attorney's conflict of interest. *See Strickland*, 466 U.S. at 692.

694.  The United States Supreme Court has indicated that, in order to establish a violation of the Sixth Amendment right to counsel, a defendant who raised no objection must

130

demonstrate that an actual conflict of interest adversely affected his lawyer's performance. *See Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980).

695. Texas courts have adopted this rule and have also indicated that an "actual conflict of interest" exists if counsel is required to make a choice between advancing his client's interest in a fair trial or advancing other interests (perhaps his own) to the detriment of his client's interest. *Ex parte Morrow*, 952 S.W.2d 530, 538 (Tex. Crim. App. 1997); *Monreal v. State*, 947 S.W.2d 559, 564 (Tex. Crim. App. 1997); *Barbaro v. State*, 115 S.W.3d 799, 801 (Tex. App.— Amarillo 2003, pet. ref'd); *Thompson v. State*, 94 S.W.3d 11, 16 (Tex. App.—Houston [14th Dist.] 2002, pet. ref' d); *McKinny v. State*, 76 S.W.3d 463, 477 (Tex. App.—Houston [1st Dist.] 2002, no pet.).

696. Texas courts have also indicated that, in order to show a violation of his right to reasonably effective counsel based on a conflict of interest, a defendant must show (1) that defense counsel was actively representing conflicting interests and (2) that the conflict had an adverse effect on specific instances of counsel's performance. *See, e.g., Ex parte Morrow*, 952 S.W.2d at 538; *Monreal*, 947 S.W.2d at 564; *Thompson*, 94 S.W. 3d at 15–16; *McKinny*, 76 S.W.3d at 477.

697. Application of these principles to the conflict of interest claim [Ramirez] is now urging for the first time shows that [Ramirez] falls far short of meeting the requirements to establish such a claim.

698. After all, [Ramirez] has failed to provide any factual support for his claim that a conflict of interest existed between himself and attorney Rolando Garza in the first place.

699. Instead, the affidavit by [Ramirez's] sister Berta Alicia Ramirez which is attached as Exhibit D to [Ramirez's] initial application for writ, summarized on pages 91–92 of this order, and admitted into evidence at the evidentiary hearing in this case merely says that Berta had had a baby by a man named Andreas Garza (sic) a few days before the officers

came looking for [Ramirez]; that Andreas Garza is Rolando Garza's cousin, that Rolando Garza had been the only one who had contacted Berta about [Ramirez's] case; that he had only discussed trying to arrange for her transportation from Ohio to Edinburg for the trial; that Berta does not think that Rolando Garza had wanted her at the trial; that Andreas Garza had had an altercation with [Ramirez] "prior to all this happening"; and that Berta thinks that this had had an impact on Rolando Garza and had, "at the very least, created an appearance of a conflict".

700. Moreover, the record of [Ramirez's] trial does not contain any indication that anyone ever mentioned a potential conflict of interest between [Ramirez] and attorney Rolando Garza.

701. In addition, this Court has already noted (see Findings of Fact Nos. 399–404, 428, and 432 on pages 277–79, 289, and 291–92, respectively of this order), Rolando Garza provided credible testimony explaining his relationship with his cousin Andres Garza, when he discovered the relationship between Andres and [Ramirez's] sister, the fact that he had made [Ramirez] aware of that relationship, and its lack of effect on his representation of [Ramirez] during the evidentiary hearing in this case.

702. In addition, [Ramirez] provides no evidence showing that any relationship between himself and Rolando Garza had affected Rolando Garza's efforts on his behalf, other than his sister's remark that she thought that that was the case.

703. Such speculation on the part of an obviously biased witness is a far cry from actual evidence proving that Rolando Garza's efforts had been impacted in any way by any alleged conflict between [Ramirez] and Andres Garza.

704. Thus, in the final analysis, [Ramirez] has failed to meet his burden of proof to show both an actual conflict of interest existed and that said conflict, if it did exist, had affected Rolando Garza's performance on his behalf.

705. In fact, [Ramirez] has not even attempted to provide any examples of specific instances in which Rolando Garza's actions, or inactions, on his behalf were affected by the alleged conflict between Andres Garza and [Ramirez].

3 Supp. SHCR 925–29.

The state habeas court properly identified the relevant Federal law and reasonably applied it to the facts in this case. As mentioned above, *Cuyler* has never been extended to include conflict of interest claims based upon personal conflicts. As such, it was reasonable for the state court to deny the claim under *Cuyler*. *See White v. Woodall*, 572 U.S. 415, 426 (2014) ("Section 2254(d)(1) . . . does not require state courts to extend [Supreme Court] precedent or license federal courts to treat the failure to do so as error.").

Furthermore, the state court denial was reasonable applying either *Cuyler* or *Strickland*. In Ramirez's application, he claimed that the alleged conflict caused divided loyalties, but he did not argue that this divided loyalty adversely affected counsel's performance. 1 SHCR 232. As noted above, Ramirez presented little evidence to support the claim. Berta's affidavits prove little more than the fact that she was in a relationship with co-counsel's cousin, Andres Garza, and that Ramirez had had some sort of conflict him prior to Ramirez's trial. 1 SHCR 289; 2 SHRR A24. In the state court hearing, co-counsel was questioned about the alleged conflict, and he testified that he knew of the relationship but was not aware of an alleged conflict. 2 SHRR 32–37.

Ramirez presented no evidence that co-counsel's limited knowledge of the relationship affected his representation of Ramirez. Even with the testimony and exhibits admitted at his hearing, Ramirez's evidence was insufficient to support any aspect of the claim. Thus, he failed to prove a conflict existed, that it affected counsel's behavior in any way, or that had the alleged conflict not existed, there is a reasonable probability of a different result. As such, the state court's denial of this claim was reasonable.

> **b.    Ramirez's new evidence cannot be considered. However, even with the new evidence the claim fails.**

In support of this claim in his current petition, Ramirez attaches a new affidavit executed by Berta. ECF 28-2 at 70–ECF 28-3 at 4. However, as this claim was adjudicated on the merits in state court, evidence not presented there cannot be considered in deciding Ramirez's instant claim. *See supra* Answer V.

Nonetheless, even if this Court could consider Berta's new affidavit and review this claim de novo, it is meritless. Ramirez again argues that the personal relationships between his and co-counsel's relatives created a conflict of interest. ECF 67 at 280. However, Berta's new affidavit provides no evidence that co-counsel was aware of the alleged altercation between Ramirez and his cousin. ECF 28-2 at 70–ECF 28-3 at 4. Furthermore, Ramirez does not support the proposition that such a situation constitutes a conflict of interest.

134

As to the adverse effect prong, Ramirez alleges that co-counsel's "conflict tainted his decisions throughout his representation" and points to the fact that Berta was not called to testify on Ramirez's behalf. ECF 67 at 280. However, there is no reason to believe that (1) co-counsel made the decision on whether or not to call Berta as a witness or, (2) if co-counsel was responsible for the decision, that it was made due to the "conflict" co-counsel had with Ramirez.

Finally, Ramirez fails to prove that Berta's testimony would have been particularly helpful. "To prevail on an ineffective assistance claim based upon uncalled witnesses, an applicant must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Gregory*, 601 F.3d at 352. Ramirez merely states that, "Berta Ramirez could have offered valuable evidence to corroborate Ramirez's testimony at the suppression hearing as well as to support Ramirez's mitigation presentation." ECF 67 at 280. While the citations to two of Berta's declarations do contain information that would possibly fit in to a mitigation theory, there does not appear to be any information relevant to Ramirez's suppression hearing. ECF 28-2 at 70– ECF 28-3 at 4; 4 SHRR Ex. A24. Nonetheless, while she would have had some potential testimony about the conditions that the family lived in during part of

135

the time they were in Donna, Texas, the majority of what Berta describes are her own struggles in life.[30] ECF 28-2 at 70–ECF 28-3 at 4.

As was demonstrated in the argument in Claim 1 and will be demonstrated in the remaining claims in Claim 3, co-counsel was not ineffective. Ramirez fails to point to any law that supports his claim that the situation here constitutes a legal conflict of interest. Nor does he establish that co-counsel's performance was adversely affected. *See Cuyler*, 446 U.S. at 350. Thus, even under de novo review, Ramirez's claim fails and should be denied as meritless.

Finally, to the extent that Ramirez's claim relies on the *Cuyler* standard for analyzing ineffective assistance of counsel claims, the Supreme Court has not extended *Cuyler* to include claims based upon defense counsel's personal conflicts. As such, it is barred by the non-retroactivity principles of *Teague*.

> ### 2. The conflict claim concerning Alma Garza is procedurally defaulted and, alternatively, without merit under de novo review.

Ramirez contends that lead attorney Alma Garza was conflicted because her husband was representing Rodolfo Medrano, one of Ramirez's co-

---

[30] The struggles Berta describes include facts that would have rendered her testimony suspect at best. ECF 28-3 at 2 ("I experienced audio and visual hallucinations." "Sometimes I black out or spaz out."). Just as this information would have made Berta's testimony before the judge and jury less credible, this Court should not credit her testimony either.

defendants. ECF 67 at 272. This claim was not presented in state court. As such, it is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, it is meritless.

Ramirez's theory is that because the two clients "were in direct competition with each other over who would get the best offer from the State to plead guilty and who would be forced to go to trial" that lead counsel had a direct conflict with him. ECF 67 at 272.

### a.   The claim is procedurally defaulted.

Initially, this claim is procedurally defaulted. No allegation of conflict regarding Alma Garza was presented in Ramirez's state habeas application. This failure to present this claim in state court results in its procedural default because, if Ramirez were to attempt to bring the claim in a subsequent application, the CCA would refuse to hear the matter as an abuse of the writ. *See supra* Answer IV.

Ramirez will undoubtedly argue that *Martinez/Trevino* excuses this procedural default. However, as the claim has no merit, state habeas counsel was not deficient for failing to raise it. And even if deficiency were established, there is no actual prejudice. Finally, even if this default could be excused, *Martinez Ramirez* bars the Court from considering any of the new evidence presented for the first time in this Court. Thus, the claim, as explained below, is conclusory and meritless.

### b.      The claim is meritless.

The Director notes that Ramirez presents no proof of his factual allegations related to his lead counsel—that Alma Garza was in fact married to Hector Villarreal, that Hector Villarreal represented co-defendant Rodolfo Medrano, and that Ramirez and Medrano were ever in competition with each other. Hence, the claim is conclusory and should be denied on that basis alone. *See, e.g.*, *Koch*, 907 F.2d at 529.

Even assuming the alleged facts to be true, Ramirez provides no factual or legal basis for the argument that Alma Garza was actively representing conflicting interests. In effect, Ramirez's argument is that a married couple should be treated as a single unit for conflict purposes, but he provides no basis for that argument. Nor has he demonstrated that *Cuyler* extends to such a situation. In arguing otherwise, he pleads himself into a *Teague* bar.

Moreover, Ramirez fails to prove that he and Medrano had conflicting interests. Rather, there is some evidence that the two were never in competition as the State successfully sought a death sentence on both men. *See Medrano v. State,* No. AP-75,320, 2008 WL 5050076 (Tex. Crim. App. 2008). The practice of criminal law belies the theory that co-defendants are always in conflict with each other in a courtroom. There is no viable argument that conflict should be presumed when allegedly related attorneys represent different clients.

138

In a conspicuous effort to avoid addressing the adverse effect prong of *Cuyler*, Ramirez offers a vague allusion to lead counsel's consistent "fail[ure] to advocate for Ramirez's rights" to reach the entirely conclusory proposition that "this failure can be attributed to her conflict of interest." ECF 67 at 279. But he provides no evidence of a connection between counsel's purported "divided-loyalties" and her strategic trial decisions. *See Moss v. United States*, 323 F.3d 445, 469 (6th Cir. 2003) (explaining that the "causative language of *Sullivan* requires that the defendant demonstrate a nexus between the conflict and the adverse effect on counsel's performance"). He simply jumps over his burden on that second prong to boldly declare "[p]rejudice must be presumed, as conflicts existed between Ramirez and his counsel, which hurt counsel's performance." ECF 67 at 281.

There is no question that this alleged conflict is not remotely similar to the type of conflict required to invoke the *Cuyler* standard. Instead, it appears that Ramirez would have this Court create a new rule that there is an automatic conflict of interest when spouses represent co-defendants regardless of the paucity of proof that the co-defendants had competing interests *or* the complete lack of allegation of adverse effect.

This claim is unexhausted and procedurally barred. It should be denied as such. Alternatively, Ramirez's complaints about lead counsel fail to prove a

conflict of interest or an adverse effect. Therefore, if reviewed de novo, the claim should be denied on the merits.

## B.    Suppression hearing claim (Claim 3(C)(2))

In Claim 3(C)(2), Ramirez complains about trial counsel's performance relating to the pretrial suppression hearing. ECF 67 at 281–86. Within this claim there are seven sub-points.

Ramirez included a claim that trial counsel was ineffective at the suppression hearing as issue five in his subsequent state habeas application. 3 SHCR 1222–33. The CCA dismissed the application as an abuse of the writ without considering the merits. *Ex parte Ramirez*, 2015 WL 6282336, at *1. Based upon this, the portions of this claim that were presented in his subsequent state habeas application are procedurally defaulted. *See supra* Answer IV. Ramirez has not attempted to overcome that bar. However, not all of the sub-points in Claim 3(C)(2) were included in either of his state habeas applications. As such, those sub-points are unexhausted and procedurally barred. *See supra* Answer IV. Again, Ramirez does not address this procedural hurdle. Therefore, in the briefing on each sub-point, the Director will note the applicable procedural defect. Alternatively, all of the sub-points are without merit.

For a confession to be involuntary there must be coercion by government agents. *Colorado v. Connelly*, 479 U.S. 157, 165 (1986); *Self v. Collins*, 973 F.2d

140

1198, 1205 (5th Cir. 1992). A habeas petitioner has the burden of proving facts which would lead the court to conclude that the confession was not voluntary. *Uresti v. Lynaugh*, 821 F.2d 1099, 1103 (5th Cir. 1987).

Under *Miranda v. Arizona*, a statement made by a person in custody is inadmissible unless that person was informed that he has the right to have an attorney present during questioning, that he has the right to remain silent, and that anything that he says may be used against him. 384 U.S. 436, 444–45 (1966). A person may waive these rights so long as the waiver is knowing and voluntary. *Moran v. Burbine*, 475 U.S. 412, 421 (1986). During custodial interrogation, "the right to have counsel present . . . is indispensable to the protection of the Fifth Amendment privilege." *Miranda*, 384 U.S. at 469. When a suspect states that he wants an attorney, "the interrogation must cease until an attorney is present." *Id.* at 474; *see also Maryland v. Shatzer*, 559 U.S. 98, 103–04 (2010) (when a suspect asserts his right to counsel, the police must end all questioning until an attorney is available or the suspect reinitiates the interrogation); *Edwards v. Arizona*, 451 U.S. 477, 484 (1981).

For those reasons, a statement made after asserting *Miranda* rights is presumed involuntary, "even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards." *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991). Once the right to counsel is clearly invoked, an officer may not make further attempts to elicit statements

until the suspect initiates further discussion. *Shatzer*, 559 U.S. at 103–04; *Edwards*, 451 U.S. at 484–85. In *Edwards*, the Supreme Court clarified that, once the request for counsel is made during questioning, "an accused . . . is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484–85. The *Edwards* rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Michigan v. Harvey*, 494 U.S. 344, 350 (1990).

But ambiguous assertions of the right to counsel are not enough to require police to stop an interrogation. *See Barnes v. Johnson*, 160 F.3d 218, 224 (5th Cir. 1998) (the accused did not invoke the right to counsel in light of his prior statements and his decision to initiate discussions with police after he heard and waived his *Miranda* rights). The test is whether, viewed objectively, a reasonable police officer in the circumstances would understand the request to be an invocation of the right to a lawyer. *Davis v. United States*, 512 U.S. 452, 458–59 (1994) (the suspect's statement, "Maybe I should talk to a lawyer," made over ninety minutes into a custodial interrogation, after he previously waived his rights, was an ambiguous assertion of the right to counsel). A court must determine whether the accused "articulate[d] his desire to have counsel present sufficiently clearly that a reasonable police officer in

the circumstances would understand the statement to be a request for an attorney." *Id.* at 459.

Furthermore, even should a court determine that a confession was improperly admitted, that error is subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991); *Goodwin v. Johnson*, 132 F.3d 162, 181 (5th Cir. 1997) ("The admission of confessions obtained in violation of Edwards and its progeny constitutes trial error, and is therefore amenable to harmless error analysis."). "The harmless-error standard applicable in conducting habeas review requires the granting of habeas relief on the basis of constitutional trial error only inf the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Goodwin*, 132 F.3d at 181 (quoting *Brecht*, 507 U.S. at 620).

While the voluntariness of a confession is ultimately a legal determination, it may also involve subsidiary factual findings and mixed issues of law and fact. *See Miller v. Fenton,* 474 U.S. 104, 112 (1985); *Muniz,* 132 F.3d at 219. For the issues that are purely legal or mixed law and facts, this Court must respect a state court's determination of voluntariness so long as it was not "contrary to, or involved an unreasonable application of, clearly established federal law." 28 U.S.C.A. § 2254(d)(1); *Drinkard v. Johnson*, 97 F.3d 751, 767–68 (5th Cir. 1996). Purely factual subsidiary determinations are presumed to be correct and are overturned only if they were "based on an unreasonable

determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.A. § 2254(d)(2). When challenging a state court's factual determinations, a petitioner must rebut this presumption of correctness by "clear and convincing evidence." 28 U.S.C.A. § 2254(e)(1).

As discussed above, a petitioner must prove both deficient performance and prejudice to prevail on an ineffective assistance claim. *Strickland*, 466 U.S. at 687. To show deficient performance, a petitioner must prove that the challenged act or omission "fell below an objective standard of reasonableness," but there is a strong presumption that counsel performed effectively. *Id*. at 688–89. To show prejudice, the petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. The prejudice showing "must be substantial, not just conceivable." *Richter*, 562 U.S. at 112. As always, proving ineffectiveness "is never an easy task." *Padilla*, 559 U.S. at 371. "Even under de novo review, the standard for judging counsel's representation is a most deferential one." *Richter*, 562 U.S. at 105.

### 1. Trial counsel did not fail to investigate and present evidence that Ramirez's statement was coerced and unreliable. (Claim 3(C)(2)(a))

In Claim 3(C)(2)(a), Ramirez complains "[t]rial counsel failed to investigate or present any evidence that Ramirez made his statement involuntarily or that his statement was unreliable due to his ingestion of a

144

significant amount of the powerful benzodiazepine Rohypnol in the hours leading to his interrogation." ECF 67 at 274–75. This complaint that trial counsel failed to raise evidence about Ramirez's Rohypnol ingestion was raised in issue five of his subsequent state application. 3 SHCR 1227–28. However, the CCA dismissed that petition as an abuse of the writ under Code of Criminal Procedure article 11.071 §5. *Ex parte Ramirez*, 2015 WL 6282336, at *1. Therefore, this sub-point is procedurally defaulted because it was denied on an independent and adequate ground of state law. *See supra* Answer IV. The complaints about how trial counsel handled the discrepancies in the law enforcement timeline were never presented to the state court. Therefore, this section of the sub-point is unexhausted and procedurally barred. *See supra* Answer IV. Nonetheless, even under a de novo review, the entire sub-point is meritless. Trial counsel was not deficient in this respect and assuming, without admitting, that trial counsel was deficient, Ramirez cannot demonstrate he was prejudiced by that deficiency.

Ramirez argues that "[d]ue to counsel's failure to investigate and present evidence at Ramirez's suppression hearing, the trial court was unable to properly examine the totality of the circumstances surrounding Ramirez's statement to police." ECF 67 at 282. Ramirez suggests two general areas that trial counsel failed to properly investigate or present evidence in relation to his motion to suppress.

145

First, Ramirez complains that "[t]rial counsel failed to investigate the influence of Rohypnol on Ramirez at the time of his interrogation." ECF 67 at 283. According to Ramirez, trial counsel should have presented evidence to support his testimony at the suppression hearing that he had "taken about 15 'Roches' and had been asleep at the time of his arrest." ECF 67 at 283. Ramirez believes that an appropriate investigation in this area required consulting an expert who could offer testimony about the effects of Rohypnol. ECF 67 at 276. Ramirez also alleges that trial counsel should have called witnesses that "were available to testify about Ramirez's drug use in the hours leading up to his arrest." ECF 67 at 283.

However, Ramirez does not provide this Court with the report of an expert on the effects of Rohypnol. Without even a proposed expert and hypothetical testimony in the form of an expert report, Ramirez cannot demonstrate that hiring an expert would have been beneficial to his case.[31] *See Day,* 566 F.3d at 538. With regard to the "witnesses" that Ramirez complains were not called to testify about his drug use, Ramirez provides the name of his first cousin, Jose Luis Navarro. ECF 67 at 283. Navarro seemingly would have

---

[31] To the extent that any of the expert reports presented to this Court address the effect of drugs on Ramirez, those reports are not referenced in the briefing on this claim. Additionally, they constitute new evidence that was not presented to the state court and cannot be considered in the adjudication of his current claim. *See supra* Answer V.

testified that he "witnessed Ramirez ingest several" Rohypnol pills "the evening before his arrest."[32] ECF 67 at 283, 4 SHCR 1447. However, as Ramirez gave his statement in the late afternoon, Navarro's testimony would have put Ramirez taking the Rohypnol approximately 18 hours prior to giving his statement. It is unlikely that testimony of this type would have changed the court's opinion of Ramirez's credibility.

Next, Ramirez cites to Berta's June 29, 2009, declaration where she states that she knew Ramirez was using Rohypnol around the time he was arrested. ECF 67 at 283; 4 SHCR 1465. As already noted, this statement provides no support for Ramirez's claim that he was intoxicated when he gave his statement since Berta specifically states that she did not see Ramirez take anything prior to his arrest. 4 SHCR 1465. In other words, Ramirez offers up temporally distant or speculative testimony. He cannot show a reasonable probability of a different result with such weak evidence, or that his counsel were deficient for failing to find or present it.

Second, Ramirez complains that "[t]rial counsel were also ineffective for failing to investigate and present evidence about the discrepancies in the timeline of how police reportedly obtained Ramirez's statement." ECF 67 at

---

[32] Navarro's affidavit states that he "saw [Ramirez] take pills called Rochas the night before he was arrested." 4 SHCR 1447

284. Had counsel successfully done this, according to Ramirez, the credibility of the testifying officers would have been called into question and "strengthened Ramirez's testimony that the police influenced his statements." ECF 67 at 284.

However, he does not suggest what additional investigation trial counsel should have done to investigate the timeline surrounding Ramirez's confession. This dooms the claim. *See Gregory*, 601 F.3d at 352. The only factual support Ramirez can muster to bolster the idea that there was a discrepancy in the timeline consists of nothing more than citations to the reporter's record. ECF 67 at 284–86. It cannot be said that trial counsel did not have the very information that they elicited during cross-examination.

Therefore, Ramirez's complaint is the more mundane one of quibbling with trial counsel's strategy on how to argue the facts in evidence. The approximate nature of the timeline the officers provided was before the court. Trial counsel cross-examined Detective Edgardo Ruiz on the accuracy of his estimates of the timing of events. 6 RR 62–69. Even with timing as an issue before the court, the problem Ramirez had at the suppression hearing was that the trial judge simply did not believe him.

Nothing Ramirez has suggested here demonstrates that the court would have found his testimony credible had it been presented with the type of

evidence Ramirez suggests here. This sub-issue is procedurally defaulted and meritless. It should be denied.

### 2. Trial counsel did not fail to properly interview lay witnesses and arrange for them to appear at the hearing. (Claim 3(C)(2)(b))

In Claim 3(C)(2)(b), Ramirez asserts that trial counsel were ineffective for "failing to properly interview lay witnesses and arrange for them to appear at the hearing." ECF 67 at 286. This sub-point was presented as a part of issue five of Ramirez's subsequent state application for writ of habeas corpus. 3 SHCR 1225–26. Therefore, it is procedurally defaulted. *See supra* Answer IV. Alternatively, it is meritless.

This claim takes trial counsel to task for failing to ensure the presence of one of Ramirez's sisters, Berta Ramirez, and Jerry Garcia, the person Ramirez purportedly called after arriving at Edinburg Police Department following his arrest. ECF 67 at 286–87. Ramirez points to the fact that at a pretrial hearing four days prior to the hearing on the motion to suppress, trial counsel alerted the court that there would be difficulty in arranging everything necessary to subpoena an out-of-state witness. ECF 67 at 286. The court made it clear that it would not look favorably on any request to continue the suppression hearing. ECF 67 at 286, 4 RR 40.

Ramirez alleges that Berta's testimony "would have corroborated Ramirez's testimony about police misconduct and Ramirez's use of Rohypnol."

149

ECF 67 at 287. However, in this section Ramirez does not explain what Berta

would have said to corroborate his testimony. He merely cites to a paragraph

in Berta's 2009 state habeas affidavit. ECF 67 at 287.

> I knew that [Ramirez] abused drugs. He started using when he
> was still a child. I also knew that he was using Rohypnol around
> the time he was arrested, though I did not see him take any prior
> to his arrest. He was respectful toward me and did not show up at
> my house while high, but I still knew that he had a drug problem.
> When the detectives came to my house looking for [Ramirez,] they
> pressured me into telling them. They threatened me with arrest if
> I did not tell them. At the time, I just had a baby, about eight days
> previously, when a man named Andreas Garza. The detectives
> pressured both Andreas and me to tell them. They informed me
> that I would lose my child.

4 SHCR 1465.

Ramirez states that Berta could have provided some kind of

impeachment evidence on Detective Daniel Ochoa's testimony "about alleged

statements she made before Ramirez's arrest and information about Ramirez

having requested a lawyer." ECF 67 at 286–87. Ramirez does not indicate what

Berta would have had to say on the subject. He merely states that "[w]hat

Berta said became a major issue at the suppression hearing." ECF 67 at 287.

There was some discussion about what Berta may have known about Ramirez's

arrest, including how she was treated by law enforcement and what she

believed to be Ramirez's state of mind, 6 RR at 93, 100, 117–18, 138; 7 RR at

142–44, but considering that the reporter's record of the two-day suppression

hearing is 422 pages long, claiming that Berta's potential testimony was a

"major issue" at that hearing is quite an overstatement. Ramirez does not demonstrate that, had Berta testified, her answers to those questions would have been helpful to him.

Next, Ramirez argues that "Berta would have corroborated Ramirez's testimony about police misconduct and Ramirez's use of Rohypnol." ECF 67 at 287. However, contrary to Ramirez's assertion, there is no indication that Berta would have been able to testify about police misconduct toward Ramirez. Berta's affidavits, the only indication of her potential testimony, address only *her* interaction with the police. 4 SHCR 1465. Such testimony would not have corroborated Ramirez's testimony about law enforcement officer's treatment of him. The only question Berta could have conclusively answered was what exactly she had told officers about Ramirez's location. However, it is difficult to imagine that such a minor point would have made a difference.

Berta's potential testimony about Ramirez's use of Rohypnol, as addressed in the section related to Claim 3(C)(2)(a) above, would have been no more helpful. Berta's potential testimony on this point would not have addressed Ramirez's testimony that he was intoxicated during his interview with law enforcement. Berta only knew that Ramirez was using Rohypnol around the time he was arrested. ECF 67 at 283; 4 SHCR 1465. She did not see Ramirez take anything prior to his arrest. 4 SHCR 1465.

151

Ultimately, Ramirez does not demonstrate that, had Berta testified, her testimony would have actually been helpful to him. Even if counsel's inability to secure Berta's presence at the hearing was due to some deficiency on their part, Ramirez cannot demonstrate that he was prejudiced by it.

The other witness Ramirez complains that trial counsel did not call was Jerry Garcia. However, the only thing Ramirez states is that he "would have testified that Ramirez had asked him to contact a lawyer, corroborating Ramirez's testimony that he had requested an attorney before police began their recorded interrogation." ECF 67 at 287. There is nothing from Jerry Garcia himself regarding what his testimony would have been and, as such, Ramirez fails to prove deficiency or prejudice. *See Day,* 566 F.3d at 538. Furthermore, even if Jerry Garcia had appeared and testified as Ramirez suggests, such evidence would merely have provided corroboration that at *some* point Ramirez told *someone* that he wanted a lawyer. It does not prove that Ramirez asked any law enforcement officer for an attorney. Therefore, any evidence Garcia may have had to offer would have been insignificant in the trial court's ultimate decision.

Ramirez fails to show that counsel was deficient in their efforts to ensure the presence of the two out-of-state witnesses or that, assuming deficiency, he was prejudiced in any way. This procedurally defaulted claim is also meritless. It should be denied.

### 3.   Trial counsel did not fail to properly investigate the existence of audio and video recordings of Ramirez's arrest and booking. (Claim 3(C)(2)(c))

Here, in Claim 3(C)(2)(c), Ramirez alleges that, with relation to their performance at the suppression hearing, trial counsel were ineffective for failing to properly investigate the existence of audio and video recordings of Ramirez's arrest and booking. ECF 67 at 287–88. This sub-point was never presented to the state court. Therefore, it is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, it is meritless.

As will be discussed in greater detail in Claim 8, trial counsel did raise the subject of audio or video recordings of Ramirez's arrest with the trial court and the State. Ramirez claims that "it wasn't until four days prior to the suppression hearing that trial counsel first raised the possibility that police had videotaped Ramirez's arrest." ECF 67 at 287. Therefore, Ramirez is suggesting that, had trial counsel sought out the video earlier, they would have been able to properly evaluate its best use for Ramirez's defense. However, although this issue is unexhausted, the claim that the State improperly withheld the video was presented on direct appeal. Despite the fact the same issue was not raised, the CCA's findings on related matters are still due deference. And the CCA found that Ramirez "failed to show that there is a reasonable probability that the result of the proceeding would have been different if [trial counsel would have received] the videotape earlier." *Ramirez*,

2007 WL 4375936, at *12. Even if Ramirez proved that trial counsel was deficient in the efforts put forth to seek out the video, he cannot prove that the failure prejudiced him as the video was available in time for counsel to evaluate its possible use in Ramirez's defense.

Ramirez also complains that trial counsel "failed to investigate promptly whether the Edinburg [P]olice [D]epartment had maintained video and call records that could have supported Ramirez's testimony that he called Jerry Garcia asking for help in contacting his lawyer." ECF 67 at 288. According to Ramirez, counsel did nothing on this matter until the suppression hearing when it was discovered that the police had recorded over the video.[33] ECF 67 at 288, 26 RR 5. As discussed above, while Ramirez asking Jerry Garcia to call his lawyer may have been probative, it is hardly dispositive of the question of whether he invoked his rights to law enforcement. And, as discussed in Claim 8 related to prosecutorial misconduct, quite simply, the arrest video was not helpful. Although the record reflects that trial counsel pushed to ensure that they received the video, in the end the video was of no value to Ramirez's defense.

---

[33] According to the prosecutor, the videotapes of the booking procedures are only kept for 30 days. 26 RR 5. Ramirez was arrested on January 29, 2003. The order appointing lead counsel was signed on January 31, 2003. 1 CR 2. Not including weekends, trial counsel would have had twenty days to interview Ramirez and obtain information about a complicated case with multiple victims and co-defendants, in addition to any responsibilities on other cases, in which to determine if there was any reason to seek out recordings from the jail before they were deleted.

Trial counsel were not deficient in seeking audio and video of Ramirez's arrest and booking. However, even if they were, Ramirez cannot demonstrate prejudice as nothing he has suggested would have made the slightest difference in the trial court's decision that his statement was voluntarily given. This sub-issue is unexhausted and procedurally barred. It is also meritless and should be denied.

> ### 4. If trial counsel subpoenaed the "wrong" booking officer to the suppression hearing, that mistake did not rise to the level of insufficient assistance of counsel. (Claim 3(C)(2)(d))

In Claim 3(C)(2)(d), Ramirez argues that trial counsel was ineffective for subpoenaing the wrong booking officer to the suppression hearing. ECF 67 at 288–89. This sub-point was never presented to the state court. Therefore, it is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, it is meritless.

Here, Ramirez complains that, instead of subpoenaing the booking officer he claims was present at the jail when he requested a lawyer, trial counsel subpoenaed another officer, Alberto Alvarez, who was not on duty at the time. ECF 67 at 288. However, factual support for this claim is lacking. Ramirez states that the "right" booking officer was Ricardo Garcia. ECF 67 at 288. However, Ramirez does not offer any proof of what Garcia would have been able to testify to, so he fails to demonstrate deficiency and prejudice. *See,*

155

*e.g.*, *Day*, 566 F.3d at 538. Without that crucial piece of information, this claim is purely speculative, and cannot form the basis of a winning IATC claim. *See, e.g.*, *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) ("This Court has made clear that conclusory allegations of ineffective assistance of counsel do not raise a constitutional issue in a federal habeas proceeding."). Ramirez does not show that Ricardo Garcia was the "right" booking officer. Ramirez does not show that Ricardo Garcia's testimony would have been favorable. Ramirez does not show that objectively reasonable counsel would have subpoenaed Garcia or that the failure to do so prejudiced him. In short, Ramirez does not show any of the elements necessary for his claim to be successful.

Therefore, this claim is unexhausted and procedurally barred. It is also conclusory and meritless. It should be denied.

### 5.   Trial counsel did not fail to competently impeach the State's law enforcement witnesses. (Claim 3(C)(2)(e))

In Claim 3(C)(2)(e), Ramirez asserts that trial counsel were ineffective for failing to competently impeach the State's law enforcement witnesses. ECF 67 at 289–91. This claim has never been presented to a state court and is unexhausted and procedurally barred. *See supra* Answer IV. Ramirez does not attempt to overcome the bar. The claim should be denied on this basis. Alternatively, the claim is without merit.

In this claim, Ramirez complains that trial counsel unsuccessfully attempted to impeach Detective Edgardo Ruiz[34] using the statement from Rosie Gutierrez. ECF 67 at 289. Detective Edgardo Ruiz testified that he first learned that a victim had been struck with a frying pan from Ramirez. 6 RR 77, 82–83. However, counsel was unsuccessful in impeaching the detective because Ms. Gutierrez's statement did not mention a frying pan. 6 RR 81–82; ECF 67 at 289. According to Ramirez, trial counsel should have used information contained in the statement of co-defendant Marcial Bocanegra instead. ECF 67 at 289.

However, Ramirez does not demonstrate that counsel's impeachment of Detective Edgardo Ruiz was deficient. "Because decisions regarding cross-examination are strategic, they usually 'will not support an ineffective assistance claim.'" *United States v. Bernard*, 762 F.3d 467, 472 (5th Cir. 2014) (quoting *Dunham v. Travis*, 313 F.3d 724, 732 (2d Cir. 2002)). There is no reason to believe that impeaching Detective Edgardo Ruiz with Bocanegra's statement would have been of any use. As noted in the briefing in Claim 8, there is no reason to believe that Edgardo Ruiz was aware of Bocanegra's statement. However, Detective Edgardo Ruiz took Ms. Gutierrez's statement

---

[34] There are two Edinburg Police Department Detectives with the surname Ruiz that were involved in the investigation of this crime—Edgardo Ruiz and Ramiro Ruiz. Both were involved in taking Ramirez's statement.

the night before his interview with Ramirez. 6 RR 81. As such, it cannot be said that counsel's decision not to use the Bocanegra statement was objectively unreasonable. Furthermore, Ramirez does not prove that he was prejudiced by counsel's method of impeaching Detective Edgardo Ruiz in the manner he suggests. Because there is no evidence that Detective Edgardo Ruiz knew about Bocanegra's statement, its mere existence proves nothing.

Ramirez next complains that, when Detective "Ramiro Ruiz testified that he had not questioned Ramirez before taping his statement," trial counsel did not "impeach Ramiro Ruiz with his own admissions on the recording that questioning had preceded the recording." ECF 67 at 290.

During direct examination by co-counsel, Detective Ramiro Ruiz testified that the first contact he had with Ramirez was when he read him his *Miranda* warnings. 6 RR 184. Detective Ramiro Ruiz testified that he had not heard any of the conversation between Ramirez and Detective Edgardo Ruiz and that he had not had a conversation with Ramirez himself. 6 RR 185. Co-counsel argued to the trial court that Detective Ramiro Ruiz said that he did not talk to anyone, but that there were "numerous instances where he is reciting facts back to [Ramirez]." 6 RR 190. Co-counsel questioned Detective Ramiro Ruiz aggressively about various questions he asked Ramirez during the interview that implied previous knowledge. 6 RR 188–204. As a review of the record demonstrates, this was a significant part of co-counsel's strategy in questioning

Detective Ramiro Ruiz. Ramirez does not indicate what more he believes co-counsel should have done or what the results would have been, so he fails to prove deficiency and prejudice.

Finally, Ramirez suggests that trial counsel should have asked to recess the hearing to allow them to research and locate witnesses to "present[] a wealth of information about the Edinburg police department's corruption." ECF 67 at 290–91. However, is very clear that the trial judge believed that the proper "question [was] whether [Ramirez's] individual rights were violated, not whether—someone else's." 6 RR 206. Although there was a discussion about whether co-counsel could prove that there was a pattern of violating a defendant's rights, the Court pointed out that continuing to question a defendant after he asks for an attorney is not "in and of itself a violation of anyone's rights, because they can ask for a lawyer and then say, you know what, I still want to talk to you." 6 RR 207. Furthermore, as this claim is that counsel did not request a recess, since the hearing continued through until the next day, a recess would have been unnecessary. There was sufficient time to do research that could have discovered the type of evidence that Ramirez cites to in his briefing.[35] Finally, based on the Court's comments, it is unlikely that

---

[35] To the extent the internet citations in Ramirez's briefing are intended to be evidence to support his claim, they cannot be considered because they were not presented to the state court. *See supra* Answer V. Furthermore, the Director notes that the two articles that are cited were published in July of 2015 and would not have

internet research, even had it been admissible, would have swayed the Court. Therefore, counsel's failure to request a recess could not have prejudiced Ramirez.

Nothing Ramirez suggests here proves that, had counsel acted in the manner Ramirez now says they should have, the court would have found either Detective Edgardo Ruiz or Detective Ramiro Ruiz to be not credible. Therefore, there is no reason to believe that had counsel made different decisions in this regard, Ramirez's statements to law enforcement would have been excluded.

This sub-issue is unexhausted, procedurally barred, and meritless. It should be denied.

### 6. Trial counsel did not fail to conduct a proper direct examination of Ramirez. (Claim 3(C)(2)(f))

Here, in Claim 3(C)(2)(f), Ramirez avers that trial counsel failed to conduct a competent direct examination of him at the suppression hearing. ECF 67 at 291–92. This claim has never been presented to a state court and is unexhausted and procedurally barred. *See supra* Answer IV. Ramirez does not attempt to overcome the bar. Alternatively, the claim is without merit.

The entirety of this claim is based upon a question the trial court asked trial counsel after Ramirez left the stand. ECF 67 at 291. The judge asked trial

---

been available to trial counsel at the suppression hearing held in October of 2004. ECF 67 at 290–91; 6 RR–7 RR.

counsel if they were aware that Ramirez had not been asked whether "he was interviewed by that investigator . . . before" his statement was recorded. ECF 67 at 291; 7 RR 187. Co-counsel responded to the trial court's question that the word "interview" was not used, but that Ramirez had testified that the "investigator kept going over there and talking to him or kept going to the cell." 7 RR 187–88. The Court specifically found that Ramirez's testimony on that point was not credible. Supp CR 11.

Apparently, Ramirez believes that the outcome of the suppression hearing hinged on asking the question in the exact words suggested by the trial court, because he says that "[b]y failing to ask a question necessary to meet their burden of proof at the suppression hearing, there was virtually no chance that the trial court would suppress Ramirez's coerced and unreliable statement." ECF 67 at 292. However, since the Court did not believe any of Ramirez's testimony, it would not have mattered how the question was asked. Supp CR 10–11. Therefore, additional testimony from a witness that was deemed not to be credible would not have made a difference.

There is no reason to believe that had trial counsel asked this final question Ramirez's statement would have been excluded. This claim is unexhausted, procedurally barred, and meritless. It should be denied.

### 7. Trial counsel was not ineffective for not retaining a false confession expert. (Claim 3(C)(2)(g))

In Claim 3(C)(2)(g), Ramirez alleges that trial counsel was ineffective for failing to hire an expert in false confessions. ECF 67 at 292. This specific issue was raised by Ramirez in his subsequent state habeas application as issue one. 3 SHCR 1140–55. Therefore, this sub-point is procedurally defaulted because it was denied on an independent and adequate ground of state law. *See supra* Answer V. As Ramirez makes no attempt to overcome this hurdle to obtaining relief on this issue, it should be denied. Nonetheless, a de novo review of the issue fails on the merits.

Ramirez provides little briefing in support of this claim. As far as deficiency, Ramirez merely makes the conclusory statement that a false confession expert "was vital as false confessions dramatically reduce innocent defendants' likelihood of success." ECF 67 at 292. As support for this claim Ramirez cites to the first two pages of the report of the false confession expert that was presented to the state court. ECF 67 at 292; 4 SHCR 1303–38. But this does not demonstrate that counsel had to call an expert witness lest they be deemed deficient. Indeed, "any number of hypothetical experts . . . might possibly have been useful," but "[c]ounsel was entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective trial tactics and strategies." *Richter*, 562 U.S. at 107. Ramirez fails to

show deficient performance because he fails to show it was necessary to retain a false confessions expert.

Concerning prejudice, Ramirez states that he "was prejudiced because his statement would reasonably have been suppressed had trial counsel demonstrated through expert testimony Ramirez's specific vulnerabilities that would lead him to make a false confession." ECF 67 at 292. However, he does not provide any analysis as to how false confession testimony would have affected the results of his suppression hearing. As noted above, the trial court did not believe Ramirez's version of events surrounding his confession. Supp CR 10–11. Therefore, expert testimony connecting his uncredible testimony to research on false confessions would have served no purpose.

Ultimately Ramirez's conclusory briefing fails to prove trial counsel was deficient for failing to call a false confession expert or that he was prejudiced by that failure. Relief should be denied because the claim is procedurally defaulted, conclusory, and without merit.

## C.    Pretrial investigation and preparation (Claim 3(C)(3))

In Claim 3(C)(3), Ramirez claims that trial counsel was ineffective for failing to conduct an adequate pretrial investigation. ECF 67 at 293–95. This claim is unexhausted and procedurally barred because it was never presented to the state court. *See supra* Answer IV. Alternatively, it is meritless.

"An applicant who alleges a failure to investigate on the part of his counsel must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the trial." *Gregory*, 601 F.3d at 352. If a petitioner claims that counsel failed to call witnesses, he "must name the witness, demonstrate that the witness would have testified, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable." *Id.*

Ramirez argues that "[t]rial counsel failed to investigate key evidence and follow up on issues that the State had retained experts to discuss." ECF 67 at 293. Despite the litany of things Ramirez claims trial counsel did not do, he does not explain what the proposed investigation would have discovered or how it would have been helpful to his defense. This inadequate briefing means Ramirez fails in his burden to demonstrate deficiency and prejudice. *See Gregory*, 601 F.3d at 352.

Ramirez complains that trial counsel waited until less than a month before trial before asking to view the crime scene. Ramirez does not explain how that delay had any effect on his trial. Ramirez next argues that trial counsel "never pursued conflicting testimony about where [the frying pan] was found and whether testing was ever done." ECF 67 at 294. However, Ramirez does not explain where the conflicting testimony would have come from or how it would have been helpful. Ramirez further alleges that "trial counsel never

followed up, investigated, or presented evidence that Ramirez was not Lenny and had never gone by that name," but he does not explain what follow-up should have been done or what it would have uncovered. ECF 67 at 294.

Finally, Ramirez complains that "[c]ounsel failed to timely secure their own experts." ECF 67 at 294. Ramirez argues that, although counsel was aware that the "case involved gangs, coerced confessions, use of benzodiazepines and other drugs, DNA testing, and ballistics," counsel never retained experts on any of those issues. ECF 67 at 295. However, Ramirez does not provide any reports from experts of these types to demonstrate what the proposed expert testimony would have been, or how it would have benefitted him. So he again fails to show deficiency and prejudice. *See Gregory*, 601 F.3d at 352.

Essentially, Ramirez offers nothing but complaints. He presents no evidence that had trial counsel acted in conformity with his current suggestions anything helpful would have resulted. His claim is conclusory and is therefore without merit. It is also unexhausted and procedurally barred. It should be denied.

### D.    Grand jury challenge claim (Claim 3(C)(4))

Ramirez claims that trial counsel were ineffective for failing to raise a challenge to the grand jury. ECF 67 at 296. This claim was not raised in state

court. It is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, it is without merit.

As support for his claim, all Ramirez offers is an ABA guideline suggesting that trial counsel should consider whether to investigate or challenge the grand jury procedure and a case that is cited for the general proposition that investigation and preparation are required for effective representation of defendants. ECF 67 at 296. Ramirez does not argue that by failing to make a challenge to the grand jury counsel "fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Ramirez does not claim that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. Ramirez fails to even allege that there was anything to find if counsel had conducted any investigation. *See, e.g.*, *Gregory*, 601 F.3d at 352. At best, this argument can be viewed as a conclusory and weak attempt to raise a valid claim of IATC. *See, e.g.*, *Miller*, 200 F.3d at 282. It should be dismissed as unexhausted and procedurally barred or alternatively denied on the merits.

### E.    Change of venue claim (Claim 3(C)(5))

In Claim 3(C)(5), Ramirez states that his trial counsel provided ineffective assistance by failing to request a change of venue. ECF 67 at 297–98. This claim was not raised in state court. As a result, it is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, it is meritless.

1.   **Law**

"The Sixth Amendment secures to criminal defendants the right to trial by an impartial jury." *Skilling v. United States*, 561 U.S. 358, 377 (2010). Due process does not tolerate convictions "obtained in a trial atmosphere that [was] utterly corrupted by press coverage." *Id*. at 380 (alteration in original) (quoting *Murphy v. Florida*, 421 U.S. 794, 798 (1975)). However, "extensive knowledge in the community of either the crimes or the putative criminal is not sufficient by itself to render a trial constitutionally unfair." *Dobbert v. Florida*, 432 U.S. 282, 303 (1977). "Prominence does not necessarily produce prejudice, and juror *impartiality*, we have reiterated, does not require *ignorance*." *Skilling*, 561 U.S. at 381. A presumption of prejudice applies only in "extreme" cases. *Id*.

Otherwise, "a habeas petitioner must demonstrate that 'the particular jurors selected for service in his case were biased against him.'" *Coble v. Davis*, 682 F. App'x 261, 274 (5th Cir. 2017) (quoting *Busby v. Dretke*, 359 F.3d 708, 725 (5th Cir. 2004)); *see also Dobbert*, 432 U.S. at 303 ("[Petitioner] has directed us to no specific portions of the record, in particular the voir dire examination of the jurors, which would require a finding of constitutional unfairness as to the method of jury selection or as to the character of the jurors actually selected.").

The law governing change of venue in Texas is effectively the same as the underlying due process right to an impartial jury:

> To justify a change of venue based upon media attention, a defendant must show that the publicity was pervasive, prejudicial, and inflammatory. Widespread publicity by itself is not considered inherently prejudicial. Indeed, even extensive knowledge of the case in the community as a result of pretrial publicity is not sufficient if there is not also some showing of prejudicial or inflammatory coverage. The mere existence of media attention or publicity is not enough, by itself, to merit a change of venue.

*Gonzalez v. State*, 222 S.W.3d 446, 449 (Tex. Crim. App. 2007) (footnotes omitted).

### 2.    Argument

Ramirez argues that his trial counsel were ineffective for failing to move for a change of venue due to pretrial publicity. ECF 67 at 297–98. He states that the crime occurred in Hidalgo County "where violence between the Tri-City Bombers and the Texas Chicano Brotherhood was widely publicized." ECF 67 at 297.

Ramirez does not demonstrate that had counsel filed a motion for a change of venue, there was any chance that it would have been granted. He points to some comments made by the court acknowledging media presence and some newspaper articles. ECF 67 at 298. However, there is no attempt to tie these facts to the required legal standard—he does not show media saturation, a hostile populous, or that these murders garnered more media coverage than any other violent crime in the region. Nor does Ramirez provide sworn testimony from county residents that he could not obtain a fair and

impartial trial as required as a prerequisite to obtaining a change of venue under Texas law. Tex. Code Crim. Proc. art. 31.03(a). There is no evidence that the press coverage was "extreme", much less that the trial was "utterly corrupted" by it. Nor does he show that any of the jurors were actually biased. Without these things, Ramirez cannot demonstrate that his motion to change venue would have likely been granted or that his trial was fundamentally unfair such as to show *Strickland* prejudice. *See, e.g.*, *Miller*, 200 F.3d at 282 (failing to show deficiency or prejudice because petitioner failed to show that motion to change venue would have been granted). This sub-point is unexhausted and, as such, procedurally barred, and it is alternatively meritless. It should be denied.

### F.    Jury selection claim (Claim 3(C)(6))

In Claim 3(C)(6), Ramirez argues that his trial counsel provided ineffective assistance during the jury selection phase of his trial. ECF 67 at 298–302. Ramirez did not raise this issue in state courts; therefore, it is unexhausted and procedurally barred in this forum. *See supra* Answer IV. Ramirez does not acknowledge or attempt to overcome this bar. The claim should be denied on this basis. Nonetheless, if this claim is reviewed de novo, it fails on the merits.

Ramirez complains that when jury selection began, "counsel were still attempting to learn the State's evidence against him and were only in the

initial stages of investigating mitigation." ECF 67 at 301. However, there is no explanation of how this fact, even if assumed to be true, had an actual impact on how counsel conducted voir dire. Ramirez does not explain how trial counsel failed to properly conduct voir dire. Nor does he indicate how he was prejudiced by such a failure. He does not point out any juror that he believes should have been winnowed out through proper voir dire. The closest Ramirez comes is where he complains that counsel failed to use a peremptory challenge on juror number two who was in law enforcement. ECF 67 at 302. However, there is no explanation of how a failure to "adequately and meaningfully question jurors" was to blame for this failure. On the contrary, Ramirez points out information received about the juror through voir dire questioning. ECF 67 at 302. Clearly it was not a failure to adequately and meaningfully question this juror that led to him being on Ramirez's jury.

Furthermore, Ramirez does not identify any topics that counsel should have discussed during voir dire to educate potential jurors. He does not attempt to demonstrate how, if there were any errors, those errors prejudiced him. In short, this issue is no more than a discussion of the law on effective assistance of counsel in capital voir dire. There is no application of that law to Ramirez's case or his trial counsel's performance. It is conclusory and it should be denied as such. *See, e.g.*, *Miller*, 200 F.3d at 282.

The issue is unexhausted, procedurally barred, inadequately briefed, conclusory, and meritless. It should be denied.

## G.    Peremptory strike claim (Claim 3(C)(7))

In Claim 3(C)(7), Ramirez asserts that trial counsel were ineffective for failing to object to the State's peremptory challenges as being improperly based upon gender. ECF 67 at 302–04. This claim was raised on state habeas as issue nineteen. 1 SHCR 233–37. As such, Ramirez must demonstrate the unreasonableness of the state court's decision. He does not do so. Alternatively, the claim is meritless in its own right.

In *Batson v. Kentucky,* the Supreme Court set forth a three-step test to evaluate a defendant's claim that the State used peremptory strikes in a racially discriminatory manner: (1) a defendant must make a prima facie showing that the prosecutor exercised his peremptory challenges on the basis of race; (2) the burden then shifts to the prosecutor to articulate a race-neutral reason for striking the juror in question; and (3) the trial court must determine whether the defendant carried his burden of proving purposeful discrimination. 476 U.S. 79, 96–98 (1986).

> To establish a prima facie case under *Batson*, "a defendant (1) must show that he is a member of a cognizable racial group, and that the prosecutor has exercised peremptory challenges to remove members of the group from the venire; (2) is entitled to rely on the fact that peremptory challenges constitute a jury selection practice that permits those to discriminate who are of a mind to discriminate; and (3) must show that these facts and

circumstances raise an inference that the prosecutor exercised peremptory challenges on the basis of race.

*Moore v. Vannoy,* 968 F.3d 482, 490 (5th Cir. 2020) (quoting *Higgins v. Cain*, 720 F.3d 255, 265–66 (5th Cir. 2013)). In *J.E.B. v. Alabama ex rel. T.B.,* the Supreme Court extended the protections of *Batson* to the discriminatory use of peremptory strikes based on gender. 511 U.S. 127, 143 (1994).

In regard to raising a claim of IATC for failure to raise an objection under *J.E.B.*, the Fifth Circuit has said that "[i]f [a petitioner] fails to show that a *J.E.B.* violation occurred, however, then he also fails to show that [his] attorney's performance was deficient or that she was prejudiced thereby." *Herbert v. Rogers,* 890 F.3d 213, 220 (5th Cir. 2018). In analyzing an alleged violation of *J.E.B.*, courts employs the same analysis as a *Batson* claim. *Id. (*citing *J.E.B.*, 511 U.S. at 144.) "The petitioner must present a prima facie case that the state discriminated on the basis of gender during the jury selection." *Id.* at 221. After the defendant establishes a prima facie case, the burden of production then shifts to the State to provide non-discriminatory bases for the strikes. *Id.* "The burden of persuasion, on the other hand, lies at all times with the party asserting the *Batson* challenge." *Splawn v. Thaler,* 494 F. App'x 448, 451 (5th Cir. 2012).

According to Ramirez, trial counsel should have objected to the State's peremptory challenges because "[t]he State used 11 of its 15 peremptory

strikes (this amounted to 73% of its peremptory strikes) to remove women from Ramirez's jury." ECF 67 at 303. Had trial counsel lodged an initial objection, Ramirez claims that trial counsel "could have established prima facie discrimination and the burden would have shifted to the prosecutor to explain the exclusion by offering permissible gender-neutral justifications for the strikes." ECF 67 at 303. Furthermore, Ramirez, without providing any reasoning as to why, claims that counsel "should have objected to the State not only striking women, but also to disproportionately striking non-white veniremembers." ECF 67 at 303.

This issue was raised on state habeas as issue nineteen. 1 SHCR 233—37. The following are the habeas court's findings on this matter:

706.   The State would next submit that the claim that the State used its peremptory challenges in a discriminatory manner in order to exclude women from the jury asserted in [Ramirez's] eighteenth and nineteenth grounds for review is not properly before this Court for consideration.

707.   After all, [Ramirez] did not object to any of the State's peremptory challenges either when said challenges were made or after the jury selection process had been completed.

708.   Moreover, this contention was not raised on direct appeal, nor could it have been asserted at that level, given the lack of any trial complaint.

709.   In addition, despite the fact that over three years have passed since [Ramirez] filed his application for writ and indicated that the parties had agreed that this court should

allow him an additional 90 days to fully brief this topic, he has not provided any factual support for his discrimination claim.

710. In *Batson v. Kentucky*, 476 U.S. 79, 89 (1986), the United States Supreme Court held that, while a prosecutor ordinarily may exercise peremptory challenges for any reason related to his views concerning the outcome of the trial, the Equal Protection Clause forbids challenging potential jurors solely on account of their race.

711. Said Court also outlined a three-step process for evaluating *Batson* claims.

712. This process first requires the opponent of the peremptory challenge make a prima facie showing of racial discrimination; secondly provides that, if the opponent makes the requisite showing, the burden then shifts to the proponent of the strike to articulate a race-neutral explanation; and third indicates that the trial court must then decide whether the opponent has proved purposeful discrimination. *Batson*, 476 U.S. at 96–98.

713. The Court of Criminal Appeals has mentioned and applied this process for evaluating *Batson* claims in such recent cases as *Nieto v. State*, 365 S.W.3d 673, 675–76 (Tex. Crim. App. 2012) and *Grant v. State*, 325 S.W.3d 655, 657 (Tex. Crim. App. 2010).

714. The Courts have also pointed out that the trial court's ruling in the third step must be sustained on appeal unless it is clearly erroneous. *See Snyder v. Louisiana*, 552 U.S. 472, 477 (2008); *Nieto*, 365 S.W.3d at 677; *Grant*, 325 S.W.3d at 657.

715. They have also indicated that, because the trial court's ruling requires an evaluation of the credibility and demeanor of prosecutors and venire members, the reviewing court must defer to the trial court's ruling in the absence of exceptional circumstances. *See Snyder*, 552 U.S. at 477; *Grant*, 325 S.W.3d at 657; *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008).

716. The courts extended the rationale concerning discrimination in the exercise of peremptory challenges to discrimination based on gender in *J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 129 (1994); *Fritz v. State*, 946 S.W.2d 844, 847 (Tex. Crim. App. 1997).

717. Application of these principles to the facts in this case shows the invalidity of [Ramirez's] contention that the trial prosecutors had discriminated against women in exercising their peremptory challenges.

718. In so demonstrating, this Court would first point out that the passage of several years since jury selection occurred in this case obviously limits one's ability to reconstruct the thought processes underlying the decisions concerning exercise of their peremptory challenges which had been made by the trial prosecutors.

719. Nonetheless, evaluation of the questionnaires and individual voir dire of the prospective jurors who became the subject of the trial prosecutors' peremptory challenges provides insight into reasons for many of said strikes.

720. For example, prospective juror # 1, Jessica Rene Cavazos, had said that she really does not believe in the death penalty both in her questionnaire and during her individual voir dire. *See* Question 29 in Ms. Cavazos' questionnaire, found in 55 R.R. and her explanation of said answer at 8 R.R. 47.

721. Moreover, the State only exercised a peremptory challenge against Ms. Cavazos after it had first urged a motion for cause and had said challenge denied. *See* 8 R.R. 86–89.

722. Prospective juror # 39, Gemenis Yvette Pena, had stated that her religion would prevent her from being fair and impartial, had mentioned the right to receive forgiveness, and had said that the death penalty was very hard. *See* Question 29 in Ms. Pena's questionnaire, found in 57 R.R. and her explanation of said answer at 13 R.R. 177–79. She had also indicated that she had a brother in jail in Minnesota for child molestation (*see* 13 R.R. 187–89) and described a

175

bad experience she had had with a McAllen police officer (*see* 13 R.R. 190).

723.  Prospective juror # 44, Blanca Estella Gomez Munoz, had indicated that she had received deferred adjudication for a possession of marihuana (*see* 14 R.R. 4–5) and that she had a brother who was in prison for drugs on a charge from Hidalgo County (*see* 14 R.R. 30). She had also indicated that she was going through a bitter divorce; that she had reported that her husband had assaulted her three different times; and that the police had never arrested her husband, put him in jail, or taken the cases to the District Attorney's Office. *See* 14 R.R. 32–38.

724.  Finally, the record reflects that the prosecutor asked Ms. Munoz if she could be fair and impartial despite these matters and that she responded that her private life has nothing to do with her serving as a juror and that she could be fair and impartial. *See* 14 R.R. 44–47.

725.  Prospective juror # 47, Amy Navarro, had stated that she had a brother in prison in California (*see* 14 R.R. 93) and had also indicated that she did not agree with the Texas law which provides that one is an adult for criminal purposes at age 17 (*see* 14 R.R. 107–14).

726.  Prospective juror # 72, Maria de los Angeles Lopez, had indicated that she had friends who were gang members and that she knew someone who had been killed in a drive-by shooting. *See* 17 R.R. 8–12. She had also stated that she was nervous and scared about talking about gangs. *See* 17 R.R. 18-19.

727.  Moreover, the State only exercised a peremptory challenge against Ms. Lopez after it had first urged a motion for cause and had had said challenge denied. *See* 17 R.R. 37–38.

728.  Prospective juror # 86, Graciela Martinez Rodriguez, had said that she had an uncle who had a pending murder charge. *See* 18 R.R. 7–-80.

729. Prospective juror # 126, Oralia Ordaz, had stated that she felt that, if the defendant was found guilty and "they kill him right away", that he would get off easy and not pay for the lives he took. See 22 R.R. 7–8.

730. Prospective juror # 127, Elsa Odela Jimenez, had indicated that she does not approve of the death penalty on her questionnaire. *See* Question 29 in Ms. Jimenez' questionnaire, found in 62 R.R. When asked about this answer, she said that God is the only one who can take a life. *See* 22 R.R. 76.

731. Ms. Jimenez had also indicated that she had relatives in prison. *See* 22 R.R. 96–98.

732. Finally, prospective juror # 159, Maribel Garza, had stated that she was an educational diagnostician who assessed students for intelligence and learning disabilities. *See* 24 R.R. 2–3.

733. [Ramirez's] claim that the State had discriminated against female prospective jurors also does not make sense on a practical level. After all, why would the State want to exclude women from serving in a case involving the murder of six individuals, one of whom was killed in front of his mother?

3 Supp. SHCR 929–34.

55. *Batson v. Kentucky*, 476 U.S. 79 (1986) outlines the law concerning proof of discrimination in jury selection.

56. *Batson* imposes a three-part process for determining whether peremptory challenge has been exercised with improper discriminatory intent, which requires (1) that the party opposing the challenge establish a prima facie case of purposeful discrimination; (2) if that occurs, that the party making the challenge offer a race-neutral (or gender) explanation for said challenge; and (3) that the trial court then determine whether the party opposing the peremptory

177

challenge has established purposeful discrimination. *See Batson*, 476 U.S. at 96–98.

57.  [Ramirez] claimed that the State improperly struck women from his jury. [Ramirez] did not make this claim at trial.

58.  The record in this case show clear neutral reasons for each strike made by the State. *See* Findings of Fact 720–732.

3 Supp. SHCR 946.

Ramirez fails to address these findings. The information supplied by these veniremembers provided gender-neutral reasons that would lead a prosecutor to believe that they were not likely to look favorably on the State's case. 3 Supp. SHCR 923–34. Veniremember Cavazos stated that she really did not believe in the death penalty. 3 Supp. SHCR 932. Veniremember Pena provided a number of gender-neutral bases for the State's exercise of a peremptory strike. 3 Supp. SHCR 932. First, she stated that her religious beliefs would prevent her from being fair and impartial in a case involving the death penalty. 3 Supp. SHCR 932; 13 RR 177. Second, she explained that her brother was incarcerated. 13 RR 187–89. Finally, she explained that she had previously experienced an unpleasant encounter with law enforcement. 13 RR 190. Similarly, Veniremember Gomez Munoz related multiple aspects of her life that would cause a prosecutor concern. 3 Supp. SHCR 932–34; 14 RR 1–62. Both she and her brother had been in trouble with the law. 3 Supp. SHCR 932; 14 RR 4–5, 30. Further, Gomez Munoz stated that although she had been

178

assaulted by her estranged husband on three occasions, he had never been arrested or prosecuted. 3 Supp. SHCR 932–33.; 14 RR 44–47. Veniremember Navarro had a brother in prison and expressed her disagreement with the law that provides that a person over seventeen is prosecuted as an adult. 3 Supp. SHCR 933; 14 RR 107–14. Veniremember Lopez had friends who were members of a street gang. 3 Supp. SHCR 933; 17 RR 8–9. She knew someone who had been killed in a gang-related drive-by shooting. 3 Supp. SHCR 933; 17 RR 11–12. Finally, she stated that there were things that she was not saying about gangs because she was nervous and scared. 3 Supp. SHCR 933; 17 RR 18–19. Veniremember Martinez Rodriguez had an uncle who had a pending murder charge. 3 Supp. SHCR 933; 18 RR 76–80. Veniremember Ordaz "stated that she felt that, if the defendant was found guilty and 'they kill him right away', that he would get off easy and not pay for the lives he took. *See* 22 RR 7–8." 3 Supp. SHCR 934. Veniremember Jimenez did not approve of the death penalty and that God is the only one who should take a life. 3 Supp. SHCR 934; 322 RR 76–77. Veniremember Jimenez also had relatives in prison. 3 Supp. SHCR 934; 322 RR 96–98. Finally, Veniremember Garza "stated that she was an education diagnostician who assessed students for intelligence and learning disabilities. *See* 34 RR 2–3. The statements made by these veniremembers provided ample cause for a prosecutor to strike them—regardless of gender.

179

The habeas reasonably concluded that "[t]he record in this case show clear neutral reasons for each strike made by the State." 3 Supp. SHCR 946.

In the present case, Ramirez states that "[t]he State used 11 of its 15 peremptory strikes (this amounted to 73% of its peremptory strikes) to remove women from Ramirez's jury." ECF 67 at 303. Based upon this, Ramirez concludes that trial counsel could have established a prima facie case of discrimination. ECF 67 at 303. However, Ramirez does not acknowledge that 1/3 of the jury that served on Ramirez's case were women. 2 CR 511. Additionally, of the two alternate jurors, one of them was a woman. 2 CR 511.

Standing alone, the fact that the State used 73% of its strikes to exclude female veniremembers does not itself provide a viable prima facie case of discrimination. "In deciding whether the defendant has made the requisite [prima facie] showing, the trial court should consider *all* relevant circumstances." *Batson*, 476 U.S. at 96. Those circumstances would have included, among other things, the ultimate composition of the jury and the answers the veniremembers had given during individual voir dire. Therefore, the only evidence Ramirez presents to this Court are simple statistics about the percentage of female veniremembers struck, he does not demonstrate that a *Batson/J.E.B.* challenge would have progressed beyond the initial prima facie stage.

Further, to successfully prove an ineffective assistance of counsel for failure to challenge the State's use of peremptory strikes to improperly remove members of a particular gender, it is insufficient to bring forth evidence that merely establishes the prima facie case. Ramirez must demonstrate an actual *J.E.B.* violation occurred. *Herbert,* 890 F.3d at 220. Ramirez wholly fails to surmount this hurdle. Furthermore, with regard to the single sentence alleging racial discrimination, Ramirez fails to successfully demonstrate a prima facie case that the State improperly exercised its peremptory strikes on the basis of race.

Ramirez fails to demonstrate the unreasonableness of the state court's adjudication. Furthermore, reviewed de novo, the issue is meritless. It should be denied.

## H.    Continuance claim (Claim 3(C)(8))

In Claim 3(C)(8), Ramirez contends that trial counsel were ineffective for failing to request continuances. ECF 67 at 304–06. This issue was not presented for adjudication in state court. It is unexhausted and therefore procedurally barred. *See supra* Answer IV. Alternatively, the claim is meritless.

The claim is simple. Ramirez says that trial counsel's failure to request continuances despite being unprepared constituted deficient performance and

prejudiced him. ECF 67 at 304–06. However, Ramirez has not proven either prong of *Strickland* and, therefore, his claim is meritless.

First, Ramirez must show that counsel's actions, or inactions, fell below an objective standard of reasonableness by not moving the court to continue the case. However, Ramirez does not demonstrate that asking the court to continue the case would have had a chance of being successful. Just as counsel cannot be deemed ineffective for making a frivolous objection, so too counsel should not be found to have provided ineffective assistance for failing to make a formal request when it was obvious that the request would have been denied. *See* 4 RR 40. Based upon the court's comments, the trial would go forward as scheduled. Trial counsel was well aware of the court's position on the matter. Making repeated requests to continue matters would have done nothing more than aggravate the judge. This is something counsel would have seen firsthand and as experienced trial attorneys, knew to try to avoid at all costs.

Furthermore, because it is clear that the court would not have continued the case, Ramirez is unable to show that he was prejudiced by the failure to request one. 4 RR 40. Additionally, Ramirez must show, not only that the request to continue would have been granted, but that the continuance would have benefitted him such that the result of the proceeding would have been different. As has been previously explained, the presence of the two out of state witnesses would not have changed the result of Ramirez's trial. Furthermore,

because Ramirez cannot prove that counsel was ineffective at trial, he cannot prove that, with the benefit of a continuance, counsel's performance would have changed the verdict at guilt or punishment.

Ramirez completely fails to overcome the presumption that he received effective assistance of counsel. This sub-issue is unexhausted, procedurally barred, and meritless. It should be denied.

## I.    Innocence claim (Claim 3(C)(9))

In Claim 3(C)(9), Ramirez professes that trial counsel were ineffective for failing to investigate and raise innocence claims. ECF 67 at 306–08. This claim was presented in Ramirez's subsequent state application as issue two. 3 SHCR 1155–63. Therefore, it is procedurally defaulted. *See supra* Answer IV. Alternatively, the claim is meritless.

This claim is essentially another complaint that trial counsel did not do enough to keep Ramirez's statement out of evidence. ECF 67 at 307 ("Trial counsel were ineffective for failing to investigate and present evidence of Ramirez's innocence. The prosecution's case against Ramirez rested almost exclusively on his statement to the police."). Considering what they had to work with, trial counsel's performance at the guilt phase of trial cannot be considered ineffective. Trial counsel was up against an enormous hurdle. They had a client who was an admitted TCB (Tri-City Bombers or Bombitas) gang member with the tattoos and associates to prove it. *See* 35 RR 170; 36 RR 13–

16; 47 RR Ex. 312. The offense was clearly committed by TCB members against members of a rival gang. Ramirez had provided a detailed confession in which he acknowledged that he had taken on a leadership role at points during the commission of the crime. *See* 45 RR Ex. 102a. The options for raising innocence claims were exceedingly slim. Trial counsel attempted to attack the most damning piece of evidence—the defendant's own words in the form of his statement to law enforcement. As noted above, none of Ramirez's post hoc criticisms show that trial counsel's actions related to the attempted suppression of Ramirez's statement were ineffective. Having been unsuccessful at keeping the statement out, counsel nonetheless attempted to sow doubt about the voluntary nature of the statement in the minds of the jurors. *See generally* 29 RR 47–139, 165–69; 36 RR 108–27. Counsel unsuccessfully attempted to get a jury instruction that would focus the jurors on the evidence that the statement was not taken in a proper manner. 2 CR 514–15.

Ramirez argues that trial counsel had "evidence that the actions which Ramirez attributed to himself during the recorded police statement were committed by another man named Lenny, according to co-defendant, Marcial Bocanegra." ECF 67 at 307. However, the affidavit where Bocanegra states that Ramirez was not "Lenny" was not executed until the state habeas proceedings. 4 SHCR 1405. Therefore, trial counsel could not have had that

information at trial and, other than Ramirez himself, there are no other witnesses that could have testified that Ramirez was not "Lenny."

Furthermore, there was little to be gained by quibbling about who may have ever been called Lenny. Bocanegra did not testify at trial nor was his statement entered into evidence. Therefore, his description of the crimes committed by "Lenny" was not specifically before the jury. Additionally, while during his interview Ramirez confessed to actions that Bocanegra had previously attributed to "Lenny," the name "Lenny" is not mentioned by anyone during Ramirez's interview. 45 RR Ex. 102A. Since the identity of "Lenny" was not a major issue at Ramirez's trial, he cannot demonstrate that trial counsel was deficient for failing to present evidence on the subject. Similarly, Ramirez cannot demonstrate he was prejudiced by the failure to present evidence that he had never been known as "Lenny."

In short, counsel's performance was reasonable in light of the facts of the case they were given. Ramirez has not demonstrated that counsel was deficient or that any alleged deficiency prejudiced him. This sub-issue is procedurally defaulted and meritless. It should be denied.

## J.    Confession claim (Claim 3(C)(10))

In Claim 3(C)(10), Ramirez asserts that his trial counsel were "ineffective for failing to present evidence to the jury that his confession was involuntary, false, and unreliable." ECF 67 at 308. This claim was not presented to the state

court. It is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, it is meritless.

According to Ramirez, trial counsel should have done the following:

1. Investigated and presented evidence of the discrepancies in the detective's testimony;

2. Presented witnesses Berta Ramirez, (Ramirez's sister), Ricardo Garcia (the booking officer), and Jerry Garcia (a friend) to confirm that Ramirez requested a lawyer, and an expert "to explain the effects of Rohypnol;"

3. Presented "evidence that Ramirez falsely admitted to committing acts attributable to another man named Lenny;" and

4. Introduced the arrest video "to further undermine the detectives' testimony about his state of mind."

ECF 67 at 309. In other words, this claim presents some of the same complaints about trial counsel's performance at trial that Ramirez raised in relation to trial counsel's performance at the suppression hearing in Claim 3(C)(2) above. The analysis of the impact of the evidence is equally relevant here. Similar to his complaint in Claim 3(C)(2), Ramirez does not prove that if the evidence had been presented, the jury would have disregarded his confession.

Ramirez further appears to suggest that trial counsel should have tried to present much of the mitigation evidence from Claim 1 to the jury in an attempt to prove that his confession was false. ECF 67 at 309. Ramirez provides no caselaw suggesting that trial counsel must present what would

constitute a mitigation case to demonstrate a defendant's "susceptibility to influence and ultimate willingness to admit to acts." ECF 67 at 309. In other words, he provides no briefing that trial counsel should, or can, present mitigating evidence in the guilt-innocence phase of trial. Nor does Ramirez provide any reasonable basis to show that a trial court would have admitted such evidence. ECF 37 at 309. This sub-issue is unexhausted and, as a consequence, procedurally barred, and it is without merit. It should be denied.

## K.      Preservation for review claim (Claim 3(C)(11))

In this sub-part to Claim 3, Ramirez claims that trial counsel failed to properly object to various evidence and procedures at trial in order to preserve the issues for appeal. Within sub-part eleven to Claim 3, Ramirez specifies five sub-points. ECF 67 at 310–16.

As a preliminary matter, *Strickland* applies only to the proceeding in which the alleged conduct occurred. Its protections have never been extended to permit the defendant to demonstrate prejudice by pointing to harm that occurred in a subsequent proceeding. Therefore, Ramirez's attempt to extend *Strickland* to include a situation where trial counsel's alleged deficiencies prejudiced his appeal is foreclosed by the principles of *Teague*. Furthermore, each of his complaints are meritless.

### 1. Failure to object to gruesome photographs (Claim 3(C)(11)(a))

In Claim 3(C)(11)(a), Ramirez alleges that his trial counsel was ineffective in failing to object to what he refers to as "some" of the "excessively gruesome photographs." ECF 67 at 310–11. This claim is unexhausted and procedurally barred.[36] *See supra* Answer IV. Alternatively, the claim fails under a de novo review of the merits.

Fifth Circuit caselaw indicates that admitting gruesome photographs of the victim's body in a murder case ordinarily does not rise to an abuse of discretion where those photos have nontrivial probative value. *See, e.g., United States v. Fields,* 483 F.3d 313, 355 (5th Cir. 2007). Nonetheless, evidentiary rules provide that evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. "However, to warrant exclusion, the danger of unfair prejudice—on this ground or any other—must *substantially* outweigh the probative value of the evidence." *Id.* Therefore, "the application of Rule 403 must be cautious and sparing. Its major function is limited to excluding matter of scant or cumulative probative force,

---

[36] Ramirez raised two claims on direct appeal related to the admission of the allegedly gruesome photographs. However, these claims were that the trial court erred in admitting them rather than trial counsel was ineffective for failing to object. *Ramirez*, 2007 WL 4375936 at *18.

dragged in by the heels for the sake of its prejudicial effect." *United States v. Pace,* 10 F.3d 1106, 1116 (5th Cir. 1993).

Ramirez's argument on this point is vague. At the same time he is complaining that trial counsel failed to "state a coherent objection," Ramirez fails to distinguish which photographs were objected to and which ones he now claims should have been objected to. ECF 67 at 310–11. On direct appeal, Ramirez alleged that the trial court erroneously admitted State's Exhibits 26 through 95. *Ramirez*, 2007 WL 4375936, at *18. As Ramirez objected at trial to the admission of exhibits 69–71, 74–80, 85–89, and 93–95, the CCA found any claim regarding the other photographs to be waived. *Ramirez*, 2007 WL 4375936, at *18.

However, Ramirez only provides this Court with one specific complaint— that trial counsel's objections to exhibits 88 and 89 did not specifically reference that the photographs contained images of "the victims' wounds and brain matter." ECF 67 at 310. Ramirez does not explain how using the words "brain matter" would have made any difference in the trial court's ruling or the CCA's decision on appeal. As to Ramirez's only specific argument concerning exhibits 88 and 89, trial counsel did preserve the issue on appeal through objection at trial, but the CCA found them properly admitted. *Ramirez*, 2007 WL 4375936, at *18. Thus, Ramirez fails to show deficiency or prejudice on this point.

Furthermore, there is no explanation of what he believes trial counsel should have stated when objecting to the other photographs that were unsuccessfully challenged—exhibits 69–71, 74–80, 85–87, and 93–95—or those that weren't challenged. Ramirez also throws in a sentence complaining about trial counsel's failure to object to the admission of the video taken by police of the crime scene, but similarly does not explain what was objectionable about the video. ECF 67 at 311.

Ramirez does not claim that the photographs were not probative. He merely complains that they were haunting and inflammatory. ECF 67 at 311. However, the question is not whether the evidence was prejudicial to Ramirez. The question is whether the probative nature of the photographs is substantially outweighed by their prejudicial nature. Ramirez does not address this balancing test.

Nor does Ramirez explain what was objectionable about the video or the photographs, demonstrate that counsel was deficient for failing to object to them, prove that such an objection would have likely succeeded, or demonstrate that he was prejudiced by counsel's deficiency at trial or on appeal. The claim is conclusory and should be denied as such. *See, e.g.*, *Miller*, 200 F.3d at 282.

Because Ramirez cannot show that the photographs were improper, he cannot show that his trial counsel were ineffective for failing to preserve the

record so as to allow him to complain about them on appeal. This claim is unexhausted and, as such, procedurally barred, meritless, and should be denied.

### 2. Failure to object to untranslated statements (Claim 3(C)(11)(b)).

Claim 3(C)(11)(b) alleges that trial counsel were ineffective for failing to object to certain statements that were admitted without an official translation. ECF 67 at 311–12. This claim is unexhausted, procedurally barred, and inadequately briefed. Therefore, the claim should be denied. *See supra* Answer IV. Alternatively, the claim fails on the merits even on a de novo review.

The entirety of this claim is as follows:

> Ramirez made several statements in Spanish during his recorded statement. Without objection from Ramirez's counsel, Detective Ramiro Ruiz testified regarding *his* interpretation of Ramirez's statements. (29 RR at 38–40, 42–43). The State then introduced a transcript of Ramirez's untranslated statement as an exhibit for the jury to review. (29 RR at 36–37.) Trial counsel were ineffective for failing to object and argue that these statements must be translated into English for the jury's consideration. Trial counsel had a duty to object to false, misleading, or unsupported statements, but they failed to do so. Ramirez was prejudiced.

ECF 67 at 311–12.

As is evident from the text above, not only does Ramirez not address the procedural bar on this issue, but he also does not present enough facts or law to allege a constitutional claim for relief. *See, e.g.*, *Miller*, 200 F.3d at 282. Ramirez does not explain on what grounds counsel should have objected. There

is no reason to believe that an objection would have been successful. He does not explain if, and how, Ramiro Ruiz's translation was inaccurate. He does not explain how the inaccurate translation, if there was one, prejudiced him. Similarly, he does not explain the same for the untranslated transcript of the statement. This claim is unexhausted, procedurally barred, inadequately briefed, conclusory, and meritless. It should be denied.

### 3. Failure to challenge admission of other bad acts (Claim 3(C)(11)(c))

In Claim 3(C)(11)(c), Ramirez complains that trial counsel failed to object when "the State solicited testimony implying Ramirez was connected to other violent crimes." ECF 67 at 312. This claim is unexhausted, procedurally barred, and inadequately briefed. *See supra* Answer IV. It should be denied on that basis alone. Alternatively, the claim fails on the merits even on a de novo review.

It seems that Ramirez believes that trial counsel should object to any incidental testimony about the existence of any crime, other than the one the defendant is charged with, at trial. The section heading of Ramirez's claim alleges that his trial counsel failed "to challenge admission of other bad acts." ECF 67 at 312. However, in the three sentences of briefing on the issue, Ramirez complains about a single sentence uttered by Detective Ramiro Ruiz during his testimony. ECF 67 at 312. This is the only identified bad act that

Ramirez believes trial counsel should have objected to, specifically Detective Ramiro Ruiz's "referencing the 'Donna murders,' of which Ramirez was never suspected and during which Ramirez was in the custody of TYC." ECF 67 at 312. However, when the context of that statement is reviewed, it becomes obvious why trial counsel did not object—any objection would have been completely baseless and nonsensical. Making such an objection would have done nothing more than irritate the judge and make counsel look foolish before the jury.

Detective Ramiro Ruiz was testifying about the investigation to identify the actual names of individuals for whom they only had nicknames. 28 RR 47–55. Detective Ramiro Ruiz explained that, while investigating identities, he met with a member of the Hidalgo County Sheriff's Office. 28 RR 50. The question and response are as follows:

Q.   Now, what was it that the Sheriff's Office was doing at that time that caused you and the Sheriff's Office to get together?

A.   They were conducting an investigation of the shooting of the women in Donna.

28 RR 50. After this exchange, next question was about the true identity of an individual who had gone by the nickname, "El Gallo." The "shooting of the women in Donna" was not discussed further. 28 RR 50.

The testimony Ramirez complains of here did nothing more than explain how the investigation progressed. There was no allegation, or implication, that

193

Ramirez was a part of another crime. There was no basis for trial counsel to lodge an objection. The introduction of this statement did not prejudice Ramirez. The failure to object to its admission was not deficient. Any objection to the statement would have been futile, so relief may not be had. *See, e.g.*, *Ward v. Dretke*, 420 F.3d 479, 498 (5th Cir. 2005) (counsel is not ineffective for failing to lodge an objection that was likely futile). This claim is unexhausted and procedurally barred, inadequately briefed, and meritless in the alternative. It should be denied.

### 4. Failure to contest the State's evidence of gang membership. (Claim 3(C)(11)(d))

In yet another inadequately briefed claim, Claim 3(C)(11)(d), Ramirez avows that "trial counsel did nothing to contest the State's evidence" of gang membership. ECF 67 at 312–13. This claim is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, as it is inadequately briefed, the claim fails on the merits.

Ramirez seems allege that trial counsel did not do enough to disclaim his membership in the Tri-City Bombers street gang.[37] He thinks that counsel should have objected to Detective Robert Alvarez's qualifications as a gang expert. ECF 67 at 313. However, Ramirez keeps the basis for this objection to

---

[37] Ramirez fails to acknowledge trial counsel's attempt to prevent Officer Mendiola from testifying about Ramirez's statement at booking when he admitted to being a member of the "Bombitas." 35 RR 50.

himself. Ramirez further believes that trial counsel should have objected to Detective Alvarez's "unsupported testimony" that "photographs are an important way to identify gang membership" and his identification that "everyone in the photograph was a TCB member." ECF 67 at 313. Yet, there is nothing offered to suggest that the use of photographs is not an acceptable way to assist in identifying gang members. Ramirez also argues that trial counsel should have objected to the admission of State's Exhibit 312. ECF 67 at 313. However, Detective Alvarez testified that he recognized every individual in the photographs and that he recognized each of them to be members of the TCB gang. 36 RR 15–17. There is nothing objectionable about the testimony or the photograph. There was no need to even be qualified as a gang expert to be able to testify to this information.

Furthermore, Ramirez complains that trial counsel "even solicited information about gangs that benefited the State" from Detective Alvarez. ECF 67 at 313. However, a review of the reporter's record reveals that the entirety of the testimony that Ramirez points to was elicited outside the presence of the jury during trial counsel's voir dire of Detective Ramirez on his qualifications as an expert, during which trial counsel was attempting to convince the court not to qualify Alvarez as an expert. 35 RR 66–70. Therefore, trial counsel's questioning of Alvarez was not ineffective. She was attempting to explore the witness's knowledge and opinions as an expert. This is exactly the purpose of

this type of hearing. Rather than being ineffective, this was trial counsel attempting to do what Ramirez says he wanted them to do—keep Alvarez out as a gang expert.

Ramirez has not demonstrated that trial counsel's actions fell below an objective standard of reasonableness. Furthermore, Ramirez has not demonstrated that any alleged deficiency prejudiced him. This unexhausted and procedurally barred claim is also inadequately briefed and meritless. It should be denied.

### 5. Failure to challenge the charge language, request an instruction on conspiracy criminal responsibility, and ask for special verdict forms. (Claim 3(C)(11)(e))

Claim 3(C)(11)(e) is a multifarious complaint where Ramirez essentially raises three issues. First, he argues that "[t]rial counsel were ineffective for failing to challenge the charge in Count One as being insufficient to sustain a capital murder conviction." ECF 67 at 313. Second, Ramirez complains that trial counsel was "ineffective for failing to request that the jury be instructed on criminal responsibility for the anticipated result of a conspiracy under Texas Penal Code Ann. § 7.02(b) (2003)." ECF 67 at 314. Finally, Ramirez argues that trial counsel was ineffective for failing "to request special verdict forms." ECF 67 at 314. Ramirez did not raise these issues in the state court and, therefore, the claims are unexhausted and procedurally barred in this

Court. *See supra* Answer IV. Alternatively, they are inadequately briefed, conclusory, and without merit.

With regard to Ramirez's complaint that trial counsel failed to challenge the charge in Count One because it was insufficient to sustain a capital murder conviction, his entire argument is that the charge does not "adequately ensure sufficient culpability under *Tison v. Arizona*." ECF 67 at 313–14. According to Ramirez, his trial attorneys should have raised this objection to the trial court. ECF 67 at 313–14. This is the entirety of Ramirez's briefing on this issue.

Although the briefing does not specify, it appears that Ramirez is challenging his punishment jury charge. In the charge, special issue number two addressed any concerns under *Tison*. 2 CR 562. That special issue required the jury to find either that Ramirez himself caused the death of one or more of the victims or that he "intended to kill the deceased or another or anticipated that a human life would be taken." 2 CR 562. This charge sufficiently addresses the concerns under *Tison*.

Because the charge was appropriate, trial counsel was not deficient for failing to object to it. Counsel is not deficient for failing to make a frivolous objection. *Green v. Johnson,* 160 F.3d 1029, 1037 (5th Cir. 1998). Furthermore, because the charge was appropriate, even had counsel objected, the objection would have failed.

Ramirez next argues that

> Trial counsel failed to request critical instructions [under Texas Penal Code §7.02(b)] to assist the jury's understanding of the requisite level of culpability to warrant a capital conviction, and the court neglected to instruct the jury appropriately. Trial counsel's failure to request clarifying instructions on key issues, regarding the capital murder charges, prejudiced Ramirez.

ECF 67 at 314. Trial counsel was not deficient for failing to request a jury instruction under § 7.02(b). 2 CR 539. Ramirez was not charged and convicted as a conspirator. 2 CR 539. Rather, he was charged as a principal or as a party to the offense pursuant to Texas Penal Code § 7.02(a). Therefore, Ramirez's jury charge on guilt included the appropriate instructions on the law of parties pursuant to that code section. 2 CR 539. Because § 7.02(b) was not relevant to Ramirez's case, trial counsel was not deficient for failing to request a jury instruction based upon it. As such, Ramirez could not have been prejudiced by the failure to request an inapplicable jury instruction.

Finally, as far as his complaint about trial counsel's failure to request a particular verdict form, Ramirez is not clear as to what kind of form should have been requested. ECF 67 at 313–15, 348–50, 394. Here, in Claim 3(C)(11)(e), Ramirez argues that the special forms should have been used due to the "complexities and seriousness of Ramirez's case required the jury to make individualized factual findings." ECF 67 at 314. He states that the need for these "special" forms "became evident in Ramirez's direct appeal

proceedings when the CCA ruled that Ramirez had been convicted twice of the same crime." ECF 67 at 314–15. According to Ramirez, "[h]ad trial counsel requested special verdict forms, the CCA would have known more about the jury's decision." ECF 67 at 314–15.

However, because Ramirez fails to specify what trial counsel should have requested, he cannot show that trial counsel was deficient. Similarly, without suggesting what counsel failed to ask for, Ramirez cannot demonstrate that he was prejudiced by counsel's failure. Ramirez has an obligation to state with *specificity* the factual and legal basis of his federal constitutional claims. *See, e.g.*, *Koch*, 907 F.2d at 530 ("Mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue."); Rule 2, 28 U.S.C. § foll. 2254. In short, nothing in Ramirez's briefing under Claim 3(C)(11)(e) raises a claim for relief. The issue is unexhausted, procedurally barred, inadequately briefed, conclusory, and alternatively meritless. It should be denied.

### 6. Failure to object to Ramirez's improper confinement and excessive security presence in front of the jury. (Claim 3(C)(11)(f))

In Claim 3(C)(11)(f), Ramirez alleges that he received ineffective assistance of counsel because his trial attorneys failed to object to the "shackling and to the excessive security presence in the courtroom." ECF 67 at 315. This claim is unexhausted and procedurally barred because it was never

raised in state court. *See supra* Answer IV. Alternatively, it is inadequately briefed, conclusory, and without merit.

Ramirez argues that he "had a due process right to be tried without physical restraints absent a compelling justification those restraints were necessary." ECF 67 at 315. Ramirez claims that his legs were shackled during the trial and that there was excessive security in the courtroom. ECF 67 at 315. Ramirez does not provide citations to the record to support these allegations. Nonetheless, according to Ramirez, "[c]ounsel had a duty to protect Ramirez from the inherent prejudice of shackling but failed to do so." ECF 67 at 315.

Ramirez claims that he was prejudiced by trial counsel's failure to object to the alleged shackling and excessive security in two ways. First, he alleges the security measures negatively impacted his presumption of innocence and denied him an impartial jury. ECF 67 at 316. Second, he claims that "restraints inhibit the defendant, thereby impeding his ability to assist counsel in his own defense." ECF 67 at 316. Of course, for any of this to be the case, (1) there must have actually been excessive security and/or shackling; (2) the jury must have been able to observe and recognize the excessive security and/or shackling, (3) the shackling must have affected Ramirez's ability to interact with counsel, and (4) any hypothetical objection would have had to have been successful. Ramirez provides no proof of any of these necessary circumstances. Nor does

he prove that trial counsel had to make such an objection or that the result of his trial would have been different had they done so. The claim is conclusory and should be denied as such. *See, e.g.*, *Miller*, 200 F.3d at 282.

Ramirez does not provide the necessary factual allegations supported by the record to allege a constitutional claim for relief. The issue is unexhausted, procedurally barred, inadequately briefed, conclusory, and meritless. It should be denied.

### L.    Complete record claim (Claim 3(C)(12))

Claim 3(C)(12) is a complaint that trial counsel failed to make sure that a proper record was made of all of the proceedings. ECF 67 at 317–19. The issue is unexhausted and procedurally barred as it has never been presented to a state court. *See supra* Answer IV. Alternatively, it is meritless.

According to Ramirez, trial counsel "made a practice of conducting proceedings off the record and of not making objections." ECF 67 at 317. Specifically, Ramirez says that,

> counsel failed to request the recording of relevant portions of the trial, including bench conversations, throughout pretrial and guilt phase proceedings. (*See, e.g.*, 6 RR at 55; 7 RR at 12–13, 102; 26 RR at 1; 27 RR at 39, 147; 28 RR at 61, 108.) And trial counsel failed to incorporate relevant arguments and case law into the record. (*See, e.g.*, 7 RR at 138–39, 179.)

ECF 67 at 319.

However, there is no requirement that every single word of a trial must be taken down. This is recognized by the cases cited by Ramirez that indicate there must be a "record of sufficient completeness." ECF 67 at 319. Ramirez fails to provide caselaw saying that if trial counsel allows any conversations to occur off the record and without objection, such behavior is automatically ineffective. *See Green,* 160 F.3d at 1045.

Ramirez seems to believe that because the claim relates to the failure to make a record, he does not have to demonstrate prejudice. He is wrong. In *Green*, the Fifth Circuit found that a claim that trial counsel failed to ensure there was a record of a pretrial suppression hearing and a bench conference did not warrant habeas relief unless the petitioner made a showing of actual prejudice. *Id.*

Here, Ramirez does not explain why it was deficient for trial counsel not to insist on a record on the occasions he references. He certainly makes no attempt to demonstrate that he was prejudiced by the lack of record. Ramirez does not meet his burden under *Strickland*. The claim should be denied because it is unexhausted and therefore procedurally barred, inadequately briefed, and meritless.

### M.    Cumulative effect claim (Claim 3(C)(13))

Ramirez alleges that he was "prejudiced by the cumulative effect of trial counsel's deficiencies." ECF 67 at 319–20. However, this claim was not

presented to the state courts and is therefore unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, the claim is meritless.

Alternatively, "[f]ederal habeas relief is only available for cumulative errors that are of a constitutional dimension." *Coble v. Dretke*, 444 F.3d 345, 355 (5th Cir. 2006) (citing *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997)). It is well-settled that the cumulative error doctrine requires a showing that constitutional error occurred during the petitioner's state court trial. *See Young v. Stephens*, 795 F.3d 484, 494 (5th Cir. 2015) (noting petitioner's failure to demonstrate any constitutional error committed during his trial, as required to satisfy the cumulative error doctrine); *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007) (federal habeas relief is only available for cumulative errors that are of a constitutional dimension); *Miller*, 200 F.3d at 286 n.6 (absent constitutional error, there is nothing to cumulate); *Jackson v. Johnson*, 194 F.3d 641, 659 n.59 (5th Cir. 1999) (cumulative error doctrine provides relief only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness); *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992).

In this case however, none of the alleged errors could have cumulatively caused a suspect verdict, due to the fact that the individual claims of error lack merit. Thus, there are no errors to cumulate. *See United States v. Bell*, 367 F.3d 452, 471 (5th Cir. 2004) (reversal under cumulative error doctrine

unwarranted where claims did not "so fatally infect the trial that they violated the trial's fundamental fairness"); *Westley v. Hudson*, 83 F.3d 714, 726 (5th Cir. 1996) (holding that "[m]eritless claims or claims that are not prejudicial [or claims that are procedurally barred] cannot be cumulated, regardless of the total number raised"). As Ramirez's other claims of IATC are meritless, so too is this one.

## IV. The Trial Court Did Not Commit Error in Ramirez's Case That Violated His Constitutional Rights. (Claim 4)

Claim 4 is a multipart claim where Ramirez details a further eighteen claims of trial court error. ECF 67 at 321–351.

### A. As neither had a conflict with Ramirez, the trial court did not commit error by appointing Alma Garza and Rolando Garza. (Claim 4(A))

Claim 4(A) is a parallel to Claim 3(A). ECF 67 at 278–81, 321–23. Here, Ramirez advances that the trial court, by assigning Alma Garza and Rolando Garza, erred by appointing unqualified and conflicted counsel. ECF 67 at 321–23. This claim was never presented to the state courts which means it is procedurally defaulted. *See supra* Answer IV. Alternatively, it is without merit.

The factual basis for this claim is the same as that found in Claim 3(A). The same complaint is merely repackaged as a claim that the trial judge violated Ramirez's rights by appointing allegedly conflicted counsel. The Director incorporates the entirety of the briefing for that issue herein. As

204

counsel was not conflicted, the trial court did not err in appointing them, or keeping them, on Ramirez's case.

Additionally, Ramirez fails to provide this Court with any precedent that requires a trial court to sua sponte explore trial counsel's family lineage to ensure there are no conflicts. What he seeks is a new rule, putting the onus on trial courts, rather than counsel, to ensure conflict-free representation, but *Teague* bars relief.

This claim is unexhausted and procedurally barred, barred by non-retroactivity principles, and alternatively meritless. It should therefore be denied.

## B.    The trial court did not err in admitting the crime scene and autopsy photographs. (Claim 4(B))

Claim 4(B) alleges that the trial court erred in admitting what he refers to as "excessively gruesome photographs." ECF 67 at 310–11, 323–24. This claim was not presented to the state court on direct appeal or on state habeas.[38] Therefore, it is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, the claim fails under a de novo review of the merits.

---

[38] Ramirez did raise a claim on direct appeal that the trial court improperly admitted photographs under Texas law. *Ramirez,* 2007 WL 4375936, at *18–19. However, because that claim did not raise a federal constitutional question, it did not exhaust the claim for purposes of federal habeas review. *See Wood v. Quarterman,* 503 F.3d 408, 413 (5th. Cir. 2007).

### 1.    Law

"According to the Supreme Court, the admission of evidence may violate the Due Process Clause of the Fourteenth Amendment if the evidence is 'so unduly prejudicial that it renders the trial fundamentally unfair.'" *Wood,* 503 F.3d at 414. Evidence that is improperly admitted "will justify habeas relief only if the admission was a crucial, highly significant factor in the defendant's conviction." *Neal v. Cain*, 141 F.3d 207, 214 (5th Cir.1998). Even if the admission of evidence was constitutional error, a claim must nonetheless fail if a petitioner does not show that the [evidence] had a substantial and injurious effect or influence in determining the jury's verdict." *Wood*, 503 F.3d at 414 (quoting *Janecka v. Cockrell,* 301 F.3d 316, 328–29 (5th Cir. 2002)).

### 2.    Argument

On appeal, the CCA overruled the two points of error Ramirez raised in relation to the admission of certain photographs. *Ramirez,* 2007 WL 4375936, at *18–19. In doing so, the CCA explained the following:

> In points of error twenty-two and twenty-four, [Ramirez] complains that the trial court erroneously admitted State's Exhibits 26 through 95, in violation of Rule 403 of the Texas Rules of Evidence. He asserts, "The trial court's conclusion that the photographs were more probative than prejudicial was not supported by the evidence." He further argues that the photographs "did not go to resolve any disputed issue and were calculated 'solely to inflame the minds of the jury.'"

> Although [Ramirez] complains about State's Exhibits 26 through 95, he objected only to the admission of State's Exhibits

69, 70, 71, 74 through 80, 85 through 89, and 93 through 95. He failed to object to the other photographs at issue. Thus, he has waived his complaints pertaining to State's Exhibits 26 through 68, 72, 73, 81 through 84, and 90 through 92. TEX. R. APP. P. 33.1.

Rule 403 requires that a photograph have some probative value and that its probative value not be substantially outweighed by its inflammatory nature. Tex. R. Evid. 403; *Long v. State,* 823 S.W.2d 259, 272 (Tex. Crim. App. 1991). A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case. *Long,* 823 S.W.2d at 272; *Santellan v. State,* 939 S.W.2d 155, 172 (Tex. Crim. App. 1997). The admissibility of photographs over an objection is within the sound discretion of the trial judge. *Sonnier v. State,* 913 S.W.2d 511, 518 (Tex. Crim. App. 1995).

The photographs depict the victims as they were found at the crime scene. They are in color and are approximately 8 ½" by 11" in size. State's Exhibits 69, 70, and 71 show the body of Delgado, III, lying face-down in the grass from various angles. His head injury is not visible in State's Exhibit 69, but it is visible in State's Exhibits 70 and 71. State's Exhibits 88 and 89 show Delgado, III, after he was turned over on his back. His head injury is visible in both photographs, but State's Exhibit 88 depicts his face and head at a closer angle.

State's Exhibits 74, 75, 76, and 77 show the bodies of Almendarez and Delgado, Jr., lying face-down in the east-side house. State's Exhibits 78, 79, and 80 offer closer views of their head injuries. State's Exhibits 93, 94, and 95 show their injuries from another angle, after they had been turned over onto their backs.

State's Exhibits 85 and 86 show the body of Castillo as it was found in the bedroom of the east-side house. He is lying face-down, and the gunshot wound to his buttocks is visible. State's Exhibit

207

87 shows the body of Jerry Hidalgo as he was being turned over onto his back. He is shirtless and his injuries are visible in the photograph.

The trial court admitted the photographs, ruling that they were "not duplicative" and that their probative value was not outweighed by any prejudicial effect. The trial court did not abuse its discretion in admitting the photographs. Although the photographs depict the victims' bloody gunshot wounds, they portray no more than the gruesomeness of the injuries inflicted. *Narvaiz v. State,* 840 S.W.2d 415, 429 (Tex. Crim. App. 1992). The danger of unfair prejudice did not substantially outweigh the probative value of the photographs. The photographs were relevant and probative to the jury's understanding of the crime scene and the victims' injuries. Points of error twenty-two and twenty-four are overruled.

*Ramirez,* 2007 WL 4375936, at *18–19.

In this Court, Ramirez argues that the "photographs were so unduly prejudicial that admitting them for the jury to consider rendered Ramirez's trial unfair." ECF 67 at 323. According to Ramirez, "[t]the highly prejudicial effect of these photographs easily outweighed any potential minimal probative value." ECF 67 at 324. Notably, in his argument on this point, none of the cases Ramirez cites to have anything to do with the admission of crime scene or autopsy photographs.[39] ECF 67 at 323–24.

---

[39] *Romano v. Oklahoma*, 512 U.S. 1 (1994); *Brecht v. Abrahamson*, 507 U.S. 619 (1993) (whether the prosecution's use for impeachment purposes of petitioner's post-*Miranda* silence violated due process); *Darden v. Wainwright*, 477 U.S. 168 (1986); *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) (whether certain comments by the prosecution rendered defendant's trial unfair); *Bruton v. United States,* 391 U.S. 123 (1968) (whether trying a defendant in the same proceeding as his co-defendant was unfairly prejudicial*)*.

Ramirez complains that the "photographs were highly inflammatory and were duplicative or offered no probative value." ECF 67 at 324. Ramirez does not explain which photographs were duplicative of others or how their prejudicial nature outweighed their probative value. And given the CCA's review of these photographs, albeit on state law grounds

There was a large crime scene and six separate victims. That the breadth of such a crime would require a large number of photographs to document is understood. Therefore, if any of those photographs were duplicative, the marginal prejudice that they may have added in this case is minimal. It is difficult to see how a few additional photographs showing the same thing significantly harmed Ramirez in light of the totality of the images.

This claim is unexhausted and procedurally barred. It should be denied on this basis. However, as demonstrated above, the claim must also fail on its own merits.

## C.   The trial court did not violate Ramirez's constitutional rights by requiring him to wear leg restraints. (Claim 4(C))

In Claim 4(C), Ramirez argues that he was denied due process of law and the presumption of innocence as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, because the trial court permitted Ramirez to be shackled in the presence of the jury. ECF 67 at 325–27. This claim corresponds to Claim 3(C)(11)(f). ECF 67 at 315–16. This claim

is unexhausted and procedurally barred. It should be denied. *See supra* Answer IV. Alternatively, it is meritless.

Ramirez argues that he "had a due process right to be tried without physical restraints absent a compelling justification those restraints were necessary." ECF 67 at 325. According to Ramirez, the trial court failed to determine that the shackling was necessary before requiring the restraints. ECF 67 at 325. Ramirez makes the assumption that the jurors observed the shackling and therefore his presumption of innocence was undermined. Further, according to Ramirez, "[i]n Texas, shackling a defendant is particularly prejudicial because a jury must affirmatively find that a capital defendant poses a future danger in order to impose a sentence of death." ECF 67 at 325. Ramirez sums up his argument with the conclusory, unsupported claim that "[b]ecause the restraints were not justified, the court violated Ramirez's due process rights and substantially affected his trial." ECF 67 at 326. However, Ramirez cites nowhere in the record to even support the allegation that he was wearing a leg brace.[40] ECF 67 at 325–27.

On the subject of physical restraints, the Supreme Court has held:

> Thus, the Fifth and Fourteenth Amendments prohibit the use of physical restraints *visible* to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial. Such a

---

[40] As noted in the briefing on Claim 3(C)(11)(f), Ramirez provides no record citations on that issue either.

determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.

*Deck v. Missouri*, 544 U.S. 622, 629 (2007) (emphasis added).

Ramirez provides no citation to the record to prove that he was in fact physically restrained in any way. Relatedly, he provides no citation to the record where trial counsel objected to his restraints. Nor is there any proof that the jury had any opportunity to observe the hypothetical restraints. In short, this claim is not supported by any facts, is conclusory, and should be denied as such. *See Koch*, 907 F.2d at 530 ("Mere conclusory allegations on a critical issue are insufficient to raise a constitutional issue."). The issue is unexhausted, procedurally barred, inadequately briefed, conclusory, and meritless. It should be denied.

### D.     The trial court did not fail to ensure that all of Ramirez's trial proceedings were recorded. (Claim 4(D))

In Claim 4(D), Ramirez complains that the trial court failed to ensure that the entirety of his proceedings were properly recorded. ECF 67 at 326. This claim was not raised in state courts; therefore, it is unexhausted and procedurally barred in this forum. *See supra* Answer IV. Ramirez does not acknowledge or attempt to overcome this bar. It should be denied on this basis. Nonetheless, if the claim is reviewed de novo, it is meritless.

Ramirez says that the trial court erred in "conducting numerous critical proceedings off the record during Ramirez's trial." ECF 67 at 326. Ramirez then cites to "[t]he context surrounding these unrecorded discussions" and concludes that "they involved critical subject matters, including objections to evidence or argument (*e.g.* 32 RR at 124), and discussions about witnesses (*e.g.* 32 RR at 75)." ECF 67 at 326.

A criminal defendant has the right to adequate review based upon a sufficiently complete and accurate record. *See Higginbotham v. Louisiana*, 817 F.3d 217, 222 (5th Cir. 2016).  However, "a complete verbatim transcript is not always required to ensure that a defendant's right to meaningful appellate review is satisfied." *Id.* Furthermore, habeas relief is unwarranted on claims alleging an incomplete record "barring a showing that the alleged violation resulted in actual prejudice." *Green,* 160 F.3d at 1045.

The Supreme Court has never held that defendants have a federal constitutional right to have bench conferences recorded. *See Madera v. Risley,* 885 F.2d 646, 648 (9th Cir. 1989). Ramirez does not claim otherwise. In fact, none of the cases Ramirez cites to address the constitutional right to have any particular trial proceedings recorded. *Parker v. Dugger* emphasizes the need for meaningful appellate review that considers "the defendant's actual record." 498 U.S. 308, 321 (1991). *Gregg v. Georgia* reiterates the fact that the death penalty should not be "imposed in an arbitrary or capricious manner." 428 U.S.

153, 195 (1976). Finally, *Draper v. Washington* held that a state cannot condition the grant of free transcripts to indigent defendants based on a trial judge's decision that the appellate claims are not frivolous. 372 U.S. 487, 499–500 (1963). None of these cases support the idea that Ramirez's due process rights were violated when the trial court conducted bench conferences off the record. Should a new rule to this effect be created, it would be of no benefit to Ramirez due to the non-retroactivity principles established in *Teague*.

Ramirez references four instances where conversations were conducted off the record. ECF 67 at 326. However, he does nothing more than provide cites to the reporter's record. ECF 67 at 326. There is no attempt to demonstrate that the failure to record these conversations prevented him from raising a claim on direct appeal, state habeas, or federal habeas. "A record is adequate for full appellate review so long as it contains the portions necessary to address the alleged errors below." *Higginbotham*, 817 F.3d at 222. The briefing on this claim fails to make a showing that he suffered actual prejudice from the failure to record four conversations. It is speculation and conclusory claims do not warrant relief.

This claim is unexhausted and procedurally barred Alternatively, it is conclusory and meritless. Claim 4(D) should be denied.

### E.   The trial court did not err by denying Ramirez's requests for new counsel. (Claim 4(E))

In Claim 4(E), Ramirez alleges that the trial court erred in denying his requests for the appointment of new counsel. ECF 67 at 327. This claim is unexhausted and procedurally barred and should be denied. *See supra* Answer IV. Alternatively, it is inadequately briefed, conclusory, and fails to state a claim for relief.

All Ramirez has to say on this issue is that he requested appointment of new counsel and that the trial court failed to do so. Ramirez enjoyed no constitutional right to counsel of preference. *See, e.g.*, *Green*, 160 F.3d at 1045. In any event, Ramirez provides no factual or legal bases for his claim. Therefore, the Director has nothing to respond to and it should be denied as conclusory. *See, e.g.*, *Koch*, 907 F.2d at 529.

### F.   The trial court did not err by failing to continue the suppression hearing. (Claim 4(F))

In Claim 4(F), Ramirez alleges that the trial court erred by not continuing the suppression hearing. ECF 67 at 327. Ramirez did not raise this issue in the state courts; therefore, it is unexhausted and procedurally barred in this forum. *See supra* Answer IV. Alternatively, the claim fails on the merits.

Ramirez attempts to take the trial court to task for failing to reschedule the suppression hearing when trial counsel indicated they would have difficulty ensuring that two of Ramirez's witnesses would be available to

testify. ECF 67 at 327–28. Ramirez asserts that the trial court's refusal to continue the hearing violated his constitutional right to due process of law. ECF 67 at 328.

"[T]he grant or denial of a continuance rests in the sound discretion of the trial judge and his action may be successfully questioned only by showing an abuse of the wide decisional latitude that he is given." *Kirkpatrick v. Blackburn*, 777 F.2d 272, 278 (5th Cir. 1985). When reviewing the matter on federal habeas, the question is whether the court's action denied a petitioner "a fundamentally fair trial." *Id.* "The test applied to determine whether a trial error makes a trial fundamentally unfair is whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Id.* at 278–79. "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case." *Reed v. Stephens,* 739 F.3d 753, 779 (5th Cir. 2014) (internal quotation omitted).

Although there were discussions where trial counsel indicated that a continuance would have been helpful, trial counsel never informally or formally requested one. *See* Tex. Code Crim. Proc. art 29.06. Thus, the trial court had nothing upon which to rule, so Ramirez cannot demonstrate that it abused its discretion in denying a continuance request it did not have before it, let alone proving up an erroneous ruling reaching constitutional dimensions.

215

In any event, as also discussed in the related ineffective assistance claim, Ramirez has not demonstrated that the presence of the two witnesses would have changed the result of the suppression hearing. *See supra* Claim for Relief III(B). As such, Ramirez cannot show that the refusal to continue a hearing so that those witnesses could be present denied him a fundamentally fair trial.

Finally, Ramirez has provided this Court with no case holding that a defendant has a due process right to a sua sponte continuance. Should such a rule be announced, *Teague* nonretroactivity principles prevents this Court from granting Ramirez relief.

This claim is unexhausted, procedurally barred, and *Teague* barred. It is also meritless. It should be denied.

## G. The trial court did not err in allowing testimony about Ramirez's statements during the booking process. (Claim 4(G))

In Claim 4(G), Ramirez contends that the trial court erred in admitting the statements he made during the booking process. ECF 67 at 329–31. This issue was raised to the state courts on direct appeal as issue number thirteen. *Ramirez,* 2007 WL 4375936, at *14–15. As it was properly adjudicated on the merits by the state court, Ramirez must overcome the deference owed that adjudication. He fails to do so. Alternatively, the claim fails on the merits under a *de novo* review.

### 1.   Facts

At trial, the State called Officer Robert Mendiola. 35 RR 29. When Ramirez was being booked into the Hidalgo County Jail, he was processed by Officer Mendiola. 35 RR 32–36. At trial, Mendiola testified that, as a part of the booking process, in order to obtain information necessary to maintain a safe and well-operated facility, inmates are routinely asked a series of basic questions as a part of that process. 35 RR 32–36. These questions cover topics such as identification information, addresses, medical information, previous suicide attempts, and possible gang affiliation. 35 RR 32–36. The question related to gang affiliation is asked to determine if there is reason to be concerned about placing that particular inmate in a cell with someone associated with a rival gang. 35 RR 32–36. These routine questions are administrative in nature and are not designed to obtain incriminating information from inmates. 35 RR 32–36. Mendiola testified that, in accordance with standard procedure, he asked Ramirez if he was affiliated with a gang. 35 RR 35–36. This question elicited a hearsay objection from defense counsel that was overruled. 35 RR 35–36. At this point, in compliance with a motion in limine filed by defense counsel, the attorney for the State asked to approach the bench. 35 RR 36. The State informed the Court that it intended to ask Mendiola for Ramirez's response to the gang affiliation question. 35 RR 36. Defense counsel objected again to hearsay, but also that Mendiola had not read

Ramirez his *Miranda* warnings prior to questioning him. 35 RR 37. The Court elected to excuse the jury and a discussion about the matter was had on the record. 35 RR 38–46. After the discussion, the Court recessed. 35 RR 46. When the judge returned to the bench, further argument was heard on the matter. 35 RR 46–49. The jury re-entered the courtroom where Mendiola remained on the stand and was asked further general questions. 35 RR 49–53. He testified that all of the information received by inmates during the booking process is entered into the computer. 35 RR 49–53. He had a copy of the computer printout with him, and it was tendered to defense counsel. 35 RR 49–53. Mendiola left the stand without answering the question of what Ramirez had said in response to the gang affiliation question. 35 RR 49–53.

The State then called Detective Robert Alvarez of the Edinburg Police Department. 35 RR 54. Prior to joining the Edinburg Police Department, Detective Alvarez worked at the Hidalgo County Jail as a detention officer. 35 RR 54–57. Detective Alvarez testified about the booking process. Detective Alvarez testified similarly to Officer Mendiola regarding the purpose for asking about gang affiliation. 35 RR 55–58.

After Detective Alvarez left the stand, the State called another witness. 35 RR 117. Once that witness's testimony concluded, Officer Mendiola was re-called to the stand. 35 RR 169. At this point, the State asked Mendiola what Ramirez told him in response to the question about gang affiliations. 35 RR

170. Defense counsel renewed their objections "as to hearsay and the Fifth Amendment" and "38.22."[41] 35 RR 170. The Court overruled the objection and Mendiola answered that Ramirez said that he was associated with the "Bombita" gang. 35 RR 170.

### 2.   Law

In *Pennsylvania v. Muniz*, a plurality of the Supreme Court stated that an exception to *Miranda*'s requirements existed for "routine booking question[s]" asked "to secure the 'biographical data necessary to complete booking or pretrial services.'" 496 U.S. 582, 601 (1990) (plurality opinion) (quoting Brief for United States as Amicus Curiae 12). The Fifth Circuit recognizes such a "booking exception" to the dictates of *Miranda. United States v. Arellano-Banuelos*, 912 F.3d 862, 868 (5th Cir. 2019); *see also Presley v. City of Benbrook*, 4 F.3d 405, 408 n.2 (5th Cir. 1993) ("In the wake of *Muniz*, it has been universally accepted by courts, both federal and state, that a routine booking question exception to the Fifth Amendment exists."). The Fifth Circuit has clarified the nature of this "booking exception," stating that "[t]he permissible booking questions include data such as a suspect's name, address, height, weight, eye color, date of birth, and current age." *Presley*, 4 F.3d at 408. It has also put limits on the exception, stating that "questions designed to elicit

---

[41] Defense counsel was referencing Texas Code of Criminal Procedure article 38.22 on the admissibility of a defendant's statements.

incriminatory admissions are not covered under the routine booking question exception." *United States v. Arellano-Banuelos*, 912 F.3d 862, 868 (5th Cir. 2019) (quoting *Virgen-Moreno*, 265 F.3d 276, 293–94 (5th Cir. 2001)).

### 3. The statement was admissible, and the state court adjudication was reasonable.

On direct appeal, the CCA overruled the point of error related to this claim, and stated as follows:

> *Miranda* and Article 38.22 apply only to custodial interrogation. *Dowthitt v. State,* 931 S.W.2d 244, 263 (Tex. Crim. App. 1996). A custodial interrogation occurs when a defendant is in custody and is exposed to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response. *Roquemore v. State,* 60 S.W.3d 862, 868 (Tex. Crim. App. 2001); *Rhode Island v. Innis,* 446 U.S. 291, 300–01 (1980). Questions normally attendant to administrative "booking" procedure do not constitute "interrogation" because they do not normally elicit incriminating responses. *Cross v. State,* 144 S.W.3d 521, 524 n.5 (Tex. Crim. App. 2004); *Pennsylvania v. Muniz,* 496 U.S. 582, 601 (1990) (questions about defendant's name, address, height, weight, eye color, date of birth, and current age were not designed to elicit incriminatory admissions); *South Dakota v. Neville,* 459 U.S. 553, 564 n.15, 103 (1983) (in the context of a DWI arrest, a police inquiry of whether the suspect would take a blood-alcohol test was not "interrogation" within the meaning of *Miranda* ).

> Mendiola testified that during booking procedures all prisoners are routinely asked about "[m]edical [history], their gang affiliation, and their addresses." He explained that he routinely asks prisoners about their gang affiliation "[s]o that we won't put them with a rival gang if they are gang-related" because "a fight would happen" and "[s]omebody would get hurt." The gang-affiliation question in this case was one normally attendant to the administrative booking procedure and was necessary to secure the safety of inmates and employees at the county jail. It was a routine

booking question as opposed to a custodial interrogation; thus, Mendiola was not required to give [Ramirez] the warnings of *Miranda* and Article 38.22. We also point out that [Ramirez] had already acknowledged his gang affiliation in his *Mirandized* audiotaped statement to Ramiro and Edgardo Ruiz the previous day. Point of error thirteen is overruled.

*Ramirez*, 2007 WL 4375936, at *15.

In overruling Ramirez's point of error, the CCA identified and applied the proper precedent. Based upon that precedent, the CCA found that the type of general booking questions asked by Mendiola were not "custodial interrogation." Under *Miranda*, custodial interrogation consists of "both express questioning and words or actions" that, the officer knows or reasonably should know are likely to elicit an incriminating response. *Muniz,* 496 U.S. at 601; *Presley*, 4 F.3d at 408. The booking questions asked by Mendiola were not designed to or likely to elicit an incriminating response. The questions were asked as a part of a routine data gathering process. Therefore, Ramirez was not entitled to receive *Miranda* warnings before being asked such questions, or at least a reasonable jurist could so hold.

Furthermore, the CCA also noted that Ramirez acknowledged his gang membership in his *Mirandized* statement to Edgardo and Ramiro Ruiz. *Ramirez*, 2007 WL 4375936, at *15. This finding of harmlessness is also entitled to deference. *See, e.g.*, *Mitchell v. Esparza*, 540 U.S. 12, 17–18 (2003) (per curiam). Given this record, and that Mendiola's testimony was cumulative

of Ramirez's admission via his confession, it was not unreasonable for the CCA to find harmless. For the same reasons, Ramirez could not show actual harm under *Brecht*. Thus, relief must be denied.

Ramirez fails to overcome the deference owed to the state court adjudication, and, alternatively, his claim fails on the merits. Claim 4(G) should be denied.

### H.   The trial court did not err in admitting statements Ramirez made during police interrogation. (Claim 4(H))

In Claim 4(H), Ramirez asserts that the trial court erred in admitting the statements he made during police interrogation.[42] ECF 67 at 331–35. This issue was raised on direct appeal as issue fifteen and again on state habeas as issue thirteen. The state court adjudications of the claims were reasonable, and Ramirez makes no attempt to prove otherwise. Therefore, his claim fails under

---

[42] Ramirez also throws in a complaint that the trial court refused to continue the suppression hearing on the admissibility of his confession. ECF 67 at 332. This complaint has no bearing on the appropriateness of the trial court's decision to admit the statement. However, to the extent Ramirez intends that the be a basis for relief, he raises the failure to continue the suppression hearing as a separate claim, Claim 4(F). Therefore, it will not be discussed here.

Ramirez adds another short complaint about the fact that the statement was admitted "without an official translation of the statements from Spanish into English." ECF   67 at 333—34. This too has no bearing on the admissibility of Ramirez's statement, particularly in light of the fact that there was no objection raised on this basis. To the extent Ramirez intends the complaint to be an independent claim, it is inadequately briefed and conclusory. Therefore, it fails to state a basis for relief.

AEDPA. Nonetheless, should Ramirez succeed in having his claim considered de novo, it is likewise meritless.

### 1.    Law

Under certain circumstances, an involuntary confession can form the basis for habeas relief. *Sims*, 385 U.S. at 544; *Williams*, 727 F.2d at 1389. To be involuntary there must be coercion by government agents. *Connelly*, 479 U.S. at 165; *Self*, 973 F.2d at 1205. A habeas petitioner has the burden of proving facts which would lead the court to conclude that the confession was not voluntary. *Uresti*, 821 F.2d at 1103.

Under *Miranda*, a statement made by a person in custody is inadmissible unless that person was informed that he has the right to have an attorney present during questioning, that he has the right to remain silent, and that anything that he says may be used against him. 384 U.S. at 444–45. A person may waive these rights so long as the waiver is knowing and voluntary. *Burbine*, 475 U.S. at 421. During custodial interrogation, "the right to have counsel present . . . is indispensable to the protection of the Fifth Amendment privilege." *Miranda*, 384 U.S. at 469. When a suspect states that he wants an attorney, "the interrogation must cease until an attorney is present." *Id*. at 474; *see also Shatzer*, 559 U.S. at 103–04; *Edwards*, 451 U.S. at 484.

For those reasons, a statement made after asserting *Miranda* rights is presumed involuntary, "even where the suspect executes a waiver and his

statements would be considered voluntary under traditional standards." *McNeil*, 501 U.S. at 177. Once the right to counsel clearly is invoked, an officer may not make further attempts to elicit statements until the suspect initiates further discussion. *Shatzer*, 559 U.S. at 103–04; *Edwards*, 451 U.S. at 484–85. In *Edwards*, the Supreme Court clarified that, once the request for counsel is made during questioning, "an accused . . . is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused initiates further communication, exchanges, or conversations with the police." 451 U.S. at 484–85. The *Edwards* rule is "designed to prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights." *Harvey*, 494 U.S. at 350.

In *Connelly* the Supreme Court observed that "[t]here is obviously no reason to require more in the way of a 'voluntariness' inquiry in the *Miranda* waiver context than in the Fourteenth Amendment confession context. The sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion.*"* 479 U.S. at 169–70.

While the voluntariness of a confession is ultimately a legal determination, that determination may also involve subsidiary factual determinations and mixed issues of law and fact. *See Miller,* 474 U.S. at 112; *Muniz,* 132 F.3d at 219. For the issues that are purely legal or mixed law and facts, this Court must respect a state court's determination of voluntariness so

long as it was not "contrary to, or involved an unreasonable application of, clearly established federal law." § 2254(d)(1); *Drinkard*, 97 F.3d at 767–68. Purely factual subsidiary determinations are presumed to be correct and are overturned only if they were "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d)(2). When challenging a state court's factual determinations, a petitioner must rebut this presumption of correctness by "clear and convincing evidence." § 2254(e)(1).

## 2.     State court decision

This issue was first raised on direct appeal in issue fifteen. The issue was raised again on state habeas as issue thirteen. 1 CR 224–29; 3 Supp. CR 922–24.

Ramirez argues that, because the trial court did not enter written findings of fact and conclusions of law in accordance with state statutory requirements until ordered to do so by the CCA, and that when the trial court did enter findings it adopted the State's proposed findings, he was prejudiced. ECF 67 at 333. Ramirez provides no rationale as to why he would be prejudiced by the timing of the entry of findings. Ramirez also gives no basis to the conclusion that the adoption of the State's proposed findings prejudiced him. Finally, Ramirez does not explain how the alleged failure to comply with a state specific procedural rule impacted his rights under federal law.

That aside, the CCA's opinion on direct appeal addresses this issue as follows:

> In point of error fifteen, [Ramirez] claims that the trial court erred in admitting the audiotaped statement he made to Officers Edgardo Ruiz and Ramiro Ruiz. In support of his claim, he alleges that the testimony at the suppression hearing indicated that "the policemen talked to [Ramirez] about his statement before they turned on the audiotape" and that "the defendant was under the influence of roach pills at the time he gave his statement."

> The determination of whether a confession is voluntary is based on an examination of the totality of circumstances surrounding its acquisition. *Wyatt v. State,* 23 S.W.3d 18, 23 (Tex. Crim. App.2000) (citing *Penry v. State,* 903 S.W.2d 715, 744 (Tex. Crim. App. 1995)). At a suppression hearing, the trial court is the sole judge of the credibility of witnesses and the weight of their testimony. *Id.* Therefore, we will not disturb the trial court's findings if those findings are supported by the record. *Id.* We will only consider whether the trial court properly applied the law to the facts. *Id.*

> [Ramirez] testified at the suppression hearing that he had taken "Roche" pills on the morning of January 29 and that he was asleep when the police came to arrest him that afternoon. When he arrived at the Edinburg Police Department, he was placed in a holding cell, where he went back to sleep. He testified that Officer Ramiro Ruiz came into his holding cell and "kept making, like, comments, like saying I knew what I was there for." Ramiro said, "You know that you are here for those shootings that happened in Monte Cristo. Why are you acting stupid?" Ramirez kept falling asleep, and "[e]very time [Ramiro] came by, he kind of made noises to wake me up." He testified that Ramiro asked him why he was so sleepy, and he responded that he "was Roched up." He was taken out of his cell to the "booking area" to be photographed and fingerprinted. When he was placed back into the holding cell, Ramiro told him he was going to take him out for questioning regarding "what had happened at Monte Cristo Road." They went back to the booking area, and at that point [Ramirez] "asked them for a lawyer." [Ramirez] testified that he told Ramiro he wanted to

call attorney Charles Banker, who had represented him in the past, and that he wanted to look up his number. Ramiro said they did not have a phone book, so [Ramirez] called a friend and asked him to have [Ramirez's] mother call Charles Banker. After he made his phone call, he was taken to Officer Edgardo Ruiz's office for questioning.

[Ramirez] testified that Edgardo and Ramiro told him "they knew everything that had happened" and that Robert Gene Garza a/k/a "Bones" had made a statement against him. He testified that they played part of Garza's audiotaped statement and said, "Everybody is crying. Why don't you just go ahead and save yourself. You are the only stupid one getting sent to death row because everybody is pointing the finger to you." [Ramirez] told them to put him back into his cell because he did not want to talk to them. He "denied it for a while longer," then "admitted that [he] was there." He agreed to waive his rights and gave an audiotaped statement because he "wanted to go back to sleep," and he thought they were not going to let him go until he talked to them. He testified that he "couldn't make decisions correctly" because he was "intoxicated."

Edgardo Ruiz testified that he first met [Ramirez] when he was brought to his office at the Edinburg Police Department on the afternoon of January 29. Edgardo testified that he read [Ramirez] his rights "about a minute" after he met with him. [Ramirez] indicated that he understood his rights, signed a written waiver of his rights, and agreed to talk to him. Edgardo gave [Ramirez] some "general information" that they already had some suspects and that they had reason to believe that Ramirez was also involved, but he did not tell him that Garza had implicated him. [Ramirez] then began telling Edgardo his version of events. Edgardo was about to take a written statement from him when Ramiro "came by to check how was everything going." Ramiro suggested that they audiotape [Ramirez's] statement, and [Ramirez] agreed. When Ramiro left to get a cassette recorder, Edgardo and [Ramirez] "kind of paused for a while ... waiting." Edgardo testified that Ramirez was "very cooperative," did not appear to be intoxicated, and never complained that he was tired, sleepy, hungry, or thirsty.

227

Ramiro testified that his first contact with [Ramirez] was in Edgardo's office. He testified that he did not see [Ramirez] in his jail cell or at booking. Edgardo told Ramiro that he was taking [Ramirez's] statement, and Ramiro suggested that they audiotape it. He left Edgardo's office to get a cassette recorder and returned about five minutes later. He and Edgardo then proceeded to take [Ramirez's] audiotaped statement.

The trial court made findings of fact that included the following:

(1)     Edgardo read [Ramirez] his rights before he was interviewed;

(2)     [Ramirez] indicated that he understood his rights and agreed to waive his rights and speak with Edgardo;

(3)     [Ramirez] gave his account of the crime only after being advised of his rights and waiving his rights;

(4)     Edgardo did not observe any signs that [Ramirez] was intoxicated;

(5)     [Ramirez] did not complain of being tired or sleepy; and

(6)     Ramiro did not speak with [Ramirez] in the booking area or jail cell prior to taking his statement in Edgardo's office.

The trial court found that the testimony of Edgardo and Ramiro was credible and that the testimony of [Ramirez] was not credible. The trial court ultimately concluded that "the statement, in question, was recorded as a result of the knowing, intelligent, and voluntary waiver by [Ramirez] of his rights and is a free and voluntary statement made by [Ramirez]."

The trial court's findings and conclusions are supported by the record. Point of error fifteen is overruled.

*Ramirez,* 2007 WL 4375936, at *13–14 (footnote omitted).

### 3.    Argument

Ramirez must demonstrate that his confession was involuntary under established federal law. He cannot do so. *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("We have stated many times that 'federal habeas corpus does not lie for errors of state law.'" (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990))).

Ramirez lays out three reasons why he believes his statement should have been suppressed. ECF 67 at 332.Ramirez's first argument is that the police continued to question him after he requested counsel. ECF 67 at 332–33. The only evidence Ramirez has to suggest that this is true is his testimony from the hearing on the motion to suppress. ECF 67 at 333. However, the trial court found that Ramirez's testimony was not credible. Supp CR 10–11. On the other hand, the court determined that the testimony of the officers was credible. Given this swearing match, Ramirez cannot show unreasonableness in the trial court's choice of credibility. *See, e.g.*, *Morales v. Thaler*, 714 F.3d 295, 303 (5th Cir. 2013) ("Even if the parties contradicted each other on every point during the new-trial hearing, the state courts would not have been 'objectively unreasonable' to believe one party over another about a he-said, she-said disagreement.").

Next, Ramirez says that he "could not knowingly and voluntarily waive his Miranda rights because he was under the influence of Rohypnol, a powerful sleep-aid, and the detectives were employing tactics to force him into waiving

his rights." ECF 67 at 332. Again, as support for this allegation, Ramirez's only evidence is his suppression hearing testimony. ECF 67 at 332. Ramirez testified that when he was pulled from the holding cell to speak to detectives, he "was Roched up so [he] was drowsy." 7 RR 32. There are only two "tactics" that Ramirez claimed the detectives employed. First, he testified that the detectives were laughing and telling Ramirez that he knew what he was there for. 7 RR 34. Second, Ramirez testified that one of the detectives took his gun out of his holster and "kind of like pointed it" at him and showed it to him. 7 RR 123. The first of these tactics is not conceivably coercive. The trial court did not make a finding that any of Ramirez's testimony credible. Therefore, it is unlikely that the court believed anything Ramirez had to say about the second tactic. Supp CR 10–11. *See, e.g.*, *Morales*, 714 F.3d at 303. With this credibility determination, Ramirez simply cannot show unreasonableness.

Finally, Ramirez argues "that the detectives interrogated him prior to giving him his Miranda warnings, then told him what to say." ECF 67 at 332. Again, the only proof Ramirez offers is his testimony from the suppression hearing that the trial court found not to be credible. ECF 67 at 332. And this credibility determination dooms his claim. *See, e.g.*, *Morales*, 714 F.3d at 303.

Ultimately, Ramirez's evidence on this point is severely lacking. In short, the only evidence Ramirez has is his testimony at the suppression hearing.[43] However, while the testimony of the officers was taken as credible, Ramirez's testimony was deemed to be not credible by the trial court, who was in the best position to judge the witnesses' testimony. Supp CR 6–14.

Ramirez offers nothing to challenge the reasonableness of the CCA's decision on this issue. He offers nothing to support the claim in this Court. His claim is meritless and should be denied.

### I.   The trial court did not err in allowing Sgt. Champion to testify about Ramirez's admission to possessing marijuana in the jail. (Claim 4(I)).

In Claim 4(I), Ramirez maintains that the trial court erred in allowing Sgt. Alex Champion to testify that Ramirez admitted "possess[ing] marijuana while in county jail awaiting trial" during the punishment phase of trial. ECF 67 at 334. This issue was raised on direct appeal as issue seventeen-b. *Ramirez*, 2007 WL 4375936, at *16. However, the CCA found that because Ramirez failed to object to the testimony at trial, he waived the complaint on appeal. *Ramirez*, 2007 WL 4375936, at *16. The contemporaneous objection rule is an adequate and independent state law ground. *See Amos*, 61 F.3d at 340–41.

---

[43] As noted previously, even if Ramirez had the type of hypothetical testimony from Berta Ramirez and Jerry Garcia he alleges is out there, the proposed testimony, even if believed entirely, does not address what happened in the interview room.

Therefore, the claim is procedurally defaulted and must be denied. *See supra* Answer IV. Nonetheless, should Ramirez succeed in having his claim considered de novo, it is likewise meritless.

The trial court did not err in allowing un-objected to testimony to come into evidence. A trial court has no duty to sua sponte exclude evidence. Even if it was error to allow the testimony, the error was harmless. Ramirez claims that, in a capital murder trial with six victims, the testimony about a small amount of marijuana was "so unduly prejudicial that it violated Ramirez's Due Process rights and rendered the trial fundamentally unfair." ECF 67 at 335. This argument, in addition to being entirely conclusory, beggars belief. The jurors had all of the evidence from the guilt phase of the trial. Ramirez participated in a robbery/murder where six people died. He led a charge into one of the homes and directed others in restraining victims. In all likelihood he was the one who beat and then shot one of these victims. He had a history of previous criminal activity. In a case with evidence like this, testimony about a misdemeanor amount of marijuana could never be so unduly prejudicial so as to render Ramirez's trial fundamentally unfair.

Finally, as the CCA noted, trial counsel did object to this testimony. As the Supreme Court has not created a rule that a trial court must sua sponte exclude evidence that has not been objected to, Ramirez's claim is barred by the nonretroactivity principles of *Teague*.

This claim is procedurally defaulted, conclusory, *Teague* barred, and meritless. It should be denied.

### J.   The trial court did not err when it overruled Ramirez's motion for mistrial. (Claim 4(J))

In Claim 4(J), Ramirez complains that the trial court erred in denying his motion for a mistrial after the State referenced an incident where a death row inmate had stabbed a prison guard. ECF 67 at 335; 38 RR at 198–99. This claim has never been presented to a state court and is unexhausted and procedurally barred. *See supra* Answer IV. Ramirez does not attempt to overcome the bar. The claim should be denied on this basis. Alternatively, the claim is without merit.

Ramirez's contention that the trial court erred in failing to grant a mistrial under state law is not a proper consideration on habeas review. *See Lavernia v. Lynaugh*, 845 F.2d 493, 496 (5th Cir. 1988) (the failure to grant a mistrial is a matter of state law and is not one of constitutional dimension). Indeed, alleged violations of state law do not provide a basis on which to grant federal collateral relief. *See, e.g., Coleman*, 501 U.S. at 730; *McGuire*, 502 U.S. at 67–68. Even the misapplication of state law in denying a motion for mistrial would not entitle Ramirez to relief. *Dickerson v. Guste*, 932 F.2d 1142, 1145 (5th Cir. 1991) (petitioner's claim that the state court violated state law in denying his motion for new trial provided no basis for federal habeas relief

absent the showing of an independent violation of a federal constitutional right). For a federal writ to issue, there must be a violation "of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). That does not exist here.

Even assuming Ramirez's adequately raises a due process allegation, it is meritless. A state court's denial of a motion for mistrial will trigger federal habeas corpus relief only if it was "error . . . so extreme that it constitutes a denial of fundamental fairness under the Due Process Clause." *Bridge v. Lynaugh*, 838 F.2d 770, 772 (5th Cir. 1988). A trial is fundamentally unfair only when there is a reasonable probability that the verdict might have been different had the trial been properly conducted. *Kirkpatrick*, 777 F.2d at 279. A habeas petitioner must show that "the trial court's error had a 'substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 623.

The testimony that Ramirez complains about was elicited by the State during cross-examination of Ramirez's TDCJ expert, Larry Fitzgerald. ECF 67 at 335. Fitzgerald testified on direct about the security and supervision offenders assigned to administrative segregation are subject to. 38 RR 182–89. During cross-examination, the following exchange took place.

> Q. [by prosecutor] Okay. Death row is more restrictive. They are watched and limited. Is that right?

234

A.   That's correct.

Q.   And yet violence occurs on death row on a regular basis. Is that right?

A.   I would not call it regular. I would say it does occur.

Q.   On November 24, 2004 of this year, a death row inmate speared a guard?

A.   That's correct.

Q.   And you are aware of that because it was even printed in the Austin American Statesman, isn't that right?

A.   Yes, sir.

Q.   And in fact, a death row inmate from this county, by the name of Jorge Alfredo Salinas, attacked and stabbed a prison guard. Isn't that right?

38 RR 198–99. At this point, lead counsel objected as to relevance. 38 RR 199.

Ultimately, the Court ruled that he would "allow that discussion to occur and

testimony to be presented regarding events of that type without mentioning

specifics about the incident." 38 RR 199. Lead counsel asked the Court to

instruct the jury to disregard and asked for a mistrial. 38 RR 199. The Court

denied the requests. 38 RR 199.

Ramirez's sparse briefing fails to prove that the testimony was actually

objectionable. In cross-examining Ramirez's expert, the State was permitted to

explore his breadth of knowledge for purposes of testing his expertise. Ramirez

also fails to provide any convincing argument that the short exchange had any

effect on the jury's verdict. Ramirez merely makes the conclusory statement that "[t]his error was so extreme as to deny Ramirez fundamental fairness under the Due Process Clause." ECF 67 at 335–36. In light of the fact that Ramirez had been found guilty of participating in a crime that resulted in the murder of six people and the evidence of his previous crimes, cross-examination about the violent nature of prison life is unlikely to have had much effect on the jury.

This claim is unexhausted and procedurally barred, conclusory, and meritless. It should be denied.

### K.   The trial court did not err in allowing Alvarez to testify as a gang expert. (Claim 4(K))

Claim 4(K) takes issue with the trial court's decision to allow Robert Alvarez to testify as a gang expert during the punishment phase of trial. ECF 67 at 336–37. This claim has never been presented in state court. Therefore, it is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, it is meritless.

Ramirez's claim is conclusory. He simply points to the reporter's record where Alvarez was permitted to testify as a gang expert about local gangs, their activities, and how to identify gang members and gang affiliations. ECF 67 at 336. He then baldly claims that Alvarez wasn't a qualified expert, citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589–92 (1993) and Federal

Rule of Evidence 702, and asserts that Alvarez's testimony was unduly prejudicial. ECF 67 at 336–37. Ramirez offers nothing further to support this claim for relief.

In any event, *Daubert* is simply an interpretation of Federal Rule of Evidence 702. *See Daubert*, 509 U.S. at 589 ("The primary locus of this obligation is Rule 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify."). It is not a constitutional mandate of which the states must obey. Indeed, *Daubert* does not even apply to the federal death penalty sentencing scheme. *See Fields*, 483 F.3d at 341–43. Thus, what Ramirez appears to be complaining about is a decision to admit testimony under state law, but that is not a federal claim. *See Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (noting that errors of state law do not warrant federal habeas relief); *Little v. Johnson*, 162 F.3d 855, 862 (5th Cir. 1998) ("In habeas actions, this court does not sit to review the mere admissibility of evidence under state law.").

Nonetheless, Alvarez was properly qualified as an expert. The trial court held a lengthy *Kelly/Daubert* hearing outside the presence of the jury. 35 RR 66–116; *Kelly v. State*, 824 S.W.2d 568 (Tex. Crim. App. 1992); *Nenno v. State*, 970 S.W.2d 549 (Tex. Crim. App. 1998). Alvarez had specialized training about gang recognition and gang investigation. 35 RR 66. He had served as a liaison from the Edinburg Police Department to a law enforcement intelligence group.

35 RR 66. Alvarez had experience in the area as a detention officer, patrol officer, juvenile investigator, and adult investigator. 35 RR 54–66. In each of those positions he dealt with gang issues and worked with gang members. 35 RR 54–66. He had been accepted as a gang expert in previous cases. 35 RR 68. Based upon these qualifications, it was not error to qualify Alvarez as an expert. And given the discretionary nature of admitting expert testimony, it was certainly not error rising to a level of constitutional dimensions. *See, e.g., Wood,* 503 F.3d at 414.

Furthermore, even if it was error to allow Alvarez to testify as a gang expert, that error was harmless. *See Brecht,* 507 U.S. at 637. Officer Mendiola testified that Ramirez acknowledged that he was a member of the Bombitas gang during booking. 35 RR 169–71. Ramirez admitted to being a TCB or Bombitas member during his custodial interview. 45 RR Ex.102A. Alvarez testified based upon his personal knowledge that the individuals shown in a photograph, including Ramirez, were gang members. 36 RR 16. Alvarez's expert testimony was not necessary to prove that Ramirez was a member of the Bombitas. The admission of that testimony did not render Ramirez's trial fundamentally unfair.

The claim unexhausted and procedurally barred. It is also conclusory due to the inadequate briefing. Furthermore, is meritless on its face and should be denied.

238

**L.    The trial court did not err in admitting evidence of other serious crime. (Claim 4(L))**

In a similarly inadequately briefed claim, Ramirez argues in Claim 4(L) that the trial court committed error when it permitted Detective Ramiro Ruiz to testify that he had received a lead on Ramirez's involvement in this case through investigation into another crime. ECF 67 at 337. This claim has never been presented in state court, so it is procedurally defaulted. *See supra* Answer IV. Alternatively, it is without merit.

Ramirez points to two sections of Detective Ramiro Ruiz's testimony that he finds objectionable.

Q.    There was a list of people's real names given to you on January 21st of 2003. And between the arrest of Marcial Bocanegra and before the arrest of "El Gallo," "Bones," "Kreeper," and—

A.    Yes

Q.    And who was it that you got those correct names from?

MS. A.R. GARZA: Judge, I object as to leading.

THE COURT: Overruled.

A.    I received the names from the Hidalgo County Sheriff's Office Deputy Sheriff Jerry Lopez. He was the—he was investigating the shooting from Donna at the time, and he—

Q.    Excuse me. What shooting in Donna was that?

MS. A.R. GARZA: Your Honor, I object. It is not relevant to this particular case.

239

29 RR 139–40.

The court took a recess and held a hearing outside the presence of the jury on the testimony. 29 RR 140–51. After the hearing, the jury was brought back into the courtroom and testimony continued.

Q. You [Detective Ramiro Ruiz] were given a list of names and nicknames on January 21st, 2003. Is that right?

A. Yes.

Q. And what agency did they come from?

A. From Hidalgo County Sheriff's Office.

Q. Was that list of nicknames, was that in relation to a request that you had made concerning your investigation?

A. Yes.

Q. And was that list of nicknames, did that list come from an investigation that the Hidalgo sheriff's county—Hidalgo County Sheriff's Office, did that come from a case that they were investigating?

A. Yes.

Q. Were there names on that list that weren't related to your particular investigation?

A. Yes.

Q. Now, between the 16th—or actually, on the 21st, that was when you learned the names, the correct names, of "Juanon," "Gallo," "Bones" and "Kreeper." Is that right?

A. Yes.

Q.    And you had been given those names by Guadalupe Bocanegra. Correct?

A.    Yes.

29 RR 151–52.

The admission of this testimony was not error. Detective Ramiro Ruiz did not testify as to any specifics of the shooting in Donna. 29 RR 139–40, 151–52. The testimony merely explained why a detective at the Hidalgo County Sheriff's Office had compiled a list of nicknames and their corresponding given names of gang members. 29 RR 139–40. There was no suggestion that everyone suspected of the murders in this case was also a suspect in the Donna shooting. In fact, Detective Ramiro Ruiz did not testify that he found Ramirez's name on the list. There was no implication that Ramirez was connected to another serious crime. This brief refence to another investigation, in which there was no suggestion that Ramirez was connected and with no detail about the offense, does not rise to the level of a due process violation. *See, e.g., Wood,* 503 F.3d at 414.

Furthermore, even if the testimony was erroneously admitted, that error was harmless. *See Brecht,* 507 U.S. at 637. Again, the evidence of Ramirez's guilt was strong. Ramirez gave a statement to law enforcement. 45 RR Ex.102A. He confessed in detail and confessions are exceptionally powerful evidence. *See Fulminante*, 499 U.S. at 296 ("A confession is like no other

evidence."). The information Ramirez gave the detectives was not something that would have been known by someone who was not involved in the offense. Detective Ramiro Ruiz's reference to the Donna shooting was brief, vague, and not inculpatory. 29 RR 139–40. It was not a major point in trial as was evidenced by the fact that the prosecution made no mention of it in closing. Such a passing reference to another murder did not render Ramirez's trial fundamentally unfair.

This claim is unexhausted and procedurally barred. Alternatively, it is meritless. It should be denied.

### M. The trial court did not err in ordering Ramirez to show the jury his arms for the State to obtain testimony about the content of Ramirez's tattoos in the guilt phase. (Claim 4(M))

Ramirez asserts in Claim 4(M) that the trial court erred by making him bare his arms to the jury so that the State's witness could identify his tattoos. ECF 67 at 338–40. The Director understands Ramirez to base this claim on his Fifth Amendment right not to incriminate himself. ECF 67 at 338–40. Ramirez never presented Claim 4(M) to the state court for adjudication. Therefore, it is unexhausted and procedurally barred. *See supra* Answer IV. The claim should be denied on this basis.

Alternatively, the claim fails on the merits. As legal support for this claim, Ramirez cites to Supreme Court cases *Hiibel v. Sixth Jud. Dist. Court of Nev., Humboldt Cnty.*, 542 U.S. 177, 189 (2004)*, United States v. Hubbell*,

530 U.S. 27, 34–35 (2000), and *United States v. Doe*, 465 U.S. 605, 614 n.13 (1984). Ramirez also cites to a case from the Second Circuit. *United States v. Greer*, 631 F.3d 608 (2d Cir. 2011). ECF 67 at 339.

In *Hiibel*, the Supreme Court was faced with the question of whether a Nevada statute that required that a suspect disclose his name when requested by a law enforcement officer violated the defendant's rights under the Fourth and Fifth Amendments to the United States Constitution. 542 U.S. at 185–89. The Court concluded that the law did not violate either amendment. *Id.* Because the issue was whether a suspect could be required to state his name, the Supreme Court's decision in *Hiibel* has little to no bearing on Ramirez's issue before this Court.

The holdings in *Hubbell* and *Doe* also provide no support for Ramirez's claim. Both of these cases relate to whether a defendant can be compelled to produce documents that may incriminate him. In *Hubbell*, the Supreme Court noted that a defendant "may be required to produce specific documents even though they contain incriminating assertions of fact or belief because the creation of those documents was not 'compelled' within the meaning of the privilege." 530 U.S. at 35–36. However, the Court also acknowledged that "the act of producing documents in response to a subpoena may have a compelled testimonial aspect. We have held that the act of production itself may implicitly communicate statements of fact. By producing documents in compliance with

a subpoena, the witness would admit that the papers existed, were in his possession or control, and were authentic." *Id.* at 36. In *Doe*, the Court refused to overturn a District Court's finding that the production of subpoenaed documents would involve testimonial self-incrimination. *Doe*, 465 U.S. at 613–14. Ramirez's case does not implicate the production of documents, so these cases are not apropos.

However, there is binding precedent from the Fifth Circuit that forecloses Ramirez's claim. In *United States v. Velasquez*, the Fifth Circuit addressed the question of whether a defendant's tattoos were "testimonial" when admitted into evidence, not for identification purposes, but rather as substantive evidence of affiliation with the Texas Syndicate. 881 F.3d 314, 337 (5th Cir. 2018). Citing to *Greer*, the Fifth Circuit stated that "because getting the tattoo was 'not the product of government compulsion . . . [the] Fifth Amendment claim fails.'" *Id.* at 338–39 (*citing Greer*, 631 F.3d at 613). Furthermore, the Court concluded the following:

> Defendants' decision to place the Texas Syndicate tattoos on their bodies was wholly voluntary and not a product of compulsion asserted by the Government. Defendants' tattoos were also on places on their bodies that are characteristically highly likely to be visible.
>
> Additionally, the Government did not rely on Defendants' truth-telling to prove the existence of the tattoos, or explain how the tattoos affiliated Defendants with the Texas Syndicate. Defendants were not required to restate, repeat, or affirm the truth of Agent Hause statements that explained to the juries in

> both trials that Defendants had tattoos indicative of Texas Syndicate membership. Allowing evidence of Defendants' tattoos to be presented did not constitute error, much less plain error by the district court.

*Velasquez,* 881 F.3d at 336–39 (citation omitted).

The situation here are virtually identical to the fact pattern in *Velasquez*. Ramirez claims that the trial court violated his Fifth and Fourteenth Amendment rights by ordering him to display his tattoos before the jury. ECF 67 at 339–40. He further alleges that the "error was highly prejudicial and had a 'substantial and injurious effect' on the outcome of Ramirez's trial." ECF 67 at 339–40. However, the evidence of his tattoos was admissible. It was not error to order Ramirez to bare his arms. Because the trial court did not err in having Ramirez display his tattoos, there was no constitutional error.

Furthermore, even if it were error to order Ramirez to show his tattoos to the jury, that error was harmless. *See Brecht,* 507 U.S. at 637. The purpose of the tattoo evidence was to confirm Ramirez's association with the Bombitas gang. 36 RR 17–45. However, if the jury did not have the tattoo evidence, in Ramirez's statements at booking and in his interview with the Detectives Ruiz, Ramirez himself acknowledged his gang membership. As such, the evidence of Ramirez's association with the Bombitas was before the jury and the admission of the tattoo evidence, which was effectively cumulative, cannot be said to have had a substantial and injurious effect on the outcome of Ramirez's trial.

This claim is unexhausted and procedurally barred. Alternatively, it is meritless. It should be denied.

### N.   The trial court did not prevent Ramirez from presenting relevant mitigating evidence. (Claim 4(N))

In Claim 4(N), Ramirez complains that "the trial court prevented Ramirez from presenting testimony from his psychological expert, Dr. Kate Allen, by significantly restricting the scope of her testimony." ECF 67 at 340.

Ramirez first raised this argument on direct appeal. However, the claim was found to be inadequately briefed. *Ramirez*, 2005 WL 4375936 at *19–20. Accordingly, the claim is procedurally defaulted because it was decided on an adequate and independent state law basis. *See Roberts*, 681 F.3d at 607–08. It should therefore be denied on this basis. *See supra* Answer IV.

Ramirez then raised the claim in issues five and six on state habeas. 1 SHCR 195–202. There, it received an adjudication on the merits. 3 Supp. SHCR 888–901. However, Ramirez does not address the state court adjudication, but it was reasonable, and Ramirez fails to demonstrate entitlement to relief. Furthermore, and alternatively, the claim fails on the merits.

Citing *Chambers v. Mississippi*, 410 U.S. 284 (1973) and *Washington v. Texas*, 388 U.S. 14 (1967), Ramirez argues that "a defendant has a Sixth Amendment right to confront and cross-examine witnesses and to call

witnesses in his defense." ECF 67 at 340. According to Ramirez, the trial court's refusal to allow Dr. Allen to testify in detail about the hearsay bases for her opinion denied him the right to present evidence in his defense. ECF 67 at 340–41. On state habeas, the trial court's findings on this issue are as follows:

555.  When Dr. Kate Allen took the stand on Saturday, December 18, 2004 she was first questioned about the basis for her opinions outside of the presence of the jury. *See* 39 R.R. 1–28.

556.  During this questioning, which is more fully described in Findings of Facts Nos. 160–70 on pages 202–05 of this Order, Judge Gonzalez stated that Dr. Allen would be allowed to give her own opinions, but might not be allowed to discuss all of the other matters she might want to bring up and expressed a concern about the jury taking the information she had based her opinions on as reliable and correct. *See* 39 R.R. 8, 26–28.

557.  During Dr. Allen's ensuing testimony before the jury, which is described on pages 156–58 of this Order, she was asked about changes in the physiology of the brain; the State objected to the global nature of the question; the jury was excused while that issue, and particularly the fact that there had been no testing in that area done in regard to [Ramirez], was discussed; it was noted the Dr. Allen had already generally discussed the topic; and said topic was not further discussed when the jury returned. *See* 39 R.R. 53–59.

558.  When Alma Garza next asked Dr. Allen what she had found in reviewing the first psychological that was done on [Ramirez], the State objected; the jury was again excused; and there was an extensive discussion concerning what testimony would and would not be allowed. *See* 39 R.R. 59–90.

559.  During said discussion, Judge Gonzalez told Ms. Garza not to say that he "had not allowed her to get into anything with

this" and that Dr. Allen had given a lot of opinions, including her main opinion; Ms. Garza said that the problem was that the jury had not been allowed to hear what Dr. Allen was basing her opinion on and that Dr. Allen should be allowed to say "her opinion is based on this, because in reviewing that, this is what happened to the child"; and Judge Gonzalez stated that TEX. R. EVID. 705 spoke directly to the issue, that he had allowed Dr. Allen's opinions in, that Dr. Allen herself had admitted that she did not know if all of the information she had reviewed was true, that Ms. Garza now wanted Dr. Allen to testify as if they were proven facts, and that his concern was that this would leave a false impression with the jury. *See* 39 R.R. 61–66.

560. As the discussion continued, Ms. Garza persisted in objecting to not being allowed to go further into the content of the underlying basis for Dr. Allen's opinions and Judge Gonzalez stated that Rule 705 gave the court the power and duty to make sure that either side did not bring in all kinds of inadmissible hearsay evidence and that the last question Ms. Garza had asked had basically called for Dr. Allen to read the psychological into evidence. *See* 39 R.R. 66–70.

561. When Judge Gonzalez asked what events Ms. Garza wanted Dr. Allen to be allowed to talk about, Ms. Garza mentioned [Ramirez's] father beating his mother when she was pregnant; Judge Gonzalez noted that that was a topic Dr. Allen had never even given an opinion about; Ms. Garza and Dr. Allen stated that they also wanted to present testimony about [Ramirez's] mother still being beaten after [Ramirez] was born; the prosecutor pointed out that this was all according to people who were not there to testify or who had exercised their right not to testify; and Ms. Garza told Judge Gonzalez that he could have given a limiting instruction. *See* 39 R.R. 70–74.

562. After Judge Gonzalez had asked what limiting instruction he could possibly give, he pointed out that Dr. Allen had yet to tell the jury that her opinions could be different if the information she relied on was not true and that this was the

concern which the State and the law had in allowing underlying facts that are normally inadmissible because the law does not want to leave the impression that the underlying facts are necessarily true to be left with the jury. *See* 39 R.R. 74–75.

563. Judge Gonzalez then stated that he was simply asking that Ms. Garza find a middle ground; that Ms. Garza had gotten all of Dr. Allen's opinions in; that Ms. Garza wanted to now go into information based on an interview of [Ramirez], whom the State could not question, and into specific events; that he had allowed "it" up to that point, but had to put a limit on it; and that he was sustaining the objection to the last question asked before the jury was excused. *See* 39 R.R. 75–78.

564. When Alma Garza suggested that the State's prison experts had been allowed to go into specifics, Judge Gonzalez explained that that situation was very different, that the example of the gang expert was more analogous to the situation being discussed, but still involved a general opinion; and that Dr. Allen, by way of contrast, had catered her opinion to [Ramirez]. *See* 39 R.R. 79–81.

565. After Alma Garza had said that, in her opinion, Dr. Allen had not been specific enough, Judge Gonzalez asked Ms. Garza what specifically she wanted to get in front of the jury; Ms. Garza relied that, in regard to the first psychological, she wanted to show how old the child had been and what the psychologist had found concerning the child being truthful and wanting help; Judge Gonzalez noted that Dr. Allen had already testified about that topic; Ms. Garza referred to information that the second psychological had shown that the child had given up on the system by that point, two years later; and Judge Gonzalez pointed out that Dr. Allen had already testified that [Ramirez] had been helped by the system, but had re-offended when he got out. *See* 39 R.R. 81–84.

566. When Judge Gonzalez asked what other areas she wanted to go into, Alma Garza stated that she wanted to cover how

domestic violence affected a child's development and Judge Gonzalez remarked that that topic was "fair game". *See* 39 R.R. 84–85, 86.

567. When Ms. Garza then said that she wanted to go into what attachment disorder was and how significant it was in understanding a child's development and behavior, Judge Gonzalez noted that Ms. Garza had already asked that and that Dr. Allen had already explained what attachment disorder was; Ms. Garza started to again mention the second part of the topic, dealing with the significance of attachment disorder; and Judge Gonzalez stated that Ms. Garza could ask Dr. Allen about that subject and remarked that Dr. Allen had given a lot of solid opinions that were based on her experience and her education and on the information that Ms. Bowen had shared with her. *See* 39 R.R. 85.

568. When Alma Garza next said that she had wanted to ask Dr. Allen how effective the socialization program which [Ramirez] had received at T.Y.C. had been for [Ramirez], Judge Gonzalez stated that Dr. Allen had already testified about that topic, asked Dr. Allen if that was correct, and received an affirmative response. *See* 39 R.R. 85–86.

569. At this point, Judge Gonzalez told Alma Garza that he would allow her to cover "all those areas", many of which she had already covered, but that he would not allow an open-ended question about what Dr. Allen had found in that report, which would basically involved "regurgitating hearsay"; Ms. Garza said that she would not be able to argue that "there is some information, if believable, this happened to the child" and that the jury could believe it or not; Judge Gonzalez explained that the jury was not given the task of believing or not believing that hearsay information, but rather had the task of believing or not believing Dr. Allen's opinions; and Judge Gonzalez further pointed that that there was no way to challenge the reliability issues concerning that hearsay information. *See* 39 R.R. 86–88.

570. Alma Garza then informed Judge Gonzalez that she would, at some point, make a bill of exceptions "as to the

information that I would have asked from this witness". *See* 39 R.R. 89.

571.  When the jury returned, Dr. Allen described how domestic violence and child abuse affect a child's development; stated that she had earlier testified that the re-socialization which [Ramirez] had gone through in T.Y.C. had occurred too late in his life; explained the basis for said opinion; and admitted that she had never gone to see [Ramirez's] neighborhood and that her understanding of his neighborhood was based on information from other people. *See* 39 R.R. 90–99.

572.  After the jury had returned its punishment phase verdict and been released, Judge Gonzalez asked the attorneys to remain while the bill of exceptions was made. *See* 39 R.R. 154.

573.  Alma Garza then asked that Defense Exhibits Nos. 8, 9, and 10, Gilda Bowen's bio-psychosocial report, life history outline, and personality development comparison be admitted as the information that "the mitigating specialist (sic)" would have testified to and asserted that Judge Gonzalez had only allowed the witness to give general opinions, without getting into [Ramirez's] life in detail. *See* 39 R.R. 154–55, 160.

574.  After Judge Gonzalez had reminded Ms. Garza that the question she had asked when he asked her to limit the information she was soliciting from the expert was a question about what was found in a psychological report, Ms. Garza stated that that was one of the areas; that the issue had also involved admissibility of specific facts as to how the witness had arrived at her opinion; that the jury had not been allowed to hear that information about [Ramirez's] life being "in total shambles since he was a child"; and that she felt that it would have made a difference to the jury. *See* 39 R.R. 155–56.

575.  Judge Gonzalez then remarked that there was no question that that evidence had come in; that Ms. Garza was talking about the details of the hearsay that had been heard by the

251

mitigation specialist; that the person who had testified was not even the person who had interviewed "these people"; that []there was no reason why "those people couldn't have been brought in to testify, if they had information to share with this jury"; and that he had allowed the witness to give all the opinions she had, but had not allowed her to "basically regurgitate" those things that she learned from interviews which Gilda Bowen had shared with her. *See* 39 R.R. 156–58.

576. After Alma Garza had again shared her belief that the witness should have been able to go into the details contained in the exhibits, Judge Gonzalez noted that 50% of the information contained in Defense Exhibit No. 9 was based on interviews with [Ramirez]; used that exhibit to illustrate the problem with admitting said information; and again observed that he had not kept Dr. Allen from giving her expert opinions and had instead merely limited testimony about the underlying basis for her opinions because they relied on information that would be otherwise inadmissible. *See* 39 R.R. 158–61.

577. In *Chambers v. Mississippi*, 410 U.S. 410 U.S. 284, 298–303, (1973), the United States Supreme Court considered a situation in which the trial court had barred, on hearsay grounds, the testimony of three witnesses who would have testified that another individual named McDonald had named himself as the murderer.

578. In doing so, said Court noted that Mississippi did not recognize an exception to said rule for declarations against interest, indicated that the hearsay statements it was considering had been made under circumstances that provided considerable assurance of their reliability, mentioned the fundamental right to present witnesses in one's own defense, indicated that an accused must comply with established rules of evidence and procedure designed to assure both fairness and reliability in exercising said right, and pointed out that the testimony in question was critical to Chamber's defense. *Chambers*, 410 U.S. at 298–302.

579. The Supreme Court then remarked, "In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice". *Chambers*, 410 U.S. at 302.

580. Said Court then concluded that the exclusion of this critical evidence, coupled with the refusal to allow Chambers to cross-examine McDonald based on Mississippi's ban on impeaching one's own witness, had denied Chambers due process. *Chambers*, 410 U.S. at 302.

581. It also stated that it was not announcing any new principles of constitutional law, but rather was merely holding that, under the facts and circumstances of that case, the trial court's ruling had deprived Chambers of a fair trial. *Chambers*, 410 U.S. at 302–03.

582. In *Green v. Georgia*, 442 U.S. 95, 97 (1987), the Supreme Court applied *Chambers v. Mississippi* to a situation in which the trial court had relied on the hearsay rule to exclude testimony that a co-defendant had said that he had killed the victim from a capital sentencing proceeding.

583. The courts have rejected arguments similar to the one which [Ramirez] asserts in his fifth and sixth grounds for review and limited Chambers and Green to their own facts.

584. For example, in *Watts v. Quarterman*, 448 F. Supp. 2[d] 786 (W.D. Tex. 2006), the federal district court dealt with a situation in which the trial court repeatedly sustained hearsay objections when a self-described "mitigation specialist" was asked the contents of Watts' school, medical, or jail records and the contents of her discussions with Watts' family and friends." *Watts*, 448 F.S.3d at 796, 801.

585. In addressing that issue, said court mentioned the relevant facts, observed that the defense had failed to make a contemporaneous objection to the trial court's rulings, and noted that the issue was also not raised on direct appeal. *Watts*, 448 F.S.3d at 801–06.

586. It then said that none of the opinions *Watts* relied on hold that the Eighth Amendment abrogates state evidentiary rules, including the hearsay rule; noted that the Fifth Circuit had, to the contrary, rejected a similar complaint in *McGinnis v. Johnson*, 181 F.3d 686, 693 (5th Cir. 1999), (2000); and indicated that the trial court's rulings did not render Watts' trial fundamentally unfair. *Watts*, 448 F. Supp. [2d] at 809.

587. When said case was appealed to the Fifth Circuit, said Court noted that the contemporaneous objection requirement, the rules of evidence, and the prohibition against hearsay were not abrogated in the context of capital sentencing. *Watts v. Quarterman*, 244 F. App'x 572, 2007 U.S. App. LEXIS 18295 (5th Cir. 2007) at **11–12.

588. In *Edwards v. Scroggs*, 849 F.2d 204, 212 (5th Cir. 1988), (1989), Edwards claimed that the way the trial court had applied the rules of evidence, particularly the hearsay rule, to exclude certain evidence violated *Chambers* and *Green* and defeated the ends of justice.

589. In addressing said claim, the Fifth Circuit quoted a passage from *Barefoot v. Estelle*, 697 F. 2d 593, 597 (5th Cir. 1983) stating that *Green* is limited to its facts, but also noting that certain egregious evidentiary errors may be redressed by the due process clause. *Edwards*, 849 F.2d at 212.

590. It then said that it agreed with the district court that the application of the hearsay rule to exclude the proffered evidence did not render Edwards' trial fundamentally unfair. *Id.*

591. In *Valle v. Quarterman*, No. 08-70005, 2008 U.S. App. LEXIS 22165 (5th Cir. 2008) (unpublished), at *10, the Fifth Circuit considered a claim that the trial court had erred in excluding the audio portion of an interview with Valle's mother and a transcript of said interview because Valle's constitutional interest in presenting mitigation evidence outweighed the State's interest in enforcing its hearsay rule.

254

592. In addressing this claim, said Court noted that Valle was relying on *Chambers* and *Green*; that those cases were distinguishable from the case before it; and that it had limited said cases to their facts. *Valle*, 2008 U.S. App. LEXIS at *14–16.

593. In *McGinnis v. Johnson*, 181 F.3d 686, 692–93 (5th Cir. 1999), the Fifth Circuit utilized similar reasoning to reject an argument that the exclusion of a psychologist's testimony about what the defendant had told him violated due process.

594. This case law demonstrates that the trial judge properly applied the hearsay rule to bar those aspects of Dr. Allen's testimony which relied on second-hand information.

595. In particular, this case law indicates that application of the hearsay rule to bar presenting testimony through second-hand reports is valid except in extreme situations in which reliance on said rule will deprive the defendant the ability to exercise a critical constitutional right.

596. It also shows that *Chambers* and *Green*, the cases which stated that a state evidentiary rule must give way to protection of a critical constitutional right, involved fact patterns in which the excluded testimony involved someone else's admission that they had committed the crime.

597. Finally, the relevant law indicates that the courts have limited *Chambers* and *Green* to such unique facts and rejected arguments relying on said cases which are similar to those urged by [Ramirez] in situations which, like the one involved in this case, do not involve such obviously critical evidence.

598. Thus, Judge Gonzalez did not deny [Ramirez] a fair trial when he barred Dr. Allen from presenting hearsay testimony about what others had told her, nor did said rulings deny [Ramirez] the right to present relevant mitigation evidence.

3 Supp. SHCR 888–901.

Rule 705(d) of the Texas Rules of Evidence states that "[i]f the underlying facts or data would otherwise be inadmissible, the proponent of the opinion may not disclose them to the jury if their probative value in helping the jury evaluate the opinion is outweighed by their prejudicial effect." Therefore, the underlying hearsay bases of Dr. Allen's opinions were not admissible unless the court found that their probative value was greater than their prejudicial value. The court, in its sound discretion, found that the prejudicial effect outweighed any probative value.

Federal habeas corpus relief does not exist to correct errors of state constitutional, statutory, or procedural law, unless a federal issue is also presented. *See McGuire,* 502 U.S. at 67–68 (holding complaints regarding the admission of evidence under California law did not present grounds for federal habeas relief absent a showing that admission of the evidence in question violated due process); *Lewis v. Jeffers,* 497 U.S. 764, 780 (1990) (recognizing that federal habeas relief will not issue for errors of state law); *Pulley v. Harris,* 465 U.S. 37, 41 (1984) (holding a federal court may not issue the writ on the basis of a perceived error of state law). In reviewing state criminal convictions, a federal habeas court does *not* sit as a super-state appellate court. *McGuire,* 502 U.S. at 67–68; *Jeffers,* 497 U.S. at 780; *Pulley,* 465 U.S. at 41. Only if the state evidentiary ruling violates a *federal* constitutional right or is so egregious that it rendered trial fundamentally unfair, should a federal habeas court

256

grant relief. *Brown v. Dretke,* 419 F.3d 365, 376 (5th Cir.2005); *Wilkerson v. Cain,* 233 F.3d 886, 890 (5th Cir. 2000); *Johnson v. Puckett,* 176 F.3d 809, 820 (5th Cir.1999). Failure to permit certain evidence is a due process violation only when the omitted evidence is a crucial, critical, highly significant factor in the context of the entire trial. *Johnson,* 176 F.3d at 821.

In *McGinnis v. Johnson,* the Fifth Circuit held a state trial court did not violate due process by permitting an expert to testify as to his opinions about a petitioner's state of mind but excluding the petitioner's statements themselves. 181 F.3d 686, 692–93 (5th Cir. 1999) The Fifth Circuit's decision in *McGinnis* demonstrates that the state court's adjudication was objectively reasonable. Dr. Allen was permitted to testify at some length about her opinions and some of the bases of those opinions. The trial court's decision not to permit her to go even further into the hearsay bases of her testimony was not error.

Even if it was error to prevent Dr. Allen from providing additional hearsay testimony, that error was harmless. *See Brecht,* 507 U.S. at 637. Dr. Allen was permitted to testify about enough background information to support her opinions. The jury was therefore aware of some of the difficulties that Ramirez faced in life. Testimony from the juvenile parole officer, Ricardo Leal, also addressed some of the problems in his home life. 38 RR 71–133. The aggravating evidence in this case was strong. Ramirez had admitted to

participating in the violent and bloody murder of six people at one time. 45 RR Ex.102A. Ramirez had a history of involvement with law enforcement, including being adjudicated of previous violent offenses. 38 RR 71–133; 47 RR Ex.335, Ex.336, Ex.337. Additional hearsay testimony, which would not have been offered for the truth of the matter, would not have been able to overcome the aggravating evidence against Ramirez. Prohibiting Dr. Allen from presenting additional background hearsay evidence did not render Ramirez's trial fundamentally unfair.

Ramirez's claim fails under AEDPA as he fails to address or attempt to overcome the deference owed to the state court adjudication of this claim. Alternatively, the claim is meritless. It should be denied.

**O.** **The exclusion of venire members for cause did not violate Ramirez's right to an impartial jury and due process under the Sixth, Eight, and Fourteenth Amendment to the U.S. Constitution. (Claim 4(O))**

Ramirez's Claim 4(O) alleges that the trial court improperly dismissed veniremembers in violation of federal law. ECF 67 342–44. This claim is unexhausted and procedurally barred because it was not presented in state court, so it should be denied. *See supra* Answer IV. Alternatively, it is meritless.

According to Ramirez, "the trial court dismissed venire members who merely voiced general objections to the death penalty or expressed

conscientious or religious scruples against its infliction in violation of *Witherspoon* [*v. Illinois*, 391 U.S. 510 (1968)]." ECF 67 at 343. He continues, asserting that "the trial court dismissed veniremembers based on their views about the death penalty without giving counsel the opportunity to rehabilitate those persons." ECF 67 at 343. Finally, Ramirez argues that "the trial court had improper contact with, and thus improperly influenced, the jury's deliberations in Ramirez's proceedings." ECF 67 at 344.

The claim is entirely conclusory. Ramirez doesn't name or reference a single veniremember who was supposedly improperly removed in violation of *Witherspoon*. Nor does Ramirez describe the supposedly improper contact between the trial judge and any or all jurors. So conclusory is this claim that the Director cannot respond but to allege insufficient briefing. *See, e.g., Koch*, 907 F.2d at 529. As such, in addition to being unexhausted and procedurally barred, the claim is conclusory and inadequately briefed. It should be denied.

### P. The trial court did not err in giving voluntariness instructions. (Claim 4(P))

In Claim 4(P), Ramirez argues that the trial court did not give the proper voluntariness instruction required by Texas law. ECF 67 at 344–48. This claim was not raised in state court, and it is therefore unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, it is meritless.

"Improper jury instructions in state criminal trials do not generally form the basis for federal habeas relief." *Galvan v. Cockrell*, 293 F.3d 760, 764 (5th Cir. 2002). "[T]he 'inquiry is not whether there was prejudice to the [petitioner], or whether state law was violated, but whether there was prejudice of constitutional magnitude.'" *Id.* (second alteration in original) (quoting *Sullivan v. Blackburn*, 804 F.2d 885, 887 (5th Cir. 1986)). To garner relief, the omission of a particular instruction must "by itself so infect[] the entire trial that the resulting conviction violates due process." *Id.* (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)). And, even if there is error, it is subject to harmless error analysis. *Id.*

Article 38.23 is strictly a matter of state law that does not provide a cognizable basis for federal habeas relief unless it involves a denial of fundamental fairness. *See, e.g., Charles v. Thaler,* 629 F.3d 494, 500 (5th Cir. 2011). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *McGuire,* 502 U.S. at 67–68. Ramirez's claim relates to Texas criminal procedure rules and "'does not involve such a denial of fundamental fairness as to fall within the purview of federal habeas corpus.'" *Ables v. Scott,* 73 F.3d 591, 592 (5th Cir. 1996).

In any event, Ramirez fails to show how the trial court's application of article 38.23 or its decision about which of the state voluntariness instructions

it would give rendered his trial "fundamentally unfair." He provides a review of the law about when a confession is voluntary, but he does not explain what the Due Process Clause requires of a jury instruction on the subject. He merely states that "'voluntariness' has a constitutional, legal definition to which specific legal standards attach." ECF 67 at 347. But due process does not require that a defendant specifically receive a Texas-law jury instruction. Nor does due process require that the jury be instructed on voluntariness whatsoever. *See Sims v. Georgia*, 385 U.S. 538, 544 (1967) ("A constitutional rule was laid down in [*Jackson v. Denno*] that a jury is not to hear a confession unless and until the trial judge has determined that it was freely and voluntarily given. The rule allows the jury, if it so chooses, to give absolutely no weight to the confession in determining the guilty or innocence of the defendant but it is not for the jury to make the primary determination of voluntariness."). Ramirez fails to demonstrate constitutional entitlement to a voluntariness instruction under federal law.

He also fails to demonstrate entitlement to a voluntariness instruction under Texas law. In Texas, just as there are three theories under which a suspect's statement can be excluded, Texas law also provides for three types of jury instructions that relate to the taking of confessions: "(1) a 'general' Article 38.22, § 6 voluntariness instruction; (2) a 'general' Article 38.22, § 7 warnings instruction (involving warnings given under § 2 and § 3); and (3) a 'specific'

Article 38.23(a) exclusionary-rule instruction." *Oursbourn*, 259 S.W.3d at 173.

"The Section 7 instruction sets out the requirements of 38.22, § 2 or § 3 and

asks the jury to decide whether all of those requirements were met." *Id.*

> In essence, the Section 6 'general' instruction asks the jury: 'Do you
> believe, beyond a reasonable doubt, that the defendant's statement
> was voluntarily made? If it was not, do not consider the defendant's
> confession.' The Section 7 instruction sets out the requirements of
> 38.22, § 2 or § 3 and asks the jury to decide whether all of those
> requirements were met. The Article 38.23(a) 'specific' instruction
> is fact-based: For example, 'Do you believe that Officer Obie held a
> gun to the defendant's head to extract his statement? If so, do not
> consider the defendant's confession.'

*Id.* at 173–74. "A statement that is 'involuntary' as a matter of constitutional

law is also 'involuntary' under Article 38.22, but the converse need not be true.

*Id.* at 169.

In *Oursbourn*, the CCA clarified the distinction between the different

voluntariness instructions: "Due process and *Miranda* claims may warrant

both "general" and "specific" voluntariness instructions; Texas statutory

claims warrant only a "general" voluntariness instruction." *Id.* at 174. It is the

defendant's responsibility to specify which involuntariness theory he is

alleging—"a general (perhaps subjective) lack of voluntariness or a specific

police-coerced lack of voluntariness." *Id.* As the CCA has made clear, there is

no due process right to voluntariness instructions based upon Texas statutory

claims.

In Ramirez's case, the trial court gave the following 38.22 § 6 "general" voluntariness instruction:

> You are instructed that if you believe from the evidence or if you have reasonable doubt thereof that the alleged confession or statement of the Defendant was not voluntarily made you will not consider the same for any purpose.
>
> You are instructed that unless you believe beyond reasonable doubt that the alleged confession or statement introduced into evidence was voluntarily made by the Defendant or if you have reasonable doubt thereof you shall not consider such alleged statement or confession for any purpose.

2 CR 532.

Ramirez also requested that the court give the article 38.23(a) exclusionary rule instruction. 2 CR 514–15. Article 38.23(a) reads as follows:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas, or of the Constitution or laws of the United States of America, shall be admitted in evidence against the accused on the trial of any criminal case.
>
> In any case where the legal evidence raises an issue hereunder, the jury shall be instructed that if it believes, or has a reasonable doubt, that the evidence was obtained in violation of the provisions of this Article, then and in such event, the jury shall disregard any such evidence so obtained.

Ramirez's requested instruction read as follows:

> No evidence obtained by an officer or other person in violation of any provisions of the Constitution or laws of the State of Texas or of the Constitution or laws of the United States of America shall be admitted in evidence against the accused on the trial of any criminal case.

If you believe, or have reasonable doubt, that evidence was obtained illegally then and in such event you shall disregard any such evidence so obtained.

In *Miranda Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed. 2d 694 (1966), the U.S. Supreme Court determined that prior to any questioning, the person must be warned that he has the right to remain silent, that any statement he does make may be used as evidence against him, and that he has right to the presence of an attorney, either retained or appointed. Unless suspect knowingly, voluntarily and intelligently waives these rights any incriminating responses to questioning may not be introduced into evidence in the prosecution's case in chief in subsequent criminal proceeding.

Now if you believe, or have reasonable doubt, that Juan Ramirez, while under arrest was first questioned by the police without having been informed of and having knowingly, voluntarily, and intelligently waived his rights under *Miranda,* then and in such event, you shall disregard the recorded statement and any such evidence obtained therefrom.

2 CR 514–15.

The trial court's refusal to instruct the jury as requested was not error. A defendant is entitled to a jury instruction under article 38.23(a) only if there is a factual dispute regarding how the evidence was obtained. *See Chambers v. State,* No. PD-0424-19, 2022 WL 1021279, at *2 (Tex. Crim. App. 2022). Furthermore, to raise a disputed fact, there must be some "affirmative evidence." *Madden v. State,* 242 S.W.3d 504, 513 (Tex. Crim. App. 2007). "[A] cross-examiner's questions do not create a conflict in the evidence." *Id.* As Ramirez chose not to testify and offered nothing more than cross-examination of the officers to suggest that the confession was not voluntary, there was no

disputed fact under article 38.23(a) requiring the jury instruction pursuant to that law.

Furthermore, even if it was error not to give the instruction Ramirez requested under Texas law, Ramirez's claim fails. A defendant has a right to have an evidentiary hearing and a finding of voluntariness by a judge before a jury hears his confession. *Jackson v. Denno,* 378 U.S. 368, 385–87 (1964); *Williams v. Maggio*, 727 F.2d 1387, 1391 (5th Cir. 1984). However, once that has occurred, a defendant does not have the right to have the jury independently determine voluntariness. *See Martinez v. Estelle,* 612 F.2d 173, 177 (5th Cir. 1980). Here, the trial court properly held a *Jackson v. Denno* hearing and determined that Ramirez's confession was voluntary before it was presented to the jury. 6 RR, 7 RR, Supp CR 6–14. Therefore, if there was any error in not giving the article 38.23(a) instruction, that error was harmless because Ramirez received all the process he was due.

Finally, as explained above, a petitioner is not constitutionally entitled to a second bite at the voluntariness apple. The rule he asks for constitutionalizes that belief. Thus, Ramirez asks for a new rule, but *Teague* bars its application to his case. Relief should be denied on this ground too.

This claim is unexhausted and procedurally barred. Additionally, the claim is not cognizable on federal habeas. But even if it was, Ramirez fails to

demonstrate constitutional error or harm. Finally, the claim is *Teague* barred. This claim must be denied.

### Q. Ramirez's constitutional rights were not violated when the trial court failed to use special verdict forms. (Claim 4(Q))

In Claim 4(Q), Ramirez argues that "the trial court's failure to use special verdict forms for the sentencing phase" of his trial violated his constitutional rights. ECF 67 at 348. This claim is unexhausted and procedurally barred because it was not presented in state court. *See supra* Answer IV. Ramirez is not clear about what "special verdict forms" should have been given to the jury. ECF 67 at 313–15, 348–50, 394. Therefore, this issue is also inadequately briefed and conclusory. Alternatively, it is meritless.

Ramirez's argument leads one to believe that this claim relates to the failure to use a special verdict form at punishment. ECF 67 at 348–50. In Texas, the punishment verdict form in a capital murder case where the State is seeking the death penalty can vary slightly depending on the issues raised by the facts of the case—there may be two or three special issue questions. Tex. Code Crim. Proc. art. 37.071 §2. Due to this fact, the verdict form is occasionally referred to as a special verdict form. The verdict forms used here included all of the necessary questions for the special issues relevant to this case. 2 CR 561–64. Nonetheless, because Ramirez takes issue with the statutory instructions, he argues that "the court should have required a special

verdict form." ECF 67 at 349–50. However, he does not give the Court any indication what a special verdict form in this context would look like. All he says is that "[w]ithout a special verdict form the trial court had no way to know if the jury verdict was constitutionally sound and had the requisite number of jurors in agreement." ECF 67 at 350.

Improper jury instructions do not usually form the basis for federal habeas relief. *McGuire,* 502 U.S. at 71–72. Erroneous jury instructions warrant reversal of a state court adjudication only when they rendered the entire trial fundamentally unfair. *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977). "The only question [] is 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.'" *McGuire*, 502 U.S. at 72 (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973)).

The punishment jury instructions on future dangerousness and mitigation are addressed in the briefing addressing Claim 10. The special issue addressing whether the defendant caused, intended, or anticipated the death of another is covered in the briefing on Claim 17(L). The Director incorporates the briefing in those sections herein. Because the jury instructions and verdict forms on each of the special issues comply with due process, that the trial court used those instructions and forms was not error. As such, the trial court's failure to use some other special verdict form did not render Ramirez's trial fundamentally unfair.

This claim is unexhausted and procedurally barred. It is also inadequately briefed, conclusory, and meritless. It should be denied.

### R. The cumulative effect of any alleged trial court errors did not prejudice Ramirez. (Claim 4(R))

Finally, in Claim 4(R), Ramirez ends his complaints about the trial court with a catch-all argument that

> [t]he trial court committed numerous errors during Ramirez's trial. Even if this Court were to find that none of them merits relief alone, the cumulative effect of all the errors is so prejudicial that Ramirez is entitled to relief. The errors "so infected the entire trial that the resulting conviction violates due process."

ECF 67 at 350 (quoting *Naughten*, 414 U.S. at 147).

This claim was necessarily not presented to the state courts as many of the sub-points, as explained above, have never been raised in that forum. As such, it is unexhausted and therefore procedurally defaulted. *See supra* Answer IV. It should be denied on that basis alone.

Moreover, "[t]he Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief." *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002); *see Derden*, 978 F.2d 1453 at 1456 (recognizing that "the Supreme Court has not directly spoken" about cumulative error). Hence, *Teague* bars relief.

Finally, and alternatively, there are no trial court errors to cumulate, so the claim is entirely meritless. *See, e.g.*, *Mullen v. Blackburn*, 808 F.2d 1143,

1147 (5th Cir. 1987) ("Twenty times zero equals zero."). And many, if not most, of the trial court error claims above are procedurally defaulted, so they are not eligible for cumulation. *See Derden*, 978 F.2d at 1458 ("[T]he error complained of must not have been procedurally barred from habeas corpus review."). For these multiple reasons, the claim should be denied.

## V.     Ramirez's Trial Judge Was Not Biased. (Claim 5)

In Claim 5, Ramirez alleges that the trial court judge—Judge Noe Gonzalez—was biased. Ramirez has never presented this issue in state court; therefore, the issue is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, a review of the claim reveals it to be meritless as well.

### A.     Law

A claim of judicial bias may be based on either presumptive or actual bias. *See Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008). The Supreme Court has only identified three conflict-of-interest type situations where a judge's failure to recuse constitutes presumptive bias:

> (1) when the judge "has a direct personal, substantial and pecuniary interest in the outcome of the case," (2) when he "has been the target of personal abuse or criticism from the party before him," and (3) when he "has the dual role of investigating and adjudicating disputes and complaints."

*Id.* at 672 (quoting *Bigby v. Dretke,* 402 F.3d 551, 559 (5th Cir. 2005)). A claim of presumptive bias requires a petitioner to "establish that a genuine question exists concerning [the judge's] impartiality." *Bigby*, 402 F.3d at 559. To

establish a claim of actual bias, a petitioner must establish that a judicial officer's actions "show a deep-seated, extreme favoritism or antagonism [toward the defendant] . . . such that fair judgment is impossible." *Buntion*, 524 F.3d at 673.

"[J]udicial rulings alone almost never constitute a valid basis or partiality motion." *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citing *United States v. Grinnell Corp.*, 384 U.S. 563, 583 (1966)). Nor do intemperate remarks, including those that are critical or disapproving of, or even hostile to, counsel and the parties, constitute actual bias unless they display a "deep-seated favoritism or antagonism that would make fair judgment impossible." *Id.* at 555.

### B. Argument

Ramirez does not appear to be alleging actual bias. Instead, he states that "the appearance of bias requires reversal." ECF 67 at 352. Ramirez cites to the concurring opinion in *Liteky* in support of this contention. ECF 67 at 351. However, the concurring opinion by Justice Kennedy does not stand for the proposition that due process requires reversal when there is an appearance of bias, nor does the opinion of the Court, because the only matter being decided in *Liteky* was the standard for federal statutory disqualification. *See Litkey*, 510 U.S. at 541 ("This case presents the question whether required recusal under [28 U.S.C. § 455(a)] is subject to the limitation that has come to be

known as the 'extrajudicial source' doctrine."). And Ramirez provides no other precedent to support his argument that an appearance of bias requires reversal.

Further, Ramirez does not allege any of the established grounds for presumptive bias. For example, Ramirez has not claimed that Judge Gonzalez was "the target of personal abuse or criticism from the party before him." *Buntion*, 524 F.3d at 672. Presumptive bias also occurs when a judge has "a direct personal, substantial *and pecuniary* interest in the outcome of the case." *Id.* at 672 (emphasis added). Again, there is no hint that Judge Gonzalez had any interest, much less a pecuniary interest, in the outcome of Ramirez's trial. Finally, Ramirez does not claim that there is a presumptive bias because the judge "ha[d] the dual role of investigating and adjudicating disputes and complaints." *Id.*

What Ramirez does provide is the observation that Judge Gonzalez "had been the committing judge in several of Ramirez's juvenile proceedings." ECF 67 at 352. However, if merely having presided over previous criminal or quasi-criminal cases involving defendants was sufficient to establish bias, it would be difficult in the case of many defendants to find a judge qualified to serve. Indeed, if having previous knowledge of a defendant's crimes was sufficient to demonstrate bias, then judges could not preside over the trials of co-defendants. As the Supreme Court noted in *Liteky,* "[i]t has long been regarded

271

as normal and proper for a judge to sit in the same case upon its remand, and to sit in successive trials involving the same defendant." 510 U.S. at 551. That Judge Gonzalez presided over other cases involving Ramirez did not create an impermissible bias of constitutional magnitude. Indeed, there is no evidence that the trial court remembered Ramirez had ever appeared before him.[44]

Next, Ramirez points to a handful of comments made by Judge Gonzalez during the course of the proceedings. The majority of the comments were made in a pretrial hearing. Rather than pull statements out of their proper context, the following is the relevant portion of the hearing:

| THE COURT: | Have your client brought forward, Mr. and Mrs. Garza. |
| | |
| | Mr. Ramirez, you have never been in front of this Court and this Judge; is that correct? |
| | |
| RAMIREZ: | Not that I recall, sir. |
| | |
| THE COURT: | Okay. I don't recall you being in my courtroom, either. I'm just pointing it out because I'm going to go over certain rules that I go by, and I expect all defendants and all lawyers to abuse by these rules, simple rules. |
| | |
| | You respect me, I'm going to respect you. Okay? |
| | |
| RAMIREZ: | Yes, sir. |
| | |
| THE COURT: | Now, I am going to warn you, and it has happened before and that's why do it with all |

―――――――――――――

[44] It appears that Ramirez did not recognize the judge either. 2 RR 11.

272

defendants, especially defendants that are charged with crimes of this type. You need to be very careful when you are over at the County Jail, when you are being transferred back and forth, because your actions or reactions to things that are going on around you, will come up at the Punishment Phase if it gets to the Punishment Phase of this case.

Do you understand that?

RAMIREZ:  Yes, Your Honor.

THE COURT:  In other words, anything that you say, anything that you do, any threat you make, or any threat that is made against you and you reacted to it, all that kind of material can come in, and be used against you.

Do you understand that?

RAMIREZ:  Yes, sir.

THE COURT:  Now, I know every single one of these deputies, and they have got to do a job. And I have had defendants, you know, tell the deputies something, and they send a message to me, somebody doesn't want to come to court or somebody is having problems making it to court. And I always do the same thing. I bring them in and I go ahead and warn you.

Now, I have had all kinds of people. And there hasn't been anyone in this County that has sentenced more people in accordance with death sentences that juries have handed down.

And I can tell you that just because you are charged with the crime that you are charged with, it doesn't mean that I'm going to treat you any differently. I treat all defendants the same.

273

|           | Do you understand that?                                                                                                                                                                                                                                                                                                                                      |
|-----------|-------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| RAMIREZ:  | Yes, sir.                                                                                                                                                                                                                                                                                                                                                    |
| THE COURT: | Be very careful.                                                                                                                                                                                                                                                                                                                                            |
|           | Now, you are entitled to wear street clothes, so your lawyers will will [sic] make arrangements with you and your family. If your family can't afford it, then they will make arrangements to get clothes over here so that you can be wearing street clothes when you come and make appearances in this court. |

2 RR 11–13.

The first comment Ramirez complains about is when Judge Gonzalez stated that "there hasn't been anyone in this County that has sentenced more people in accordance with death sentences." ECF 67 at 352. Ramirez provides no explanation of how this statement, or the fact of it, renders the Judge improperly biased. Furthermore, the sentence that follows makes it very clear that the judge was saying that he treats "all defendants the same" regardless of the charge. 2 RR 13.

Next, he complains that Judge Gonzalez warned him "to be very careful." ECF 67 at 352. Judge Gonzalez says that twice in the conversation with Ramirez. First, Judge Gonzalez was telling Ramirez to be cognizant of doing or saying anything in jail that may later be used against him during the punishment phase of trial. 2 RR 12. The second time is a general statement

274

that comes after he tells Ramirez he won't treat him any differently from any other defendant. 2 RR 13. Judge Gonzalez was simply admonishing Ramirez—for his own good—to behave to avoid potential negative consequences. Instead of demonstrating bias, Judge Gonzalez's admonishments show a judge providing a defendant more rights than which he was entitled.

Ramirez next claims that Judge Gonzalez demonstrated bias by stating he did not want outbursts in his courtroom. ECF 67 at 352. This is the type of thing that judges say to defendants every day in courtrooms across the country. The use of the term "outbursts" does not necessarily imply aggressive or disrespectful displays. Anything deemed to be outside the normal flow of a trial, such as asking the judge questions in the middle of proceedings, could be considered an "outburst." Regardless, as Judge Gonzalez repeatedly mentioned, his admonishments were given to everyone and were not directed to Ramirez for a specific reason. In fact, that is the overarching theme to Judge Gonzalez's comments. He provided Ramirez the same instructions he would give any defendant which demonstrates the opposite of bias.

Ramirez next complains that Judge Gonzalez "asked questions that supported the State's case and made statements aligning himself with the prosecutor." ECF 67 at 352. Presumably, according to Ramirez, asking a leading question of a witness demonstrates support for the sponsoring party. However, it is more likely that asking a leading question of someone who has

already testified is the most expedient way to clarify the testimony of a witness on a matter. Regardless, a single instance of asking a witness a leading question is insufficient to demonstrate bias.

Ramirez also complains that Judge Gonzalez referred to the prosecutor as "my Clint Eastwood." ECF 67 at 352. The meaning of that nickname requires significant speculation. However, from the judge's comment, it seems that he was referencing the prosecutor's tendency to speak slowly. Judge Gonzalez stated as follows:

> THE COURT:   And, in fact, I don't mind telling you all that when you all get prepared for individual voir dire, which is just one day away, those of you that have selected juries on capital cases where the State is seeking the death penalty in my court know, especially Mr. Thompson—I notice that your voice is—
>
> Your demeanor is somewhat quicker nowadays. You used to be much more deliberate. Just for the record, I used to call Mr. Thompson my Clint Eastwood.
>
> But, let me say this: The reason that I'm pointing this out is that it is important for the State and for the defense to get this case tried as efficiently and quickly and as consistent—and consistent with the constitutional rights of your client.

7 RR 205. Regardless of what specifically the judge meant by the nickname, it seems clear that the prosecutor no longer fit the bill. The idea that this throw away comment is indicative of judicial bias is ludicrous.

Finally, Ramirez unhelpfully makes the vague statement that the judge made "various statements reflecting prejudgment of Ramirez's case." ECF 67 at 352. However, on this point Ramirez does not cite to anything in the record. Therefore, the Director is unable to provide an intelligent response to this allegation. It should be denied as conclusory. *See Ross*, 694 F.2d at 1011–12.

The claim is procedurally defaulted. Alternatively, individually or collectively, Ramirez falls far short of demonstrating that Judge Gonzalez was biased. Claim 5 should be denied.

## VI.   Ramirez Was Not Denied His Right to Confront a Witness Against Him in Violation of the Sixth Amendment's Confrontation Clause. (Claim 6)

In Claim 6, Ramirez argues that his Sixth Amendment right to confront the witnesses against him was violated. ECF 67 at 353. Citing to *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004), Ramirez complains that the testimonial statements of witnesses who did not appear at trial were admitted although there was no evidence that they were unavailable and despite the fact that he had been unable to cross-examine them prior to trial. ECF 67 at 353. Ramirez did not raise this issue in state courts; therefore, it is unexhausted and procedurally barred in this forum. *See supra* Answer IV. Ramirez does not acknowledge or attempt to overcome this bar and the claim should be denied. Nonetheless, if this claim is reviewed de novo, it fails on the merits.

### A.    Law

The Sixth Amendment's Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Confrontation Clause bars the admission of testimonial statements of a witness who does not appear at trial unless he is unavailable to testify and the defendant had a prior opportunity to cross-examine him. *Crawford,* 541 U.S. at 59. A statement is "testimonial" if "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." *Davis v. Washington*, 547 U.S. 813, 822 (2006). In evaluating the statements, courts determine "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 576 U.S. 237, 245 (2015) (alteration in original) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)). "[W]hen a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony . . . the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." *Bryant*, 562 U.S. at 358–59.

On habeas review of state criminal convictions, a federal court does *not* sit as a super-state appellate court. *McGuire,* 502 U.S. at 67–68; *Jeffers,* 497 U.S. at 780; *Pulley,* 465 U.S. at 41. A federal court may grant habeas relief

based on an erroneous state court evidentiary ruling only if the ruling violates a specific federal constitutional right or is so egregious it renders the petitioner's trial fundamentally unfair. *Goodrum v. Quarterman.* 547 F.3d 249, 261 (5th Cir. 2008). Federal habeas review of a state court's evidentiary ruling focuses exclusively on whether the ruling violated the Constitution. *Bigby*, 402 F.3d at 563. Furthermore, confrontation clause complaints are subject to harmless error analysis. *See Delaware v. Van Arsdall,* 475 U.S. 673, 680–84, (1986); *United States v. Stalnaker,* 571 F.3d 428, 434 (5th Cir. 2009). The federal standard for harmless error is whether the error had a substantial and injurious effect on the jury's verdict. *See Brecht,* 507 U.S. at 637.

### B.  Argument

The specific problem, according to Ramirez, is that his juvenile probation officer, Ricardo Leal, was permitted to "testif[y] about specific, prejudicial examples of Ramirez's conduct, which Leal learned about second-hand from unidentified declarants." ECF 67 at 353. This alleged violation of *Crawford* occurred during the punishment phase of Ramirez's trial. ECF 67 at 353. Ramirez complains about two portions of Leal's testimony. The first:

> Q.    Okay. He was placed on [juvenile parole] December 20, 2001. Was there a time that you considered he was in violation of his parole?
>
> A.    Yes.
>
> Q.    And when was that?

A.    If I may be allowed to go into the file, I believe it was a month and a half or two months he was on parole.

Q.    Go ahead and take a look at your notes there, if you would.

A.    (Complies.)

(Brief pause.)

A.    On January 19 of 2000, I discovered that Juan had—had— I'm sorry. I'm sorry. I got the wrong information right now.

(Brief pause.)

A.    January 16, 2002, I got information that Juan might have been arrested by the Alamo PD.

Q.    He was placed on parole one month later, you had information that he had been arrested?

A.    Yes, sir.

Q.    Did that information come from the Defendant himself? Did he tell you he had been arrested?

A.    No sir.

Q.    Did you look into it?

A.    Yes, sir.

Q.    And after looking into it what did you do?

A.    Once I looked into it, and I—it was confirmed that he had been arrested, I issued out directive—what we call a Texas Youth Commission directive, similar to warrant.

Q.    To have him picked up to have him arrested–

A.    Yes, sir.

280

38 RR 91–92.

The second part of Leal's testimony, about which Ramirez complains, occurred a few questions later:

Q.    When was the next time you heard from him or have him contact you?

A.    The next information had on Juan was March 16 of 2002.

Q.    Okay.

A.    That's when we were informed that Juan had been—Juan had been arrested and charged with resisting arrest and unlawful carrying of weapon.

Q.    As far as the juvenile justice system goes, what was done those particular charges?

A.    Those charges being that Juan was already an adult, they were deferred to the Cameron County DA.

Q.    So even though he is an adult, he is still being supervised by juvenile parole officer?

A.    Yes, sir when all youths are committed, unless there is an exception, where the Judge might classify youth as sentenced offender. But other than that, all kids are committed to our custody until the age of 21.

Q.    So based on the situation that you had with him at that time violation of his parole what was what happened to him with regard to the juvenile justice system?

A.    I went ahead and discussed the case with my supervisor, and the decision was made to proceed with an administrative hearing, a revocation hearing.

38 RR 93–94.

Ramirez complains that "[t]his testimony violated Ramirez's confrontation rights because Leal's testimony turned on a review of probation records prepared at least in part by individuals who the State did not show were unavailable to testify at trial and were previously available for cross-examination." ECF 67 at 353. Ramirez initially loses because the Confrontation Clause does not apply to capital sentencing proceedings. *Fields*, 483 F.3d at 335 ("Neither the text of the Sixth Amendment nor the history of murder trials supports the extension of the Confrontation Clause to testimony relevant only to penalty selection in a capital case."). As such, Ramirez cannot make out the deprivation of a constitutional right, so he is not entitled to relief. *See* § 2254(a).

Assuming such a right, the statements were not testimonial in nature. Rather, Leal testified that Ramirez was arrested on two separate occasions and on one of those instances it was for resisting arrest and unlawfully carrying a weapon. This information was passed along, most likely in a quick phone call, so that Leal could do his job—supervise Ramirez in accordance with the terms of his juvenile parole. The information was used for that purpose—both times administrative hearings were ultimately held based upon actions taken by Leal. 38 RR 91–94. The statements did not contain specific factual allegations of any crime. The idea that these "out-of-court statements" were made "to establish or prove past events potentially relevant to later criminal

prosecution" or as "a substitute for trial testimony" is untenable. *Davis*, 547 U.S. at 822; *Clark*, 576 U.S. at 245.

Leal's testimony about Ramirez's arrests does not offend the Confrontation Clause for a second reason. Leal's purportedly offending statements were not hearsay. The information was likely elicited at Ramirez's trial, not for the truth of the matter asserted, but to explain Leal's actions in moving to revoke his juvenile probation. But "[t]he Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted." *Crawford*, 541 U.S. at 59 n.9. Accordingly, there was no violation of Ramirez's right to confront the witnesses against him. *See Williams v. Illinois*, 567 U.S. 50, 78–79 (2012) (part of expert's testimony was not admitted for the truth of the matter asserted and therefore didn't violate the Confrontation Clause).

Nonetheless, even if the Leal's testimony on the two arrests was improper, it was certainly not significant in light of the punishment evidence as a whole. The jury had evidence of actual convictions on top of the totality of the evidence admitted during the guilt portion of the trial. The likelihood that the information about two arrests played any role in the jury's verdict is minimal. Therefore, the probability that the testimony had a substantial and injurious effect on the jury's verdict is virtually nonexistent. Ramirez cannot meet his burden under a de novo review of the claim.

Finally, the claim is *Teague*-barred. As explained above, the Confrontation Clause does not apply to capital punishment proceedings. Accordingly, Ramirez is seeking a new rule in trying to garner relief from evidence admitted at that phase, purportedly in violation of the Confrontation Clause. As such, *Teague*'s non-retroactivity principles bar relief.

This claim is unexhausted and therefore procedurally barred, is not of constitutional dimension, barred by *Teague*, and plainly meritless in the alternative. It ought to be denied.

## VII. Ramirez Is Not Actually Innocent of the Crime for Which He Was Convicted. (Claim 7)

In Claim 7, Ramirez alleges that he "is actually innocent, so his conviction and death sentence violate the Due Process Clause of the Fourteenth Amendment and the prohibition against cruel and unusual punishment of the Eighth Amendment to the U.S. Constitution." ECF 67 at 355–59.

"The Fifth Circuit does not recognize freestanding claims of actual innocence on federal habeas review." *In re Swearingen*, 556 F.3d 344, 348 (5th Cir. 2009); *see Reed*, 739 F.3d at 766 ("Reed concedes that our precedent preclude his freestanding actual innocence claim."); *Foster v. Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006) ("[A]ctual-innocence is not an independently cognizable federal-habeas claim."); *Dowthitt*, 230 F.3d at 741 (expressly

rejecting the assuming arguendo portion of *Herrera*). Therefore, Ramirez's Claim 7 does not present a proper ground for federal habeas relief as even he admits. ECF 67 at 349 n.49.

To the extent that Ramirez tries to establish gateway innocence for purposes of overcoming procedural default, he fails. The burden of proving actual innocence as a gateway is an exacting standard that Ramirez cannot meet. None of the evidence submitted by Ramirez credibly refutes the damaging evidence against him.

Actual innocence, if proven, serves as a gateway through which a habeas petitioner may bypass a procedural bar to have his constitutional claims heard. *See Schlup v. Delo*, 513 U.S. 298, 315 (1995). Where a capital petitioner claims gateway innocence, the *Schlup* "more likely than not" standard applies, i.e., the petitioner must show that "in light of the new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536–37 (2006) (citing *Schlup*, 513 U.S. at 327).

A petitioner cannot overcome this hurdle by merely compiling evidence that favors his claim of actual innocence. The evidence instead must be "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 327. While the Supreme Court has not defined what

285

constitutes "new reliable evidence" under *Schlup*, the Fifth Circuit has held that such evidence is not "new" if "it was always within the reach of [petitioner's] personal knowledge or reasonable investigation." *Hancock v. Davis*, 906 F.3d 387, 389–90 (5th Cir. 2018) (citing *Moore,* 534 F.3d at 465).

The Supreme Court has "often emphasized 'the narrow scope' of the [actual innocence] exception." *Calderon v. Thompson*, 523 U.S. 538, 559 (1998) (quoting *Sawyer*, 505 U.S. at 340). "Given the rarity of such evidence, '*in virtually every case*, the allegation of actual innocence has been *summarily* rejected.'" *Calderon*, 523 U.S. at 560 (emphasis added) (quoting *Schlup*, 513 U.S. at 324); *see also Schlup*, 513 U.S. at 324 ("[C]laims of actual innocence are rarely successful."). In part, this is because a reviewing court does not look at the new evidence in isolation but makes "a holistic judgment about 'all the evidence,'" including "how reasonable jurors would react to the overall, newly supplemented record." *House*, 547 U.S. at 538–39 (quoting *Schlup*, 513 U.S. at 328). The Supreme Court has emphasized that it is only in the most "extraordinary" of cases that a petitioner's new evidence will be sufficient to overcome the "presumed guilt of a prisoner convicted in state court" so as to permit federal review of defaulted claims. *Id.* at 537.

While a state court does not adjudicate a *Schlup* claim for federal purposes, "it still may decide matters relevant to one, quite possibly in the course of deciding highly similar issues of state or federal law." *Sharpe v. Bell*,

593 F.3d 372, 378 (4th Cir. 2010). As a result, not only must Ramirez contend with *Schlup*'s exacting standard, but the state court's findings of fact, including its credibility determinations, in deciding similar issues—*e.g.*, DNA retesting not being exculpatory, sufficiency of the evidence to support Ramirez's conviction, admissibility of Ramirez's confession, and counsel not presenting a false confession expert—are presumed correct and cannot be set aside absent clear and convincing evidence to the contrary. § 2254(e)(1).

The majority of Ramirez's claim is largely a rehash of arguments that were already considered, and rejected, by the jury that convicted him. For the few arguments that Ramirez did not present to the convicting jury, he fails to support them with new reliable evidence that was previously unavailable and instead relies almost exclusively on conjecture and speculation. The only remotely "new" evidence Ramirez presents are the declarations of co-defendant Marcial Bocanegra. ECF 67 at 357–59. However, the statement of a co-defendant could never be considered outside the reach of reasonable investigation, so it may not be considered. *Hancock*, 906 F.3d at 389–90. And even if it were, it is hardly reliable.

As Ramirez does not provide any new evidence to support his allegation of gateway innocence, this Court should conclude that it, in addition to not being a viable freestanding claim for relief, Ramirez fails to satisfy *Schlup*'s

demanding standard and thus provides no gateway to excuse his procedural defaults.

## VIII. The State Did Not Commit Misconduct. (Claim 8)

Claim 8 is a multipart claim where Ramirez raises nine claims of prosecutorial misconduct. ECF 67 at 359–85.

### A.    The State did not improperly deny the existence of the arrest video until after the suppression hearing. (Claim 8(A))

In Claim 8(A), Ramirez alleges that the "State committed misconduct when it denied the existence of the arrest video until after the suppression hearing." ECF 67 at 361. This claim was presented to the CCA as issue nine of Ramirez's direct appeal. *Ramirez*, 2007 WL 4375936, at *9–12. As such, the CCA's decision on this matter is due deference from this Court. Ramirez has not attempted to demonstrate an unreasonable adjudication or overcome the presumption of correctness and his claim must fail. Alternatively, Ramirez's claim lacks merit under a de novo review.

As mentioned above, the CCA adjudicated this claim on the merits on direct appeal:

> Defense counsel first addressed the possible existence of the videotape during the arraignment proceedings on October 12, 2004:

> > [DEFENSE COUNSEL]: The other question was, when our client was arrested out in the Hargill area, there was somebody there with a camera that was there with the

police. We are not sure if it was a police officer or not, but if it was and there is a video of that, we would like a copy of that.

* * *

[PROSECUTOR]: We have no reason to believe that one exists, Your Honor. This is the first that we have ever heard of any such thing, but we'll inquire of the arresting officers to see if they saw anybody else in the area filming.

THE COURT: Okay. Just make sure that you check into that.

When defense counsel again asked for the arrest videotape during the pretrial proceedings on October 18, the prosecutor responded that the police had informed him that there was none.

The hearing on [Ramirez]'s motion to suppress was held on October 22 and 23. Detective Daniel Ochoa testified that he was present when [Ramirez] was arrested at his aunt's trailer house in Hargill at around 2:45 p.m. on January 29, 2003. He testified that Detective Oziel Plata had a video camera, but that there was no videotape because Plata "couldn't obtain anything from where he was at." He testified that police recovered a duffel bag containing a gun and clothing, but did not find any drugs at the residence. He could not recall if police retrieved [Ramirez]'s wallet. Neighbor Marita Morales testified that she observed one of the arresting officers with a video camera:

> Yeah, one of them when they went in. When they got off the vehicle, I saw a guy that had one right here on the side. And while they were walking toward the trailer, I guess he turned it on and he went to follow the rest inside the house, and then when he got to the stairs, one of them yelled, camera, camera, and he went inside, started filming inside the house.

She stated that she saw the "red little light" on the camera but acknowledged it was possible that it could have been a "stand-by light." When the police brought [Ramirez] outside, she overheard them talking: "I heard—I think they said that they

had—they had found a gun and, like, a bag of drugs or something in the room. That's why they were filming, I guess." She further stated that the officer with the video camera kept filming outside the trailer for ten to fifteen minutes after police took [Ramirez] away.

[Ramirez] testified at the hearing on the motion to suppress that he was asleep when the police arrived to arrest him. He testified that, as police escorted him from the trailer, he "noticed a gentleman that was pointing a video camera on [him]." He testified that he was still drowsy when he arrived at the Edinburg Police Department because he "was Roched up," which means "[b]eing under the influence of pills." He testified that he had taken fifteen pills called "Roches" and that he kept the pill packages inside his wallet, which was located on top of the night stand. He testified that, when he was in his cell prior to making his statement, Officer Ramiro Ruiz asked him why he was sleepy and he responded that he "was Roched up." At the close of the hearing, the trial court reminded the State to continue to look for any videotapes that may exist.

On November 5, during the individual voir dire proceedings, the following exchange occurred:

[PROSECUTOR]: Judge, I requested that on behalf of the State, pursuant to discovery orders that you had entered, we have been able to obtain a copy of a videotape that shows some of the arrest on Hargill, Texas.

I'm going to hand to the defense a copy of that.

* * *

THE COURT: Is there anything that they would not have gotten from the reports and from, you know, the testimony that they have already received that may be contained in that videotape?

[PROSECUTOR]: I believe a wallet is shown in the photographs and the wallet is shown in the videotape. And in reviewing the testimony of the officer, he testified about the wallet, that he said he could not remember if he did or did not get it out of the bag.

290

And I believe on the videotape it shows him taking the wallet, I think, if I'm remembering right, out of the bag. That's the same officer.

* * *

[PROSECUTOR]: We took it upon ourselves to make the copy. Because of the Court's order, we didn't wait for them to get us a copy of the tape. We got a copy for them.

THE COURT: Let me say this: You have handed in open court a copy of the videotape. The only thing I will ask you to do is this: I will ask you to allow them to see the original just to—just to appease them to make sure that there is nothing in the original that is not on the copy.

But take a look at it over the weekend, I guess.

[DEFENSE COUNSEL]: I will.

THE COURT: Let me know if there is anything else to take up.

[PROSECUTOR]: And so that we can be clear, the videotape also contains audio. They can turn up the volume an[d] listen to what is being said and all that, and then they can compare that to their pretrial hearings and to the testimony and they will be able to distinguish. But there is nothing on the audio that says, hey, we found drugs or anything like that that is picked up by the recorder.

* * *

THE COURT: By the way, if there is anything in the videotape that the State or the defense wishes the Court to consider for purposes of any reconsideration of the motion to—or additional evidence in support or against the Motion to Suppress, I will be glad to reopen evidence now that that videotape has been obtained.

So if either side wants to reopen evidence on the Motion to Suppress, you are free to do so. Just request it from the Court.

[DEFENSE COUNSEL]: At this time, what we would like to

291

do is review the videotape over the weekend and see what shows up and make a decision at a later date.

\* \* \*

[DEFENSE COUNSEL]: I think that this Monday they informed us that they found the wallet. The wallet was in the desk drawer or locker of one of the police officers. It wasn't with the rest of the evidence that we reviewed previously. And we have asked them to take us over there, and at a later date we'll go when we have time and look at the wallet.

During final pretrial proceedings on November 22, defense counsel requested to see "the original videotape of the Hargill arrest, because all we got was a copy, and I know that there was, like, three minutes missing in there and some of it at the end." The trial court ordered the State to "give them the opportunity to check that tape to make sure that it is a true and correct copy."

The guilt/innocence phase proceedings began on November 29. Defense counsel neither requested that the trial court reopen evidence on the motion to suppress nor introduced the videotape into evidence at trial. The issue did not arise again until defense counsel filed a motion for a new trial alleging that the State engaged in suppression and spoliation of the arrest videotape.

To establish a *Brady* violation, [Ramirez] must show that the prosecutor (1) failed to disclose evidence (2) favorable to the accused and (3) that the evidence is material. *Harm v. State,* 183 S.W.3d 403, 406 (Tex. Crim. App. 2006). Evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *United States v. Bagley,* 473 U.S. 667, 682 (1985); *Ex parte Kimes,* 872 S.W.2d 700, 702–03 (Tex. Crim. App. 1993). [Ramirez] claims that the videotape would have "corroborated [Ramirez's] position that his statement was involuntary because he was impaired from having ingested roach pills."

Defense counsel testified at the hearing on the motion for a new trial that, if the State had disclosed the videotape prior to the hearing on the motion to suppress, then she would have questioned

the arresting officers about whether they found drugs in the trailer and would have called an expert to testify about "the effects of this type of drug on this individual, the voluntariness of the statement, that sort of thing." However, she admitted that she knew about the "Roche" pills before [Ramirez] testified at the suppression hearing. She testified that "the point to the tape" was that [Ramirez] looked "dazed" when he was arrested. She acknowledged that she failed to introduce the tape into evidence at trial but claimed that she did not have time to decide if that was the best course of action. The trial court pointed out that she received the tape "long before the evidence portion [of trial] started" and that she had co-counsel to assist her in making that decision. Further, Ramiro Ruiz denied talking with [Ramirez] in his jail cell prior to the taking of his statement, and Edgardo Ruiz testified that he did not detect any signs that [Ramirez] was intoxicated during the taking of his statement. [Ramirez] has failed to show that there is a reasonable probability that the result of the proceeding would have been different if the State had disclosed the videotape earlier.

*Ramirez*, 2007 WL 4375936, at *9–12.

To establish a violation of *Brady*, a petitioner must show that: (1) the evidence was suppressed by the State, either intentionally or inadvertently; (2) the evidence was favorable to the defendant, either because it was exculpatory or impeaching; (3) the evidence was material either to guilt or punishment; and (4) the failure to discover the allegedly favorable evidence was not the result of a lack of due diligence. *See Strickler v. Greene*, 527 U.S. 263, 281–82 (1999); *Parr v. Quarterman*, 472 F.3d 245, 254 (5th Cir. 2006). Evidence is material only if "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). A

293

"reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

The CCA's adjudication was undoubtedly reasonable. Because prosecutors provided the videotape to Ramirez pretrial, he cannot demonstrate suppression. That is because "[t]he Supreme Court has never expressly held that evidence that is turned over to the defense during trial has been 'suppressed' within the meaning of *Brady*." *Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008). While the Supreme Court is silent on the matter, the Fifth Circuit has addressed it, holding "that such evidence is not considered to have been suppressed." *Id*. at 335. Accordingly, because there was no suppression, the CCA's denial is reasonable.

Furthermore, the videotape was not exculpatory, nor could it have been used to impeach any witness. Ramirez's argument in his direct appeal brief was essentially the same as part of the argument he makes to this Court. Presumably this argument was intended to address the requirement that the evidence must be exculpatory or impeaching and materiality. As Ramirez phrases the argument in this Court,

> Had the State timely disclosed the videotape, it would have revealed, at a minimum that Ramirez had "Roche pills" (7 RR at 57–61), which would have corroborated Ramirez's explanation that his statements to police were compromised by the effects of drugs (7 RR at 152–54.).

ECF 67 at 362. Ramirez adds to the current petition an argument that, with additional investigation, "the video may have also revealed other material and/or exculpatory information." ECF 67 at 362.

However, the fact that Ramirez had "Roche pills" when he was arrested does not necessarily imply that he had taken any. Furthermore, Ramirez provides no legal support for the contention that corroborating evidence is exculpatory or impeaching under *Brady*. To the extent that he is suggesting that such a rule should be created, that argument is barred by the nonretroactivity principles of *Teague*.

Just as the video was not exculpatory or impeaching, as the CCA's decision reasonably concluded, the video was not material. *See United States v. Williams,* 132 F.3d 1055, 1060 (5th Cir. 1998); *United States v. McKinney*, 758 F.2d 1036, 1049–50 (5th Cir. 1985) (when the issue is late disclosure of *Brady* material, "the inquiry is whether the defendant was prejudiced by the tardy disclosure"). The CCA held that Ramirez was not prejudiced by the tardy disclosure. While Ramirez did not have the tape prior to the suppression hearing, the trial court said it would consider supplementation to the motion to suppress after the tape was disclosed. 26 RR 9–11. And counsel received the tape over three weeks prior to trial. 17 RR 133, 27 RR. The record reflects that trial counsel had ample opportunity to review the tape and utilize it had they chosen to do so.

As far as the suggestion that additional investigation may have revealed other material or exculpatory evidence, if this were the case, Ramirez has had ample time to develop such evidence. As just noted, Ramirez received the video three weeks prior to trial. Furthermore, Ramirez has had almost seventeen years to investigate whether the video could reveal anything.

The CCA cited proper precedent and applied that law reasonably to the facts in this case. Even if their decision is unreasonable, Ramirez's claim is meritless on de novo review. Claim 8(A) should be denied.

## B.   The State did not commit misconduct with relation to the arrest video. (Claim 8(B))

Claim 8(B) alleges that the State "committed misconduct when it engaged in or allowed police to engage in spoilation" of the arrest video. ECF 67 at 363. This claim was not presented to the state court as a constitutional violation.[45] Therefore, it is unexhausted and procedurally barred. *See supra* Answer IV. This claim should be denied on this basis. Alternatively, the claim fails on its own merits.

When a petitioner claims that the prosecution has engaged in spoilation of evidence, he must show that the evidence was material to either guilt or punishment. *Arizona v. Youngblood,* 488 U.S. 51, 57–58 (1988). In order for

---

[45] A state law claim that the State engaged in spoilation of evidence was raised on direct appeal and rejected by the CCA. *Ramirez*, 2007 WL 4375936, at *12.

evidence to be considered material, its exculpatory value must have been apparent before it was destroyed or spoiled. *Bower v. Quarterman*, 497 F.3d 459, 476 (5th Cir. 2007). Furthermore, the evidence must have been "of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." *California. v. Trombetta,* 467 U.S. 479, 489 (1984). Additionally, evidence is not material unless there is a reasonable probability that, the proceeding would have ended differently had the evidence been disclosed. *Bower*, 497 F.3d at 476. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley,* 473 U.S. 667, 682 (1985). Absent a showing of bad faith, failure to preserve potentially useful evidence does not constitute a denial of due process. *Youngblood,* 488 U.S. at 57–58.

Ramirez claims that "[t]he record from the final pretrial conference supports that the State deleted three minutes from the copy of the arrest video it ultimately produced to Ramirez. (26 RR 9–11)." ECF 67 at 363. However, the record supports nothing of the sort. The exchange on the arrest video started with Ramirez's lead counsel telling the Court that she wanted to view the original of the video.

> GARZA:    Judge think that we wanted to look at— there was, let me see, the original videotape of the Hargill arrest, because, all we got was copy, and I know that there was, like, three minutes missing in there and some of it at the end.

[PROSECUTOR]: Judge—

GARZA:            I wanted to take look at it and see what that looks like in comparison to what we got.

THE COURT:       Make arrangements to do it before Thanksgiving.

[PROSECUTOR]: Judge, just as far as that goes, I think that discovery says that we give her copy. The rules of discovery say that we give her copy of what is offered into evidence. I think that she can cross examine whoever offers that to see where the original is and things of that nature.

THE COURT:       She has the ability, though, to check whether or not the copy is an exact copy of the original. She doesn't have to necessarily take your word for it, unless it is a burden to you to have that videotape examined by them just to make sure that it is—you know, it is the exact copy. And it happens a lot, like when a videotape—especially when videotape—I'm not saying this videotape was edited, but there is some videotapes—for example, it has happened with families where they will say, Well, we are not offering the first part of the videotape because that's the quinceanera we went to last week.

                 The second part of the videotape is the videotaping of the accident. Well, they have right to examine the whole tape just to make sure that there is nothing more there.

[PROSECUTOR]: But it has become burdensome, Your Honor. They have asked to listen to the original confession tape. They have asked to look again at some of the ballistics that were recovered in the case that they had already seen.

|  | They are asking to view this video, which ties up, not only us, because we do have schedule for 3:00 this afternoon to meet them out at the crime scene. |
|---|---|
| THE COURT: | How long is the video? |
| GARZA: | It is just few minutes, Judge. I think that there was, like, total of about nine, 10 minutes of the video. There was like three minutes missing in between. |
| [PROSECUTOR]: | But see that ties us up and it ties up our investigator, our evidence man who has to go out there and do that instead of getting ready on this case. |

26 RR 9–10. The Court eventually ordered the State to accommodate the viewing. 26 RR 11.

In this exchange, lead counsel indicates her belief that something was missing from the *copy* of the video she received. 26 RR 9. The State was ordered to permit the defense to view the original. 26 RR 11. Trial counsel did not lodge any further complaints on the subject. The reasonable interpretation of this is that there was nothing missing. Nonetheless, Ramirez assumes that there was missing time and that it "likely contained evidence that, at a minimum, corroborated Ramirez's explanation that he was intoxicated when arrested." ECF 67 at 363. Ramirez then concludes "that the State's failure to preserve the complete video should give rise to the inference that the footage was favorable to Ramirez." ECF 67 at 363. Ramirez's claim is merely speculative.

As noted above, Ramirez must prove materiality—that the evidence was exculpatory and that he could not have obtained comparable evidence in any other manner. Ramirez's conclusory statement does not come close to doing so. He also must show that, had he received the evidence, there is a reasonable probability that the results of his trial would have been different. On this, Ramirez speculates that, since the evidence "likely" contained support for the idea that he was intoxicated when he was arrested, it would have "undermined the admissibility and/or persuasive force of the statements he gave to the police." ECF 67 at 363. This unsupported conclusion is insufficient to show a reasonable probability of a different result. Finally, Ramirez does not even suggest that the purportedly missing three minutes was destroyed due to bad faith on the part of the State. In short, Ramirez fails to allege or provide support for the factors necessary for successfully raising a claim of this type.

This claim is unexhausted and procedurally barred. It is also conclusory and meritless. This claim should be denied.

### C.   The State did not sponsor false testimony at the suppression hearing. (Claim 8(C))

In Claim 8(C), Ramirez alleges that the "State committed misconduct when it sponsored the false testimony of Edinburg Police Officer Edgar Ruiz." ECF 67 at 364–67. Ramirez did not raise this issue in the state courts; therefore, it is unexhausted and procedurally barred in this forum. *See supra*

Answer IV. Ramirez does not acknowledge or attempt to overcome this bar and the claim should be denied. Nonetheless, if it were reviewed de novo, the claim fails on the merits.

The Supreme Court held in *Napue v. Illinois* that it is a violation of the Fifth and Fourteenth Amendments to the United States Constitution for the prosecution to knowingly use perjured testimony. 360 U.S. 264, 269 (1959). To succeed in this type of due process claim, a defendant must show that the testimony complained of was actually false, the State knew or should have known that it was actually false, and the false testimony was material. *In re Raby*, 925 F.3d 749, 756 (5th Cir. 2019). False testimony is material if there is "any reasonable likelihood" that it could have affected the jury's verdict. *Id*. But, in habeas, Ramirez must demonstrate more—that the false testimony had a substantial and injurious effect on the jury's decision. *See Barrientes v. Johnson*, 221 F.3d 741, 756–57 (5th Cir. 2000).

Ramirez argues that at the suppression hearing Detective Edgardo Ruiz testified falsely when he said that Ramirez admitted to using a frying pan as a weapon to assault one of the victims. ECF 67 at 364–67. Ramirez points out that co-defendant Marcial Bocanegra provided the same detail in the statement he gave to Detectives Soto and Ochoa a week prior to Edgar Ruiz's interview of Ramirez. ECF 67 at 365.

Ramirez states that "[a]t the suppression hearing, Edinburg Officer Edgar Ruiz testified that Ramirez's statement included previously unknown information—that one of the victims had been struck with a frying pan." ECF 67 at 364. However, the section from the reporter's record that Ramirez quotes reveals a subtle nuance that Ramirez misses or ignores. Edgardo Ruiz's testimony was not that it was previously unknown by *all* of law enforcement that someone was beat with a skillet. The testimony is that *Ruiz* learned that information from Ramirez. 6 RR 83–84. ("Prosecutor: And that was information you learned from the defendant's statement? E. Ruiz: From the defendant.") While this is a seemingly minor distinction, it proves that there was nothing false in Ruiz's testimony. In other words, Ruiz was testifying about what he learned, not what law enforcement knew as a whole. Ruiz therefore fails to establish falsity.

Even if Ruiz testified falsely, the falsity was not material. First and foremost, Ramirez complains about testimony at a preliminary hearing, not before the jury. Thus, he fails to show any effect on the jury's verdict. If Ruiz himself did not know the detail about the frying pan, he could not have fed that information to Ramirez to put into his statement. Furthermore, this is not like situations where information possessed by law enforcement is imputed to prosecutors. The significance of the testimony, and its factual accuracy, have absolutely nothing to do with what other officers may have been aware of.

Furthermore, there is no reason to believe that had the Court been aware of this alleged falsity, Ramirez's statement would have been suppressed. This particular detail does not provide any insight into any of the complaints Ramirez raised at the suppression hearing. It is not evidence that Ramirez was intoxicated, asked for an attorney, or was interrogated without having been provided his *Miranda* warnings. Ramirez suggests that, if the State corrected Detective Edgardo Ruiz's testimony, the detective's credibility would have been in doubt. ECF 67 at 366. According to Ramirez, "the primary dispute was between Ruiz's and Ramirez's conflicting testimony regarding what occurred before Ramirez gave his recorded statement." ECF 67 at 366. However, even had the Court developed some doubt about Detective Edgardo Ruiz's testimony, that would not have automatically rendered Ramirez's testimony credible. Additionally, a copy of the warnings Ramirez received and signed was admitted into evidence. 6 RR 14. The Court also had the recording of the interview as well as a written transcript. 7 RR 18, 127. Even had the court questioned the credibility of Detective Edgardo Ruiz, the signed *Miranda* warnings and the taped confession supported his testimony. Finally, Detective Edgardo Ruiz was not the only law enforcement officer whose testimony contradicted Ramirez's version of events. Detective Ramiro Ruiz also testified and was deemed credible by the Court. Supp CR 6–14. Even had the State

acted to correct the allegedly false testimony, Ramirez cannot show that the court would have made a different ruling.

As Detective Edgardo Ruiz's testimony was not false, there was nothing for the State to correct. Moreover, the supposedly false testimony was not material. This claim is unexhausted and procedurally barred and meritless. It should be denied.

### D. The State did not commit misconduct regarding Marcial Bocanegra. (Claim 8(D))

In Claim 8(D), Ramirez avers that the State committed misconduct in relation to co-defendant, Marcial Bocanegra, in two ways. ECF 67 at 367–74. Ramirez argues that, "[b]eyond violating *Brady*, the State's disclosure violations also amounted to prosecutorial misconduct because the State misled the court regarding the undisclosed information and misrepresented the evidence." ECF 67 at 367–68. First, he says that the State "concealed and then misrepresented the nature of the cooperation agreement it reached with Marcial Bocanegra." ECF 67 at 368. Second, Ramirez claims that the State violated *Brady* by failing to turn over exculpatory evidence received from Bocanegra. ECF 67 at 372. Ramirez did not raise these issues in the state courts; therefore, they are unexhausted and procedurally barred in this forum, and Ramirez does not acknowledge or attempt to overcome this bar. *See supra*

Answer IV. These claims should, accordingly, be denied. Nonetheless, if they are reviewed de novo, the claims fail on the merits.

1. **The State did not improperly conceal the cooperation agreement reached with Marcial Bocanegra. (Claim 8(D)(1))**

In Claim 8(D)(1), Ramirez complains that the State concealed a cooperation agreement reached with Bocanegra in violation of the court's disclosure order. ECF 67 at 368–72.

Ramirez filed requests asking for the State to be ordered to turn over any agreements, promises, or inducements made to each witness, "including, but not limited to, plea bargain agreements . . . , agreements to dismiss or reduce or not bring charges, or any other agreement of leniency." 1 CR 69; *see* 1 CR 113; 1 CR 176. There were also times at various pretrial hearings where Ramirez's trial counsel inquired as to "deals with the co-defendants." ECF 24-2 at 18, 39, 72.

As explained in the offense report of Detective Soto, the State's agreement with Bocanegra was that, if he provided information about the crime, that information which "checked out," and that the information helped in the arrest and conviction of the person(s) involved in the crime, the State "would do away with the death penalty and life sentence and would start the sentence at 50 years." ECF 24-2 at 140. Soto's report also specifically states that even if Bocanegra assisted in the investigation, "if the information he was

providing was not true that the district attorney could refuse to help him out." ECF 24-2 at 141.

Ramirez alleges that it was a violation of *Brady* for the State not to immediately inform trial counsel about this agreement reached between Bocanegra and the district attorney's office. ECF 67 at 368, 372. Ramirez is wrong. Although the information may not have been turned over immediately upon request, since the information was provided to Ramirez prior to trial, there was no *Brady* violation. *Powell*, 536 F.3d at 335. Furthermore, the information was not exculpatory or impeaching because Bocanegra never testified. Similarly, Ramirez was not prejudiced by receiving the information two weeks prior to trial. As noted above, in analyzing claims of untimely disclosure, the question is whether the defendant was prejudiced by the delay. *Williams,* 132 F.3d at 1060. A defendant is not prejudiced if he receives the evidence in time to effectively use it at trial. *United States v. Walters,* 351 F.3d 159, 169 (5th Cir. 2003). Bocanegra did not testify. Even if the State had never told Ramirez that Bocanegra had agreed to cooperate in the investigation in exchange for a limit on sentencing, the failure to disclose that information would not have harmed Ramirez.

Claim 8(D)(1) is unexhausted, procedurally barred, and meritless and should be denied as such.

### 2. The State did not conceal exculpating evidence obtained from Bocanegra. (Claim 8(D)(2))

In Claim 8(D)(2), Ramirez alleges that the State hid exculpatory evidence received from Bocanegra.[46] ECF 67 at 372–74. This claim is based upon the offense report of Detective Soto of the Edinburg Police Department. However, Ramirez does not claim that he did not have access to Detective Soto's report. Ramirez's failure to actually allege suppression of Detective Soto's report dooms any *Brady* claim.

The first part of Ramirez's argument is based upon a section of Soto's report which describes showing photo lineups to Bocanegra. ECF 34-2 at 143. The report indicates that Bocanegra identified some of the people in the lineups and signed them to indicate his identification. ECF 24-2 at 143. Ramirez complains that "the State never disclosed the signed photo lineups." ECF 67 at 373. However, as the photo lineup was discussed in Detective Soto's report, Ramirez could have discovered this information with the exercise of due diligence. To establish a *Brady* claim, Ramirez must prove, not only that the State suppressed favorable, material evidence, but that the evidence was not discoverable through due diligence. *Kutzner v. Cockrell*, 303 F.3d 333, 336 (5th Cir. 2002).

---

[46] If this were true, and had Bocanegra testified, Ramirez would not have benefitted by possessing evidence to impeach Bocanegra's testimony.

On March 8, 2019, after his conviction, Bocanegra was contacted by, and gave a declaration to, Ramirez's federal habeas attorneys. ECF 67-17 at 6–7. Among other things, Bocanegra states that he did not identify Ramirez from the photographs. ECF 67-17 at 6. Ramirez concludes that "this evidence would have been favorable to Ramirez and material to guilt and punishment." ECF 67 at 373.

However, Ramirez fails to prove favorability as he presents no evidence that his photo was in the lineups viewed by Bocanegra. It seems that Ramirez assumes this fact and concludes that Bocanegra's failure to identify him is exculpatory in nature. However, if Ramirez's photo was not present, Bocanegra could not have identified Ramirez and his non-identification is neither exculpatory nor impeaching. Ramirez's attempt to demonstrate favorability is conclusory and insufficient to demonstrate a *Brady* violation. *See Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000) (denying *Brady* claim because it was based on a "conclusory allegation that . . . [was] based purely on speculation").

Ramirez also fails to demonstrate materiality. For one, Ramirez fails to prove that Bocanegra's alleged non-identification was favorable. For another, neither Bocanegra nor Detective Soto testified at Ramirez's trial, as Ramirez concedes. ECF 67 at 372. And Ramirez has made no allegation that he would have called either to bring out the alleged non-identification via testimony.

Thus, he fails to show that there is a reasonable probability of a different result.

Next, Ramirez states that Bocanegra "did not identify Ramirez as among those who participated in the murders." ECF 67 at 373. However, as Ramirez had Bocanegra's statement, it cannot be said that the State suppressed the fact that he did not identify Ramirez.[47]

Regardless, most of the participants Bocanegra named were only identified by nicknames. Whether Bocanegra used Ramirez's proper name is therefore irrelevant. Furthermore, while the fact that Ramirez was not named by Bocanegra could be possibly deemed favorable to Ramirez's defense, it is in no way definitively exculpatory. His failure to name Ramirez does not mean that Ramirez was not involved. Additionally, despite the fact that there were ten co-defendants in this case, Soto noted that Bocanegra identified only eight participants: Gallo, Rick (LNU), Lenny (LNU), Perro, "two other guys", Bones, and Kido. ECF 24-2 at 141. Thus, Bocanegra's account is not the definitive list of all who were involved. Furthermore, when Bocanegra was executing his statement, he told Soto that "there were more details, which could be added" but that "he would provide the information at his trial." ECF 67 at 145.

---

[47] The fact that trial counsel had Bocanegra's statement forms the basis for one of Ramirez's complaints about trial counsel's performance. *See* Claim 3(C)(2)(e)—"Trial counsel failed to competently impeach the State's law enforcement witnesses" at the suppression hearing.

Furthermore, even if the fact that Bocanegra did not specifically identify Ramirez was exculpatory, it was not material. Ramirez confessed to the crime. Ramirez's confession was detailed and provided information that only someone who had been present at the scene would have known. And such evidence is exceptionally powerful, overwhelming even. *See Fulminante*, 499 U.S. at 296 ("A confession is like no other evidence."). The jury would not have been distracted from this fact by the knowledge that one co-defendant out of eleven others failed to specifically identify Ramirez as one of the actors.

Ramirez further complains that "the actions which [were] attributed to Ramirez, were, according to Bocanegra, committed by another individual by the name of Lenny." ECF 67 at 373. Ramirez claims that the fact that he was not "Lenny" was settled by a declaration Bocanegra provided in conjunction with Ramirez's state habeas proceedings in 2014. ECF 67 at 373. At that point, Bocanegra claimed that he had met Ramirez for the first time in the Hidalgo County Jail.[48] Bocanegra later went further and, in 2019, signed a declaration at the request of federal counsel in which he then claimed that he was in fact "Lenny." ECF 24-2 at 143.

Both declarations are suspect. Declarations made by a co-defendant after his case is completed that tend to exculpate another co-defendant are less than

---

[48] This seems quite unlikely as both had admitted to being members of the same gang.

310

reliable. *Drew v State*, 743 S.W.2d 207, 288 (Tex. Crim. App. 1987) (testimony from an accomplice that exonerates a defendant without exposing the accomplice to further criminal liability is to be viewed with suspicion); *see also Keeter v. State*, 74 S.W.3d 31, 38 (Tex. Crim. App. 2002).

Furthermore, Bocanegra's declarations do not say that he provided the information contained within them to the State at the time of trial. The State had no way of knowing that Bocanegra was going to claim to have never met Ramirez prior to seeing him in jail or that he was, almost fifteen years later, going to claim that he was "Lenny." In other words, "[t]he prosecution has no duty to turn over . . . evidence that does not exist." *Brogdon v. Blackburn*, 790 F.2d 1164, 1186 (5th Cir. 1986). Therefore, this information was not reasonably exculpatory or impeaching, or material, and most importantly it was not in the possession of the State.

The State did not receive exculpatory evidence from Bocanegra. As such, there was nothing to conceal. Claim 8(D)(2) is unexhausted, procedurally barred, and meritless and should be denied as such.

### E. The State did not commit misconduct by failing to disclose conditions at TYC. (Claim 8(E))

In Claim 8(E), Ramirez alleges that the "State committed misconduct when it failed to disclose conditions in the TYC and made false arguments to the jury regarding those conditions." ECF 67 at 375–79. Ramirez did not raise

311

this issue in the state courts; therefore, it is unexhausted and procedurally barred in this forum. Ramirez does not acknowledge or attempt to overcome this bar. Therefore, the claim should be denied. *See supra* Answer IV. Nonetheless, if it were reviewed de novo, the claim fails on the merits.

According to Ramirez,

> The State knew of the[] rampant problems within the TYC, problems which ultimately led to appointment of a conservator to oversee the agency and eventually to its dissolution. This information would have been favorable to Ramirez and material to the question of the proper penalty. By failing to disclose it, the State created the false impression that Ramirez would have benefited from his placement with TYC but for his own character and conduct.

ECF 67 at 378.

Ramirez doesn't show suppression because he doesn't show that the prosecution team knew about the "rampant problems" in TYC. "Before a *Brady* claim can arise, [Ramirez] must show that the prosecution team had access to the evidence." *Summers v. Dretke*, 431 F.3d 861, 874 (5th Cir. 2005). "Exactly who constitutes a member of the prosecution team is done after a 'case-by-case analysis of the extent of interaction and cooperation between the two governments." *United States v. Cutno*, 431 F. App'x 275, 278 (5th Cir. 2011) (unpublished) (quoting *Avila v. Quarterman*, 560 F.3d 299, 307 (5th Cir. 2009)). Here, Ramirez has not alleged nor proven that TYC was a member of the prosecution team—"No person connected with [Ramirez's] case as a prosecutor,

prosecutorial staff, or law enforcement officer had knowledge of" TYC's "rampant problems." *Summers*, 431 F.3d at 874. With no imputation, there is no *Brady* claim.

Ramirez also fails to demonstrate suppression because he must show that the failure to discover the allegedly favorable evidence was not the result of a lack of due diligence on his part. *See Strickler*, 527 U.S. at 281–82; *Parr*, 472 F.3d at 254. Ramirez does not claim that trial counsel could not have discovered information about TYC's "rampant problems." In fact, this is a large part of the factual basis in Claim 1. Furthermore, Ramirez has not proven that trial counsel was unaware of the problems at TYC. Ramirez cannot demonstrate suppression.

Ramirez also includes in this claim an argument that the State allowed testimony that TYC "had provided Ramirez with exhaustive rehabilitative programs . . . le[aving] the jury to infer that Ramirez could not be rehabilitated and that he was a future danger." ECF 67 at 377. According to Ramirez, "[t]he State reinforced this inference through argument." ECF 67 at 377. Ramirez references a number of comments made by the State during closing argument at the punishment phase to support his point. ECF 67 at 377. Of these, two could be deemed to relate to the rehabilitative nature of TYC:

> MR. THOMPSON: He was originally given the opportunity. He was placed on probation in a treatment facility at Driscoll. Then he went to Coastal Bend. And when he got out of there—after he

313

> committed these petty crimes to get him in there, he got out. He violated his probation. He intentionally and knowingly caused bodily injury to Jorge Luis Reyes by the use of a knife.

39 RR 137–38. Whatever might be said of the prosecutor's comment, it is not an assertion that TYC "had provided Ramirez with exhaustive rehabilitative programs." Rather, from context, the statement is ambiguous. It could mean that Ramirez was given an *opportunity* to rehabilitate himself (which is distinct from being given the resources to successfully rehabilitate himself). Or it could mean that Ramirez had been "given the opportunity" to harm personnel at these treatment facilities and that he shouldn't be given another opportunity to do so. *See* 39 RR 137 ("Are we going to take our capital murderer and send him someplace else to let prison guards and nurses and other prisoners deal with him?").

The second of the comments Ramirez points to as reinforcing the inference that TYC provided his with rehabilitative programs is vague and has nothing to do with TYC at all.[49] Furthermore, it was not directed at the future dangerousness issue.

> MR. THOMPSON: The third question, the mitigating issue question, what they want you to say here is that society, some 15 years ago, let this defendant down, and that because of an attachment disorder—it seems like if that attachment disorder is

---

[49] The prosecutor references that society allegedly let Ramirez down "15 years ago." 39 RR 141. Ramirez would have been a toddler at that point and would have had no association with TYC.

a problem that leads to this, it is going to be a problem in prison, too. If you can't get cured from it, then we can expect more of this.

39 RR 141–42.

It cannot be seriously argued that the single ambiguous comment related to TYC made by the prosecution during closing was of such importance that, but for the argument, "the result of the proceeding would have been different.". *Bagley*, 473 U.S. at 682. Moreover, just like with Claim 1, even if the jury had information regarding TYC's "rampant problems" before them, a different result is not reasonably probable given the State's overwhelming punishment case.

Ramirez has not established that the TYC information was possessed by the prosecution team, that he could not have discovered it through due diligence, or that it was sufficiently material or favorable to have made any difference at his trial. In short, the claim utterly fails. The claim is unexhausted and procedurally barred, and meritless. It should be denied.

### F. The State did not commit misconduct by improperly arguing for a limitation on mitigating evidence. (Claim 8(F))

In Claim 8(F), Ramirez avows that the "State committed misconduct by urging an unconstitutional limitation on mitigating evidence." ECF 67 at 379–81. Ramirez did not raise this issue in the state courts; therefore, it is unexhausted and procedurally barred in this forum. Ramirez does not

315

acknowledge or attempt to overcome this bar. Therefore, the claim should be denied. *See supra* Answer IV. Nonetheless, if it were reviewed de novo, the claim fails on the merits.

Ramirez takes issue with two areas of the State's closing argument at punishment: the prosecutor argued:

> [I]f you your mom gets beaten by your dad, then maybe that is a mitigating factor for a person to engage in domestic violence.
> . . . .
> You see one parent abuse the other, then maybe somewhat that is an extenuating circumstance when you abuse your own spouse, because you saw it when you were growing up.
>
> And child abuse, maybe that's a mitigating—maybe that reduces the person's blame when they abuse their own child. Maybe you can makethat kind of argument.

39 RR 141.

> Is it sufficient that because somebody says his mom didn't love him or love him enough, is it sufficient to reduce the punishment that he deserves for these six cases?
>
> Now, maybe it is sufficient if this was a child abuse case. Maybe that background would be sufficient if this was a domestic violence case.

39 RR 142. According to Ramirez, "the prosecutor sought to discourage the jurors from finding Ramirez's suffering to be mitigating because his conduct did not replicate the traumatic behavior inflicted on him as a child." ECF 67 at 380. Citing *Penry v. Lynaugh,* 492 U.S. 302, 322 (1989), Ramirez argues that "[i]t is not enough for the state court to merely permit the admission of relevant

316

mitigating evidence when, at the same time, the prosecutor impedes a sentencer from giving complete effect to that evidence." ECF 67 at 380–81.

A claim of prosecutorial error during closing argument is "the narrow one of due process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 180 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)); *see Ortega v. McCotter*, 808 F.2d 406, 410 (5th Cir. 1987). The relevant question, therefore, is whether the alleged error "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 180 (quoting *Donnelly*, 416 U.S. at 643). It is not enough that the prosecutor's argument was "undesirable or even universally condemned." *Id.* (quoting *Darden v. Wainwright*, 699 F.2d 1031, 1036 (11th Cir. 1983)). The trial is rendered fundamentally unfair only if, in the context of the entire trial, the complained of conduct was a "crucial, critical, highly significant" factor. *Lowery v. Estelle*, 696 F.2d 333, 342 (5th Cir. 1983).

At the outset, *Penry* is entirely distinguishable. The problem in *Penry* was that the jury had no legal mechanism to "consider and give effect to all of Penry's mitigating evidence in answering the special issues without any jury instructions on mitigating evidence." *Id.* The prosecutor's argument that instructed the jury to follow the law was relevant only due to "the absence of appropriate jury instructions." *Id.*

317

Furthermore, the arguments Ramirez complains about are a far cry from impeding the jury from completely considering mitigating evidence. A prosecutor is entitled to argue that the evidence presented is not sufficiently mitigating to warrant a sentence of life in prison. *See Boyde v. California*, 494 U.S. 370, 385 (1990) (finding "no objectionable prosecutorial argument" where prosecutor "argued to the jury that the mitigating evidence did not 'suggest [petitioner's] crime is less serious or that the gravity of the crime is any less' and that '[n]othing I have heard lessens the seriousness of this crime'" (alterations in original)). In short, "[a]lthough the prosecutor argued that in his view the evidence did not sufficiently mitigate [Ramirez's] conduct, he never suggested that the background and character evidence could not be considered." *Id.* (first alteration in original) (quoting *People v. Boyde*, 758 P.2d 25, 47 (Cal. 1988)). There was no error.

However, even if the prosecutor's argument could have been interpreted to suggest that the jury should not give proper consideration to Ramirez's full mitigation case, any harm was cured by the jury charge, which read as follows:

> You shall consider all evidence submitted to you during the whole trial as to the Defendants background or character or the circumstances of the offense that mitigates against the imposition of the death penalty

2 CR 560.

Jurors are presumed to follow the law as given to them by the court. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000). Juries give less weight to arguments of counsel than they do instructions from the court. *Boyde*, 494 U.S. at 384. Statements by counsel "are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates" while instructions from the court "are viewed as definitive and binding statements of the law." *Id.* "[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations." *Donnelly,* 416 U.S. at 647. This minimal argument, mitigated by the jury's instructions, did not render Ramirez's trial fundamentally unfair.

The State did not "improperly argu[e] for a limitation on mitigating evidence." ECF 67 at 379. However, to the extent that the argument could be viewed that way, any harm to Ramirez was cured by the instructions given to the jury by the court. Therefore, not only is this claim unexhausted and procedurally barred, but it is also meritless. It should be denied.

### G. The State's closing arguments were not improper. (Claim 8(G))

In Claim 8(G) Ramirez claims that the "State committed misconduct when the prosecutors made inflammatory and improper comments during

arguments." ECF 67 at 381–83. Ramirez did not raise this issue in the state courts; therefore, it is unexhausted and procedurally barred in this forum. Ramirez does not acknowledge or attempt to overcome this bar. Therefore, the claim should be denied. *See supra* Answer IV. Nonetheless, if it were reviewed de novo, the claim fails on the merits.

Improper closing arguments by the State "are a sufficient ground for habeas relief only if they are so prejudicial that they render the trial fundamentally unfair." *Harris v. Cockrell,* 313 F.3d 238, 245 (5th Cir.2002). "Such unfairness exists 'only if the prosecutor's remarks evince either persistent and pronounced misconduct or . . . the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred.'" *Id.* at 245 (quoting *Kirkpatrick*, 777 F.2d at 281). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden,* 477 U.S. at 181 (quoting *Donnelly*, 416 U.S. at 643). An instruction by the court may ameliorate the risk of prejudice to the defendant. *See Ward,* 420 F.3d at 499.

Ramirez complains about two portions of the State's argument at the close of the guilt phase. With regard to the first area Ramirez claims was inappropriate, the prosecutor said the following:

> And then [the charge] goes on to say, in the course of deliberations, a juror should not hesitate to re-examine his or her own views or change his or her opinion if convinced it is erroneous.

320

What that is saying, look, 12 of you remember the facts better, all 12 minds put together. You can go back into that jury room, talk about it, and render a decision, a decision that is justice for the six deceased, for Ray, Jerry, Juan Delgado, Jr., Juan Delgado III, Jimmy Almendarez, and Ruben Castillo.

37 RR 121.

Ramirez's problem with this argument is that, he claims, the prosecutor "argu[ed] or suggest[ed] that the jury instructions" required the jurors to render a "decision that is justice for the six deceased." ECF 67 at 382. However, Ramirez does not explain how that is an improper argument. The instructions told the jury to reach a decision. 2 CR 529–536. And, obviously, a verdict at the trial of a man charged with participating in their murders would render justice to the victims—regardless of the jury's decision. It is justice when the guilty are convicted. It is also justice when the innocent are acquitted. And the above quoted argument did not tell the jury which way to even vote. In any event, the Fifth Circuit has previously found that a "prosecutor's closing argument, in which he requested the jury to 'have the courage to go out there and find these Defendants guilty,' to be a permissible plea for law enforcement." *Kirkpatrick*, 777 F.2d at 281 (quoting *United States v. Caballero*, 712 F.2d 126, 131 (5th Cir. 1983)). The same is true here. There was no error in the prosecutor's call for a just verdict.

Even if the prosecutor's justice comments are interpreted as somehow improper, there is no showing of a fundamentally unfair trial. The State's evidence was strong. The prosecutor's argument on this point was short and ambiguous. The jury's instructions explained that they could only find Ramirez guilty if they unanimously agreed beyond a reasonable doubt. 2 CR 529–536. In no way did the prosecutor render Ramirez's trial fundamentally unfair with this brief, equivocal, and instruction-cured argument.

The second closing argument that Ramirez challenges as improper reads as follows:

> This investigation involved the Edinburg Police Department—
> . . . .
> —the Department of Public Safety here in McAllen, there in Austin. You heard testimony of sheriff's deputies being involved. There was a task forced set up at some point when they went and executed all these search and arrest warrants.
>
> They had federal agents, Alcohol, Tobacco & Firearms, Border Patrol, doing all of these—helping to solve this horrendous crime.

37 RR 155–56.

Here, Ramirez claims that the prosecutor was arguing "that the State's case was stronger because 'federal agents' participated in solving it." ECF 67 382. However, taken in context, it is obvious that the prosecutor was not attempting to do this. In the section immediately prior to the above quoted argument, the prosecutor warned the jury not to go down "rabbit trail[s]" that

there were other suspects who were not investigated. 37 RR 154. The prosecutor's recitation of the various agencies involved was clearly intended to draw attention to the thoroughness of the investigation in order to convey to the jury that any reasonable leads had been investigated. But even if it was improper, the brief mention of federal resources for no explicit reason did not render Ramirez's trial fundamentally unfair—the jury was told to consider the evidence, not the arguments of the parties, in assessing guilt or innocence. The claim has no merit. *See, e.g.*, 2 CR 540 ("if you find from the evidence").

Ramirez also argues that the State's closing at the conclusion of the punishment phase contained improper arguments. ECF 67 at 381. First, Ramirez alleges that the following argument was improper because the prosecutor indicated that "Ramirez's age was not mitigating because two of the victims were also young adults." ECF 67 at 382. This is the relevant portion:

> Throughout the trial, you kept hearing testimony about how young the Defendant is, and that, oh, he is the youngest one. He was 18 when he committed the crime. You heard from the child development specialist that they brought this morning.

> Child development? He was 18 when he committed this crime. He is an adult. He made choices. He made decisions. He knew his choices were wrong. He knew breaking the law was wrong.

> You heard from the expert, and she gets up here and she testifies about his childhood, his lack of parents.

> Jerry Hidalgo. What about him? He was young.

. . . .

323

But at punishment, you get to look back and revisit the circumstances of the crime. And these are the circumstances: That he was beating Jerry Hidalgo with a frying pan and he admits to it. Beating him on the head. That's cold. Tying him up, shot him, asking the mother, where is the money, where is the drugs? Cold-hearted killer. A violent person.

We showed you the photo of Juan Delgado, III, at Christmastime. He didn't live to see another Christmas. He got shot in the back of the head close-range—I'm sorry, about three feet apart, is what the doctor said. One to the head. Laid down, left in the grass.

Jimmy Almendarez, he was young. What about him?

39 RR 118–21.

The final segment Ramirez complains about came a little later in the punishment closing, wherein he alleges that the State argued he'd be a future danger based on the violent actions of another inmate:

Remember, Mr. Orendain asked about somebody from this county that was in administrative segregation because he was on death row? That's administrative segregation.

And was he aware of this man that had committed violence, stabbed somebody in the eye, or stabbed 11 times with a tool that they had made from things that they had on death row.

Mr. Fitzgerald said, yes, it is a prison. It is violent.

And that is where this man is going.

39 RR 137.

Courts are not to "lightly attribute an improper meaning to ambiguous prosecutorial comment." *Ward v. Whitley*, 21 F.3d 1355, 1363 (5th Cir. 1994).

324

"An improper prosecutorial argument that does not implicate a specific constitutional provision, however, is not cognizable on collateral review unless the defendant shows an abridgment of due process, that is, that the improper argument rendered the proceeding fundamentally unfair." *Id.* at 1364.

Ramirez's view of these arguments is not the only one or necessary. The discussion about age is not focused on a comparison of the Ramirez's age to that of one of the victims. The focus of the argument was a response to the testimony of Dr. Allen and is an argument that Ramirez was legally an adult and therefore responsible for his actions. In other words, the prosecutor was arguing that Ramirez's evidence of youth wasn't sufficiently mitigating to warrant a life sentence, a totally propre argument. *See Boyde*, 494 U.S. at 385. The comments that two of the victims were also young were tossed randomly in the argument. This would have had little to no impact on the jury. Finally, an argument that ended in the common knowledge that prison is violent, even when it included a reference to a single incident of violence, is nothing the jury was unaware of. And it was clear that the prosecutor was discussing whether Ramirez's prison expert was well informed in rendering his opinion. None of the complained of arguments, if improper, had any impact on the verdict in Ramirez's case, in part because they were a very small part of the overall argument presented by the State. This claim is unexhausted and procedurally barred and meritless in the alternative. It should be denied.

## H.     The State did not commit any other forms of misconduct. (Claim 8(H))

In Claim 8(H) Ramirez claims that the "State committed various other forms of misconduct." ECF 67 at 383–84. Ramirez did not raise this issue in the state courts; therefore, it is unexhausted and procedurally barred in this forum. Ramirez does not acknowledge or attempt to overcome this bar. Therefore, the claim should be denied. *See supra* Answer IV. Nonetheless, if it were reviewed de novo, the claim would fail on the merits.

However, there is nothing to review. This claim is nothing more than a laundry list of speculation:

> This misconduct included, but was not limited to: making statements to the media in the jury's presence; sponsoring false testimony regarding prison classification and/or conditions; mischaracterizing Ramirez's juvenile record, including regarding his future dangerousness; failing to investigate, disclose, or timely disclose material evidence and issues related to Ramirez's guilt, innocence, penalty, or related to the witnesses with information in his case; knowingly or with implied knowledge eliciting false testimony and evidence or allowing false testimony and evidence to go uncorrected; questioning witnesses in ways which were argumentative or misleading; misstating the law or evidence (or failing to correct misstatements of the law or evidence) to potential jurors, the jury, and the court; presenting to the court and jury charges and theories known to be false or that that could not be supported with testimony and evidence; continuing to prosecute Ramirez despite conflicts of interest; failing to maintain or supervise the proper handling and maintenance of crucial evidence; introducing testimony and evidence in violation of Ramirez's fair trial, due process, and confrontation rights, and that violated the rules of court and evidence which protect those constitutional rights; and limiting trial counsel's investigation and defense by failing to disclose or correct evidence and limiting

> Ramirez's defense through police misconduct, tampering with evidence or witnesses, mishandling evidence, and by improperly limiting defense access to evidence and witnesses.

ECF 67 at 383–84.

Ramirez impugns the ethical nature of the prosecutors based upon— nothing. There is no factual support for his allegations. Ramirez presents this Court with a multifarious and conclusory claim based upon "information and belief" and the vague hope that he will be permitted further investigation *and* that the investigation will actually produce something of benefit. However, it must be noted that some of the "misconduct" would require no further investigation to uncover, for example, "questioning witnesses in ways which were argumentative or misleading; misstating the law or evidence (or failing to correct misstatements of the law or evidence) to potential jurors, the jury, and the court." ECF 67 at 383–84. Ramirez does not explain why he is unable to properly raise these record-based type of claims. The issue is unexhausted, procedurally barred, inadequately briefed, conclusory, and meritless. It should be denied.

## I.     Cumulative prejudice. (Claim 8(I))

In Claim 8(I), Ramirez argues that in determining any prejudice to him, this Court "must consider the cumulative effect of the harm." ECF 67 at 384. Ramirez did not raise this issue in the state courts; therefore, it is unexhausted and procedurally barred in this forum. Ramirez does not acknowledge or

327

attempt to overcome this bar. Therefore, the claim should be denied. *See supra* Answer IV. Nonetheless, if it is reviewed de novo, the claim fails on the merits.

According to Ramirez, in the event he fails to prove prejudice on his individual claims of prosecutorial misconduct, "taken together, these instances of misconduct 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" ECF 67 at 384–85 (quoting *Donnelly*, 416 U.S. at 643).

Ramirez provides no Supreme Court precedent permitting cumulation of distinct allegations of prosecutorial error—suppression, false testimony, and improper argument—may be cumulated for harm purposes. *See Lorraine*, 291 F.3d at 447; *Derden*, 978 F.2d at 1456. Any argument to the contrary is *Teague* barred. Regardless, as demonstrated above, Ramirez fails to successfully prove a single instance of prosecutorial misconduct. There is nothing to cumulate. *See, e.g.*, *Mullen*, 808 F.2d at 1147. And most of these allegations are unexhausted and procedurally barred, so they don't qualify for cumulation even if such a review were permissible. *See Derden*, 978 F.2d at 1458. In addition to being unexhausted and procedurally barred, his claim lacks merit. It should be denied.

## IX.    There Was No Juror Misconduct at Ramirez's Trial. (Claim 9)

Ramirez's Claim 9 purports to be a claim of juror misconduct. ECF 67 at 385. This claim is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, it is meritless.

### A.    Law

"One touchstone of a fair trial is an impartial trier of fact—'a jury capable and willing to decide the case solely on the evidence before it.'" *McDonough v. Greenwood,* 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips,* 455 U.S. 209, 217 (1982)). In *Tanner v. United States*, the Supreme Court established a constitutional rule forbidding a jury from being exposed to an external influence. 483 U.S. 107, 117 (1987). "Whether an influence is 'external' or 'internal' depends on the facts of each case, but at its core the distinction amounts to an examination of the 'nature of the allegation' of an improper influence on the jury." *Oliver v. Quarterman*, 541 F.3d 329, 336 (5th Cir. 2008); *see also Robinson v. Polk,* 438 F.3d 350, 363 (4th Cir. 2006) ("Under clearly established Supreme Court case law, an influence is not an internal one if it (1) is extraneous prejudicial information; *i.e.,* information that was not admitted into evidence but nevertheless bears on a fact at issue in the case, or (2) is an outside influence upon the partiality of the jury, such as 'private communication, contact, or tampering with a juror.'" (citations omitted) (quoting *Remmer v. United States*, 347 U.S. 227, 229 (1954))). A claim of this

type is subject to harmless error analysis and a petitioner is not entitled to habeas relief on the claim unless the jury misconduct "had a substantial and injurious effect or influence in determining the jury's verdict." *Pyles v. Johnson*, 136 F.3d 986, 992 (5th Cir. 1998) (quoting *Brecht*, 507 U.S. at 635).

## B.   Argument

In Claim 9, Ramirez states that his right to an impartial jury was "violated for several reasons," but only really attempts to demonstrate two. ECF 67 at 385–87. First, Ramirez claims that his "jurors felt threatened and scared to be seated on a jury in a gang-related case." ECF 67 at 385. As proof of this, Ramirez points to one of the exhibits attached to his original petition— the declaration of Angel Hernandez, who says an unnamed juror told him that the "jurors took different routes home because of concerns for their safety." ECF 28-1 at 100. He next points to an exhibit attached to his amended petition—the declaration of Juan Guzman, of a juror from his trial.[50] ECF 67-17 at 13–14. Juror Guzman states that court personnel told jurors to be careful, and he describes being worried about his safety during the trial. ECF 67-17 at 13. Finally, he points to the declaration of Bonifacio Raymundo, another juror

---

[50] There is no way of knowing if this is the same juror referenced in Angel Hernandez's declaration.

from Ramirez's trial.[51] ECF 67-17 at 26–27. Juror Raymundo says that another unnamed juror requested escorts out of the courthouse after they rendered their verdict.[52] ECF 67-17 at 26–27. None of these affidavits can be considered in evaluating Ramirez's claim in this Court.[53] *See supra* Answer V.

---

[51] As with Juror Guzman, there is no way of knowing if Juror Raymundo is the juror referenced by Angel Hernandez.

[52] The juror who made the request is not named and therefore it is unknown if the juror was Juror Guzman or the unnamed juror referenced by Angel Hernandez. ECF 67-17 at 26.

[53] In addition to the fact that new evidence may not be considered on federal habeas, these affidavits are also not permitted under the Texas and Federal Rules of Evidence. The text of Rule 606(b) of the Federal and Texas Rules of Evidence are identical—"During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters." Fed. R. Evid. 606(b)(1); Tex. R. Evid. 606(b)(1). Both the Texas and the Federal Rules of Evidence have exceptions to this rule—

    (2)    Exceptions. A juror may testify about whether:
        (A)    extraneous prejudicial information was improperly brought to the jury's attention;
        (B)    an outside influence was improperly brought to bear on any juror; or
        (C)    a mistake was made in entering the verdict on the verdict form.
Fed. R. Evid. 606(b)(2).

    (2)    Exceptions. A juror may testify:
        (A)    about whether an outside influence was improperly brought to bear on any juror; or
        (B)    to rebut a claim that the juror was not qualified to serve.
Tex. R. Evid. 606(b)(2).

As described in the analysis of each juror's affidavit, none of the information they had to offer was about an actual outside influence.

Regardless, none of these declarants provide any evidence of outside influences. They all may have had generalized fear about serving on a case in which a gang member participated in the execution of six people, but that natural and reasonable fear came from evidence in the case. It is not an outside influence, so it is not a basis for a finding of juror misconduct. In any event, none of the jurors said that this generalized fear at all affected them in their deliberations. As such, Ramirez cannot prove that this fear had a substantial and injurious effect on his verdict.

Second, Ramirez alleges that jury deliberations were impacted "by the introduction of extraneous information." ECF 67 at 386. As evidence of this, Ramirez states that the court admonished the "guilt-phase jury on multiple occasions to avoid media about the case during the trial." ECF 67 at 386. However, Ramirez only cites to a single location in the record. That section is during individual voir dire where the trial court is giving general instructions to a veniremember that had just been "preliminarily selected as a first alternate juror." 24 RR 84. However, this is not evidence suggesting media coverage of the case. This is evidence of the judge doing his job. The type of basic instructions the court gave are designed specifically to prevent the type

of problem Ramirez is complaining about here.[54] Because the court properly reminded jurors to avoid media coverage, Ramirez concludes that "the jury was exposed to extrinsic information about the case and jurors considered this extraneous information during their deliberations." ECF 67 at 386. Ramirez provides absolutely no evidence to support his claim of outside influence, and it should be denied as conclusory.[55] *See, e.g.*, *Ross*, 694 F.2d at 1011–12. As is discussed in the issue relating to change of venue, media coverage of a trial does not mean that the trial is automatically rendered unfair.

Finally, even if all of Ramirez's allegations were true, he cannot show that these minor influences on the jury harmed him. As has been explained, the evidence on guilt and punishment was strong. Ramirez confessed to a leadership role in the murder of six people. 45 RR Ex.102A. He had a history of violent criminal activity. 47 RR Ex.335, Ex.336, Ex.337. An amorphous fear of serving on a jury in a gang related case and the possible existence of media coverage of the case would have had little impact in Ramirez's case. Certainly, he cannot show that the effect of the alleged jury misconduct had a substantial or injurious effect on his case.

---

[54] In fact, preliminary instructions that include prohibitions on reading or listening to anything in the case are *required* in civil cases in Texas. *See* Tex. Rules Civ. Proc. 226a.

[55] In fact, neither the declaration of Juror Guzman nor Juror Raymundo provide any support for this bold statement.

In sum, the only evidence of alleged jury misconduct Ramirez can muster is that serving on the jury created fear for one, possibly two, jurors and that the court instructed jurors to avoid media coverage of the case. This "evidence" doesn't prove that any outside influences affected the jury's deliberations. Ramirez does not attempt to overcome the procedural bar on this issue, and alternatively, his claim is completely meritless and should be denied.

## X. The Jury Instructions Given During Ramirez's Punishment Trial Were Constitutional. (Claim 10)

Claim 10 is the usual complaint about the jury instructions regarding the special issues. ECF 67 at 388–94. Ramirez exhausted Claim 10(A) on state habeas briefed as issue nine. 1 SHCR 205–11. Therefore, the state court's adjudication is due deference. Claim 10(B) is unexhausted and procedurally barred. Ramirez addresses neither his burden to overcome the state adjudication's presumption of correctness under AEDPA on Claim 10(A) or the procedural bar to Claim 10(B). These issues must fail due to these deficiencies. Furthermore, even under a de novo review, both claims are barred under the principles established in *Teague* and fail on the merits.

### A. The Texas mitigation special issue adequately defines mitigating evidence and does not create a reasonable possibility that the jury would construe the mitigating evidence narrowly. (Claim 10(A))

In Claim 10(A), Ramirez argues that "as neither 'mitigating evidence' nor 'mitigating circumstances' were defined for the jury, the instructions

effectively instructed the jury to disregard important classes of mitigating evidence if they were not linked to 'blameworthiness' or 'culpability' for the crime." ECF 67 at 390. According to Ramirez, because the mitigation special issue "require[es] a causal nexus between mitigation and the crime at issue, the jury instructions were unconstitutional." ECF 67 at 390.

Relevant mitigating evidence must be "within 'the effective reach' of the sentencer" during punishment. *Johnson v. Texas*, 509 U.S. 350, 368 (1993) (quoting *Graham*, 506 U.S. at 475–76). "[I]n a capital case, '[t]he sentencer must . . . be able to consider and give effect to [mitigating] evidence in imposing [a] sentence, so that 'the sentence imposed . . . reflec[ts] a reasoned *moral* response to the defendant's background, character, and crime.'" *Penry v. Johnson*, 532 U.S. 782, 788 (2001) (*Penry II*) (all alterations but first in original) (quoting *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (*Penry I*)). Therefore, the sentencing instructions must provide the jury with an adequate vehicle to consider Ramirez's evidence and come to a reasoned moral conclusion. *Id.* at 800.

Ramirez identifies no clearly established Supreme Court precedent that casts any doubt on the continued validity of Texas's capital sentencing scheme, including the definition of mitigating evidence. And the Fifth Circuit has repeatedly rejected the claim that the mitigation special issue unconstitutionally narrows the mitigating evidence that can be considered.

335

*Sprouse v. Stephens*, 748 F.3d 609, 622 (5th Cir. 2014); *White v. Thaler*, 522 F. App'x 226, 235 (5th Cir. 2013); *Blue v. Thaler*, 665 F.3d 647, 666 (5th Cir. 2011); *Cantu v. Quarterman,* 341 F. App'x 55, 61 (5th Cir. 2009); *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001). In fact, at least implicitly, the *Penry II* Court approved of Texas's mitigation special issue. 532 U.S. at 803 ("A clearly drafted catchall instruction on mitigating evidence also might have complied with *Penry I*. Texas' current capital sentencing scheme (revised after Penry's second trial and sentencing) provides a helpful frame of reference."). Specifically, on the allegation that the use of the word "blameworthiness" unconstitutionally limits the jury's consideration of mitigating evidence or creates a "causal nexus," the Fifth Circuit has noted that it has never been found to be unconstitutional "to define mitigating evidence as evidence that reduces moral blameworthiness." *Blue*, 665 F.3d at 667.

As noted, the state court addressed this claim on state habeas as issue nine. The findings on this issue, and the related issues, are as follows:

608. The Court of Criminal Appeals has repeatedly utilized sound reasoning in rejecting the constitutional challenges to the mitigation special issue asserted in Applicant's eighth, ninth, and tenth grounds for review.

609. For example, said Court has repeatedly rejected the argument that the mitigation issue is unconstitutional in that it does not assign the State the burden of proof to show that there are no mitigating circumstances that would warrant a life sentence. *See, e.g., Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010); *Segundo v. State*, 270

S.W.3d 79, 102 (Tex. Crim. App. 2008); *Roberts v. State*, 220 S.W.3d 521, 534–35(Tex. Crim. App.), cert. denied, 552 U.S. 920 (2007); *Crustinger v. State*, 206 S.W.3d 607, 613 (Tex. Crim. App.); *Perry v. State*, 158 S.W.3d 438, 446–48 (Tex. Crim. App. 2004); *Blue v. State*, 125 S.W.3d 491, 501 (Tex. Crim. App. 2003); *Allen v. State*, 108 S.W.3d 281, 285 (Tex. Crim. App. 2003).

610. Said Court also consistently rejected the argument that the definition of mitigation unconstitutionally narrowed the jury's discretion to factors involving moral blameworthiness. *See, e.g., Coble*, 330 S.W.3d at 296; *Lucero v. State*, 246 S.W.3d at 86, 96 (Tex. Crim. App. 2008); *Roberts*, 220 S.W.3d at 534; *Perry*, 158 S.W.3d at 449; *Cantu v. State*, 939 S.W.2d 627, 648–49 (Tex. Crim. App. 1997).

611. Moreover, in *Roberts*, 220 S.W.3d at 534, the Court of Criminal Appeals noted that the applicant did not explain how the instruction that was given prevented the jury from giving effect to any of his allegedly mitigating evidence, and indicated that it did not perceive any barrier to the jury doing so.

612. That observation also applies to the situation involved in the instant case.

613. The Court of Criminal Appeals has also repeatedly indicated that sufficiency of the evidence to support the jury's answer to the mitigating circumstances special issue is not subject to appellate review. *See, e.g.*, *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *Howard v. State*, 153 S.W.3d 382, 384 (Tex. Crim. App. 2004); *Resendiz v. State*, 112 S.W.3d 541, 549 (Tex. Crim. App. 2003); *Allen v. State*, 108 S.W.3d 281, 285 (Tex. Crim. App. 2003); *Salazar v. State*, 38 S.W.3d 141, 146 (Tex. Crim. App. 2001); *McFarland v. State*, 928 S.W.2d 482, 498 (Tex. Crim. App. 1996); *Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995).

614.   In fact, the Court of Criminal Appeals so noted in footnote 12 in its opinion on direct appeal in this case. See *Ramirez*, 2007 Tex. Crim. App. Unpub. LEXIS at *23.

615.   Said Court has also repeatedly rejected arguments that the Texas death penalty scheme is unconstitutional for not providing a mechanism for meaningful appellate review of the jury's decision regarding mitigating circumstances. *See*, *e.g.*, *Fuller v. State*, 253 S.W.3d 220, 234 (Tex. Crim. App. 2008); *Russeau*, 171 S.W.3d at 886; *Allen*, 108 S.W.3d at 285; *Prystash v. State*, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999); *Eldridge v. State*, 940 S.W.3d 646 S.W.2d 652–53 (Tex. Crim. App. 1996); *Green v. State*, 934 S.W.2d 92, 106–07 (Tex. Crim. App. 1996); *McFarland*, 928 S.W.2d at 498–99.

616.   [Ramirez] concedes that the law in regard to his challenges to the mitigation issue is against him, but asks that it be changed.

617.   However, [Ramirez] does not develop any arguments why the current law, which is based on sound evaluation of the issues involved, should be re-examined and ultimately changed.

618.   Nor are there any valid grounds for changing said law.

3 Supp. SHCR 903–06. Ramirez does not acknowledge the court's adjudication or attempt to overcome the deference it is due under AEDPA. Therefore, the claim should be denied on this basis. Alternatively, the issue *Teague* barred and fails on the merits as explained herein. Regardless, this claim must fail.

## B.   The special issue instruction on future dangerousness is constitutional. (Claim 10(B))

In Claim 10(B), Ramirez argues that the Texas future dangerousness special issue instruction is unconstitutional because it "fails to genuinely narrow

338

the class of defendants eligible for the death penalty," and is "vague on its face and as applied to Ramirez," because it fails to define the terms probability, criminal acts of violence, or continuing threat to society. [56] ECF 67 at 391–92. Although an issue related to the future dangerousness special issue was raised on direct appeal, it argued that the issue violated due process because of the unreliability of predictions of future dangerousness. App. Prelim. Brief at 93–97. As this was the only claim related to the future dangerousness special issue that Ramirez raised in state court, this issue is unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, it barred by the retroactivity rules as established in *Teague*. Furthermore, it is meritless.

First, Ramirez complains that the issue, as interpreted by the courts, violates the Eighth Amendment because the circumstances of the crime itself can be sufficient to meet the State's burden under the first special issue, the future dangerous issue "performs absolutely no narrowing function." ECF 67 at 391–92. Ramirez offers no further analysis on this point.

The Fifth Circuit has also determined that Texas's narrowing scheme, which occurs during the guilt-innocence phase, "is constitutionally valid . . . in

---

[56] The title of Ramirez's complaint states that "[t]he mitigation special issue instruction given in Ramirez's case was unconstitutionally vague and a violation of Ramirez's Eighth and Fourteenth Amendment rights." ECF 67 at 391. However, the body of the claim relates to the future dangerousness issue and Ramirez's conclusion references "the mitigation special issue on future dangerousness." ECF 67 at 394.

that it rationally narrows the classes of defendants determined to be eligible and selected for the death penalty." *Sonnier v. Quarterman*, 476 F.3d 349, 366 (5th Cir. 2007). Moreover, at the time Ramirez's conviction became final, the Supreme Court had approved of Texas's narrowing scheme. *See Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) ("The legislature may itself narrow the definition of capital offenses, as Texas and Louisiana have done, so that the jury finding of guilt responds to this concern."). Because Texas's narrowing scheme was held constitutional at the time Ramirez's conviction became final, *Teague* bars this aspect of the claim and it should be denied.

Second, Ramirez complains that the special issue is unconstitutionally vague because "[n]either the statute nor the required jury charge defines the terms 'probability,' 'criminal acts of violence,' or 'continuing threat to society.'" ECF 67 at 392.

However, terms that are reasonably within the common understanding of juries, and that are not technical or ambiguous, need not be defined in the trial court's charge. *United States v. Anderton*, 629 F.2d 1044, 1048–49 (5th Cir. 1980). "Where terms used are words simple in themselves, and are used in their ordinary meaning, jurors are supposed to know such common meaning and terms and under such circumstances such common words are not necessarily to be defined in the charge to the jury." *Druery v. State*, 225 S.W.3d 491, 509 (Tex. Crim. App. 2007); *see Asgrow Seed Co. v. Winterboer*, 513 U.S.

179, 187 (1995) ("When terms used in a statute are undefined, we give them their ordinary meaning."); *Castro v. Collecto, Inc.*, 634 F.3d 779, 786 (5th Cir. 2011) (same); *TGS-NOPEC Geophysical Co. v. Combs*, 340 S.W.3d 432, 439 (Tex. 2011) ("Undefined terms in a statute are typically given their ordinary meaning"). A reviewing court must presume that the jurors understood the terms at issue in the terms' ordinary meaning.

"The future dangerousness issue has been held constitutional by the Supreme Court and [the Fifth Circuit] have repeatedly held that the term 'probability' as used in the Texas special issue is not so vague as to require additional instructions." *Scheanette v. Quarterman*, 482 F.3d 815, 827 (5th Cir. 2007). The terms used in the future dangerousness verdict form are acceptable because they "have a plain meaning of sufficient content that the discretion left to the jury [is] no more than that inherent in the jury system itself." *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009). The Fifth Circuit has specifically and repeatedly rejected challenges to the failure to define these terms. *See Blue*, 665 F.3d at 667–68; *Scheanette*, 482 F.3d at 827; *Hughes*, 191 F.3d at 615–16; *Woods v. Johnson*, 75 F.3d 1017, 1033–34 (5th Cir. 1996). Ramirez cites no constitutional authority that would have required the trial court to give any specific definition to any of the terms he mentions, and *Teague* would prevent Ramirez from benefitting from any such rule created in the future.

Finally, Ramirez raises another complaint about the failure to use a special verdict form. However, this time the argument is more specific. Ramirez says that

> [A] special verdict form for the mitigation special issues (*see* Tex. Code Crim. Proc. Ann. Art. 37.071 § 2(b)) should have been required under Texas law to ensure the reliability of Ramirez's death sentence, as provided under the Eighth Amendment have been violated.

ECF 67 at 394. But the punishment verdict form used in this case tracks the statute. The questions asked on the punishment form are as follows:

> Special Issue No. 1:
> Is there a probability that the Defendant, JUAN RAUL NAVARRO RAMIREZ, would commit criminal acts of violence that would constitute a continuing threat to society?
>
> Special Issue No. 2:
> Do you find from the evidence beyond a reasonable doubt that JUAN RAUL NAVARRO RAMIREZ, the Defendant himself, actually caused the deaths of Jimmy Almendarez, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo, the deceased, on the occasion in question, or, if he did not actually cause the death of the deceased, that he intended to kill the deceased or another or anticipated that a human life would be taken?
>
> Special Issue No. 3:
> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is sufficient mitigating circumstance or circumstances to warrant that sentence of life imprisonment rather than death sentence be imposed.
>
> Under the law applicable in this case, if the Defendant is sentenced to imprisonment in the Institutional Division of the Texas

> Department of Criminal Justice for life, the Defendant will become eligible for release on parole, but not until the actual time served by the Defendant equals 40 years, without consideration of any good conduct time. It cannot accurately be predicted how the parole laws might be applied to this Defendant if the Defendant is sentenced to term of imprisonment for life because the application of those laws will depend on decisions made by prison and parole authorities, but eligibility for parole does not guarantee that parole will be granted.

2 CR 567–69. Therefore, it is unclear how the verdict form that was used in this case fails to comply with Ramirez's complaint. The failure to so specify means the claim is conclusory and subject to summary denial. *See Ross*, 694 F.2d at 1011–12.

Claim 10(B) is unexhausted and procedurally barred. Ramirez fails to overcome this procedural impediment to relief. Alternatively, the issue is *Teague* barred and fails on the merits as explained herein. Claim 10(B) should be denied.

## XI.   Ramirez's Death Sentence Is Reliable and Valid Despite the Fact That One of His Convictions for Capital Murder Was Overturned. (Claim 11)

In Claim 11, Ramirez complains that the jury improperly considered the invalid second conviction of capital murder in answering the special issue questions that led to his death sentence. ECF 67 at 394–96. This issue was exhausted in state habeas as issue seven of his original application. 1 SHCR 202–04. Ramirez does not acknowledge the state court's adjudication. Therefore, the deference owed to that adjudication under AEDPA dooms the

claim in this Court. Furthermore, even under a de novo review, Ramirez's claim fails on the merits.

As noted in the procedural history of this case, Ramirez was originally convicted of two counts of capital murder. Both counts were based on the same set of facts and victims. The CCA overturned the conviction on the second count as a violation of the double jeopardy clause. *Ramirez,* 2007 WL 4375936, at *5. Ramirez alleges that,

> it is nearly certain that, in deliberating on the appropriate punishment for count one, the jury considered the guilty verdicts on two separate counts of capital murder as a factor militating in favor of death, even though one count was invalid. The jury's consideration of this invalid factor very likely skewed its punishment selection.

ECF 67 at 396.

The state habeas court found as follows on this issue:

> 604.  [Ramirez's] claim that said relief was not sufficient and that he should be afforded a new punishment hearing relies on a premise that the jury had considered the two convictions in answering the punishment phase issues which (A) defies the practical reality of the situation and (B) lacks any factual basis.

> 605.  After all, the jury, which had just heard several days of testimony about the facts involved, obviously realized that it was dealing with one fact pattern involving the murder of six individuals, and not more than one fact situation.

> 606.  Moreover, the trial court submitted two separate punishment phase jury charges, with each one covering one particular count of the indictment.

607.   In addition, [Ramirez] provides no factual support for his claim that the jury had considered the existence of the conviction as to Count Two in answering the special issues in regard to Count One.

3 Supp. CR 902–03.

As the state habeas court aptly noted, this jury had listened to over two weeks of testimony in this case when they answered the special issue questions. *See* 27 RR–39 RR. The jury was well aware that the two convictions arose from the same set of facts and the same victims. That there were two separate convictions based on the same facts would have had far less impact than the knowledge that there were six murdered victims. Ramirez's argument to the contrary, that the two convictions "likely skewed [the jury's] punishment selection," is mere conjecture. ECF 67 at 396.

Citing to *Stringer v. Black*, 503 U.S. 222, 230 (1990), Ramirez claims that his death sentence cannot survive the scrutiny required to ensure that the sentence was not based on an invalid factor. ECF 67 at 396. In *Stringer,* the underlying question was what to do when an aggravating factor under the state's death penalty scheme was later invalidated. 503 U.S. at 229–30. Having found petitioner guilty of capital murder, a Mississippi jury, in the sentencing phase of the case, found that there were three statutory aggravating factors. *Id*. at 225–26. The third factor was whether "[t]he capital murder was especially heinous, atrocious or cruel." *Id*. at 226. Mississippi is a "weighing"

state. *Id.* at 229. Therefore, after a jury convicts a defendant of capital murder and found at least one aggravating factor, it must then weigh the aggravating factors with the mitigating evidence. *Id.* Therefore, when one of the aggravating factors the jury weighed against the mitigating evidence was invalidated, the Supreme Court held that "[i]n order for a state appellate court to affirm a death sentence after the sentencer was instructed to consider an invalid factor, the court must determine what the sentencer would have done absent the factor." *Id.* at 230.

However, *Stringer* does not help Ramirez demonstrate that the state court's adjudication was unreasonable. This is so because *Stringer* is distinguishable from Ramirez's case. Texas is not a weighing state. Even if it were, a second count of capital murder is not an "aggravating factor." As already noted, the jury was well aware of the factual situation. They knew that the second conviction was not based upon any additional criminal activity of Ramirez. The existence of a second conviction did not contribute to Ramirez's death sentence. Nothing Ramirez has said on the issue suggests otherwise. Because *Stringer* has little to no relevance to Ramirez's case, it does not qualify as clearly established Federal law that the state court should have considered in evaluating Ramirez's claim. As such, the state court adjudication of this claim, which was based on a reasonable determination of the facts in evidence, is due deference by this Court.

346

Finally, the Supreme Court has never held that the sentence in a valid conviction must be overturned when a conviction, in the same case, is vacated on double jeopardy grounds. Therefore, Ramirez's claim is foreclosed by the nonretroactivity principles of *Teague*.

Ramirez fails to acknowledge the state court adjudication of his claim. Thus, he fails to demonstrate that it was based upon an unreasonable determination of the laws or facts. Therefore, AEDPA dictates that the claim must fail. Alternatively, standing alone the claim fails on the merits. It should be denied.

## XII.   The Evidence Presented at Trial Was Sufficient to Support Ramirez's Conviction and Death Sentence. (Claim 12)

In Claim 12, Ramirez argues that the evidence presented at his trial was insufficient to convict him and to sentence him to death. ECF 67 at 397–99. This claim was presented and rejected by the CCA on direct appeal as issues one, two, and three. *Ramirez,* 2007 WL 4375936, at *6–9. Ramirez fails to address that adjudication or make any attempt to demonstrate that it was based upon an unreasonable determination of the law or facts.[57] This failure dooms his claim. Alternatively, the issue fails on the merits.

---

[57] The CCA's decision on direct appeal does not suffer the same infirmities that Ramirez claims plague the adjudication on his habeas application. *See* ECF 67 at 162–63, 166–76 Therefore, Ramirez offers absolutely no reason to question the CCA's adjudication of his appellate claims.

### A.    Law

In *Jackson v. Virginia*, the Supreme Court enunciated the standard of review when a state prisoner challenges the sufficiency of the evidence in a federal habeas corpus proceeding. 443 U.S. 307, 319 (1979). The Court stated the issue to be "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.* This rule "makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam). And it is solely the *Jackson* standard that applies in this forum. *Pemberton v. Collins*, 991 F.2d 1218, 1224 (5th Cir. 1993).

"To determine sufficiency of a state conviction as a matter of *constitutional* law, [a federal court] look[s] merely to the '*substantive elements* of the criminal offense as defined by state law.'" *Brown v. Collins*, 937 F.2d 175, 181 (5th Cir. 1991) (quoting *Jackson*, 443 U.S. at 324 n.16). A federal habeas court is required to give great deference to a state court's determination that the evidence was constitutionally sufficient. *Callins v. Collins,* 998 F.2d 269, 276 (5th Cir. 1993); *Parker v. Procunier,* 763 F.2d 665, 666 (5th Cir. 1985).

Specifically, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court may do so only if the state court was 'objectively unreasonable.'" *Cavazos*, 565 U.S. at 2 (quoting *Renico v. Lett*, 559 U.S. 766, 773 (2010)). In other words, viewing *Jackson* through § 2254(d) results in a "twice-deferential standard." *Parker v. Matthews*, 567 U.S. 37, 43 (2012) (per curiam).

### B.    The state court adjudication was reasonable.

In his direct appeal to the CCA, Ramirez raised complaints relating to the sufficiency of the evidence in his first three claims. *Ramirez,* 2007 WL 4375936, at *8. With regard to these claims, the CCA stated:

> [Ramirez] claims in points of error one, two, and three that "[t]he verdict is contrary to the law and evidence" and that the evidence is legally and factually insufficient to support his capital murder conviction. He contends that he did not kill anyone and that he had no intent to promote or assist the commission of capital murder by another.

> In evaluating the legal sufficiency of the evidence, we must view the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307 (1979). Evidence is factually insufficient when, although legally sufficient under a *Jackson v. Virginia* analysis, the evidence is so weak that the jury's verdict seems clearly wrong and manifestly unjust, or when, considering conflicting evidence, the jury's verdict, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence. *Watson v. State,* 204 S.W.3d 404, 414–15 (Tex. Crim. App. 2006).

Having vacated the judgment in Count Two, we need only determine if the evidence was sufficient to support his capital murder conviction in Count One. The charge of the court in Count One authorized the jury to convict [Ramirez] as either a principal or as a party under Section 7.02(a) of the Texas Penal Code. The charge stated in pertinent part:

Now, if you believe from the evidence beyond a reasonable doubt

that on or about JANUARY 5, 2003 in Hidalgo County, Texas, the Defendant, JUAN RAUL NAVARRO RAMIREZ, did then and there intentionally or knowingly cause the deaths of Jimmy Almendarez, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo, by shooting them with a firearm and said murders were committed during the same criminal transaction;

OR

If you believe from the evidence beyond a reasonable doubt that on or about JANUARY 5, 2003 in Hidalgo County, Texas, ROBERT GARZA a/ka/ [sic] BONES, JUANON a/k/a BARNEY, FREDDY KRUEGER, SALVADOR SOLIS, MARCIAL BOCANEGRA, or RODOLFO MEDRANO a/k/a KREEPER, did then and there intentionally or knowingly cause the deaths of Jimmy Almendarez, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo, by shooting them with a firearm and said murders were committed during the same criminal transaction, and the Defendant, JUAN RAUL NAVARRO RAMIREZ, then and there knew of the intent, if any, of the said ROBERT GARZA a/ka/ [sic] BONES, JUANON a/k/a BARNEY, FREDDY KRUEGER, SALVADOR SOLIS, MARCIAL BOCANEGRA, or RODOLFO MEDRANO a/k/a KREEPER, to murder the said Jimmy Almendarez, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo, by

350

shooting them with a firearm, and the Defendant acted with intent to promote or assist the commission of the offense by ROBERT GARZA a/ka/ [sic] BONES, JUANON a/k/a BARNEY, FREDDY KRUEGER, SALVADOR SOLIS, MARCIAL BOCANEGRA, or RODOLFO MEDRANO a/k/a KREEPER, by encouraging, directing, aiding or attempting to aid ROBERT GARZA a/ka/ [sic] BONES, JUANON a/k/a BARNEY, FREDDY KRUEGER, SALVADOR SOLIS, MARCIAL BOCANEGRA, or RODOLFO MEDRANO a/k/a KREEPER, to commit the offense of capital murder of Jimmy Almendarez, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo, by carrying a firearm to the scene of the crime, by rushing Ruben Castillo, a victim, into the eastside house at the scene of the crime, by tying up Jerry Eugene Hidalgo, a victim, by directing Marcial Bocanegra to tie up Rosie Gutierrez, by asking where the drugs and money were at the scene of the crime, by searching the house at the scene of the crime, by telling other gang members when to leave the scene, or by beating Jerry Eugene Hidalgo, a victim, with a pan, then you will find the Defendant, JUAN RAUL NAVARRO RAMIREZ, guilty of the offense of Capital Murder as alleged in the indictment.

The jury returned a general verdict of guilty as charged in the indictment.

The evidence showed that victims Almendarez, Delgado, III, Jerry Hidalgo, Delgado, Jr., Castillo, and Ray Hidalgo were all shot to death during a "pseudo-cop" type of robbery. In his own statement to police, [Ramirez] implicated himself, Bones, Juanon, Krueger, Solis, and Bocanegra. He did not mention Rodolfo Medrano a/k/a "Kreeper"; however, he stated that he did not know the names of some of the other individuals who were involved. The evidence showed that Medrano later hid weapons that were used in the offense. [Ramirez] stated that "it was supposed to be a pseudo-cop robbery" and "we were supposed to go in there to look for drugs and weapons, and that was it." However, he was aware that the guns and bullets had been cleaned of fingerprints and was

told prior to the offense that the victims had guns, "So you gotta put them down." [Ramirez], along with the other assailants, selected a weapon, brought it to the scene, hid in the tall grass behind the houses, and "rushed" a man who went outside to use the bathroom. [Ramirez] admitted that he and two others rushed into one house where "there was only a lady and a guy" and that he tied up the male victim and ordered another to tie up the female victim. He also admitted that he searched the house, demanded the drugs, and beat the male victim with a pan. Surviving witness Rosie Gutierrez confirmed that the assailant who was giving orders to the others also demanded "drugs, money, gold and guns" while beating Jerry Hidalgo.

The evidence, when viewed in the light most favorable to the verdict, was such that any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson,* 443 U.S. at 319. Further, the evidence was not so weak that the jury's verdict seems clearly wrong and manifestly unjust, nor was the jury's verdict against the great weight and preponderance of the evidence. *Watson,* 204 S.W.3d at 414–15. Points of error one, two, and three are overruled.

In points of error 2a and 3a, [Ramirez] contends that the evidence is legally and factually insufficient to support the sentence of death. He challenges the sufficiency of the evidence to support the jury's affirmative answers to the anti-parties and future dangerousness special issues in the punishment-stage jury charge. The anti-parties issue is amenable to both a factual and a legal sufficiency review, but the future-dangerousness issue is amenable only to a legal sufficiency review. *Valle v. State,* 109 S.W.3d 500, 504 (Tex. Crim. App. 2003); *Renteria v. State,* 206 S.W.3d 689, 707 (Tex. Crim. App. 2006).

The anti-parties special issue in the charge asked:

Do you find from the evidence beyond a reasonable doubt that JUAN RAUL NAVARRO RAMIREZ, the Defendant himself, actually caused the deaths of Jimmy Almendarez, Juan Delgado, III, Jerry Eugene Hidalgo, Juan Delgado, Jr., Ruben Castillo, and Ray Hidalgo, the deceased, on the occasion in question, or,

352

if he did not actually cause the death of the deceased, that he intended to kill the deceased or another or anticipated that a human life would be taken?

[Ramirez] argues that the evidence is insufficient to show that he actually caused the deaths of the deceased, that he intended to kill the deceased or another, or that he anticipated that a human life would be taken. He also contends that the evidence fails to show that he is a "defendant whose participation is major and whose mental state is one of reckless indifference to the value of human life," as required by *Tison v. Arizona,* 481 U.S. 137, 152 (1987).

In support of his argument, [Ramirez] contends that others planned the offense and provided the weapons and that he "was recruited rather than being a leader." He asserts that there is no evidence that he "expected violence to erupt during the incident." He claims that there is no evidence that he "should have known that the masked man would return to shoot Jerry [Hidalgo]" or that he was physically present when that shooting occurred. He further contends that his acts of tying up Jerry Hidalgo and hitting him with a pan did not equal "reckless indifference to the value of human life."

The evidence showed that [Ramirez] did much more than tie up Jerry Hidalgo and hit him with a pan. He went armed to the scene and assumed a leadership role when he entered the west-side house. By his own admission, he ordered one of his cohorts to tie up Ms. Gutierrez, he searched the house, and he held Jerry at gunpoint, demanding the drugs from him and beating him when he failed to "cooperate." He also admitted that he took a gold chain from Jerry. Ms. Gutierrez confirmed in her testimony that the masked man with the "Police" jacket who ordered the assailants to tie up her and Jerry also demanded "drugs, money, gold and guns," hit Jerry in the head multiple times, and at one point stated, "Let's go."

The evidence also showed that [Ramirez] anticipated that a human life would be taken. He knew that the guns and bullets had been cleaned of fingerprints and he had been told: "They got guns and there might be some people in there, too, so you gotta put them

down 'cause the family members got some guns." The evidence showed that the targets of the robbery were drug dealers from an opposing gang, and Investigator Alvarez testified that the gangs had "a green light" to fight with or kill each other.

Finally, there was circumstantial evidence that tended to show that [Ramirez] himself may have shot and killed Jerry Hidalgo. Ms. Gutierrez testified that the assailant in charge of the west-side house was wearing a ski mask and a "Police" jacket. The evidence points to [Ramirez] as that assailant. Ms. Gutierrez could not identify Jerry's shooter, but she testified that he was also wearing a ski mask and a "Police" jacket. [Ramirez] admitted that he had a "cuerno de chivo," which Officer Ruiz testified was an AK–47, which uses 7.62 by 39 caliber bullets. Bullets recovered from the scene and from Jerry's body during the autopsy were identified as 7.62 by 39 caliber.

The evidence, viewed in the light most favorable to the verdict, is sufficient to show that [Ramirez] intended to kill the deceased or another or anticipated that a human life would be taken. *Jackson,* 443 U.S. at 319. The jury's affirmative answer to the anti-parties special issue is not clearly wrong and manifestly unjust or against the great weight and preponderance of the evidence. *Watson,* 204 S.W.3d at 414–15. The evidence was legally and factually sufficient to support the jury's affirmative answer to the anti-parties special issue. The evidence was also sufficient to satisfy the *Tison* requirements of major participation plus reckless indifference. 481 U.S. at 152.

With regard to the future dangerousness special issue, the State presented punishment evidence that [Ramirez], who was eighteen years old when he committed the instant offense, had numerous prior juvenile adjudications. In 1998, [Ramirez] was adjudicated for burglary of a vehicle, two counts of criminal trespass, and possession of marijuana, and he was placed in a juvenile rehabilitation facility. In 2000, he was confined in a Texas Youth Commission facility after pleading true to: two counts of aggravated assault, one for intentionally and knowingly causing bodily injury with a knife and one for intentionally and knowingly causing bodily injury with a firearm; and two counts of aggravated assault, one for knowingly discharging a firearm at a vehicle and

one for knowingly discharging a firearm at a habitation. The State also presented punishment evidence that [Ramirez], while in the Hidalgo County Jail awaiting trial, hid marijuana and razor blades in his cell. The evidence, viewed in the light most favorable to the verdict, is sufficient to show that there is a probability that [Ramirez] would commit criminal acts of violence that would constitute a continuing threat to society. *Jackson,* 443 U.S. at 319. Points of error 2a and 3a are overruled.

*Ramirez,* 2007 WL 4375936, at *6–9.

The CCA correctly identified the established law on sufficiency of evidence. The Court reasonably applied that law to the facts as presented at trial. A mere disagreement on how the evidence could be interpreted does not rise to the level of legal insufficiency. It also does not show the only question that matters here—whether all reasonable jurists would disagree with the CCA's application of *Jackson*. That Ramirez believes that his interpretation of the facts is more likely or more reasonable is of no surprise. It is also of no significance.

As with every one of his adjudicated claims, Ramirez fails to acknowledge the state court's adjudication and does not attempt to prove it objectively unreasonable. His claim fails on this basis alone.

## C. Alternatively, the claim fails even if reviewed de novo.

Nonetheless, even when considered *de novo*, Ramirez's claim fares no better than his non-existent effort to overcome his burden under AEDPA. In his petition before this Court, Ramirez's briefing is less detailed than the one

355

presented to the CCA on direct appeal. Here, Ramirez focuses his claim as a challenge to the fact that the jury, and the appellate court, concluded that he killed or intended to kill. ECF 67 at 397–99. However, Ramirez's argument consists of nothing more than conclusory statements that do little more than quibble with the credibility and factual determinations made by the jury.

Ramirez first states that he "did not kill, nor did he intend to kill." ECF 67 at 398. In making this statement, Ramirez ignores the fact that the jury did not have to find that he killed or intended to kill. Ramirez was convicted under the law of parties. Therefore, the jury was authorized to find Ramirez guilty if they found that Ramirez himself killed one, or more, of the victims. 1 CR 4. The jury was also authorized to find Ramirez guilty of capital murder if they found that he encouraged, directed, aided, or attempted to aid the person who did kill the victims. 1 CR 4.

Regarding the evidence necessary to sentence Ramirez to death, the anti-parties charge required the jury to find that he caused or intended to cause the death of the victims, *or* "that he anticipated that a human life would be taken." 2 CR 562. Even if there were no evidence suggesting that Ramirez did not kill or intend to kill—which is not the case—Ramirez's verdict stands since the evidence undoubtedly proved that he aided his co-defendants and anticipated that a life would be taken.

Next, Ramirez complains that "the evidence presented at trial [did not] support that Ramirez was a major participant in this crime." ECF 67 at 398. Ramirez also claims that "no evidence physically linked him to the crime."[58] ECF 67 at 398. To the extent that this statement means that there was not any evidence that placed him physically at the scene, this is incorrect. For either of these allegations to be true, one would have to ignore Ramirez's confession, which specifically placed him at the crime scene and placed him in a leadership role in charge at one of the houses. Perhaps this is why Ramirez attempts to brush aside his detailed statement by dismissively saying that it "was tainted with indications of a false confession." ECF 67 at 398. However, the fact that Ramirez continues to challenge the admissibility of his confession does not remove the confession from the equation in determining whether the evidence was sufficient to support the verdict.

As far as the events leading up to the crime, Ramirez was aware that the guns and bullets had been cleaned of fingerprints and was told prior to the offense that the victims had guns, "So you gotta put them down." Ramirez said that he, along with the other assailants, selected a weapon, brought it to the

---

[58] Assuming this statement means that there is no physical evidence that linked him to the crime scene, that is of no account. Physical evidence is not necessary for a jury to find a defendant guilty in any case. The question is not whether the State's case is strong, it's whether it's legally sufficient.

scene, hid in the tall grass behind the houses, and "rushed" a man who went outside to use the bathroom.

The jury was entitled to believe Ramirez at his word with regard to what he knew and what he did. They had the corroborating testimony of Ms. Gutierrez. Contrary to his present assertion, Ramirez's statement did far more than "place[] him at the crime scene with multiple other people" wearing similar clothing. ECF 67 at 399. Ramirez's statement put a loaded gun in his hands, headed into a house where the victims were believed to have guns, with the understanding that he would need to "put them down." His statement placed him lying in wait, rushing a man, and giving orders to tie up a woman and ransack a house while he tied up and beat another victim.

Finally, as though it is proof of some irrefutable argument, Ramirez finishes his briefing by saying that his "statement provides no evidence that [he] shot Jerry Hidalgo or the other victims." ECF 67 at 399. However, as has been explained, the crime to which Ramirez has been tried, convicted, and sentenced to death for does not require proof that he shot anyone.

Based on these facts, a rational trier of fact could have found him guilty of capital murder. The CCA's application of the correct legal standard to the applicable facts in this case was reasonable. Ramirez never attempts to prove otherwise. Therefore, deference is owed to that determination by this Court.

Alternatively, Ramirez's claim fails on the merits. Either way this claim should be denied.

## XIII. Ramirez Received Effective Assistance of Counsel on Appeal. (Claim 13)

Ramirez argues in Claim 13 that he received ineffective assistance from his appellate counsel (IAAC). ECF 67 at 399–404. Issue sixteen of Ramirez's state habeas application purported to allege that his appellate counsel was ineffective. 1 SHCR 230. However, the only mention of appellate counsel was in the title of the claim. 1 SHCR 230–32. The briefing focused exclusively on trial counsel. 1 SHCR 230–32. This briefing was insufficient to alert the state court regarding the federal nature of the claim, or allege how appellate counsel was ineffective, so the claim is unexhausted and procedurally barred. *See supra* Answer IV. On this alone, Ramirez's claim should be denied. Alternatively, reviewed *de novo*, the claim is meritless.

### A.   Law

The *Strickland* standard applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). As to the performance prong, an attorney's decision not to raise a claim because the attorney concludes it lacks merit falls within the "wide range of professionally competent assistance' required under the Sixth Amendment[.]" *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Strickland*, 477 U.S. at 690). Indeed,

"'winnowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Id.* (quoting *Jones v. Barnes*, 463 U.S. 745, 751–52 (1983)); *see Robbins*, 528 U.S. at 288 ("Notwithstanding *Barnes*, it is still possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, but it is difficult to demonstrate that counsel was incompetent"). Appellate counsel "need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Robbins*, 528 U.S. at 285–86. Furthermore, "[g]enerally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome." *Id.* at 288 (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)); *see also Varga v. Quarterman*, 321 F. App'x 390, 396 (5th Cir. 2009).

As to the prejudice prong, a petitioner "must show a reasonable probability that, but for his counsel's [error], he would have prevailed on his appeal." *Robbins*, 528 U.S. at 285. Appellate "[c]ounsel is not deficient for, and prejudice does not issue from, failure to raise a legally meritless claim." *United States v. Wilkes*, 20 F.3d 651, 653 (5th Cir. 1994) (quoting *Smith v. Puckett*, 907 F.2d 581, 585 n.6 (5th Cir. 1990)).

### B.   Insufficiently briefed claims on appeal

In his complaint about appellate counsel, Ramirez first points to the issues appellate counsel did raise but that were denied as insufficiently briefed. ECF 67 at 402.

Issue eight of Ramirez's direct appeal was that "[t]he Texas Death penalty statute is unconstitutional as applied to this defendant, who was 18 at the time of the offense, considering evolving standards of decency." *Ramirez,* 2007 WL 4375936, at *19. In his brief on direct appeal, Ramirez acknowledged that the issue had been raised and denied on appeal in cases prior to Ramirez's. *Id.* As the Director's briefing on Claims 2 and 17(B) herein demonstrates, the precedent on this issue is clear and, had appellate counsel raised this issue in a sufficient manner, the issue would have undoubtedly failed. Therefore, Ramirez fails to show that appellate counsel was deficient for not raising a meritless claim and suffered no prejudice from appellate counsel's failure to entertain the CCA with lengthy briefing on this matter again.

Issue twelve on direct appeal was that "[th]e trial court erred in excluding evidence at the punishment phase: the interview with the expert." *Ramirez,* 2007 WL 4375936, at *19. Ramirez raises this issue as Claim 4(N) in his current petition. ECF 67 at 340–41. The Director incorporates his briefing on that issue herein for all purposes, which demonstrates the claim has no merit. Again, Ramirez's appellate counsel was not deficient for failing to raise a meritless claim

361

and was not prejudiced by appellate counsel's failure to brief a losing claim on appeal.

> Appellate issue fourteen read as follows:
>
> [Ramirez] was deprived of counsel at a critical stage of the proceedings, the twenty-nine days following the pronouncement of sentence from December 18, 2004 until January 17, 2005. The defendant's right to counsel preempts the state procedural rule on time limits for filing a Motion for New Trial. U.S. CONST. amend. VI; TEX. CONST. Art. I, sec. 10.

*Ramirez,* 2007 WL 4375936, at *19. The fact that Ramirez fails to raise this as a claim in his current petition demonstrates his knowledge that this claim is meritless. However, as the CCA noted in a footnote, it is also factually inaccurate as appellate counsel was appointed on December 22, 2004. *Ramirez,* 2007 WL 4375936, at *19 n.20. Ramirez does not demonstrate deficient performance in a claim that was factually unsupported and was not prejudiced by the failure to sufficiently brief this issue on appeal.

> Direct appeal issue twenty-six argued the following:
>
> The trial court erred in overruling [Ramirez's] Motion for Mistrial responding to evidence of the stabbing of a death row guard by Jorge Salinas. [record citation omitted]. [Ramirez] did not open the door to such argument. The prosecutor pried the door open. Any instruction could not have cured such an error.

*Ramirez,* 2007 WL 4375936, at *19 (second alteration in original).

Direct appeal issue twenty-six is seemingly covered by Claim 4(J) of Ramirez's current petition. However, the briefing in Ramirez's current petition is

362

no more informative than the sparse briefing by his appellate attorney who Ramirez alleges was ineffective. Nonetheless, the Director incorporates the entirety of his briefing on that claim herein for all purposes. As the issue is meritless, Ramirez does not prove deficiency or prejudice by the failure to sufficiently brief it on appeal.

> Issue twenty-seven on direct appeal reads as follows:
>
> The trial court erred in admitting the defendant's statement without an official translation of the non-English portion of the statement, containing both words of the defendant and words of the officer taking the statement.

*Ramirez,* 2007 WL 4375936, at *19. Ramirez appears to acknowledge that this claim was unlikely to be meritorious by failing to include it in his current petition. Nonetheless, this issue is partially addressed as an IATC claim in Claim 3(C)(11)(b) of Ramirez's current petition.[59] ECF 67 at 311–12. The Director incorporates his briefing on that matter for all purposes on this issue. As that claim was meritless, Ramirez does not prove deficient performance and was not prejudiced by his appellate counsel's failure to provide sufficient briefing on the matter.

---

[59] Again, the briefing on the issue contained in Ramirez's current petition is supported by little more briefing than the issue denied by the CCA as insufficiently briefed. *See* ECF 67 at 311–12.

### C.  Claims that should have been raised on appeal

After his single sentence complaint about the claims the CCA dismissed as insufficiently briefed on direct appeal, Ramirez lists additional errors that he believes appellate counsel committed by failing to raise—(1) claims related to the "mitigation special issue jury instruction or any other jury instruction errors," (2) a challenge to the CCA's decision to select the most serious offense when determining which one of the convictions to set aside, (3) a request for a new penalty trial after the conviction in count two was overturned, (4) a gender-based *Batson* claim; and (5) claims of prosecutorial misconduct. ECF 67 at 403.

First among these, Ramirez argues that appellate counsel was ineffective for failing to raise claims related to the "mitigation special issue jury instruction or any other jury instruction errors." ECF 67 at 403. As demonstrated by the briefing on Claims 3(C)(11)(e), 4(P), and 17(F), these issues are so clearly foreclosed by established precedent that there is no doubt they would have been unsuccessful if appellate counsel had raised them on direct appeal. Accordingly, he fails to prove appellate counsel fell below an objective standard of reasonableness by raising clearly foreclosed claims or that any failing prejudiced him.

Next, Ramirez complains that appellate counsel should have "challenge[d] [the] CCA's decision to select the most serious offense when

determining which one of the convictions to set aside." ECF 67 at 403. For one, Ramirez does not suggest how appellate counsel was supposed to challenge the CCA's decision, i.e., a decision that occurred after he wrote his appellate brief. And he does not prove that Ramirez was constitutionally entitled to appellate counsel after that point. So, Ramirez fails to demonstrate deficiency or prejudice, and his claim is *Teague* barred because it suggests constitutional entitlement to counsel beyond what is currently recognized.

In any event, Ramirez does not establish that there was a basis to challenge the CCA's decision regarding which conviction to vacate, or that had the CCA overturned the other conviction, Ramirez would have benefitted in any way. Both convictions were for capital murder. Both convictions carried a death sentence. Ramirez had nothing to gain, and therefore nothing to lose, by one conviction being upheld over the other. As such, appellate counsel was not deficient for failing to urge one particular conviction be overturned and was not prejudiced by which death sentence was upheld.

Ramirez also argues that appellate counsel should have insisted on a new penalty trial based upon the fact that one of the convictions was overturned. ECF 67 at 403. As demonstrated by the Director's briefing on Claim 11 herein, any attempt to do raise such a claim would have been unsuccessful. Therefore, appellate counsel was neither deficient for failing to raise this issue, nor was Ramirez prejudiced by this alleged deficiency.

Ramirez further complains that appellate counsel failed to raise a *Batson* challenge even though the State's peremptory strikes of women amounted "to a prima facie case of purposeful discrimination." ECF 67 at 404. The question of trial counsel's failure to raise a *Batson* objection is addressed in Ramirez's current petition as Claim 3(C)(7). ECF 67 at 302–04. As trial counsel failed to raise the issue in the trial court, it was not preserved for appellate review. Appellate counsel cannot be deemed ineffective for failing to raise an issue that was waived at the trial court level. *See Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017) ("In most cases, an unpreserved trial error will not be a plainly stronger ground for appeal than preserved errors."). Ramirez acknowledges this in his briefing on Claim 3(C)(7). *See* ECF 67 at 304 ("Counsel's deficient performance not only prejudiced Ramirez at trial but also on appeal."). However, as the Director's briefing demonstrates, trial counsel was not ineffective in this respect. Thus, by default, appellate counsel was not ineffective either, and Ramirez cannot show he suffered any prejudice for failing to raise a defaulted claim.

Next, Ramirez cites to Claim 9 of his current petition and states that appellate counsel "also failed to present other claims regarding prosecutorial misconduct." ECF 67 at 404. Then, citing to Claims 3 and 8 of his current petition, Ramirez further complains that appellate counsel "failed to raise trial counsel's conflicts of interest, their ineffective assistance . . . or any issues

relating to Ramirez's innocence." ECF 67 at 404. Like defaulted claims, IATC claims are generally not successful on direct appeal. *See Trevino*, 569 U.S. at 423 ("Texas procedure makes it 'virtually impossible for appellate counsel to adequately present an [IATC] claim' on direct review." (quoting *Robinson v. State*, 16 S.W.3d 808, 810–11 (Tex. Crim. App. 2000))). This is, in part, because they "often depend on evidence outside the trial record," *Martinez*, 566 U.S. at 13, just like an innocence claim. Accordingly, Ramirez cannot show deficient conduct for failing to raise claims not suited for direct appeal. And again, as the Director's briefing demonstrates, these issues are meritless. As such, appellate counsel was not deficient for failing to raise them. Furthermore, even had Ramirez's appellate counsel had raised these issues, they would have failed. Therefore, Ramirez cannot demonstrate the prejudice necessary to succeed in raising a *Strickland* claim.

Finally, Ramirez fails to acknowledge that appellate counsel successfully raised a double jeopardy claim that lead to one of Ramirez's convictions being overturned. *Ramirez,* 2007 WL 4375936 at *5. In light of this, it is impossible for Ramirez to demonstrate that the claims appellate counsel did not raise were "plainly stronger than those actually presented to the appellate court." *Davila*, 137 S. Ct. at 2067. Furthermore, the "several meritorious claims" Ramirez argues his appellate counsel should have raised are entirely without merit.

This claim is unexhausted and procedurally barred. Alternatively, the claim fails on the merits. It should be denied.

## XIV. The Texas Court of Criminal Appeals's Prohibition on Raising Sufficiency of the Evidence Claims on Direct Appeal Regarding the Mitigation Special Issue Did Not Violate Ramirez's Eighth or Fourteenth Amendment Rights. (Claim 14)

In Claim 14, Ramirez maintains that because the CCA prohibits "defendants from raising sufficiency of the evidence claims on direct appeal regarding the mitigation special issue," juries "have unfettered discretion over which offenders to sentence to death." ECF 67 at 404–05. This issue was raised on state habeas as issue ten. 1 SHCR 205–11. Ramirez fails to acknowledge or address the state court adjudication and this claim fails under § 2254(d). Alternatively, the claim fails on the merits.

The state court issued the following findings on Ramirez's issue ten.

613. The Court of Criminal Appeals has also repeatedly indicated that sufficiency of the evidence to support the jury's answer to the mitigating circumstances special issue is not subject to appellate review. *See, e.g., Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005); *Howard v. State*, 153 S.W.3d 382, 384 (Tex. Crim. App. 2004); *Resendiz v. State*, 112 S.W.3d 541, 549 (Tex. Crim. App. 2003); *Allen v. State*, 108 S.W.3d 281, 285 (Tex. Crim. App. 2003); *Salazar v. State*, 38 S.W.3d 141, 146 (Tex. Crim. App. 2001); *McFarland v. State*, 928 S.W.2d 482, 498 (Tex. Crim. App. 1996); *Colella v. State*, 915 S.W.2d 834, 845 (Tex. Crim. App. 1995).

614. In fact, the Court of Criminal Appeals so noted in footnote 12 in its opinion on direct appeal in this case. *See Ramirez*, 2007 Tex. Crim. App. Unpub. LEXIS at *23.

368

615. Said Court has also repeatedly rejected arguments that the Texas death penalty scheme is unconstitutional for not providing a mechanism for meaningful appellate review of the jury's decision regarding mitigating circumstances. *See e.g., Fuller v. State*, 253 S.W.3d 220, 234 (Tex. Crim. App. 2008); *Russeau*, 171 S.W.3d at 886; *Allen*, 108 S.W.3d at 285; *Prystash v. State*, 3 S.W.3d 522, 536 (Tex. Crim. App. 1999); *Eldridge v. State*, 940 S.W.3d 646 S.W.2d 652–53 (Tex. Crim. App. 1996); *Green v. State*, 934 S.W.2d 92, 106–07 (Tex. Crim. App. 1996); *McFarland*, 928 S.W.2d at 498–99.

616. Applicant concedes that the law in regard to his challenges to the mitigation issue is against him, but asks that it be changed.

617. However, Applicant does not develop any arguments why the current law, which is based on sound evaluation of the issues involved, should be re-examined and ultimately changed.

618. Nor are there any valid grounds for changing said law.

3 Supp SHCR 905–06.

In addition to adopting the trial court's findings, the CCA denied Ramirez's application on its own review. *Ramirez*, 2015 WL 6282336, *1. Therefore, the state court decision of the federal issue constitutes an adjudication on the merits.

The denial on the merits was reasonable. Ramirez's complaint is that the mitigation special instruction defines mitigation evidence as "evidence that a juror might regard as reducing the Defendant's moral blameworthiness," but does "not assign a burden of proof." ECF 67 at 405. Then, Ramirez correctly

states that the CCA does not review claims of sufficiency of the evidence regarding mitigation. *See Smith v. State,* 297 S.W.3d 260, 278 (Tex. Crim. App. 2009). According to Ramirez, this fails to ensure that defendants are "given the individualized treatment on appeal that the Constitution requires." ECF 67 at 405–06.

However, the Fifth Circuit has repeatedly rejected arguments that the Constitution mandates state appellate review of the sufficiency of "mitigating" evidence supporting or opposing a capital sentencing jury's answer to the Texas capital sentencing scheme's mitigation special issue. *See Woods v. Cockrell,* 307 F.3d 353, 359–60 (5th Cir. 2002). "[Fifth] Circuit precedent has specifically rejected the argument that there is a constitutional requirement that mitigation special issue evidence be subject to appellate review by the state." *Rowell* v. *Dretke,* 398 F.3d 370, 378 (5th Cir. 2005). Accordingly, the state court's denial of relief is objectively reasonable.

Nonetheless, Ramirez cites to *Clemons v. Mississippi*, 494 U.S. 738, 752 (1990), as support for his claim. ECF 67 at 405–06. However, reliance upon *Clemons* is misplaced. As Ramirez acknowledges, Texas is not a "weighing" state. ECF 67 at 405. However, Ramirez's statement that "similar concerns that led the Supreme Court to prohibit automatic affirmance of death sentences in weighing states afflict the Texas system" is both unsupported and inaccurate. ECF 67 at 406.

As previously noted, the Court in *Clemons* was addressing the effect that the invalidation of one of the aggravating factors used to weigh against the mitigating evidence had in the evaluation of the sentence for appellate purposes. 494 U.S. at 748–55. The fact pattern, the legal analysis, nor the holding in *Clemons* have any relevance to Ramirez's case. The Supreme Court held that, because Mississippi was a weighing state, an appellate court is not permitted to automatically affirm the sentence simply because one aggravating circumstance remains. 494 U.S. at 751. The Court held that to do so, would not constitute the appellate reweighing that was necessary to ensure that "the sentencing decision [was] based on the facts and circumstances of the defendant, his background, and his crime." *Id*. at 750–51. In short, the Supreme Court's decision in *Clemons* was fact specific and wholly dependent on the existence of a weighing scheme. The holding there has no place in the analysis whether appellate review of the sufficiency of the evidence of the Texas mitigation special issue is required under due process.

In addition, at the time Ramirez's case was being reviewed, no court had held that lack of appellate review on this issue violated a petitioner's due process rights, *Teague* forecloses complaints *See Rowell*, 398 F.3d at 377.

Ramirez's refusal to acknowledge the state court's adjudication or the clear precedent mandating denial of his claim is fatal. Ramirez fails to overcome the deference given to state court adjudications under § 2254(d).

Alternatively, the claim is meritless and *Teague* barred. The claim should be denied.

## XV.  Ramirez's Post-Conviction Counsel Were Effective. (Claim 15)

Ramirez alleges that all three sets of attorneys who represented him on state habeas were ineffective. ECF 67 at 406. This claim has never been raised in state court and is unexhausted and procedurally barred. *See supra* Answer IV. Ramirez does not attempt to overcome the bar and the claim should be denied on this basis. Furthermore, this claim is not cognizable on federal habeas review.

It is well settled in this circuit that alleged infirmities in state habeas proceedings are not cognizable grounds for federal habeas relief. *Henderson v. Stephens*, 791 F.3d 567, 578 (5th Cir. 2015); *Ladd v. Stevens*, 748 F.3d 637, 644 (5th Cir. 2014); *Tercero v. Stephens*, 738 F.3d 141, 147 (5th Cir. 2013); *In re Gentras*, 666 F.3d 910, 911 (5th Cir. 2012); *Kinsel v. Cain*, 647 F.3d 265, 273 & n.32 (5th Cir. 2011); *Beazley*, 242 F.3d at 271. Likewise, complaints of ineffective assistance of state habeas counsel are not cognizable grounds for federal habeas relief, including post-*Martinez* and *Trevino*. 28 U.S.C. § 2254(i) ("The ineffectiveness or incompetence of counsel during Federal or State collateral post-conviction proceedings shall not be a ground for relief in a proceeding arising under section 2254."); *Davila*, 137 S. Ct. at 2068 (recognizing that the Court has never held the Constitution guarantees a

postconviction right to counsel); *Martinez*, 566 U.S. at 17 (recognizing that § 2254 still precludes a petitioner from relying on ineffective assistance of postconviction counsel as a ground for relief); *Stevens v. Epps,* 618 F.3d 489, 502 (5th Cir. 2010); *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008); *Beazley*, 242 F.3d at 271. Finally, given the current status of the law, Ramirez's claim is barred by the nonretroactivity principles of *Teague*.

The Director also notes that Ramirez's complaints are unfounded. His state application raises nineteen grounds for relief. 1 SHCR 82–237. The petition is supported by 26 exhibits. 1 SHCR 240–473. The amended petition raises 16 claims with 51 exhibits attached in support. Of the 51 exhibits, four of them are expert affidavits and reports. 4 SHCR 1293–94. One of those experts is Dr. Deborah Davis, an expert on false confessions whose affidavit and report is attached to support the claim that trial counsel was ineffective for not having presented such an expert at trial. 4 SHCR 1303–38. While Ramirez's petition currently pending in this Court also includes such a claim, he does not present this Court with the same type of evidentiary support.[60] ECF 67 at 192.

---

[60] Ramirez does reference the first two pages of Dr. Davis's report in his briefing on the subject. ECF 67 at 292. However, in the section labeled "Incorporation by Reference," Ramirez "incorporates by specific reference all facts, allegations, and arguments made elsewhere in this Petition into each and every claim in this Petition." ECF 67 at 176. Presumably, since he believes them to have been ineffective, Ramirez did not incorporate every claim and exhibit presented by state habeas counsel.

Additionally, Ramirez received a live hearing on his state habeas petition. The hearing took place over two days and 35 exhibits were entered into evidence. Ramirez received effective assistance of three sets of attorneys on state habeas. Those attorneys raised and vigorously argued many of the arguments that Ramirez has brought to this Court. That current counsel would have constructed certain arguments differently, chosen different experts, or raised additional claims is not evidence that his state counsel was ineffective.[61] Thus, even if this Court could review the instant claim, it would lack merit.

This claim is both unexhausted and procedurally barred, non-cognizable, *Teague* barred, and meritless. It should be denied.

## XVI. The State Court's Denial of Ramirez's Postconviction Motion to Test DNA Evidence Is Not Cognizable in Federal Habeas. (Claim 16)

In Claim 16, Ramirez argues that the state trial court's denial of his motion to test DNA evidence pursuant to Chapter 64 of the Texas Code of Criminal Procedure violated his due process rights. ECF 67 at 412–16. However, this claim is not cognizable on federal habeas review because Ramirez has no federal constitutional right to testing pursuant to a state law.

---

[61] It could easily be argued that not alleging every generic claim that has been flatly rejected on numerous occasions is evidence of state habeas counsel's effectiveness. *See Davila*, 137 S. Ct. at 2067.

Even if Ramirez had the right to raise this issue in federal court, the state court's denial of his DNA motion was reasonable.

### A.    Alleged errors in denying a motion for DNA testing under Chapter 64 are not cognizable on federal habeas.

"Chapter 64 provides for forensic DNA testing but does not provide a vehicle for obtaining relief if testing reveals affirmative evidence of innocence." *Ex parte Tuley*, 109 S.W.3d 388, 391 (Tex. Crim. App. 2002). Because Chapter 64 is simply a mechanism to access and test evidence, proving its constitutional infirmity "would 'neither terminat[e] custody, accelerat[e] the future date of release from custody, nor reduc[e] the level of custody'" for Ramirez. *Skinner v. Switzer*, 562 U.S. 521, 534 (2011) (alterations in original) (quoting *Wilkinson v. Dotson*, 544 U.S. 74, 86 (2005) (Scalia, J., concurring). Hence, Ramirez's claim is one for a Section 1983 suit, not habeas. *Id.*

Moreover, "[t]here is no free-standing due process right to DNA testing, and the task of fashioning rules to 'harness DNA's power to prove innocence without unnecessarily overthrowing the established system of criminal justice' belongs 'primarily to the legislature.'" *Ex parte Gutierrez,* 337 S.W.3d 883, 889 (Tex. Crim. App. 2011) (quoting *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne,* 557 U.S. 52, 62 (2009)). But federal habeas relief on behalf of a person in custody pursuant to a state court judgment is available "only on the ground" that the petitioner "is in custody in violation of the Constitution or laws or

treaties of the United States." § 2254(a). Of note, the jurisdictional scope of § 2254(a) is plainly limited to violations of *federal* law. *Id.* For this reason, the Fifth Circuit has long held that "infirmities in state habeas proceedings do not constitute grounds for relief in federal court." *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999) (collecting cases). The reason is two-fold. First, an "attack on a state habeas proceeding . . . is an attack on a proceeding *collateral* to the detention and not the detention itself." *Nichols v. Scott*, 69 F.3d 1255, 1275 (5th Cir. 1995). In other words, a cognizable habeas claim is one that alleges "a constitutional challenge . . . [to] the detention *itself*." *See Trevino*, 168 F.3d at 180 (emphasis added). For the same reason, a challenge to a Chapter 64 proceeding—like a state habeas challenge—is not cognizable because it is an attack on a proceeding collateral to the judgment of conviction. *Id.*

Second, habeas challenges to the procedures used by the Texas courts to deny a Chapter 64 motion are not cognizable because a petitioner's postconviction "right" to access DNA evidence for testing is solely a creation of Texas law. *See Richards v. Dist. Att'y's Off.*, 355 F. App'x 826 (5th Cir. 2009) (holding that petitioner's postconviction claim regarding access to DNA evidence failed because petitioner "cannot establish the deprivation of a constitutional right" whether his claims sound in habeas or § 1983); *Cortez v. Stephens*, No. 4:12-CV-2869, 2013 WL 4520038, at *1 (S.D. Tex. Aug. 26, 2013)

("Any right petitioner may have regarding post-conviction DNA testing arises solely under Texas law and does not raise a federal constitutional issue.").

Undaunted by the established law on the matter, Ramirez tries to cobble together a new federal constitutional rule that would entitle him to have this claim heard on federal habeas.[62] First, he points out that "if a State establishes postconviction proceedings, [then] these proceedings must comport with due process." ECF 67 at 414 (quoting *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 293 (1998)). Next, Ramirez claims that a capital defendant must "receive notice of the State's grounds for denying review of his federal constitutional claim, and an opportunity to be heard where those grounds turn out to be factually and materially incorrect." ECF 67 at 414.

However, Ramirez's proceedings followed that envisioned by the DNA statute. Furthermore, the argument relating to receiving notice of the State's grounds for denying review makes no sense in this setting.[63] Ramirez did not have a federal constitutional claim in relation to his DNA motion. Ramirez certainly received notice of the grounds on which his motion was denied. Ramirez received a live hearing on his motion. DNA RR.[64] The trial court

---

[62] Even if Ramirez were successful in this desperate attempt, it would be of no use to him as he would be denied relief under *Teague*.

[63] For example, Ramirez cites to the concurring opinions in a case related to a capital petitioner's right to be given notice of a clemency hearing. *Woodard*, 523 U.S. at 293.

[64] "DNA RR" refers to the reporter's record of the hearing on Ramirez's DNA motion. "DNA CR" refers to the clerk's record related to Ramirez's DNA motion.

issued a five-page order denying Ramirez's motion for DNA testing. DNA CR at 143–47. In affirming the trial court's denial of Ramirez's motion, the CCA issued a twenty-three-page opinion explaining its rationale. *Ramirez v. State,* 621 S.W.3d 711 (Tex. Crim. App. 2021).

Nonetheless, plowing on, Ramirez next argues that "because the right of access to DNA testing is an essential component to satisfy numerous federal constitutional claims, the state court's denial impeded Ramirez's ability to adequately raise constitutional violations." ECF 67 at 415. In making this argument, Ramirez cites to *Herrera* and notes that actual innocence is not a constitutional claim but can serve as a gateway to have other constitutional claims heard.[65] It is unclear how the use of actual innocence claims as a gateway to allow consideration of otherwise barred federal constitutional claims has anything to do with alleged errors in the denial of a motion for DNA testing that fail to state a claim for relief in federal court.

Without acknowledging the precedent directly on point, Ramirez appears to hope that by randomly citing to various areas of constitutional law he can create a valid federal constitutional claim. However, wishing does not make it so. Ramirez cannot overcome the simple legal fact that the state court's

---

[65] That Ramirez points this out is interesting as he attempts to raise a freestanding claim of actual innocence in claim seven. ECF 67 at 355–59.

denial of his motion for DNA testing did not deny violate any federal constitutional rights.

Finally, should it be determined that the improper denial of DNA testing pursuant to a state law could form the basis for a constitutional challenge to a petitioner's detention, this claim would be barred under the nonretroactivity principle established in *Teague*.

### B. The state court's denial of Ramirez's motion was proper.

Chapter 64 of the Texas Code of Criminal Procedure permits a "convicted person" to move for "forensic DNA testing of evidence containing biological material." Tex. Code Crim. Proc. art. 64.01. There are a number of requirements that must be met before a trial court may order testing. Tex. Code Crim. Proc. art. 64.03. The evidence must still exist and have been subjected to a secure chain of custody. Tex. Code Crim. Proc. art. 64.03(a)(1)(A). There must be "a reasonable likelihood that the evidence contains biological material suitable for DNA testing" and identity must be an issue in the case. Tex. Code Crim. Proc. art. 64.03(a)(1). Further, the convicted person must show by a preponderance of the evidence that he or she "would not have been convicted if exculpatory results had been obtained through DNA testing," and that "the request for proposed DNA testing is not made to unreasonably delay the execution of sentence or administration of justice." Tex. Code Crim. Proc. art. 64.03(a)(2).

379

In determining whether the convict has met his burden, the court assumes that the results of the testing would be favorable to him—that he would be excluded as a contributor to the sample. *Reed v. State*, 541 S.W.3d 759, 774 (Tex. Crim. App. 2017). Further, an applicant must show that the DNA testing of the material, if not his DNA, would show that he did not commit the crime as either a principle or a party. *Ex parte Gutierrez*, 337 S.W.3d at 900. The question is whether exculpatory results "would alter the landscape if added to the mix of evidence that was available at the time of trial." *Reed*, 541 S.W.3d at 774. DNA testing alone does not always resolve a case. Where there is enough other incriminating evidence and an explanation for the DNA result, science alone cannot prove a prisoner innocent. *See House*, 547 U.S. at 540–48.

Ramirez sought DNA testing on two hats/masks that were dropped at the crime scene by one or more of the perpetrators. DNA CR 19–30. Ramirez claimed that "[t]he DNA testing that Ramirez requests can identify the assailants that entered Gutierrez's house." DNA CR at 29. However, by arguing that "exculpatory results" would "provide further support that Ramirez in fact was not one of the men who entered Gutierrez's house," Ramirez also acknowledges that exculpatory results would not provide any conclusive proof that Ramirez was not involved in the crime. DNA CR at 28–29.

Ramirez was required to prove by a preponderance of the evidence that he would not have been convicted if the DNA on the hat or mask did not belong

to him. Ramirez wholly failed to meet this burden. The only way Ramirez could succeed is if his confession were completely disregarded. However, while a confession cannot be used as a basis to argue that identity was not an issue, it should not be ignored in weighing the inculpatory evidence against any potential exculpatory evidence to come from DNA testing. *See* Tex. Code Crim. Proc. art. 64.03(b-1); *see Reed*, 541 S.W.3d at 774.

There were eleven perpetrators[66] participating in the offense—many of whom were wearing hats, masks, or both That Ramirez's DNA was not on two of them would prove nothing more than his DNA was not on those particular hats or masks. It does not prove that he did not commit the crime. It does not prove that he was not at the scene. It does not even prove that he was not wearing one of the hats or masks. All an "exculpatory result" would accomplish is the muddying of the waters. *See Kutzner v. State*, 75 S.W.3d 427, 439 (Tex. Crim. App. 2002) (exculpatory results that would "merely muddy the waters" are insufficient to show that the Appellant would not have been convicted). Given the evidence of Ramirez's involvement in the murders, Ramirez cannot legitimately argue DNA evidence would exculpate him, only that some other

---

[66] Marcial Bocanegra, Rodolfo Medrano, Juan Cordova, Humberto Garza, III, Robert Garza, Jorge Norberto Espinoza Martinez, Salvador Solis, Reymundo Sauceda, Juan Miguel Nunez, and Petition, Juan Ramirez. 28 RR 47–56.

person or persons were possibly involved. However, that would hardly be a novel discovery in a case where Ramirez had 11 co-defendants.

Ramirez failed to show by a preponderance of the evidence that exculpatory DNA results, when weighed against the evidence presented at trial, would have resulted in a different verdict. *See Holberg v. State*, 425 S.W.3d 282, 285 (Tex. Crim. App. 2014).

Ramirez's claim in this Court is not cognizable and cannot lead to federal habeas relief. Furthermore, if the Court reviewed the matter on the merits, the claim fails because the CCA properly affirmed the trial court's denial of his motion for DNA testing. This claim should be denied.

## XVII. Ramirez's Death Sentence Is Constitutional. (Claim 17)

In Claim 17, Ramirez raises the usual litany of arguments against the death penalty and particularly the death penalty in Texas. As such, it is necessary to travel the well-trodden road of issues that have been conclusively decided numerous times.

### A. Execution of those with mental illness is not unconstitutional. (Claim 17(A))

In Claim 17(A), Ramirez argues that those with "severe mental illness" should be exempt from a death sentence. ECF 67 at 416–23. This claim was seemingly raised, and then abandoned, on state habeas as issue four. 1 SHCR 191–95; *Ex parte Ramirez,* 2015 WL 6282336, at *1. Therefore, it is

unexhausted and procedurally barred. *See supra* Answer IV. Yet again, Ramirez has made no effort to overcome the bar. Therefore, the claim should be summarily denied. Alternatively, the claim fails on the merits.

Ramirez alleges that evolving standards of decency prove that those "with severe mental illness" are ineligible for execution under the Eighth Amendment. ECF 67 at 416–23. As proof, he alleges that twenty-three of the twenty-seven jurisdictions with the death penalty identify severe mental illness as a mitigating factor,[67] and that professional organizations and the international community oppose execution of the severely mentally ill. ECF 67 at 417, 419–21. Further, he argues that the severely mentally ill have diminished culpability, likening them to intellectually disabled individuals or juveniles. ECF 67 at 417, 421.

However, this argument is foreclosed by the numerous Fifth Circuit cases that have repeatedly held that the Eighth Amendment does not bar the execution of those with mental illness. *See, e.g., Ward v. Stephens*, 777 F.3d 250, 269 (5th Cir. 2015) (finding that "reasonable jurists could not debate whether Ward's death sentence violates the Eighth Amendment" based on bipolar disorder); *Mays v. Stephens*, 757 F.3d 211, 219 (5th Cir. 2014) (same,

---

[67] There is a marked difference between a possible mitigating factor and being a categorical exclusion.

but for "psychotic disorder not otherwise specified"); *ShisInday v. Quarterman*, 511 F.3d 514, 521 (5th Cir. 2007).

The law on this issue is clear. In fact, so much so that recently the Fifth Circuit summarily disposed of a claim exactly like the one Ramirez presents to this Court. In *Smith v. Davis*, the Fifth Circuit stated that "[Petitioner] argues that those who are severely mentally ill are similar to the intellectually disabled and juvenile offenders and therefore the severely mentally ill lack the moral culpability to permit a sentence of death. We have rejected this argument before." 927 F.3d 313, 339 (5th Cir. 2019). This Court must do the same.

Finally, the non-retroactivity principles of *Teague*, bar relief in this forum. *Ripkowski v. Thaler*, 438 F. App'x 296, 303 (5th Cir. 2011). Specifically, the Fifth Circuit has recognized the distinction between the mentally ill and the intellectually disabled and has held that *Atkins v. Virginia*, 536 U.S. 3304 (2002), only protects the latter. *In re Neville,* 440 F.3d 220, 221 (5th Cir. 2006). For this and the above reasons, relief must be denied.

### B. Ramirez's death sentence is not inconsistent with the evolving standards of decency that mark the progress of a maturing society. (Claim 17(B))

Claim 17(B) is the familiar complaint that the death penalty is out of step with evolving standards of decency. ECF 67 at 422–39. This claim has never been presented to a state court and is unexhausted and procedurally

barred. *See supra* Answer IV. Ramirez does not attempt to overcome the bar. The claim should be dismissed on this basis. Alternatively, the claim is without merit.

Ramirez claims that the death penalty is no longer consistent with societal standards of decency for four reasons: (1) there is a national trend towards abolition, (2) the death penalty is excessive, (3) the United States is out of step with the international community's consensus against the death penalty, and (4) capital punishment has failed to ensure reliability, consistency, and equal protection of the law. ECF 67 at 422–39. Claims 2 and 17(A) also relate to these complaints. The Director incorporates the briefing on those claims herein for all purposes.[68]

The constitutionality of the death penalty has been upheld over and over again. *See Glossip v. Gross*, 576 U.S. 863, 868 (2015) ("[I]t is settled that capital punishment is constitutional."); *Baze v. Rees*, 553 U.S. 35, 61 (2008) ("This Court has ruled that capital punishment is not prohibited under our Constitution."); *United States v. Jones*, 132 F.3d 232, 242 (5th Cir. 1998) ("We are bound by Supreme Court precedent which forecloses any argument that

---

[68] Furthermore, in his briefing on this matter, Ramirez raises complaints that the death sentence is "unconstitutional because Ramirez has been and will continue to be confined for a time that is unnecessarily lengthy and under conditions that are torturous and inhumane." ECF 67 at 422. Ramirez deemed that this drive-by complaint merited its own claim, Claim 17(D), so it will not be addressed in this section.

the death penalty violates the Constitution under all circumstance."). Arguably, this Court does not have the authority to invalidate the death penalty as Ramirez requests. *See United States v. Robinson*, 367 F.3d 278, 291 (5th Cir. 2004). Regardless, Ramirez's sparse claims of changes in in the death penalty landscape utterly fail to prove that the national consensus has changed such as to render the death penalty out of step with the evolving standards of decency. The fact that the Supreme Court and the Fifth Circuit have upheld death sentences, denied writs of certiorari, and denied stays of execution over and over again in recent years is proof of that fact. *See e.g.*, *Buntion v. Lumpkin,* 142 S. Ct. 1464 (2022); *Buntion v. Lumpkin,* 31 F.4th 952 (5th Cir. 2022); *Rhoades v. Martinez,* 142 S. Ct. 54 (2021); *Rhoades v. Martinez*, No. 21-70007, 2021 WL 4434711 (5th Cir. Sept. 27, 2021) (unpublished); *Hummel v. Lumpkin,* 141 S. Ct. 330 (2020); *Hummel v. Davis*, 807 F.App'x 282 (5th Cir. 2020). This claim is unexhausted and procedurally barred and meritless. It should be denied.

## C. The Texas death penalty scheme does not violate Ramirez's due process rights because it is not unconstitutionally arbitrary. (Claim 17(C))

Ramirez argues in Claim 17(C) that the Texas death penalty scheme is unconstitutionally arbitrary. ECF 67 at 439–43. Ramirez claims that death sentences are not based upon any objective basis and instead depend on the

prosecutors, counties, and races of various individuals involved in the process. ECF 67 at 440.

This claim was raised as claim thirteen of Ramirez's "amended" state habeas application. 3 SHCR 1262–72. However, that application was dismissed as a subsequent application by the CCA under article 11.071 § 5. *Ex parte Ramirez,* 2015 WL 6282336 at *1. Therefore, the claim is procedurally defaulted. *See supra* Answer IV. Ramirez fails to acknowledge or address the procedural challenges he faces. On this alone, Ramirez's claim should be denied. Alternatively, the claim is meritless.[69]

Ramirez claims that in Texas, "capital punishment continues to be arbitrarily and wantonly applied." ECF 67 at 441. According to Ramirez decisions to seek death have "nothing to do with any individual crime, trial, or defendant, but are based on such determinations as geography or race." ECF 67 at 442. In so claiming, Ramirez cites to statistics on which jurisdictions produce the most death sentences in Texas.

The Fifth Circuit has previously rejected the claim that the Constitution prohibits imposition of the death penalty because it is imposed disparately depending on the county in which the capital murder was committed. *Allen,*

---

[69] This claim overlaps with his Claim 17(K), which relates directly to the role of prosecutor discretion in the decision to seek the death penalty. Therefore, prosecutor specific briefing is contained in the argument relating to Claim 17(K) and the Director incorporates same for all purposes on this issue.

805 F.3d at 628–31. The Fifth Circuit in *Allen* held that the claim was without merit because "no Supreme Court case has held that the Constitution prohibits geographically disparate application of the death penalty due to varying resources across jurisdictions." *Id*. at 629. Indeed, the Supreme Court has expressly acknowledged prosecutorial discretion and varying law-enforcement capabilities and held that capital punishment is nonetheless permissible. *Id*. at 631 (citing *McCleskey v. Kemp*, 481 U.S. at 307 n.28).

Additionally, the Supreme Court has held that so long as the crime fits within a constitutionally valid definition of a chargeable offense, a prosecutor's "conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978) (alteration in original) (quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962)). Indeed, prosecutorial discretion is essential to the criminal justice process. *See McCleskey*, 481 U.S. at 297.

> In *Gregg v. Georgia*, the Supreme Court noted:
>
> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense.

> Nothing in any of our cases suggests that the decision to afford an individual defendant mercy violates the Constitution.

428 U.S. 153, 199 (1976). The Supreme Court went on to say that "*Furman* held only that, in order to minimize the risk that the death penalty would be imposed on a capriciously selected group of offenders, the decision to impose it had to be guided by standards so that the sentencing authority would focus on the particularized circumstances of the crime and the defendant." *Id*. at 199. The *Furman* concerns were "best met by a system that provides for a bifurcated proceeding at which the sentencing authority is apprised of the information relevant to the imposition of sentence and provided with standards to guide its use of the information." *Id*.

Finally, the Fifth Circuit has rejected arguments where the petitioner attempted to support his claim with general documentation alleging racial disparities:

> [R]elying on various newspaper articles and statistics, [petitioner] complains that he was the victim of racially discriminatory prosecution policies at the Dallas County District Attorney's Office. He makes no effort to prove purposeful discrimination against him or a discriminatory effect on him, as are required to make such a claim under [*McClesky*, 481 U.S. at 292]. In light of this fundamental failing, we cannot grant relief.

*Goss v. Johnson*, 199 F.3d 439, 1999 WL 1067676 at *5 (5th Cir. 1999) (unpublished).

Ramirez's claim fails because whether or not the jurisdiction in which he was prosecuted played a role in ultimately being sentenced to death, this has no effect on the constitutionality of his sentence. He not only fails to show that the decisionmakers in his case acted with a discriminatory purpose, he also fails to even provide evidence that there are racial disparities in the imposition of the death penalty in Hidalgo County in general. *McCleskey*, 481 U.S. at 292. Rather, Ramirez makes a sweeping claim that, "as a Hispanic man, [he] was undoubtedly prejudiced by jurors' unconscious biases." ECF 67 at 443. Ramirez offers nothing in way of support of this conclusory claim and it should be denied on such basis. *See, e.g.*, *Ross*, 694 F.2d at 1011–12. This claim is procedurally defaulted and entirely meritless. It should be denied.

### D. The amount of time spent on death row does not violate Ramirez's Constitutional rights. (Claim 17(D))

In Claim 17(D), Ramirez argues that because he has successfully used the legal system to delay the execution of his lawful sentence for sixteen years, it would be beyond the bounds of civilized society to execute him or even to continue to hold him on death row. ECF 67 at 443–49. This claim was not raised properly before the state court and is therefore unexhausted and procedurally barred. *See supra* Answer IV. It should be dismissed on this basis. Alternatively, it is completely baseless.

Leaving aside Ramirez's significant efforts to remain on death row, the Fifth Circuit has repeatedly rejected this same claim. In *Buntion*, the Fifth Circuit denied a certificate of appealability (COA) on this very claim calling it "undebatably meritless." 31 F.4th at 961. Similarly, in *Ruiz v. Davis*, the court denied a COA on such a claim stating that prisoners who have benefitted from the careful and meticulous process of judicial review of a capital sentence may not later complain that the same process that exists to protect them violates their constitutional rights. 850 F.3d 225, 228 (5th Cir. 2017). The court succinctly concluded that "claims of this nature have been rejected by every court that has heard them." *Id.* at 229. This holding is consistent with every case the Fifth Circuit has heard on the matter. *See ShisInday*, 511 F.3d at 526 (denying COA on claim that delay constitutionally precluded the execution of a petitioner who had spent 25 years on death row); *Reed v. Quarterman*, 504 F.3d 465, 488 (5th Cir. 2007) (recognizing that well-settled circuit authority clearly establishes that inordinate delay in executing a condemned prisoner does not violate the Eighth Amendment); *Felder v. Johnson*, 180 F.3d 206, 215 (5th Cir. 1999) (describing as bordering on the legally frivolous the argument that executing a prisoner who had spent 20 years on death row violated the Constitution); *White v. Johnson*, 79 F.3d 432, 439–40 (5th Cir. 1996) (holding no constitutional violation resulted from inordinate delay in carrying out the execution of a condemned prisoner because there are compelling justifications

for the delay between the imposition of a capital sentence and an execution); *Fearance v. Scott*, 56 F.3d 633, 635–40 (5th Cir. 1995) (rejecting the argument that a prisoner who successfully challenged his initial capital sentence could complain of unconstitutional delay in scheduling his execution).

Furthermore, under *Teague*, Ramirez's claim does not warrant federal habeas corpus relief under even a de novo standard of review. *See White*, 79 F.3d at 437–39 (holding *Teague* foreclosed claim that prolonged incarceration before execution is cruel and unusual punishment). This claim is unexhausted and procedurally barred, *Teague* barred, and meritless. This claim should be denied.

### E.   Ramirez's mental impairments do not render him insufficiently culpable or ineligible for the death penalty. (Claim 17(E))

In Claim 17(E), Ramirez argues that his "mental impairments render him insufficiently culpable, and thus ineligible, for the death penalty." ECF 67 at 449. However, Ramirez's briefing on this matter, which is essentially a repackaged version of his arguments from Claims 1, 2, and 17(A), fails to sufficiently support such a claim.

Ramirez raised claims relating to "mental impairments" on state habeas, however, he later expressly waived them. *See* 1 SHCR 183–95 (Claims 2 and 4 of Ramirez's initial state habeas application); 3 SHCR 1163–84, 1242–44 (Claims 3 and 8 of Ramirez's amended state habeas application); *Ex parte*

*Ramirez,* 2015 WL 6282336 at *1. Therefore, it is procedurally defaulted. *See supra* Answer IV. Yet again, Ramirez has made no effort to overcome the bar. Therefore, the claim should be summarily denied. Alternatively, the claim is meritless.

The substance of this claim comes from briefing throughout other parts of Ramirez's petition, most notably in Claim 1, 2, and 17(A). *See* ECF 67 177–273; 416–21. Therefore, the Director incorporates all relevant briefing in response to those claims herein and for all purposes. Specifically, as noted in the briefing on Claim 17(A), the Director cited to the Fifth Circuit holding in *Smith,* which rejected yet again an argument that those who have mental impairments are less culpable and therefore ineligible for the death penalty. 927 F.3d at 339. The Director will not belabor a subject so well settled. This claim is procedurally defaulted and meritless. It should be denied.

### F.   Ramirez's constitutional rights were not violated by the "12-10" instruction. (Claim 17(F))

In Claim 17(F), Ramirez argues that his constitutional rights were violated when the trial court was prohibited from instructing the jury that a vote by one juror would result in a life sentence. ECF 67 at 452–57. Ramirez raised this claim for the first time as claim fourteen in his "amended" state habeas application which was dismissed by the CCA as an abuse of the writ. 3 SHCR 1272–78; *Ex parte Ramirez,* 2015 WL 6282336, at *1. As such it is

393

procedurally defaulted in this forum. *See supra* Answer IV. Ramirez has not attempted to overcome this bar and his claim should be denied.

Alternatively, Ramirez's claim lacks merit. In Texas, the jury is instructed that it cannot answer the special issues on deliberateness and future dangerousness "No" unless at least ten jurors agree on that answer. Ultimately, Ramirez's complaint is that the jury is prohibited from being informed about the effect of its failure to agree on the special issues submitted when lack of agreement would result in a life sentence. ECF 67 at 452–57.

The Supreme Court has rejected the theory that a trial court's failure to instruct the jury as to the consequences of deadlock gives rise to an Eighth Amendment violation. *Jones v. United States,* 527 U.S. 373, 381 (1999). In *Jones,* the Supreme Court held the Eighth Amendment does not require a capital sentencing jury be instructed as to the effect of a "breakdown in the deliberative process," because (1) the refusal to give such an instruction does not affirmatively mislead the jury regarding the effect of its verdict, and (2) such an instruction might well undermine the strong governmental interest in having the jury express the conscience of the community on the ultimate question of life or death). *Id.* at 382.

Likewise, the Fifth Circuit has repeatedly rejected the argument that the Texas 12-10 rule violates the Supreme Court's holding in *Caldwell v. Mississippi*, 472 U.S. 320 (1985) by misleading the jury as to the impact of a

hung jury. *See, e.g., Reed*, 739 F.3d at 779; *Druery v. Thaler*, 647 F.3d 535, 543–44 (5th Cir. 2011) (rejecting challenges to Texas's 12-10 Rule based on *Mills v. Maryland*, 486 U.S. 367 (1988), the Eighth Amendment, *Caldwell*, and due process under the Fourteenth Amendment); *Blue*, 665 F.3d at 669–70 (rejecting Eighth Amendment claim citing *Romano v. Oklahoma*, 512 U.S. 1 (1994), that the 12-10 Rule affirmatively misleads jurors about their role in the sentencing process); *Hughes v. Dretke*, 412 F.3d 582, 593–94 (5th Cir. 2005) (holding the same arguments underlying Ramirez's claim here were so legally insubstantial as to be unworthy of a certificate of appealability); *Alexander v. Johnson*, 211 F.3d 895, 897–98 (5th Cir. 2000) (holding *Teague* precluded applying such a rule in a federal habeas context); *Davis v. Scott*, 51 F.3d 457, 466–67 (5th Cir. 1995) (holding the same); *Jacobs v. Scott*, 31 F.3d 1319, 1328-29 (5th Cir. 1994) (rejecting application of the Supreme Court's holding in *Mills v. Maryland* to a Texas capital sentencing proceeding).

Disregarding precedent, Ramirez argues that because his jury was never instructed as to the consequences of failing to reach a unanimous verdict in favor of the prosecution or obtaining ten votes in favor of the defense on any of the special issues, the jury was misled as to the significance of a hung jury or a single holdout juror. ECF 67 at 452–57. According to Ramirez, this violated his rights to due process. ECF 67 at 452–57. However, as explained above, the law does not support his argument and it is therefore baseless.

Finally, because the Supreme Court has never held that the 12-10 Rule is unconstitutional, Ramirez is seeking a new rule of law, which is barred under *Teague*. *See Alexander*, 211 F.3d at 897 (holding that petitioner's 12-10 arguments were *Teague* barred). Because Ramirez's claim here is procedurally barred, meritless, and *Teague* barred, he is not entitled to relief. Claim 17(F) should be denied.

### G. Texas's capital sentencing scheme is not unconstitutional for failing to require the State to prove the mitigation special issue beyond a reasonable doubt. (Claim 17(G))

In Claim 17(G), Ramirez asserts the Texas death penalty statute is unconstitutional because "special issue three—whether mitigation evidence warrants a life sentence—need not be found beyond a reasonable doubt." ECF 67 at 457. This claim was not raised in the state courts and is therefore unexhausted and procedurally barred. *See supra* Answer IV. Alternatively, it is meritless.

Ramirez argues that the mitigation special issue "is a finding of fact that increases a defendant's possible penalty from a penalty of life to a penalty of death. The Sixth Amendment mandates it must be made unanimously and beyond a reasonable doubt." ECF 67 at 460. This claim has been repeatedly rejected by the higher courts. *See Rowell,* 398 F.3d at 378 ("No Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof.")

Nonetheless, Ramirez argues that the Supreme Court's opinions in *Apprendi* v. *New Jersey,* 530 U.S. 466 (2000); *Ring v. Arizona,* 536 U.S. 584 (2002), and *Hurst v. Florida,* 577 U.S. 92 (2016), render the Texas capital sentencing scheme unconstitutional. ECF 67 at 460. In *Apprendi*, the Supreme Court struck down on due process grounds a state scheme that permitted a trial judge to make a factual finding based on a preponderance of the evidence regarding the defendant's motive or intent underlying a criminal offense and, based on such a finding, increase the maximum end of the applicable sentencing range for the offense by a factor of one hundred percent. 530 U.S. at 497. Two years later, in *Ring*, the Supreme Court applied the holding and its reasoning in *Apprendi* to strike down a death sentence, stating that "[a] defendant may not be exposed to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." 536 U.S. at 602 *(*quoting *Apprendi,* 530 U.S. at 483). The Court determined that the Arizona scheme was unconstitutional because "it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty." *Id.* at 609.

However, Ramirez's argument is untenable because the absence of mitigating circumstances is not an element of the crime or a sentencing aggravator that must be pled and proved by the State beyond a reasonable doubt. First, the prescribed statutory maximum penalty for capital murder in

Texas is death, and each element of the offense and aggravating sentencing factor was proved to the jury beyond a reasonable doubt. Tex. Pen. Code § 19.03, Tex. Code Crim. Proc. § 12.31. Second, the absence of sufficient mitigating circumstances is not an element of capital murder and is not an aggravating fact that increases the penalty for capital murder. Rather, the presence of sufficient mitigating circumstances is plainly a mitigating fact which allows a defendant to escape the maximum penalty for capital murder. "In Texas, the statutory maximum for a capital offense is death. The mitigation issue does not increase the statutory minimum. To the contrary, the mitigation issue is designed to allow for the imposition of a life sentence, which is *less* than the statutory maximum." *Rayford v. State,* 125 S.W.3d 521, 534 (Tex. Crim. App. 2003).

"The Texas capital sentencing scheme's 'mitigation' Special Issue serves not to render the defendant eligible for the death penalty or to 'select' the defendant for execution; rather, it allows the capital sentencing jury unfettered discretion to dispense an act of grace to the otherwise condemned defendant." *Hernandez v. Thaler,* No. SA-08-CA-805-XR, 2011 WL 4437091, at *54 (W.D. Tex. Sept. 23, 2011), *modified on reh'g,* 2012 WL 394597 (W.D. Tex. Feb. 6, 2012). Hence, *Ring* and its progeny have no role to play in Texas's sentencing scheme and they fail to prove unconstitutionality in Ramirez's punishment. As

there is no existing law that supports Ramirez's claim, it is also barred by the nonretroactivity principles of *Teague*.

Claim 17(G) is unexhausted and procedurally barred. It is also *Teague* barred and meritless. It should be denied.

### H.   Texas's capital sentencing scheme does not unconstitutionally limit what constitutes mitigation. (Claim 17(H))

Next, in Claim 17(H), Ramirez argues that the Texas capital sentencing scheme is unconstitutional because it "expressly limits the evidence a jury may consider mitigating." ECF 67 at 461–63. Ramirez raised this claim on state habeas as issue nine of his initial application. 1 CR 205–11. Because there is an adjudication by the state court that is owed deference, 3. Supp. SHCR 903–06, Ramirez must show that the state court decision was based on an unreasonable application of, or was contrary to, clearly established law or was based an unreasonable determination of facts in light of the record. § 2254(d). Ramirez has not attempted to make this showing, so the issue must fail. Nonetheless, and alternatively, the claim also fails under a de novo review of the merits.

Ramirez argues that "Texas's statute requires the trial court to instruct the jury that it 'shall consider mitigating evidence that a juror might regard as reducing the defendant's moral blameworthiness.'" ECF 67 at 461 (citing Tex. Code Crim. Proc. art. 37.071 § 2(e)(4)). According to Ramirez, "this instruction

399

precluded the jury from giving effect to any category of mitigation evidence that did not specifically relate to Ramirez's 'moral blameworthiness.'" ECF 67 at 463.

However, contrary to Ramirez's contention, the instructions provided to his jury did not mention "moral blameworthiness" at all. Within the punishment charge, the jury was instructed as follows:

> You shall consider all evidence submitted to you during the whole trial as to the Defendant's background or character or the circumstances of the offense that mitigates against the imposition of the death penalty.

2 CR 560. Special issue number three read, in relevant part, as follows:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

2 CR 563.[70]

 "Whether mitigation exists, however, is largely a judgment call (or perhaps a value call); what one juror might consider mitigating another might not." *Kansas v. Carr*, 577 U.S. 108, 119 (2016). Relatedly, and as discussed above, the Supreme Court has rejected contentions that the Eighth or Fourteenth Amendments require jury instructions singling out particular

---

[70] Ramirez does not complain that the instruction failed to define "mitigating circumstances" or "personal moral culpability"

circumstances as mitigating. *See Buchanan v. Angelone*, 522 U.S. 269, 279 (1998) ("The absence of an instruction on the concept of mitigation and of instructions on particular statutorily defined mitigating factors did not violate the Eighth and Fourteenth Amendments to the United States Constitution.").

The constitutional standard for evaluating the propriety of a capital sentencing jury charge is set forth in *Boyde,* wherein the Supreme Court held the test for determining whether jury instructions satisfy the Constitution is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence. *Johnson v. Texas,* 509 U.S. 350, 367–368 (1993). Ramirez identifies no potentially mitigating evidence before the jury at the punishment phase of his trial which he contends the jury was unable to properly consider in answering one or more of the Texas capital sentencing special issues because of the lack of definitions of the terms "personal moral culpability," "moral blameworthiness," or "mitigating circumstances." *See Beazley,* 242 F.3d at 259–60 (holding the Texas capital sentencing scheme's statutory definition of "mitigating evidence" as that which renders the defendant less morally blameworthy did not preclude consideration of any aspect of the defendant's character or record or any of the circumstances of the offense the defendant proffers as a basis for a sentence less than death).

401

The Fifth Circuit has repeatedly rejected arguments that the Texas capital sentencing scheme's definition of "mitigation" is too narrow. *See, e.g., Sprouse,* 748 F.3d at 622–23 (denying a COA on this same issue); *Blue,* 665 F.3d at 665–66 (Article 37.071 does not unconstitutionally preclude the jury from considering as a mitigating factor any aspect of a defendant's character or record and any of the circumstances of the offense the defendant proffers as a basis for a life sentence); *Beazley,* 242 F.3d at 260 ("The definition of mitigating evidence does *not* limit the evidence considered under the third special issue (whether mitigating circumstances warrant a life, rather than a death, sentence). '[V]irtually *any* mitigating evidence is capable of being viewed as having some bearing on the defendant's 'moral culpability' apart from its relevance to the particular concerns embodied in the Texas special issues.'" (alteration in original) (quoting *Graham*, 506 U.S. at 476)).

Finally, because the Supreme Court has never held that Texas's present mitigation special issue is unconstitutional for failing to define the term "blameworthiness," or any other term, Ramirez's claim is *Teague*-barred.

This claim was raised in state court, but Ramirez fails to address the reasonableness of that adjudication. Therefore, this claim should be denied under § 2254(d). Alternatively, the claim is *Teague* barred and meritless. Regardless, the claim fails.

## I.   The capital sentencing scheme under which Ramirez was sentenced is not unconstitutional for failing to ensure a proportionality review. (Claim 17(I))

Ramirez alleges in Claim 17(I) that the Texas capital sentencing scheme "fails to ensure a comparative proportionality review of Ramirez's sentence, rendering the sentence unconstitutional." ECF 67 at 464. This claim was not raised before the state court and is therefore unexhausted and procedurally barred. *See supra* Answer IV. It should be denied on this basis. Alternatively, it is without merit.

The Supreme Court has rejected the argument that a state appellate court is required to independently re-weigh aggravating and mitigating evidence. *Pulley*, 465 U.S. at 50–51 ("There is thus no basis in our cases for holding that comparative proportionality review by an appellate court is required in every case in which the death sentence is imposed and the defendant requests it."). The Fifth Circuit has also consistently held no such "proportionality review" of a capital sentence is constitutionally mandated. *Cobb v. Thaler*, 682 F.3d 364, 381 (5th Cir. 2012) (holding that *Pulley* forecloses petitioner's claim that he was entitled to proportionality review); *Roach v. Quarterman*, 220 F. App'x 270, 275–76 (5th Cir. 2007) (holding that "appellate review of the proportionality of a death sentence is not required where a statute properly channels a sentencer's discretion"). And because the Supreme Court has never held that the Texas scheme requires proportionality review,

Ramirez's claim is barred under *Teague*. Hence, Claim 17(I) is unexhausted and procedurally barred, *Teague* barred and meritless. It should be denied.

> **J.   Texas's capital sentencing scheme does not violate the Eighth and Fourteenth Amendments of the U.S. Constitution because sufficiently narrows the class of death-eligible defendants. (Claim 17(J))**

In Claim 17(J), Ramirez argues that he was tried under an unconstitutional statutory scheme "because it does not sufficiently channel the sentencer's discretion or sufficiently narrow the class of death-eligible defendant." ECF 67 at 465-67. This claim is unexhausted and procedurally barred, and Ramirez fails to allege cause and prejudice to overcome his default. *See supra* Answer IV. It should therefore be denied.

At any rate, this claim is meritless. The Fifth Circuit has held that the Texas scheme does not fail to narrow the class of defendants eligible for the death penalty. *White*, 522 F. App'x at 235; *Taylor v. Thaler*, 397 F. App'x 104, 108–10 (5th Cir. 2010) (unpublished); *Sonnier*, 476 F.3d at 366–67. The Supreme Court has repeatedly upheld the constitutionality of the Texas death-penalty scheme. *Johnson*, 509 U.S. at 362 (holding that its previous opinions upholding the Texas capital sentencing scheme found no constitutional deficiency in the means used to narrow the group of offenders subject to capital punishment because the statute itself adopted different classifications of

murder for that purpose); *Graham*, 506 U.S. at 476; *Franklin v. Lynaugh*, 487 U.S. 164, 181 (1988); *Jurek v. Texas*, 428 U.S. 262, 270–71 (1976).

Further, in *Woods v. Johnson*, the Fifth Circuit found that the *Jurek* Court "held that the constitutionally required narrowing function . . . under the Texas scheme was adequately performed at the guilt/innocence stage by the narrow categories of murder meeting the statutory definition of capital murder." 75 F.3d at 1033. The court pointed out that *Jurek* was subsequently confirmed by the Supreme Court in *Lowenfield*. *Id.* at 1033–34. Indeed, in *Lowenfield*, the Court held: "We see no reason why this narrowing function may not be performed by jury findings at either the sentencing phase of the trial or the guilt phase. Our opinion in *Jurek*[ ] establishes this point." 484 U.S. at 244–45.

Ramirez's claim is foreclosed by this precedent. Moreover, he simply renders general assertions that the scheme is too broad and that "most murders in Texas could be categorized as first-degree murder." ECF 67 at 466. However, Ramirez's argument is confusing. He states that the death penalty is too broadly defined in Texas because the "pool" of individuals eligible for death penalty because Texas has "no statutory recognition of non-capital murder (e.g. second-degree murder)." ECF 67 at 466. Although he previously acknowledged the capital murder statute that narrows the crimes that qualify for the death penalty, he then appears to state that every offense that is

405

categorized as "first-degree murder" qualifies for the death penalty. ECF 67 at 466.

Precedent is clear. The Fifth Circuit has explained that Section 19.03 distinguishes between capital and non-capital murder. Ramirez offers no evidence to the contrary. In short, there is no merit to Ramirez's claim.

Moreover, because the Supreme Court has never held that Texas's capital sentencing statute does not sufficiently narrow the class of death-eligible defendant, Ramirez's claim is barred under non-retroactivity doctrine of *Teague. See Kerr v. Thaler*, 384 F. App'x 400, 404 (5th Cir. 2010) (unpublished). This issue is unexhausted, procedurally barred, *Teague* barred, and meritless. It should be denied.

## K. Texas's capital sentencing scheme does not violate the Eighth and Fourteenth Amendments of the U.S. Constitution due to the discretion it affords the prosecutor. (Claim 17(K))

In Claim 17(K), Ramirez presents yet another unexhausted, procedurally defaulted, and meritless claim. Here, he trots out the standard complaint that the death penalty scheme in Texas is unconstitutional "because it affords the prosecutor unbridled discretion to seek the death penalty."[71] ECF

---

[71] This claim overlaps with Ramirez's Claim in 17(C). To the extent that the arguments are relevant, the Director incorporates the briefing on Claim 17(C) for all purposes on this issue.

67 at 467–68. As with his other unexhausted claims, Ramirez makes no attempt to overcome the procedural bar and instead jumps directly into a discussion of the merits, such as they are. Therefore, his claim is procedurally barred and should be denied as such. *See supra* Answer IV.

Alternatively, Ramirez's claim is meritless. Contrary to Ramirez's arguments, prosecutorial discretion does not render Texas's death penalty unconstitutional. The Fifth Circuit has previously rejected the claim that the Constitution prohibits imposition of the death penalty because it is imposed disparately depending on the county in which the capital murder was committed. *Allen*, 805 F.3d at 628–31. The Fifth Circuit in *Allen* held that the claim was without merit because "no Supreme Court case has held that the Constitution prohibits geographically disparate application of the death penalty due to varying resources across jurisdictions." *Id*. at 629. Indeed, the Supreme Court has expressly acknowledged prosecutorial discretion and varying law-enforcement capabilities and held that capital punishment is nonetheless permissible. *Id*. at 631 (citing *McCleskey*, 481 U.S. at 307 n.28).

Additionally, the Supreme Court has held that "so long as the prosecutor has probable cause to believe that the accused committed an offense defined by statute, the decision, whether or not to prosecute, and what charge to file or bring before a grand jury, generally rests entirely in his discretion." *Bordenkircher*, 434 U.S. at 364. So long as the crime fits within a

407

constitutionally valid definition of a chargeable offense, "'the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation' so long as 'the selection was [not] deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" *Hayes,* 434 U.S. at 364 (quoting *Oyler*, 368 U.S. at 456). Indeed, prosecutorial discretion is essential to the criminal justice process. *See McCleskey*, 481 U.S. at 297. "Exceptionally clear proof" is required before courts will infer abuse of prosecutorial discretion. *Id.*

The decision to seek the death penalty ultimately boils down to prosecutor discretion, based upon an examination of all the facts. In *Jurek,* the Supreme Court rejected an argument alleging "that arbitrariness still pervades the entire criminal justice system of Texas from the prosecutor's decision whether to charge a capital offense in the first place and then whether to engage in plea bargaining, through the jury's consideration of lesser included offenses, to the Governor's ultimate power to commute death sentences" finding that "[t]his contention fundamentally misinterprets the *Furman* decision." 428 U.S. at 275.  In *Gregg,* the Supreme Court noted:

> The existence of these discretionary stages is not determinative of the issues before us. At each of these stages an actor in the criminal justice system makes a decision which may remove a defendant from consideration as a candidate for the death penalty. *Furman*, in contrast, dealt with the decision to impose the death sentence on a specific individual who had been convicted of a capital offense. Nothing in any of our cases suggests

> that the decision to afford an individual defendant mercy violates
> the Constitution.

428 U.S. at 199. The Supreme Court went on to say that "*Furman* held only

that, in order to minimize the risk that the death penalty would be imposed on

a capriciously selected group of offenders, the decision to impose it had to be

guided by standards so that the sentencing authority would focus on the

particularized circumstances of the crime and the defendant." *Id*. at 199. In a

footnote, the Court explained that,

> [i]n order to repair the alleged defects pointed to by [petitioner], it
> would be necessary to require that prosecuting authorities charge
> a capital offense whenever arguably there had been a capital
> murder and that they refuse to plea bargain with the defendant.
> If a jury refused to convict even though the evidence supported the
> charge, its verdict would have to be reversed and a verdict of guilty
> entered or a new trial ordered, since the discretionary act of jury
> nullification would not be permitted. Finally, acts of executive
> clemency would have to be prohibited.

*Id*. at 199 n.50.  The Court rejected such a system as it "would have the vices

of the mandatory death penalty statutes" held unconstitutional in other cases.

*Id*. (citing *Woodson v. North Carolina,* 428 U.S. 280 (1976); *Roberts v.*

*Louisiana,* 428 U.S. 325 (1976)).

Ramirez does not dispute that a prosecutor has discretion to seek, or not

seek, the death penalty. He does not argue that financial or racial

considerations played a role in the decision to prosecute him for capital murder,

or indeed that such is a problem in the application of the death penalty in Texas

generally. He merely argues that the geography of where a crime is prosecuted "has greater bearing on whether a capital sentence is sought than any individualized determination about the case itself, the defendant, or the crime." ECF 67 at 468.

Most damning, Ramirez does not even allege that the above-described considerations played any part in the prosecutor's decision to charge him with capital murder or the jury's unanimous verdict sentencing him to death. It is significant that the statistics Ramirez cites on the number counties that have inmates who have been executed or are on death row show that Hidalgo County is not a county where a defendant is more likely to be subject to a capital murder prosecution. ECF 67 at 468 n. 94. If anything, Ramirez benefitted from the general existence of prosecutorial discretion. It is his fault that the crime he committed was so heinous that even a county that seeks the death penalty less frequently deemed his crime worthy of the ultimate punishment.

In the end, the fact remains, Ramirez committed a capital crime for which the United States Constitution and Texas laws permit the imposition of the death penalty. *McCleskey*, 481 U.S. at 297. Ramirez chose to commit this capital murder in Hidalgo County. The decision to seek the death penalty against Ramirez was clearly within the prosecutor's discretion. Ramirez does not allege that "arbitrary" or improper considerations played any part in the

prosecutor's decision making or that a prosecutor would not have sought the death penalty if Ramirez had only committed his crime in a different county.

Finally, there was no binding precedent that due process should prevent Texas prosecutors from exercising their discretion to seek the death penalty at the time Ramirez's conviction became final. Thus, the relief Ramirez seeks is barred by *Teague* and not subject to any exception. The Court should therefore deny habeas relief on Ramirez's procedurally defaulted, meritless, and *Teague*-barred claim.

### L.   It is not a violation of the Eighth Amendment to convict someone in Texas of capital murder under the State's law of parties. (Claim 17(L))

In Claim 17(L), Ramirez argues that it is unconstitutional to sentence a defendant to death under the Texas law of parties statute. Tex. Pen. Code § 7.02(b). ECF 67 at 469–70. According to Ramirez, it is unconstitutional because "it qualifies for capital murder those who have neither committed murder nor intended to do so." ECF 67 at 469. According to Ramirez, this "proscribes execution for those who are in proximity to murder, a capital guilt-by-association." ECF 67 at 470. As are so many others, this claim is unexhausted and procedurally defaulted. It should be summarily denied as such. *See supra* Argument IV. However, should this Court choose to address Ramirez's claim on the merits, it is alternatively, baseless.

In *Enmund v. Florida,* the Supreme Court held that it is a violation of the Eighth Amendment to impose the death penalty on "one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U.S. 782, 797 (1982). "For the purposes of imposing the death penalty, [a defendant's] criminal culpability must be limited to his participation in the robbery, and his punishment must be tailored to his personal responsibility and moral guilt." *Id.* at 801. The Eighth Amendment thus bars imposition of the death penalty on people who may be guilty of capital murder, by definition, but who lacked the intent to commit the murder. *Cabana v. Bullock,* 474 U.S. 376, 385 (1986) *overruled in part on other grounds by Pope v. Illinois,* 481 U.S. 497 (1987).

The Supreme Court also recognized the appropriateness of the death penalty for those who "contemplate[d] that lethal force will be employed by others[.]" *Enmund,* 458 U.S. at 799; *see id.* at 788, 797, 801. Thus, in *Tison v. Arizona,* the Court created an exception, expressly holding that the concerns of *Enmund* are *not* implicated where the death sentence is based on a determination that the defendant personally killed, attempted to kill, intended that lethal force be used, or acted with a reckless disregard for life by knowingly engaging in criminal activities known to carry a grave risk of death. 481 U.S. 137, 156–58 (1987); *Cabana,* 474 U.S. at 386–87.

412

The Supreme Court stated in *Tison*, "[a] narrow focus on the question of whether or not a defendant 'intended to kill,' is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers." 481 U.S. at 157. The *Tison* Court went on to state that, "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though not inevitable, lethal result." *Id.* at 157–58.

The Texas death-penalty scheme requires the jury to make the requisite finding of culpability, sufficient to satisfy the standards of *Tison* and *Enmund*. The special issues submitted to the jury during the punishment phase instructed the jury to make a determination on whether Ramirez "caused the deaths" of the deceased, "or if he did not actually cause the death of the deceased, that he intended to kill the deceased or another or anticipated that a human life would be taken." 2 CR 562; *Enmund,* 458 U.S. at 797.

"A critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime." *Tison*, 481 U.S. at 156. That Ramirez "anticipated" that a human life would be taken *is* sufficient to satisfy the requirement of *Tison* that the defendant act with a "reckless indifference to human life." A robber who kills

413

during the commission of his intended offense, and who acts with utter indifference to the fact that his robbery may have the unintended consequence of the death of his victim, exhibits a "reckless indifference to the value of human life [that] may be every bit as shocking to the moral sense as an 'intent to kill.'" *Id.* at 157.

Finally, the Fifth Circuit has specifically "held that Texas' 'law of parties' may support a conviction for capital murder." *Montoya v. Scott*, 65 F.3d 405, 415 (5th Cir. 1995). Therefore, Ramirez's claim is barred by the *Teague* nonretroactivity rule.

While citing to it throughout his brief, Ramirez does not acknowledge the precedent of *Enmund* when it comes to this issue. This is because it alone forecloses this claim as frivolous. Ramirez is guilty of every permutation of capital murder that has been held to be constitutional under a law of parties' theory—he contemplated that others would use lethal force, displayed reckless indifference to human life, and intended the death of others. His claim is both unexhausted and meritless. It should be denied.

## XVIII. Texas's Legal Injection Protocol Is Constitutional. (Claim 18)

In Claim 18, Ramirez offers a general complaint about the lethal injection protocol in Texas. ECF 67 at 470–73. This claim is unexhausted and procedurally barred. *See supra* Answer IV. Furthermore, the claim is not cognizable as well as meritless. As such, it should be denied.

Challenges to execution protocols must be made in § 1983 suits. *Glossip v. Gross*, 576 U.S. 863, 879 (2015). "[A] method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence." *Id*. Therefore, this claim is not cognizable on habeas review.

Alternatively, Ramirez's method-of-execution claim is meritless. Ramirez states that the Constitution forbids "inflicting pain beyond that necessary to end the condemned prisoner's life" in carrying out a death sentence. ECF 67 at 471. According to Ramirez, the drug used in Texas will cause "flash pulmonary edema [that] produces sensations of drowning and asphyxia comparable to drowning." ECF 67 at 471. Ramirez does not explain who provided this expert medical opinion. Similarly, he speaks of "autopsies conducted on executed prisoners" with no reference to where this information comes from. ECF 67 at 471. Based upon this unknown information, Ramirez concludes "it is extremely likely that prisoners executed according to the Execution Procedure will experience sensations of suffocation and drowning before they die." ECF 67 at 472. Then, Ramirez implies that his self-created probability of "extremely likely" is the equivalent of a "substantial risk of serious harm." ECF 67 at 472.

Ramirez does not acknowledge the holding in *Baze* where the Supreme Court concluded that "[s]ome risk of pain is inherent in any method of

execution—no matter how humane—if only from the prospect of error in following the required procedure. It is clear, then, that the Constitution does not demand the avoidance of all risk of pain in carrying out executions." *Baze,* 553 U.S. at 47. Furthermore, challenges to pentobarbital have been rejected on more than one occasion. *Whitaker v. Collier*, 862 F.3d 490, 498 (5th Cir. 2017); *Wood v. Collier*, 836 F.3d 534, 540 (5th Cir. 2016).

Next, Ramirez mentions a "Buzzfeed" article complaining that the compounding pharmacy believed to supply the drug for the Texas lethal injection protocol was cited for "keeping out-of-date drugs in stock, using improper procedures to prepare IV solutions, and inadequate cleaning of hands and gloves." ECF 67 at 473. He does not connect that in any meaningful way to how these alleged citations from an unknown point in time provide support to his current federal constitutional claim.

In sum, Ramirez's claim is nothing more than conclusory allegations and unproven facts bound together with a couple of brief references to actual law. There is no merit whatsoever to any of it.

## XIX. There Are No Constitutional Errors in Ramirez's Case to Cumulate. (Claim 19)

In Claim 19, Ramirez asserts that the errors alleged in his current petition "each independently entitle him to relief." ECF 67 at 473. Nonetheless, acknowledging that he is extremely unlikely to succeed on his claims, Ramirez

claims that if this Court concludes that his individual claims do not merit relief, this Court "must analyze the cumulative prejudicial impact of the errors set forth." ECF 67 at 473. This claim is unexhausted and procedurally barred because it was necessarily not raised in state court as many of the claims it relies upon were not presented either. Hence, it should be denied on this basis. *See supra* Answer IV. Alternatively, it is *Teague* barred and meritless.

As previously discussed, Ramirez cites no Supreme Court precedent permitting cumulation of entirely distinct claims—prosecutorial misconduct, ineffective assistance, juror misconduct, etcetera—may be cumulated for harm purposes. *See Lorraine*, 291 F.3d at 447; *Derden*, 978 F.2d at 1456. Accordingly, his attempt to cumulate is barred by *Teague*.

"Federal habeas corpus relief may only be granted for cumulative errors in the conduct of a state trial where (1) the individual errors involved matters of constitutional dimension rather than mere violations of state law; (2) the errors were not procedurally defaulted for habeas purposes; and (3) the errors "so infected the entire trial that the resulting conviction violates due process." *Derden*, 978 F.2d at 1454. Notably, "any cumulative error theory must refer only to *errors* committed in the state trial court," and "not just complain of unfavorable rulings or events in the effort to cumulate errors." *Id*. at 1458 (emphasis added).

As Ramirez's claims are insufficient individually, raising them cumulatively does not render them sufficient. *See Yohey*, 985 F.2d at 229 (explaining that because certain errors were not of constitutional dimension and others were meritless, petitioner "has presented nothing to cumulate"). Moreover, the vast bulk of his claims are procedurally defaulted, so they are not available for purposes of cumulation. Because Ramirez has failed to show he is entitled to relief on any claim, his claim of cumulative error necessarily fails, even under de novo review.

The issue is unexhausted and therefore procedurally barred, prohibited on nonretroactivity principles, and meritless. It should be denied.

## CONCLUSION

This Court should deny with prejudice Ramirez's federal petition for writ of habeas corpus, should deny a certificate of appealability on all issues raised, and should deny his request for further factual development.

Respectfully submitted

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

JOSH RENO
Deputy Attorney General
for Criminal Justice

EDWARD L. MARSHALL
Chief, Criminal Appeals Division

*/s/ Rachel L. Patton*
RACHEL L. PATTON*
Assistant Attorney General
State Bar No. 24039030
Southern ID No. 3120286

P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 936-1400
(512) 936-1280 (fax)

ATTORNEYS FOR RESPONDENT

*Attorney in Charge

419

## CERTIFICATE OF SERVICE

I do hereby certify that on July 19, 2022, I electronically filed the foregoing pleading with the Clerk of the Court for the U.S. District Court, Southern District of Texas, using the electronic case-filing system of the Court. The electronic case-filing system sent a "Notice of Electronic Filing" to the following attorneys of record, who consented in writing to accept this Notice as service of this document by electronic means:

Jennifer Moreno
Zach Buchanan
Assistant Federal Defenders
District of Arizona
850 W. Adams St., Ste. 201
Phoenix, AZ 85007
Telephone: 602-382-2816
Email: jennifer_moreno@fd.org
Email: zach_buchanan@fd.org

*/s/ Rachel L. Patton*
RACHEL L. PATTON
Assistant Attorney General