United States Courts
Southern District of Texas
FILED

*May 31, 2024*

Nathan Ochsner, Clerk of Court

United States District Court
Southern District of Texas

**ENTERED**

May 31, 2024

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| **JUAN RAUL NAVARRO RAMIREZ,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. 7:18-CV-386** |
| | § | |
| **BOBBY LUMPKIN, Director, Texas** | § | |
| **Department of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

## <u>REPORT AND RECOMMENDATION</u>

Petitioner JUAN RAUL NAVARRO RAMIREZ, a Texas death-row inmate represented by court-appointed counsel, initiated this action by filing a *Petition for a Writ of Habeas Corpus Under 28 U.S.C. § 2254* (Dkt. No. 24), which he later supplemented through an amended petition (Dkt. No. 67) (collectively, the "Petition").

Following a jury trial in the 370th Judicial District Court of Hidalgo County, Texas, Petitioner was convicted and sentenced to death on two counts of capital murder. The Texas Court of Criminal Appeals (the "TCCA") affirmed the conviction and sentence on one of the two counts on direct appeal and again on collateral review. Now, seeking federal habeas review, Petitioner raises several claims for relief from his conviction and sentence, including multiple Sixth Amendment claims of ineffective assistance of counsel, as well as Eighth Amendment claims of cruel and unusual punishment, among others. The Petition seems to focus, nonetheless, on the claim that trial counsel rendered ineffective assistance at the punishment phase of the trial in failing to investigate and present mitigating evidence of Petitioner's purported neurodevelopmental disabilities, brain damage, and mental illness.

Respondent has filed a *Motion for Summary Judgment* (the "Summary Judgment Motion") (Dkt. No. 91), together with a copy of the state court record (Dkt. Nos. 85 through 90).[1]   Respondent moves for dismissal or denial on grounds that Petitioner's claims are untimely, non-cognizable, unexhausted, procedurally defaulted, or without merit.   Petitioner has filed a combined response and *Cross-Motion for Summary Judgment* (the "Cross-Motion") (Dkt. No. 103).   The parties have also filed further response and reply briefs.   (Dkt. Nos. 109, 112).

This case has been referred to the Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b)(l).   Having considered the record, the parties' arguments, and the applicable law—giving particular attention to the standards of the Anti-Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2241 *et seq.* (the "AEDPA")—the Magistrate Judge concludes that Petitioner's claims are non-cognizable, unexhausted, procedurally defaulted, or without merit.   Accordingly, the Magistrate Judge RECOMMENDS that the Summary Judgment Motion (Dkt. No. 91) be GRANTED, that the Cross-Motion (Dkt. No. 103) be DENIED, that the Petition (Dkt. Nos. 24, 67) be DENIED, and that this action be DISMISSED.   The Magistrate Judge also RECOMMENDS that a Certificate of Appealability be DENIED.

## I.  BACKGROUND

### A.  <u>Offense Conduct</u>

This case involves the gang-related murder of six men in what became known locally as the "Edinburg massacre."  *Garza v. Thaler*, 487 F. App'x 907, 910 (5th Cir. 2012) (per curiam).

In the early morning hours of January 5, 2003, police responded to a 9-1-1 call from a residential property in Edinburg, Texas located on Monte Cristo Road (the "Monte Cristo Property").  *Ramirez v. State*, 2007 WL 4375936, at *1 (Tex. Crim. App. Dec. 12, 2007).  The

---

[1] Any citations to the state court record will refer to the docket entry, attachment, and page numbers as they appear in the case management/electronic case-file (CM/ECF) system.

Monte Cristo Property consisted of two buildings—the "east-side" and "west-side" houses—separated by a dirt driveway. *Id.* Officers observed that the houses had been ransacked, as if someone had been looking for something. *Id.* They found the corpses of six men. *Id.* Each of the men had been shot, some multiple times. *Id.* The victims were eventually identified as Jimmy Almendarez, Ruben Castillo, Juan Delgado, III ("Delgado, III"), Juan Delgado, Jr. ("Delgado, Jr.") (collectively, the "Delgados"), and brothers Jerry Eugene Hidalgo ("J. Hidalgo") and Ray Hidalgo ("R. Hidalgo") (collectively, the "Hidalgos"). *Id.*

Rosie Gutierrez ("Gutierrez"), the sole survivor from the west-side house, provided the following account of what transpired on the night in question, as summarized by the TCCA:

> [Gutierrez] testified that she and her sons, [the Hidalgos,] lived at [the Monte Cristo Property,] and that the Delgados, Almendarez, and Castillo were her sons' friends. On the night of January 4, [Gutierrez] played dominoes with her sons in the west-side house. [R. Hidalgo] went to the east-side house with Delgado, Jr., at around midnight. Shortly thereafter, [Gutierrez] and [J. Hidalgo] finished playing dominoes and went into the living room. [Gutierrez] suffered from a medical condition that affected her legs, so she laid down in a borrowed hospital bed she kept in the living room to watch television while [J. Hidalgo] talked on the phone with a friend. She heard loud booming noises that sounded like fireworks; then someone banged on her door, and three or four men entered her house. The leader, a man who spoke Spanish and who had a long gun with holes in the barrel, pointed the gun at her head and told her to lie down and face the wall. He was wearing a ski mask and a jacket with the word "Police" on the sleeves and back. He ordered his cohorts to tie up [Gutierrez] and [J. Hidalgo,] and they used extension cords to do so. The man who tied up [Gutierrez] was unmasked and carried a smaller handgun. The other men who restrained [J. Hidalgo] were masked, and [Gutierrez] was unsure if they had guns. The leader demanded "drugs, money, gold and guns" and kept hitting [J. Hidalgo] in the head with his gun. [J. Hidalgo] responded that they did not have anything. "They" told [J. Hidalgo] to take off his gold necklace and asked for the car keys. [J. Hidalgo] answered that the car was "no good" and that they would get caught if they left in it. "The guy" pulled off [J. Hidalgo's] tennis shoes and asked if anyone wanted them. He then dropped the tennis shoes, stating, "Let's go," and they left.
>
> Shortly thereafter, "a man with a ski mask" carrying a long gun and wearing a jacket with "Police" on it came back into the house and ransacked the living room. He left, came back inside, shot [J. Hidalgo] "a whole bunch of times," then left again. [Gutierrez] then untied herself and called 9-1-1.

*Id.* at \*2.

As detailed further below, investigators would conclude that the crime was a gang-on-gang robbery-homicide targeting members of the "Texas Chicano Brotherhood," or the "Chicanos," by a rival group known as the "Tri-City Bombers," also called the "Bombitas" or, formerly, the "TCBs." *See id.* at \*1, 4.

## B.  Investigation

On January 13, 2003, investigators received a call from an informant who related details of the crime unknown to the public—including the "pseudo-cop" nature of the robbery-homicide—along with the whereabouts of potential persons of interest.  (Dkt. No. 87-12 at 16).

The tip led investigators to Guadalupe Bocanegra ("G. Bocanegra"), a member of the Tri-City Bombers.  *Medrano v. State*, 2008 WL 5050076, at \*2, 16 (Tex. Crim. App. Nov. 26, 2008). Based on information provided by G. Bocanegra, multiple suspects were apprehended, including his brother, Marcial Bocanegra ("M. Bocanegra").  *Id.* at \*2, 16-17.  M. Bocanegra went on to implicate several other individuals, leading to Petitioner's arrest.  *See id.* at \*2, 17.

## C.  Arrest, Confession, and Booking

On January 29, 2003, Petitioner was arrested at his aunt's house in Hargill, Texas and transported to the Edinburg Police Department, where he met with Investigator Edgardo Ruiz ("Investigator E. Ruiz") and Investigator Ramiro Ruiz ("Investigator R. Ruiz").  *Ramirez*, 2007 WL 4375936, at \*10, 13-14.  Upon waiving his *Miranda* rights, Petitioner gave a recorded statement to the investigators.  *Id.* at \*14.  The TCCA summarized his statement as follows:

> [Petitioner] admitted that he "used to hang around with" some "TCB" gang members.  He said that at 7:00 or 8:00 p.m. on January 4, Robert Garza (a/k/a "Bones") called and asked him if he wanted to make some money.  "Bones" told him it was about "some jelly beans," which means "some pounds."  Bones told him an amount, which [Petitioner] thought was "a thousand pounds or a little bit

more of something." He agreed to participate and met Bones at the home of a person who went by the name Juanon (a/k/a "Barney"). Some of the other people present included Salvador Solis, Freddy Krueger, and [M. Bocanegra.] Most of them were wearing black, some wore ski masks, and all of them wore gloves. [Petitioner] stated that "it was supposed to be a pseudo-cop" type of robbery, and they "were supposed to go in there to look for drugs and weapons."

[Petitioner] stated that when he arrived at Juanon's, the guns and bullets had already been cleaned of fingerprints. [Petitioner,] the last one to choose his weapon, selected a "cuerno de chivo." [Petitioner] said the men drove to the scene in a black or dark blue truck and a light brown Escalade, and the "one with the Escalade" was "the one who was telling us what was going down." The "one with the Escalade" said: "They got guns and there might be some people in there, too, so you gotta put them down 'cause the family members got some guns."

[Petitioner] stated that they hid in the tall grass in a field behind the houses with their high-caliber weapons. When a man stepped outside to use the bathroom, they got up, "started rushing the houses," and "rushed him in." [Petitioner,] Salvador, and another man went into one house where "there was only a lady and a guy." [Petitioner] stated: "We heard . . . some gunshots in the other house, but we didn't know what was it about, so we didn't think nothing bad was happening." [Petitioner] stated that they put the male victim down on the floor at gunpoint and that he ordered one of the men to tie up the female victim, who was in bed. [Petitioner] checked the house for other people, drugs, or weapons but did not find anyone or anything. [Petitioner] then "tied down the guy with an orange extension cord" and "started demanding the drugs." The male victim responded that he had nothing and that all of the drugs were in the other house, so [Petitioner] "started beating him up" and "hit him with a pan a couple of times." [Petitioner] also took a gold chain from his neck, which he later threw away.

[Petitioner] said that Salvador kept an eye on the door and that [Petitioner] and "the other guy" held the male victim at gunpoint. After a while, [Petitioner] heard gunshots at the other house. He went outside and saw the others running out of the house, saying, "Let's go. Let's go." He asked one of them "where was everything at" and was told "that nothing was there, and that we gotta leave." [Petitioner] heard more gunshots as he and his two cohorts were running away. They ran across the field, got into the truck, and left. Everyone met back at Juanon's, where [Petitioner] heard Bones say, "I shot the mother fuckers."

*Id.* at *3-4 (footnotes omitted).

On January 30, Petitioner was booked into custody at the Hidalgo County Jail. *Id.* at *14.

During a customary inquiry about any gang affiliations, Petitioner admitted to being a member of the Bombitas or Tri-City Bombers. *Id.* at *3 n.6, 4, 14-15.

## II.  PRE-TRIAL PROCEEDINGS

### A.  Indictment

On February 26, 2004, Petitioner was indicted by a grand jury on two counts of capital murder.  (Dkt. No. 85-1 at 13).

Count One charged Petitioner with "intentionally and knowingly caus[ing] the deaths of [Almendarez, Castillo, Delgado, III, Delgado, Jr., J. Hidalgo, and R. Hidalgo] by shooting them with a firearm . . . during the same criminal transaction[.]"  (*Id.*).  Count Two charged Petitioner with "intentionally caus[ing] the deaths of [the same individuals] by shooting them with a firearm . . . in the course of committing or attempting to commit . . . robbery . . . as a member of a criminal street gang[.]"  (*Id.*).

Petitioner's case was assigned to the 370th District Court of Hidalgo County with the Honorable Noe Gonzalez presiding.  (Dkt. No. 85-2 at 2).

### B.  Defense Appointments

On January 31, 2003, the trial court appointed local criminal defense attorney Alma Garza ("Ms. Garza") as lead counsel.  (Dkt. No. 85-1 at 11).

However, it would present a struggle to find qualified attorneys, investigators, and experts for the numerous co-defendants charged in the robbery-homicide, such that more than a year passed before the rest of Petitioner's defense team was assembled.  (*See* Dkt. No. 90-27 at 85, 89-90).  On September 3, 2003, the trial court appointed as co-counsel attorney Rolando Garza ("Mr. Garza") (Dkt. No. 85-1 at 227),[2] who would primarily assume the role of a legal researcher (*see* Dkt. No. 90-17 at 281, 298).  That same day, private investigator, Juan Castillo ("Investigator Castillo"), was appointed as a fact investigator for the defense.  (Dkt. No. 85-1 at

---

[2] Despite their last name, there is no indication from the record that Ms. Garza and Mr. Garza shared a familial relationship.

233).  On June 1, 2004, a social worker, Gilda Bowen, was appointed as Petitioner's mitigation specialist, or "mitigation investigator," for purposes of sentencing.  (*Id.* at 240, 252-61).

## C.  **Suppression Hearing**

Within the context of Petitioner's claims for relief, one pre-trial hearing becomes worthy of discussion—the hearing on a motion by the defense to suppress Petitioner's interrogation statement for lack of voluntariness.

The trial court held the suppression hearing on October 22 and 23, 2004, or around one month before the start of trial.  (Dkt. Nos. 86-15, 86-16).  The defense took the position that Petitioner's statement was rendered involuntary by the fact that Petitioner was under the influence of Rohypnol, a strong sedative, and based on the interrogation techniques utilized by Investigators R. Ruiz and E. Ruiz.  *See Ramirez*, 2007 WL 4375936, at *13.  The TCCA summarized Petitioner's testimony as follows:

> [Petitioner] testified at the suppression hearing that he had taken [Rohypnol, or "Roche,"] pills on the morning of January 29 and that he was asleep when the police came to arrest him that afternoon.  When he arrived at the Edinburg Police Department, he was placed in a holding cell, where he went back to sleep.  He testified that [Investigator R. Ruiz] came into his holding cell and "kept making, like, comments, like saying I knew what I was there for."  [Investigator R. Ruiz] said, "You know that you are here for those shootings that happened in Monte Cristo.  Why are you acting stupid?"  [Petitioner] kept falling asleep, and "[e]very time [Investigator R. Ruiz] came by, he kind of made noises to wake me up."  He testified that [Investigator R. Ruiz] asked him why he was so sleepy, and he responded that he "was Roched up."  He was taken out of his cell to the "booking area" to be photographed and fingerprinted.  When he was placed back into the holding cell, [Investigator R. Ruiz] told him he was going to take him out for questioning regarding "what had happened at Monte Cristo Road."  They went back to the booking area, and at that point [Petitioner] "asked them for a lawyer."  [Petitioner] testified that he told [Investigator R. Ruiz] he wanted to call attorney Charles Banker, who had represented him in the past, and that he wanted to look up his number.  [Investigator R. Ruiz] said they did not have a phone book, so [Petitioner] called a friend[, later identified as a Jerry Garcia ("J. Garcia"),] and asked him to have [Petitioner's] mother call Charles Banker.  After he made his phone call, he was taken to [Investigator E. Ruiz's] office for questioning.

[Petitioner] testified that [Investigators E. Ruiz and R. Ruiz] told him "they knew everything that had happened" and that Robert Gene Garza a/k/a "Bones" had made a statement against him.  He testified that they played part of Garza's audiotaped statement and said, "Everybody is crying.  Why don't you just go ahead and save yourself.  You are the only stupid one getting sent to death row because everybody is pointing the finger to you."  [Petitioner] told them to put him back into his cell because he did not want to talk to them.  He "denied it for a while longer," then "admitted that [he] was there."  He agreed to waive his rights and gave an audiotaped statement because he "wanted to go back to sleep," and he thought they were not going to let him go until he talked to them.  He testified that he "couldn't make decisions correctly" because he was "intoxicated."

*Id.*

Among the witnesses called by the prosecution were Investigators R. Ruiz and E. Ruiz,

whose testimony was summarized by the TCCA as follows:

[Investigator E. Ruiz] testified that he first met [Petitioner] when he was brought to his office at the Edinburg Police Department on the afternoon of January 29.  [Investigator E. Ruiz] testified that he read [Petitioner] his rights "about a minute" after he met with him.  [Petitioner] indicated that he understood his rights, signed a written waiver of his rights, and agreed to talk to him.  [Investigator E. Ruiz] gave [Petitioner] some "general information" that they already had some suspects and that they had reason to believe that [Petitioner] was also involved, but he did not tell him that Garza had implicated him.  [Petitioner] then began telling [Investigator E. Ruiz] his version of events.  [Investigator E. Ruiz] was about to take a written statement from him when [Investigator R. Ruiz] "came by to check how was everything going."  [Investigator R. Ruiz] suggested that they audiotape [Petitioner's] statement, and [Petitioner] agreed.  When [Investigator R. Ruiz] left to get a cassette recorder, [Investigator E. Ruiz] and [Petitioner] "kind of paused for a while . . . waiting."  [Investigator E. Ruiz] testified that [Petitioner] was "very cooperative," did not appear to be intoxicated, and never complained that he was tired, sleepy, hungry, or thirsty.

[Investigator R. Ruiz] testified that his first contact with [Petitioner] was in [Investigator E. Ruiz's] office.  He testified that he did not see [Petitioner] in his jail cell or at booking.  [Investigator E. Ruiz] told [Investigator R. Ruiz] that he was taking [Petitioner's] statement, and [Investigator R. Ruiz] suggested that they audiotape it.  [Investigator R. Ruiz] left [Investigator E. Ruiz's] office to get a cassette recorder and returned about five minutes later.  [The investigators] then proceeded to take [Petitioner's] audiotaped statement.

*Id.* at *14.

The trial court denied the motion to suppress, crediting the investigators' version of events over that of Petitioner and finding that Petitioner's statement was the result of a knowing, intelligent, and voluntary *Miranda* waiver.  *Id.*

## D. <u>Jury Selection</u>

On October 20, 2004—prior to the suppression hearing, jury qualification commenced. (Dkt. No. 90-17 at 191).  Individual voir dire proceedings followed.  (*Id.* at 192-93).  Both sides used available peremptory challenges.  (*See id.* at 200-02).  On November 22 and 29, 2004, both parties indicated they had no objections to the impaneled jurors.  (*Id.* at 204).

## III.  TRIAL—GUILT PHASE

The guilt phase of what would be a thirteen-day trial began on November 29, 2004.  (Dkt. Nos. 87-11 through 87-21).

## A. <u>Prosecution's Case-in-Chief</u>

As part of its case-in-chief, the prosecution presented evidence that the robbery-homicide was the culmination of gang warfare involving the Tri-City Bombers and its breakaway faction and rival, the Texas Chicano Brotherhood, or the Chicanos.  Its theory, with respect to Petitioner's involvement, was that Petitioner played a leading role in the robbery and shot and killed J. Hidalgo himself.  The main witnesses offered by the prosecution were as follows: (i) the sole survivor from the west-side house, Gutierrez, who recounted the events on the night of the crime and detailed the assailants' appearances and actions, particularly those of the lead assailant; (ii) a detective with the Edinburg Police Department, Robert Alvarez ("Detective Alvarez"), who was qualified as a gang expert and testified as to the rivalry between the Tri-City Bombers and the Chicanos and the significance of Petitioner's tattoos; (iii) Investigator E. Ruiz, who testified as to the events surrounding Petitioner's interrogation and the voluntariness of

Petitioner's audiotaped statement; (iv) Investigator R. Ruiz, who corroborated Investigator E. Ruiz's testimony about the interrogation and further testified about the weapons and ballistics used in the offense; and (v) a local peace officer, Robert Mendiola ("Officer Mendiola"), who testified about Petitioner's booking inquiry at the Hidalgo County Jail.

Gutierrez testified that the Hidalgos were Chicanos, *Ramirez*, 2007 WL 4375936, at *4, as corroborated by Investigator R. Ruiz's testimony about their tattoos (*see* Dkt. No. 87-11 at 37, 45). The jury was presented with an audio recording (Dkt. No. 87-13 at 13-14) and a corresponding transcript (Dkt. No. 88-6 at 31-39) of Petitioner's interrogation, whereby Petitioner admitted to being a member of the Tri-City Bombers. According to Officer Mendiola, Petitioner stated at booking that he was affiliated with the Bombitas, and Detective Alvarez confirmed that Petitioner's tattoos were indicative of the gang. *Ramirez*, 2007 WL 4375936, at *4. Detective Alvarez further testified that the leaders of both gangs had authorized their members to fight or kill each other without prior approval. *Id.*

Given Gutierrez's failure to identify Petitioner in court as one of the men who invaded the west-side house, the prosecution relied on Petitioner's interrogation statement, as well as the ballistics evidence, to establish his involvement. As recounted, Petitioner admitted that he met with his co-defendants prior to the offense, selected a weapon—a "*cuerno de chivo*"—and carried it to the scene, where he tied up J. Hidalgo, directed M. Bocanegra to tie up Gutierrez, took J. Hidalgo's gold chain, searched the house for drugs and money, demanded drugs, and beat J. Hidalgo. Investigator R. Ruiz testified that a *cuerno de chivo* referred to "an AK-47, which uses 7.62 by 39 caliber bullets." *Id.* at *3 n.7, 8. When presented with a photo of a black, 7.62-by-39 caliber rifle, Gutierrez stated it closely resembled the weapon used by the lead assailant.

(Dkt. No. 87-15 at 24).  Forensics confirmed that bullets recovered from the scene and from J. Hidalgo's body were 7.62 by 39 caliber.  *Ramirez*, 2007 WL 4375936, at *1 & n.4, 4, 8.

## B.  Defense's Case-in-Chief

The defense's strategy was to attempt to cast doubt on the credibility of Petitioner's interrogation statement and the prosecution's witnesses, many of whom were called again to the stand, including Gutierrez, Investigator E. Ruiz, Investigator R. Ruiz, and Detective Alvarez.

For one, the defense highlighted certain inconsistencies between the interrogation statement and the prosecution's physical and testimonial evidence.  These included discrepancies over the descriptions of the Monte Cristo Property, the vehicle used by the assailants, and the assailants' attire.  (*See* Dkt. No. 87-21 at 37-38).  The defense argued that these inconsistencies raised serious doubts as to the level of Petitioner's involvement in the offense.  (*See id.*).

The defense also attempted to cast doubt over the connection between Petitioner's tattoos and the Tri-City Bombers.  Detective Alvarez was presented with a music CD of musician Bobby Pulido, the cover of which displayed a stylized letter "O" with a cross over the center—a symbol similar to that signifying membership in the Tri-City Bombers.  (*Id.* at 18-19).  The defense argued that the musician's use of the symbol undermined its exclusivity as a gang identifier, thereby weakening the tattoo evidence.  (*Id.*).

Regarding Petitioner's involvement, the defense also argued that it was unlikely that Petitioner, who was eighteen years of age at the time, was in command of older men in their twenties and thirties.  (*Id.* at 38).

## C.  Jury Instructions and Verdict

On December 15, 2004, after eleven days of the guilt phase of the trial proceedings, the case was handed over to the jury for deliberations.  (Dkt. No. 85-2 at 230-36, 238-49).

Notably, consistent with the "law of parties" under Texas Penal Code §§ 7.01 and 7.02, the jury was instructed that Petitioner could be found guilty "if the offense [was] committed by his own conduct, by the conduct of another for which he [was] criminally responsible, or . . . both[,]" and that Petitioner would be criminally responsible "if, acting with intent to promote or assist the commission of the offense, he solicit[ed], encourage[d], direct[ed], aid[ed], or attempt[ed] to aid the other person to commit the offense." (*Id.* at 230-31, 240).

Later that same day, the jury reached its verdict, finding Petitioner guilty of capital murder under both counts of the indictment. (*Id.* at 237, 250).

## IV. SENTENCING PROCEEDINGS

Texas law determines a capital defendant's punishment by way of a separate sentencing hearing. *See* Tex. Code Crim. Proc. art. 37.071 § 2(a)(1). In a capital murder trial, the jury's answers to special-issue questions determines whether the sentence should be death or life imprisonment. Tex. Code Crim. Proc. art. 37.071 § 2(g). The three special-issue questions here were phrased to the jury as follows:

(i)  Is there a probability that [Petitioner] would commit criminal acts of violence that would constitute a continuing threat to society?

(ii)  Do you find from the evidence beyond a reasonable doubt that [Petitioner] himself, actually caused the deaths of . . . the deceased, on the occasion in question, or, if he did not actually cause the death of the deceased, that he intended to kill the deceased or another or anticipated that a human life would be taken?

(iii)  Whether, taking into consideration all of the evidence, including the circumstances of the offense, [Petitioner's] character and background, and the personal moral culpability of [Petitioner,] there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed

(Dkt. No. 85-2 at 262-64, 268-70); *see also* Tex. Code Crim. Proc. art. 37.071 § 2(b)(1)-(2), (e)(1).

For ease of reference, the evidence and arguments presented by the parties as to each special issue will be discussed in turn.

## A.  **Special Issue No. 1—Future Dangerousness**

As to the continuing-threat-to-society issue, also known as the "future dangerousness" inquiry, *see Daniel v. State*, 485 S.W.3d 24, 31 (Tex. Crim. App. 2016), the parties offered evidence over whether Petitioner could adjust to prison life without committing acts of violence.

### 1.  **Prosecution**

In the years leading up to the robbery-homicide, Petitioner amassed a considerable juvenile criminal record and spent significant stretches of time in the custody of the Texas Youth Commission (the "TYC"), the former agency responsible for operating the state's juvenile corrections facilities.  The prosecution called two witnesses to testify as to Petitioner's juvenile record and his behavioral issues as a juvenile offender, specifically, Hidalgo County Juvenile Probation Officer Olga Torres and TYC Parole Officer Ricardo Leal.  The prosecution also called law enforcement officers to testify as to Petitioner's behavior during pre-trial detention, specifically, Alex Champion, a sergeant with the Hidalgo County Sheriff's Department ("Sergeant Champion"), and two detention officers at the Hidalgo County Jail, Jorge Arreazola ("Officer Arreazola") and Ricky Garza ("Officer Garza").

Torres testified that Petitioner was placed in rehabilitation facilities from April 1998 through May 2000 following adjudications for burglary of a vehicle, trespass, and cannabis possession.  (Dkt. No. 87-22 at 17-22; Dkt. No. 88-10 at 226-31, 238-42).  According to Torres, probation officers assess a juvenile's family and school environments to determine if removal from home is in their best interest and, if so, to recommend placement in a rehabilitation facility, where they can receive education and family and drug counseling.  (Dkt. No. 87-22 at 17-18, 20-

21).  Torres stated that her recommendation to place Petitioner in a rehabilitation facility was based on her assessment of his family and school life, coupled with the results of Petitioner's psychological evaluations.  (*Id.* at 20-21).  However, on May 31, 2000, upon adjudication of two counts of aggravated assault, one for causing bodily injury with a knife and the other with a firearm, and two counts of deadly conduct, one for discharging a firearm at a vehicle and the other at a habitation, Petitioner was committed to the TYC.  (Dkt. No. 88-10 at 243-49).

Next, Leal went on to describe Petitioner's time in TYC custody.  Classified as a violent offender, Petitioner was transferred to the Evins Regional Juvenile Center on August 17, 2000.  (Dkt. No. 87-22 at 23, 25).  Petitioner progressed through the TYC's socialization program, was paroled on Leal's recommendation, and moved to a halfway house on April 5, 2001.  (*Id.* at 25-26).  According to Leal, a juvenile offender's parole release depends on the parole officer's approval of the of juvenile's home.  (*Id.* at 24-25).  When parole is recommended, albeit with concerns about the juvenile's home environment, the juvenile may be placed in an independent living program, such as a halfway house.  (*Id.* at 25-26).  Absent halfway house availability, a juvenile may be released home despite the probation officer's concerns.  (*Id.* at 26, 30-33).  Two months after being paroled, on June 11, 2001, Petitioner was returned to TYC custody for a behavioral violation.  (*Id.* at 26, 33-34).  Parole was again granted on December 20, 2001, this time to his home, but barely a month later, on January 16, 2002, Petitioner was arrested in Alamo, Texas, and again in Cameron County, Texas on March 16, 2002.  (*Id.* at 26-28).  As a result, his parole was revoked, and Petitioner was placed in the Coke County Juvenile Justice Center in June 2002.  (*Id.* at 28).  Parole was granted back to Petitioner's home for a second time on November 22, 2002.  (*Id.*).  Less than three months later, Petitioner committed the robbery-homicide at issue.

Even after his arrest for the robbery-homicide, Petitioner's behavioral issues apparently continued. Sergeant Champion testified that detention officers searched Petitioner's cell upon smelling the odor of cannabis emanating therefrom and discovered a bag of the substance. (*Id.* at 7). Petitioner admitted to ownership of the bag. (*Id.*). Moreover, Officer Arreazola and Officer Garza testified that they found razor blades hidden in Petitioner's cell. (*Id.* at 14-15).

The prosecution argued that, if assessed a life sentence, Petitioner could be placed in the general population classification and commit acts of violence towards other inmates and detention officers. (*Id.* at 52-54; Dkt. No. 87-23 at 35). The prosecution suggested that, even in administrative segregation—spending twenty-three hours in his cell with one hour of recreational time per day (Dkt. No. 87-22 at 51)—Petitioner could still commit acts of violence (*see id.* at 54; Dkt. No. 87-23 at 35).

### 2. Defense

The defense's strategy was to elicit and present evidence that Petitioner would not pose a threat to others within a structured environment.

In cross-examining Leal, the defense highlighted Petitioner's behavioral improvements at the Evins detention center, such that Petitioner tutored others and was involved in only minor behavioral incidents. (Dkt. No. 87-22 at 34). Petitioner had been gainfully employed at a private business during his stay at the halfway house. (*Id.* at 34-35). Cross-examination also established that Petitioner had exhibited a consistently respectful demeanor towards Officer Arreazola, Torres, and Leal. (*Id.* at 13, 19, 36).

As part of its case-in-chief, the defense called four of its own witnesses: (i) Dwight Stewart, a certified gang awareness trainer, who was qualified as a gang expert and testified generally as to why youth join gangs; (ii) Larry Fitzgerald, a former spokesperson for the Texas

prison system, who was qualified as a prison classification expert and testified about acts of violence in the prison system; (iii) Dr. Kate Allen ("Dr. K. Allen"), a sociologist and child development expert, who testified as to the effects of familial and socio-economic difficulties on a child's neuropsychological development; and (iv) Salomon Avila, a pastor at the Hidalgo County Jail, who testified about his interactions with Petitioner during pre-trial detention.

Stewart opined that Petitioner's gang, the Tri-City Bombers, was not considered a security threat in the Texas prison system. (*Id.* at 49).

Noting that Petitioner adjusted well within the TYC's structured setting, Dr. K. Allen opined that Petitioner could adjust to an environment where the precise elements of needed support were provided. (Dkt. No. 87-23 at 17, 28-29).

Fitzgerald testified about the classification of prisoners in the Texas state prison system. According to Fitzgerald, when an individual enters the system, they undergo a diagnostic process involving various physical and psychological examinations, the information from which is reviewed by a classification committee to assign the individual a specific classification—such as general population or administrative segregation. (Dkt. No. 87-22 at 50-52). Individuals deemed security threats, such as some gang members, are placed in administrative segregation. (*Id.* at 51). Conceding that a member of a low-level criminal street gang, such as the Tri-City Bombers, would not necessarily be segregated, Fitzgerald explained that, once placed in administrative segregation, a prisoner would not have any contact with the other prisoners. (*Id.* at 52-53). Fitzgerald also noted that it is not a "regular" occurrence for inmates on death row or administrative segregation to commit acts of violence against corrections officers. (*Id.* at 54).

Pastor Avila testified—much like Officer Arreazola, Torres, and Leal—that he did not feel threatened while interacting with Petitioner in his detention cell. (Dkt. No. 87-23 at 29-30).

### 3. Jury's answer

The jury answered in the affirmative as to the future-dangerousness special issue. *Ramirez*, 2007 WL 4375936, at *7.  As the TCCA would opine, "[t]he evidence, viewed in the light most favorable to the verdict, [was] sufficient to show that there [was] a probability that [Petitioner] would commit criminal acts of violence that would constitute a continuing threat to society."  *Id.* at *9.  In reaching this conclusion, the TCCA took note of Petitioner's violent juvenile record—including his aggravated assault offenses—and the evidence of contraband—including the razor blades—found in his cell.  *Id.*

## B.  <u>Special Issue No. 2—Anti-Parties Issue</u>

"The anti-parties issue ensures that a defendant is not given the death penalty after being convicted on the basis of a parties liability theory unless the jury also finds that the defendant intended death or anticipated that a human life would be taken."  *Prystash v. State*, 3 S.W.3d 522, 540 (Tex. Crim. App. 1999) (Keller, J., concurring).

The following from the prosecution's closing arguments summarizes its position:

> If somebody is walking into a house with weapons, [7.62-by-39-millimeter caliber rifles,] shouldn't he have anticipated that somebody would die?  They cleaned the bullets.  They cleaned the weapons.  Sure.

(Dkt. No. 87-23 at 35).

The defense, on the other hand, attempted to portray Petitioner as a mere follower, not a leader, offering that the other assailants had planned the crime and provided the weapons. *Ramirez*, 2007 WL 4375936, at *8.  The defense further asserted that there was no evidence that Petitioner expected violence to erupt during the crime, that he should have known that the masked assailant would return to kill J. Hidalgo, or even that he was physically present when the

shooting occurred.  *Id.*  Otherwise, the defense argued that binding J. Hidalgo and beating him

with a pan did not rise to the requisite threshold of reckless indifference to human life.  *Id.*

The jury answered in the affirmative as to the anti-parties special issue.  *Id.* at *7.  As the

TCCA would observe—

> [t]he evidence . . . showed that [Petitioner] anticipated that a human life would be
> taken.  He knew that the guns and bullets had been cleaned of fingerprints and he
> had been told: "They got guns and there might be some people in there, too, so
> you gotta put them down 'cause the family members got some guns."   The
> evidence showed that the targets of the robbery were drug dealers from an
> opposing gang, and [Detective] Alvarez testified that the gangs had "a green
> light" to fight with or kill each other.

*Id.* at *8.

## C.  Special Issue No. 3—Mitigating Circumstances

Texas law allows capital sentencing jurors to consider as mitigating factors any evidence

that they might regard as reducing the defendant's "moral blameworthiness."  *See Hall v. State*,

663 S.W.3d 15, 43 (Tex. Crim. App. 2021) (citing Tex. Code Crim. Proc. art. 37.071 § 2(f)(4)).

The prosecution argued that there was "nothing mitigating" and asked the jurors to

"decide for themselves" by weighing the evidence already presented.  (Dkt. No. 87-23 at 35).

The defense placed considerable emphasis on this special issue.  On cross-examination,

the defense elicited information from Torres about Petitioner's home environment, including his

poverty-stricken neighborhood, uneducated and inattentive parents, and early exposure to drugs.

(Dkt. No. 87-22 at 19-20).  Leal conceded that, although he had approved transfers back home

when Petitioner was paroled, Leal did have concerns about the "[gang] activity in the

neighborhood" and the possibility that Petitioner might face retaliation.  (*Id.* at 33).  The defense

also called its own experts—Stewart and Dr. K. Allen—to offer further mitigating evidence.

### 1. Stewart

As a certified gang awareness trainer with the National Gang Crime Research Center, Stewart explained that he had worked with gang members and various local and state juvenile justice entities, including the TYC, gathering intelligence on gangs and gang membership and activities.  (Dkt. No. 87-22 at 38-39).  Stewart highlighted several reasons why people join gangs, including the need to belong, family ties, protection from violence, and financial gain. (*Id.* at 46-48).  He emphasized that the lack of love and attention at home, as well as fear of violence in the community, can be significant factors for many.  (*See id.* at 47).

### 2. Dr. K. Allen

The defense relied heavily on the mitigating testimony provided by Dr. K. Allen, which was summarized by the trial court on state habeas review as follows:

> [Dr. K. Allen] indicated that she is licensed to practice clinical social work in California and Texas; has a Bachelor's degree in psychology and sociology, a Masters in clinical social work, and a doctorate in family sociology; is retired from a university faculty position; and has a private consultation practice in forensic social work.  She also noted that her areas of expertise include Attachment Disorder, Fetal Alcohol Syndrome, Post-traumatic Stress Disorder, and general psychiatric diagnoses; that attachment disorder refers to a child who has not bonded with his mother or any other parent figure; that the first three years are very important to a child's development; and that one part of this early development involves learning to handle stress.

> [Dr. K. Allen] next stated that the child is then ready to go into the bigger world of school or daycare; that we expect one to be able to control their negative emotions in constructive ways by their late teens and early 20s; and that she had looked at documents that were made available to her by [trial] counsel's office, [Petitioner's] school records, his I.Q. testing, his [TYC] records, psychological evaluations on [Petitioner,] newspaper articles about the killings, and the mitigation reports provided by "the mitigation expert specialist, Ms. Bowen."  She then stated her conclusions that [Petitioner] suffered from attachment disorder, chronic depression, post-traumatic stress disorder, and substance dependency; said that she based them on her education, training, and clinical experience; and noted that she had also looked at the data which had been provided to her.

[Dr. K. Allen] then said that the conditions she had mentioned had resulted from maternal abandonment and chronic domestic violence and child abuse during [Petitioner's] formative years; that the deprivation in his family had been matched by very injurious elements outside of it, including violence and gang dominance; and that there had not been any meaningful societal interventions with [Petitioner] until age 16. She also said that the intervention had been very good, but had been too late; that [Petitioner] had been returned to the same environment; that his mother had been unable or unwilling to discipline and protect him; that he had thus become part of gang life; and that these conditions had resulted in his inability to exercise the full range of choices in his behavior normally expected of a law-abiding citizen.

[Dr. K. Allen] next said that she had developed the idea that [Petitioner] had raised himself from the mitigation specialist's report of her interviews with [Petitioner] and others around him and from [Petitioner's] [TYC] and school records; that she had also reviewed the psychological reports on [Petitioner]; that the fact that [Petitioner] had done well while at [the TYC,] but had not done so once he got out shows that he had had support while in [the TYC,] but had lacked it once he got out; and that a return to an environment lacking positive authority will cause one to regress and return to the gang as a source of authority.

(Dkt. No. 90-17 at 162-64 (citations omitted)).

### 3. Excluded evidence

Given the nature of his claims for relief, it is important to note that this evidence of Petitioner's background constituted only a portion of what the defense sought to introduce.

The defense initially planned to secure mitigation testimony over Petitioner's upbringing from his mother and sister. Due to the family's sudden unavailability, however, the defense sought instead to incorporate the substance of their anticipated testimony through Dr. K. Allen.[3] (Dkt. No. 90-17 at 399). It seems that in forming her opinion about Petitioner's psychological conditions, Dr. K. Allen had reviewed several reports on Petitioner's background prepared by Bowen. (Dkt. No. 87-23 at 5). Upon the prosecution's objections, and following lengthy

---

[3] The reasons for the sudden unavailability of Petitioner's mother and sister, as well as the decision by trial counsel to rely on Dr. K. Allen's testimony in lieu of that of the family, would become a central issue for purposes of state habeas review and the instant proceedings, as discussed below.

argument by the attorneys, the trial court excluded any discussion by Dr. K. Allen of the information in the underlying reports, deeming it inadmissible hearsay.  (*Id.* at 6-27).

The reports at issue—a "Bio-Psychosocial Report," a Life History Outline, and a Personality Development Comparison—were later proffered and admitted into the record (Dkt. No. 88-12 at 24-33, 35-37, 39-44), along with the TYC records (Dkt. Nos. 88-14, 88-16, 88-18), as part of the defense's bill of exceptions (Dkt. No. 87-23 at 43-45).  In making its bill of exceptions, the defense contended that the trial court's evidentiary ruling had hampered its ability to put the case before the jury:

> [The trial court] only allowed [Dr. K. Allen] to give opinions in general, that [the defense] could not get into the details of [Petitioner's] life in detail, about all the beatings that his mother received when she was pregnant with him, as he was growing up, all the family violence, how he had to—how he intervened at the age of three years old to help his mother, to save his mother from another beating, from just family violence from when he was just a baby, baby, and how he developed, about the school.

(*Id.* at 43).

### 4. Jury's answer

The jury answered in the negative on this issue.  (Dkt. No. 85-2 at 264-65, 270-71).

## D. <u>Sentencing Verdict</u>

On December 18, 2004, Petitioner was sentenced to death on both counts of capital murder.  (Dkt. No. 85-2 at 292, 296).

## V.  DIRECT APPEAL

## A. <u>Appellate Counsel</u>

Immediately following Petitioner's death sentence, the trial court appointed attorney Larry Warner to represent Petitioner in his automatic direct appeal to the TCCA pursuant to Article 37.071 of the Texas Code of Criminal Procedure.  (Dkt. No. 85-2 at 300).

On March 31, 2006, Mr. Warner moved to abate the appeal until after the trial court had issued findings and conclusions over the motion to suppress (Dkt. No. 85-13 at 106-14), which motion the TCCA proceeded to deny on April 3, 2006 (*id.* at 105).

Subsequently, Mr. Warner failed to file appellate pleadings within the applicable deadline (*id.* at 92-93, 104), such that he would eventually be held in contempt (*id.* at 82-83).

## B.  Points of Error

On July 24, 2006, Mr. Warner filed a preliminary brief on Petitioner's behalf, raising twenty-one points of error.  (Dkt. No. 85-3).  On August 16, 2006, Mr. Warner raised additional points through a second preliminary brief (Dkt. No. 85-6), which became the sole focus of the appellate proceedings.  The points of error, as understood by the TCCA, were as follows:

1.  The verdict was contrary to the law and evidence.

2.  The evidence was legally insufficient to support the conviction.

2a.  The evidence was legally insufficient to support the sentence of death.

3.  The evidence was factually insufficient to support the conviction.

3a.  The evidence was factually insufficient to support the sentence of death.

4.  The trial court erred in imposing two death sentences, one for killing more than one person in the same transaction, and the other for murder during robbery, as imposing two death sentences violates the Fifth Amendment prohibition against two punishments for the same conduct.

5.  The trial court erred in imposing two death sentences, one for killing more than one person in the same transaction, and the other for murder during robbery, as imposing two death sentences violates Texas constitutional law prohibiting two punishments for the same conduct.

6.  The trial court erred in overruling Petitioner's timely and specific request for a jury instruction under Article 38.23 of the Texas Code of Criminal Procedure, concerning the voluntariness of his interrogation statement.

7.   The trial court erred in overruling Petitioner's motion to quash the indictment on the basis that the second count of the indictment charged two offenses, engaging in organized criminal activity and capital murder.

8.   The Texas death penalty statute is unconstitutional as applied to Petitioner, who was 18 at the time of the offense, given evolving standards of decency.

9.   The prosecution engaged in misconduct by denying that there was video of the raid on Petitioner's aunt's trailer until the suppression hearing.

10.   The prosecution engaged in spoliation of the evidence by recording over part of the tape showing the Rohypnol pills on the floor.

11.   The Texas statute proscribing criminal gangs, Section 71.02 of the Texas Penal Code, makes Petitioner responsible for the acts of others without requiring proof beyond reasonable doubt.

12.   The trial court erred in excluding the interview of "the expert" at the punishment phase.

13.   The trial court erred in overruling Petitioner's objection that Officer Mendiola's question to Petitioner, "Are you a member of criminal street gang?" was not a routine booking question.

14.   Petitioner was deprived of counsel at a critical stage of the proceedings, the twenty-nine days following the pronouncement of sentence from December 18, 2004 until January 17, 2005.

15.   The trial court erred in admitting Petitioner's audiotaped statement.

16.   The trial court erred in admitting Petitioner's unwarned statement at booking to Officer Mendiola that Petitioner was a gang member .

17a.   The trial court erred in admitting Petitioner's triple-hearsay statement to the parole officer that Petitioner was in the Bombitas gang.

17b.   The trial court erred in admitting Petitioner's statement to Sergeant Champion that Petitioner possessed cannabis in his cell.

18.   The trial court deprived Petitioner of a complete appellate record by not submitting findings and conclusions as to Petitioner's statements.

19.   The TCCA deprived Petitioner of due process of law by requiring him to proceed on appeal on an incomplete appellate record.

20. The reliability of testimony on future dangerousness was so low as to violate the federal guarantee of due process.

21. The reliability of testimony on future dangerousness was so low as to violate Texas' guaranty of due process.

22. The trial court erred in admitting, over objection, victim autopsy photos.

23. This point of error was omitted from the second appellate brief. *Ramirez*, 2007 WL 4375936, at *20 n.21.

24. The trial court abused its discretion in admitting, over objection, photographs of crime scene and the victims.

25. The trial court erred in admitting unreliable evidence, specifically, Detective Alvarez's testimony that Leal told Detective Alvarez that Petitioner told Leal that Petitioner was a Tri-City Bomber.

26. The trial court erred in overruling Petitioner's motion for mistrial for the introduction of evidence that a Texas inmate on death row, Jorge Salinas, had stabbed a guard.

27. The trial court erred in admitting Petitioner's statement without an official translation of the English portion of the statement.

(Dkt. No. 85-6 at 9-14, 21-25, 63-121).

## C.  Appellate Opinion by TCCA

On December 12, 2007, the TCCA issued its opinion over the direct appeal. *Ramirez*, 2007 WL 4375936. Several points of error were dismissed on state procedural grounds: points 8, 12, 14, 26, and 27 for inadequate briefing pursuant to Rule 38.1 of the Texas Rules of Appellate Procedure; points 17a, 17b, and 25 for failure to raise timely objection pursuant to Rule 33.1; and points 18 and 19 for failure to preserve error for appellate review. *Id.* at *16, 19-20. Points 7 and 11 were dismissed as moot based on the reversal of Count Two as discussed below. *Id.* at *6, 9. Most of the remaining points were denied on the merits. *Id.* at *6-19.

Petitioner's appeal did meet with limited success, however, as to points 4 and 5. Petitioner contended thereby that "the trial court violated the federal and state constitutional

protections against double jeopardy by subjecting him to multiple punishments for the same offense." *Id.* at *5. The State conceded error. *Id.* The TCCA agreed that Petitioner was subjected to multiple punishments for the same offense in violation of double jeopardy because both counts "ar[o]se from the same conduct on the same date involving the same victims." *Id.*

The TCCA thus vacated the trial court's judgment and reversed the conviction on Count Two but otherwise affirmed the judgment as to Count One. *Id.* at *20.

## D. **Writ of Certiorari**

On October 6, 2008, the United States Supreme Court denied Petitioner's petition for writ of certiorari. *Navarro-Ramirez v. Texas*, 555 U.S. 831 (2008).

## VI. STATE HABEAS REVIEW

Texas law generally requires a petitioner to bring a state habeas petition concurrently with their direct appeal. *See Guidry v. Lumpkin*, 2 F.4th 472, 489 (5th Cir. 2021) (per curiam) (citing Tex. Code Crim. Proc. art. 11.071 § 4); *see also Ex parte Reynoso*, 257 S.W.3d 715, 719 (Tex. Crim. App. 2008) (per curiam).

Here, the same judge who presided over Petitioner's trial, Judge Gonzalez, would preside over the state habeas proceedings in his capacity as judge for the state habeas court.

## A. **State Habeas Counsel**

On December 22, 2004, upon appointing appellate counsel, Judge Gonzalez also appointed attorney David Sergi to represent Petitioner in state habeas corpus proceedings brought under Article 11.071 of the Texas Code of Criminal Procedure. (Dkt. No. 85-2 at 300).

Given Mr. Sergi's failure to file a timely state habeas petition, however, Petitioner would submit a pro se motion to have counsel removed. (*See* Dkt. No. 85-22 at 2). On August 15, 2007, the state habeas court held a hearing on the matter and granted Petitioner's motion. (*Id.*).

The TCCA later ordered Mr. Sergi to show cause for his failure to timely file a habeas petition.  (*Id.*).  On July 7, 2008, the TCCA found Mr. Sergi in contempt insofar as he did not attempt to show good cause.  (*Id.* at 3).  Contemporaneously, the TCCA appointed attorney Paul Mansur as substitute counsel and extended the deadline to submit a habeas petition.  (*Id.*).

**B.  Initial State Habeas Petition**

On July 2, 2009, Petitioner, through Mr. Mansur, filed his initial state habeas application (the "Initial State Petition") (Dkt. No. 90-18 at 92-249), raising nineteen grounds for relief:

    1.    [Petitioner] was denied the [Sixth and Fourteenth Amendment rights to] effective assistance of counsel . . . when [trial counsel] failed to investigate and present mitigating evidence that called for a sentence less than death.

    2.    [Petitioner's] death sentence must be set aside because he is mentally retarded.

    3.    [Petitioner's trial counsel were] ineffective for failing to investigate and present evidence of [Petitioner's] mental retardation.

    4.    Even if it is determined that [Petitioner] is not mentally retarded, his death sentence violates the Due Process Clause of the Fifth and Fourteenth Amendments and the Eighth Amendment[.]

    5.    [Petitioner] was denied a fair trial as guaranteed by the Sixth Amendment and by the Due Process Clause of the Fourteenth Amendment . . . when the trial court restricted his ability to present mitigation evidence through his expert, [Dr. K.] Allen.

    6.    [Petitioner] was denied the [Eighth Amendment] right to present relevant mitigation evidence during the punishment phase[.]

    7.    [Petitioner's] death sentence should be set aside and he should be afforded a new sentencing hearing because . . . [the punishment was based on a conviction invalidated by the TCCA] in violation of . . . the due process clause of the Fourteenth Amendment, the right to a fair trial provisions of the Sixth Amendment, and the requirements of the Eighth Amendment[.]

    8.    [Petitioner's] death sentence should be set aside because the . . . mitigation special issue . . . failed to assign a burden of proof in violation of . . . [Fourteenth Amendment] due process . . . and . . . the Eighth Amendment.

9.    [Petitioner's] death sentence should be set aside because the . . . mitigation special issue . . . failed to adequately define what is meant by mitigation or mitigating evidence and the terms used created a reasonable possibility that the jury would construe mitigating evidence narrowly such that it would not give full consideration and effect to all of [Petitioner's] mitigating evidence in violation of the Eighth Amendment[.]

10.   [Petitioner] is entitled to a new direct appeal because the [TCCA's] refusal to allow review of the mitigation special issue violates [Petitioner's] rights to due process under the Fourteenth Amendment, to reliability of the death sentence as guaranteed by the Eighth Amendment, and to a fair trial secured by the various provisions of the Sixth Amendment.

11.   [Petitioner] was denied the [Sixth and Fourteenth Amendment rights to] effective assistance of counsel . . . when [trial counsel] and [appellate counsel] failed to raise issues on appeal relating to punishment.

12.   [Petitioner] is factually innocent, and his conviction and death sentence violate the due process clause of the Fourteenth Amendment . . . and the prohibition against cruel and unusual punishment of the Eighth Amendment[.]

13.   [Petitioner] is entitled to relief because the trial court allowed the [prosecution] to introduce his statement into evidence, which was the principle evidence supporting this conviction, even though [Petitioner] did not voluntarily give the statement, and the trial court's actions violated [Petitioner's] privilege against self-incrimination, due process right, and right to counsel as guaranteed in the Fifth, Sixth, and Fourteenth Amendments . . . , as well as the provisions of the Texas Confession Statute in Article 38.22 of the Texas Code of Criminal Procedure.

14.   [Petitioner] was not competent to stand trial[.]

15.   [Petitioner] was denied the [Sixth and Fourteenth Amendment rights to] effective assistance of counsel . . . when [trial counsel] failed to investigate his claims relating to innocence; failed to investigate witnesses, secure their presence at trial, and present evidence relating to the voluntariness of [Petitioner's] confession; failed to investigate and present evidence of [Petitioner's] competency to stand trial; and failed to preserve these issues for review.

16.   [Petitioner] was denied the [Sixth and Fourteenth Amendment rights to] effective assistance of counsel . . . when [trial counsel] and [appellate counsel] failed to raise issues relating to guilt-innocence.

17. [Petitioner] was denied the [Sixth and Fourteenth Amendment rights to] effective assistance of counsel . . . because [trial] counsel labored under a conflict of interest.

18. [Petitioner] was denied [Fourteenth Amendment] equal protection . . . when the [prosecution] used its peremptory strikes in a discriminatory manner in order to exclude women from the jury.

19. [Petitioner] was denied the [Sixth and Fourteenth Amendment rights to] effective assistance of counsel . . . because [trial counsel] and [appellate counsel] failed to raise the *Batson* discriminatory use of peremptory strikes issue at trial and on direct appeal.

(*Id*. at 92-95).

Notably, the scope of the first of the above grounds affects the analysis of whether Petitioner's main claim for purposes of the Petition—similarly labeled Claim 1—is subject to dismissal for the lack of exhaustion.

Unlike Claim 1 in the instant Petition—which focuses in part on the efficacy of trial counsel's investigation and presentation of the mental health evidence (Dkt. No. 67 at 177-251)—the first claim in the Initial State Petition referenced mental health evidence as more of an afterthought under a section labeled "other mitigation evidence" (*see* Dkt. No. 90-18 at 152-69). The evidence offered by habeas counsel in that section involved a neuropsychological assessment by Dr. Gilbert Martinez, a neuropsychologist ("Dr. Martinez").  (*Id.* at 156-65). Drawing from tests administered to Petitioner in June 2009, as well as mental health reports, school records, and legal documents, Dr. Martinez placed Petitioner within the "mild mental retardation" range of functioning.  (*Id.* at 164-65).   According to Dr. Martinez, the neuropsychological deficits experienced by Petitioner hindered his understanding of the legal proceedings. (*Id.* at 164).

As discussed below, however, this claim would later be withdrawn considering a conflicting opinion by the State's own examining expert.

**C.  Substitution of State Habeas Counsel**

Over four years later after the filing of the Initial State Petition, on November 7, 2012, Mr. Mansur moved to withdraw as state habeas counsel (Dkt. No. 90-20 at 44), explaining that his acceptance of new employment with the Texas Defender Service raised a potential conflict of interest with Petitioner's case (Dkt. No. 90-19 at 550-51).   The next day, the Texas Office of Capital and Forensic Writs (the "OCW") moved to replace Mr. Mansur on condition that counsel receive a one-year extension for review and investigation and the filing of an amended petition for habeas relief.   (Dkt. No. 90-20 at 45-48).   On November 9, 2012, the state habeas court granted Mr. Mansur's motion to withdraw and appointed counsel from the OCW as substitute state habeas counsel.   (*Id.* at 49).   At least four attorneys from the OCW would file briefs and make appearances on Petitioner's behalf, chief amongst them attorney Brad D. Levenson.

**D.  Amended State Habeas Petition**

On November 6, 2013, habeas counsel filed a second state habeas application titled as an *Amended Initial Application for a Writ of Habeas Corpus* (the "Second State Petition") (Dkt. No. 90-20 at 89-264), which raised sixteen claims for relief.

On February 18, 2014, the State moved to send the Initial State Petition and the Second State Petition to the TCCA for a determination as to whether the Second State Petition was subject to the restriction associated with subsequent applications for the writ of habeas corpus. (Dkt. No. 90-21 at 500-19).   The State argued that the Second State Petition was an application subsequent—not an amendment—to the Initial State Petition insofar as it raised new claims and altered the basis of others.   (*Id.* at 505-17).   That same day, the state habeas court ordered that the two petitions be sent to the TCCA (*id.* at 522-40), holding as follows:

> [Article 11.071 § 5(c) of the Texas Code of Criminal Procedure] clearly demonstrates that the intent of the statute is to have the [TCCA] evaluate whether

any of the purported grounds for relief asserted in the subsequent application for writ meet the exceptions to the general rule barring consideration of the merits of, or granting of· relief based on, contentions contained in a subsequent writ.

* * *

[The state habeas court] finds that the [Second State Petition] filed on November 6, 2013 must be treated as a subsequent application for writ.

After all, . . . [the Second State Petition] contains two contentions, Claims Six and Fourteen, which were not asserted in the [Initial State Petition.]

Moreover, . . . [the Second State Petition] also contains five contentions, Claims One, Two, Five, Ten, and Thirteen, which deal with the same general subject area as claims asserted in the [Initial State Petition,] but assert entirely distinct arguments.

Because substance controls over form, said new arguments must also be considered as new claims not asserted in the [Initial State Petition] in this case.

Furthermore, the [Second State Petition] was clearly filed outside of the time specified in Section 4(a) and (b) of Article 11.071, meaning that it must, under Section 5(f) of said statute, be treated as a subsequent writ.

(*Id.* at 536-38).

On February 24, 2014, state habeas counsel filed a post-order response to the State's motion, arguing that: (i) the state habeas court had agreed orally to the one-year extension; (ii) any permission to file a post-extension amendment was understood to also permit the presentation of claims discovered during the extension period; and (iii) any new arguments were mere expansions of the same claims in the Initial State Petition.  (*Id.* at 541-55).

The state habeas court never addressed the response.  The TCCA would not issue a decision on the State's motion until its decision on the state habeas case at large.  In the meantime, however, the TCCA ordered the issuance of findings of fact and conclusions of law by the state habeas court (Dkt. No. 90-9 at 2-3), such that the state habeas court decided to continue proceedings on the Initial State Petition (Dkt. No. 90-17 at 231-32).  Ultimately, the

TCCA agreed with the state habeas court, deeming the Second State Petition a subsequent application and dismissing it for an abuse of the writ. *Ex parte Ramirez*, 2015 WL 6282336, at *1 (Tex. Crim. App. Oct. 14, 2015) (per curiam); *Ramirez v. State*, 621 S.W.3d 711, 723 (Tex. Crim. App. 2021) ("[W]e dismissed [the Second State Petition] as an abuse of the writ *without reviewing the merits* of the claims [Petitioner] raised therein." (emphasis added)).

**E. <u>Withdrawal of Claims Involving Mental Impairment</u>**

**1. Examination by the State's expert**

Among the claims designated for resolution by the state habeas court was Petitioner's claim of ineffective assistance of trial counsel involving his mental health. (Dkt. No. 90-7 at 16-17). In response to this designation, the State moved to compel Petitioner to submit to a psychological evaluation by an examining expert, Dr. Thomas Allen ("Dr. T. Allen"). (Dkt. No. 90-20 at 53-76; Dkt. No. 90-21 at 454-75). The state habeas court granted the motion, reasoning that Petitioner had waived his right against self-incrimination by agreeing to be examined for mental health issues by Dr. Martinez. (Dkt. No. 90-21 at 483-496).

Petitioner was examined by Dr. T. Allen on August 25, 2014. (Dkt. No. 67-17 at 29). Through a report dated August 29, 2014 (*id.* at 29-50), Dr. T. Allen disagreed with Dr. Martinez, opining that Dr. Martinez's opinions "were clearly inconsistent with the results of [both the TYC's and his own] testing" (*id.* at 39). According to Dr. T. Allen, what Dr. Martinez attributed to mild mental retardation were, rather, manifestations of antisocial personality disorder, and Petitioner otherwise "function[ed] within the law-normal range of intelligence." (*Id.* at 47).

**2. Notice of intent to withdraw**

On October 21, 2014, Petitioner's counsel filed a *Notice of Intent to Withdraw Claims Regarding Mental Impairments*, stating that—

[i]n light of the evaluation of [Petitioner] conducted by [Dr. T. Allen] . . . , the reliability and veracity of previous testing of [Petitioner] by [Dr. Martinez] is significantly compromised.  As such, [Petitioner] now withdraws [Claims Two, Three, Four, and Fourteen] from his [Initial State Petition.]

* * *

[Petitioner] will offer no evidence in support of the preceding claims at his evidentiary hearing, as no credible evidence currently exists.

(Dkt. No. 90-15 at 45-47).

### 3. Scope of withdrawal

At a subsequent evidentiary hearing before the state habeas court held over November 3 and 4, 2014 (Dkt. No. 90-27 at 1; Dkt. No. 90-28 at 1), state habeas counsel and Petitioner himself stated that it was Petitioner's intent to abandon the claims involving mental impairments.

| | |
|---|---|
| [Counsel]: | We want to, again, put on the record that we are waiving the [mental retardation]/intellectual disability claims.  And that is Ground For Review—from the application, Ground for Review 2, 3, 4, and 14. |
| The Court: | And those—When you say you're waiving them, what you're saying is you're abandoning them based on evidence that you have received and have been able to be developed during this process of you preparing for the writ; is that correct? |
| [Counsel]: | Right.  The [mental retardation] claim was originally brought by prior habeas counsel, and we have come to learn . . . We are not feeling confident of the results from the . . . the doctor that was hired by prior habeas counsel[, Mr. Mansur.] |
| The Court: | Have you discussed those issues with your client, and is your client in agreement with that? |
| [Counsel]: | We have discussed it with him.  I believe he is. |
| The Court: | All right.  [Petitioner,] if you can stand again.  [Petitioner,] you understand that they are abandoning your claims on 2, 3, 4 and 14 of the [Initial State Petition] filed on your behalf?  Those are having to do with your mental condition. |
| [Petitioner]: | Right.  Can I—Real quick? |

| The Court: | Sure. |
| | (Discussion off the record.) |
| [Petitioner]: | I understand, and I agree with it. |
| The Court: | All right. |
| [Counsel]: | Thank you, Your Honor. |

(Dkt. No. 90-27 at 12-13).

Through a concurrence to the TCCA's subsequent habeas opinion, Judge Elsa Alcala referred to the above excerpt and noted that—

> [habeas counsel] and the [state habeas] court specifically mentioned only the claims by number that were presented in the [Initial State Petition.] Nonetheless, it appears clear to me that [Petitioner] was abandoning his intellectual-disability claims in the [Initial State Petition] and the [Second State Petition] because the hearing occurred after the [Second State Petition] had been filed, and [Petitioner] was represented at that hearing by the [habeas counsel] who filed the [Second State Petition.] Viewing the comments of the [state habeas] court, [state habeas counsel,] and [Petitioner] at the hearing in context, it appears to me that *[Petitioner] abandoned all of his intellectual-disability claims* in his initial and subsequent writs.

*Ex parte Ramirez*, 2015 WL 6282336, at *2 (Alcala, J., concurring) (emphasis added).

Indeed, Petitioner did not explore any argument concerning his mental health again during the remainder of the state habeas proceedings.

## F.  Evidentiary Hearing

At the evidentiary hearing, state habeas counsel focused on establishing Petitioner's claims of the ineffective assistance of counsel, specifically, claims 1 and 15 of the Initial State Petition.  (Dkt. No. 90-27 at 6; *accord* Dkt. No. 90-17 at 277-78).  Presented as witnesses were Petitioner's trial defense team—Mr. Garza, Ms. Garza, Investigator Castillo, and Bowen—as well as his mother, Juana Ramirez, and sister, Juana "Janie" Ramirez.  (Dkt. No. 90-26 at 6).

Also offered into evidence were affidavits by appellate counsel, Mr. Warner, several experts—including Dr. K. Allen—and several of Petitioner's relatives and acquaintances.  (*See id.* at 7).

Most relevant for present purposes is the testimony of Mr. Garza, Ms. Garza, and Petitioner's mother and sister.

### 1.  Mr. Garza

Mr. Garza testified as to his experience and qualifications and his relative role in the defense, such as that of a legal researcher.  Mr. Garza also testified as to the nature of his apparent familial connection to Petitioner, such that a cousin of Mr. Garza had fathered a child with one of Petitioner's sisters, Berta Ramirez ("B. Ramirez").  The state habeas court summarized Mr. Garza's testimony as follows:

> [Mr.] Garza . . . provided credible testimony that he had been appointed to represent [Petitioner] as second-chair counsel; that he had worked in the appellate section of the Hidalgo County District Attorney's Office for two years and had then gone into private practice taking criminal appointments, doing trials, and handling appeals; that he had been in private practice for about four years before representing [Petitioner]; that he had handled about 2-3 jury trials to a verdict as a defense attorney by that point; that these cases had included an aggravated sexual assault, another sexual assault, a felony theft, and maybe a DWI trial; and that he had never before represented a defendant in a case where the [prosecution] was seeking the death penalty.

> \* \* \*

> [Mr.] Garza further provided credible testimony that [Ms. Garza] had "pretty much" been in charge of the witnesses; that he had been given the task of conducting discovery at the District Attorney's office; that both of them had gone to examine the physical evidence several times; and that he had also done a lot of legal research.

> Mr. Garza likewise gave credible testimony that he had been particularly involved in preparing the motion to suppress; that he had spoken to [Petitioner] about that matter; that he had been present during jury selection and the presentation of evidence; and that he had, however, probably had the most involvement in regard to the motion to suppress.

[Mr.] Garza also provided credible testimony that [Ms.] Garza, as the lead counsel, had had the final say in making decisions and deciding which witnesses would be called; that he recalls a former D.P.S. trooper or investigator named Juan Castillo being appointed for [Petitioner's] case; that [Investigator Castillo's] role was to look for people for the attorneys; that [Investigator Castillo] had, at one point, been looking for [Petitioner's] mother and sister[.]

\* \* \*

Mr. Garza also provided credible testimony that he would have objected if he had thought that the [prosecution] was exercising its peremptory challenges in a discriminatory manner.

\* \* \*

[Mr.] Garza further provided credible testimony . . . that he is aware that [his cousin, Andres Garza,] had had a child with [Petitioner's] sister [B. Ramirez]; that he had found this information out during the course of the trial; . . . that he had not known about this relationship when he was appointed to represent [Petitioner]; and that he thinks that he had become aware of it when his cousin showed up with [B. Ramirez] to one of the court proceedings.

. . . Mr. Garza gave a credible response that he did not know [if his cousin and B. Ramirez were married.]

\* \* \*

[Mr.] Garza then provided credible testimony that he believed that this information about [Petitioner] being known as "Lenny" had come from a co-defendant; that he had reviewed the statements of [Petitioner's] co-defendants prior to the trial; that [Petitioner] had said that that was not [Petitioner's] nickname; that he does not recall anyone except for the one co-defendant saying that "Lenny" was [Petitioner's] nickname; . . . and that . . . the co-defendant had said that . . . "Lenny" . . . had dropped his hat.

Mr. Garza also provided credible information that he and the lawyers for some of [Petitioner's] co-defendants had shared some of the discovery of the voluminous material pertaining to the murders involved; [and] that [although] he likes to ask attorneys for co-defendants what their client says and if he can talk to them[,] . . . [the attorneys] will tell him "no" . . . .

[Mr.] Garza further provided credible testimony that he does not recall subpoenaing any school records "or anything like that" for the punishment phase of [Petitioner's] case; that he had reviewed some of the material which was being accumulated and spoken to [Ms.] Garza to try to determine "the best way to pitch it"; that he does not recall interviewing any witnesses to try to find mitigating

evidence in preparation for the punishment phase or directing [Bowen] to conduct any interviews to find mitigating evidence; and that so instructing [Bowen] would have been [Ms.] Garza's responsibility.

* * *

[Mr.] Garza also provided credible testimony that the defense had hoped to put on [Petitioner's] mother and his sister to testify about this evidence; . . . that [Petitioner's] family members had not ended up testifying because they could not be located; that the address and telephone numbers the defense had had for them were no longer good; that the investigator had tried to locate them; that he does not recall when exactly they had lost contact with these individuals; and that he would have probably learned that they could not locate them from [Ms.] Garza.

* * *

[Mr.] Garza also provided credible information that he had told [Petitioner] that his cousin had [a child] with [B. Ramirez] when he found out about said relationship; that [Petitioner] had never told [Mr. Garza] that [Petitioner] did not want [Mr. Garza] to remain as one of his lawyers after [Mr. Garza] had done so; that he had been in the middle of the pre-trials in [Petitioner's] case when he found out about this relationship; that he would try to stay away from this cousin because he would ask him for money "and things like that"; that he would not risk his law license for a relative he doesn't even want to be around; and that the fact that [Mr. Garza] was related to Andres Garza had not affected his handling of [Petitioner's] case in any way.

* * *

[Mr.] Garza also provided credible testimony that the record would speak for itself as to how [the trial court] had handled the situation involving Dr. [K.] Allen's testimony; that [the trial court] had ruled that she could testify generally, but could not give specifics, because she did not have personal knowledge; that the information which Dr. [K.] Allen had relied on had derived from what she read or was told by [Bowen,] who had actually talked to the people; and that basically said information had been fed to [Dr. K. Allen] by Mr. Garza, [Ms.] Garza, or [Bowen.]

(Dkt. No. 90-17 at 280-301 (citations omitted)).

## 2. Ms. Garza

Ms. Garza testified as to her qualifications and experience, the roles assigned to members of the defense team, the extent of the defense team's investigative knowledge and efforts, the

causes of delays in preparing for the trial, her rationale for hiring Bowen, her trial strategy, especially with respect to Dr. K. Allen's testimony, the disappearance of Petitioner's mother and sister prior to their scheduled testimony, and the question of whether her husband and his family represented Petitioner's co-defendants.   Ms. Garza's testimony, as summarized by the state habeas court, was as follows:

> [Ms.] Garza provided credible testimony that she had been appointed as lead counsel for [Petitioner] on January 31, 2003; that she had begun working with the Hidalgo County District Attorney's Office on August 15, 1989 and had gone into private practice in December of 1997; that her specialty has always been criminal law; that she would also handle[ ] some civil cases, family law cases, custody cases, child support cases, immigration matters, and real estate matters; that she had handled defendants charged with capital murder prior to representing [Petitioner]; that she does not remember having represented any defendants whom the State was seeking death against prior to representing [Petitioner.]

> Ms. Garza also provided credible testimony that what often occurs is that the [prosecution] will be seeking death and will then enter into a plea bargain for a life sentence; that she had handled quite a few capital murder cases, including one or two that had been found not guilty; that [Petitioner's] case is the only one in which someone she represented had received a death sentence; that she had second-chaired another case i[n] which the defendant had opted to try the[ir] case [before] the judge and had received a life sentence.

> [Ms.] Garza further provided credible testimony that she had been on the list of attorneys approved to be appointed lead counsel in a death penalty case in 2003; that the process to be included on that list involved applying with the administrative judge and meeting required qualifications; that she had qualified every year and had just stopped re-applying for inclusion about two years ago, because she did not want to take on any more court-appointed capital murder cases.

> * * *

> Ms. Garza also gave credible testimony that [Mr.] Garza had been appointed about seven months after she was appointed; that the fact that there were 12 co-defendants, only about 6-8 lawyers in the county qualified to handle capital murders, and a need to find lawyers for each defendant was the reason it had taken a while "to get the ball rolling on everybody"; that she had been appointed to represent two individuals and had had to tell the other judge that she could not take on another defendant because of the potential conflict involved; that she does not think that her husband Hector J. Villarreal, her nephew Oscar Rene Flores, or

her brother-in-law Evarto R. "Beto" Villarreal had been appointed to represent any of the co-defendants, but is not sure if any of those individuals had been appointed.

Ms. Garza further provided credible testimony that she and [Mr.] Garza had worked on some aspects of [Petitioner's] case together; that [Mr.] Garza had handled a lot of the research, the pre-trial motions, and the suppression motions; that the two of them had "divided up the experts"; and that both of them had worked with the investigator in the case.

* * *

[Ms.] Garza also provided credible testimony that she had filed a motion to have a mitigation specialist appointed on May 24, 2004; that [Bowen] had been appointed on June 1, 2004; that she had known [Bowen] for a while prior to this time, had seen [Bowen's] work on social studies and other types of reports, and had liked the fact that [Bowen] did not "really like to leave a stone unturned"; that she does not know if [Bowen] had previously worked on a death penalty case; and that she had told [Bowen] to interview [Petitioner,] to look at [Petitioner's] records "at Evins", and to talk to [Petitioner's] family; that she and [Bowen] would discuss their game plan concerning who they thought [Bowen] needed to talk to; and that [Bowen] had reported to her more than to Mr. Garza, as she likes for people to give her a summary, which [Ms. Garza] would then share with the rest of the defense team.

* * *

[Ms.] Garza also provided credible testimony that she had also personally interviewed [Petitioner] to try and find mitigating evidence from his background many times; that she would make it a point to talk to all of her clients several times because they might not realize that something is important and say anything about it until it came out at some later point; that she had spoken with members of [Petitioner's] family, including his mother and his sister, who was from Donna, Texas; and that [Petitioner's] father had called her at one point when they were in the middle of the case, but [he] had not known anything about [Petitioner] other than what [Petitioner] was charged with.

* * *

[Ms.] Garza further gave credible testimony that . . . she would have objected if [s]he had thought that the [prosecution] was exercising its peremptory challenges in a discriminatory manner; that to prepare for the suppression hearing, she and [Mr.] Garza had reviewed all the evidence in the file, looked at the statements, and spent a lot of time preparing for and doing research for the suppression hearing[.]

* * *

[Ms.] Garza further provided credible testimony that the problem with any fact witnesses concerning whether [Petitioner] had been present that night was that they were all co-defendants; that she had talked to the attorney for one co-defendant about whether she could talk to his client; that she does not remember which co-defendant she was referring to; that the attorneys had, of course, all told her that they were not going to let her talk to their clients; and that she would have done the same thing.

* * *

[Ms.] Garza also gave credible testimony that there had been trial testimony that [Petitioner] was known by the nicknames "Ram" and "Lenny"; that the information that [Petitioner] was known as "Lenny" had come from something with writing in it; that she does not recall any of the statements of the co-defendants which she had reviewed prior to [Petitioner's] trial mentioning a person named "Lenny" being involved in the crime; that she had conducted an investigation into whether that was a nickname for [Petitioner] and had, in particular, asked [Petitioner] and his family members if he was known by that name; and that she does not recall anybody ever connecting [Petitioner] to that name, other than the State's gang expert.

* * *

Ms. Garza further provided credible testimony that [Petitioner's] mother and sister had ended up not testifying; that they had been there all through the trial; that there had been a lot of issues, a lot of things going on, and a lot of death threats; that [Petitioner's] mother and sister had stopped showing up at the trial shortly before they were scheduled to testify; that they had told her that they were going to move to Corpus Christi because of the threats and "what was going on", but had also said that they would be available to testify; that she had kept trying to call them; and that they were never able to get ahold of them.

[Ms.] Garza likewise provided credible testimony that she had told them to make sure that they were available to her when she needed them; that she had called them at the telephone number that they had left her, and had never gotten a call back; that she had never been able to talk to them; that Dr. [K.] Allen was one of the experts that was supposed to testify; and that she had sent Dr. [K.] Allen documents to review as soon as they became available to her, which was several months in advance; that she had hoped that Dr. [K.] Allen would be able to testify regarding some of the information she had gathered through [Bowen;] and that Dr. [K.] Allen's testimony was a key part of her punishment phase strategy.

Ms. Garza also provided credible testimony that Dr. [K.] Allen was not allowed to testify to everything that she had hoped that she would be able to say; that Dr.

[K.] Allen had become ill and could not be "here"; that she had been restricted in regard to what all of her experts could say; that she had been hoping that, since she could not get the family members here to testify, Dr. [K.] Allen would be allowed to talk about the information that they would have given; that she had been surprised when Judge Gonzalez prohibited Dr. [K.] Allen from testifying regarding that underlying information, because a testifying expert usually gathers information from other sources and is then allowed to testify; and that she thinks that this type of hearsay information from [Petitioner's] family members which she had hoped to on through Dr. [K.] Allen was admissible.

[Ms.] Garza likewise provided credible testimony that she had researched the issue of testifying experts prior to trial; that she had also already known the law in this area off the top of her head because she had used experts many times over the years, both from the prosecution and the defense side; that she would have considered filing a motion for a continuance to see if she could somehow find the family members she could not locate if she had known that the judge was going to restrict Dr. [K.] Allen's testimony; and that being able to put on the family members would have remedied some of the problems with the restrictions on Dr. [K.] Allen's testimony.

Ms. Garza further gave credible testimony that she had not considered hiring an expert regarding the issue of potential false confessions, over [the State's] objection that the false confession claim was part of the [Second State Petition,] as well as credible testimony that she had also not considered hiring an expert regarding juvenile brain development.

\* \* \*

[Ms.] Garza further gave credible testimony that the reason for the delay in proceeding with [Petitioner's] case was the fact that it had taken awhile it to be investigated and for all of the evidence to come into the District Attorney's Office and that the court had had to scramble to find qualified attorneys to represent the multiple defendants and to find qualified experts, such as mitigation specialists.

\* \* \*

[Ms.] Garza further testified that . . . [had Bowen testified,] the defense would have had to allow the [prosecution] to see [the Bio-Psychosocial Report;] that the last sentence of said report sa[id] that "[Petitioner] is just as much a victim as the individuals who lost their lives on January 5, 2003"; that the [prosecution] would have been able to ask [Bowen] about that statement if she had testified; that it depended how that remark would have gone over with the jury, as it could have gone either way; and that [the Life History Outline of Petitioner] show[ed] that the source of most of the information it contain[ed] was either [Petitioner,] his mother, or other members of his family.

(Dkt. No. 90-17 at 301-318 (footnotes and citations omitted)).

### 3. Petitioner's mother and sister

Petitioner's mother and sister generally alleged that they planned to testify in support of Petitioner at his sentencing but were rendered effectively unreachable by Ms. Garza. According to their testimony, Petitioner, through Ms. Garza, encouraged his family to move out of the local area due to safety concerns associated with Petitioner's then-contemplated testimony against other gang members. (Dkt. No. 90-17 at 328-31). Supposedly in response to those exhortations, the family relocated to Corpus Christi. (*Id.* at 328).

## G. State Habeas Court's Findings and Conclusions

After the hearing, the state habeas court ordered the parties to submit proposed findings of fact and conclusions of law on the Initial State Petition. (Dkt. No. 90-15 at 54). On January 5, 2015, Petitioner submitted proposals through counsel. (*Id.* at 57-133). That same day, the State also submitted proposals, totaling over four hundred pages. (Dkt. No. 90-16). Three days later, the state habeas court adopted the State's proposals with little alteration. (Dkt. No. 90-17).

The state habeas court addressed issues raised in the Initial State Petition—as well as several issues raised for the first time in the Second State Petition due to pending questions about their procedural viability. (*See id.* at 279-80). Overall, the state habeas court found the testimony of trial counsel credible and concluded that they provided effective assistance without any conflicts of interest. (*See id.* at 395-407).

As to the unavailability of Petitioner's mother and sister, the state habeas court found that Petitioner was responsible for his family's relocation, and that Ms. Garza was aware of their relocation but faced difficulties contacting them due to the family's failure to provide her with reliable, up-to-date contact information. (*Id.* at 399).

The court also deemed that all claims raising Petitioner's mental health issues had been waived. (*Id.* at 398).

## H. **Habeas Opinion by TCCA**

On October 14, 2015, the TCCA denied habeas relief based on the state habeas court's findings and conclusions and its own review. *Ex parte Ramirez*, 2015 WL 6282336, at *1. The Second State Petition was dismissed for abuse of the writ. *Id.* Judge Alcala issued her concurrence addressing the scope of the withdrawal of the mental health claims. *Id.* at *2.

## VII. STATE DNA ACTION UNDER CHAPTER 64

On October 23, 2015, state habeas counsel filed on Petitioner's behalf a motion for post-conviction DNA testing pursuant to Chapter 64 of the Texas Code of Criminal Procedure before the state district court. (Dkt. No. 89-2 at 19-31). For reference, Chapter 64 authorizes the filing of a motion seeking forensic DNA testing of evidence that was in the possession of the State during trial but was either (i) not previously subjected to DNA testing, or (ii) although previously subjected to DNA testing, can be subjected to testing techniques that provide a reasonable likelihood of results that are more accurate and probative. Tex. Code Crim. Proc. art. 64.01(b).

Petitioner requested DNA testing on two pieces of evidence found at the crime scene: "a black ski mask with the word 'Police' written on it[,]" and "a black knit cap with an '8 Ball' logo on it[.]" *Ramirez*, 621 S.W.3d at 718.

On June 7, 2017, the state district court denied Petitioner's Chapter 64 motion. (Dkt. No. 89-2 at 145). However, the order was entered under an incorrect case number, and the court clerk otherwise failed to serve the order on Petitioner's counsel. (*Id.*). Accordingly, Petitioner did not file an immediate appeal of the denial.

On November 1, 2018, the state district court corrected the errors and entered a superseding order, specifying that this was intended "to allow [Petitioner] an opportunity to appeal the denial of his Chapter 64 motion." (*Id.* at 147).

On May 5, 2021, the TCCA affirmed the denial on appeal, holding that Petitioner—

> ha[d] not established by a preponderance of the evidence that he would not have been convicted if exculpatory results had been obtained through DNA testing of the two items at issue. Given the number of accomplices, murdered victims, party liability, testimony of [two of the victims' aunt,] admitted physical evidence, and [Petitioner's] confession, the hats could not have produced true exculpatory evidence in this case.

*Ramirez*, 621 S.W.3d at 723.

## VIII.  FEDERAL HABEAS PETITION

### A.  Initial Proceedings

On October 30, 2015, only days after the submission of the Chapter 64 motion, the instant case was opened upon the filing of an advisory by state habeas counsel concerning the appointment of federal habeas counsel.  (Dkt. No. 1).  State habeas counsel advised that, although they were statutorily precluded from representing clients in federal habeas actions, they were proceeding expeditiously in Petitioner's case considering the potential lapse of the applicable statute of limitations.  (*Id.* at 1-2).  State habeas counsel further advised that the Capital Habeas Unit of the Federal Public Defender for the District of Arizona had been recruited to take on Petitioner's representation.  (*Id.* at 2-3).

Days later, state habeas counsel moved for the appointment of federal habeas counsel (Dkt. No. 2), and on November 19, 2015, the motion was granted.  (Dkt. No. 4).

On November 30, 2018, federal habeas counsel filed Petitioner's initial federal petition for a writ of habeas corpus.  (Dkt. No. 24).  Federal habeas counsel explained that they were filing the initial petition "to demonstrate continued diligence" and given the uncertainties

associated with the ongoing Chapter 64 litigation in state court.  (*Id.* at 13-14).  The apparent concern was over whether the appeal of the superseding order denying the Chapter 64 motion operated to continue to statutorily toll the federal limitations period.  (*See id.*).

In 2019, this case was stayed and administratively closed while Petitioner litigated the Chapter 64 proceedings.  (Dkt. Nos. 38, 49, 54).

On June 8, 2021, after the TCCA affirmed the denial of the Chapter 64 motion, the Magistrate Judge granted Petitioner's motion to vacate the stay and ordered Petitioner to file an amended petition for habeas relief.  (Dkt. Nos. 56, 62).

## B.  **Petitioner's Grounds for Relief**

On July 15, 2021, federal habeas counsel filed Petitioner's amended federal petition.  (Dkt. No. 67).  As outlined therein, Petitioner raises the following claims for relief, many of which consist of various sub-claims.

    1.    Trial counsel rendered ineffective assistance within the meaning of the Sixth Amendment during the penalty phase of the trial.  (Dkt. No. 67 at 177-251).[4]

        1A.    Trial counsel failed to investigate and present evidence of Petitioner's mental impairments, specifically, his neurodevelopmental disabilities, brain damage, and mental illness.  (*Id.*).

---

[4] Petitioner speaks in terms of a single claim, or Claim 1, in complaining of trial counsel's failure to investigate and present evidence of his "mental health within the context of a broad investigation of his psycho-social history."  (Dkt. No. 67 at 183, 192).  However, the Magistrate Judge has opted to re-label and treat this claim instead as two sub-claims, or Sub-claim 1A and Sub-claim 1B, dealing with counsel's handling of Petitioner's respective mental impairments and psycho-social history.  The intent in doing so is to recognize the distinction previously drawn by Petitioner's own attorneys, recognize Respondent's disparate treatment of the various aspects of Petitioner's claim, and simplify the Magistrate Judge's ensuing legal analysis.  As discussed above, during the state habeas proceedings, state habeas counsel drew an apparent distinction between trial counsel's handling of the mental impairments evidence and psycho-social history insofar as state habeas counsel withdrew any claims involving only the ostensible mental impairments.  That withdrawal, which was accepted by the state habeas court, serves as the basis for Respondent's lack-of-exhaustion defense as to those aspects of Petitioner's claim now being re-labelled under Sub-claim 1A.  Respondent otherwise appears to concede that those aspects of the claim under re-labelled Sub-claim 1B have been fully exhausted and should thus be addressed here on the merits.  These matters are discussed further below in the context of the Magistrate Judge's analysis of the lack-of-exhaustion defense as to Sub-claim 1A.

1B.    Trial counsel failed to investigate and present evidence of Petitioner's psycho-social history, including his socio-economic background, adverse childhood experiences, and gang associations. (*Id.*).

2.    The imposition of the death sentence violates the Eighth Amendment prohibition on cruel and unusual punishment because Petitioner was only 18 years old at the time of the crime. (*Id.* at 252-73).

3.    Trial counsel rendered ineffective assistance during the pre-trial and guilt phases of the trial.[5] (*Id.* at 273-321).

3A.    Ms. Garza labored under a conflict of interest based on her family's representation of Petitioner's co-defendants and her strained relationship with Petitioner. (*Id.* at 278-81).

3B.    Mr. Garza labored under a conflict of interest based on the relationship between Mr. Garza's cousin and Petitioner's sister, B. Ramirez. (*Id.*).

3C.    Trial counsel rendered ineffective assistance for purposes of the suppression proceedings due to their failure to investigate and present evidence of police coercion and the unreliability of Petitioner's interrogation statement. (*Id.* at 281-86).

3D.    Trial counsel rendered ineffective assistance for purposes of the suppression proceedings due to their failure to investigate and present evidence of Petitioner's intoxication at the time of his interrogation and his request for counsel, specifically, the testimony of Petitioner's sister, B. Ramirez, and his friend, J. Garcia. (*Id.* at 286-87).

3E.    Trial counsel rendered ineffective assistance for purposes of the suppression proceedings due to their belated discovery of the recordings of Petitioner's arrest and booking. (*Id.* at 287-88).

3F.    Trial counsel rendered ineffective assistance for purposes of the suppression proceedings due to their failure to investigate and present testimonial evidence of Petitioner's request for counsel during booking. (*Id.* at 288-89).

---

[5] The Magistrate Judge has opted to re-label the numbering or lettering of Petitioner's sub-claims under Claim 3 to simplify the ensuing legal analysis and so that the labeling is consistent with the format and convention used by Petitioner for purposes of his other claims and sub-claims.

3G.     Trial counsel's representation was ineffective during the suppression hearing for their failure to impeach a police witness.  (*Id.* at 289-91).

3H.     Trial counsel rendered ineffective assistance during the suppression hearing for their improper examination of Petitioner.  (*Id.* at 291-92).

3I.     Trial counsel rendered ineffective assistance for purposes of the suppression proceedings due to their failure to investigate and present expert testimony regarding the effects of his intoxication on the reliability of his interrogation statement.  (*Id.* at 292).

3J.     Trial counsel rendered ineffective assistance for purposes of the suppression proceedings due to their failure to adequately investigate and contest the prosecution's evidence.  (*Id.* at 293-95).

3K.     Trial counsel rendered ineffective assistance for their failure to contest the grand jury proceedings.  (*Id.* at 296-97).

3L.     Trial counsel rendered ineffective assistance for their failure to request a change of venue in light of the media attention.  (*Id.* at 297-98).

3M.     Trial counsel rendered ineffective assistance for their inadequate questioning of potential jurors for bias.  (*Id.* at 298-302).

3N.     Trial counsel rendered ineffective assistance for their failure to object to the prosecution's discriminatory peremptory challenges.  (*Id.* at 302-04).

3O.     Trial counsel rendered ineffective assistance for their failure to request continuances.  (*Id.* at 304-06).

3P.     Trial counsel rendered ineffective assistance for purposes of the guilt phase of the trial due to their failure to investigate and present evidence of Petitioner's actual innocence.  (*Id.* at 306-08).

3Q.     Trial counsel rendered ineffective assistance for purposes of the guilt phase of the trial due to their failure to present evidence of the involuntariness, falsity, and unreliability of Petitioner's interrogation statement.  (*Id.* at 308-10).

3R.     Trial counsel rendered ineffective assistance for purposes of the guilt phase of the trial due to their failure to timely object to the prosecution's admission of gruesome photos of the crime scene.  (*Id.* at 310-11).

3S.   Trial counsel rendered ineffective assistance for purposes of the guilt phase of the trial due to their failure to timely object to the admission of Petitioner's statements without English translations.  (*Id.* at 311-12).

3T.   Trial counsel rendered ineffective assistance for purposes of the guilt phase of the trial due to their failure to timely object to the admission of Petitioner's prior bad acts.  (*Id.* at 312).

3U.   Trial counsel rendered ineffective assistance for purposes of the guilt phase of the trial due to their failure to timely object to the admission of the testimonial evidence of Petitioner's gang involvement.  (*Id.* at 312-13).

3V.   Trial counsel rendered ineffective assistance for purposes of the guilt phase of the trial due to their failure to timely object to the indictment, request jury instructions on the requisite culpability for conspiracy, and request special verdict forms for individualized factual findings.  (*Id.* at 313-15).

3W.   Trial counsel rendered ineffective assistance for purposes of the guilt phase of the trial due to their failure to timely object to Petitioner's physical restraints in the courtroom.  (*Id.* at 315-16).

3X.   Trial counsel rendered ineffective assistance for their failure to request a proper record of all pre-trial and guilt-phase proceedings.  (*Id.* at 317-19).

3Y.   The cumulative effect of trial counsel's errors amounted to ineffective assistance for purposes of the pre-trial and guilt phases.  (*Id.* at 319-21).

4.   The trial court committed various constitutional errors during the guilt phase of the trial.  (*Id.* at 321-51).

4A.   The trial court erred under the Sixth and Fourteenth Amendment by appointing unqualified attorneys with conflicts of interest as trial counsel.  (*Id.* at 321-23).

4B.   The trial court violated Petitioner's rights to a fair trial and due process in admitting gruesome photos of the crime scene.  (*Id.* at 323-24).

4C.   The trial court erred under the Fifth, Sixth, and Fourteenth Amendments in requiring Petitioner to be in physical restraints in the courtroom.  (*Id.* at 325-26).

4D.     The trial court erred under the Sixth, Eighth, and Fourteenth Amendments in conducting various proceedings off the record. (*Id.* at 326-27).

4E.     The trial court violated Petitioner's constitutional rights in denying Petitioner's request for new counsel. (*Id.* at 327).

4F.     The trial court erred in denying trial counsel's motion to continue the suppression hearing. (*Id.* at 327-29).

4G.     The trial court erred under the Fifth, Sixth, and Fourteenth Amendment in admitting testimonial evidence of Petitioner's booking inquiry statements. (*Id.* at 329-31).

4H.     The trial court erred in admitting Petitioner's interrogation statements. (*Id.* at 331-34).

4I.     The trial court erred in admitting testimonial evidence of Petitioner's admission to possessing cannabis in his jail cell. (*Id.* at 334-35).

4J.     The trial court erred in denying Petitioner's motion for a new trial. (*Id.* at 335-36).

4K.     The trial court erred in qualifying Detective Alvarez as a gang expert. (*Id.* at 336-37).

4L.     The trial court erred in admitting evidence linking Petitioner to another crime. (*Id.* at 337).

4M.     The trial court erred in ordering Petitioner to demonstrate his tattoos to the jury. (*Id.* at 338-40).

4N.     The trial court erred under the Sixth, Eighth, and Fourteenth Amendments in excluding Dr. K. Allen's testimony. (*Id.* at 340-41).

4O.     The trial court erred under the Sixth, Eighth, and Fourteenth Amendments in its exclusion of venirepersons for cause. (*Id.* at 342-44).

4P.     The trial court erred under the Fifth and Fourteenth Amendments and Texas law in giving an improper jury instruction on the voluntariness of confessions. (*Id.* at 344-48).

4Q.     The trial court erred under the Sixth, Eighth, and Fourteenth Amendments for its failure to use special verdict forms. (*Id.* at 348-50).

4R.     The cumulative effect of the trial court's errors prejudiced Petitioner. (*Id.* at 350-51).

5.   The trial judge was biased against Petitioner in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*Id.* at 351-53).

6.   Petitioner was denied the right to confront a witness against him in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*Id.* at 353-55).

7.   Petitioner is actually innocent. (*Id.* at 355-59).

8.   The prosecution engaged in misconduct throughout the proceedings in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*Id.* at 359-85).

8A.     The prosecution engaged in misconduct when it delayed the disclosure of the existence of the video recording of Petitioner's arrest until after the suppression hearing. (*Id.* at 361-63).

8B.     The prosecution engaged in misconduct when it spoliated, or allowed the police to spoliate, the video recording of Petitioner's arrest. (*Id.* at 363).

8C.     The prosecution engaged in misconduct when it presented false testimony at the suppression hearing. (*Id.* at 364-67).

8D.     The prosecution engaged in misconduct when it concealed exculpatory evidence provided by Petitioner's co-defendant, M. Bocanegra. (*Id.* at 367-74).

8E.     The prosecution engaged in misconduct when it failed to disclose the conditions of the TYC facilities. (*Id.* at 375-79).

8F.     The prosecution engaged in misconduct when it improperly requested to limit the jury's consideration of Petitioner's mitigating evidence. (*Id.* at 379-81).

8G.     The prosecution engaged in misconduct when it made improper comments in closing arguments. (*Id.* at 381-83).

8H.     The prosecution engaged in various incidents of misconduct. (*Id.* at 383-84).

8I. The cumulative effect of the prosecutorial misconduct prejudiced Petitioner. (*Id.* at 384-85).

9. Juror misconduct during both phases of trial deprived Petitioner of his rights to a fair and impartial jury, the assistance of counsel, confrontation, equal protection, and a fair trial. (*Id.* at 385-87).

10. The trial jury instructions violated Petitioner's rights to a reliable sentence and to due process under the Eighth and Fourteenth Amendments. (*Id.* at 388-94).

   10A. The mitigation special issue instruction inadequately defined mitigating evidence. (*Id.* at 388-91).

   10B. The future dangerousness special issue instruction is unconstitutionally vague. (*Id.* at 391-94).

11. Petitioner's sentence was based in part on an invalid murder conviction in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments. (*Id.* at 394-96).

12. The evidence is factually and legally insufficient to support Petitioner's conviction and sentence. (*Id.* at 397-99).

13. Appellate counsel rendered ineffective assistance in violation of the Sixth Amendment. (*Id.* at 399-04).

14. The [TCCA] prohibited Petitioner from raising sufficiency-of-the-evidence claims on direct appeal regarding the mitigation special issue in violation of the Eighth and Fourteenth Amendments. (*Id.* at 404-06).

15. State habeas counsel rendered ineffective assistance under the Sixth Amendment. (*Id.* at 406-11).

16. The state court violated Petitioner's due process rights by denying his motion to test DNA evidence. (*Id.* at 412-16).

17. Petitioner's death sentence is unconstitutional. (*Id.* at 416-70).

   17A. Petitioner's death sentence is unconstitutional because he is mentally ill. (*Id.* at 416-21).

   17B. Petitioner's death sentence is unconstitutional because it is inconsistent with societal standards. (*Id.* at 422-39).

17C.  Petitioner's death sentence is unconstitutional due to the arbitrariness of the Texas death penalty scheme.  (*Id.* at 439-43).

17D.  Petitioner's death sentence is unconstitutional due to the length of time Petitioner has spent on death row.  (*Id.* at 443-49).

17E.  Petitioner's death sentence is unconstitutional because his mental impairments reduce his culpability.  (*Id.* at 449-52).

17F.  Petitioner's death sentence is unconstitutional due to the statutory omission of deadlock instructions.  (*Id.* at 452-57).

17G.  Petitioner's death sentence violates the Eighth Amendment because Texas law does not require that the mitigation special issue be proven beyond a reasonable doubt.  (*Id.* at 457-60).

17H.  Petitioner's death sentence is unconstitutional due to the statutory limitation on the definition of mitigating evidence.  (*Id.* at 461-63).

17I.  Petitioner's death sentence violates the Fifth and Eighth Amendments because Texas law does not require a proportionality review.  (*Id.* at 463-64).

17J.  Petitioner's death sentence violates the Eighth Amendment because Texas law does not adequately narrow the class of persons eligible for death penalty.  (*Id.* at 465-67).

17K.  Petitioner's death sentence violates the Eighth Amendment because Texas law allows for excessive prosecutorial discretion to seek the death penalty.  (*Id.* at 467-68).

17L.  Petitioner's death sentence violates the Eighth Amendment because Texas law allows for a capital murder conviction based on the application of the law of parties.  (*Id.* at 469-70).

18.  Texas' lethal injection protocol violates the Eighth Amendment's prohibition on cruel and unusual punishment.  (*Id.* at 470-73).

19.  Cumulative prejudice requires habeas relief as to Petitioner's conviction and sentence.  (*Id.* at 473-75).

Claim 15 has since been withdrawn by federal habeas counsel through subsequent reply briefing and will not be discussed further.  (Dkt. No. 103 at 259-60).  Petitioner initially raised ineffective assistance of state habeas counsel as both an exception to the application of the

procedural bar with respect to certain claims and as this standalone claim for federal habeas relief. (Dkt. No. 67 at 406-11). Petitioner now concedes, however, that established law does not recognize ineffective assistance of habeas counsel as an actionable claim. (Dkt. No. 103 at 259-60). Indeed, the Fifth Circuit has stated that a separate claim of ineffective assistance of state habeas counsel "is a nonstarter, for there is no freestanding right to *any* assistance of counsel in state habeas proceedings, let alone to *effective* assistance of counsel in such proceedings." *Francois v. Lumpkin*, 2022 WL 2357086, at *2 (5th Cir. 2022) (per curiam) (emphasis in original) (citing *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)).

### C. <u>Cross-Motions and Subsequent Briefing</u>

On July 19, 2022, Respondent filed the Summary Judgment Motion. (Dkt. No. 91). Thereby, Respondent raises several affirmative defenses. To begin, Respondent moves for the dismissal of the Petition on grounds that it was filed outside the applicable limitations period. Respondent contends that many of the claims are barred from federal review due to either lack of exhaustion, insofar as Petitioner failed to previously raise them in state court, or procedural default for their dismissal based on state procedural grounds. As to any claims that were adjudicated on the merits by the TCCA, Respondent argues that the denial of such claims is subject to deference by this court under the standards articulated by the AEDPA.

On February 13, 2023, Petitioner filed the Cross-Motion. (Dkt. No. 103). Through that filing, Petitioner responds to some—but not all—of Respondent's affirmative defenses, albeit without extensive discussion of the applicable standards. Nor does Petitioner discuss which individual claims are subject to summary relief in his favor. Instead, Petitioner appears to challenge Respondent's arguments about the application of the AEDPA's deferential standards and procedural law. (*See, e.g.*, *id.* at 2, 10-13).

On March 13, 2023, Respondent filed a reply and response to the briefs.  (Dkt. No. 109).

On April 19, 2023, Petitioner filed a reply.  (Dkt. No. 112).

## IX.  LEGAL STANDARDS

### A.  Collateral Review Under § 2254

Pursuant to 28 U.S.C. § 2254, as amended by the AEDPA, federal courts may grant habeas corpus relief to persons in state custody.  Section 2254(d) provides in part as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

For purposes of determining disputed questions of law under subsection (d)(1), a state court decision is "contrary to" clearly established federal law if it reaches a conclusion opposite to that reached by the Supreme Court on a question of law or if it arrives at a different result than the Supreme Court did on a set of materially indistinguishable facts.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  An "unreasonable application" of federal law occurs where "the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.  This is an "objective unreasonableness" standard, such that "a federal habeas court may not issue the writ simply because [it] concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 409, 411.  A petitioner

must show, instead, that the state court's ruling on their claim was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.[6]  *Woods v. Donald*, 575 U.S. 312, 316 (2015) (per curiam) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)) (quotations omitted).  In conducting a review under subsection (d)(1), the factual record is limited to that before the state courts, even in the case of a summary opinion.  *See Woodfox v. Cain*, 772 F.3d 358, 368 (5th Cir. 2014) (citing *Cullen v. Pinholster*, 563 U.S. 170, 180-82, 187-88 (2011)).

"When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington*, 562 U.S. at 99.  There is no requirement that a state court write an opinion explaining its reasoning.  *Id.* at 98.  "For such a situation, [the federal habeas court]: (1) assumes that the state court applied the proper 'clearly established Federal law'; and (2) then determines whether its decision was 'contrary to' or 'an objectively unreasonable application of' that law."  *Schaetzle v. Cockrell*, 343 F.3d 440, 443 (5th Cir. 2003) (quoting *Catalan v. Cockrell*, 315 F.3d 491, 493 & n.3 (5th Cir. 2002)).  Otherwise, a federal habeas court will look to the last reasoned state court opinion.  *See Salts v. Epps*, 676 F.3d 468, 479 (5th Cir. 2012).

---

[6] Petitioner generally argues that the AEDPA is unconstitutional insofar as the "objectively unreasonable" standard suspends the writ of habeas corpus and violates the principle of separation of powers.  (*See* Dkt. No. 67 at 166-70).  According to Petitioner, the standard suspends the writ because it "prevents federal courts in certain circumstances from granting relief even when a conviction or sentence is unconstitutional[.]"  (*Id.* at 168).  The standard also violates the separation-of-powers doctrine, Petitioner continues, to the extent that Congress is "robbing" the writ, and thus the courts, of the "power to remedy constitutional wrongs."  (*Id.* at 169-70).  The Fifth Circuit, however, has repeatedly rejected such arguments and otherwise held that the AEDPA is constitutional.  *See Cobb v. Thaler*, 682 F.3d 364, 737-77 (5th Cir. 2012); *see also Rivas v. Thaler*, 432 F. App'x 395, 406 (5th Cir. 2011) (per curiam); *Dufrene v. Brazoria Cnty. Dist. Att'y Off.*, 146 F. App'x 715, 716-17 (5th Cir. 2005) (per curiam); *Clark v. Thaler*, 2009 WL 3614455, at *3 (N.D. Tex. Oct. 30, 2009) (collecting cases).

Insofar as the interpretation of state law is concerned, "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions[,]" such that "a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).   In terms of disputed factual findings under subsection (d)(2), a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (citing 28 U.S.C. § 2254(d)(2)).

Pursuant to 28 U.S.C. § 2254(e)(1), any factual findings by the state court are presumed correct unless rebutted by the petitioner through clear and convincing evidence. *Blue v. Thaler*, 665 F.3d 647, 654 (5th Cir. 2011) (citing 28 U.S.C. § 2254(e)(1)).   Clear and convincing evidence leaves a reasonable factfinder firmly convinced that the factual contentions are highly probable. *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).   This standard requires evidence that decisively tilts the evidentiary scales in favor of the petitioner, outweighing any opposing evidence. *See id.*   Falling short of meeting this standard is evidence that merely raises "debatable inferences" about the underlying facts, especially when it comes to credibility determinations. *See Neal v. Vannoy*, 78 F.4th 775, 783 (5th Cir. 2023); *id.* at 787 (citing *Rice v. Collins*, 546 U.S. 333, 342 (2006)); *id.* at 788 n.6 (quoting *Kinsel v. Cain*, 647 F.3d 265, 270 n.17 (5th Cir. 2011)). Section 2254(e)(1)'s presumption of correctness applies even where the state court adopts proposed findings by the party opposing habeas relief.[7]   *See Basso v. Stephens*, 555 F. App'x 335, 342 (5th Cir. 2014) (per curiam).

---

[7] Petitioner raises the global argument that the presumption of correctness should not apply here insofar as the state habeas court conducted an "uncritical" review of the State's proposed factual findings and adopted those proposed findings "nearly verbatim." (*See* Dkt. No. 67 at 170-75).   Petitioner points out that, "in both the proposed ordered and signed orders[,] Judge Gonzalez refer[red] to himself numerous

"[A] state court's factual determination is 'not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Woodfox*, 772 F.3d at 368 (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). This presumption applies not only to express factual findings, but also to implicit or unarticulated findings which are necessary to the state court's conclusions of mixed law and fact. *Murphy v. Davis*, 901 F.3d 578, 597 (5th Cir. 2018) (quoting *Valdez v. Cockrell*, 274 F.3d 941, 948 n.11 (5th Cir. 2001)) (quotations omitted). In conducting this factual determination, a federal habeas court is necessarily limited, by the language of subsection (d)(2) itself, to a review of the state court factual record. *Blue*, 665 F.3d at 656 (citing *Pinholster*, 563 U.S. at 185 n.7).

Even if a specific finding of fact is found erroneous by clear and convincing evidence under § 2254(e)(1), such finding does not necessarily invalidate the reasonableness of the state court's overall factual determination under § 2254(d)(2). *See Valdez*, 274 F.3d at 951 n.17; *see also Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022).

Claims presenting mixed questions of law and fact are reviewed under a hybrid analysis, such that a state court's legal conclusions are reviewed under § 2254(d)(1), while the underlying factual findings are reviewed under § 2254(d)(2) and (e)(1). *Neal*, 78 F.4th at 783.

---

times as 'Judge Ramirez[,]'" and that "both the proposed and signed orders repeatedly refer[red] to an expert witness retained during state habeas proceedings, Dr. Gilbert Martinez, as 'Dr. Ramirez.'" (*Id.* at 171-72). In support of his position, Petitioner cites to cases such as *Jefferson v. Upton*, 560 U.S. 284 (2010) (per curiam). In *Upton*, the Supreme Court remanded a capital habeas case over the question of whether the state habeas court's findings should have been entitled to a presumption of correctness where the state habeas court adopted proposed findings "drafted exclusively by the attorneys for the State pursuant to an ex parte request" and there was evidence of the non-critical adoption of those findings insofar as the findings "recounted evidence from a nonexistent witness." *Id.* at 292-94. To begin, the instant case is distinguishable from *Upton* because, rather than make an ex parte request from the State, the state habeas court requested proposed findings from both parties. (Dkt. No. 90-15 at 54, 57-133; Dkt. No. 90-16). Moreover, while the adopted findings contained some apparent oversights, none of these were substantive in nature, such as the review of evidence that was never even entered into the record. Regardless, the cases cited by Petitioner each involve the review of habeas decisions based on pre-AEDPA standards. Since the AEDPA's inception, "[t]he Fifth Circuit has repeatedly rejected the argument that habeas findings adopted verbatim from those submitted by the state court are not entitled to deference." *Cole v. Lumpkin*, 2021 WL 4067212, at *4 n.3 (S.D. Tex. Sept. 7, 2021) (collecting cases).

**B.  <u>Statute of Limitations</u>**

    **1.  One-year period**

A federal habeas corpus petition filed after April 24, 1996, the effective date of the AEDPA, is subject to a one-year limitations period found in 28 U.S.C. § 2244(d).  *See Flanagan v. Johnson*, 154 F.3d 196, 198 (5th Cir. 1998).

Pursuant to § 2244(d)(1), the limitations period runs from the latest of four dates:

(A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;

(B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

The most typical start date is that under subsection (d)(1)(A), or the date on which the judgment becomes "final."  *See id.* § 2244(d)(1)(A).  A judgment becomes final when the Supreme Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari.  *Jimenez v. Quarterman*, 555 U.S. 113, 119 (2009) (quoting *Clay v. United States*, 537 U.S. 522, 527, 528-32 (2003)) (quotations omitted).  If a federal prisoner chooses not to seek direct review before the Supreme Court, then the conviction becomes final when the time for filing a certiorari petition expires.  *Id.* (quoting *Clay*, 537 U.S. at 527) (quotations omitted).

## 2. **Statutory tolling**

Where certain circumstances are met, the limitations period is automatically subject to statutory tolling. Section 2244(d)(2) provides that "[t]he time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under [subsection (d).]" 28 U.S.C. § 2244(d)(2). A state habeas application made pursuant to Article 11.071 of the Texas Code of Criminal Procedure qualifies as an application for post-conviction review. *See Ramirez v. Davis*, 2019 WL 4454399, at *1 (S.D. Tex. July 22, 2019), *report and recommendation adopted*, 2019 WL 4451372 (S.D. Tex. Sept. 17, 2019) (Alvarez, J.). Also falling within the scope of this statutory tolling provision is a motion for post-conviction DNA testing pursuant to Chapter 64 of the Texas Code of Criminal Procedure. *Hutson v. Quarterman*, 508 F.3d 236, 240 (5th Cir. 2007) (per curiam).

A state post-conviction application initiates statutory tolling only if it is properly filed and remains pending. *Leonard v. Deville*, 960 F.3d 164, 168 (5th Cir. 2020). An application is "properly filed" if it conforms with a state's procedural filing requirements, *Villegas v. Johnson*, 184 F.3d 467, 470 (5th Cir. 1999), or "those prerequisites that must be satisfied before a state court will allow a petition to be filed and accorded some level of judicial review[,]" *id.* at 470 n.2. An application that is not properly filed will not toll the limitations period. *See Davis v. Quarterman*, 342 F. App'x 952, 953 (5th Cir. 2009) (per curiam). A state court's ruling as to whether an application is properly filed is generally dispositive. *See Koumjian v. Thaler*, 484 F. App'x 966, 968 (5th Cir. 2012) (per curiam).

Although the federal courts "are sensitive to state law when determining whether a motion is still 'pending,' federal law still determines the time limits under AEDPA." *Lookingbill*

*v. Cockrell*, 293 F.3d 256, 262 (5th Cir. 2002), *cert. denied*, 537 U.S. 1116 (2003).   In the context of § 2244(d)(2), a state habeas application is pending as long as the ordinary state collateral review process is "in continuance," or, in other words, until the application has achieved final resolution through the State's post-conviction procedures.   *Grillette v. Warden, Winn Corr. Ctr.*, 372 F.3d 765, 769 (5th Cir. 2004) (quoting *Carey v. Saffold*, 536 U.S. 214, 219-20 (2002)) (quotations omitted).   Included in this period are the day the application is filed and the day on which it is decided.   *Windland v. Quarterman*, 578 F.3d 314, 315 (5th Cir. 2009).

Irrelevant for purposes of statutory tolling, however, is a state habeas application filed after the limitations period under the AEDPA has already expired.   *Scott v. Johnson*, 227 F.3d 260, 263 (5th Cir. 2000).

### 3. Equitable tolling

The limitations period is not jurisdictional and thus subject to equitable tolling.   *Holland v. Florida*, 560 U.S. 631, 645 (2010).   Equitable tolling is available only where the petitioner bears the burden of showing (i) the diligent pursuit of their rights, and (ii) that some extraordinary circumstance stood in their way and prevented timely filing.   *Mathis v. Thaler*, 616 F.3d 461, 474 (5th Cir. 2010) (quoting *Holland*, 560 U.S. at 649) (quotations omitted).   "Courts must consider the individual facts and circumstances of each case in determining whether equitable tolling is appropriate."   *Alexander v. Cockrell*, 294 F.3d 626, 629 (5th Cir. 2002) (per curiam) (citing *United States v. Patterson*, 211 F.3d 927, 931 (5th Cir. 2000) (per curiam)).

The diligence required for equitable tolling "is 'reasonable diligence,' not 'maximum feasible diligence.'"   *Manning v. Epps*, 688 F.3d 177, 183 (5th Cir. 2012) (quoting *Holland*, 560 U.S. at 653).   In establishing diligence, a petitioner must refer to specific actions taken in pursuit of their rights, such as circumstances that they attempted to contact counsel for information and

documents, requested documents from the clerk of court, or sought new counsel.  *See Holland*, 560 U.S. at 653; *see also United States v. Barnes*, 2020 WL 6931287, at *2 (M.D. La. Nov. 24, 2020).  Waiting too long to act, however, may cut against the petitioner.  *See Haarmann v. Thaler*, 2011 WL 5155705, at *4 (S.D. Tex. Oct. 28, 2011).  A petitioner must exercise diligence even if they receive inadequate legal representation, are abandoned by counsel, or otherwise fail to hear from counsel about the status of their case.  *See Manning*, 688 F.3d at 184 n.2, 185-86.

As for extraordinary circumstances, a garden variety claim of excusable neglect, such as a simple miscalculation that leads to a missed filing deadline, does not suffice.  *Holland*, 560 U.S. at 651-52 (citations and quotations omitted); *see also Cousin v. Lensing*, 310 F.3d 843, 849 (5th Cir. 2002) ("[M]ere attorney error or neglect is not an extraordinary circumstance . . . ."), *cert. denied*, 539 U.S. 918 (2003).  "A petitioner's failure to satisfy the statute of limitations must result from external factors beyond [their] control; delays of the petitioner's own making do not qualify."  *In re Wilson*, 442 F.3d 872, 875 (5th Cir. 2006) (per curiam).  Typically, the petitioner must show they were actively misled about or prevented from asserting their rights.  *See Patterson*, 211 F.3d at 930.

## C.  **Exhaustion of Remedies**

### 1.  **Presentation of claims**

A petitioner "must exhaust all available state remedies before [they] may obtain federal habeas corpus relief."  *Sones v. Hargett*, 61 F.3d 410, 414 (5th Cir. 1995).  Section 2254(b) provides in this regard as follows:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
> (A)   the applicant has exhausted the remedies available in the courts of the State; or

(B)(i)   there is an absence of available State corrective process; or

(ii)   circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1).

A petitioner has "exhausted" their state remedies where they have fairly presented the substance of their claims to the state courts.  *Vela v. Estelle*, 708 F.2d 954, 958 (5th Cir. 1983) (citing *Picard v. Connor*, 404 U.S. 270, 278 (1971)).  Generally, this requires presenting those claims to the highest court of the state on either direct or collateral review.  *See Busby v. Dretke*, 359 F.3d 708, 723 (5th Cir. 2004).

"To determine whether a § 2254 petitioner has exhausted a claim, [their] federal claim should be compared with the claim [they] raised in state court."  *Loynachan v. Davis*, 766 F. App'x 156, 159 (5th Cir. 2019) (citing *Woodfox v. Cain*, 609 F.3d 774, 790 (5th Cir. 2010)).  It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.  *Wilder v. Cockrell*, 274 F.3d 255, 259 (5th Cir. 2001) (quoting *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (per curiam)) (quotations omitted).  The claim in state court must specify both the same legal and factual bases as the subsequent federal claim.  *Lucio v. Lumpkin*, 987 F.3d 451, 464 (5th Cir. 2021).  "Greater specificity or better framing of a claim in the federal application as compared to the state petition does not necessarily render the claim unexhausted."  *Vollmer v. Davis*, 673 F. App'x 406, 410 (5th Cir. 2016) (per curiam).  A claim is deemed unexhausted where it is based on a new legal theory distinct from that relied upon in the state court.  *Nickleson v. Stephens*, 803 F.3d 748, 753 (5th Cir. 2015) (quoting *Wilder*, 274 F.3d at 259) (quotations omitted).  A petitioner will not

have exhausted available state remedies if they have the right under state law to raise, by any available procedure, the question presented. 28 U.S.C. § 2254(c).

### 2. Exceptions

Unexhausted claims cannot provide the basis for habeas relief unless there is an applicable exhaustion exception, or the state waives an exhaustion defense. *See Mercadel v. Cain*, 179 F.3d 271, 276-77 (5th Cir. 1999) (per curiam).

District courts—subject to appellate review—may assess case-specific facts to determine if exceptional circumstances warrant deviation from the general rule against the federal review of unexhausted claims. *Frisbie v. Collins*, 342 U.S. 519, 521 (1952). Exceptional circumstances may exist "if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief." *Graham v. Johnson*, 94 F.3d 958, 969 (5th Cir. 1996) (per curiam) (quoting *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)) (internal quotations omitted).

The exhaustion requirement is not jurisdictional and, thus, may be waived by the respondent. *Divers v. Cain*, 698 F.3d 211, 215 (5th Cir. 2012). The waiver of an exhaustion defense must be express and made through counsel. 28 U.S.C. § 2254(b)(3). Notwithstanding the lack of exhaustion, a federal court may deny a petition on the merits. 28 U.S.C. § 2254(b)(2).

### 3. Mixed petitions

A § 2254 petition containing both exhausted and unexhausted claims is considered a "mixed" petition. *Alexander v. Johnson*, 163 F.3d 906, 908 (5th Cir. 1998). A mixed petition must ordinarily be dismissed without prejudice unless there is an absence of available State corrective process or circumstances exist that render such process ineffective to protect the rights of the applicant. *Id.* (quoting 28 U.S.C. § 2254(b)(1)(B)) (quotations omitted). A federal district

court should generally stay, rather than dismiss, a mixed habeas petition to allow the presentation of unexhausted claims in state court if: (i) the petitioner had good cause for his failure to exhaust; (ii) the unexhausted claims are potentially meritorious; and (iii) there is no indication that the petitioner engaged in intentionally dilatory or abusive litigation tactics. *Rhines v. Weber*, 544 U.S. 269, 278 (2005) (citing *Rose v. Lundy*, 455 U.S. 509, 522 (1982)). Otherwise, a federal district court may dismiss a mixed petition on the merits if doing so serves the principles of comity and federalism. *See Campos v. Johnson*, 958 F. Supp. 1180, 1187 (W.D. Tex. 1997).

### 4. Presentation of evidence

A federal habeas court generally may not consider new evidence to support a claim if the petitioner is responsible for failing to develop the factual basis of that claim in the state courts. *See Shinn v. Ramirez*, 596 U.S. 366, 381-82 (2022). New evidence may be considered only if:

    (A)   the claim relies on—

          (i)   a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or

          (ii)  a factual predicate that could not have been previously discovered through the exercise of due diligence; and

    (B)   the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2). "[E]ven if all these requirements are satisfied, a federal habeas court still is not *required* to hold a hearing or take any evidence[,]" which decision "must be informed by principles of comity and finality . . . ." *Shinn*, 596 U.S. at 381-82 (emphasis in original).

#### D.  **Procedural Default**

##### 1.  **State procedural grounds**

Pursuant to the procedural default doctrine, federal habeas relief from state convictions is generally unavailable on claims that are barred under state law because of a petitioner's failure to comply with state procedural rules.  *Webb v. Blackburn*, 773 F.2d 646, 648 (5th Cir. 1985) (citing *Wainwright v. Sykes*, 433 U.S. 72, 86-91 (1977)).  For the doctrine to apply, the last state court rendering a judgment in the case must "clearly and expressly" state that the judgment rests on a state procedural bar.  *Harris v. Reed*, 489 U.S. 255, 263 (1989); *see also Amos v. Scott*, 61 F.3d 333, 338 (5th Cir. 1995).  That bar must be independent and adequate, meaning that it (i) must not "rest primarily on federal law" or "be interwoven with the federal law" and (ii) must be "strictly or regularly followed by the cognizant state court."  *Amos*, 61 F.3d at 338-39.  Where a claim was denied on appellate or collateral review by a state court in express reliance on a state procedural rule, a federal court presumes the rule's independence and adequacy, absent a showing by the petitioner that the rule is not strictly or regularly applied.  *See Roberson v. Stephens*, 614 F. App'x 124, 133 (5th Cir. 2015) (per curiam) (citing *Sones*, 61 F.3d at 416).  A state doctrine that is not regularly applied is not entitled to respect as an independent and adequate state ground for denial of relief.  *See Lowe v. Scott*, 48 F.3d 873, 876 (5th Cir. 1995).

In Texas, the failure to raise record-based claims on direct appeal generally bars them from state habeas review.  *Dorsey v. Quarterman*, 494 F.3d 527, 532 (5th Cir. 2007) (citing *Ex parte Gardner*, 959 S.W.2d 189, 191 (Tex. Crim. App. 1996), *clarified on reh'g*, (Feb. 4, 1998)).  Such failure constitutes an independent and adequate state law ground barring federal habeas review.  *See id.*  Similarly, claims not raised through an initial state habeas petition are generally barred from federal collateral review insofar as Texas law generally does not permit successive

petitions.  *See Canales v. Stephens*, 765 F.3d 551, 564-66 (5th Cir. 2014); *see also Neville v. Dretke*, 423 F.3d 474, 480 (5th Cir. 2005) (citing Tex. Code Crim. Proc. art. 11.071 § 5(a)).

### 2. Exceptions

When a claim is procedurally defaulted, federal habeas review is barred unless the petitioner (i) shows cause for the default and actual prejudice as a result of the alleged violation of federal law, or (ii) demonstrates that failure to consider the claim will result in a fundamental miscarriage of justice.  *Coleman v. Thompson*, 501 U.S. 722, 749-50 (1991).

### a. Cause and prejudice

A showing of cause requires that some objective factor, external to the defense, that impeded counsel's efforts to comply with the state's procedural rule.  *Smith v. Quarterman*, 515 F.3d 392, 403 (5th Cir. 2008) (citing *Murray v. Carrier*, 477 U.S. 478, 488 (1986)).  Such objective factors may include: (i) interference by officials that make compliance with the procedural rule impracticable; (ii) a showing that the factual or legal basis for the claim was not reasonably available to counsel at the prior occasion; and (iii) ineffective assistance of counsel in the constitutional sense.  *Castrellon v. United States*, 2022 WL 817076, at *6 (W.D. Tex. Mar. 17, 2022) (citing *Murray*, 477 U.S. at 488).

The Supreme Court's recent cases of *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013), recognize that the lack of the effective assistance of state habeas counsel may constitute "cause" to forgive the procedural default of a claim for the ineffective assistance of trial counsel.  *See Shinn*, 596 U.S. at 380.  For the *Martinez-Trevino* exception to apply, state law must either (i) require that claims of ineffective assistance be raised for the first time on collateral review, *Martinez*, 566 U.S. at 17, or (ii) effectively ban ineffective assistance claims on appellate review as a matter of procedural design and systematic operation, *Trevino*,

569 U.S. at 429.   Texas law has been recognized to effectively ban claims of ineffective assistance on appellate review.  *Id.* at 428.

The movant must also show "actual prejudice" from the error, or that the error worked to the movant' s actual and substantial disadvantage, infecting the entire proceeding with error of constitutional dimensions.  *Canales*, 765 F.3d at 562 (quoting *United States v. Frady*, 456 U.S. 152, 167, 170 (1982)) (quotations omitted).

### b.  Miscarriage of justice—Actual innocence

A fundamental miscarriage of justice meets the cause-and-prejudice standard.  *Engle v. Isaac*, 456 U.S. 107, 135 (1982).  In a non-capital case, this exception applies only when a petitioner is actually innocent of the offense of conviction.  *Sawyer v. Whitley*, 505 U.S. 333, 339-40 (1992).  Actual innocence, for such purposes, means factual innocence, not mere legal insufficiency.  *Bousley v. United States*, 523 U.S. 614, 623-624 (1998) (citing *Sawyer*, 505 U.S. at 339).  Capital cases, however, present a unique and more expansive definition of actual innocence.  Through *Sawyer v. Whitley*, 505 U.S. 333 (1992), the Supreme Court held that, in the death penalty context, actual innocence means, not only innocence of the underlying offense, but also "innocence of the death penalty," meaning ineligibility for execution.  *Id.* at 336.  To successfully invoke actual innocence, a petitioner must present new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial.  *House v. Bell*, 547 U.S. 518, 537 (2006) (quoting *Schlup v. Delo*, 513 U.S. 298, 324 (1995)) (quotations omitted).

While the Fifth Circuit has not decided what affirmatively constitutes "new" evidence, various cases "have explained what does not." *Hancock v. Davis*, 906 F.3d 387, 389-90 (5th Cir. 2018).  The Fifth Circuit has observed that evidence does not qualify as new if it was always

within the reach of the petitioner's personal knowledge or reasonable investigation. *Id.* at 390

(quoting *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008)) (quotations omitted); *see also*

*Lucas v. Johnson*, 132 F.3d 1069, 1074 (5th Cir. 1998) (holding that evidence was neither new

nor newly discovered because its essence and character were presented, or available for

presentation, to the jury).

Because actual innocence refers here to factual innocence, the respondent is not limited to

the existing record to rebut any showing that petitioner might make but, rather, may present any

admissible evidence of the petitioner's guilt, even if that evidence was not presented during the

state proceedings. *Bousley*, 523 U.S. at 624.

A petitioner raising actual innocence to overcome a procedural bar faces distinct burdens

of proof depending on whether they are challenging their conviction or an aspect of their

sentencing.  A challenge to an underlying conviction is subject to the "more likely than not"

standard, *Calderon v. Thompson*, 523 U.S. 538, 559-60 (1998) (citing *Schlup*, 513 U.S. at 327),

whereas challenging a special circumstance for death penalty eligibility demands the "clear and

convincing evidence" standard, even if the special circumstance is an element of the underlying

conviction, *id.* (citing *Sawyer*, 505 U.S. at 348).

It must be emphasized that actual innocence is not itself a basis for relief, *Foster v*

*Quarterman*, 466 F.3d 359, 367 (5th Cir. 2006), but rather "a gateway to consideration of claims

of constitutional error that otherwise would be barred from review[,]" *United States v. Scruggs*,

691 F.3d 660, 671 (5th Cir. 2012).

## E.  Ineffective Assistance of Counsel

An ineffective-assistance-of-counsel claim is analyzed according to the Supreme Court's

two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984):

> First, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Id.* at 687.  Thus, under *Strickland*, the petitioner must show that counsel's performance was both (i) deficient and (ii) prejudicial.

## 1. Deficient performance

Counsel's performance is deficient where it falls below an objective standard of reasonableness.  *Id.* at 687-88.  In reviewing this *Strickland* factor, "every effort [is] made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689.  A reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*  Counsel will be "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.* at 690.  A court will not second-guess strategic decisions or fault counsel for deviations from best practices.  *Premo v. Moore*, 562 U.S. 115, 122 (2011) (quoting *Strickland*, 466 U.S. at 689) (quotations omitted).  Rather, the court looks to whether the attorney was incompetent under prevailing professional norms.  *Id.* (quoting *Strickland*, 466 U.S. at 690) (quotations omitted).  Moreover, the reasonableness of counsel's conduct must be viewed as of the time of that conduct, *Maryland v. Kulbicki*, 577 U.S. 1, 4 (2015) (per curiam), such that it is based on the law in place when the ostensible error occurred, *see United States v. Webster*, 392 F.3d 787, 796-97 (5th Cir. 2004).  There is no duty of counsel to anticipate changes in the law.  *United States v. Fields*, 565 F.3d 290, 296 (5th Cir. 2009).

A capital case imposes more exacting burdens on counsel.  The Constitution does not require defense counsel to present mitigating evidence in every case.  *Wiggins v. Smith*, 539 U.S. 510, 533 (2003).  However, "in the context of a capital sentencing proceeding, defense counsel has the obligation to conduct a 'reasonably substantial, independent investigation' into potential mitigating circumstances."  *Neal v. Puckett*, 286 F.3d 230, 236-37 (5th Cir. 2002) (per curiam) (quoting *Baldwin v. Maggio*, 704 F.2d 1325, 1332-33 (5th Cir. 1983)).  Indeed, "[a] cursory effort will not suffice; defense counsel must deeply probe a defendant's background, extensively exhaust various avenues of investigation, and seriously consider potentially mitigating themes."  *Charles v. Thaler*, 2011 WL 5040438, at *5 (S.D. Tex. Oct. 24, 2011), *aff'd sub nom. Charles v. Stephens*, 736 F.3d 380 (5th Cir. 2013) (per curiam).

### 2. Prejudice

To demonstrate prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Strickland*, 466 U.S. at 694.  A reasonable probability means "a probability sufficient to undermine confidence in the outcome."  *Id.*  This showing is specific to the stage of the proceedings in which the deficient performance is alleged to have occurred.

For example, a movant who alleges that counsel failed to make a reasonable investigation "must allege with specificity what the investigation would have revealed and how it would have altered the outcome of the [case.]"  *United States v. Green*, 882 F.2d 999, 1003 (5th Cir. 1989).  In raising the failure to call a witness, the movant "must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense."  *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009).  Ineffective assistance at

sentencing generally requires the showing of a reasonable probability of a lesser sentence. *United States v. Ayers*, 2010 WL 2487072, at *9 (S.D. Tex. June 14, 2010) (citing *United States v. Grammas*, 376 F.3d 433, 438-39 (5th Cir. 2004)).

In the context of an appeal, where the ineffective assistance is based on counsel's failure to raise an issue, the movant must show that the appeal would have had, with reasonable probability, a different outcome if the attorney adequately addressed the issue, and then that the attorney's deficient performance led to a fundamentally unfair and unreliable result. *Loud v. Stephens*, 2016 WL 11892951, at *6 (W.D. Tex. Feb. 29, 2016) (quoting *United States v. Dovalina*, 262 F.3d 472, 474-75 (5th Cir. 2001)) (quotations omitted), *report and recommendation adopted*, 2016 WL 11892950 (W.D. Tex. Apr. 15, 2016). The "reasonable probability" of a different result "requires a 'substantial,' not just 'conceivable,' likelihood of a different result." *Pinholster*, 563 U.S. at 189 (quoting *Harrington*, 562 U.S. at 112). Accordingly, a reviewing court "must 'counter-factually determine the probable outcome on appeal had counsel raised the argument.'" *United States v. Reinhart*, 357 F.3d 521, 530 (5th Cir. 2004) (quoting *United States v. Phillips*, 210 F.3d 345, 350 (5th Cir. 2000)).

### 3. Petitioner's burden

The burden of proof to establish ineffective assistance is on the petitioner, who must do so by a preponderance of the evidence. *Jernigan v. Collins*, 980 F.2d 292, 296 (5th Cir. 1992). The failure to raise a meritless argument is an insufficient basis for ineffective assistance because the result of the proceeding would not have been different had the issue been raised. *United States v. Kimler*, 167 F.3d 889, 893 (5th Cir. 1999). Also, mere conclusory allegations do not raise a constitutional issue in habeas proceedings. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000) (citing *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983) (per curiam)).

### 4.  Scope of review

"Establishing that a state court's application of *Strickland* was unreasonable under §

2254(d) is all the more difficult" insofar as "[t]he standards created by *Strickland* and § 2254(d)

are both highly deferential, and when the two apply in tandem, review is doubly so."

*Harrington*, 562 U.S. at 105 (citations and internal quotations omitted).  Where a prisoner

presents a state-adjudicated claim of ineffective assistance of counsel on federal review, the

reviewing court's evaluation of the state court decision is a mixed question of law and fact.

*Strickland*, 466 U.S. at 698.  This evaluation entails two main areas of inquiry, which involve:

assessing the state court's factual determination for objective reasonableness under § 2254(d)(2),

with individualized findings presumed correct unless rebutted by clear and convincing evidence

as per § 2254(e)(1); and determining whether counsel rendered ineffective assistance under

*Strickland*, or whether the state court's application of *Strickland* was reasonable under §

2254(d)(1).  *See Neal*, 78 F.4th at 783 (citing *Austin v. Davis*, 876 F.3d 757, 782-84 (5th Cir.

2017)); *see also id.* at 786 (citing *Morales v. Thaler*, 714 F.3d 295, 301-06 (5th Cir. 2013)).

## X.  TIMELINESS OF THE PETITION

In analyzing Petitioner's claims, the Magistrate Judge begins by taking note of the

parties' respective positions as to the timeliness of the Petition.  Respondent raises the

affirmative defense of limitations, contending that Petitioner failed to file the Petition within the

AEDPA's one-year limitations period.  Petitioner responds that the Petition is timely when

accounting for statutory tolling or, otherwise, equitable tolling.

The limitations period began to run when the judgment on his conviction became "final."

*See* 28 U.S.C. § 2244(d)(1)(A).  It is uncontested that the conviction here became final when the

Supreme Court denied certiorari review.  *See Giesberg v. Cockrell*, 288 F.3d 268, 271 (5th Cir.

2002) (per curiam).  Certiorari was denied, and thus the statute of limitations started running, on October 6, 2008.  *See Navarro-Ramirez*, 555 U.S. 831 (2008).

It is also uncontested that at least part of the limitations period was subject to statutory tolling, which was triggered by the filing of the Initial State Petition.  *See Ramirez*, 2019 WL 4454399, at *1.  The Initial State Petition was filed on July 2, 2009 (Dkt. No. 90-18 at 92-249), and the limitations period was tolled until the TCCA denied the Initial State Petition on October 14, 2015, *Ex parte Ramirez*, 2015 WL 6282336.  At this point, according to Petitioner's calculations, 97 days remained of the one-year limitations period.  (Dkt. No. 90-37 at 2).

A second round of statutory tolling was triggered by the filing of the Chapter 64 motion for DNA testing.  *See Hutson*, 508 F.3d at 240.  The Chapter 64 motion was filed on October 23, 2015.  (Dkt. No. 89-2 at 19).  Deducting eight days between the TCCA's denial and the filing of the Chapter 64 motion, this would leave 89 days remaining of the one-year limitations period.

That said, the errors associated with the service and docketing of order denying the Chapter 64 motion have fulminated a dispute between the parties as to when statutory tolling ended and the limitations period resumed running.  As previously noted, the state district court denied the Chapter 64 motion on June 7, 2017.  (*Id.* at 145).  The order of denial, however, was not served on Petitioner and was docketed under an incorrect case number.  (*Id.*).  To rectify these errors, the state district court entered a superseding order on November 1, 2018, expressly stating that its intent was to provide Petitioner with an opportunity to perfect an appeal of the denial.  (*Id.* at 147).  Petitioner filed a notice of appeal on November 9, 2018 (*id.* at 148-51), and the appeal proceeded without objection by the State.  The TCCA affirmed the denial of the Chapter 64 motion on May 5, 2021.  *Ramirez*, 621 S.W.3d 711.

Now, through the Summary Judgment Motion, Respondent argues that statutory tolling ended on June 7, 2017 upon the issuance of the original order denying the Chapter 64 motion and, thus, that the Petition in this case, dated November 30, 2018, was filed well outside the limitations period.  (Dkt. No. 91 at 90-93).  In making this argument, Respondent notes that, pursuant to Rule 26.2(a) of the Texas Rules of Appellate Procedure, Petitioner had 30 days in which to appeal the denial order.  (*Id.* at 91-92).  According to Respondent, the superseding order of denial was without legal effect because the state district court had already lost jurisdiction over the matter.  (*Id.* at 92).  That said, Respondent makes no mention of the court errors that prevented Petitioner from receiving notice of the denial order.

Through his Cross-Motion, Petitioner contests Respondent's argument that the state district court lacked authority to enter the superseding order of denial.  (Dkt. No. 103 at 20-22).  Petitioner notes that a Texas district court maintains authority to issue a *nunc pro tunc* judgment if it "reflect[s] the judgment that was actually rendered but that for some reason was not properly entered into the record at the time of the judgment."  (*Id.* at 20 (citing *Blanton v. State*, 369 S.W.3d 894, 897-98 (Tex. Crim. App. 2012))).  Petitioner thus takes the position that the superseding order, which was issued with the express purpose of rectifying the court's clerical error, was a properly appealable order.  (*See id.* at 20-22).

It is difficult to accept Respondent's position that the superseding order had no effect. Nothing in the record suggests that the TCCA questioned the timeliness of Petitioner's appeal. As Petitioner highlights, "[h]ad the [TCCA] considered [the Chapter 64 appeal] untimely or the superseding order an abuse of the trial court's authority, it could not have accepted jurisdiction over [the] appeal and would have been required to dismiss it as untimely."  (*Id.* at 21 (citing

*Slaton v. State*, 981 S.W.2d 208, 209 (Tex. Crim. App. 1998) (per curiam) ("[W]ithout a timely filed notice of appeal, a court of appeals lacks jurisdiction over the appeal[.]"))).

Moreover, Respondent ignores case law concerning the effect of certain post-judgment orders on the calculation of the limitations period.  Although that case law addresses when a conviction is deemed "final" for purposes of § 2244(d)(1)(A), it seems equally applicable to the present context.  For example, the Supreme Court has held that, if a petitioner is allowed to file an out-of-time appeal during state collateral review, but before they file for federal habeas relief, the limitations period is effectively "reset," such that the conviction becomes final at "the conclusion of the out-of-time direct appeal, or the expiration of the time for seeking review of that [out-of-time] appeal."  *Jimenez*, 555 U.S. at 120-21.  Similarly, here, it can be argued that the state district court's superseding order "reset" or "revived" the tolling period.

Accordingly, the record and relevant law suggest that Petitioner is entitled to statutory tolling and, thus, that the Petition is timely.[8]

That said, these questions are merely academic.  The Magistrate Judge need not make definitive findings of fact and recommendations with respect to the limitations matter insofar as Petitioner is, ultimately, not entitled to habeas relief.  As will be discussed below, Petitioner's claims are non-cognizable, unexhausted, procedurally defaulted, or without merit.

## XI.  PROCEDURAL VIABILITY OF CLAIMS—OVERVIEW

Through this report and recommendation, the Magistrate Judge will conduct an individual analysis of each of Petitioner's various claims and sub-claims.  Where applicable, the Magistrate

---

[8] Alternatively, to the extent that Petitioner was indeed deprived of proper notice of the original denial order, this may justify equitable tolling.  *See Williams v. Thaler*, 400 F. App'x 886, 892 (5th Cir. 2010) (per curiam) ("[T]he simple fact that a petitioner did not receive notice that the AEDPA limitations period had ceased to toll may be an extraordinary circumstance that warrants equitable tolling."); *see also Critchley v. Thaler*, 586 F.3d 318, 321 n.3 (5th Cir. 2009) ("[W]hen the state [court] fails to provide notice of its ruling on a state habeas petition to the affected petitioner as is required by Texas law, equitable tolling rules govern that situation.").

Judge will address procedural grounds for their dismissal, specifically, non-cognizability, the lack of exhaustion, and procedural default.  Given the sheer number of claims and sub-claims, however, the Magistrate Judge will first conduct an initial overview of the procedurally inviable claims and sub-claims, as well as an overview of the reasons or exceptions raised by Petitioner in attempting to circumvent any procedural inadequacies.

## A.  Non-Cognizable Claims

Through the Summary Judgment Motion, Respondent contends that the following claims are not cognizable on federal habeas review insofar as Petitioner raises non-habeas-type issues:

> Claim 7—Unconstitutionality of the death sentence based on actual innocence (Dkt. No. 91 at 321-22);

> Claim 16—Error by the trial court due to the denial of the Chapter 64 motion (*id.* at 411);

> Claim 18—Unconstitutionality of lethal injection (*id.* at 451).

Petitioner appears to concede that Claim 7 is not cognizable.  (Dkt. No. 67 at 356 n.49 (quoting *Schlup*, 513 US. at 324-25) ("A *Schlup* claim of innocence is thus not itself a constitutional claim[.]")).  Petitioner makes no mention of Claim 16's cognizability.  As to Claim 18, however, Petitioner does refer to Supreme Court case law in disputing Respondent's position. (*See* Dkt. No. 103 at 283-84 (citing *Hill v. McDonough*, 547 U.S. 573 (2006)).  As discussed further below, the Magistrate Judge agrees with Respondent that these claims are not cognizable on federal habeas review and, thus, that they are subject to dismissal.

## B.  Unexhausted Claims

Respondent raises the affirmative defense that Petitioner failed to exhaust the following claims and sub-claims:

> Claim 1—Ineffective assistance of trial counsel for the failure to investigate and present mitigating evidence at the sentencing phase of trial;

Sub-claim 1A—Failure to investigate and present mitigating evidence of Petitioner's mental impairments (*see* Dkt. No. 91 at 104, 107);

Claim 3—Ineffective assistance of trial counsel due to various factors;

Sub-claim 3A—Ms. Garza's conflict of interest (*id.* at 162, 173-74);

Sub-claim 3E—Failure to timely discover the existence of Petitioner's arrest and booking recordings for the suppression hearing (*id.* at 190);

Sub-claim 3F—Failure to investigate and present testimonial evidence of Petitioner's request for counsel during booking (*id.* at 192);

Sub-claim 3G—Failure to competently impeach prosecution witnesses at the suppression hearing (*id.* at 193);

Sub-claim 3H—Failure to adequately examine Petitioner at the suppression hearing (*id.* at 197);

Sub-claim 3J—Failure to conduct an adequate pre-trial investigation (*id.* at 200);

Sub-claim 3K—Failure to raise a grand jury challenge (*id.* at 202-03);

Sub-claim 3L—Failure to request a change of venue (*id.* at 204);

Sub-claim 3M—Failure to conduct an adequate jury selection (*id.* at 206);

Sub-claim 3O—Failure to request continuances (*id.* at 218);

Sub-claims 3R through 3W—Failure to raise timely objections to preserve an appeal (*id.* at 225, 228, 229, 231, 233, 236-37);

Sub-claim 3X—Failure to request a proper record of all proceedings (*id.* at 238);

Sub-claim 3Y—Cumulative effect of errors (*id.* at 239-40);

Claim 4—Errors by the trial court;

Sub-claim 4A—Failure to appoint qualified trial counsel (*id.* at 241);

Sub-claim 4B—Admission of photographs of the crime scene (*id.* at 242);

Sub-claim 4C—Use of in-court physical restraints (*id.* at 246-47);

Sub-claim 4D—Failure to ensure a proper record of all proceedings (*id.* at 248);

Sub-claim 4E—Denial of request for new counsel (*id.* at 251);

Sub-claim 4F—Failure to continue suppression hearing (*id.*);

Sub-claim 4J—Denial of motion for mistrial (*id.* at 270);

Sub-claim 4K—Qualification of Detective Alvarez as a gang expert (*id.* at 273);

Sub-claim 4L—Admission of evidence of another crime (*id.* at 276);

Sub-claim 4M—Demonstration of Petitioner's tattoos to the jury (*id.* at 279);

Sub-claim 4O—Dismissal of venirepersons (*id.* at 295);

Sub-claim 4P—Improper jury instruction on the voluntariness of confessions (*id.* at 297);

Sub-claim 4Q—Failure to use a special verdict form (*id.* at 303);

Sub-claim 4R—Cumulative effect of errors (*id.* at 305);

Claim 5—Trial court misconduct based on the presiding judge's bias (*id.* at 306);

Claim 6—Violation of right to confront witnesses (*id.* at 314);

Claim 8—Prosecutorial misconduct;

Sub-claim 8B—Spoliation of evidence (*id.* at 333);

Sub-claim 8C—Introduction of false testimony at the suppression hearing (*id.* at 337);

Sub-claim 8D—Concealment of exculpatory evidence (*id.* at 341);

Sub-claim 8E—Failure to disclose the conditions at the TYC (*id.* at 348-49);

Sub-claim 8F—Improper request to limit mitigating evidence (*id.* at 352);

Sub-claim 8G—Improper comments made in closing arguments (*id.* at 357);

Sub-claim 8H—Other violations of Petitioner's constitutional rights (*id.* at 363);

Sub-claim 8I—Cumulative effect of misconduct (*id.* at 364);

Claim 9—Juror misconduct (*id.* at 366);

Claim 10—Improper jury instructions;

Sub-claim 10B—Inadequate definition of future dangerousness (*id.* at 371, 376);

Claim 13—Ineffective assistance of appellate counsel (*id.* at 396);

Claim 17—Unconstitutionality of the death sentence due to various factors;

Sub-claim 17A—Petitioner's mental illness (*id.* at 419-20);[9]

Sub-claim 17B—Inconsistency with societal trends (*id.* at 421-22);

Sub-claim 17D—Length of time on death row (*id.* at 427);

Sub-claim 17E—Petitioner's insufficient culpability due to mental impairments (*id.* at 429-30);

Sub-claim 17I—Absence of statutory requirement for proportionality review (*id.* at 440);

Sub-claim 17J—Absence of statutory requirement narrowing class of persons eligible for death penalty (*id.* at 441);

Sub-claim 17K—Excessive prosecutorial discretion to seek death penalty (*id.* at 443);

Sub-claim 17L—Capital murder conviction predicated on the law of parties (*id.* at 448);

Claim 18—Unconstitutionality of lethal injection (*id.* at 451);

Claim 19—Cumulative effect of constitutional errors (*id.* at 454).

---

[9] Respondent argues that Sub-claim 17A is unexhausted because claim 4 of the Initial State Petition—its presumable state counterpart—was expressly withdrawn by state habeas counsel. (Dkt. No. 91 at 419-20). Denying their parity, Petitioner nonetheless concedes that Sub-claim 17A is a new, unexhausted claim. (Dkt. No. 103 at 261).

Petitioner concedes through the Cross-Motion that most of these claims and sub-claims are unexhausted.  With respect to some of these, however, Petitioner argues that the exhaustion requirement is excused because: (i) state habeas counsel failed to raise the claims or sub-claims; (ii) the nature of the claims or sub-claims is such that he could not have raised them until now; (iii) a fundamental miscarriage of justice would occur based on his mental impairments; or (iv) a fundamental miscarriage of justice would occur based on his actual innocence.  Otherwise, Petitioner does not address the procedural posture of Claims and Sub-claims 4B through 4F, 4J through 4M, 4O through 4R, 8B, 10B, and 13.

The matter of exhaustion appears to be in dispute with respect to Sub-claims 1A, 3J, and 4A.  (*Compare* Dkt. No. 91 at 104, 107, 200, 241 *with* Dkt. No. 103 at 27, 44, 211, 229).  The main dispute centers around Sub-claim 1A, concerning trial counsel's failure to investigate and present mitigating evidence of mental impairments.  Respondent argues that Sub-claim 1A is unexhausted insofar as it was withdrawn for consideration by state habeas counsel prior to a merits review.  (*See* Dkt. No. 91 at 104, 107).  Petitioner responds that Sub-claim 1A was unreasonably excluded from review, that the other claims and sub-claims were properly presented and adjudicated, and that any failure to meet the exhaustion requirement is otherwise subject to exception.  (Dkt. No. 103 at 27-181, 184-227, 229-31, 233, 235-48).

As will be discussed further below, the Magistrate Judge agrees with Respondent that Sub-claims 1A and 4A are unexhausted but concludes that the procedural debate concerning Sub-claim 3J is moot insofar as the sub-claim is meritless.  Moreover, none of the ostensibly exceptional circumstances raised by Petitioner appear to excuse the application of the exhaustion requirement.  Petitioner also fails to demonstrate any plausible exceptions to Texas' successive-

petition ban, such that he would be precluded from exhausting his claims in the state courts. *See Canales*, 765 F.3d at 564-66.

Any unexhausted claims above are thus procedurally barred from federal review. *See Mercadel*, 179 F.3d at 276-77 (explaining that a federal court cannot grant writ on an unexhausted claim absent applicable exceptions); *see also Kunkle v. Dretke*, 352 F.3d 980, 989 (5th Cir. 2003) (finding that Texas' long-standing prohibition on successive habeas petitions provides an independent and adequate state procedural ground to bar federal habeas relief).

**C. Procedurally Defaulted Claims**

Even among the claims Petitioner did properly exhaust in state court, Respondent raises the affirmative defense that many of these are procedurally defaulted. Respondent points out that the following claims, first raised in the Second State Petition, were dismissed for abuse of the writ, precluding federal review based on an independent and adequate state ground. *See Canales*, 765 F.3d at 566.

> Claim 3—Ineffective assistance of trial counsel due to various factors;
>
>> Sub-claim 3C—Failure to investigate and address police coercion and the unreliability of Petitioner's interrogation statement at the suppression hearing (Dkt. No. 91 at 182);
>>
>> Sub-claim 3D—Failure to investigate and present evidence at the suppression hearing of Petitioner's intoxication at the time of his interrogation and his request for counsel, specifically, the testimony of B. Ramirez and J. Garcia (*id.* at 186);
>>
>> Sub-claim 3I—Failure to investigate and present expert testimony regarding the effects of Petitioner's intoxication on the reliability of his interrogation statement at the suppression hearing (*id.* at 199);
>>
>> Sub-claim 3P—Failure to investigate and raise innocence arguments (*id.* at 220);

Sub-claim 3Q—Failure to present evidence of the involuntariness, falsity, and unreliability of Petitioner's confession during the guilt phase;[10]

Claim 17—Unconstitutionality of the death sentence due to various factors;

Sub-claim 17C—Arbitrariness of the death penalty (*id.* at 424);

Sub-claim 17F—Absence of jury instructions on the consequences of a deadlock over special issues (*id.* at 430-31).

Moreover, Respondent points out that the following claims were dismissed on direct appeal on multiple state procedural grounds. *See Ramirez*, 2007 WL 4375936, at *16, 19-20.

Claim 2—Unconstitutionality of the death sentence due to Petitioner's age at the time of the offense (Dkt. No. 91 at 157);

Claim 4—Error by the trial court;

Sub-claim 4I—Admission of testimony involving Petitioner's concealment of cannabis in his jail cell (*id.* at 268).

Petitioner concedes default as to Claim 2 and Sub-claims 3C, 3D, 3I, and 3Q (Dkt. No. 103 at 181-82, 190, 194, 201, 224-25), although he does raise his actual innocence as a way around the procedural bar (Dkt. No. 103 at 182-83, 184-89).  Similarly, Petitioner appears to acknowledge default as to Sub-claims 17C and 17F but raises state habeas counsel's representation and actual innocence as procedural gateways.  (*Id.* at 265-66, 270-71).  Petitioner makes no mention of Sub-claim 4I.  He contests the default, however, with respect to Sub-claim 3P.  (*Compare* Dkt. No. 91 at 200 *with* Dkt. No. 103 at 221-22).

As will be discussed further below, the Magistrate Judge agrees with Respondent that Claims and Sub-claims 2, 3C, 3D, 3I, 3Q, 4I, 17C, and 17F are procedurally barred or subject to dismissal due to Petitioner's failure to comply with state procedures, *see Webb*, 773 F.2d at 648;

---

[10] Although Respondent argues Sub-claim 3Q is unexhausted (Dkt. No. 91 at 222-23), Petitioner concedes that the sub-claim is procedurally defaulted insofar as it was first raised in the Second State Petition (Dkt. No. 103 at 224-25).

*see also Shinn*, 596 U.S. at 378-79, but concludes that the dispute over the procedural default of Sub-claim 3P is moot insofar as the sub-claim is meritless.

**D.  Summary**

To summarize, Claims 7, 16, and 18 are not cognizable, Claims and Sub-claims 1A, 3A, 3E through 3H, 3K through 3M, 3O, 3R through 3Y, 4A through 4F, 4J through 4M, 4O through 4R, 5, 6, 8B through 8I, 9, 10B, 13, 17A, 17B, 17D, 17E, 17I through 17L, 18, and 19 are unexhausted, and Claims and Sub-claims 2, 3C, 3D, 3I, 3Q, 4I, 17C, and 17F are procedurally defaulted.  The procedural status of Sub-claims 3J and 3P is disputed but ultimately immaterial insofar as the sub-claims are meritless.  The remaining claims and sub-claims—1B, 3B, 3N, 4G, 4H, 4N, 8A, 10A, 11, 12, 14, 17G, and 17H—were adjudicated by the TCCA, such that federal review is fully available within the limits of the AEDPA.[11]  These matters, including the inapplicability of any exceptions raised by Petitioner, will be addressed with further particularity as part of the analysis below.  In the interests of justice, however, the merits, or lack thereof, of many of the procedurally inviable claims will also be addressed.

## XII.  ANALYSIS OF CLAIMS

**A.  Sub-claim 1A—Ineffective Assistance of Trial Counsel for the Failure to Investigate and Present Mitigating Evidence of Petitioner's Mental Impairments**

Through Sub-claim 1A, Petitioner contends that trial counsel were ineffective for purposes of sentencing insofar as they "failed to investigate and present readily available evidence of [his] neurodevelopmental disabilities, brain damage, and mental illness[,]"[12] including conditions like clinical depression and post-traumatic stress disorder.  (Dkt. No. 67 at

---

[11] Respondent acknowledges that these claims and sub-claims are exhausted, other than with respect to Sub-claim 17G.

[12] Both the state habeas court and state habeas counsel used, interchangeably, the terms "mental impairments," "mental retardation," "intellectual disabilities," and "mental health issue[s]."  (*See* Dkt. No. 90-15 at 30; Dkt. No. 90-27 at 12-13; Dkt. No. 90-28 at 35).

177).   Offering evidence of the results of recent neurological and psychological testing, Petitioner contends that these conditions—which stem from genetic disposition, neglect, and physical and psychological trauma—severely impaired his cognitive reasoning, impulse control, and overall decision-making abilities.  (*Id.* at 226-40).  Had counsel properly investigated and presented this evidence, Petitioner argues, the jury would have determined that he lacked the requisite culpability for the death sentence.  (*Id.* at 248-51).

Respondent takes the position that Sub-claim 1A is unexhausted because Petitioner failed to present its substance for merits review as part of its state counterpart—claim 1 of the Initial State Petition ("State Claim 1").  According to Respondent, state habeas counsel withdrew all arguments related to Petitioner's mental impairments from the Initial State Petition, effectively abandoning this sub-claim.  (*See* Dkt. No. 91 at 104, 107).

Petitioner responds that, although he previously raised and presented Sub-claim 1A as part of State Claim 1, the state habeas court failed to consider the merits in its adjudication of State Claim 1.  According to Petitioner, the state habeas court erroneously construed habeas counsel's withdrawal of other enumerated claims as encompassing Sub-claim 1A, such that the adjudication of State Claim 1 was based on an unreasonable determination of the facts under § 2254(d)(2).  (Dkt. No. 103 at 25-44).  In support, Petitioner offers that, "[a]t the evidentiary hearing, [he] presented evidence in the form of reports and declarations which directly challenged the prejudicial inadequacy of trial counsel's mental health investigation, consistent with the assertions in [State Claim 1.]"  (*Id.* at 29).  To the extent that the substance of Sub-claim 1A was indeed withdrawn by state habeas counsel, Petitioner continues, such withdrawal constituted the ineffective assistance of state habeas counsel, which should suffice to overcome any procedural bar based on the lack of exhaustion.  (*Id.* at 179-81).

Here, the Magistrate Judge concludes that Sub-claim 1A is unexhausted due to state habeas counsel's withdrawal of its substance—or any issues concerning his ostensible mental impairments—from State Claim 1 during the state habeas proceedings.  Moreover, while Petitioner does raise an exception to this procedural bar based on the ineffective assistance of state habeas counsel, Petitioner fails to establish that the withdrawal at issue was anything other than reasoned strategy.  These issues—the lack of exhaustion and the assistance of state habeas counsel—will be discussed in turn below.

### 1.  Lack of exhaustion

Exhaustion of Sub-claim 1A hinges on its fair presentation in state court, which depends in turn on whether the mental-impairment component of State Claim 1 was withdrawn by state habeas counsel.  As noted above, the state habeas court understood Petitioner's withdrawal of "claims regarding mental impairments" (Dkt. No. 90-15 at 45-47) to encompass all issues and arguments concerning his mental health—including the relevant portion of State Claim 1 (Dkt. No. 90-17 at 398).  Petitioner argues that the "[s]tate habeas court leaped to an unsubstantiated, clearly erroneous conclusion" based on "no evidence" that he "wholesale waived" the mental health component of State Claim 1.  (Dkt. No. 103 at 29).  Petitioner, however, fails to consider the entire context of the state habeas proceedings.

As a threshold matter, Sub-claim1A's state counterpart, along with the rest of mental health claims in the Initial State Petition, depended almost exclusively on the expert report of Dr. Martinez, who assessed Petitioner as having an IQ score of 59 and diagnosed him with mild mental retardation.  (*See* Dkt. No. 90-18 at 156-65).  As Petitioner concedes:

> Included in [State Claim 1] were allegations that trial counsel had failed to develop and present evidence concerning [Petitioner's] mental health and brain impairment.  However, because Dr. Martinez was the only professional to actually evaluate [him,] there was little left to support mental-health related mitigation

> under [State Claim 1.]   The lack of evidence bearing on [Petitioner's] mental
> health and cognitive impairments would virtually guaranty the failure of [State
> Claim 1.]

(Dkt. No. 24 at 61).

This evidentiary pillar was significantly undermined by the subsequent report of Dr. T. Allen, who diagnosed the behaviors ascribed to Petitioner as antisocial personality disorder. (Dkt. No. 67-17 at 47).   In making this diagnosis, Dr. T. Allen characterized Dr. Martinez's findings as aberrational and inconsistent with all of Petitioner's other evaluations.  (*Id.* at 39).

To be clear, Dr. T. Allen's report was crucial because a diagnosis of antisocial personality disorder often serves as the prosecution's "strongest possible evidence in rebuttal" against claims of mitigating circumstances. *See Evans v. Sec'y, Dep't of Corr.*, 703 F.3d 1316, 1327 (11th Cir. 2013) (quoting *Wong v. Belmontes*, 558 U.S. 15, 24 (2009) (per curiam)) (quotations omitted); *see also Atwood v. Ryan*, 870 F.3d 1033, 1063 (9th Cir. 2017) ("[E]vidence of an antisocial personality disorder may be highly damaging.").   This is because a diagnosis of antisocial personality disorder has the tendency to prove a defendant's future dangerousness. *See Cockrum v. Johnson*, 119 F.3d 297, 302-04 (5th Cir. 1997).

Prior to Dr. T. Allen's report, state habeas counsel had subpoenaed Dr. Martinez as a witness for the evidentiary hearing.  (Dkt. No. 90-15 at 8, 15).   Upon receiving the report, however, state habeas counsel clearly recognized its detrimental impact on Petitioner's mental-health related arguments.  According to Petitioner's own account—

> once [Dr. Martinez] learned of [Dr. T. Allen's] test results, Dr. Martinez refused
> to testify in support of his own test results.  [State habeas counsel] consulted . . .
> Dr. [James Underhill, a neuropsychologist, whose] file notes show that he did a
> rough comparison of the results of all of the IQ testing that had been done [on
> Petitioner,] and he concluded that the 59 IQ score obtained by Dr. Martinez was
> an outlier.

(Dkt. No. 24 at 59-60). State habeas counsel thus expressly informed the state habeas court that the withdrawal at issue was due to the anticipated negative impact of Dr. T. Allen's report. (*See* Dkt. No. 90-15 at 45-47; Dkt. No. 90-27 at 12-13).

State habeas counsel's conduct throughout the remainder of the state habeas proceedings demonstrated that this withdrawal amounted to Petitioner's abandonment of all mental health issues. For one, despite dedicating the post-withdrawal evidentiary hearing almost exclusively to Petitioner's ineffective-assistance claim, state habeas counsel did not present any mental health evidence. In fact, the only reference to Petitioner's mental health occurred when state habeas counsel elected to reiterate that Petitioner was withdrawing his claims because he was "not feeling confident of the results from [Dr. Martinez.]" (Dkt. No. 90-27 at 12). When the state habeas court noted that "one of the big areas that everyone wanted to cover—was [Petitioner's] mental health issue—is gone[,]" state habeas counsel remained silent. (Dkt. No. 90-28 at 35).

Petitioner may contend now that state habeas counsel offered evidence implicating his mental health, such as reports from Dr. Ruben Gur, a neuropsychologist, and Dr. Jane Maxwell, an addiction specialist (Dkt. No. 103 at 30-35 (citing Dkt. No. 90-29 at 101-125)), but at no point did state habeas counsel refer to this evidence during the hearing itself. Rather, state habeas counsel stated that the claim relied on—

> various people who knew [Petitioner] while he was growing up, who can provide information and insight into his background, who can describe the turmoil in their house growing up, the negative impact of the gangs in the area, who can describe their father's physical and verbal abuse to the point where [Petitioner,] himself, stabbed him with a knife at the age of three years old in an attempt to protect his mother.

(Dkt. No. 90-28 at 48).

As part of the state habeas court's procedures, each party was required to submit proposed findings of fact and conclusions of law following the evidentiary hearing. (Dkt. No.

90-15 at 54). The proposals offered by state habeas counsel on behalf of Petitioner represent perhaps the best indication of which issues they considered to be "live." (*See id.* at 63-131). Indeed, these proposals did not address Dr. Martinez's report or any issue relating to Petitioner's neuropsychological functioning or mental health.

When the state habeas court did issue findings and conclusions, these did not refer to any mental health component in State Claim 1 except in the following context:

> Those aspects of [Petitioner's] challenge to the adequacy of his attorneys' investigation and presentation of potential mitigating evidence dealing with his mental condition, cognitive disorder, mental retardation, psychological afflictions, or the psychological effects of his use of drugs or alcohol are not part of the analysis of the constitutional adequacy of said attorneys' investigation and presentation of potential mitigating evidence since [Petitioner] has waived all of his claims dealing with his mental condition.

(Dkt. No. 90-17 at 398). Even through their subsequent objections to the TCCA, state habeas counsel did not complain that the state habeas court misunderstood the scope of the claims withdrawn by Petitioner. (*See* Dkt. No. 90-31).

Moreover, withdrawal of the evidence was consistent with sound strategy. Again, evidence of a diagnosis of antisocial personality disorder can be a strong rebuttal against mitigating circumstances, *see Evans*, 703 F.3d at 1327, not least because it supports future dangerousness, *see Cockrum*, 119 F.3d at 302-04. Recognizing this, the Fifth Circuit regularly deems that counsel acted reasonably in taking actions to limit the fact-finder's exposure to evidence of antisocial personality disorder. *See Smith v. Davis*, 927 F.3d 313, 337 (5th Cir. 2019); *Saldaño v. Davis*, 701 F. App'x 302, 314 (5th Cir. 2017) (per curiam); *Cockrum*, 119 F.3d at 301-05 (discussing delicate balance an attorney must maintain when considering whether a diagnosis of antisocial personality disorder would prove a defendant's future dangerousness).

Here, the record supports that Petitioner withdrew or abandoned all issues based on his mental impairments before the TCCA had the opportunity to review their merits. The parties may debate whether Petitioner waived the mental health component of State Claim 1, but it is unambiguous that the state habeas court and the parties understood that Petitioner no longer sought relief on that basis. Buried beneath the intricate arguments, procedural quagmire, and expanded federal claim is this simple fact: Petitioner did not give the state courts a fair opportunity to review the substance of this federal claim. Sub-claim 1A is thus unexhausted.

### 2. Assistance of state habeas counsel

Recognizing this procedural hurdle, Petitioner contends that the withdrawal of the mental impairment claims by state habeas counsel effectively constitutes ineffective assistance, thus allowing Sub-claim 1A to overcome the procedural bar under *Martinez v. Ryan*, 566 U.S. 1 (2012), and *Trevino v. Thaler*, 569 U.S. 413 (2013). (Dkt. No. 103 at 179-81; Dkt. No. 67 at 165, 411).[13] However, for the reasons discussed below, Petitioner fails to demonstrate that he received deficient state habeas representation.

As an initial matter, consideration of habeas counsel's efforts depends only on the state court record, such that any evidence Petitioner has developed since the conclusion of state habeas review does not factor into the present determination. *See Shinn*, 596 U.S. at 382. Moreover, examination of state habeas counsel's efforts is "highly deferential," requires a "fair assessment" without "the distorting effects of hindsight," and is based on "the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. A reviewing court must

---

[13] As discussed, the *Martinez-Trevino* exception normally applies to claims that are defaulted based on state procedural grounds and thus barred on federal review. *See Shinn*, 596 U.S. at 380. The Fifth Circuit does not appear, however, to have explicitly extended *Martinez-Trevino* to claims that are barred for the failure to exhaust state remedies. Regardless, because Petitioner fails to establish ineffective assistance for purposes of *Martinez-Trevino*, the Magistrate Judge will assume for the sake of argument that the exception applies in the failure-to-exhaust context.

entertain the range of possible reasons that a petitioner's attorney may have had for proceeding as they did. *Green v. Lumpkin*, 2023 WL 2941470, at *5 (5th Cir. Apr. 13, 2023) (per curiam) (quoting *Pinholster*, 563 U.S. at 196) (quotations omitted).

With that framework in mind, Petitioner fails to show *Strickland* error associated with the withdrawal of his mental impairment claims. As noted, upon recognizing the challenges posed by Dr. T. Allen's report, state habeas counsel made the strategic decision to withdraw all claims involving Petitioner's mental impairments. Doing so ensured that the state habeas court would not be exposed to damaging expert testimony about Petitioner's diagnosed antisocial personality disorder. Withdrawal seemed the natural decision given Dr. Martinez's apparent refusal to testify about his own report. Thus, although state habeas counsel tried initially to litigate mental health issues, the circumstances they faced forced them to make strategic decisions which cannot be judged in the harsh light of hindsight. *See Fields*, 565 F.3d at 294. Nor does Petitioner make any serious effort to argue actual prejudice, or that, had state habeas counsel differently, there is a reasonable probability that the state habeas court would have granted habeas relief. *See Soliz v. Davis*, 750 F. App'x 282, 290 (5th Cir. 2018) (per curiam). Considering again the apparent flaws in Dr. Martinez's opinions and his unwillingness to testify to those opinions, the record does not show that zealously championing the full breadth of State Claim 1, or that supplementing it with other evidence in the state court record, would have made a difference.

### 3. Conclusion—Sub-claim 1A

The record unequivocally demonstrates that state habeas counsel, the State, the state habeas court, and at least one judge at the TCCA understood that all habeas claims raising Petitioner's mental health issues were withdrawn. Consequently, Petitioner's *Strickland* claim implicating trial counsel's investigation and presentation of mental impairments, or

neurodevelopmental impairments, brain damage, and psychological issues, was never presented for exhaustion. While state habeas counsel's withdrawal of mental health issues certainly limited the scope of Petitioner's case before the TCCA, it was nonetheless a sound strategic decision made by counsel and therefore cannot forgive the procedural bar.

For these reasons, Sub-claim 1A is procedurally barred as unexhausted.

**B. Sub-claim 1B—Ineffective Assistance of Trial Counsel for the Failure to Investigate and Present Mitigating Evidence of Petitioner's Psycho-Social History**

The *Strickland* deficiencies raised by Petitioner for purposes of Sub-claim 1B include the following: (i) failing to adequately investigate and present readily available evidence of Petitioner's socio-economic background, childhood experiences, and the institutional shortcomings of the TYC facilities and the public school system, which supposedly contributed to his susceptibility to "manipulation by adult criminal gang members;" (ii) failing to adequately present the limited socio-economic evidence that was gathered through the respective gang and prison experts, Stewart and Fitzgerald; (iii) failing to secure the testimony of Petitioner's family, such as that of his mother and sister; (iv) misjudging the admissibility of Petitioner's psycho-social history through the testimony of Dr. K. Allen; (v) delaying the pre-sentencing defense investigation by mitigation specialist Bowen; and (vi) undermining Dr. K. Allen's testimony preparations. (Dkt. No. 67 at 177-251). Had counsel adequately presented all available mitigating evidence, Petitioner argues, a jury could have reasonably determined that Petitioner's culpability was diminished by factors beyond his control, thereby warranting a life sentence. (*Id.* at 248-51). Petitioner supplements this claim with evidence newly developed on federal review, which consists primarily of declarations from family and friends concerning Petitioner's adverse socio-economic background and childhood experiences and the prevalence of gang violence and

drug use in his community.[14]  (Dkt. No. 28-1 at 42-109; Dkt. Nos. 28-2 through 28-10; Dkt. Nos. 29 through 29-10; Dkt. Nos. 30 through 30-2; Dkt. No. 30-3 at 1-77; Dkt. No. 67-17 at 9-11, 16-18; Dkt. No. 67-18; Dkt. No. 67-19 at 2-3, 44-62).

Respondent raises a broad lack-of-exhaustion defense as to any aspects of this claim that were not previously raised in the Initial State Petition.  (*See* Dkt. No. 91 at 93).  Indeed, in reviewing the record, it seems that two of these issues are unexhausted, and Petitioner does not otherwise argue in support of any exception to the procedural bar.  First, although the Second State Petition made a brief mention of trial counsel's failure to adequately present Petitioner's adverse socio-economic background through gang and prison experts Stewart and Fitzgerald (Dkt. No. 90-20 at 164-65), this issue was not explored further by state habeas counsel during the evidentiary hearing and, thus, was not considered by the state habeas court.  Also, state habeas counsel did not raise the issue of trial counsel's failure to investigate the lack of institutional support from his schools and juvenile facilities.  These issues, therefore, will not be reviewed.

Respondent concedes proper exhaustion of the remaining issues but argues that the TCCA's adjudication—premised on the conclusion that trial counsel's performance was neither deficient nor prejudicial (Dkt. No. 90-17 at 395-403)—was reasonable within the purview of § 2254(d) (Dkt. No. 91 at 93, 100-12, 155-56).  Petitioner challenges this view, arguing that the adjudication was "objectively unreasonable within the meaning of § 2254(d)(2)."  (Dkt. No. 103

---

[14] This new evidence also includes: (i) declarations from Petitioner's teachers outlining his academic and social struggles and the public school system's failure to address his need for special education; (ii) declarations from TYC officers criticizing the TYC's practices of releasing juvenile offenders without rehabilitative support; (iii) an expert opinion by Debbie Dunn, a special education and learning disability specialist, diagnosing Petitioner with learning disabilities; (iv) an expert opinion by Michele Deitch, a juvenile corrections expert, about the adverse conditions at TYC facilities during Petitioner's commitment; and (v) an expert opinion by Gregory Boyle, a gang rehabilitation expert, opining that Petitioner was compelled into gang involvement by experiences of hopelessness, lack of parental support, trauma, and mental illness.  (Dkt. No. 28-1 at 42-52, 71-72, 94-100, 107-09; Dkt. No. 28-2 at 2-7, 31-56, 68-69; Dkt. No. 28-3 at 16-102; Dkt. Nos. 28-4 through 28-10; Dkt. Nos. 29 through 29-10; Dkt. Nos. 30 through 30-2; Dkt. No. 30-3 at 1-77; Dkt. No. 67-18; Dkt. No. 67-19 at 2-3).

at 43).    According to Petitioner, the state habeas court's underlying factual findings lack evidentiary support and are "rebutted by clear and convincing evidence" pursuant to § 2254(e)(1) insofar as the state habeas court disregarded evidence of ineffective assistance that was inconsistent with, or otherwise uncontested by, trial counsel's testimony.    (*Id.* at 47-86). Petitioner also contests the state court decision under § 2254(d)(1), offering his newly developed evidence to support *Strickland* prejudice.   (*Id.* at 86-124).

Reviewing Sub-claim 1B—which presents mixed questions of law and fact, *see Strickland*, 466 U.S. at 698—entails the two-step inquiry of determining: (i) whether the state habeas court's overall determination of the facts was reasonable under § 2254(d)(2), for which the court's specific findings of fact are presumed correct unless rebutted by clear and convincing evidence under § 2254(e)(1); and (ii) whether the state habeas court's conclusion that trial counsel was not ineffective was a reasonable application of *Strickland* under § 2254(d)(1).   *See Neal*, 78 F.4th at 783, 786.  The Magistrate Judge concludes that the state habeas court's factual findings remain presumptively correct, that its adjudication was based on a reasonable determination of the facts, and that the court's legal conclusion was a reasonable application of federal law clearly established under *Strickland*.

## 1.  State habeas court's findings and determination under § 2254(d)(2), (e)(1)

At the evidentiary hearing, members from the trial defense team offered testimony about their legal experience and roles in the mitigation investigation, the scope of the mitigation inquiry, justifications for foregoing certain investigatory leads, causes for delays, the circumstances leading to the absence of Petitioner's family, and Ms. Garza's reasoning behind using Dr. K. Allen's testimony to present Petitioner's psycho-social history to the jury. Petitioner's family, specifically, his mother and sister, offered competing testimony about their

unavailability for purposes of the sentencing hearing.  Deeming the defense team's testimony to

be credible, the state habeas court issued the following findings of fact.[15]

> Although [Petitioner's] case was the first death penalty case handled by [Mr.] Garza, he was, at the time, an experienced criminal law practitioner at both the trial and appellate level.
>
> Although [Petitioner's] case was the first death penalty case handled by [Ms.] Garza, she was, at the time, also an experienced criminal law practitioner, who had handled non-death penalty capital murder cases and was on the list of attorneys approved to be appointed lead counsel in death penalty cases.
>
> In addition, the record of [Petitioner's] case demonstrates that [trial counsel] and [Mr. Warner] on direct appeal had done a commendable job of representing [Petitioner,] particularly given the material they had had to work with.
>
>                * * *
>
> In particular, the record demonstrates that trial counsel had met their constitutional obligation to conduct an independent investigation of the facts of [Petitioner's] case.
>
> [Petitioner's] trial attorneys made [a] reasonable strategic decision to focus their strategy at the punishment phase of his trial on the mitigation issue.
>
> [Petitioner's] trial attorneys and [Bowen] conducted a constitutionally adequate investigation into potential[ly] mitigating circumstances in [Petitioner's] background.
>
>                * * *
>
> [Ms.] Garza spoke to [Petitioner] about mitigating evidence in his background as well as to family members in compliance with her duty to investigate.
>
> Further, the defense team procured the assistance of [Bowen,] a mitigation specialist.  [Bowen] talked to [Petitioner] and his family members and prepared a detailed [Bio-Psychosocial Report,] which contained extensive information about [Petitioner] and his background.

---

[15] Despite the state habeas court's characterization as conclusions of law, these constitute primarily factual findings.  *See Neal*, 78 F.4th at 786 (explaining that the existence of a strategic decision is a question of fact, whereas the reasonableness of that strategic decision is a question of law); *see also Hoffman v. Cain*, 752 F.3d 430, 442 (5th Cir. 2014) (listing examples of isolated findings of fact).

Additionally, [Mr. Garza] testified that the defense team was aware of [B. Ramirez, Petitioner's] oldest sister; however, they were only able to determine that she lived somewhere in Ohio, and not a definite address or location.

[Petitioner's state habeas mitigation specialist's] investigation was substantially similar to that conducted by [Petitioner's] trial team.

[Petitioner's] mother and sister moved to Corpus Christi and became unavailable to trial counsel; [trial counsel] preformed a constitutionally adequate sentencing phase in light of the limitations imposed by [Petitioner's] family's unavailability.

[Ms.] Garza was aware that [Petitioner's] mother and sister were moving to Corpus Christi[;] however[,] it was not at her direction. Rather, [Petitioner's] family moved at his direction. Further, [Petitioner's] trial counsel [were] not provided reliable and current contact information. The record merely reflects that at some time, after the trial, counsel [were] provided a Corpus Christi address and phone number.

In any event, family members are hardly objective and often change their views as to willingness to testify and what to say after the defendant receives a death sentence.

This left the attorneys to come up with a "fall-back" position: the use of Dr. [K.] Allen as an expert witness.

The record demonstrates that [Petitioner's] attorneys had adequately investigated [his] background and had presented the evidence concerning that subject which was available to them, given the unavailability of the members of [Petitioner's] family.

The Trial Court properly exercised its discretion under Texas Rule of Evidence 705(d) in weighing the admission of the background information used by Dr. [K.] Allen against the potential that the jury would be [led] to believe that Dr. [K.] Allen was testifying as to the truth of [Petitioner's] background. This Court weighed the potential that the jury would get the impression that the hearsay information is necessarily true against the [Petitioner's] right to present mitigation.

A miscalculation as to how the Trial Court will apply a rule of evidence does not constitute ineffective assistance[,] particularly when the rule in question inherently allows the court discretion in the area involved.

It is inappropriate to use hindsight to judge the actions of trial counsel as to what this Court would let in and must instead evaluate it based on the circumstances at the time. Given that the balancing test leaves the admission in the sound

discretion of the trial court, trial counsel [were] not ineffective for attempting to use their "fall back" method to present the mitigation evidence to the jury.

Trial counsel made a reasonable strategic decision as to how to handle presentation of mitigation evidence given the unexpected limitations on the availability of the witnesses they had intended to utilize to present said evidence to the jury. The witnesses were simply out of contact with the defense team at the critical stage of the case.

Trial [c]ounsel competently made an offer of proof to challenge [the] trial court's ruling on [the] Rule 705 issue; said offer reflects that counsel understood the possibility of an adverse ruling on the admissibility of Dr. [K.] Allen's testimony and competently preserved the issue for appeal.

[Petitioner's] trial attorneys also made a sound strategic decision not to attempt to interview [Petitioner's] co-defendants based on the fact that it was very unlikely that the codefendants' attorneys would allow them to do so.

Said attorneys likewise made a valid strategic decision not to call any of [Petitioner's] co-defendants to testify because they might say things that hurt the defense's case.

The trial record demonstrates that [Petitioner's] attorneys were fully prepared by the time [Petitioner's] case went to trial.

The additional information [Petitioner] now criticizes his attorneys for not finding or not presenting, which is largely cumulative of that which his [m]other and sister would have been able to testify to and that [Bowen] provided in her [Bio-Psychosocial Report,] would not have affected the end result, a decision that none of said information about [Petitioner] constituted sufficient mitigating circumstances to warrant imposition of a life sentence.

(Dkt. No. 90-17 at 396-402). Based on these factual findings, the state habeas court concluded that trial counsel did not fail to render effective assistance as to their investigation and presentation of potential mitigating evidence. (*Id.* at 395).

Petitioner contends that clear and convincing evidence of ineffective assistance rebuts these findings and renders the state habeas court's overall factual determination objectively unreasonable. (Dkt. No. 103 at 46-86). Petitioner raises a total of nine § 2254(e)(1) challenges. First, according to Petitioner, the state habeas court erred in making its credibility finding that

Ms. Garza communicated with Petitioner's family "for mitigating evidence about his background." (*Id.* at 50 (citing Dkt. No. 90-17 at 306)). This finding, he argues, was contradicted by Ms. Garza's declaration that only Bowen conducted mitigation interviews. (*Id.* (citing Dkt. No. 90-20 at 30)). Second, Petitioner contests the finding that any delay by Ms. Garza in assembling the defense team and initiating the investigation was merely attributable to the high volume of concurrent capital murder trials in a small county. (*Id.* at 50-51 (citing Dkt. No. 90-17 at 313-14)). Third, Petitioner complains that the state habeas court credited Bowen's testimony that she had asked Ms. Garza to ask the court for more time to continue with the mitigation investigation but was told by Ms. Garza that a continuance request had already been denied. (*Id.* at 52-53 (citing Dkt. No. 90-17 at 327)). Fourth, according to Petitioner, the state habeas court erred in finding that Ms. Garza instructed Bowen to conduct an extensive interview with Petitioner (*id.* at 54 (citing Dkt. No. 90-17 at 310)), when Bowen only spent five hours in communication with Petitioner, including travel time (*id.* at 54-55 (citing Dkt. No. 90-29 at 228-29)). Fifth, Petitioner contests the finding that Ms. Garza had subpoenaed Petitioner's juvenile records (*id.* at 61 (citing Dkt. No. 90-17 at 310)), insofar as trial counsel's files contained only a redacted version of said records obtained from the prosecution (*id.* (citing Dkt. No. 90-18 at 188-89)). Sixth, Petitioner challenges the credibility finding that Ms. Garza had provided Dr. K. Allen necessary documents several months in advance of her testimony. (*Id.* at 64-65 (citing Dkt. No. 90-17 at 311-12)). Petitioner points out here that Ms. Garza, as late as October 18, 2004, had avowed that she had not received the TYC records, that Dr. K. Allen was not retained until November 9, 2004, and that Petitioner's records were not sent to Dr. K. Allen until around mid-December. (*Id.* (citing Dkt. No. 86-13 at 7; Dkt. No. 32-6)). Seventh, Petitioner contests the finding that Ms. Garza had researched and was familiar with the admissible scope of expert

testimony.[16]  (*Id.* at 75 (citing Dkt. No. 90-17 at 313)).  Petitioner argues that certain courtroom discussions reflect Ms. Garza's ignorance over the matter (*id.*), and he notes that Mr. Garza did not recall conducting any related research (*id.* at 76 (citing Dkt. No. 90-17 at 297-98)).  Eighth, the state habeas court erred, Petitioner argues, in finding that trial counsel were not at fault for the unavailability of his mother and sister as witnesses.  (*Id.* at 77-79 (citing Dkt. No. 90-17 at 399)).  According to Petitioner, his family's relocation to Corpus Christi was irrelevant insofar as they could still have been located with diligence (*id.* (citing Dkt. No. 90-27 at 109)), and that, contrary to the factual finding, trial counsel obstructed their appearance in court (*id.* at 79-80, 81 n.10 (citing Dkt. No. 28-1 at 74-76; Dkt. No. 26-1 at 87)).  Ninth, Petitioner challenges the finding that his defense team was "only able to determine that [B. Ramirez] lived somewhere in Ohio, and not a definite address or location."  (*Id.* at 82-83 (citing Dkt. No. 90-17 at 398)).  According to Petitioner, B. Ramirez's address was provided to them in a filing served by the prosecution.[17]  (*Id.* at 83 (citing Dkt. No. 85-2 at 165; Dkt. No. 86-13 at 14-16)).

Petitioner also argues that his newly developed evidence is admissible under § 2254(e)(1) to challenge the above factual findings.  (*Id.* at 80).

That said, Petitioner's challenges rely mostly on debatable inferences.  As discussed, debatable inferences are insufficient to rebut the strong presumption of correctness afforded to a trial court's credibility determinations.  *See Neal*, 78 F.4th at 783, 787, 788 n.6.  Petitioner does

---

[16] Petitioner also raises error associated with the state habeas court's application of Rule 705(d) of the Texas Rules of Evidence, which governs the disclosure of otherwise inadmissible facts underlying an expert's opinion, in determining the admissibility of Dr. K. Allen's testimony.  (Dkt. No. 103 at 76 (citing Dkt. No. 90-17 at 400)).  According to Petitioner, Rule 803(6) of the Texas Rules of Evidence, governing the business records hearsay exception, set the proper standard.  (*Id.*).  Federal habeas courts, however, do not review state court interpretations of state law.  *Norris v. Davis*, 826 F.3d 821, 834 (5th Cir. 2016).

[17] Petitioner, however, omits any challenge to the state habeas court's more relevant finding that B. Ramirez was unavailable at the time of the suppression hearing.  (Dkt. No. 90-17 at 405).  He also fails to clarify whether the address listed in the prosecution's filing was either B. Ramirez's address at the time or during trial counsel's attempts to locate her.

not rebut any of the factual findings by clear and convincing evidence, *see Blue*, 665 F.3d at 654, and fails to show that a reasonable factfinder would convincingly find that the evidence he points to outweighs any opposing evidence. *See Colorado*, 467 U.S. at 316 (articulating clear-and-convincing-evidence standard).

For instance, Petitioner contests the state habeas court's implicit finding that external factors excused trial counsel's investigative delays. (Dkt. No. 103 at 50-51). According to Petitioner, a sixteen-month search for a mitigation investigator was "not supported by any evidence," and any difficulty in finding a mitigation specialist should not have otherwise excused Ms. Garza from conducting her own independent investigation pursuant to the American Bar Association's guidelines (the "ABA Guidelines"). (*Id.* at 51). Petitioner contends that the state habeas court erred in failing to defer to the ABA Guidelines, while relying instead on Ms. Garza's explanations, which lacked credibility. (*Id.* at 50-51). However, the state habeas court expressly considered these arguments (Dkt. No. 90-17 at 268, 277-78), and the presiding judge—himself a drafter of the Texas ABA Guidelines—opined that the ABA Guidelines established more of an aspirational standard (*see* Dkt. No. 90-28 at 32).

As another example, Petitioner challenges the state habeas court's finding as to his family's unavailability. He argues that the record of their pre-trial relocation—supported by Bowen's billing records (Dkt. No. 90-29 at 228) and Bio-Psychosocial Report (Dkt. No. 88-12 at 24-33)—and their initial presence in the courtroom support the inference that trial counsel should have been able to contact them after their move. (Dkt. No. 103 at 77-78). However, this inference does not adequately rebut the state habeas court's finding that "[Petitioner's] trial counsel [were] not provided reliable and current contact information."[18] (Dkt. No. 90-17 at 399).

---

[18] Even Petitioner's new evidence—a medical report by his mother's physician (Dkt. No. 26-1 at 87)—fails to rebut the finding. The report includes a handwritten note of limited legibility, purportedly

Even if Petitioner were able to rebut any individual findings under § 2254(e)(1), that would not automatically render unreasonable under § 2254(d)(2) the state habeas court's broader determination of the facts, *see Valdez*, 274 F.3d at 951 n.17, specifically, that trial counsel thoroughly investigated potential mitigating circumstances and were fully prepared for trial (Dkt. No. 90-17 at 397-98, 401). Much like his § 2254(e)(1) challenges, Petitioner's objections to the overall determination rely on debatable inferences and ostensible inconsistencies, such as purported discrepancies between Ms. Garza's statements and the evidence on the state record, Ms. Garza's failure to review and present the juvenile records, and additional delays in Ms. Garza's investigation and presentation of mitigating evidence.[19] (*See* Dkt. No. 103 at 55-75). Petitioner is unable to demonstrate that the state habeas court's overall determination of the facts was beyond the bounds of reasonable fact-finding. *See Blue*, 665 F.3d at 655.

In addition to these challenges based on the state record, Petitioner seeks to employ his newly developed evidence in contesting both the state habeas court's individual factual findings under § 2254(e)(1) and the reasonableness of its factual determination under § 2254(d)(2).

---

indicating that Petitioner's mother refrained from attending the sentencing hearing because "they"—interpreted by Petitioner as a reference to trial counsel—had opposed her appearance. (Dkt. No. 103 at 79). Hearsay issues aside, any inferences drawn from this note fare even worse than those derived from Petitioner's relocation-timing argument. Indeed, it is equally plausible that "they" refers to members of Petitioner's gang or his rival gang. Regardless, as discussed below, this new evidence cannot be considered because the federal review of a state court's factual determination under § 2254(d)(2) and (e)(1) is limited to the state record.

[19] More specifically, Petitioner contends that Bowen's billing records contradicted Ms. Garza's declaration concerning Bowen's interview with B. Ramirez (Dkt. No. 103 at 55-56), that Ms. Garza's belated TYC-records discovery fell short of ABA Guidelines (*id.* at 57-58), that Ms. Garza failed to review the TYC records (*id.* at 56, 59, 60-61), that her failure to review the TYC records was not a strategic decision (*id.* at 58), that the admission of the TYC records under Texas Rule of Evidence 803(6) could have prevented the exclusion of Dr. K. Allen (*id.* at 57, 72-75), that Ms. Garza's attempt to mislead the trial court regarding her lack of access to the TYC records was rebutted by the prosecution and contradicted by Bowen's billing records (*id.* at 59-60), that Ms. Garza belatedly obtained Petitioner's school records (*id.* at 62-63), that Ms. Garza's belated funding request for Dr. K. Allen suggested the attorney's inadequate preparation (*id.* at 63), and that Dr. K. Allen was not provided with Petitioner's records in a timely manner (*id.* at 64-69).

In support of § 2254(e)(1) admissibility, Petitioner cites to *Lambert v. Blackwell*, 387 F.3d 210 (3d. Cir. 2004) and *Taylor v. Maddox*, 366 F.3d 992 (9th Cir. 2004)).  (Dkt. No. 103 at 80).  According to these authorities, the language of § 2254(e)(1) contemplates a challenge to a state court's individual fact determinations based wholly or in part on evidence outside the state trial record.  *Lambert*, 387 F.3d at 235 (citing *Taylor*, 366 F.3d at 999-1000); *see Taylor*, 366 F.3d at 1000 (state court's factual findings surviving intrinsic review under § 2254(d)(2) are presumed correct under § 2254(e)(1), which may then be challenged with extrinsic evidence).  Subsequently, however, the Supreme Court ruled in *Cullen v. Pinholster*, 563 U.S. 170 (2011), that § 2254(d)(1) review is circumscribed by the record before the state court.  *Id.* at 181.  Offering "clarity" in this regard, the Supreme Court noted that "§ 2254(d)(2) includes the language 'in light of the evidence presented in the State court proceeding,' whereas § 2254(d)(1) does not."  *Id.* at 185 n.7.  Following the *Pinholster* ruling, through *Murray v. Schriro*, 745 F.3d 984 (9th Cir. 2014), the Ninth Circuit expressly abandoned its prior interpretation of § 2254(e)(1).  *Id.* at 999-1000.  The Third Circuit does not appear to have since abandoned its own interpretation of § 2254(e)(1) post-*Pinholster*.  *See Eley v. Erickson*, 712 F.3d 837, 846 n.11 (3d Cir. 2013).  Nonetheless, in the *Lambert* case, the Third Circuit did highlight the Fifth Circuit's fundamentally different understanding of the relationship between § 2254(d)(2) and § 2254(e)(1): individual factual challenges are first evaluated under § 2254(e)(1), then the entirety of the factual determination is reviewed under § 2254(d)(2).  *Lambert*, 387 F.3d at 236 n.19, 239 (citing *Valdez*, 274 F.3d at 951 n.17).

Indeed, as contemplated by *Pinholster*, the Fifth Circuit bars evidence newly presented on federal review under § 2254(d)(2), *see Blue*, 665 F.3d at 656, reading § 2254(d)(2) and (e)(1) as two parts of a single approach to reviewing the reasonableness of the state court's fact

determination, *see Neal*, 78 F.4th at 783.  The Fifth Circuit even considers a § 2254(e)(1) review to be "arguably more deferential" than a review under § 2254(d)(2).  *See Blue*, 665 F.3d at 654. The Fifth Circuit's framework—to which this court is bound—thus calls for the rejection of Petitioner's stance that his new evidence can be considered to rebut the state court's findings under § 2254(e)(1).

Otherwise, in support of § 2254(d)(2) admissibility, Petitioner relies on *Ward v. Stephens*, 777 F.3d 250 (5th Cir. 2015).  (Dkt. No. 103 at 126, 167 (citing *Ward*, 777 F.3d at 258-59)). According to Petitioner's interpretation of *Ward*, new evidence may support an exhausted claim, provided it neither significantly changes and strengthens the claim's posture nor fundamentally alters its legal basis.  (*Id.* at 126).  However, the *Ward* case considered the role of new evidence in the context of assessing the exhaustion of a claim under § 2254(b)(1), not the scope of evidence on federal habeas review.  *Ward*, 777 F.3d at 257-58.  Contrary to Petitioner's position, *Ward* further clarified, based on *Pinholster*, that only the state court record is considered for purposes of § 2254(d)(1) review, 777 F.3d at 264 (citing *Pinholster*, 563 U.S. at 181-82), a restriction which applies a fortiori to § 2254(d)(2) review, *see Blue*, 665 F.3d at 655-56. Additionally, while Petitioner contends that he has satisfied the diligence requirement under § 2254(e)(2)(A)(ii), his new evidence fails to establish that further fact-finding would exonerate him.  *See Shinn*, 596 U.S. at 381 (citing 28 U.S.C. § 2254(e)(2)(B)).  Petitioner's new evidence is inadmissible for § 2254(d)(2) review.

Any new evidence, therefore, is excluded from consideration in reviewing of the state court's factual determination under § 2254(d)(2) and (e)(1).

## 2.  Ineffective assistance under § 2254(d)(1) and *Strickland*

For purposes of the § 2254(d)(1) inquiry, Petitioner contends that a constitutionally adequate investigation and presentation of evidence by trial counsel would have offered the jury "a sound foundation for understanding the psycho[-]social environment in which Petitioner's myriad mental and neurological disabilities originated, developed, and then festered, when educational and juvenile systems outright failed him."  (Dkt. No. 67 at 222-26).  As noted, Petitioner's arguments rely almost exclusively on evidence he developed on federal habeas review.  (*Id.* at 248-51).  Again, this evidence includes declarations from family and friends about Petitioner's disadvantaged background and experiences, educator declarations about his academic struggles and lack of special education, TYC officer declarations criticizing the system's release practices, and expert opinions over Petitioner's learning disabilities, the inadequacy of the TYC facilities, and Petitioner's susceptibility to gang involvement.

As a threshold matter, according to Petitioner, his new evidence demonstrates that uncontrollable psycho-social factors rendered him susceptible to gang influence, which, in turn, supports a reasonable probability that at least one juror would have reached a different conclusion as to his moral culpability.  (*Id.* at 182, 226, 251).  However, consistent with the discussion above, Petitioner's new evidence will not be considered here, as § 2254(d)(1) review is limited to the state record.  *See Woodfox*, 772 F.3d at 368.

Moving to the merits, the alleged deficiencies raised by Petitioner—excluding the two unexhausted issues regarding his gang and prison experts and lack of institutional support from schools and juvenile facilities—are evaluated in reviewing the state habeas court's application of the *Strickland* standard under § 2254(d)(1).  Again, Petitioner contests the constitutional adequacy of various facets of trial counsel's representation.  He complains that trial counsel

failed to investigate and present evidence of his socio-economic background, childhood experiences, and the prevalence of gang violence in his community, which would have supposedly demonstrated his heightened susceptibility to gang involvement. He also criticizes counsel's handling of his psycho-social history insofar as they failed to procure the testimony of his mother and sister, misjudged the admissibility of Dr. K. Allen's testimony, delayed Bowen's investigation, and undermined Dr. K. Allen's testimony preparations. Finally, Petitioner takes issue with counsel's qualifications to defend a capital case.

Regardless of these alleged deficiencies, Petitioner fails to establish resulting prejudice. *See Strickland*, 466 U.S. at 697 ("[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies."). As addressed, the state habeas court considered Petitioner's voluminous affidavits from family and friends, which provided a sympathetic insight into his turbulent upbringing and other psycho-social factors. This evidence, however, was largely cumulative, varying from the evidence presented at trial only in detail, without altering its overall mitigating effect. *See Villegas v. Quarterman*, 274 F. App'x 378, 384 (5th Cir. 2008) (per curiam). Dr. K. Allen presented her expert opinion on Petitioner's psycho-social history, testifying that Petitioner's inability to make reasonable behavioral choices stemmed from mental impairments exacerbated by prolonged neglect, abuse, and gang influence. (Dkt. No. 87-23 at 14). While the details of Petitioner's tragic childhood experiences could have evoked emotion, the jury had already been made aware of the general circumstances of Petitioner's upbringing. The Fifth Circuit has refused to find *Strickland* prejudice where trial counsel presents—even if briefly— mitigating evidence similar to the additional evidence offered on collateral review. *See Villegas*, 274 F. App'x at 384; *see also Coble v. Quarterman*, 496 F.3d 430, 436 (5th Cir. 2007);

*Rodriguez v. Quarterman*, 204 F. App'x 489, 501 (5th Cir. 2006) (per curiam).   Simply, Petitioner fails to satisfy his burden to show that the outcome would have been different.   *See Berghuis v. Thompkins*, 560 U.S. 370, 389 (2010).

Moreover, the brutal facts of the robbery-homicide would have remained overwhelmingly compelling in sentencing Petitioner to death.   Petitioner not only participated in the violent robbery-homicide but also commanded the other assailants.   Bound and beaten, the victims were murdered in an execution-like manner.   The "horrific facts of the crime," *Martinez v. Quarterman*, 481 F.3d 249, 259 (5th Cir. 2007), and "cruel manner in which he killed," *Miniel v. Quarterman*, 339 F.3d 331, 347 (5th Cir.2003), weigh heavily against a finding of *Strickland* prejudice, *see Knight v. Quarterman*, 186 F. App'x 518, 535 (5th Cir. 2006); *see also Ladd v. Cockrell*, 311 F.3d 349, 360 (5th Cir. 2002); *Andrews v. Collins*, 21 F.3d 612, 624 n.23 (5th Cir. 1994); *Russell v. Lynaugh*, 892 F.2d 1205, 1213 (5th Cir. 1989).

Jurors would have also deemed compelling Petitioner's persistent refusals to reform his life in compliance with societal expectations, even during incarceration.   As a juvenile, Petitioner had been arrested for several felonies, including multiple counts of aggravated assault and deadly conduct.   During juvenile corrections custody, Petitioner continued to exhibit violent behaviors and utter disregard for law and order.   Petitioner also repeatedly violated the conditions of supervised release—engaging in activity that resulted in his arrest, seeking the company of gang members, and eventually carrying out their violent agenda in the underlying robbery-homicide.   Then, while awaiting trial in this very case, he was caught with weapons and drugs in his cell.

With that view of the evidence, Petitioner fails to show that the state habeas court's conclusion was contrary to or an objectively unreasonable application of *Strickland*.

For these reasons, the exhausted aspects of Sub-claim 1B are without merit.

### 3. Conclusion

Here, Petitioner failed to properly exhaust his arguments as to trial counsel's alleged failures to have his gang and prison experts, Stewart and Fitzgerald, review his records, investigate his background, and testify at sentencing. These unexhausted issues are not available for federal habeas review. As to the properly exhausted aspects of this sub-claim, the record does not support Petitioner's contention that trial counsel unconstitutionally ignored crucial mitigating evidence. Petitioner fails to rebut the presumption of correctness as to the state habeas court's factual findings and does not demonstrate that the findings were objectively unreasonable. Finally, Petitioner fails to show that the state habeas court's decision was contrary to, or an unreasonable application of, established federal law under *Strickland*.

### C. **Claim 2—Unconstitutionality of the Death Sentence Due to Petitioner's Age**

Through Claim 2, Petitioner contends that his age at the time of the offense makes him ineligible for a death sentence under the cruel and unusual punishment clause of the Eighth Amendment because (i) evolving societal and judicial standards exempt those under the age of 21 and (ii) he has the cognitive and emotional characteristics of a juvenile offender with insufficient culpability. (Dkt. No. 67 at 252-73). When this claim was raised on direct appeal, the TCCA dismissed it for inadequate briefing pursuant to Rule 38.1 of the Texas Rules of Appellate Procedure. *Ramirez*, 2007 WL 4375936, at *19-20. Rule 38.1 has been recognized to "constitute an independent and adequate state ground for denial of [federal habeas] relief." *Roberts v. Thaler*, 681 F.3d 597, 608 (5th Cir. 2012). Petitioner appears to concede procedural default but argues for the application of the miscarriage-of-justice exception to the procedural bar based on his mental impairments. (Dkt. No. 103 at 181-82 (citing *Williams v. Thaler*, 602 F.3d 291, 307 (5th Cir. 2010), *abrogated on other grounds by Thomas v. Lumpkin*, 995 F.3d 432,

440 (5th Cir. 2021))).   According to Petitioner, his mental impairments not only render his sentence unconstitutional but also forgive the procedural bar by demonstrating his factual innocence of the offense of conviction.   (*Id.* at 182 (citing *Sawyer*, 505 U.S. at 345, 347)).

The Magistrate Judge concludes that Petitioner has failed to establish an exception to the procedural bar and that the claim is otherwise meritless.

### 1. Actual innocence of the death penalty

Petitioner claims that his mental impairments make him ineligible for the death penalty insofar as they establish his actual innocence of the capital murder conviction.   (Dkt. No. 103 at 182).   This claim, in turn, ostensibly invokes the fundamental-miscarriage-of-justice exception to the otherwise applicable procedural bar.   (*Id.*).   To successfully raise this exception, Petitioner must demonstrate, by clear and convincing evidence, that, but for a constitutional error, no reasonable juror would have found him eligible for the death penalty under applicable state law. *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quoting *Sawyer*, 505 U.S. at 336) (quotations omitted); *see also Calderon*, 523 U.S. at 559-60.   Petitioner must present new, reliable evidence in support.   *Calderon*, 523 U.S. at 559-60.

Petitioner's proffered evidence simply does not clearly and convincingly demonstrate that, but for the alleged constitutional error, no reasonable juror would have found him eligible for the death penalty under the Texas law.   *See Dretke*, 541 U.S. at 393.

The Eighth Amendment has been held to preclude the execution of those deemed intellectually disabled under "prevailing clinical standards."   *See Moore v. Texas*, 581 U.S. 1, 15 (2017).   The Fifth Circuit, however, has consistently refused to extend death penalty ineligibility to those with mental impairments falling short of intellectual disability.   *See Smith*, 927 F.3d at 339 (citing *Rockwell v. Davis*, 853 F.3d 758, 763 (5th Cir. 2017); *Mays v. Stephens*, 757 F.3d

211, 219 (5th Cir. 2014); *In re Neville*, 440 F.3d 220, 221 (5th Cir. 2006) (per curiam)).  While

Petitioner may argue that his mental impairments reduce his culpability (Dkt. No. 103 at 182,

261, 269), he does not contend that his impairments meet the intellectual disability threshold.[20]

      Second, assuming for the sake of argument that the mental impairments ostensibly faced

by Petitioner can render a defendant ineligible for the death penalty, Petitioner fails to satisfy the

applicable "clear and convincing evidence" standard.  In support of his mental impairments,

Petitioner offers the psychological evaluations conducted during his juvenile detention by Dr.

Gary Whitworth and Dr. Michelle Woehr, TYC psychologists who diagnosed Petitioner with

major depressive disorder, post-traumatic stress disorder, poly-substance dependence, an

unspecified conduct disorder, and a reading disorder.  (Dkt. No. 90-19 at 29; Dkt. No. 90-21 at

251).  Beyond mere conclusory statements, however, Petitioner does not attempt to substantiate

that this evidence outweighs the State's evidence, *see Dretke*, 541 U.S. at 393, including what

evidence the State could present on remand, *see Bousley*, 523 U.S. at 624, such as Dr. T. Allen's

diagnosis of antisocial personality disorder.

      Petitioner thus fails to overcome the procedural bar.[21]

---

[20] Nor does Petitioner even offer any evidence that he is intellectually disabled.  Texas courts "apply contemporary clinical standards—the framework set forth in the DSM-5—for assessing intellectual disability." *Petetan v. State*, 622 S.W.3d 321, 325 (Tex. Crim. App. 2021) (footnote omitted).  Despite having reviewed Dr. Martinez's findings, none of Petitioner's new experts suggest the possibility that Petitioner is intellectually disabled within the meaning of the relevant standards.  (*See* Dkt. No. 30-3 at 79-83, 85-86; Dkt. No. 30-4 at 6-19; Dkt. No. 67-17 at 55-79).

[21] Petitioner raises the same argument in attempting to overcome the procedural bar as to multiple sub-claims within Claim 17, which generally concerns the constitutionality of the death sentence.  According to Petitioner, a federal court can reach the merits of these sub-claims under a miscarriage-of-justice theory because "his severe mental illnesses and emotional disturbances" render his culpability as low as that of "those who are intellectually disabled."  (Dkt. No. 103 at 261-62, 264, 265-66, 269-70, 270-71).  The same reasoning preventing the consideration of Claim 2 prevents the federal review of the sub-claims under Claim 17.  Actual innocence is not cognizable as a substantive claim, whether attacking death eligibility under *Sawyer* or the underlying conviction under *Schlup*.  *See Rocha v. Thaler*, 626 F.3d 815, 818-20 (5th Cir. 2010); *see also Foster*, 466 F.3d at 367.

### 2.  Age limit for the death penalty

Regardless, Claim 2 is without merit.

Petitioner was eighteen years and nine months of age on the date of the robbery-homicide.  (*See* Dkt. No. 88-10 at 244).  The law currently allows for the execution of an offender who committed the crime after their eighteenth birthday.  Recognizing that "a line must be drawn" somewhere, the Supreme Court held in *Roper v. Simmons*, 543 U.S. 551 (2005), that "[t]he age of 18 is the point where society draws the line for many purposes between childhood and adulthood."  *Id.* at 574.  The *Roper* court thus unequivocally declared that eighteen is "the age at which the line for death eligibility ought to rest."  *Id*.

Yet, relying on novel constitutional theories and expert opinions about brain maturation, Petitioner argues that the death penalty line should instead be drawn at age 21.  (Dkt. No. 67 at 255-66).  In Petitioner's view, the *Roper* decision is part of a march towards this new rule.  (*See* Dkt. No. 103 at 183-84).  According to Petitioner, "(1) . . . a national consensus [has] develop[ed] against executing [persons under 21 years of age]; (2) scientific consensus supports a finding of lesser culpability for certain classes of offenders; and/or (3) . . . a capital sentence fails to serve the purported aims of punishment."  (Dkt. No. 67 at 256).

The rule in *Teague v. Lane*, 489 U.S. 288 (1989), however, bars federal habeas courts from granting relief based on the creation of new constitutional rules.  *See Caspari v. Bohlen*, 510 U.S. 383, 389-90 (1994).  A "new rule" is one which was not dictated by precedent existing at the time the defendant's conviction became final.  *See O'Dell v. Netherland*, 521 U.S. 151, 156 (1997).  A federal court lacks authority to mandate any extension of *Roper* to those who, like Petitioner, committed their crimes before age 21, as "[t]he explicit overruling of an earlier holding no doubt creates a new rule[.]"  *See Saffle v. Parks*, 494 U.S. 484, 488 (1990).

For these reasons, Claim 2 is procedurally barred as defaulted and otherwise without merit.

**D.  Claim 3—Trial Counsel's Pre-trial and Guilt Phase Representation**

Through Claim 3, Petitioner raises several categories of complaints about the ineffective assistance of trial counsel, enumerated as the following sub-claims:

Sub-claim 3A—Ms. Garza's conflict of interest (Dkt. No. 67 at 278-81);

Sub-claim 3B—Mr. Garza's conflict of interest (*id.*);

Sub-claim 3C—Failure to investigate and address police coercion and the unreliability of Petitioner's interrogation statement at the suppression hearing (*id.* at 281-86);

Sub-claim 3D—Failure to investigate and present at the suppression hearing evidence of Petitioner's intoxication at the time of his interrogation and his request for counsel, specifically, the testimony of B. Ramirez and J. Garcia (*id.* at 286-87);

Sub-claim 3E—Failure to timely discover the existence of Petitioner's arrest and booking recordings for the suppression hearing (*id.* at 287-88);

Sub-claim 3F—Failure to investigate and present testimonial evidence of Petitioner's request for counsel during booking (*id.* at 288-89);

Sub-claim 3G—Failure to competently impeach prosecution witnesses at the suppression hearing (*id.* at 289-91);

Sub-claim 3H—Failure to adequately examine Petitioner at the suppression hearing (*id.* at 291-92);

Sub-claim 3I—Failure to investigate and present evidence of the effects of Petitioner's intoxication on the reliability of his interrogation statement at the suppression hearing (*id.* at 292);

Sub-claim 3J—Failure to conduct an adequate pre-trial investigation (*id.* at 293-95);

Sub-claim 3K—Failure to raise a grand jury challenge (*id.* at 296-97);

Sub-claim 3L—Failure to request a change of venue (*id.* at 297-98);

Sub-claim 3M—Failure to conduct an adequate jury selection (*id.* at 298-302);

Sub-claim 3N—Failure to object to the prosecution's peremptory challenges (*id.* at 302-04);

Sub-claim 3O—Failure to request continuances (*id.* at 304-06);

Sub-claim 3P—Failure to investigate and raise innocence arguments (*id.* at 306-08);

Sub-claim 3Q—Failure to present evidence of the involuntariness, falsity, and unreliability of Petitioner's confession during the guilt phase (*id.* at 308-10);

Sub-claims 3R through 3W—Failure to raise timely objections to preserve an appeal (*id.* at 310-16) ;

Sub-claim 3X—Failure to request a proper record of all proceedings (*id.* at 317-19);

Sub-claim 3Y—Cumulative effect of errors (*id.* at 319-21).

Respondent raises the defenses of exhaustion and procedural default with respect to all aspects of Claim 3 except as to Sub-claims 3B—concerning Mr. Garza's alleged conflict of interest—and 3N—concerning trial counsel's failure to object to peremptory challenges.  (Dkt. No. 91 at 162-241).  Petitioner contests Respondent's procedural challenge only as to Sub-claims 3J—concerning trial counsel's failure to conduct an adequate pre-trial investigation—and 3P—concerning trial counsel's failure to raise an actual-innocence claim.   These sub-claims, Petitioner argues, were adjudicated by the state habeas court.  (Dkt. No. 103 at 211, 221-22).

Petitioner also invokes the actual-innocence exception as to any procedurally barred sub-claims.  (*Id.* at 184-89).  In support, Petitioner offers a witness declaration raising ostensible wrongdoing by law enforcement associated with his arrest and interrogation.  (Dkt. No. 67-17 at 20).  Also offered are declarations by M. Bocanegra, who alleges that Petitioner is not the "Lenny" he initially referred to as the lead assailant.  (*Id.* at 6-7; *see also* Dkt. No. 89-2 at 42-48). As to Sub-claim 3Y, concerning the cumulative effect of counsel's error, Petitioner argues

against the imposition of the procedural bar on grounds of impossibility, or that "[t]here was no earlier proceeding where [he] could have had the cumulative consideration of all the [sub-claims] presented here." (Dkt. No. 103 at 227).

The Magistrate Judge concludes that Sub-claims 3B and 3N were exhausted on state collateral review, Sub-claims 3A, 3E through 3H, 3K through 3M, 3O, and 3R through 3Y are unexhausted, and Sub-claims 3C, 3D, 3I, and 3Q were presented initially in the Second State Petition but are defaulted on state procedural ban on subsequent habeas petitions, *see Ex parte Ramirez*, 2015 WL 6282336, at *1. More specifically, Petitioner raised Sub-claims 3C and 3D in the Second State Petition as part of claim 5 (*see* Dkt. No. 90-20 at 197-208) and Sub-claim 3I as claim 1 (*see id.* at 115-30). Sub-claim 3Q is deemed procedurally defaulted, notwithstanding Petitioner's failure to raise a significant portion of the sub-claim in state court, given Petitioner's presentation of some of its issues in the Second State Petition as part of claim 2. (*See id.* at 130-38). Petitioner fails to overcome the procedural bar, based on actual innocence or otherwise, as to any aspect of Claim 3. The contested procedural postures of Sub-claims 3J and 3P are immaterial, as these sub-claims are meritless. Accordingly, the following discussion will focus only on Petitioner's actual innocence raised as a procedural gateway and Sub-claims 3B, 3J, 3N, 3P, and 3Y. As addressed below, none of those sub-claims warrant federal habeas relief.

### 1. Actual innocence

Petitioner makes the broad statement that "any default of [Claim 3] is excused" by the fundamental-miscarriage exception based on actual innocence. (Dkt. No. 103 at 189). Unlike Claim 2, however, Petitioner argues that he is actually innocent because (i) his co-defendant's spouse allegedly heard Detective Alvarez's admission that Petitioner's interrogation statement

was obtained illegally and (ii) M. Bocanegra's statements about Lenny show that Petitioner did not actually commit the robbery-homicide.[22]  (*See id.* at 184-89).

Petitioner submits, as exculpatory evidence of his actual innocence, a declaration by Dina Martinez, the wife of co-defendant Jorge Martinez, stating as follows:

> [Detective] Alvarez told me that that [sic] some of [Petitioner's] statement to the police was taken illegally and that[,] of all the people who were arrested in connection with these crimes, [Petitioner's] arrest was the most problematic. [Detective Alvarez] did not elaborate beyond saying [Petitioner's] arrest was "wrong."

(Dkt. No. 67-17 at 20).  Petitioner is silent as to the admissibility of this declaration, which is entirely dependent on hearsay.[23]  Given this shortcoming, the declaration will not be considered in support of Petitioner's actual innocence.  *See Young v. Stephens*, 2014 WL 2628941, at *19 (W.D. Tex. June 13, 2014) (denying petitioner's request for leave to file hearsay declarations for their lack evidentiary value), *aff'd*, 795 F.3d 484 (5th Cir. 2015), *as revised* (July 30, 2015).

That said, in arguing for actual innocence, Petitioner relies chiefly on the statements made by his co-defendant, M. Bocanegra.  The record contains three sworn statements by M. Bocanegra.  The first of these, which was made to police in 2003, after the robber-homicide, described Lenny's actions in the west-side house:

> I went with Lenny to [the west-side] house.  Lenny went inside the house. . . . I did go inside and Lenny told me to tie [Gutierrez] up.  I did hear a gunshot coming from the area of the other house. . . . I did as Lenny told me and tied [Gutierrez] up loosely in living room where she was laying on the sofa.  Lenny had [J. Hidalgo] on the floor.  Lenny got an orange extension cord and tied [J.

---

[22] As part of the state habeas proceedings, Petitioner asserted actual innocence based on an alibi statement provided by his girlfriend, as well as a co-defendant's statement that purported to minimize Petitioner's involvement in the robbery-homicide.  (Dkt. No. 90-18 at 224-34).  The state habeas court denied this claim of actual innocence on its merits.  (Dkt. No. 90-17 at 377-83, 404).  For present purposes, Petitioner has abandoned those grounds, relying instead on statements by M. Bocanegra.

[23] Indeed, there is no indication from his trial testimony that Detective Alvarez was even involved in effecting Petitioner's arrest, let alone in conducting the interrogation.  Thus the basis for his personal knowledge of these matters is unclear.

Hidalgo] up after he took [J. Hidalgo's] shoes, chain and shirt.  Lenny was beating [J. Hidalgo] on the head with a frying pan, after he kicked [J. Hidalgo] several times.  After I saw that Lenny was not letting up on [J. Hidalgo] I told Lenny to stop.  Lenny pointed his [AK-47] at me and told me in Spanish that he would drop me there, if I did not do what I needed to do.  Lenny went to check [Gutierrez] and got after me, because I had tied [Gutierrez] up loosely.  Lenny was walking around the house and he had been asking [Gutierrez] and [J. Hidalgo] if they had any drugs and or [sic] weapons.  [J. Hidalgo] told Lenny to take anything that he wanted.  I do not know if [Lenny] actually took anything . . . from [J. Hidalgo.]

[Gutierrez] was calm and she showed no emotion.  Lenny threw a rag on [J. Hidalgo's] head.  I do not remember the color of the rag.  Lenny left to the [east-side] house and I heard gunshots right after that. I was leaving the [west-side] house and Lenny came back.  Lenny asked me in Spanish[,] ["]Que Onda,["] meaning ["]what's going on, why was I leaving?["]  I stayed silent.  I thought that Lenny was going to shoot me there, but the other guys came out from the [east-side] house.  I then saw that Lenny went inside the [west-side house] and I heard several gunshots after that.  I then ran from the area.

(Dkt. No. 89-2 at 43-44).

Later, M. Bocanegra attested through a 2013 affidavit that Petitioner was not Lenny:

After I was arrested, I gave the police a statement in which I described an individual named Lenny.  Lenny was that person's nickname, but I do not know his actual name.  I had never met him before that night.

I met [Petitioner] for the first time in Hidalgo County Jail.  [Petitioner] is not Lenny.

The Lenny that I described is not [Petitioner.]  I do not know how the police linked [Petitioner] to Lenny.  If they did, it was not through me.

(*Id.* at 47-48).

Lastly, through a 2019 declaration, M. Bocanegra admitted that he was in fact the man originally identified as Lenny:

I made a statement to police in which I attributed certain actions to another individual named "Lenny."  However, I did the actions that I attributed to "Lenny" in my statement to the police.  When I described to the police what "Lenny" did on January 5, 2003, including that "Lenny" was involved in the shooting, I was describing my own actions on that date.

(Dkt. No. 67-17 at 6).

According to Petitioner, the latter two statements "reveal[ ] that [he] and Lenny are not the same person."  (Dkt. No. 67 at 358).

To frame his burden within the actual innocence standard, Petitioner must show: (i) that M. Bocanegra's statements are new and reliable evidence; and (ii) that, in light of such evidence, it is more likely than not that no reasonable juror would have convicted Petitioner.  *See Woodfox*, 609 F.3d at 793-94 (citing *Fairman v. Anderson*, 188 F.3d 635, 644 (5th Cir. 1999)).   One example of new, reliable evidence that may establish factual innocence would include a credible declaration of guilt by another.  *Fairman*, 188 F.3d at 644.

M. Bocanegra's two latest accounts of the crime are not credible and thus not reliable. M. Bocanegra has provided three different accounts, varying widely in several crucial details— including the number of the assailants involved, what each assailant did, and who they were. When Petitioner presented M. Bocanegra's 2013 affidavit as part his Chapter 64 motion proceedings, the State argued that the affidavit was not credible because: (i) an exculpatory post-conviction statement by a co-defendant is inherently suspect, especially when the co-defendant came forward with the information after they no longer faced any consequences; (ii) M. Bocanegra and Petitioner were members of the same street gang; and (iii) the post-conviction statement contradicted Petitioner's own interrogation statement.  (Dkt. No. 89-2 at 113-14). Again, through his own statement, Petitioner effectively admitted to taking on a leadership role during the robbery-homicide, which admission was corroborated by the eyewitness testimony of one of the victims, namely, Gutierrez.  The TCCA affirmed the state district court's finding that the 2013 affidavit was not credible.  *Ramirez*, 621 S.W.3d at 723.  For similar reasons, M. Bocanegra's 2019 statement also lacks credibility.

Moreover, Petitioner fails to show that it is more likely than not that no reasonable juror would have convicted him in the light of M. Bocanegra's statements. Petitioner's argument depends on the notion that "the prosecution vigorously used [Petitioner's] involuntary statement and the statement of [M. Bocanegra] that someone named [']Lenny['] committed the offenses to support [its] theory." (Dkt. No. 67 at 310). However, this misrepresents the trial record. The prosecution did not place any special reliance on M. Bocanegra's account of Lenny's actions or otherwise attempt to connect Petitioner to Lenny. M. Bocanegra was not called as a witness at Petitioner's trial. His statement was not otherwise introduced into the record. Nor did the prosecution introduce testimony or evidence that Petitioner was even known as Lenny.[24] Instead, the prosecution based its case on correlating the description of events in Petitioner's own interrogation statement with Gutierrez's testimony. Simply, the jury was never presented with any information about M. Bocanegra's statements concerning Lenny's actions.

For these reasons, Petitioner fails to establish his actual innocence for purposes of overcoming the procedural bar.

### 2. Sub-claim 3B—Mr. Garza's conflict of interest

Through Sub-claim 3B, Petitioner contends that Mr. Garza had a conflict of interest that adversely affected his representation of Petitioner. According to Petitioner, his sister B. Ramirez's relationship with Mr. Garza's cousin played into Mr. Garza's decision not to call B. Ramirez as a witness. (Dkt. No. 67 at 280). Petitioner argues that B. Ramirez "could have offered valuable evidence to corroborate [Petitioner's] testimony at the suppression hearing as well as to support [Petitioner's] mitigation presentation." (*Id.*). When Petitioner raised this sub-claim in the Initial State Petition (Dkt. No. 90-18 at 242-43), the state habeas court denied it on

---

[24] As reviewed further below, the name of Lenny was brought up during the trial, not by the prosecution, but by Ms. Garza during the cross-examination of Investigator R. Ruiz.

the merits (Dkt. No. 90-17 at 388-90, 406-07). Petitioner fails to demonstrate, however, that the state adjudication was unreasonable. Despite this failure to examine Sub-claim 3B under § 2254(d), the reasonableness of the state court's decision will be reviewed.

Although Petitioner lumps Sub-claim 3B with *Strickland* claims, his argument centers instead on *Cuyler v. Sullivan*, 446 U.S. 335 (1980), which held that a defendant may establish a Sixth Amendment violation by showing that an "actual" conflict of interest adversely affected their attorney's performance. *Id.* at 348. An "actual conflict" exists when counsel is compelled to compromise their duty of loyalty or zealous advocacy to the accused by choosing between, or blending, the divergent or competing interests of a former or current client. *Perillo v. Johnson*, 205 F.3d 775, 781 (5th Cir. 2000) (quotations omitted). An "adverse effect" requires proof that some plausible alternative defense strategy or tactic could have been pursued but was not because of the actual conflict impairing counsel's performance. *Id.* (quotations omitted). "Assuming the defendant establishes an actual conflict that adversely affected counsel's performance, prejudice is presumed without any further inquiry into the effect of the actual conflict on the outcome of the defendant's trial." *Id.* at 781-82. The Supreme Court has held that *Cuyler* only applies to conflicts due to representation of "multiple or serial" clients. *Beets v. Scott*, 65 F.3d 1258, 1265 (5th Cir. 1995); *see also Hernandez v. Johnson*, 108 F.3d 554, 559 (5th Cir. 1997). Here, because neither of Petitioner's attorneys represented his co-defendants, relief is unavailable under *Cuyler*.

Federal courts may also consider claims of conflict under *Strickland* when the attorney's self-interest undermines their duty of loyalty to the client. *See Beets*, 65 F.3d at 1265-66. To prevail, a petitioner must demonstrate that trial counsel's representation fell below an objective standard of reasonableness and that, in light of the overall result of the prosecution, this

deficiency prejudiced the defense, thereby undermining the reliability of the trial proceedings. *See id.* at 1272-73. Even under the *Strickland* standard, Petitioner fails to demonstrate a conflict of interest rising to the level of a constitutional violation.

The state habeas court explored the relationship between Mr. Garza, his cousin, and B. Ramirez. Petitioner relied on an affidavit from his sister, who stated:

> I do not think [Mr. Garza] wanted me there. [Andres Garza] is his cousin, and prior to all this happening, [Andres Garza] had an altercation with [Petitioner.] I think this had an impact on [Mr. Garza,] and at the very least, created an appearance of conflict.

(Dkt. No. 90-18 at 300). During the state evidentiary hearing, Mr. Garza explained that, upon discovering the relationship, he timely notified Petitioner and tried to stay away from his cousin. (Dkt. No. 90-17 at 299). Mr. Garza affirmed that the situation did not affect his decisions in this case. (*Id.* at 300). The state habeas court issued findings and conclusions denying Petitioner's sub-claim, stating that Petitioner "f[ell] far short of meeting the requirements to establish" a conflict and that Petitioner "failed to provide any factual support for his claim that a conflict of interest existed between himself and [Mr.] Garza in the first place." (*Id.* at 388). Petitioner makes no effort to overcome the deference afforded this decision. In fact, neither the Cross-Motion, which relies wholly on the allegations in the Petition, nor the Petition itself, refers to the governing AEDPA standard. Petitioner thus fails to show he is entitled to federal habeas relief.

For these reasons, Sub-claim 3B is without merit.

**3. Sub-claim 3J—Failure to conduct an adequate pre-trial investigation**

Through Sub-claim 3J, Petitioner offers a wide-ranging set of contentions that trial counsel failed to comply with professional standards for pre-trial investigations. More specifically, Petitioner complains that trial counsel failed to: (i) verify, or present a counternarrative of, the opinions of the State's experts; (ii) cross-check the location of discovery

for the State's physical evidence—the frying pan used against J. Hidalgo and a black cap—and request the DNA testing thereof; (iii) retain experts to testify on "gangs, coerced confessions, use of [sedatives] and other drugs, DNA testing, and ballistics[;]" and (iv) conduct a crime-scene reconstruction to challenge the State's ballistics evidence.[25]  (Dkt. No. 67 at 293-95).

Respondent raises the affirmative defense of failure to exhaust, arguing that Sub-claim 3J was never presented in state court.  (Dkt. No. 91 at 200).  Petitioner takes the position that the state habeas court adjudicated Sub-claim 3J on the merits (Dkt. No. 103 at 211) insofar as it determined that "trial counsel had met their constitutional obligation to conduct an independent investigation of the facts of [Petitioner's] case" (Dkt. No. 90-17 at 397).

It is questionable whether the state habeas court's broad determinations—devoid of reference to any particular claims—encompassed the specific issues raised here.  Nonetheless, as mentioned, this inquiry into Sub-claim 3J's procedural posture is rendered moot by the sub-claim's manifest lack of merit.  While Petitioner offers a litany of ways in which trial counsel's preparations ostensibly fell short, his meager briefing on the legal consequences of those errors does not support the weight of his allegations.  Other than providing a laundry list of complaints, Petitioner makes no effort to prove, under the familiar *Strickland* standard, how counsel performed deficiently in each instance and to specify how each error prejudiced his defense.

For these reasons, Sub-claim 3J is without merit.

---

[25] Petitioner also complains in the context of this sub-claim that trial counsel failed to investigate and present M. Bocanegra's 2003 statement to police whereby he identified Lenny as the lead assailant.  (Dkt. No. 67 at 294).  Through Sub-claim 3P, however, Petitioner raises a similar complaint over trial counsel's failure to proffer M. Bocanegra's identification of Lenny as evidence of his actual innocence.  (*Id.* at 306-08).  Because the issue of M. Bocanegra's identification is more fully argued by Petitioner through Sub-claim 3P, it will be addressed by the Magistrate Judge in the context of that sub-claim.

### 4. Sub-claim 3N—Failure to object to the prosecution's peremptory challenges

Through Sub-claim 3N, Petitioner complains of trial counsel's failure to object to the prosecution's use of peremptory strikes, noting that the prosecution used eleven of its fifteen challenges to remove women from the venire.[26]  (Dkt. No. 67 at 302-04).  Petitioner contends that counsel should have objected to the disproportionate number of strikes against women, upon which the prosecution would have been required to provide gender-neutral justifications for its strikes.  (*Id.* at 303 (citing *Johnson v. California*, 545 U.S. 162, 168 (2005)).  Respondent concedes exhaustion but argues that the adjudication of this sub-claim was reasonable and that, alternatively, this sub-claim is meritless.  (Dkt. No. 91 at 208).  Petitioner offers no rebuttal.

Through cases like *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) and *Batson v. Kentucky*, 476 U.S. 79 (1986), the Supreme Court has held that the Equal Protection Clause prohibits the prosecution from intentionally discriminating against potential jurors based on protected categories such as gender.  The *J.E.B.-Batson* inquiry outlines a three-step process for determining whether preemptory strikes have been applied in a discriminatory manner: (i) the claimant must make a prima facie showing that the peremptory challenges have been exercised based on a protected category; (ii) if this requisite showing has been made, the burden shifts to the party accused of discrimination to articulate neutral explanations for the peremptory challenges; and (iii) the trial court must determine whether the claimant has carried their burden of proving purposeful discrimination.  *See Batson*, 476 U.S. at 93-98.

The state habeas court concluded that the "[a]pplication of [the *J.E.B.-Batson*] principles to the facts in this case shows the invalidity of [Petitioner's] contention that the trial prosecutors

---

[26] Petitioner also makes the conclusory statement that trial counsel should have objected to the prosecution's "disproportionate[ ] striking [of] non-white veniremembers."  (Dkt. No. 67 at 303). Petitioner, however, did not exhaust that argument in state court and makes no effort to substantiate his claim that the prosecution exercised its strikes in a racially discriminatory fashion.

had discriminated against women in exercising their peremptory challenges." (Dkt. No. 90-17 at 392). The state habeas court then proceeded to list gender-neutral grounds for each of the peremptory strikes, including negative experiences with law enforcement and having family members who were incarcerated. (*Id.* at 392-95). In terms of *Strickland*, this amounted to the conclusion that the failure to raise any objection under *J.E.B.-Batson* was not prejudicial insofar as the objection would have been overruled. The TCCA adopted the state habeas court's findings and conclusions in their entirety. *Ex parte Ramirez*, 2015 WL 6282336, at *1.

At no point does Petitioner engage with, much less demonstrate the unreasonableness of, the state habeas decision. Instead, through the Cross-Motion, Petitioner argues for a *J.E.B.-Batson* violation as if the issue were being raised before the trial court. (*See* Dkt. No. 67 at 302-04; Dkt. No. 103 at 217-18). In other words, Petitioner makes no effort to show that the state habeas court's detailed rejection of this sub-claim was contrary to, or an unreasonable application of, federal law. Petitioner thus fails to show that he is entitled to relief under the AEDPA's standards.

For these reasons, Sub-claim 3N is without merit.

### 5. Sub-claim 3P—Failure to investigate and raise innocence arguments

Through Sub-claim 3P, Petitioner complains of trial counsel's failure to investigate and present evidence of his actual innocence, specifically, M. Bocanegra's 2003 statement to police. (Dkt. No. 67 at 306-08). In what seems to be a distinct but related argument, Petitioner also contends that trial counsel should have challenged the voluntariness of his interrogation statement on grounds that Investigators R. Ruiz and E. Ruiz unduly influenced his responses based on information gleaned from M. Bocanegra's account. (*Id.* at 307-08).

Respondent invokes the defense of procedural default, arguing that this sub-claim was newly presented in the Second State Petition and, thus, dismissed on procedural grounds by the TCCA. (Dkt. No. 91 at 220). Petitioner takes the position that the state habeas court adjudicated Sub-claim 3P on the merits when it determined that the foregoing of interviews of Petitioner's co-defendants was a strategic decision and constitutionally sound. (Dkt. No. 103 at 222).

The state habeas court concluded that trial counsel "made a sound strategic decision not . . . to interview [Petitioner's] co-defendants [as] it was very unlikely that the co-defendants' attorneys would allow them to do so."[27] (Dkt. No. 90-17 at 401). The state habeas court further determined that trial counsel "were fully prepared by the time [Petitioner's] case went to trial" and that they "made a valid strategic decision not to call any of [his] co-defendants to testify because they might say things that hurt the defense's case." (*Id.*). Like the uncertainty surrounding the exhaustion of Sub-claim 3J, it is unclear whether these determinations addressed the issues raised in this sub-claim, which were not presented in the Initial State Petition. Any questions over procedural viability are immaterial, however, as this sub-claim is meritless.

To be clear, through his 2019 declaration, M. Bocanegra does not swear that he would have told his more recent stories at the time of Petitioner's trial. (*See* Dkt. No. 67-17 at 6-7). Even if M. Bocanegra would have spoken to counsel, it is not clear what his trial testimony would have been. Given that M. Bocanegra was being contemporaneously prosecuted for capital murder, *see Bocanegra v. State*, 2007 WL 2744173, at *1 (Tex. App. Sept. 20, 2007), it seems unlikely that he would have admitted to being J. Hidalgo's killer. Petitioner does not articulate why M. Bocanegra would risk jeopardizing his case—and potentially his life—by testifying that Petitioner was not the shooter, much less that M. Bocanegra himself was the shooter. Indeed, it

---

[27] Indeed, Ms. Garza testified at the state habeas hearing that counsel for at least one co-defendant declined her request for a client interview. (Dkt. No. 90-17 at 309).

was not until well after Petitioner's trial that M. Bocanegra negotiated a guilty plea and was sentenced to life in prison.[28]   The fact that M. Bocanegra has nothing to lose now in changing his story casts further doubt over its veracity.   Petitioner thus fails to establish a reasonable probability that, had counsel secured M. Bocanegra's testimony, the outcome of his trial would have been different.  *See Strickland*, 466 U.S. at 694.

With respect to trial counsel's ostensible failure to impugn the voluntariness of Petitioner's interrogation statement based on M. Bocanegra's account, Petitioner states that Investigator R. Ruiz "testified [at trial] that [Petitioner] and 'Lenny' were the same person[.]" (Dkt. No. 67 at 307 (citing Dkt. No. 87-20 at 40)).   Petitioner, however, misstates the record. The relevant exchange at trial between Ms. Garza and Investigator R. Ruiz was as follows:

| | |
|---|---|
| [Ms. Garza]: | Do you remember going to the crime scene . . . ? |
| [Investigator R. Ruiz]: | Yes. |
| [Ms. Garza]: | And do you remember finding a beanie out there? |
| [Investigator R. Ruiz]: | Yes. |
| [Ms. Garza]: | And because of what you learned, [that] the beanie belonged to Lenny? |
| [Investigator R. Ruiz]: | I'm not sure of that. |
| [Ms. Garza]: | Do you recall that? |
| [Investigator R. Ruiz]: | No.  I don't know the details.  I don't know the—who it belonged to.  I don't know exactly that— |
| [Ms. Garza]: | You didn't get information from [M. Bocanegra] that it belonged to Lenny? |
| [The prosecution]: | Objection to hearsay, Your Honor. |
| [The trial court]: | Sustained. |

---

[28] M. Bocanegra's case files can be accessed by running his case number, CR-0948-03-C, through the Hidalgo County Records Inquiry page available at https://pa.co.hidalgo.tx.us/Search.aspx?ID=100.

| [Ms. Garza]: | But the cap was found out at the crime scene.  Is that correct? |
|---|---|
| [Investigator R. Ruiz]: | Yes.  We found the cap. |

                                    * * *

| [Ms. Garza]: | Other than you saying that [Petitioner] is known as Lenny, do you have any other personal knowledge that his name is Lenny? |
|---|---|
| [Investigator R. Ruiz]: | Well, it is not me saying it. |
| [Ms. Garza]: | Well, sir, do you have personal knowledge?  Yes or no? |
| [Investigator R. Ruiz]: | Then I would have to say no, because it is not me. |

(Dkt. No. 87-20 at 40).    Trial counsel brought up Lenny, and Investigator R. Ruiz
unambiguously denied saying that Petitioner and Lenny were the same person.[29]

Irrespective of Investigator R. Ruiz's belief as to whether Petitioner was Lenny,
Petitioner fails to explain how M. Bocanegra's statement affected his own interrogation.  (Dkt.
No. 88-6 at 31-39).  To begin, none of the testimony at the suppression hearing suggests that
Lenny was ever mentioned during Petitioner's interrogation, and Petitioner did not make
mention of Lenny as part of his statement.   Moreover, Petitioner fails to explain how trial
counsel's presentation of evidence that he was not Lenny would have changed the outcome of
his trial when the prosecution never placed any particular emphasis on that notion.  As discussed
in the context of the actual innocence gateway, the prosecution built its case on the correlation
between Petitioner's interrogation statement and the testimony provided by the surviving victim,
Gutierrez.  Whether trial counsel's alleged failure lies in raising actual innocence arguments or in

---

[29] If anything, this exchange corroborates defense counsel's testimony at the state habeas hearing that they
were aware of the co-defendant statements by the time of trial.  (See Dkt. No. 90-17 at 294-95, 309-10).
The exchange further suggests that, following this unsuccessful attempt to undermine the importance of
the knit cap as evidence—an item never brought into the spotlight by the prosecution—trial counsel made
a strategic decision not to raise further arguments based on M. Bocanegra's statement.

challenging the voluntariness of his interrogation statement, Petitioner fails to demonstrate how proving that he was not the Lenny mentioned in M. Bocanegra's statement would have made it "reasonably likely that one juror would have voted not to convict" him in light of the overwhelming evidence presented to the contrary. (Dkt. No. 103 at 224).

For these reasons, Sub-claim 3P is without merit.

### 6. Sub-claim 3Y—Cumulative effect of trial counsel's errors

Through Sub-claim 3Y, Petitioner contends that the cumulative effect of all the errors alleged within Claim 3 warrants habeas relief. (Dkt. No. 67 at 319-21). Conceding his failure to exhaust this issue, Petitioner argues that "[t]here was no earlier proceeding where [he] could have had the cumulative consideration of all the [sub-]claims presented here." (Dkt. No. 103 at 227). Petitioner's "impossibility" contention is merely conclusory, as he fails to specify what precluded him from presenting his cumulative effect claim before the state courts.[30] For these reasons, Sub-claim 3Y is procedurally barred as unexhausted.

## E. Claim 4—Errors by the Trial Court

Through Claim 4, Petitioner raises eighteen grounds of trial court error, enumerated as the following sub-claims:

Sub-claim 4A—Failure to appoint qualified trial counsel (Dkt. No. 67 at 321-23);

Sub-claim 4B—Admission of photographs of the crime scene (*id.* at 323-24);

Sub-claim 4C—Use of in-court physical restraints (*id.* at 325-26);

Sub-claim 4D—Failure to ensure a proper record of all proceedings (*id.* at 326-27);

Sub-claim 4E—Denial of request for new counsel (*id.* at 327);

---

[30] Even if the individual issues comprising Sub-claim 3Y were exhausted, Petitioner's failure to raise a claim of cumulative error in state court procedurally bars federal habeas review. *See Nickleson*, 803 F.3d at 753 ("[B]ecause [the petitioner] did not fairly present to the state courts that the cumulative effect of 'errors' denied [them] due process and a fundamentally fair trial, [they] failed to exhaust [their] claim.").

Sub-claim 4F—Failure to continue suppression hearing (*id.* at 327-29);

Sub-claim 4G—Admission of evidence of Petitioner's gang membership (*id.* at 329-31);

Sub-claim 4H—Admission of Petitioner's interrogation statement (*id.* at 331-34);

Sub-claim 4I—Admission of evidence of Petitioner's concealment of cannabis in his jail cell (*id.* at 334-35);

Sub-claim 4J—Denial of motion for mistrial (*id.* at 335-36);

Sub-claim 4K—Qualification of Detective Alvarez as a gang expert (*id.* at 336-37);

Sub-claim 4L—Admission of evidence of another crime (*id.* at 337);

Sub-claim 4M—Demonstration of Petitioner's tattoos to the jury (*id.* at 338-40);

Sub-claim 4N—Exclusion of Dr. K. Allen's testimony (*id.* at 340-41);

Sub-claim 4O—Dismissal of venirepersons (*id.* at 342-44);

Sub-claim 4P—Improper jury instruction on the voluntariness of confessions (*id.* at 344-48);

Sub-claim 4Q—Failure to use a special verdict form (*id.* at 348-50);

Sub-claim 4R—Cumulative effect of errors (*id.* at 350-51).

Respondent raises the defenses of lack of exhaustion and procedural default as to all but Sub-claims 4G, 4H, and 4N—relating to the admission of evidence of Petitioner's gang membership, the admission of his interrogation statement, and the exclusion of Dr. K. Allen's testimony. (Dkt. No. 91 at 241-306) Respondent also contends that Claim 4 is wholly without merit. (*Id.*). Petitioner contests Respondent's procedural and substantive challenges only as to Sub-claim 4A. (Dkt. No. 103 at 228-32) Otherwise, Petitioner offers no response to the alleged procedural deficiencies or lack of merit of the remaining sub-claims.

The Magistrate Judge agrees with Respondent that Sub-claims 4A through 4F, 4I through 4M, and 4O through 4R are procedurally barred for lack of exhaustion or procedural default. The record shows that none of these claims were raised before the state courts. Sub-claim 4A, contrary to Petitioner's contentions, was never presented for state habeas review. Nor were Sub-claims 4B through 4F, 4J through 4M, and 4O through 4R ever raised in state court. Sub-claim 4I is procedurally defaulted insofar as it was raised on direct appeal as point 17b but dismissed for the lack of proper preservation under Rule 33.1 of the Texas Rules of Appellate Procedure. *Ramirez*, 2007 WL 4375936, at *16. Rule 33.1 has been recognized as an independent and adequate state procedural ground barring federal habeas review. *Leachman v. Stephens*, 581 F. App'x 390, 395-96 (5th Cir. 2014) (per curiam). Because Petitioner has not shown any actionable basis for federal review, no further review of these sub-claims is necessary. Accordingly, the ensuing discussion will focus only on Sub-claims 4A, 4G, 4H, and 4N.

### 1. Sub-claim 4A—Failure to appoint qualified trial counsel

Through Sub-claim 4A, Petitioner contends that the trial court committed constitutional error by appointing Ms. Garza and Mr. Garza insofar as: (i) both attorneys were laboring under impermissible conflicts, which tainted their relationship with Petitioner; and (ii) neither attorney had the experience necessary to represent a capital defendant. (Dkt. No. 67 at 321-23).

Respondent raises the defense of lack of exhaustion. (Dkt. No. 91 at 241). Petitioner responds that Sub-claim 4A is exhausted based on language in the state habeas court's findings of fact and conclusions of law. (Dkt. No. 103 at 229-31). The state habeas court found that both attorneys were "experienced criminal law practitioner[s] at both the trial and appellate level[s]" and that Ms. Garza was "on the list of attorneys approved to be appointed lead counsel in death penalty cases." (Dkt. No. 90-17 at 396).

In the alternative, Petitioner argues that state habeas counsel's ineffective assistance in failing to raise this issue overcomes the procedural bar. (Dkt. No. 103 at 231 (citing *Martinez*, 566 U.S. at 11, 13, 15-17)). In support, Petitioner cites to *Martinez*, where the Supreme Court held that counsel's ineffective assistance at the initial collateral review proceedings may establish cause for a petitioner's procedural default of a claim of ineffective assistance at trial. *Martinez*, 566 U.S. at 17.

This sub-claim is not properly exhausted. Indeed, while the state habeas court did address trial counsel's qualifications, this was within the context of Petitioner's claim of ineffective assistance of counsel, which was based in part on the argument that the lack of qualifications contributed to counsel's deficient performance. (*See* Dkt. No. 90-28 at 40-41; *see also* Dkt. No. 90-17 at 395-96). Otherwise, Petitioner does not identify any part of the Initial State Petition where he raised claims of trial court error associated with attorney conflicts or qualifications. Regardless of the state habeas court's findings, Petitioner's failure to present the same legal basis as that raised before the state habeas court renders this sub-claim unexhausted. *See Lucio*, 987 F.3d at 464 (noting that a federal habeas petitioner must present the same legal and factual bases as those raised before the state courts).

Moreover, as the Supreme Court has explicitly recognized, *Martinez* "treats ineffective assistance by a prisoner's state postconviction counsel as cause to overcome the default of a single claim—ineffective assistance of trial counsel—in a single context—where the State effectively requires a defendant to bring that claim in state postconviction proceedings rather than on direct appeal." *Davila v. Davis*, 582 U.S. 521, 524-25 (2017). The procedural exception set forth in *Martinez* is limited to claims of trial counsel's ineffective assistance and, thus, does

not extend to Petitioner's arguments of trial court error.  *See Murphy v. Davis*, 732 F. App'x 249, 256-57 (5th Cir. 2018) (per curiam).

Even if Sub-claim 4A was properly exhausted, or Petitioner has otherwise overcome the procedural bar, Petitioner does not show that this sub-claim is of merit.  This sub-claim tracks many of the same facts and arguments as Sub-claims 3A and 3B but casts them in the form of trial court error rather than ineffective assistance of counsel.  As addressed in the discussion of Sub-claim 3B, Petitioner has not shown that either attorney labored under a conflict of interest.

Petitioner also argues that trial counsel were not qualified to represent him in a capital trial.  Texas state law imposes certain prerequisites for capital representation, particularly for lead counsel.  For instance, lead counsel must "have at least five years of criminal law experience," have tried "a significant number of felony cases, including homicide trials," and have trial experience in various areas such as using experts and "investigating and presenting mitigating evidence at the penalty phase of a death penalty trial."  Tex. Code Crim. Proc. art. 26.052(d)(2).  While the Sixth Amendment guarantees the effective assistance of counsel, the federal constitution does not establish any minimum standards for the qualification of capital practitioners.  Before the state habeas court, Petitioner conceded that any deficiency in counsel's qualifications, "in and of itself, does not rise to the level of a constitutional violation[.]"  (Dkt. No. 90-28 at 41).

The Fifth Circuit has rejected the argument that the violation of a state's capital-qualifications statute supports federal habeas relief.  *See Hughes v. Dretke*, 412 F.3d 582, 589 (5th Cir. 2005).  In complaining only of a state statutory violation, a petitioner fails to allege a constitutional violation.  *See id*. at 590 (citing *Lawrence v. Lensing*, 42 F.3d 255, 258 (5th Cir. 1994)).  Any constitutional argument based on an attorney's efforts must satisfy the *Strickland*

standard.  *See id.* at 589.   The question of whether a capital defendant has received constitutionally adequate representation focuses on questions of performance and actual prejudice, not technical violations of state law.

For these reasons, Sub-claim 4A is procedurally barred as unexhausted and otherwise without merit.

## 2. Sub-claim 4G—Admission of evidence of Petitioner's gang membership

Through Sub-claim 4G, Petitioner contends that the trial court erred in admitting Officer Mendiola's testimony about Petitioner's admitted gang affiliations.  (Dkt. No. 67 at 329-331). According to Petitioner, the testimony was objectionable because Officer Mendiola failed to deliver *Miranda* warnings before asking about Petitioner's gang membership during the booking process.  (*Id.* at 330-31).  This sub-claim was raised on direct appeal as points 13 and 16 (Dkt. No. 85-6 at 11, 22-23, 41, 58-59, 106) and adjudicated by the TCCA, *Ramirez*, 2007 WL 4375936, at *14-16.  The TCCA held that—

> [t]he gang-affiliation question in this case was one normally attendant to the administrative booking procedure and was necessary to secure the safety of inmates and employees at the county jail.  It was a routine booking question as opposed to a custodial interrogation; thus, [Officer] Mendiola was not required to give [Petitioner] the warnings of *Miranda* [and those required by state law.]

*Ramirez*, 2007 WL 4375936, at *15.

Indeed, in *Pennsylvania v. Muniz*, 496 U.S. 582 (1990), the Supreme Court stated that a *Miranda* exception exists for "routine booking questions" asked to secure the biographical data necessary to complete booking or pre-trial services.  *Id.* at 601.  The Fifth Circuit also recognizes a similar "booking exception" to *Miranda*.  *See United States v. Arellano-Banuelos*, 912 F.3d 862, 868 (5th Cir. 2019).

Regardless of whether gang membership falls within the booking exception, the TCCA observed that Petitioner "had already acknowledged his gang affiliation in his *Mirandized* audiotaped statement to [Investigators E. Ruiz and R. Ruiz] the previous day." *Ramirez*, 2007 WL 4375936, at *15. Compared to Petitioner's confession, where he admitted gang membership and described his violent acts in its furtherance, Officer Mendiola's brief mention of Petitioner's gang membership was merely cumulative and far less damaging to his defense. Considering the totality of the circumstances, Petitioner has not shown that his defense was harmed by Officer Mendiola's testimony about his gang membership. Petitioner, therefore, has not demonstrated that the state courts' rejection of this sub-claim was contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

For these reasons, Sub-claim 4G is without merit.

### 3. Sub-claim 4H—Admission of Petitioner's interrogation statement

Through Sub-claim 4H, Petitioner complains that the trial court should not have allowed his interrogation statement into evidence because he did not make a knowing, intelligent, and voluntary confession. (Dkt. No. 67 at 331-34). Petitioner offers three reasons in support: (i) despite his request for counsel, Investigators E. Ruiz and R. Ruiz neither provided him an attorney nor ceased their questioning; (ii) he was under the influence of Rohypnol; and (iii) Investigators E. Ruiz and R. Ruiz did not recite the *Miranda* warnings before interrogation. (*Id.* at 331-32). Respondent generally concedes exhaustion but argues that the state courts' adjudication was reasonable. (Dkt. No. 91 at 259). The argument that investigators ignored Petitioner's invocation of the right to counsel is unexhausted insofar as Petitioner never presented it before the state courts as part of a claim of trial court error.

On appellate review, Petitioner raised this sub-claim under point 15, although he did not refer to his invocation of the right to counsel.  (Dkt. No. 85-6 at 11, 103-06).  The state district court considered the admissibility of Petitioner's statement and submitted the following factual findings to the TCCA:

> Investigator [E.] Ruiz introduced himself to [Petitioner] and informed [Petitioner] that he was going to read the *Miranda* rights and waiver to [Petitioner] . . . before [Petitioner] was interviewed.
>
> [Investigator E.] Ruiz had read the *Miranda* rights to [Petitioner] and that [Petitioner] indicated that he understood said rights.
>
> Investigator [E.] Ruiz advised [Petitioner] that: (A) [Petitioner] had the right to remain silent and not make statement at all . . . ; (B) that any statement he made may be used as evidence against him in court; (C) that he had the right to have a lawyer present to advise him prior to and during any questioning; (D) that, if he was unable to employ a lawyer, he had the right to have a lawyer appointed to advise him prior to and during any questioning; and (E) that he had the right to terminate the interview at any time.
>
> [Petitioner] indicated that he understood said rights by placing his initials next to the listing of each right and also that [he] agreed to waive said rights and speak with [Investigator E.] Ruiz.
>
> [Petitioner] . . . [provided] his account of the [robbery-homicide] only after being advised of his rights and waiving said rights.
>
> * * *
>
> Investigator [E.] Ruiz did not [observe] any signs [that Petitioner was intoxicated.]
>
> [Petitioner] did not complain of being tired or sleepy[.]
>
> * * *
>
> Investigator [R.] Ruiz did *not* make contact with [Petitioner] before meeting him in [Investigator E.] Ruiz's office[.]
>
> More specifically, . . . Investigator [R.] Ruiz did not speak with [Petitioner] in the booking area or jail cell [prior to taking] his recorded oral statement.

(Dkt. No. 85-4 at 9-12).

Based on the trial court's findings and the record, the TCCA determined that—

[a]t a suppression hearing, the trial court is the sole judge of the credibility of witnesses and the weight of their testimony.  Therefore, we will not disturb the trial court's findings if those findings are supported by the record.

\* \* \*

The trial court found that the testimony of [Investigators E. Ruiz and R. Ruiz] was credible and that the testimony of [Petitioner] was not credible.  The trial court ultimately concluded that "the statement, in question, was recorded as a result of the knowing, intelligent, and voluntary waiver by [Petitioner] of his rights and is a free and voluntary statement made by [Petitioner.]

The trial court's findings and conclusions are supported by the record.

*Ramirez*, 2007 WL 4375936, at *13-14 (citation omitted).

On state collateral review, Petitioner again raised the matter of the admissibility of his interrogation statement through claim 13 of the Initial State Petition.  (Dkt. No. 90-18 at 234-39).  Again, however, he failed to refer to the invocation of his right to counsel.  Regardless, in examining the basis for the denial of the motion to suppress, the state habeas court noted that the trial court had considered Petitioner's testimony as to his unsuccessful attempt to contact his attorney, a Charles Banker, during booking and his failure to request counsel after being *Mirandized*.  (*See* Dkt. No. 90-17 at 176-81).  As the state habeas court noted, Petitioner "had never said that he wanted a lawyer or asked how he could get one on his [interrogation] statement, although he had had an opportunity to do so."  (*Id.* at 179).

Turning to the merits of this sub-claim, Petitioner does not appear to contest the state court's decision.  Instead, he merely re-urges his earlier arguments without offering anything to show the previous decision was unreasonable.  Otherwise, his federal habeas claim—like his mirroring state habeas claim—depends on the notion that his testimony at the suppression

hearing should be credited over that of the investigators.  Petitioner thus fails to show that he is entitled to relief under the AEDPA's standards.

For these reasons, any properly exhausted aspects of Sub-claim 4H are without merit.

### 4.  Sub-claim 4N—Exclusion of Dr. K. Allen's testimony

Through Sub-claim 4N, Petitioner complains that the trial court unconstitutionally hindered his presentation of mitigating evidence by excluding the factual background behind Dr. K. Allen's opinions.  (Dkt. No. 67 at 340-41).  Petitioner raised this sub-claim on state collateral review as claims 5 and 6 in the Initial State Petition.  (Dkt. No. 90-18 at 93, 205-12).  The state habeas court concluded that the trial court properly exercised its discretion in excluding Dr. K. Allen's testimony, as the probative value of Petitioner's background information was outweighed by the potential for the jury to believe that Dr. K. Allen was testifying as to the truth of that information.  (*See* Dkt. No. 90-17 at 400 (citing Tex. R. Evid. 705(d))).  Absent any attempt by Petitioner to carry his burden of demonstrating the unreasonableness of the state court's decision, Sub-claim 4N warrants no further discussion.  *See* 28 U.S.C. § 2254(d)(1), (2).  For these reasons, Sub-claim 4N is without merit.

## F.  Claim 5—Trial Judge Bias

Through Claim 5, Petitioner contends that the state trial judge, Judge Gonzalez, exhibited bias against him in violation of his constitutional rights.  (Dkt. No. 67 at 351-53).  Such bias stemmed, according to Petitioner, from the fact that Judge Gonzalez "had been the committing judge in several of [Petitioner's] juvenile proceedings."  (*Id.* at 352).  Petitioner also points to isolated remarks made by Judge Gonzalez throughout the trial proceedings.  (*Id.*).

Petitioner appears to concede lack of exhaustion but argues that he can overcome the resulting procedural bar pursuant to *Martinez* insofar as state habeas counsel provided ineffective

assistance by not previously raising the claim.   (Dkt. No. 103 at 232-33).   As previously discussed, however, this argument is invalid.   The doctrine announced in *Martinez* has been applied to overcome the procedural bar only as to claims raising the ineffective assistance of trial counsel.   *See Milam v. Davis*, 733 F. App'x 781, 786 (5th Cir. 2018) (per curiam); *see also Murphy*, 732 F. App'x at 256-57.

Alternatively, this claim lacks merit.   Relief is unavailable to a habeas petitioner unless they establish that "a genuine question exists concerning [the trial judge's] impartiality."  *Bigby v. Dretke*, 402 F.3d 551, 559 (5th Cir. 2005).   The Supreme Court has recognized two kinds of judicial bias: actual bias and presumptive bias.   *See Buntion v. Quarterman*, 524 F.3d 664, 672 (5th Cir. 2008).   "In proving actual bias, a defendant must show a prejudiced disposition *in [their] own case*."  *Cubas v. Thaler*, 2011 WL 4373196, at *9 (S.D. Tex. Sept. 16, 2011) (emphasis in original) (quoting *Bracy v. Gramley*, 520 U.S. 899, 909 (1997)) (internal quotations omitted).   For example, a judge's prior, significant involvement as a prosecutor in critical decisions regarding a defendant's case creates an impermissible risk of actual bias.   *Williams v. Pennsylvania*, 579 U.S. 1, 8 (2016).   Judicial rulings and intemperate remarks—including those that are critical or disapproving of, or even hostile to, counsel and the parties—almost never constitute actual bias unless they display favoritism or antagonism so severe as to prevent fair judgment.   *See Buntion*, 524 F.3d at 673-74 (citations and quotations omitted).   Presumptive bias, on the other hand, occurs when there is an appearance of bias such that the probability of actual bias is too high to be constitutionally tolerable.   *See Rippo v. Baker*, 580 U.S. 285, 287 (2017) (per curiam) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)) (quotations omitted). The Supreme Court has held that presumptive bias occurs where a judge: (i) has a direct personal, substantial, and pecuniary interest in the outcome of the case; (ii) has been the target of

personal abuse or criticism from the party before him; or (iii) has the dual role of investigating and adjudicating a dispute. *Buntion*, 524 F.3d at 672 (citing *Bigby*, 402 F.3d at 559).

Petitioner has not shown actual bias and does not make a strong case for presumptive bias. For one, Petitioner does not explain why and how Judge Gonzalez was biased from having previously committed Petitioner as a juvenile. Otherwise, Petitioner contends that the trial judge manifested bias by: (i) stating that "there hasn't been anyone in this County that has sentenced more people in accordance with death sentences[;]" (ii) warning Petitioner to "[b]e very careful[;]" (iii) saying that he did not "want any outbursts in the Court[;]" and (iv) showing favoritism to the prosecution in asking the prosecution's witness ostensibly leading questions and referring to the prosecutor as "my Clint Eastwood." (Dkt. No. 67 at 352).

At best, these remarks show some tepid degree of "generalized impertinence," *see Buntion*, 524 F.3d at 673, but do not display the kind of "deep-seated favoritism or antagonism that would make fair judgment impossible[,]" *id.* at 673-74 (quoting *Liteky v. United States*, 510 U.S. 540, 555 (1994)) (internal quotations omitted).

For these reasons, Claim 5 is procedurally barred as unexhausted and otherwise without merit.

## G.  Claim 6—Right to Confront Witnesses

Through Claim 6, Petitioner argues that the admission of TYC Parole Officer Leal's testimony at the sentencing hearing regarding Petitioner's juvenile records violated his confrontation rights under the Sixth Amendment. (Dkt. No. 67 at 353-55). According to Petitioner, the testimony by Leal about being informed of Petitioner's two on-parole arrests "turned on a review of probation records [which were] prepared at least in part by individuals who[m] the [prosecution] did not show were unavailable to testify at trial and were previously

available for cross-examination." (*Id.* at 353-54). In support of his claim, Petitioner relies on *Crawford v. Washington*, 541 U.S. 36 (2004), where the Supreme Court held that the Confrontation Clause bars the admission of testimonial hearsay statements unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. 541 U.S. at 53-59.

Respondent raises the affirmative defense of lack of exhaustion. (Dkt. No. 91 at 314). Alternatively, Respondent contends that the claim is meritless insofar as the Confrontation Clause does not apply to capital sentencing proceedings or non-testimonial statements. (*Id.* at 319-21). Petitioner argues that he can overcome the resulting procedural bar insofar as state habeas counsel rendered ineffective assistance in not raising the claim before the TCCA. (Dkt. No. 103 at 224). This claim is unexhausted and thus procedurally barred. While Petitioner may invoke *Martinez* for purposes of attempting to overcome the procedural bar, again, the *Martinez* doctrine only applies to underlying ineffective-assistance-of-counsel claims.

In the alternative, this claim is meritless. To begin, the Fifth Circuit holds that "[n]either the text of the Sixth Amendment nor the history of murder trials supports the extension of the Confrontation Clause to testimony relevant only to penalty selection in a capital case." *United States v. Fields*, 483 F.3d 313, 335 (5th Cir. 2007); *see also Ochoa v. Davis*, 2016 WL 5122107, at *21 (N.D. Tex. Sept. 21, 2016). Because the Constitution does not cover testimonial evidence in the sentencing phase of trial, Petitioner cannot show the violation of a constitutional right.[31]

---

[31] Even assuming the Confrontation Clause did apply, the challenged statements were not testimonial hearsay. In *Crawford*, the Supreme Court held that the Confrontation Clause bars the admission of testimonial hearsay statements made to law enforcement officers unless the witness is unavailable and the defendant had a prior opportunity for cross-examination. 541 U.S. at 53-59. The *Crawford* court defined "testimonial" as relating to solemn declarations or affirmations made for the purpose of establishing or proving some fact, including statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial. *Id.* at 51-52; *see also Davis v. Washington*, 547 U.S. 813, 822 (2006). The record clearly demonstrates that the statements relayed by Leal about Petitioner's arrests were not intended to establish or prove past events potentially relevant to later criminal prosecution or as a substitute for trial testimony. Instead, the

For these reasons, Claim 6 is procedurally barred as unexhausted and otherwise without merit.

## H.  Claim 7—Actual Innocence

Through Claim 7, Petitioner contends that he is entitled to federal habeas relief because he is actually innocent of the offense of conviction.  In support, Petitioner relies on testimony and evidence that he was not the Lenny described by M. Bocanegra in his first statement to police.  (Dkt. No. 67 at 355-59).  Respondent argues that Petitioner fails to establish a cognizable ground for federal habeas relief and that M. Bocanegra's statement is simply unreliable.  (Dkt. No. 91 at 321-22, 324).  Petitioner appears to concede that this claim is not cognizable.  (Dkt. No. 67 at 356 n.49 (citing *Schlup*, 513 US. at 324-25)).

The Supreme Court has not accepted actual innocence as a substantive ground for federal habeas relief.  "Once a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears."  *Herrera v. Collins*, 506 U.S. 390, 399 (1993).  Thus, by the time an inmate invokes federal habeas jurisdiction, they "come[ ] before the habeas court with a strong—and in the vast majority of the cases conclusive— presumption of guilt."  *Schlup*, 513 U.S. at 326 n.42; *see also Herrera*, 506 U.S. at 399-400; *Bosley v. Cain*, 409 F.3d 657, 664 (5th Cir. 2005) (per curiam) ("[T]here is no presumption of innocence at a habeas proceeding[.]").  Indeed, the Supreme Court recognizes that "[c]laims of

---

information was provided to aid Leal in his duties as Petitioner's juvenile supervisor, specifically, the investigating of Petitioner's parole violations and making of recommendations to the court for appropriate resolutions.  (*See* Dkt. No. 87-22 at 27-28); *see also Ohio v. Clark*, 576 U.S. 237, 249-51 (2015) (addressing the evaluation of the testimonial nature of statements made to persons other than law enforcement); *United States v. Woods*, 907 F.2d 1540, 1544 (5th Cir. 1990) (citing *Brown v. Butler*, 811 F.2d 938, 941 (5th Cir. 1987)) (holding that probation officers, in making sentencing recommendations to the court based on their presentence investigations, do not act in a prosecutorial capacity).  Moreover, Leal's testimony relayed non-hearsay statements insofar as the statements were offered to provide context for his decision in seeking to revoke juvenile probation, not to prove the truth of the matter asserted, i.e., that Petitioner had been arrested. *See Crawford*, 541 U.S. at 59 n.9.

actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Herrera*, 506 U.S. at 400; *see also Schlup*, 513 U.S. at 315.

Otherwise, the Supreme Court has hypothesized about what an actual innocence claim would involve, if one existed:

> [B]ecause of the very disruptive effect that entertaining claims of actual innocence would have on the need for finality in capital cases, and the enormous burden that having to retry cases based on often stale evidence would place on the States, the threshold showing for such an assumed right would necessarily be *extraordinarily high*.

*Herrera*, 506 U.S. at 417 (emphasis added).  Such a showing would require "more convincing proof of innocence" than even the fundamental-miscarriage-of-justice standard of *Schlup v. Delo*, 513 U.S. 298 (1995).  *House*, 547 U.S. at 555.  For reference, the Supreme Court's *Schlup* case holds that a petitioner may overcome a procedural bar where they establish through new and reliable evidence that it was more likely than not that no reasonable juror would have convicted them in the light of the new evidence.  *Fairman*, 188 F.3d at 644 (quoting *Schlup*, 513 U.S. at 327) (quotations omitted).

The ostensibly new evidence offered by Petitioner here—i.e., the account of M. Bocanegra—fails to meet this hypothetical standard.  As observed by the state habeas court, M. Bocanegra's evolving account of the crime suffers from credibility defects.  At its strongest, this statement would merely muddy the waters and force the jurors to make credibility findings. Jurors would still consider M. Bocanegra's story in the context of the otherwise harmonious narrative created by Gutierrez's trial testimony and Petitioner's interrogation statement.   It simply cannot be said that M. Bocanegra's account unequivocally exculpates Petitioner.

For these reasons, Claim 7 is non-cognizable on federal habeas review and is otherwise without merit.

## I. **Claim 8—Prosecutorial Misconduct**

Through Claim 8, Petitioner raises nine grounds of prosecutorial misconduct, enumerated as the following sub-claims:

Sub-claim 8A—Belated disclosure of arrest video (Dkt. No. 67 at 361-63);

Sub-claim 8B—Spoliation of evidence (*id.* at 363);

Sub-claim 8C—Introduction of false testimony at the suppression hearing (*id.* at 364-67);

Sub-claim 8D—Concealment of exculpatory evidence (*id.* at 367-74);

Sub-claim 8E—Failure to disclose the conditions at the TYC (*id.* at 375-79);

Sub-claim 8F—Improper request to limit mitigating evidence (*id.* at 379-81);

Sub-claim 8G—Improper comments made in closing arguments (*id.* at 381-83);

Sub-claim 8H—Other violations of Petitioner's constitutional rights (*id.* at 383-84);

Sub-claim 8I—Cumulative effect of misconduct (*id.* at 384-85).

Respondent acknowledges that Sub-claim 8A was exhausted on appellate review but invokes the defense of failure to exhaust with respect to Sub-claims 8B through 8I, while contesting the merits of Claim 8 in its entirety.  (Dkt. No. 91 at 325-65).  Petitioner concedes lack of exhaustion but raises multiple arguments to overcome the procedural bar, such as ineffective assistance of state habeas counsel as to Sub-claims 8C through 8H, his innocence of the underlying conviction as to Sub-claim 8D, and the impossibility of exhaustion as to Sub-claim 8I.  (Dkt. No. 103 at 235-46).  As for Sub-claim 8A, Petitioner makes no attempt to establish the unreasonableness of the state court's adjudication under § 2254(d).

The Magistrate Judge concludes that all but Sub-claim 8A are unexhausted and, thus, not available for review.  For the reasons thoroughly discussed above, Petitioner is unable to overcome the procedural bar based on state habeas counsel's ineffective representation with respect to non-ineffective-assistance-of-trial-counsel-type claims, and Petitioner has failed establish his actual innocence.  Accordingly, the discussion below will focus only on Sub-claims 8A and 8I.  The Magistrate Judge concludes that Sub-claim 8A lacks merit and that Petitioner's impossibility argument concerning Sub-claim 8I unpersuasive.

### 1.  Sub-claim 8A—Belated disclosure of arrest video

Through Sub-claim 8A, Petitioner contends that the prosecution's untimely disclosure of the existence of the video recording of his arrest deprived him of the ability to present evidence against the voluntariness of his interrogation statement.  (Dkt. No. 67 at 361-63).  Petitioner relies on *Brady v. Maryland*, 373 U.S. 83 (1963), where the Supreme Court held that the prosecution's suppression of material evidence favorable to an accused violates due process.  *Id.* at 87.  Had the prosecution made a timely disclosure, Petitioner argues, the recording would have corroborated his alleged intoxication at the time of his police interrogation, as he was in possession of Rohypnol pills at the time of his arrest.  (*Id.* at 362).

Petitioner raised this argument through a motion for a new trial (Dkt. No. 85-2 at 305, 351-53), on which the trial court held a hearing (Dkt. No. 85-1 at 21).  The argument was raised again as point 9 in Petitioner's appellate brief (Dkt. No. 85-6 at 10-11, 95-96) and adjudicated on the merits, *Ramirez*, 2007 WL 4375936, at *9-12.  Respondent argues that Petitioner makes no attempt to show that the state adjudication was unreasonable, despite the TCCA's adjudication of this sub-claim on direct appeal.  (Dkt. No. 91 at 325).  In fact, Petitioner's Cross-Motion is

devoid of any argument challenging the state court's adjudication.   (Dkt. No. 103 at 235).
Whatever the case, the state court's decision withstands scrutiny under § 2254(d).

Through a May 2003 discovery motion, Petitioner specifically requested that the
prosecution produce copies of any "videotapes made in connection with this case[.]"  (Dkt. No.
85-1 at 207).   Initially, the prosecution denied that a recording of Petitioner's arrest existed.
(Dkt. No. 86-12 at 11; Dkt. No. 86-13 at 9).   However, on November 5, 2004, or 24 days before
trial, the prosecution produced the recording to the defense.  (Dkt. No. 87-1 at 37).   Immediately
upon disclosure, the trial court specifically told trial counsel: "if there is anything in the
videotape that the [prosecution] or the defense wishes the [trial court] to consider[,] for purposes
of any reconsideration . . . , I will be glad to reopen evidence[,] now that that videotape has been
obtained."  (Dkt. No. 87-1 at 37).   The trial court also ordered the prosecution "to give [the
defense] the opportunity to check that tape to make sure that it is true and correct copy" before
the trial.  (Dkt. No. 87-10 at 6).   Trial counsel, however, did not ask the trial court to reopen the
motion to suppress or to even introduce the videotape at trial.   The TCCA noted that—

> [Ms. Garza] testified at the hearing on the motion for a new trial that, if the
> [prosecution] had disclosed the videotape prior to the hearing on the motion to
> suppress, then she would have questioned the arresting officers about whether
> they found drugs in the trailer and would have called an expert to testify about
> "the effects of this type of drug on this individual, the voluntariness of the
> statement, that sort of thing."   However, she admitted that she knew about the
> [Rohypnol] pills before [Petitioner] testified at the suppression hearing.   She
> testified that "the point to the tape" was that [Petitioner] looked "dazed" when he
> was arrested.   She acknowledged that she failed to introduce the tape into
> evidence at trial but claimed that she did not have time to decide if that was the
> best course of action.   The trial court pointed out that [Ms. Garza] received the
> tape "long before the evidence portion [of trial] started" and that she had co-
> counsel to assist her in making that decision.   Further, [Investigator R. Ruiz]
> denied talking with [Petitioner] in his jail cell prior to the taking of his statement,
> and [Investigator E. Ruiz] testified that he did not detect any signs that
> [Petitioner] was intoxicated during the taking of his statement.   [Petitioner] has
> failed to show that there is a reasonable probability that the result of the

proceeding would have been different if the [prosecution] had disclosed the videotape earlier.

*Ramirez*, 2007 WL 4375936, at *12.

Petitioner's argument is not one of suppression but one of timing. "The Supreme Court has never expressly held that evidence that is turned over to the defense during trial has been 'suppressed' within the meaning of *Brady*." *Powell v. Quarterman*, 536 F.3d 325, 335 (5th Cir. 2008). Under Fifth Circuit case law, "such evidence is not considered to have been suppressed." *Id.*; *see also United States v. Swenson*, 894 F.3d 677, 683 (5th Cir. 2018). Instead, the Fifth Circuit asks whether the defense "was prejudiced by the tardy disclosure" and whether "the evidence is received in time for its effective use at trial." *Powell*, 536 F.3d at 335 (citing *United States v. Walters*, 351 F.3d 159, 169 (5th Cir. 2003)).

Petitioner offers nothing to demonstrate that the defense was prejudiced by the timing of the disclosure. It is unclear how the video recording could have even been helpful when the record suggests that it reflected neither Petitioner's intoxication nor his possession of Rohypnol pills. *See Ramirez*, 2007 WL 4375936, at *12. Petitioner thus fails to show that the state habeas adjudication was contrary to, or an unreasonable application of, federal law.

For these reasons, Sub-claim 8A is without merit.

**2. Sub-claim 8I—Cumulative effect of prosecutorial misconduct**

Through Sub-claim 8I, Petitioner makes the argument that the cumulative effect of all the misconduct alleged within Claim 8 warrants a new trial. (Dkt. No. 67 at 384-85). As with Sub-claim 3Y, Petitioner concedes lack of exhaustion but argues that he can show cause for the failure to exhaust insofar as he could not have raised this sub-claim earlier. (Dkt. No. 103 at 246). Again, Petitioner's "impossibility" contention is merely conclusory, as he fails to specify

what precluded him from presenting his cumulative effect claim before the state courts.  For these reasons, Sub-claim 8I is procedurally barred as unexhausted.[32]

## J.  Claim 9—Juror Misconduct

Through Claim 9, Petitioner raises multiple grounds for the violation of his right to an impartial jury.  (Dkt. No. 67 at 385-87).  In contending that jurors were subject to improper external influence, Petitioner offers several witness declarations purportedly suggesting that "jurors felt threatened and scared to be seated on a jury in a gang-related case."  (*Id.* at 385-86).  He also argues that there must have been an external influence because the court admonished the "guilt-phase jury on multiple occasions to avoid media about the case during the trial."  (*Id.* at 386 (citing Dkt. No. 87-8 at 24)).  Respondent raises the affirmative defense of lack of exhaustion.  (Dkt. No. 91 at 366).  Petitioner argues that he can show cause for the failure to exhaust insofar as he could not have raised the claim earlier.  According to Petitioner, "the evidence was secreted by the jurors themselves" until his habeas investigator questioned some of the jurors in 2017.  (Dkt. No. 103 at 247).

Petitioner fails to show cause for his failure to exhaust.  His contention that the jurors "secreted" the information at issue is simply conclusory.  Indeed, Petitioner offers nothing to suggest that he could not have discovered, through appropriate investigation, the factual basis for this claim and raised it before the TCCA.

Alternatively, Petitioner has not made a case for habeas relief.  One touchstone of a fair trial is an impartial trier of fact, which refers to a jury capable and willing to decide the case solely on the evidence before it.  *McDonough v. Greenwood*, 464 U.S. 548, 554 (1984) (quoting *Smith v. Phillips*, 455 U.S. 209, 217 (1982)) (quotations omitted).  As such, the Constitution

---

[32] Even if the individual issues comprising Sub-claim 8I were exhausted, again, Petitioner's failure to raise cumulative error in state court procedurally bars federal review.  *See Nickleson*, 803 F.3d at 753.

forbids a jury from being exposed to an external influence.  *See Tanner v. United States*, 483 U.S. 107, 117-19 (1987).

As to his first argument that jurors were afraid, and thus subject to external influence, Petitioner refers to three declarations newly developed on federal review: (i) a declaration from A. Hernandez, his former case manager at the TYC, stating that an unnamed juror told him that "jurors took different routes home because of concerns for their safety" (Dkt. No. 28-1 at 94-100); (ii) a declaration from an identified juror stating that court personnel told jurors to "be very careful," which made the juror worried about his safety during the trial (Dkt. No. 67-17 at 13-14); and (iii) a declaration from another identified juror stating that an unnamed juror requested an escort from the courthouse after the verdict (*id.* at 26-27).

These declarations, however, are of little, if any, probative value.  The declaration from A. Hernandez consists of mere hearsay, as the declarant merely recounts what an unnamed juror allegedly disclosed.  *See Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 218 (5th Cir. 2024) (affirming exclusion of hearsay statement offered in response to defendant's summary judgment motion).  Even as a direct juror declaration, this statement, like the other two juror declarations, would be unavailing.  As Respondent points out, the jurors merely describe a "generalized fear about serving on a case in which a gang member participated in the execution of six people," which is a "natural and reasonable fear . . . from [the] evidence in the case."  (Dkt. No. 91 at 369).  Petitioner has not identified any precedent equating generalized fear or safety concerns with a constitutionally significant external influence.

Otherwise, as to potential media influence, Petitioner points to one voir dire instruction delivered by the trial court to a prospective alternate juror:

> You are not to view, listen to[,] or read any accounts about this case or any other case similar to it.  In addition to that, that will extend to mean that you are not to

> listen to or read any accounts about capital punishment, the death penalty[,] or
> capital murder.

(Dkt. No. 87-8 at 24).   Petitioner misconstrues a standard preliminary jury instruction as evidence of improper exposure to news reports.  *See, e.g.*, 5th Cir. Dist. Judges Ass'n Pattern Jury Instructions Comm., *Pattern Jury Instructions (Criminal Cases)*, 1.01 Preliminary Instructions (2019) ("[D]uring the trial you must not conduct any independent research about this case, . . . [and] do not try to find out information from any source outside the confines of this courtroom.").   Petitioner does not substantiate that the jurors were aware of pervasive news reports, let alone that those reports influenced their deliberations.

For these reasons, Claim 9 is procedurally barred as unexhausted and otherwise without merit.

**K.  Claim 10—Jury Instructions**

Through Claim 10, Petitioner challenges the constitutionality of the Texas death penalty instructions.  The claim consists of two sub-claims.  Plaintiff contends for purposes of Sub-claim 10A that the mitigation instruction unconstitutionally limited the scope of relevant mitigating evidence and, for purposes of Sub-claim 10B, that the future dangerousness instruction failed to sufficiently narrow the class of death-eligible defendants.  (Dkt. No. 67 at 388-94).  Respondent raises the defense that Sub-claim 10B is unexhausted.  (Dkt. No. 91 at 371, 375-76).  Indeed, Petitioner raised Sub-claim 10A as claim 9 in the Initial State Petition but not Sub-claim 10B. (*See* Dkt. No. 90-17 at 364-67; *see also* 90-18 at 94, 215, 219-20).  The Magistrate Judge concludes that Sub-claim 10A lacks merit based on established case law upholding the special issue instruction, and that Sub-claim 10B is procedurally barred for lack of exhaustion and otherwise meritless.

### 1.   Sub-claim 10A—Inadequate definition of mitigating evidence

For reference, the mitigation special issue asked the jury at sentencing—

> [w]hether, taking into consideration all of the evidence, including the circumstances of the offense, [Petitioner's] character and background, and the personal moral culpability of [Petitioner,] there is sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

(Dkt. No. 85-2 at 264); *see also* Tex. Code Crim. Proc. art. 37.071 § 2(b), (e)(1).   Petitioner argues that the special issue's vague wording and failure to define "mitigating evidence" led jurors to believe that any mitigating evidence would somehow have to relate to the robbery-homicide itself.   (Dkt. No. 67 at 388-90).   The state habeas court, citing established state law on the mitigation special issue instruction, rejected Petitioner's plea to abandon the precedent for lack of merit.   (Dkt. No. 90-17 at 366-67).

Here, Petitioner fails to meet his burden, offering nothing by way of argument against established Fifth Circuit precedent upholding the mitigation special issue.   *See, e.g., Roach v. Quarterman*, 220 F. App'x 270, 277 (5th Cir. 2007) (quoting *Beazley v. Johnson*, 242 F.3d 248, 260 (5th Cir. 2001)) (quotations omitted) (explaining that the statutory definition of mitigating evidence allows the jury to consider "virtually any" factor as mitigating); *Sprouse v. Stephens*, 748 F.3d 609, 622 (5th Cir. 2014).

For these reasons, Sub-claim 10A is without merit.

### 2.   Sub-claim 10B—Inadequate definition of future dangerousness

The future-dangerousness special issue asked the jury whether there was "a probability that [Petitioner] would commit criminal acts of violence that would constitute a continuing threat to society[.]"   (Dkt. No. 85-2 at 262); *see also* Tex. Code Crim. Proc. art. 37.071 § 2(b). Petitioner takes issue with Texas' failure to define terms like "probability," "criminal acts of

violence," or "continuing threat to society." (Dkt. No. 67 at 391-94). That said, this sub-claim is unexhausted insofar as Petitioner failed to raise these arguments before the TCCA.

Even if the merits of Petitioner's challenge to the future-dangerousness issue were available for review, this sub-claim lacks merit. For decades, the Fifth Circuit has held that the key terms in the future-dangerousness issue are not unconstitutionally vague. *See Johnson v. Lumpkin*, 74 F.4th 334, 338-39 (5th Cir. 2023) (collecting cases), *cert. denied*, 144 S. Ct. 829 (2024). Rather, the statute's terms have been recognized to hold a common-sense meaning readily comprehensible to criminal juries, obviating the need for supplemental instructions. *See Woods v. Johnson*, 75 F.3d 1017, 1034 (5th Cir. 1996) (collecting cases).

For these reasons, Sub-claim 10B is procedurally barred as unexhausted and otherwise without merit.[33]

**L. Claim 11—Unconstitutionality of the Death Sentence Due to Reversed Conviction**

Through Claim 11, Petitioner contends that his death sentence is unconstitutional because the jury was improperly influenced by the guilty verdict on Count Two, which the TCCA reversed on double jeopardy grounds. (Dkt. No. 67 at 394-96). In essence, Petitioner argues that the same error that required reversal of his conviction on Count Two also unfairly affected the penalty phase deliberations for his conviction on Count One. Petitioner relies primarily on *Zant v. Stephens*, 462 U.S. 862 (1983), and *Stringer v. Black*, 503 U.S. 222 (1992), which addressed potential unconstitutionality in the sentencing process when the jury considers invalid, or

---

[33] Under Sub-claim 10B, Petitioner raises the argument that "a special verdict form for the mitigation special issues should have been required under Texas law to ensure the reliability of [his] death sentence[.]" (Dkt. No. 67 at 394 (citing Tex. Code Crim. Proc. art. 37.071 § 2(b))). This argument, however, is so cursory as to be impermissibly conclusory and thus incapable of giving rise to relief. *See Miller*, 200 F.3d at 282. Petitioner does not articulate how a hypothetical form would have improved upon the jury's consideration of the special issues.

subsequently invalidated, aggravating factors in their deliberations.  In rejecting this claim, the state habeas court reasoned that—

> (i)    the jury, which had just heard several days of testimony about the facts involved, obviously realized that it was dealing with one fact pattern involving the murder of six individuals, and not more than one fact situation[;]
>
> (ii)   . . . the trial court submitted two separate punishment[-]phase jury charges, with each one covering one particular count of the indictment[; and]
>
> (iii)  . . . [Petitioner] provide[d] no factual support for his claim that the jury had considered the existence of the conviction as to Count Two in answering the special issues in regard to Count One.

(Dkt. No. 90-17 at 364 (enumeration added)).

Even on federal habeas review, Petitioner has not shown that jurors considered the fact of his conviction on Count Two when answering the special-issue questions for Count One.  All he offers is mere speculation that the jury improperly relied on his later-overturned conviction.  Indeed, Petitioner's argument ignores the very reason for which the TCCA reversed his second conviction—that both counts relied on the same facts and the same victim.  Petitioner thus fails to establish the jury's consideration of any invalid factor at sentencing.

For these reasons, Claim 11 is without merit.

## M.  Claim 12—Sufficiency of the Evidence

Through Claim 12, Petitioner challenges the sufficiency of the evidence for his murder conviction within the framework of *Jackson v. Virginia*, 443 U.S. 307 (1979).  (Dkt. No. 67 at 397-99 (citing *Jackson*, 443 U.S. at 319)).   Under *Jackson*, the relevant question on habeas review is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  *Jackson*, 443 U.S. at 319.  Petitioner would exclude from the *Jackson* sufficiency review

his interrogation statement, which he deems "tainted with indications of a false confession[.]" (Dkt. No. 67 at 398). Even if it were admissible, Petitioner continues, his interrogation statement was not sufficient to show that he killed or intended to kill anyone. (*Id.* at 399).

On direct appeal, the TCCA rejected Petitioner's sufficiency claim as follows:

> The evidence, when viewed in the light most favorable to the verdict, was such that any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Further, the evidence was not so weak that the jury's verdict seems clearly wrong and manifestly unjust, nor was the jury's verdict against the great weight and preponderance of the evidence.

*Ramirez*, 2007 WL 4375936, at *7 (citing *Jackson*, 443 U.S. at 319) (internal citations omitted).

Under the AEDPA, a federal habeas court focuses only on whether the state court unreasonably applied the *Jackson* standard. *See Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam); *Perez v. Cain*, 529 F.3d 588, 594 (5th Cir. 2008).

Here, Petitioner does not make any effort to show that the TCCA's decision was unreasonable. Contradicting *Jackson* is Petitioner's approach of excluding the consideration of his interrogation statement. As reviewed above, *Jackson* specifically requires evaluating all the evidence submitted in the light most favorable to the defense, not just evidence a party deems credible. Petitioner otherwise ignores that his statement established his significant involvement in the robbery-homicide and the anticipation of a killing. *Id.* at *9.

For these reasons, Claim 12 is without merit.

## N. **Claim 13—Ineffective Assistance of Appellate Counsel**

Through Claim 13, Petitioner contends that his appellate attorney, Mr. Warner, rendered ineffective assistance. (Dkt. No. 67 at 399-404). Petitioner complains of Mr. Warner's performance relating to filing delays, inadequate pleadings, noncompliance with state appellate

rules, and the failure to raise meritorious claims.  (*Id.*).  Respondent takes the position that this claim is unexhausted and otherwise too conclusory to merit relief.  (Dkt. No. 91 at 396).

Petitioner failed to properly raise this claim before the state courts.  Although Petitioner did refer to the ineffective assistance of appellate counsel in the title to claim 16 of the Initial State Petition, Petitioner did not elaborate as to the nature of any constitutional errors associated with Mr. Warner's representation.  (*See* Dkt. No. 90-18 at 95, 240-42).  For present purposes, Petitioner offers no arguments in support of overcoming the resulting procedural bar.

Even if the state habeas court's determinations constituted a proper adjudication of this claim on the merits—which Petitioner never argues—Claim 13 lacks merit.  Petitioner must demonstrate that any claim not presented to the appellate court was plainly stronger than those actually presented.  *Loud*, 2016 WL 11892951, at *5 (citing *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)).  He also must show a reasonable probability that, but for Mr. Warner's unreasonable failure, those issues would have been successful on appeal.  *Id.* at *6 (citing *Dovalina*, 262 F.3d at 474-75).  Petitioner, however, does not substantiate the superiority of his proposed claims over those raised by Mr. Warner.  Nor does Petitioner show a reasonable probability of the success of his proposed claims on appeal.

For these reasons, Claim 13 is procedurally barred as unexhausted and otherwise without merit.

## O.  **Claim 14—Errors by the Appellate Court**

Through Claim 14, Petitioner contends that the TCCA erred when it "prohibited [him] from raising sufficiency of the evidence claims on direct appeal regarding the mitigation special issue."  (Dkt. No. 67 at 404-06).  For reference, Texas courts hold that "the sufficiency of the evidence to support a [capital] jury's negative answer to the mitigation special issue" is not

subject to appellate review.  *Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Crim. App. 2005). According to Petitioner, this holding vests the jury with "unfettered discretion over which offenders to sentence to death[,]" in violation of the Eighth Amendment and Fourteenth Amendment due process.  (Dkt. No. 67 at 404-05).

Respondent concedes exhaustion but contends that Petitioner fails to address the state habeas court's adjudication of this claim and that, alternatively, this claim lacks merit.  (Dkt. No. 91 at 405).  Indeed, the state habeas court denied this claim on the merits based on TCCA precedent.  (Dkt. No. 90-17 at 366-67 (collecting cases)).  Through the Cross-Motion, Petitioner appears to take the position that the state court adjudication was contrary to, or an unreasonable application of, constitutional law but nonetheless fails to offer any specific authority in support. (*See* Dkt. No. 103 at 258-59).  Petitioner fails to meet his burden.

The challenged aspect of the Texas death penalty scheme—the inability to challenge the sufficiency of mitigation special issue evidence on direct appeal—has consistently withstood constitutional attack before the Fifth Circuit.  *See Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir. 2005); *see also Johnson v. Cockrell*, 306 F.3d 249, 256 (5th Cir. 2002) (citing *Pulley v. Harris*, 465 U.S. 37, 45-46 (1984)) ("[T]he Supreme Court has held that the Eighth Amendment does not require an appellate court to independently re-weigh aggravating and mitigating evidence.").

For these reasons, Claim 14 is without merit.

### P.  Claim 16—Error by the State District Court Due to Denial of the Chapter 64 Motion[34]

Through Claim 16, Petitioner raises a due process violation stemming from the state district court's denial of his Chapter 64 motion for the DNA testing of two hats found at the crime scene.  (Dkt. No. 67 at 412-16).  Respondent argues that this claim is non-cognizable but,

---

[34] As explained above, Claim 15 concerning the ineffective assistance of state habeas counsel has been withdrawn by Petitioner.

rather, more properly the subject of a civil rights action 42 U.S.C. § 1983. (Dkt. No. 91 at 411-12). The Magistrate Judge agrees with Respondent.

No freestanding substantive due process right to post-conviction DNA testing exists for the purpose of seeking exculpatory evidence. *See Resendez v. Lumpkin*, 2023 WL 2412919, at *8 (S.D. Tex. Feb. 2, 2023) (citing *Dist. Att'y's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 55 (2009)), *report and recommendation adopted*, 2023 WL 2403803 (S.D. Tex. Mar. 8, 2023) (Alvarez, J.), *appeal dismissed*, 2023 WL 10477242 (5th Cir. July 7, 2023). Chapter 64 "has created the right for a convicted defendant to obtain evidence for post-conviction DNA testing, so the available procedures must be adequate to protect that right." *Ramirez v. McCraw*, 715 F. App'x 347, 350 (5th Cir. 2017) (per curiam) (citing *Osborne*, 557 U.S. at 69). Consequently, any right Petitioner may have to post-conviction DNA testing arises solely under Texas law and does not implicate a federal constitutional issue. *Resendez*, 2023 WL 2412919, at *7 (quoting *Johnson v. Thaler*, 2010 WL 2671575, at *3 (S.D. Tex. June 30, 2010)) (quotations omitted). Infirmities with state habeas proceedings are not grounds for relief in federal habeas court, *Trevino v. Johnson*, 168 F.3d 173, 180 (5th Cir. 1999), and thus a § 2254 claim challenging state courts' post-conviction procedures without invoking a violation of federal rights is not cognizable on federal habeas review, *In re Gentras*, 666 F.3d 910, 911 (5th Cir. 2012) (per curiam) (citing *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (per curiam)). Generally, the federal courts "will intervene only if the [s]tate's framework offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental, or transgresses any recognized principle of fundamental fairness in operation." *Garcia v. Castillo*, 431 F. App'x 350, 353 (5th Cir. 2011) (per curiam) (quoting *Osborne*, 557 U.S. at 69) (internal quotations omitted). Petitioner does not argue that such infirmities are at play here.

For these reasons, Claim 16 is non-cognizable on federal habeas review.

**Q.  Claim 17—Constitutionality of the Death Sentence**

Through Claim 17, Petitioner raises twelve challenges to the constitutionality of Texas'

death penalty scheme, enumerated as the following sub-claims:

Sub-claim 17A—Petitioner's mental illness (Dkt. No. 67 at 416-21);

Sub-claim 17B—Inconsistency with societal trends (*id.* at 422-39);

Sub-claim 17C—Arbitrariness of the death penalty (*id.* at 439-43);

Sub-claim 17D—Length of time on death row (*id.* at 443-49);

Sub-claim 17E—Petitioner's insufficient culpability due to mental impairments (*id.* at 449-52);

Sub-claim 17F—Absence of jury instructions on the consequences of a deadlock over special issues (*id.* at 452-57);

Sub-claim 17G—Absence of statutory requirement that mitigation special issue be proven beyond a reasonable doubt (*id.* at 457-60);

Sub-claim 17H—Statutory limitation on the definition of mitigating evidence (*id.* at 461-63);

Sub-claim 17I—Absence of statutory requirement for proportionality review (*id.* at 463-64);

Sub-claim 17J—Absence of statutory requirement narrowing class of persons eligible for death penalty (*id.* at 465-67);

Sub-claim 17K—Excessive prosecutorial discretion to seek death penalty (*id.* at 467-68);

Sub-claim 17L—Capital murder conviction predicated on the law of parties (*id.* at 469-70).

Respondent raises the affirmative defenses of lack of exhaustion and procedural default

as to all aspects of Claim 17 except Sub-claim 17H.  (Dkt. No. 91 at 419-51).  According to

Respondent, Sub-claims 17C and 17F were initially raised as claims 13 and 14 in the Second

State Petition, which the TCCA dismissed for abuse of the writ pursuant to Article 11.071 § 5 of the Texas Code of Criminal Procedure.  (*Id.* at 424, 430-31).  Petitioner argues in response that Respondent fails to establish the independent and adequate nature of the state procedural ground underlying the procedural bar.  (Dkt. No. 103 at 264-78).  In doing so, however, Petitioner does not argue that those sub-claims are exhausted.  Alternatively, Petitioner again invokes the ineffective assistance of state habeas counsel and his innocence of the death penalty as potential avenues to overcome the procedural bar as to most of the unexhausted or defaulted aspects of Claim 17.  (*Id.* at 261-77).  As to Sub-claims 17D and 17L, Petitioner raises the impossibility of exhaustion as a potential avenue to overcome the procedural bar and requests a stay of the federal proceedings for exhaustion in state court.  (*Id.* at 267, 278).

The Magistrate Judge agrees with Respondent that Sub-claims 17A, 17B, 17D, 17E, and 17I through 17L are unexhausted, that Sub-claims 17C and 17F are procedurally defaulted, and that Sub-claim 17H is exhausted.

With respect to procedural default, it is Petitioner, not Respondent, who bears the burden to rebut the presumed independence and adequacy of the state procedural rule underlying the procedural-default defense.  *Roberson*, 614 F. App'x at 133.  He fails to carry the burden of showing the rule's inconsistent or irregular application.  Indeed, the dismissal of a state habeas application for abuse of the writ is recognized by the Fifth Circuit as an independent and adequate state ground on which to base a procedural default ruling.  *See Rubio v. Lumpkin*, --- F. Supp. 3d ---, 2024 WL 1520383, at *14 (S.D. Tex. Apr. 5, 2024) (citing *Gutierrez v. Stephens*, 590 F. App'x 371, 384 (5th Cir. 2014) (per curiam)).

Also, for reasons thoroughly discussed above, Petitioner cannot overcome a procedural bar—whether resulting from procedural default or the lack of exhaustion—based on state habeas

counsel's ineffective representation with respect to non-ineffective-assistance-of-trial-counsel-type claims, and Petitioner has failed establish his actual innocence.

Notwithstanding Respondent's defense of lack of exhaustion as to Sub-claim 17G—and Petitioner's failure to contest the defense—this sub-claim does appear to have been raised and adjudicated as claim 8 of the Initial State Petition.

The ensuing discussion is confined, therefore, to the merits of Sub-claims 17G and 17H and the inefficacy of Petitioner's attempt to cure the procedural defect of Sub-claims 17D and 17L through the impossibility-of-exhaustion argument.

### 1. Sub-claim 17D—Length of time on death row

Through Sub-claim 17D, Petitioner contends that his lengthy stay on death row renders his death sentence unconstitutional.   (Dkt. No. 67 at 443-49).   Petitioner concedes non-exhaustion but argues that this sub-claim could not have been raised earlier because its factual basis—the length of time on death row—only recently ripened.  (Dkt. No. 103 at 267-68).  In the alternative, Petitioner contends that he is entitled to a stay of this action pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), so that he may return to state court for the purpose of exhausting this sub-claim.  (Dkt. No. 103 at 267).

As a threshold matter, Petitioner fails to establish the impossibility of exhaustion insofar as he has not shown at what point such a hypothetical constitutional claim—which the courts have not even recognized, *see Buntion v. Lumpkin*, 31 F.4th 952, 965 (5th Cir. 2022) (per curiam)—would become ripe.  Petitioner's argument would seemingly allow the presentation of such a claim independent of all procedural law.  Absent even a hypothetical point of ripeness, Petitioner has not shown that he could not have raised this issue before the state courts.

Otherwise, the Fifth Circuit has repeatedly rejected claims that prolonged stays on death row violate the Eighth Amendment, explaining that there is no established law in support.  *See, e.g.*, *Buntion*, 31 F.4th at 965; *Felder v. Johnson*, 180 F.3d 206, 215 (5th Cir. 1999).  Granting relief on Petitioner's argument would require creating new law, which is barred by *Teague*.  *See White v. Johnson*, 79 F.3d 432, 438 (5th Cir. 1996) (citing *Teague*, 489 U.S. at 310).

Nor does Petitioner show that he is entitled to a *Rhines* stay.  A discretionary stay under *Rhines* requires a showing of good cause for the failure to exhaust, the potential merit of the unexhausted claim, and the absence of intentional dilatory litigation tactics.  *Rhines*, 544 U.S. at 278-79.  As discussed, Petitioner fails to establish cause for his failure to exhaust state remedies.  Nor is he able to demonstrate that this sub-claim is meritorious.

For these reasons, Sub-claim 17D is procedurally barred as unexhausted and otherwise without merit.

### 2.  Sub-claim 17G—Absence of statutory requirement that mitigation special issue be proven beyond a reasonable doubt

Through Sub-claim 17G, Petitioner contends that Texas' death penalty statute is unconstitutional because "special issue three—whether mitigation evidence warrants a life sentence—need not be found beyond a reasonable doubt."  (Dkt. No. 67 at 457-60).  Respondent argues that Sub-claim 17G is unexhausted.  (Dkt. No. 91 at 433).  In response, Petitioner presumably argues that state habeas counsel's ineffective assistance overcomes any resulting procedural bar.  (*See* Dkt. No. 103 at 272).  That said, from a review of the record, Sub-claim 17G does seem to have been raised as claim 8 in the Initial State Petition (Dkt. No. 90-18 at 93-94, 215-19) and adjudicated on the merits by the state courts (Dkt. No. 90-17 at 84-85, 364-65).

Notwithstanding the parties' dispute over its procedural posture, Sub-claim 17G is meritless.  The Fifth Circuit has repeatedly rejected the argument that the prosecution bears a

burden to prove the existence of mitigating factors beyond a reasonable doubt.  *See Sparks v. Davis*, 756 F. App'x 397, 404 (5th Cir. 2018); *see also Carter v. Stephens*, 805 F.3d 552, 556 (5th Cir. 2015).  Absent any binding precedent that the Texas' mitigation special issue must be assigned a burden of proof, granting relief on this sub-claim would require the creation of new constitutional law in violation of the *Teague* doctrine.  *See Rowell*, 398 F.3d at 378.

For these reasons, Sub-claim 17G is without merit.

### 3.  Sub-claim 17H—Statutory limitation on the definition of mitigating evidence

Through Sub-claim 17H, which is nearly identical to Sub-claim 10A, Petitioner argues that the Texas capital sentencing statute impaired the jury's ability to consider factors that would result in a life sentence.  (Dkt. No. 67 at 461-63).  Specifically, Petitioner contends that the Texas capital sentencing scheme is unconstitutional because it "expressly limits the evidence a jury may consider [to be] mitigating."  (*Id.* at 461).  Respondent concedes exhaustion but argues that the state adjudication of this sub-claim was reasonable.  (Dkt. No. 91 at 436).  The Magistrate Judge agrees with Respondent that this sub-claim is meritless.

The Texas Code of Criminal Procedure defines "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness."  Tex. Code Crim. Proc. art. 37.071 § 2(f)(4).  Accordingly, the trial court informed jurors that:

> You shall consider all evidence submitted to you during the whole trial as to [Petitioner's] background or character or the circumstances of the offense that mitigates against the imposition of the death penalty.

> * * *

> You are instructed that the term "mitigating evidence," as used herein, means evidence that a juror might regard as reducing [Petitioner's] moral blameworthiness.

(Dkt. No. 85-2 at 261, 264).  Petitioner argues that the term "moral blameworthiness" violates the Constitution by limiting what evidence a jury may consider.  (Dkt. No. 67 at 461).  Petitioner also complains that the jury instructions improperly cabined the jury's consideration of mitigating evidence into its relationship to the crime itself.  (*Id.* at 462-63).

In response to challenges over this statutory definition of "mitigating evidence," the Fifth Circuit has routinely held that the Texas definition of mitigating factors "encompasses 'virtually any mitigating evidence.'"  *Roach*, 220 F. App'x at 277 (quoting *Beazley*, 242 F.3d at 260).  The Fifth Circuit has also repeatedly rejected similar attacks as to the description of mitigating evidence.  *See Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018); *Blue*, 665 F.3d at 666; *Cantu v. Quarterman*, 341 F. App'x 55, 60-61 (5th Cir. 2009) (per curiam).  Given the applicable precedent and the jury instructions issued in this case, Petitioner fails to demonstrate that the state court decision was contrary to, or an unreasonable application of, federal law.

For these reasons, Sub-claim 17H is without merit.

### 4. Sub-claim 17L—Capital murder conviction predicated on the law of parties

Through Sub-claim 17L, Petitioner argues that Texas state law-of-parties statute is unconstitutional.  The law of parties allows for a defendant's conviction "if . . . acting with intent to promote or assist the commission of the offense, [the defendant] solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense[.]"  Tex. Penal Code § 7.02(a)(2).  Petitioner argues that the statute unconstitutionally "qualifies for capital murder those who have neither committed murder nor intended to do so[,]" and allows for a death sentence based on "capital guilt-by-association."  (Dkt. No. 67 at 469-70).

Respondent raises lack of exhaustion as to Sub-claim 17L.  (Dkt. No. 91 at 448).  Petitioner responds that he could not have raised this sub-claim earlier because evolving

standards over the law of parties, which ostensibly prohibit his execution, were not available at the time of the state habeas proceedings.  (Dkt. No. 103 at 279-81).  Alternatively, Petitioner again requests a *Rhines* stay, arguing that the prior unavailability of the factual and legal bases for this sub-claim would overcome Texas' ban on subsequent habeas petitions.  (*Id.* at 278 n.43 (citing Tex. Code Crim. Proc. art. 11.071 § 5(a)(1))).

As an initial matter, Petitioner's argument distorts the law of parties.  The statute requires that a defendant, at minimum, should have anticipated a felony as a result of the carrying out of the conspiracy to be held liable.  *See* Tex. Penal Code § 7.02(b).  Here, as the TCCA noted, the record demonstrates that Petitioner anticipated that a human life would be taken.  *Ramirez*, 2007 WL 4375936, at *8-9.  This finding was reinforced by the jury's affirmative answer to the anti-parties special issue later at sentencing.  *Id.* at *9; *see also Solomon v. State*, 49 S.W.3d 356, 371 (Tex. Crim. App. 2001) (Meyers, J., concurring) (explaining that an anti-parties charge at sentencing ensures that jury deliberations are anchored solely on the defendant's own conduct).

That said, the impossibility of exhaustion does not constitute cause to overcome the applicable procedural bar insofar as the Texas courts have consistently rejected various challenges implicating the law of parties.  *See, e.g.*, *Leza v. State*, 351 S.W.3d 344, 357-58 (Tex. Crim. App. 2011) (noting that jury unanimity is not required over whether the accused was guilty of capital murder as a principal or a party); *Medrano*, 2008 WL 5050076, at *10 ("Section 7.02(b) does not . . . lack a *mens rea* requirement."); *Fuller v. State*, 2000 WL 35432767, at *3 (Tex. Crim. App. Dec. 20, 2000) ("[T]he theory of criminal responsibility set forth in section 7.02(b) [can be applied] to capital murder cases without offending a defendant's constitutional rights.").  Moreover, Petitioner is not entitled to a *Rhines* stay due to this sub-claim's manifest lack of merit.  Like the TCCA, the Fifth Circuit has consistently upheld as constitutional any

challenges to the statutory scheme at issue.  *See, e.g., Garcia v. Davis*, 704 F. App'x 316, 320-21, 320 n.1 (5th Cir. 2017); *Ramirez v. Dretke*, 398 F.3d 691, 697 (5th Cir. 2005); *Nichols v. Scott*, 69 F.3d 1255, 1261 n.9, 1267 (5th Cir. 1995); *Montoya v. Scott*, 65 F.3d 405, 415 (5th Cir. 1995); *Jacobs v. Scott*, 31 F.3d 1319, 1324 & n.9 (5th Cir. 1994).

For these reasons, Sub-claim 17L is procedurally barred as unexhausted and otherwise without merit.

## R.  <u>Claim 18—Unconstitutionality of Lethal Injection</u>

Through Claim 18, Petitioner contends that Texas' current execution protocol violates the Eighth Amendment.  (Dkt. No. 67 at 470-73).  In 2012, Texas adopted its protocol—a single, five-gram dose of pentobarbital to induce death.  *Wood v. Collier*, 836 F.3d 534, 536 (5th Cir. 2016).  According to Petitioner, pentobarbital can cause flash pulmonary edema, a condition whereby fluid fills up the lungs, causing the sensation of drowning.  (Dkt. No. 67 at 471).  Petitioner also complains that, due to regulatory violations cited against Texas' supplier of pentobarbital, he faces a substantial risk of receiving "a subpotent or contaminated drug and suffer[ing] a painful or lingering death[.]"  (*Id.* at 473).

Respondent raises the defenses that this claim is non-cognizable under federal habeas review and is otherwise unexhausted.  (Dkt. No. 91 at 451).  Citing to Supreme Court precedent like *Glossip v. Gross*, 576 U.S. 863 (2015), Respondent takes the position that challenges to a method of execution must instead be brought under 42 U.S.C. § 1983.  (*Id.* at 451-52 (citing *Glossip*, 576 U.S. at 879)).  In response, Petitioner offers that "*Glossip* cites to *Hill v. McDonough*, 547 U.S. 573 (2006), [and *Hill*] only held that lethal injection claims are cognizable in § 1983, not that they are required to be filed as such."  (Dkt. No. 103 at 284).

The Magistrate Judge agrees with Respondent that this claim is non-cognizable on federal habeas review based on the holdings of the *Glossip* and *Hill* cases. The *Glossip* case involved a prisoner on death row who contended that Oklahoma's lethal injection protocol violated the Eighth Amendment because it created an unacceptable risk of severe pain. *Glossip*, 576 U.S. at 867. In *Glossip*, the Supreme Court expressly contradicted the interpretation of *Hill* offered by Petitioner, stating as follows:

> In *Hill*, the issue was whether a challenge to a method of execution must be brought by means of an application for a writ of habeas corpus or a civil action under § 1983. We held that a method-of-execution claim must be brought under § 1983 because such a claim does not attack the validity of the prisoner's conviction or death sentence.

*Id.* at 879 (citing *Hill*, 547 U.S. at 576, 579-80) (internal citations omitted). Even if this claim were cognizable, it is unexhausted because Petitioner did not raise it before the state courts.

For these reasons, Claim 18 is non-cognizable on federal habeas review and otherwise procedurally barred as unexhausted.[35]

## S. Claim 19—Cumulative Effect of Constitutional Errors

Through Claim 19, Petitioner seeks habeas relief based on cumulative prejudice. Maintaining that each claim of error "independently entitle[s] him to relief," Petitioner contends that federal habeas review should further consider their cumulative impact. (Dkt. No. 67 at 473-75). Respondent raises the defense of lack of exhaustion. (Dkt. No. 91 at 453-54). Petitioner

---

[35] It also bears noting that, according to the Fifth Circuit, a method of execution does not violate the Eighth Amendment unless it presents a risk that is sure or very likely to cause serious illness and needless suffering, and give rise to sufficiently imminent dangers, and the reality is that pentobarbital, when used as the sole drug in a single-drug protocol, has realized no such risk. *Wood*, 836 F.3d at 540 (quoting *Glossip*, 576 U.S. at 877) (quotations omitted). Although he identifies hypothetical concerns about the use of pentobarbital, Petitioner does not point to any particularized defect in its use, administration, or efficacy. *See Raby v. Livingston*, 600 F.3d 552, 560 (5th Cir. 2010) (concluding that plaintiff "has failed to establish that the Texas lethal injection protocol creates a demonstrated risk of severe pain" rising to the level of a constitutional violation). Instead, Petitioner merely speculates that he will experience unconstitutional pain or suffering because of the drug and its supplier's manufacturing practices.

concedes his failure to exhaust but argues that the impossibility of exhaustion in state courts forgives the resulting procedural bar.  (Dkt. No. 103 at 285).

Petitioner's failure to exhaust this claim renders it procedurally barred from federal review.  *See Nickleson*, 803 F.3d at 753-54 ("[N]o other circuit court has yet held that cumulative error claims against state convictions may be reviewed in federal proceedings without exhaustion; instead, they have applied the conventional exhaustion principles.").  The argument that there was no proceeding in which Petitioner could have previously raised this claim lacks legal or factual support.  Petitioner thus fails to overcome the procedural bar.

Regardless, the claim is meritless.  Federal habeas relief is only available for cumulative errors of a constitutional dimension.  *Coble*, 496 F.3d at 440 (citing *Livingston v. Johnson*, 107 F.3d 297, 309 (5th Cir. 1997).  Indeed, "[m]eritless claims or claims that are not prejudicial cannot be cumulated, regardless of the total number raised."  *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996).  Because Petitioner has not established any individual claims of error of constitutional dimension, habeas relief is not available.

For these reasons, Claim 19 is procedurally barred as unexhausted and otherwise without merit.

### XIII.  CONCLUSION

### *Recommended Disposition*

After review of the record and relevant law, the Magistrate Judge respectfully RECOMMENDS that Respondent's Summary Judgment Motion (Dkt. No. 91) be GRANTED, that Petitioner's Cross-Motion (Dkt. No. 103) be DENIED, that the Petition (Dkt. Nos. 24, 67) be DENIED, and that this civil action be DISMISSED.

### *Certificate of Appealability*

The Magistrate Judge must also address the matter of the issuance of a certificate of appealability ("COA").

The AEDPA bars appellate review of a habeas petition unless a district or circuit court certifies specific issues for appeal.  *See* 28 U.S.C. § 2253(c); *see also* Fed. R. App. P. 22(b).  Even though Petitioner has not sought a COA, the issue may be considered sua sponte.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) (per curiam).  Indeed, a district court must address whether the circumstances justify an appeal before issuing a final judgment.  *See* Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.

A COA "may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).  "The COA determination . . . requires an overview of the claims in the habeas petition and a general assessment of their merits."  *Miller-El*, 537 U.S. at 336.  To warrant a COA as to claims denied on their merits, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  A petitioner may also satisfy this standard by showing that "jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  *Miller-El*, 537 U.S. at 327.  As to claims that a district court rejects solely on procedural grounds, the prisoner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling."  *Slack*, 529 U.S. at 484.

Because the Magistrate Judge concludes that Petitioner fails to meet these standards, it is therefore RECOMMENDED that a COA be DENIED.

*Notice to the Parties*

Within fourteen (14) days after being served a copy of this report, a party may serve and file specific, written objections to the proposed recommendations.  28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b).  Failure to file written objections within fourteen (14) days after service shall bar an aggrieved party from *de novo* review by the District Court on an issue covered in this report and from appellate review of factual findings accepted or adopted by the District Court, except on grounds of clear error or manifest injustice.

*Directive to Clerk of Court*

The Clerk of Court is **DIRECTED** to forward a copy of this report to the parties by any receipted means.

SIGNED at McAllen, Texas this 31st day of May, 2024.

_____
J. SCOTT HACKER
United States Magistrate Judge